1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9            FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                    October 2009 Grand Jury

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR No. 10-_____ **CR 10 00351** |
| Plaintiff, | ) | I N D I C T M E N T |
| v. | ) | [18 U.S.C. § 1962(d): |
| ARMANDO BARAJAS,<br>    aka "Mando," | ) | Racketeer Influenced and<br>Corrupt Organizations |
| JUAN GIL,<br>    aka "Nito," | ) | Conspiracy; 18 U.S.C.<br>§ 1962(c): Racketeer<br>Influenced and Corrupt |
| DAVID NAVARRO,<br>    aka "Plucky," | ) | Organizations; 18 U.S.C.<br>§ 1959: Violent Crime in Aid |
| JOSE HURTADO,<br>    aka "Lonely," | ) | of Racketeering; 21 U.S.C.<br>§ 846: Conspiracy to |
|     aka "Solo," | ) | Distribute and to Possess with<br>Intent to Distribute |
| FRANK ALCALA, | ) | Methamphetamine and Heroin; 21 |
| ENRIQUE JIMENEZ,<br>    aka "Cisco," | ) | U.S.C. §§ 841(a)(1),<br>841(b)(1)(A), (B), and (C): |
| CARLOS RIVERA,<br>    aka "Chino," | ) | Possession with Intent to<br>Distribute and Distribution of |
| RIGO PORTILLO,<br>    aka "Lost Boy," | ) | Methamphetamine; 18 U.S.C.<br>§ 922(g)(1): Felon in |
| JUAN DIAZ,<br>    aka "Swifty," | ) | Possession of a Firearm; 18<br>U.S.C. § 922(d)(1): Sale of a |
| CARLOS VASQUEZ,<br>    aka "Lil' Lazy," | ) | Firearm to a Prohibited<br>Person; 18 U.S.C. |
| ADOLPH MORAGA,<br>    aka "Fito," | ) | §§ 924(c)(1)(A)(i),<br>(c)(1)(A)(ii), (c)(1)(A)(iii): |
| STEVEN ESPINOZA,<br>    aka "Little Loki," | ) | Use, Carrying, Brandishing,<br>and Discharging of a Firearm |
| RAFAEL ALVAREZ,<br>    aka "Lil' Pokie," | ) | in Furtherance of a Crime of<br>Violence or Drug-Trafficking |
| DANIEL REYES,<br>    aka "Sugar," | ) | Crime; 18 U.S.C. § 2: |

| | |
|---|---|
| ZACARIAS ARTEAGA,<br>　　aka "Drew,"<br>HUGO QUIROZ,<br>ROBERT DEWESTER,<br>　　aka "Lucci,"<br>MARLON JIRON,<br>　　aka "Bow Easy,"<br>FERNANDO MORALES,<br>　　aka "Sicko,"<br>ALEX CASTRO,<br>　　aka "Sniper,"<br>ALBERT MORENO,<br>　　aka "Pelon,"<br>MICHAEL SANCHEZ,<br>　　aka "Dropper,"<br>MANUEL CALDERON,<br>　　aka "Toro,"<br>VIRGINIA GIL,<br>REBECCA ESTRADA,<br>MARIA LOPEZ,<br>JESSICA MEDINA,<br>JESSICA PEREZ,<br>RAUL PRIETO,<br>　　aka "Crook,"<br>DAVID HERNANDEZ,<br>FRANCISCO VENEGAS,<br>STEVEN VEGA,<br>　　aka "Widget,"<br>ROBERT PEREZ,<br>ROSE MARIE MAGALLANES,<br>JAMES KISSLING,<br>　　aka "Casper,"<br>JESSTINE LUCERO,<br>BIANCA LAGUNA,<br>ANDREA RICHARDS,<br>SANTACRUZ SILVA,<br>　　aka "Jose,"<br>JOSE ROMERO,<br>MARCO ANTONIO TORRES-CRUZ,<br>　　aka "Alex,"<br>INEZ MEZA,<br>　　aka "Gordo,"<br>AGUSTIN ANDALON,<br>ANGEL ARANDA,<br>　　aka "Bandit,"<br>SALVADOR MARTINEZ,<br>　　aka "Flaco,"<br>LUPE GONZALES,<br>ROGELIO PERALTA,<br>ROBERT TOLSON,<br>SANTIAGO MENDEZ, and<br>CARL COOK,<br><br>　　　　　Defendants. | Aiding and Abetting and<br>Causing an Act to be Done; 21<br>U.S.C. § 843: Use of a<br>Communication Facility to<br>Commit a Drug Trafficking<br>Crime] |

1      The Grand Jury charges:

2      <u>GENERAL ALLEGATIONS</u>

3      1. At all relevant times, defendants ARMANDO BARAJAS, also

4 known as ("aka") "Mando" ("BARAJAS"), JUAN GIL, aka "Nito" ("J.

5 GIL"), DAVID NAVARRO, aka "Plucky" ("NAVARRO"), JOSE HURTADO, aka

6 "Lonely," aka "Solo" ("HURTADO"), FRANK ALCALA ("ALCALA"),

7 ENRIQUE JIMENEZ, aka "Cisco" ("JIMENEZ"), CARLOS RIVERA, aka

8 "Chino" ("RIVERA"), RIGO PORTILLO, aka "Lost Boy" ("PORTILLO"),

9 JUAN DIAZ, aka "Swifty" ("DIAZ"), CARLOS VASQUEZ, aka "Lil' Lazy"

10 ("C. VASQUEZ"), ADOLPH MORAGA, aka "Fito" ("MORAGA"), STEVEN

11 ESPINOZA, aka "Little Loki" ("ESPINOZA"), RAFAEL ALVAREZ, aka

12 "Lil' Pokie" ("ALVAREZ"), DANIEL REYES, aka "Sugar" ("REYES"),

13 ZACARIAS ARTEAGA, aka "Drew" ("ARTEAGA"), HUGO QUIROZ ("QUIROZ"),

14 ROBERT DEWESTER, aka "Lucci" ("DEWESTER"), MARLON JIRON, aka "Bow

15 Easy" ("JIRON"), FERNANDO MORALES, aka "Sicko" ("MORALES"), ALEX

16 CASTRO, aka "Sniper" ("A. CASTRO"), ALBERT MORENO, aka "Pelon"

17 ("MORENO"), MICHAEL SANCHEZ, aka "Dropper" ("SANCHEZ"), MANUEL

18 CALDERON, aka "Toro" ("CALDERON"), VIRGINIA GIL ("V. GIL"),

19 REBECCA ESTRADA ("ESTRADA"), MARIA LOPEZ ("LOPEZ"), JESSICA

20 MEDINA ("MEDINA"), JESSICA PEREZ ("J. PEREZ"), RAUL PRIETO, aka

21 "Crook" ("PRIETO"), DAVID HERNANDEZ ("HERNANDEZ"), FRANCISCO

22 VENEGAS, aka "Cisco" ("VENEGAS"), STEVEN VEGA, aka "Widget"

23 ("VEGA"), ROBERT PEREZ ("ROBERT PEREZ"), ROSE MARIE MAGALLANES

24 ("MAGALLANES"), JESSTINE LUCERO ("LUCERO"), LUPE GONZALES

25 ("GONZALES"), and others known and unknown to the Grand Jury,

26 were members and associates of an organization engaged in, among

27 other things, murder, conspiracy to commit murder, attempted

28 murder, conspiracy to traffic in narcotics, narcotics-

1

1  trafficking, robbery, and extortion.  At all relevant times, this
2  organization, known as the Ontario Black Angels criminal street
3  gang (the "Black Angels"), operated in the Central District of
4  California and elsewhere.

GENERAL BACKGROUND OF THE GANG

5

6  2.   The Black Angels gang is a multi-generational street
7  gang that was formed in the 1950's as an automobile enthusiasts
8  club.  In its early days, the Black Angels car club attended
9  police-sponsored road rallies in Ontario, California.  By the
10  mid-1960's, however, the Black Angels had evolved into a criminal
11  street gang.

12  3.   The Black Angels gang claims as its territory the
13  entire city of Ontario, California, although the gang's members
14  also live and commit crimes in other cities within San Bernardino
15  County and the greater Los Angeles area.  Over the years, members
16  and associates of the Black Angels have been involved in
17  extensive criminal activity and acts of violence, including, but
18  not limited to, murders, attempted murders, the illegal
19  distribution and transportation of firearms, vandalism, the
20  transportation and sales of narcotics, and the smuggling of
21  contraband into correctional facilities.

22  4.   The Black Angels gang maintains two sub-cliques made up
23  of younger members working their way up through the gang.  The
24  first sub-clique, "Ontario Varrio Sur" ("OVS"), is the
25  traditional starting point for young members of the gang.  OVS
26  members often commit minor crimes, including "tagging" or leaving
27  graffiti of the gang's symbols in the neighborhoods that the gang
28  controls, bicycle theft, and the extortion of vendors in city

2

parks. Defendants QUIROZ and ROBERT PEREZ are OVS members. Eventually, some members of OVS are elevated into the "Angelitos Negros" or "Junior Black Angels." The Junior Black Angels are called upon by leaders of the Black Angels to commit crimes for the gang, including robberies and the distribution of narcotics. Defendant SANCHEZ is a Junior Black Angel. Some Junior Black Angels are "blessed," and "get their wings," thereby becoming full members of the Black Angels gang. Defendants BARAJAS, GIL, NAVARRO, HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, DEWESTER, JIRON, MORALES, A. CASTRO, MORENO, and VEGA are full members of the Black Angels gang. Presently, defendant BARAJAS maintains the authority to "bless" individuals and elevate them in status to full membership in the Black Angels gang. At present, there are a total of approximately 250 OVS, Junior Black Angels, and Black Angels members living in and around Ontario, California, with another approximately 200 individuals in state or federal prison.

5.     The progression through the ranks of the Black Angels gang is not age-specific, and members gain respect and advance based on the crimes they commit on behalf of the gang. It is possible to become a Black Angels gang member without first becoming an OVS or "Junior Black Angel," but it is rare. Some individuals are admitted to the Black Angels gang based upon an older relative's position within the gang or through their long-time association with senior Black Angels gang members. Other members are admitted based on their family connections to Mexico and/or their willingness to help bring narcotics across the

3

border into the United States.  However, membership in the Black
Angels gang typically depends upon whether the person has
participated in a significant number of criminal acts on behalf
of the Black Angels gang and particularly if the person has
served time in prison as a result.  This often is referred to as
whether the person has "put in" enough "work" for the gang.

6.   Black Angels gang members generally identify themselves
by their gang name or moniker.  Members refer to one another as
"homies," and frequently wear clothing that identifies them as
members of the gang.  In particular, Black Angels gang members
wear items displaying versions of the "A" symbol commonly
associated with the Anaheim Angels baseball team.  Some gang
members also wear the number "21" on their clothes, with "2"
representing the second letter of the alphabet, "B," and "1"
representing the first letter of the alphabet, "A," to reflect
the initials of the Black Angels.

7.   Another important aspect of Black Angels gang
membership is the display of gang tattoos.  A common tattoo among
all cliques of the Black Angels is "Onterio," "Ontario," or
"Onta," representing the city from which the gang originated.
OVS members often tattoo "OVS" on their bodies, while Junior
Black Angels have "Angelito Negros," or simply "AN," tattooed in
prominent places on their bodies.  Once a member achieves full
status in the Black Angels, he will often "get his wings," and he
will tattoo an image of a devil with a pitchfork and wings
somewhere on his body to symbolize his status as a member of the
Black Angels gang.  Only Black Angels members are allowed to have
such tattoos, and non-members displaying similar tattoos may be

1  attacked or killed.

2      8.    The Black Angels gang also uses spray-painted "tagging"

3  to demonstrate its control of its neighborhood to rival gang

4  members and the local community.  Gang "tagging" frequently

5  appears on street signs, walls, and buildings in the area

6  controlled by the gang.  "Tagging" is a public demonstration of

7  the authority of the gang.  It not only identifies the territory

8  claimed by the Black Angels gang, but also serves as a warning or

9  means to terrorize members of the public and law-abiding

10  residents of neighborhoods with threats that the neighborhood is

11  under the control of the gang.

12      9.    The Black Angels gang is aligned with an organization

13  known as the "Mexican Mafia," or "La Eme."  The Mexican Mafia is

14  an organized group of individuals that controls the distribution

15  of narcotics and other criminal activities within California's

16  state prisons and within some federal prisons.  The Black Angels,

17  like many criminal street gangs in Southern California, report to

18  leaders in the Mexican Mafia, sometimes known as "brothers" or

19  "big homies."  The Black Angels gang gained strength and

20  recognition in the 1990's, when Black Angels member and Mexican

21  Mafia brother Ruben "Tupie" Hernandez assumed overall control of

22  the Mexican Mafia from within Pelican Bay State Prison.

23  Currently, there are at least four Mexican Mafia members in the

24  Black Angels, including defendants BARAJAS and J. GIL.

25      10.   Members of the Black Angels gang and its associates

26  are continuously engaged in the distribution of narcotics,

27  specifically methamphetamine and heroin.  Black Angels gang

28  leaders, including defendants BARAJAS and NAVARRO, collect

5

1    extortion payments, referred to as "taxes," from persons

2    distributing narcotics in the areas controlled by the gang.  The

3    authority of an individual member, such as defendant NAVARRO, to

4    collect "taxes" represents an elevated position within the Black

5    Angels gang.  These drug distributors included SANTACRUZ SILVA,

6    aka "Jose" ("SILVA"), JOSE ROMERO ("ROMERO"), MARCO ANTONIO

7    TORRES-CRUZ, aka "Alex" ("TORRES-CRUZ"), SALVADOR MARTINEZ, aka

8    "Flaco" ("MARTINEZ"), SANTIAGO MENDEZ ("MENDEZ"), JAMES KISSLING,

9    aka "Casper" ("KISSLING"), and ANDREA RICHARDS ("RICHARDS").

10       11.   The Black Angels gang maintains a supply of firearms in

11   order to enforce the authority of the gang.  Many of these

12   weapons are stolen or unregistered so that they cannot be readily

13   connected to a gang member who either uses the weapon or

14   maintains it.  Weapons often are discarded or destroyed after

15   having been used to commit acts of violence on behalf of the

16   organization.  Therefore, gang leaders frequently need to

17   maintain a source of supply for additional unregistered or

18   non-traceable firearms.

19       12.   The communication of gang orders and directives is

20   passed on by gang leaders to other members.  For instance, Black

21   Angels gang members send prison notes (known as "kites" or

22   "wilas") into and out of detention facilities so that members of

23   the gang who are in custody can communicate with Black Angels

24   members who are out of custody.  Additionally, Mexican Mafia

25   "secretaries," such as unindicted co-conspirator #11, communicate

26   with leaders of the Black Angels gang, and then personally convey

27   information to incarcerated Mexican Mafia leaders.  Black Angels

28   gang members on the streets use cellular telephones to coordinate

their activities, often changing telephones on a regular basis in an effort to avoid detection by law enforcement.  Often, members of the Black Angels gang will meet in person to discuss the criminal activities of the gang in an attempt to prevent law enforcement officers from monitoring a telephone conversation involving the gang's criminal activity.

13.  Leaders of the Black Angels gang recruit and initiate juveniles to join the gang, including visiting local high schools in search of young recruits.  After a period of time committing minor crimes, new members may be "jumped in" to the gang.  This initiation process ordinarily requires that the new member be physically beaten by senior, established members of the gang and demonstrate his resilience during the beating.

14.  Female friends, girlfriends, and wives of gang members play an important role in the operation of the Black Angels gang. They are often called upon to send information to and from incarcerated members, or to arrange three-way telephone calls from inmates to other gang members.  In addition, female associates drive getaway cars from crime scenes and hide contraband on their persons when gang members are stopped in vehicles or when search warrants are executed, with the assumption being that the officer will be less likely to search the female associate.  Female associates are also asked to deliver "tax" proceeds to gang leaders and to put money "on the books" of an incarcerated member.

COUNT ONE

[18 U.S.C. § 1962(d)]

1.    Paragraphs One through Fourteen of the General Allegations are realleged and incorporated by reference as though fully set forth herein.

2.    The Black Angels, including its leadership, membership, and associates, constituted an "enterprise," as defined by Title 18, United States Code, Section 1961(4), that is, a group of individuals associated in fact.  The enterprise engaged in, and its activities affected, interstate and foreign commerce.  The enterprise constituted an ongoing organization whose members functioned as a continuing unit for a common purpose of achieving the objectives of the enterprise.

PURPOSES OF THE ENTERPRISE

3.    The purposes of the Black Angels criminal enterprise, including its members and associates, include, but are not limited to, the following:

a.    Enriching members and associates of the Black Angels gang through, among other things, control and participation in the distribution of narcotics in the Black Angels gang territory and elsewhere.

b.    Maintaining control over all Black Angels gang territory.

c.    Preserving, protecting, and expanding the power of the Black Angels gang through the use of intimidation, violence, threats of violence, assaults, and murders.

d.    Promoting and enhancing the Black Angels gang and the activities of its members and associates.

8

1       e.   Controlling the illegal activities that generate

2 income by "taxing" drug dealers and legitimate businesses in the

3 territory controlled by the Black Angels gang.

THE MEANS AND METHODS OF THE ENTERPRISE

5    4.   The means and methods by which defendants and other

6 members and associates of the Black Angels gang conduct and

7 participate in the conduct of the affairs of the Black Angels

8 gang include:

9       a.   Members and associates of the Black Angels gang

10 use the Black Angels criminal enterprise to commit, attempt, and

11 threaten to commit, acts of violence, including murder, to

12 protect and expand the enterprise's criminal operations and to

13 promote discipline and enforce the rules of the Black Angels

14 criminal enterprise.

15      b.   Members and associates of the Black Angels gang

16 use the Black Angels criminal enterprise to promote a climate of

17 fear through violence and threats of violence.

18      c.   Members of the Black Angels gang are entitled to

19 conduct, and, in fact, conduct, illegal activities under the

20 protection of the Black Angels criminal enterprise in order to

21 generate income.

22      d.   Members and associates of the Black Angels gang

23 engage in the trafficking of controlled substances in order to

24 generate income.

25      e.   Members and associates of the Black Angels

26 criminal enterprise, with the permission of Black Angels gang

27 leaders, "tax" illicit activities, including drug trafficking, in

28 order to generate income and control the illegal activity

9

1  undertaken in territories controlled by the Black Angels gang.

2  The RICO CONSPIRACY CHARGE

3      5.   Beginning on a date unknown, and continuing to on or

4  about April 7, 2010, in Riverside, San Bernardino, and Los

5  Angeles Counties, within the Central District of California and

6  elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, ALCALA,

7  JIMENEZ, RIVERA, PORTILLO, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ,

8  REYES, ARTEAGA, QUIROZ, DEWESTER, JIRON, MORALES, A. CASTRO,

9  MORENO, SANCHEZ, CALDERON, V. GIL, ESTRADA, LOPEZ, MEDINA, J.

10 PEREZ, PRIETO, HERNANDEZ, VENEGAS, VEGA, ROBERT PEREZ, LUCERO,

11 SILVA, ROMERO, TORRES-CRUZ, GONZALES, and others known and

12 unknown to the Grand Jury, being persons employed by and

13 associated with the Black Angels criminal enterprise described in

14 Paragraphs One through Fourteen of the General Allegations of

15 this indictment, and Paragraphs Two through Four of this Count,

16 which constitutes an "enterprise," as defined in Title 18, United

17 States Code, Section 1961(4), which enterprise affected

18 interstate and foreign commerce, unlawfully and knowingly

19 combined, conspired, confederated, and agreed together and with

20 each other to violate Title 18, United States Code, Section

21 1962(c), that is, to conduct and participate, directly and

22 indirectly, in the conduct of the affairs of the enterprise

23 through a pattern of racketeering activity, as that term is

24 defined in Title 18, United States Code, Sections 1961(1) and

25 1961(5), consisting of multiple acts involving extortion, in

26 violation of California Penal Code Sections 31, 182 and 518-20;

27 distribution of controlled substances, and conspiracy to

28 distribute controlled substances, including methamphetamine and

10

heroin, in violation of Title 21, United States Code, Sections
841(a)(1), 843(b), and 846; and robbery in violation of
California Penal Code Sections 31, 664, 211, and 213. It was
further a part of the conspiracy that each defendant agreed that
a conspirator would commit at least two acts of racketeering in
the conduct of the affairs of the enterprise.

A.   <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE
ACCOMPLISHED</u>

    The objects of the conspiracy were to be accomplished in
substance as follows:

    1.   Defendants BARAJAS, J. GIL, and NAVARRO, and others,
would direct the activities of the Black Angels gang and its
associates, specifically insofar as those activities involved the
distribution of narcotics, the collection and distribution of
"taxed" drug proceeds, and the commission of crimes of violence.

    2.   Defendants BARAJAS and NAVARRO, and others, would meet
with Mexican Mafia leaders and associates to report on the
activities of the gang, receive instructions from the Mexican
Mafia, and provide narcotics and money to the Mexican Mafia
arising from the gang's extortion, narcotics distribution, and
violent criminal activities.

    3.   Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ,
C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER, CALDERON,
V. GIL, ROBERT PEREZ, and GONZALES, and others, would permit
narcotics traffickers to distribute narcotics in the geographic
area controlled by the Black Angels gang in return for a
percentage of the narcotics proceeds that were sold in the areas
controlled by the Black Angels gang.

1    4.    Defendants J. GIL, NAVARRO, ALCALA, JIMENEZ, RIVERA, C.

2 VASQUEZ, ALVAREZ, REYES, ARTEAGA, JIRON, MORALES, MORENO,

3 SANCHEZ, PRIETO, HERNANDEZ, and VEGA, and others, would obtain

4 firearms and other dangerous weapons for Black Angels gang

5 members, to be used to enforce the authority of the Black Angels

6 gang, to maintain the Black Angels members and associates'

7 ability to engage in drug trafficking within the neighborhoods

8 controlled by the gang, and to exclude others from drug

9 trafficking in the neighborhoods controlled by the Black Angels

10 gang.

11    5.    Defendants BARAJAS, NAVARRO, JIMENEZ, RIVERA, C.

12 VASQUEZ, ESPINOZA, MORALES, SANCHEZ, CALDERON, and VEGA, and

13 others, would engage in acts of violence in order to enforce the

14 authority of the Black Angels gang, as well as maintain the

15 gang's ability to control the drug trafficking activity in the

16 territory controlled by the Black Angels gang.

17    6.    Defendants RIVERA, MEDINA, ROBERT PEREZ, SILVA, ROMERO,

18 and TORRES-CRUZ, and other narcotics suppliers, would obtain

19 narcotics that were then distributed to members and associates of

20 the Black Angels gang.

21    7.    Defendants BARAJAS, J. GIL, NAVARRO, JIMENEZ, HURTADO,

22 JIMENEZ, RIVERA, PORTILLO, MORAGA, REYES, ARTEAGA, QUIROZ,

23 MORALES, A. CASTRO, CALDERON, V. GIL, ESTRADA, MEDINA, PRIETO,

24 HERNANDEZ, VENEGAS, LUCERO, SILVA, ROMERO, TORRES-CRUZ, and

25 GONZALES, and others, would distribute narcotics in prison and in

26 the territory controlled by the Black Angels gang.

27    8.    Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, RIVERA,

28 PORTILLO, ALVAREZ, REYES, JIRON, A. CASTRO, V. GIL, ESTRADA,

1   LOPEZ, MEDINA, J. PEREZ, PRIETO, ROBERT PEREZ, VENEGAS, and

2   LUCERO, and others, would assist Black Angels gang members and

3   associates in the commission of violent crimes and narcotics

4   trafficking by providing access to telephones to be used for

5   criminal activity, conveying information regarding the criminal

6   activities of the Black Angels gang to incarcerated Black Angels

7   gang members and members of the Mexican Mafia, and concealing

8   contraband held by the gang to avoid the contraband's detection

9   by law enforcement.

10      9.   Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, RIVERA,

11  PORTILLO, ALVAREZ, REYES, QUIROZ, A. CASTRO, V. GIL, ESTRADA,

12  LOPEZ, MEDINA, ROBERT PEREZ, SILVA, TORRES-CRUZ, and GONZALES,

13  and others, would communicate with members of the Black Angels

14  gang and their associates to notify them of the presence of law

15  enforcement in the area controlled by the gang and report on

16  recent arrests, search warrants, and other law enforcement

17  activity conducted against members of the Black Angels gang, or

18  narcotics traffickers making extortion payments to the gang.

19  B.   OVERT ACTS

20      In furtherance of the conspiracy, and to accomplish the

21  objects of the conspiracy, defendants BARAJAS, J. GIL, NAVARRO,

22  HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ,

23  MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER,

24  JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, CALDERON, V. GIL,

25  ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ, VENEGAS,

26  VEGA, ROBERT PEREZ, LUCERO, SILVA, ROMERO, TORRES-CRUZ, GONZALES,

27  and co-conspirators Victor Felix ("Felix"), Teresa Castro ("T.

28  Castro"), Patrick Orozco ("Orozco"), Fernando Vasquez ("F.

13

Vasquez"), Richard Castorena ("Castorena"), and others known and unknown to the Grand Jury, including those defendants named in the narcotics conspiracy count, committed various overt acts, on or about the following times and dates, within the Central District of California, and elsewhere, including but not limited to the following:

1. On August 8, 2002, defendant DEWESTER possessed a 12-gauge shotgun and four shotgun shells.

2. On April 17, 2003, defendant VEGA possessed a loaded .380 caliber pistol as he fled from the police in a vehicle pursuit with victim I.A. and her small child in the car.

3. On May 9, 2004, defendant MAGALLENES possessed methamphetamine and $1,129.07 in cash in a vehicle that she was driving.

4. On December 8, 2004, defendant MORENO possessed a stolen, loaded .40 caliber semi-automatic firearm, bearing serial number 2165002.

5. On February 13, 2005, defendant MORALES possessed gang paraphernalia, one pound of methamphetamine, and six rounds of .380 caliber ammunition at his residence in Upland, California.

6. On February 17, 2005, defendant ROBERT PEREZ possessed approximately 12.7 grams of methamphetamine.

7. On April 27, 2005, defendant ALCALA and unindicted co-conspirator #1, a member of OVS, possessed methamphetamine and a loaded firearm.

8. On July 20, 2005, defendant ALCALA possessed a semi-automatic firearm.

9. On July 20, 2005, defendant ALCALA gathered other Black

14

1 | Angels gang members to approach victim D.L.'s residence, and
2 | pounded on D.L.'s door fifteen minutes after D.L. had confronted
3 | ALCALA.

4 |     10.    On September 17, 2005, defendant VEGA drove a stolen
5 | vehicle and possessed three rounds of ammunition,
6 | methamphetamine, and a knife.

7 |     11.    On October 26, 2005, defendant SANCHEZ possessed eight
8 | firearms, including a 9mm Luger handgun and a Tech-9 rifle,
9 | multiple rounds of ammunition, and Black Angels gang
10 | paraphernalia.

11 |     12.    On March 31, 2006, defendant DEWESTER possessed a
12 | stolen .25 caliber handgun and six rounds of ammunition.

13 |     13.    On December 9, 2006, defendant VEGA possessed a firearm
14 | and two rounds of ammunition as he fled from police in a vehicle
15 | pursuit.

16 |     14.    On January 30, 2007, defendant PORTILLO possessed three
17 | rounds of .44 caliber ammunition, a Walther automatic handgun,
18 | and Black Angels paraphernalia.

19 |     15.    On March 10, 2007, defendant J. GIL, an inmate at the
20 | United States Penitentiary in Victorville, California, received
21 | multiple balloons containing approximately 3.8 grams of heroin
22 | from defendant V. GIL that J. GIL then swallowed in an attempt to
23 | conceal the narcotics from prison officials.

24 |     16.    On July 10, 2007, defendants SANCHEZ and DIAZ drove in
25 | a vehicle with a video camera attached to the rear license plate
26 | so that SANCHEZ could see when law enforcement officers
27 | approached the vehicle.

28 |     17.    On April 24, 2008, defendant J. GIL requested that

15

1  defendant DIAZ broker a firearms transaction on J. GIL's behalf

2  while J. GIL was in custody.

3      18.  On May 3, 2008, defendant DIAZ reported to defendant J.

4  GIL that DIAZ had obtained firearms, including a .45 caliber

5  handgun, a .22 caliber handgun, and a semi-automatic rifle known

6  as a "mini-14," and stated that DIAZ would send J. GIL the

7  proceeds from the firearms sales.

8      19.  On June 30, 2008, defendant J. GIL, who was

9  incarcerated, instructed defendant DIAZ to place money on J.

10  GIL's books, and to give some money to defendant V. GIL.

11      20.  On November 10, 2008, defendant VEGA discharged a

12  firearm at a police officer who was following VEGA during a high-

13  speed vehicle pursuit.

14      21.  On November 10, 2008, defendant VEGA possessed seven

15  rounds of live ammunition; multiple firearm cartridges, including

16  an AK47 cartridge; and Black Angel gang paraphernalia.

17      22.  On March 7, 2009, defendant DIAZ brandished and used a

18  knife in a fight at a bar in Colton, California.

19      23.  On March 18, 2009, T. Castro delivered a portion of

20  defendant TORRES-CRUZ and T. Castro's narcotics trafficking

21  profits for the week to defendant NAVARRO as a tax in exchange

22  for the ability to distribute narcotics in the territory

23  controlled by the Black Angels gang.

24      24.  On March 20, 2009, defendant TORRES-CRUZ asked T.

25  Castro if she had any money or narcotics left, and T. Castro

26  stated that she had over $300 but only one balloon of heroin

27  remaining and no cocaine.

28      25.  On March 23, 2009, defendant TORRES-CRUZ informed

1 Orozco that TORRES-CRUZ had provided an additional 28 balloons of
2 heroin for Orozco to distribute.

3     26.  On March 30, 2009, defendant TORRES-CRUZ instructed
4 Orozco to provide T. Castro with 25 balloons of heroin and five
5 or six balloons of cocaine, for a total of 30 balloons filled
6 with narcotics to distribute in the territory controlled by the
7 Black Angel gang.

8     27.  On March 31, 2009, Castorena told defendant TORRES-CRUZ
9 that Castorena had a customer interested in purchasing $140 worth
10 of heroin from TORRES-CRUZ and Castorena.

11     28.  On April 14, 2009, Felix made arrangements with
12 defendant TORRES-CRUZ to deliver heroin to TORRES-CRUZ later that
13 day.

14     29.  On April 15, 2009, Castorena told defendant TORRES-CRUZ
15 that Castorena was ready to begin distributing narcotics, and
16 Castorena stated that he already had customers lined up to
17 purchase specific quantities of narcotics each day.

18     30.  On April 30, 2009, defendant MORALES stole a 9mm
19 Beretta 92FS handgun, a 30.06 caliber rifle, a 30/30 Winchester
20 rifle, a .22 caliber rifle, and a 52-inch flat screen televison
21 from a residence in Pinon Hills.

22     31.  On May 5, 2009, F. Vasquez told defendant TORRES-CRUZ
23 that F. Vasquez had 20 or 30 balloons of heroin left to
24 distribute, but that F. Vasquez no longer had any cocaine for
25 distribution.

26     32.  On May 6, 2009, defendant NAVARRO told defendant
27 TORRES-CRUZ that defendant JIMENEZ would collect a $200 payment
28 from TORRES-CRUZ' narcotics trafficking profits for the week.

33. On May 15, 2009, defendant NAVARRO discussed with defendant MARTINEZ a time and place to meet so that NAVARRO could collect a portion of MARTINEZ' narcotics trafficking profits for the week in exchange for MARTINEZ' ability to distribute narcotics in the territory controlled by the Black Angels gang.

34. On May 21, 2009, defendants NAVARRO, C. VASQUEZ, and HURTADO collected a $200 payment from defendant TORRES-CRUZ and T. Castro that was a portion of the proceeds of TORRES-CRUZ and T. Castro's narcotics trafficking profits for the week.

35. On May 22, 2009, defendant TORRES-CRUZ instructed Orozco to deliver a portion of their narcotics trafficking profits for the week to defendant NAVARRO.

36. On May 23, 2009, defendants NAVARRO and HURTADO agreed to meet the following day with other members of the Black Angels gang, and NAVARRO warned HURTADO not to say anything or give signals over the telephone that could be understood by law enforcement.

37. On May 28, 2009, defendants NAVARRO, JIMENEZ, REYES, ESPINOZA, and another member of the Black Angels gang armed themselves and went to the residence of a rival Chino Sinners gang member to extort money from the rival gang member.

38. On June 12, 2009, a Black Angels gang member killed P.R. by shooting P.R. approximately four times with a stolen, 9mm handgun.

39. On June 14, 2009, defendant MORALES brandished a firearm, and carried a concealed dagger as MORALES fled from law enforcement.

40. On June 14, 2009, defendant MORALES attempted to hide

1  from law enforcement in defendant JIRON's residence.

2      41.  On June 20, 2009, defendant J. PEREZ picked up assorted

3  ammunition and the 9mm handgun used to murder P.R. from defendant

4  MORALES' residence, and J. PEREZ took the firearm and ammunition

5  to defendant JIRON's residence to conceal them from the police.

6      42.  On June 22, 2009, defendants ALVAREZ and NAVARRO

7  discussed the location of the firearm that was used to murder

8  P.R., and NAVARRO instructed ALVAREZ to put the firearm in a safe

9  location, and warned ALVAREZ to avoid being detected by law

10  enforcement when moving the firearm.

11      43.  On June 23, 2009, defendant JIRON possessed a stolen

12  9mm Beretta handgun, model 92FS, bearing serial # DS007056, that

13  was used to murder P.R, as well as ammunition for the firearm.

14      44.  On June 23, 2009, defendant ALVAREZ told defendant

15  NAVARRO that defendant JIRON's residence had been searched, that

16  the police had found the firearm that had been used to murder

17  P.R., and that law enforcement officers were interviewing Black

18  Angels gang members and associates in connection with the murder

19  investigation.

20      45.  On June 23, 2009, defendants ALVAREZ and NAVARRO agreed

21  to meet in person to discuss the information law enforcement had

22  obtained regarding the murder of P.R.

23      46.  On June 23, 2009, defendant TORRES-CRUZ told defendant

24  NAVARRO that unindicted co-conspirator #2 would meet NAVARRO to

25  deliver a $200 payment to defendant NAVARRO that constituted a

26  portion of TORRES-CRUZ' narcotics trafficking profits for the

27  week, and TORRES-CRUZ told NAVARRO that TORRES-CRUZ would provide

28  NAVARRO with an additional payment the next day.

47. On June 24, 2009, defendant NAVARRO delivered a payment to defendant V. GIL from the Black Angels' extortion proceeds.

48. On June 28, 2009, defendant MARTINEZ told defendant NAVARRO that MARTINEZ was collecting money in order to make an extortion payment to NAVARRO in connection with MARTINEZ' narcotics trafficking activities, but that MARTINEZ did not presently have enough money, and NAVARRO told MARTINEZ that NAVARRO would meet with MARTINEZ and see how much money MARTINEZ had.

49. On June 30, 2009, defendants HURTADO and NAVARRO discussed the location of several police checkpoints in the City of Ontario.

50. On June 30, 2009, defendant NAVARRO collected narcotics trafficking proceeds from defendant ESTRADA.

51. On July 2, 2009, defendant SILVA advised defendant NAVARRO that M.C. robbed defendant MARTINEZ of narcotics and money, and NAVARRO advised SILVA that NAVARRO and other members of the Black Angels gang would confront M.C.

52. On July 2, 2009, defendants NAVARRO and JIMENEZ, and another member of the Black Angels gang, met at a residence where M.C. was located.

53. On July 2, 2009, defendant NAVARRO told defendant SILVA that M.C. had received a "good beating."

54. On July 3, 2009, defendant DEWESTER and defendant NAVARRO had a conversation in which DEWESTER told NAVARRO that DEWESTER knew of a narcotics trafficker in the territory controlled by the Black Angels gang from whom NAVARRO could collect extortion payments, and DEWESTER gave NAVARRO directions

1 | to locate the narcotics trafficker.

2 |     55. On July 4, 2009, defendant J. GIL instructed defendant

3 | NAVARRO to send $200 to J. GIL by Western Union or MoneyGram.

4 |     56. On July 7, 2009, defendants BARAJAS and NAVARRO

5 | discussed the collection of portions of the proceeds from

6 | defendant SILVA's narcotics sales, and BARAJAS told NAVARRO that

7 | it would be in SILVA's "best interest" to do BARAJAS a "favor"

8 | and give narcotics to an individual distributing narcotics in the

9 | Black Angel gang's territory.

10 |     57. On July 15, 2009, defendant MARTINEZ possessed high

11 | purity methamphetamine in his vehicle.

12 |     58. On July 17, 2009, defendant SILVA told defendant

13 | NAVARRO that defendant MARTINEZ had been arrested, and SILVA

14 | asked NAVARRO if SILVA could provide NAVARRO with proceeds from

15 | narcotics trafficking at a later time, as SILVA was not presently

16 | distributing narcotics because of the presence of law enforcement

17 | in the area.

18 |     59. On July 18, 2009, defendant SILVA told defendant

19 | RICHARDS to meet SILVA at a fast food restaurant and that SILVA

20 | would provide RICHARDS with narcotics for distribution.

21 |     60. On July 18, 2009, defendant HURTADO attempted to evade

22 | law enforcement officers who were pursuing HURTADO's vehicle with

23 | full lights and sirens.

24 |     61. On July 18, 2009, defendant HURTADO told defendant

25 | NAVARRO that HURTADO had sent one of his friends to pick up the

26 | narcotics that HURTADO had dropped earlier during the police

27 | pursuit.

28 |     62. On July 20, 2009, defendant RICHARDS told defendant

1   SILVA that RICHARDS wanted to meet with SILVA to obtain
2   additional narcotics, and RICHARDS told SILVA that the new
3   narcotics SILVA had provided were good and that RICHARDS'
4   customers liked them.

5       63.   On July 20, 2009, defendant MARTINEZ told defendant
6   NAVARRO that, after MARTINEZ was released from custody, MARTINEZ
7   would resume distributing narcotics in the territory controlled
8   by the Black Angels gang and would pay NAVARRO a portion of his
9   narcotics trafficking profits.

10      64.   On July 21, 2009, defendants NAVARRO and RICHARDS
11  discussed a time and place to meet so that NAVARRO could collect
12  a portion of RICHARDS' narcotics trafficking profits for the
13  week.

14      65.   On July 21, 2009, defendant RIVERA ordered
15  methamphetamine from defendant VENEGAS.

16      66.   On July 21, 2009, defendant REYES warned defendant
17  QUIROZ about police activity in the area.

18      67.   On July 21, 2009, defendant RIVERA negotiated the
19  purchase of a loaded .38 caliber handgun for $250 from defendant
20  HERNANDEZ.

21      68.   On July 22, 2009, defendant HERNANDEZ delivered a .38
22  caliber handgun to defendant RIVERA.

23      69.   On July 22, 2009, defendant RIVERA attempted to conceal
24  a loaded .38 caliber handgun from law enforcement officers.

25      70.   On July 22, 2009, defendant RIVERA told defendant
26  NAVARRO that the loaded .38 caliber handgun had been seized by
27  law enforcement, and RIVERA apologized to NAVARRO for not
28  obtaining the firearm that was meant to be used by the Black

22

1  Angels gang, and further told NAVARRO that RIVERA would attempt
2  to obtain another firearm for the gang.

3      71.  On July 22, 2009, defendants REYES and QUIROZ discussed
4  a time to meet when REYES could provide narcotics to QUIROZ for
5  distribution.

6      72.  On July 23, 2009, defendant MAGALLANES ordered $400
7  worth of narcotics from defendant SILVA.

8      73.  On July 23, 2009, defendant NAVARRO asked defendant
9  RICHARDS if he could meet with her, and RICHARDS told NAVARRO
10 that RICHARDS was available and that RICHARDS had money to give
11 NAVARRO in connection with RICHARDS' narcotics trafficking
12 activities in the territory controlled by the Black Angels gang.

13     74.  On July 24, 2009, defendant MAGALLANES informed
14 defendant SILVA that MAGALLANES had money for SILVA, and
15 MAGALLANES discussed a place to meet so that MAGALLANES could
16 obtain narcotics from SILVA.

17     75.  On July 24, 2009, defendant REYES discussed a time to
18 meet with defendant QUIROZ to collect the proceeds from QUIROZ'
19 narcotics sales.

20     76.  On July 24, 2009, defendant KISSLING spoke to defendant
21 NAVARRO and apologized that he had not yet been able to make the
22 extortion payment to NAVARRO in connection with KISSLING's
23 narcotics trafficking activities, and KISSLING told NAVARRO that
24 KISSLING was going to try to collect money owed to him by other
25 people and would call NAVARRO back later.

26     77.  On July 25, 2009, defendant RIVERA instructed defendant
27 VENEGAS to meet defendant J. PEREZ and provide her with
28 narcotics.

78.  On July 27, 2009, defendant RIVERA asked defendant VENEGAS to prepare methamphetamine for distribution.

79.  On July 28, 2009, defendants ROBERT PEREZ and NAVARRO discussed the collection of taxes from individuals distributing narcotics in the territory controlled by the Black Angels gang.

80.  On July 28, 2009, defendant ROBERT PEREZ attempted to inform defendant NAVARRO about the presence of law enforcement officers in the area.

81.  On July 29, 2009, defendants C. VASQUEZ, SANCHEZ, and ESPINOZA robbed a market in the City of Upland.

82.  On July 29, 2009, defendants NAVARRO and KISSLING discussed a time and place to meet so KISSLING could provide NAVARRO with a portion of KISSLING's narcotics trafficking proceeds for the week.

83.  On July 29, 2009, defendant RIVERA instructed defendant VENEGAS to sell some methamphetamine, but to keep $400 worth of methamphetamine for RIVERA to distribute.

84.  On July 29, 2009, defendant REYES contacted defendant MORAGA to obtain a telephone number for a third party who was involved in the distribution of narcotics.

85.  On July 30, 2009, defendant V. GIL directed defendant NAVARRO to deliver a $100 payment consisting of Black Angels' extortion proceeds to V. GIL.

86.  On July 30, 2009, defendant J. GIL instructed defendant NAVARRO to send $200 to J. GIL via Western Union.

87.  On July 31, 2009, defendant TOLSON ordered a quarter ounce of methamphetamine from defendant RIVERA, and TOLSON and RIVERA discussed the possibility of TOLSON buying methamphetamine

24

1    from RIVERA on a regular basis in the future.

2         88.  On July 31, 2009, defendant RIVERA delivered

3    approximately 4.4 grams of methamphetamine to defendants TOLSON

4    and COOK.

5         89.  On July 31, 2009, defendant TOLSON told defendant

6    RIVERA that TOLSON had been stopped by the police after

7    purchasing narcotics from RIVERA and that defendant COOK had been

8    arrested.

9         90.  On July 31, 2009, defendant QUIROZ told defendant REYES

10   that QUIROZ had $450 to give to REYES, and QUIROZ asked if REYES

11   could provide QUIROZ with additional narcotics to distribute.

12        91.  On July 31, 2009, defendant QUIROZ warned defendant

13   REYES about the presence of law enforcement officers.

14        92.  On July 31, 2009, defendant ROBERT PEREZ told defendant

15   NAVARRO that ROBERT PEREZ was receiving narcotics from Mexico and

16   that he would let NAVARRO know when "the eagle landed."

17        93.  On August 1, 2009, defendant REYES discussed a time and

18   place to meet with defendant SANCHEZ so that REYES could recover

19   a firearm from SANCHEZ.

20        94.  On August 1, 2009, defendant REYES possessed a

21   sawed-off .22 caliber rifle with an obliterated serial number, as

22   well as Black Angels paraphernalia.

23        95.  On August 1, 2009, defendant NAVARRO discussed a time

24   and place to meet with defendant KISSLING to collect a portion of

25   KISSLING's narcotics trafficking profits.

26        96.  On August 3, 2009, defendants RIVERA and HERNANDEZ

27   discussed the price and quality of narcotics, and RIVERA advised

28   HERNANDEZ that if a narcotics transaction occurred, then

                                    25

1  HERNANDEZ would receive a payment of money.

2      97.  On August 6, 2009, defendant RIVERA called unindicted

3  co-conspirator #3 to purchase methamphetamine, and unindicted

4  co-conspirator #3 instructed defendant MEZA to deliver the

5  methamphetamine to RIVERA.

6      98.  On August 6, 2009, defendant RIVERA told defendant

7  HERNANDEZ that RIVERA was going to obtain narcotics from a new

8  source of supply, and RIVERA advised HERNANDEZ that if a

9  narcotics transaction occurred, then HERNANDEZ would receive a

10  payment of money.

11      99.  On August 6, 2009, defendant PRIETO told defendant

12  RIVERA that PRIETO would not complete a robbery that PRIETO had

13  planned because RIVERA was going to supply PRIETO with a one-half

14  ounce quantity of methamphetamine to distribute instead.

15      100.  On August 6, 2009, defendant MEZA delivered

16  approximately 219 grams of methamphetamine to defendants RIVERA

17  and MEDINA, which defendant RIVERA hid in a hollowed-out battery

18  in the trunk of a vehicle.

19      101.  On August 6, 2009, defendant RIVERA possessed $3,385

20  in United States currency.

21      102.  On August 6, 2009, defendant MEZA possessed

22  approximately 27.8 grams of methamphetamine.

23      103.  On August 7, 2009, MEDINA told unindicted co-

24  conspirator #4 that defendant RIVERA had instructed her to call

25  unindicted co-conspirator #4 and another third party to collect

26  money that they owed to RIVERA for narcotics debts.

27      104.  On August 7, 2009, defendant MEDINA told the owner of

28  the vehicle from which narcotics were seized on August 6, 2009

1  that MEDINA had told the police that the car had been stolen many

2  times and thus she did not know how the narcotics had ended up in

3  the car, and MEDINA told the owner to repeat the same information

4  if the police asked him about the status of the car.

5      105.  On August 7, 2009, J. GIL, who was incarcerated at the

6  time, told V. GIL to tell other members of the Black Angels and

7  its associates that they should not communicate about gang

8  business over the telephone, as J. GIL had just read about

9  another case about law enforcement building a prosecution based

10 on recorded telephone calls.

11     106.  On August 8, 2009, defendants MEDINA and NAVARRO spoke

12 about the fact that on August 6, 2009, law enforcement officers

13 had seized a large quantity of methamphetamine from defendants

14 MEDINA and RIVERA, and MEDINA and NAVARRO discussed whether

15 defendant MEZA was cooperating with law enforcement.

16     107.  On August 13, 2009, defendant RICHARDS told defendant

17 SILVA that her customers had been complaining about the quality

18 of the narcotics that SILVA had provided, and RICHARDS made

19 arrangements to purchase additional narcotics from SILVA at a

20 price of $1150.

21     108.  On August 20, 2009, defendant PERALTA negotiated a

22 purchase of narcotics from defendant SILVA.

23     109.  On August 22, 2009, defendant V. GIL told defendant J.

24 GIL, who was incarcerated at the time, that V. GIL had been at a

25 party and had been assaulted by an 18 year-old male, and J. GIL

26 instructed V. GIL to assemble some of the younger members or

27 associates of the Black Angels gang to take care of the problem.

28     110.  On August 25, 2009, defendants NAVARRO and RICHARDS

27

discussed a time and place to meet for NAVARRO to collect a portion of defendant RICHARDS' narcotics trafficking proceeds for the week.

111.   On August 25, 2009, defendant SILVA delivered approximately 72.6 grams of methamphetamine to defendant ANDALON, who placed the methamphetamine in the console of the vehicle he was driving.

112.   On August 25, 2009, defendants SILVA and PERALTA discussed meeting at a sandwich shop so that SILVA could deliver narcotics to PERALTA.

113.   On August 25, 2009, defendant PERALTA possessed approximately 3.4 grams of methamphetamine in the car in which he was traveling.

114.   On August 25, 2009, defendant BARAJAS told defendant NAVARRO that defendant REYES had been apprehended by law enforcement with a firearm that belonged to the Black Angels gang.

115.   On August 25, 2009, defendants BARAJAS and NAVARRO discussed the July 29, 2009 robbery of a market, and BARAJAS told NAVARRO that members of the Black Angels gang should steal from houses rather than robbing stores that have surveillance cameras.

116.   On August 26, 2009, Andalon told defendant SILVA that Andalon had been arrested with narcotics in his vehicle, and Andalon told SILVA that he had not disclosed SILVA's name to the arresting officer.

117.   On August 26, 2009, defendants NAVARRO and KISSLING discussed a time and place to meet for NAVARRO to collect a portion of KISSLING's narcotics trafficking profits for the week.

1    118.  On August 28, 2009, defendants SILVA and ROMERO

2  possessed approximately 93.6 grams of methamphetamine in a

3  vehicle ROMERO was driving.

4    119.  On August 28, 2009, defendants SILVA and ROMERO

5  possessed approximately 2.35 kilograms of methamphetamine,

6  digital scales, empty plastic baggies, a bill counter, and

7  $63,894 in United States currency.

8    120.  On August 30, 2009, unindicted co-conspirator #5 told

9  defendant NAVARRO of the recent arrests of defendants SILVA and

10  ROMERO, and unindicted co-conspirator #5 stated that she wanted

11  NAVARRO to know about the arrests because they would affect

12  NAVARRO's income as a result of the decreased narcotics sales in

13  the territory controlled by the Black Angels gang.

14    121.  On September 2, 2009, defendant NAVARRO warned

15  defendant KISSLING that there were many police in the

16  neighborhood, and NAVARRO instructed KISSLING to be careful in

17  connection with KISSLING's narcotics distribution activities.

18    122.  On September 4, 2009, defendant KISSLING possessed a

19  loaded RG Industries .22 caliber revolver in the house where

20  KISSLING was residing.

21    123.  On September 4, 2009, unindicted co-conspirator #6

22  told defendant NAVARRO that police had just raided defendant

23  KISSLING's house, and unindicted co-conspirator #6 warned NAVARRO

24  that there was a heavy law enforcement presence in the area.

25    124.  On September 8, 2009, defendants NAVARRO and RICHARDS

26  discussed a time and place to meet for NAVARRO to collect a

27  portion of RICHARDS' narcotics trafficking profits for the week.

28    125.  On September 9, 2009, defendant NAVARRO spoke with

29

1 | defendant LAGUNA who told NAVARRO that defendant KISSLING had
2 | been arrested, and NAVARRO asked LAGUNA to determine who would
3 | assume the role of selling narcotics that had previously been
4 | performed by KISSLING.

5 |     126. On September 10, 2009, defendant ESTRADA, driving a
6 | stolen vehicle, possessed checks stolen from victims R.S. and
7 | V.C.

8 |     127. On September 11, 2009, defendant NAVARRO met with
9 | defendant LAGUNA so that LAGUNA could inform NAVARRO who would
10 | assume the sales of narcotics that had previously been performed
11 | by defendant KISSLING.

12 |     128. On September 11, 2009, defendant NAVARRO told
13 | unindicted co-conspirator #7 that NAVARRO was a "Black Angel,"
14 | that a particular area was his "varrio," and that NAVARRO and
15 | other members of the Black Angels gang were the only ones
16 | authorized to tax narcotics traffickers in the territory
17 | controlled by the Black Angels gang.

18 |     129. On September 12, 2009, defendants NAVARRO and MARTINEZ
19 | discussed the distribution of narcotics.

20 |     130. On September 14, 2009, unindicted co-conspirator #7
21 | told defendant NAVARRO that unindicted co-conspirator #7 and
22 | defendant MENDEZ had been paying taxes in connection with their
23 | narcotics trafficking activities to defendant ALVAREZ, and
24 | NAVARRO instructed unindicted co-conspirator #7 to pay the taxes
25 | directly to NAVARRO.

26 |     131. On September 17, 2009, defendants NAVARRO and MARTINEZ
27 | discussed a time and place to meet so that NAVARRO could provide
28 | MARTINEZ with narcotics.

1     132. On September 17, 2009, defendant ESTRADA possessed a

2 magnetic credit card strip reader and writer; numerous credit

3 cards; three driver's licenses belonging to individuals other

4 than herself, including victims M.E. and J.J.; and a social

5 security card belonging to J.J.

6     133. On September 17, 2009, defendant ESTRADA possessed

7 correspondence between herself and a member of the Black Angels

8 gang who was incarcerated in Tehachapi state prison regarding

9 ESTRADA depositing money in his jail account.

10     134. On September 17, 2009, defendant CALDERON punched

11 victim F.A. in the face and demanded that victim F.A. pay

12 CALDERON $100 per month for "protection."

13     135. On September 18, 2009, defendant CALDERON sent text

14 messages to victim F.A. demanding money and indicating that

15 CALDERON was going to "tax" victim F.A.

16     136. On September 26, 2009, defendant PORTILLO described to

17 defendant HURTADO how to swallow narcotics-filled balloons so

18 that they could be smuggled into prison, and PORTILLO and HURTADO

19 discussed having HURTADO prepare $400 worth of narcotics for such

20 a smuggling operation.

21     137. On September 26, 2009, defendant HURTADO told

22 defendant BARAJAS about the plan to smuggle narcotics to other

23 members of the Black Angels gang in prison.

24     138. On September 27, 2009, defendant PORTILLO told

25 defendant HURTADO that narcotics-filled balloons had been

26 successfully smuggled into prison, but that one of the balloons

27 had burst.

28     139. On September 27, 2009, defendant BARAJAS told

1  defendant ALVAREZ that BARAJAS needed a new telephone because
2  BARAJAS had to keep changing his phone numbers in case law
3  enforcement was listening to his calls, and ALVAREZ told BARAJAS
4  that ALVAREZ would obtain a new telephone for BARAJAS.

5      140.  On September 28, 2009, defendant BARAJAS asked
6  defendant CALDERON if CALDERON had any money for BARAJAS, and
7  CALDERON indicated that he had $50 and would get BARAJAS the
8  remainder of the money the following day.

9      141.  On September 28, 2009, unindicted co-conspirator #8,
10  who was, at the time, in custody at the California Correctional
11  Institution in Tehachapi, California, provided defendant A.
12  CASTRO with a list of inmates at the institution and the
13  quantities of narcotics that defendant A. CASTRO should arrange
14  to have delivered to them.

15      142.  On September 28, 2009, defendant ARANDA offered to
16  obtain a cellular telephone for defendant BARAJAS, and ARANDA
17  told BARAJAS that it was better to spend $60.00 on a new
18  telephone that the police would not monitor than to keep using
19  the same phone and possibly spend 60 years in prison.

20      143.  On September 28, 2009, defendant BARAJAS instructed
21  defendant MAGALLANES to purchase narcotics from him rather than
22  from defendant ARTEAGA, and BARAJAS told MAGALLANES that ARTEAGA
23  only supplies the neighborhood with narcotics because ARTEAGA was
24  given permission to do so by BARAJAS.

25      144.  On September 29, 2009, defendants NAVARRO and RICHARDS
26  discussed a time and place to meet for NAVARRO to collect a
27  portion of RICHARDS' narcotics trafficking profits for the week.

28      145.  On September 30, 2009, defendant GONZALES warned

1  defendant BARAJAS about a police checkpoint in Ontario,

2  California.

3      146.  On September 30, 2009, defendant BARAJAS instructed

4  defendant GONZALES to collect $200 each week from an individual

5  who was trafficking narcotics in the territory controlled by the

6  Black Angels gang, and GONZALES stated that she would tax the

7  narcotics dealer immediately and deliver the payment to BARAJAS.

8      147.  On September 30, 2009, defendant BARAJAS instructed

9  defendant LOPEZ to put away the narcotics and money because there

10 was a police officer two houses away from their residence, and

11 LOPEZ agreed to report law enforcement's actions to BARAJAS.

12     148.  On September 30, 2009, defendant A. CASTRO asked to

13 meet defendant BARAJAS to discuss gang business relating to

14 incarcerated members of the Black Angels gang, and the two agreed

15 to meet in person to avoid discussing the information over the

16 telephone.

17     149.  On September 30, 2009, defendant CALDERON asked

18 defendant BARAJAS if CALDERON could pay BARAJAS a portion of the

19 money CALDERON owed the following day, and BARAJAS agreed and

20 told CALDERON that CALDERON owed BARAJAS $400.

21     150.  On October 1, 2009, defendant PRIETO possessed three

22 rifles, ammunition magazines, and assorted ammunition in his

23 residence in Ontario, California.

24     151.  On October 1, 2009, defendant A. CASTRO told defendant

25 BARAJAS that A. CASTRO had obtained a telephone for BARAJAS and

26 that they could talk the next day about meeting to deliver the

27 telephone.

28     152.  On October 2, 2009, defendant A. CASTRO was in

33

1  possession of three cellular telephones.

2  153. On October 2, 2009, defendant A. CASTRO apologized to

3  defendant BARAJAS for getting arrested and stated that BARAJAS

4  and A. CASTRO needed to change their cellular telephones because

5  the police had seized the telephones A. CASTRO possessed at the

6  time of his arrest.

7  154. On October 3, 2009, defendant A. CASTRO told defendant

8  BARAJAS that A. CASTRO had a new telephone for BARAJAS.

9  155. On October 6, 2009, defendant BARAJAS told defendant

10  LOPEZ that BARAJAS would stop by defendant MORAGA's residence to

11  collect money related to the Black Angels gang's extortion

12  activities.

13  156. On October 6, 2009, defendants BARAJAS and MORAGA

14  discussed the collection of money, and BARAJAS stated he would

15  stop by MORAGA's location.

16  157. On October 6, 2009, defendants NAVARRO and RICHARDS

17  discussed a time and place to meet for NAVARRO to collect a

18  portion of RICHARDS' narcotics trafficking profits for the week.

19  158. On October 6, 2009, defendant BARAJAS told defendant

20  HURTADO that he and defendant ALCALA were going to meet with

21  unindicted co-conspirator #9, who was "hooked up with the

22  Cartel," and that ALCALA was going to pretend that ALCALA was

23  armed with a "sub-machine gun" during the meeting.

24  159. On October 6, 2009, defendant BARAJAS spoke to

25  defendant LOPEZ and reported on the meeting with unindicted

26  co-conspirator #9.

27  160. On October 8, 2009, defendant A. CASTRO and unindicted

28  co-conspirator #10 attempted to smuggle approximately six grams

of methamphetamine into the California Correctional Institution in Tehachapi, California.

161. On October 9, 2009, defendant BARAJAS made arrangements to collect a payment from defendant CALDERON in connection with CALDERON's narcotics trafficking activity.

162. On October 9, 2009, defendant BARAJAS told defendant HURTADO that BARAJAS would be traveling to defendant CALDERON's house to collect money from CALDERON, and HURTADO asked BARAJAS if BARAJAS needed HURTADO to assist with the collection.

163. On October 11, 2009, defendant BARAJAS told defendant CALDERON that BARAJAS wanted to collect additional money related to CALDERON's narcotics trafficking before BARAJAS provided CALDERON with additional narcotics to sell.

164. On October 12, 2009, unindicted co-conspirator #11 identified herself as a "secretary" of the Mexican Mafia, and unindicted co-conspirator #11 and defendant BARAJAS discussed the extortion payments BARAJAS collected from narcotics traffickers in the territory controlled by the Black Angels gang.

165. On October 13, 2009, defendants NAVARRO and RICHARDS discussed a time and place to meet for NAVARRO to collect a portion of RICHARDS' narcotics trafficking profits for the week.

166. On October 15, 2009, defendants BARAJAS and HURTADO discussed meeting that day to conduct a narcotics transaction.

167. On October 15, 2009, defendant BARAJAS provided approximately 32.2 grams of methamphetamine to defendants HURTADO and LUCERO to distribute.

168. On October 15, 2009, defendants HURTADO and LUCERO possessed approximately 32.2 grams of methamphetamine that they

intended to distribute, and LUCERO hid the methamphetamine inside her body cavities in an attempt to conceal the narcotics from law enforcement.

169.   On October 15, 2009, defendant HURTADO told defendant NAVARRO that HURTADO had to bail defendant LUCERO out of jail before the police discovered that LUCERO had methamphetamine concealed on her person.

170.   On October 15, 2009, defendant BARAJAS possessed gang paraphernalia and communications from incarcerated gang members in a residence in Pomona, California.

171.   On October 16, 2009, defendant BARAJAS and unindicted co-conspirator #11 discussed unindicted co-conspirator #11's responsibilities as a "secretary" to the Mexican Mafia; and unindicted co-conspirator #11 told BARAJAS that unindicted co-conspirator #11 participated in Mexican Mafia meetings in prison, memorized everything that was said, and later wrote it down so that she could convey the information to BARAJAS and other gang members.

172.   On October 18, 2009, defendant CALDERON asked defendant BARAJAS if BARAJAS had any narcotics to provide to CALDERON for distribution, and BARAJAS stated that BARAJAS would contact CALDERON when there were more narcotics available.

173.   On October 20, 2009, defendants NAVARRO and RICHARDS discussed a time and place to meet for NAVARRO to collect a portion of RICHARDS' narcotics trafficking profits for the week.

174.   On October 20, 2009, defendant MENDEZ paid an extortion payment to defendant NAVARRO so that MENDEZ could continue to sell narcotics within the territory controlled by the

1  Black Angel gang.

2      175.   On October 21, 2009, defendant GONZALES possessed

3  approximately 8.2 grams of methamphetamine, digital scales, and

4  plastic baggies used for packaging narcotics at a residence in

5  Ontario, California.

6      176.   On October 21, 2009, defendant GONZALES told defendant

7  BARAJAS that GONZALES' home had been searched by the police and

8  that law enforcement had found methamphetamine, but that

9  GONZALES' daughter was going to take responsibility for the

10  drugs.

11      177.   On October 22, 2009, defendant CALDERON made

12  arrangements to obtain narcotics from defendant BARAJAS to

13  distribute.

14      178.   On October 23, 2009, defendant BARAJAS possessed Black

15  Angels paraphernalia, a prison letter containing gang

16  information, and multiple "kites" from inmates seeking BARAJAS's

17  guidance as leader of the Black Angels gang.

18      179.   On December 1, 2009, defendant MENDEZ possessed 3.9

19  grams of methamphetamine, $1,753 in cash, heroin, a .25 caliber

20  pistol, and six rounds of ammunition.

21      180.   On December 9, 2009, unindicted co-conspirator #12

22  asked defendant PORTILLO to tell defendant HURTADO that law

23  enforcement had conducted a search of HURTADO's residence.

24      181.   On December 9, 2009, defendant PORTILLO possessed

25  Black Angels paraphernalia inside his residence.

26      182.   On December 9, 2009, defendant MORENO possessed a

27  stolen, loaded Ruger 9mm semi-automatic handgun, along with Black

28  Angels gang clothing and paraphernalia.

37

183. On December 29, 2009, defendant ESTRADA possessed approximately 3.8 grams of methamphetamine, a scale, and a large number of unused clear plastic baggies.

184. On January 4, 2010, defendant JIMENEZ sold approximately 3.6 grams of methamphetamine to an undercover law enforcement officer in exchange for $220.

185. On February 23, 2010, defendant ARTEAGA possessed approximately 24.9 grams of methamphetamine, drug distribution paraphernalia, $1,050 in cash, and a magazine for a .45 caliber handgun at his residence in Ontario, California.

186. On February 24, 2010, defendant MAGALLANES possessed approximately 49.1 grams of methamphetamine, 93.5 grams of marijuana, and three scales.

                    THE GRAND JURY FURTHER ALLEGES THAT:

1. Beginning on a date unknown and continuing to on or about April 7, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER, JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, CALDERON, V. GIL, ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ, VENEGAS, VEGA, ROBERT PEREZ, LUCERO, SILVA, ROMERO, TORRES-CRUZ, and GONZALES, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

        a. To distribute at least 50 grams of

1 methamphetamine, or at least 500 grams of a mixture or substance
2 containing a detectable amount of methamphetamine, a schedule II
3 controlled substance, in violation of Title 21, United States
4 Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

5        b.   To distribute at least five grams of
6 methamphetamine, or at least 50 grams of a mixture or substance
7 containing a detectable amount of methamphetamine, a schedule II
8 controlled substance, in violation of Title 21, United States
9 Code, Sections 841(a)(1) and 841(b)(1)(B)(viii);

10        c.   To distribute at least one kilogram of a mixture
11 or substance containing a detectable amount of heroin, a schedule
12 I narcotic drug controlled substance, in violation of Title 21,
13 United States Code, Sections 841(a)(1) and 841(b)(1)(A)(i); and

14        d.   To distribute at least 100 grams of a mixture or
15 substance containing a detectable amount of heroin, a schedule I
16 narcotic drug controlled substance, in violation of Title 21,
17 United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i).

18
19
20
21
22
23
24
25
26
27
28

COUNT TWO

[18 U.S.C. § 1962(c)]

1. Paragraphs One through Fourteen of the General Allegations, and Paragraphs Two through Four of Count One, and Six through Fourteen of Count One, Part A, are realleged and incorporated by reference as though fully set forth herein.

THE RACKETEERING OFFENSE

2. Beginning on a date unknown and continuing to on or about April 7, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ, RIVERA, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, DEWESTER, V. GIL, MEDINA, ROBERT PEREZ, LUCERO, and GONZALES, and others known and unknown to the Grand Jury, being persons employed by and associated with the Black Angels criminal enterprise, which was an enterprise engaged in, and the activities of which affected, interstate and foreign commerce, unlawfully and knowingly did conduct and participate, directly and indirectly, in the conduct of the affairs of that enterprise, through a pattern of racketeering activity, that is, through the commission of the acts set forth below.

THE PATTERN OF RACKETEERING ACTIVITY

3. The pattern of racketeering activity, as defined in Title 18, United States Code, Sections 1961(1) and 1961(5), consisted of the following acts:

Racketeering Act One

Conspiracy to Distribute Narcotics

1. Beginning on a date unknown to the Grand Jury and

40

continuing to on or about April 7, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ, RIVERA, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, DEWESTER, CALDERON, V. GIL, MEDINA, ROBERT PEREZ, LUCERO, and GONZALES, and others known and unknown to the Grand Jury, conspired and agreed with each other to knowingly and intentionally commit the following offenses:

a.    To distribute at least 50 grams of methamphetamine, or at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

b.    To distribute at least five grams of methamphetamine, or at least 50 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii);

c.    To distribute at least one kilogram of a mixture or substance containing a detectable amount of heroin, a schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(i); and

d.    To distribute at least 100 grams of a mixture or substance containing a detectable amount of heroin, a schedule I narcotic drug controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i).

41

Racketeering Act Two

Conspiracy to Commit Extortion

2. Beginning on an unknown date and continuing until on or about April 7, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER, CALDERON, V. GIL, ROBERT PEREZ, and GONZALES, and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed with each other to unlawfully obstruct, delay, and affect, and attempt to obstruct, delay, and affect, commerce as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by extortion, as that term is defined in Title 18, United States Code, Section 1951, in that defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER, CALDERON, V. GIL, ROBERT PEREZ, and GONZALES did obtain and attempt to obtain the property of narcotics distributors in Ontario, California, with their consent having been induced by the wrongful use of actual and threatened force, violence, and fear, in that defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER, CALDERON, V. GIL, ROBERT PEREZ, and GONZALES threatened physical violence unless the narcotics distributors paid portions of their narcotics proceeds to defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER, CALDERON, V. GIL, ROBERT PEREZ, and GONZALES, all in violation of Title 18, United States Code,

Section 1951.

Racketeering Act Three

Extortion

3. On or about June 30, 2009, in San Bernardino County, within the Central District of California, defendant NAVARRO knowingly and intentionally extorted money from defendant ESTRADA, in violation of California Penal Code Sections 518, 519, and 520.

Racketeering Act Four

Extortion

4. On or about September 17, 2009, in San Bernardino County, within the Central District of California, defendant CALDERON knowingly and intentionally extorted money from F.A., in violation of California Penal Code Sections 518, 519, and 520.

Racketeering Act Five

Armed Robbery

5. On or about July 29, 2009, in San Bernardino County, within the Central District of California, defendants C. VASQUEZ, SANCHEZ, and ESPINOZA, each aiding and abetting the other, used a firearm to rob a convenience store in Upland, California, in violation of California Penal Code Sections 211 and 213.

Racketeering Act Six

Distribution Methamphetamine

6. On or about July 31, 2009, in San Bernardino County, within the Central District of California, defendant RIVERA knowingly and intentionally distributed 4.4 grams of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

Racketeering Act Seven

Possession with Intent to Distribute Methamphetamine

7. On or about August 6, 2009, in San Bernardino County, within the Central District of California, defendants RIVERA and MEDINA knowingly and intentionally possessed with the intent to distribute at least 50 grams, that is, approximately 219 grams, of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii).

Racketeering Act Eight

Extortion

8. On or about September 30, 2009, in San Bernardino County, within the Central District of California, defendants BARAJAS and GONZALES knowingly and intentionally extorted money from a narcotics distributor, in violation of California Penal Code Sections 518, 519, and 520.

Racketeering Act Nine

Distribution of Methamphetamine

9. On or about October 15, 2009, in San Bernardino County, within the Central District of California, defendant BARAJAS knowingly and intentionally distributed at least five grams, that is, approximately 32.2 grams, of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(viii).

Racketeering Act Ten

Possession with Intent to Distribute Methamphetamine

10. On or about October 15, 2009, in San Bernardino County, within the Central District of California, defendants

44

1  HURTADO and LUCERO knowingly and intentionally possessed with the

2  intent to distribute at least five grams, that is, approximately

3  32.2 grams, of methamphetamine, a schedule II controlled

4  substance, in violation of Title 21, United States Code, Sections

5  841(a)(1) and 841(b)(1)(B)(viii).

6  Racketeering Act Eleven

7  Extortion

8       11.   On or about October 20, 2009, in San Bernardino

9  County, within the Central District of California, defendant

10 NAVARRO knowingly and intentionally extorted money from defendant

11 MENDEZ in violation of California Penal Code Sections 518, 519,

12 and 520.

13 Racketeering Act Twelve

14 Possession with Intent to Distribute Methamphetamine

15      12.   On or about October 21, 2009, in San Bernardino

16 County, within the Central District of California, defendant

17 GONZALES knowingly and intentionally possessed with the intent to

18 distribute at least five grams, that is, approximately 8.2 grams,

19 of methamphetamine, a schedule II controlled substance, in

20 violation of Title 21, United States Code, Sections 841(a)(1) and

21 841(b)(1)(B)(viii).

22 Racketeering Act Thirteen

23 Possession with Intent to Distribute Methamphetamine

24      13.   On or about February 23, 2010, in San Bernardino

25 County, within the Central District of California, defendant

26 ARTEAGA knowingly and intentionally possessed with the intent to

27 distribute at least five grams, that is, approximately 24.9

28 grams, of methamphetamine, a schedule II controlled substance, in

1  violation of Title 21, United States Code, Sections 841(a)(1) and
2  841(b)(1)(B)(viii).

COUNT THREE

[18 U.S.C. § 1959(a)(3)]

1.   At all times relevant to this Indictment, the Black
Angels criminal enterprise, as described more particularly in
Paragraphs One through Fourteen of the General Allegations, and
Paragraphs Two through Four of Count One, and One through Nine of
Count One, Part A, which paragraphs are incorporated and
realleged herein as if set forth fully herein, constituted an
enterprise as that term is defined in Title 18, United States
Code, Section 1959(b)(2), that is, a group of individuals
associated in fact which was engaged in, and the activities of
which affected, interstate and foreign commerce.  The enterprise
constituted an ongoing organization whose members functioned as a
continuing unit for a common purpose of achieving the objectives
of the enterprise.

2.   At all times relevant to this Indictment, the Black
Angels criminal enterprise, through its members and associates,
engaged in racketeering activity, as defined in Title 18, United
States Code, Sections 1959(b)(1) and 1961(1), that is, acts
involving murder, robbery, and extortion, in violation of the
California Penal Code; and the distribution of controlled
substances, including methamphetamine and heroin, in violation of
Title 21, United States Code, Sections 841(a)(1) and 846.

3.   On or about March 7, 2009, in San Bernardino County,
within the Central District of California, for the purpose of
maintaining and increasing his position in the Black Angels gang,
an enterprise engaged in racketeering activity, defendant JUAN
DIAZ, also known as "Swifty," assaulted persons with dangerous

47

1  weapons at a bar in Colton, California, in violation of

2  California Penal Code, Sections 240 and 245(a)(1), all in

3  violation of Title 18, United States Code, Section 1959(a)(3).

COUNT FOUR

[18 U.S.C. §§ 1959(a)(3), 2]

1.   Paragraphs One and Two of Count Three are hereby incorporated and realleged herein as if set forth in full.

2.   On or about July 29, 2009, in San Bernardino County, within the Central District of California, for the purpose of maintaining and increasing their position in the Ontario Black Angels gang, an enterprise engaged in racketeering activity, defendants CARLOS VASQUEZ, also known as ("aka") "Lil' Lazy," STEVEN ESPINOZA, aka "Little Loki," and MICHAEL SANCHEZ, aka "Dropper," each aiding and abetting the other, assaulted victim G.S. with a deadly weapon in a convenience store, located in Upland, California, in violation of California Penal Code Sections 240 and 245(a)(2), all in violation of Title 18, United States Code, Sections 1959(a)(3), and 2.

49

COUNT FIVE

[21 U.S.C. § 846]

1.   Paragraphs One through Fourteen of the General Allegations are re-alleged and incorporated herein by reference as though fully set forth herein.

A.   OBJECTS OF THE CONSPIRACY

Beginning on a date unknown, and continuing to on or about April 7, 2010, in Los Angeles, Riverside, and San Bernardino Counties, within the Central District of California, and elsewhere, defendants BARAJAS, J. GIL, NAVARRO, HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER, JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, CALDERON, V. GIL, ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ, VENEGAS, VEGA, ROBERT PEREZ, MAGALLANES, KISSLING, LUCERO, LAGUNA, RICHARDS, SILVA, ROMERO, TORRES-CRUZ, MEZA, ARANDA, MARTINEZ, GONZALES, TOLSON, MENDEZ, and COOK, and others known and unknown to the Grand Jury, knowingly and intentionally conspired and agreed with each other to commit the following offenses:

1.   To distribute at least 50 grams of methamphetamine, or at least 500 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(A)(viii);

2.   To distribute at least five grams of methamphetamine, or at least 50 grams of a mixture or substance containing a detectable amount of methamphetamine, a schedule II controlled substance, in violation of Title 21, United States Code, Sections

1 | 841(a)(1) and 841(b)(1)(B)(viii);

2 |     3.    To distribute at least one kilogram of a mixture or

3 | substance containing a detectable amount of heroin, a schedule I

4 | narcotic drug controlled substance, in violation of Title 21,

5 | United States Code, Sections 841(a)(1) and 841(b)(1)(A)(i); and

6 |     4.    To distribute at least 100 grams of a mixture or

7 | substance containing a detectable amount of heroin, a schedule I

8 | narcotic drug controlled substance, in violation of Title 21,

9 | United States Code, Sections 841(a)(1) and 841(b)(1)(B)(i).

10 | B.   <u>MEANS BY WHICH THE OBJECTS OF THE CONSPIRACY WERE TO BE</u>

11 |     <u>ACCOMPLISHED</u>

12 |     The objects of the conspiracy were to be accomplished in

13 | substance as follows:

14 |     1.    Defendants BARAJAS, J. GIL, and NAVARRO, and others,

15 | would direct the activities of the Black Angels gang and its

16 | associates, specifically insofar as those activities involved the

17 | distribution of narcotics, the collection and distribution of

18 | "taxed" drug proceeds, and the commission of crimes of violence.

19 |     2.    Defendants BARAJAS and NAVARRO, and others, would meet

20 | with Mexican Mafia leaders and associates to report on the

21 | activities of the gang, receive instructions from the Mexican

22 | Mafia, and provide narcotics and money to the Mexican Mafia

23 | arising from the gang's extortion, narcotics distribution, and

24 | violent criminal activities.

25 |     3.    Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ,

26 | C. VASQUEZ, MORAGA, ESPINOZA, ALVAREZ, REYES, DEWESTER, CALDERON,

27 | V. GIL, ROBERT PEREZ, and GONZALES, and others, would permit

28 | narcotics traffickers to distribute narcotics in the geographic

1 area controlled by the Black Angels gang in return for a

2 percentage of the narcotics proceeds that were sold in the areas

3 controlled by the Black Angels gang.

4     4. Defendants J. GIL, NAVARRO, ALCALA, JIMENEZ, RIVERA,

5 DIAZ, C. VASQUEZ, ALVAREZ, REYES, ARTEAGA, JIRON, MORALES,

6 MORENO, SANCHEZ, PRIETO, HERNANDEZ, and VEGA, and others, would

7 obtain firearms and other dangerous weapons for Black Angels gang

8 members to be used to enforce the authority of the Black Angels

9 gang, to maintain the Black Angels members and associates'

10 ability to engage in drug trafficking within the neighborhoods

11 controlled by the gang, and to exclude others from drug

12 trafficking in the neighborhoods controlled by the Black Angels

13 gang.

14     5. Defendants BARAJAS, NAVARRO, JIMENEZ, RIVERA, DIAZ, C.

15 VASQUEZ, ESPINOZA, MORALES, SANCHEZ, CALDERON, and VEGA, and

16 others, would engage in acts of violence in order to enforce the

17 authority of the Black Angels gang, as well as maintain the

18 gang's ability to control the drug trafficking activity in the

19 territory controlled by the Black Angels gang.

20     6. Defendants RIVERA, MEDINA, ROBERT PEREZ, SILVA, ROMERO,

21 TORRES-CRUZ, and MEZA, and other narcotics suppliers, would

22 obtain narcotics that were then distributed to members and

23 associates of the Black Angels gang.

24     7. Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, JIMENEZ,

25 RIVERA, PORTILLO, MORAGA, REYES, ARTEAGA, QUIROZ, MORALES, A.

26 CASTRO, CALDERON, V. GIL, ESTRADA, MEDINA, PRIETO, HERNANDEZ,

27 VENEGAS, VEGA, MAGALLANES, KISSLING, LUCERO, LAGUNA, RICHARDS,

28 SILVA, ROMERO, TORRES-CRUZ, MARTINEZ, GONZALES, TOLSON, MENDEZ,

1 │ and COOK, and others, would distribute narcotics in prison and in

2 │ the territory controlled by the Black Angels gang.

3 │     8. Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, RIVERA,

4 │ PORTILLO, ALVAREZ, DIAZ, REYES, JIRON, A. CASTRO, V. GIL,

5 │ ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, VENEGAS, LUCERO, and

6 │ ARABDA, and others, would assist Black Angels gang members and

7 │ associates in the commission of violent crimes and narcotics

8 │ trafficking by providing access to telephones to be used for

9 │ criminal activity, conveying information regarding the criminal

10 │ activities of the Black Angels gang to incarcerated Black Angels

11 │ gang members and members of the Mexican Mafia, smuggling

12 │ narcotics into and out of jails and prisons, and concealing

13 │ contraband held by the gang to avoid the contraband's detection

14 │ by law enforcement.

15 │     9. Defendants BARAJAS, J. GIL, NAVARRO, HURTADO, RIVERA,

16 │ PORTILLO, ALVAREZ, REYES, A. CASTRO, V. GIL, LOPEZ, MEDINA,

17 │ ROBERT PEREZ, LAGUNA, SILVA, TORRES-CRUZ, GONZALES, and TOLSON,

18 │ and others, would communicate with members of the Black Angels

19 │ gang and their associates to notify them of the presence of law

20 │ enforcement in the area controlled by the gang and report on

21 │ recent arrests, search warrants, and other law enforcement

22 │ activity conducted against members of the Black Angels gang or

23 │ narcotics traffickers making extortion payments to the gang.

24 │ C.   OVERT ACTS

25 │     In furtherance of the conspiracy, and to accomplish the

26 │ objects of the conspiracy, defendants BARAJAS, J. GIL, NAVARRO,

27 │ HURTADO, ALCALA, JIMENEZ, RIVERA, PORTILLO, DIAZ, C. VASQUEZ,

28 │ MORAGA, ESPINOZA, ALVAREZ, REYES, ARTEAGA, QUIROZ, DEWESTER,

1  JIRON, MORALES, A. CASTRO, MORENO, SANCHEZ, ARANDA, CALDERON, V.

2  GIL, ESTRADA, LOPEZ, MEDINA, J. PEREZ, PRIETO, HERNANDEZ,

3  VENEGAS, VEGA, ROBERT PEREZ, MAGALLANES, KISSLING, LUCERO,

4  LAGUNA, RICHARDS, SILVA, ROMERO, TORRES-CRUZ, MEZA, MARTINEZ,

5  GONZALES, PERALTA, TOLSON, MENDEZ, and COOK, and others known and

6  unknown to the Grand Jury, committed various overt acts, within

7  the Central District of California, and elsewhere, including the

8  overt acts numbered one through 186 as set forth in Count One of

9  this Indictment, which are hereby incorporated by reference, on

10  or about the dates specified therein.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

54

COUNT SIX

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about July 31, 2009, in San Bernardino County, within the Central District of California, defendant CARLOS RIVERA, also known as "Chino," knowingly and intentionally distributed approximately 4.4 grams of methamphetamine, a schedule II controlled substance.

1
2
3
4
5
6
7

COUNT SEVEN

[21 U.S.C. §§ 841(a)(1), (b)(1)(C)]

On or about July 31, 2009, in San Bernardino County, within the Central District of California, defendants ROBERT TOLSON and CARL COOK knowingly and intentionally possessed with the intent to distribute approximately 4.4 grams of methamphetamine, a schedule II controlled substance.

COUNT EIGHT

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about August 6, 2009, in San Bernardino County, within the Central District of California, defendant INEZ MEZA, also known as "Gordo," knowingly and intentionally possessed with intent to distribute at least five grams, that is, approximately 27.8 grams, of methamphetamine, a schedule II controlled substance.

COUNT NINE

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii)]

On or about August 6, 2009, in San Bernardino County, within the Central District of California, defendant INEZ MEZA, also known as "Gordo," knowingly and intentionally distributed at least 50 grams, that is, approximately 219 grams, of methamphetamine, a schedule II controlled substance.

COUNT TEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii)]

On or about August 6, 2009, in San Bernardino County, within the Central District of California, defendants CARLOS RIVERA, also known as "Chino," and JESSICA MEDINA knowingly and intentionally possessed with the intent to distribute at least 50 grams, that is, approximately 219 grams, of methamphetamine, a schedule II controlled substance.

COUNT ELEVEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii)]

On or about August 25, 2009, in San Bernardino County, within the Central District of California, defendant SANTACRUZ SILVA, also known as "Jose," knowingly and intentionally distributed at least 50 grams, that is, approximately 72.6 grams, of methamphetamine, a schedule II controlled substance.

COUNT TWELVE

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii)]

On or about August 25, 2009, in San Bernardino County, within the Central District of California, defendant AGUSTIN ANDALON knowingly and intentionally possessed with intent to distribute at least 50 grams, that is, approximately 72.6 grams, of methamphetamine, a schedule II controlled substance.

COUNT THIRTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)]

On or about August 25, 2009, in San Bernardino County, within the Central District of California, defendant SANTACRUZ SILVA, also known as ("aka") "Jose," and JOSE ROMERO knowingly and intentionally distributed approximately 3.4 grams of methamphetamine, a schedule II controlled substance.

62

COUNT FOURTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)]

On or about August 25, 2009, in San Bernardino County, within the Central District of California, defendant ROGELIO PERALTA possessed with intent to distribute approximately 3.4 grams of methamphetamine, a schedule II controlled substance.

COUNT FIFTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about October 15, 2009, in San Bernardino County, within the Central District of California, defendant ARMANDO BARAJAS, also known as "Mando," knowingly and intentionally distributed at least five grams, that is, approximately 32.2 grams, of methamphetamine, a schedule II controlled substance.

COUNT SIXTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about October 15, 2009, in San Bernardino County, within the Central District of California, defendants JOSE HURTADO, also known as "Solo," and JESSTINE LUCERO knowingly and intentionally possessed with the intent to distribute at least five grams, that is, approximately 32.2 grams, of methamphetamine, a schedule II controlled substance.

COUNT SEVENTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about October 21, 2009, in San Bernardino County, within the Central District of California, defendant LUPE GONZALES knowingly and intentionally possessed with the intent to distribute at least five grams, that is, approximately 8.2 grams, of methamphetamine, a schedule II controlled substance.

COUNT EIGHTEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(C)]

On or about December 1, 2009, in San Bernardino County, within the Central District of California, defendant SANTIAGO MENDEZ possessed with intent to distribute approximately 3.9 grams of methamphetamine, a schedule II controlled substance.

67

## COUNT NINETEEN

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about February 24, 2010, in San Bernardino County, within the Central District of California, defendant ROSE MARIE MAGALLANES knowingly and intentionally possessed with the intent to distribute at least five grams, that is, approximately 49.1 grams, of methamphetamine, a schedule II controlled substance.

COUNT TWENTY

[21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(viii)]

On or about February 23, 2010, in San Bernardino County, within the Central District of California, defendant ZACARIAS ARTEAGA, also known as "Drew," knowingly and intentionally possessed with the intent to distribute at least five grams, that is, approximately 24.9 grams, of methamphetamine, a schedule II controlled substance.

1

COUNT TWENTY-ONE

2

[18 U.S.C. §§ 924(c)(1)(A)(i), (c)(1)(A)(ii), (c)(1)(A)(iii)]

3    On or about June 12, 2009, in San Bernardino County, within

4    the Central District of California, defendant FERNANDO MORALES,

5    also known as "Sicko" ("MORALES"), knowingly used, carried,

6    brandished, and discharged a firearm, namely, a 9mm Beretta

7    handgun, model 92FS, bearing serial number DS007056, during and

8    in relation to, and in furtherance of, a crime of violence,

9    namely, the racketeering conspiracy set forth in Count One of

10   this Indictment, a violation of Title 18, United States Code,

11   Section 1962(d).

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

COUNT TWENTY-TWO

[18 U.S.C. § 922(g)(1)]

On or about June 23, 2009, in San Bernardino County, within the Central District of California, defendant MARLON JIRON, also known as "Bow Easy" ("JIRON"), knowingly possessed a firearm, namely, a 9 mm Beretta semi-automatic handgun, serial number DS007056, in and affecting interstate and foreign commerce.

Such possession occurred after defendant JIRON had been convicted of at least one of the following crimes punishable by imprisonment for a term exceeding one year:

1.    Assault With a Firearm, in violation of California Penal Code Section 245, in the Superior Court of the State of California, County of San Bernardino, Case Number FWV16469, on or about October 29, 1998;

2.    Possession of Narcotic Controlled Substance, in violation of California Health and Safety Code Section 11377, in the Superior Court of the State of California, County of San Bernardino, Case Number FWV701984, on or about August 27, 2008.

1
2

COUNT TWENTY-THREE

[18 U.S.C. § 922(g)(1)]

3     On or about July 22, 2009, in San Bernardino County, within

4 the Central District of California, defendant CARLOS RIVERA, also

5 known as "Chino" ("RIVERA"), knowingly possessed a firearm,

6 namely, a Colt model Agent, .38 Special caliber revolver, bearing

7 serial number H98877, and ammunition, namely six rounds of .38

8 Special caliber ammunition, bearing the head stamp of "W-W

9 SUPER," in and affecting interstate and foreign commerce.

10     Such possession occurred after defendant RIVERA had been

11 convicted of the following crime punishable by imprisonment for a

12 term exceeding one year:  Assault with a Deadly Weapon, in

13 violation of California Penal Code Section 245, in the Superior

14 Court for the State of California, County of San Bernardino, Case

15 Number FWV800678, on or about April 25, 2008.

16
17
18
19
20
21
22
23
24
25
26
27
28

72

COUNT TWENTY-FOUR

[18 U.S.C. § 922(d)(1)]

On or about July 22, 2009, in San Bernardino County, within the Central District of California, defendant DAVID HERNANDEZ, knowingly sold a firearm, namely, a Colt model Agent, .38 Special caliber revolver, bearing serial number H98877, and ammunition, namely six rounds of .38 Special caliber ammunition, bearing the head stamp of "W-W SUPER," in and affecting interstate and foreign commerce, to defendant CARLOS RIVERA, also known as "Chino" ("RIVERA"), knowing and having reasonable cause to believe that RIVERA had been convicted of a crime punishable by imprisonment for a term exceeding one year.

COUNT TWENTY-FIVE

[18 U.S.C. § 924(c)]

On or about September 4, 2009, in San Bernardino County, within the Central District of California, defendant JAMES KISSLING, also known as "Casper," knowingly possessed a firearm, namely, a loaded RG Industries model RG14, .22 Long Rifle caliber revolver, bearing serial number L825887, during and in relation to, and in furtherance of, a drug trafficking crime, namely, the conspiracy to distribute narcotics set forth in Count Five of this Indictment, a violation of Title 21, United States Code, Section 846.

COUNT TWENTY-SIX

[18 U.S.C. § 924(c)]

On or about December 1, 2009, in San Bernardino County, within the Central District of California, defendant SANTIAGO MENDEZ knowingly possessed a firearm, namely, a Raven Arms model MP-25, .25 caliber handgun, bearing serial number 1454308, during and in relation to, and in furtherance of, a drug trafficking crime, namely, the conspiracy to distribute narcotics set forth in Count Five of this Indictment, a violation of Title 21, United States Code, Section 846.

COUNT TWENTY-SEVEN

[18 U.S.C. § 922(g)(1)]

On or about December 9, 2009, in San Bernardino County, within the Central District of California, defendant ALBERT MORENO, also known as "Pelon" ("MORENO"), knowingly possessed a firearm, namely, a Ruger model P89 9mm caliber semi-automatic pistol, bearing serial number 304-42711, and ammunition, namely eleven rounds of 9mm Luger ammunition, bearing the head stamp of "WIN," and one round of 9mm Luger ammunition, bearing the head stamp of "FC," in and affecting interstate and foreign commerce.

Such possession occurred after defendant MORENO had been convicted of at least one of the following crimes punishable by imprisonment for a term exceeding one year:

1.   Willful Discharge of a Firearm, in violation of California Penal Code Section 246.3, in the Superior Court of the State of California, County of San Bernardino, Case Number FWV021853, on or about February 14, 2001;

2.   Felon in Possession of a Firearm, in violation of California Penal Code Section 12021, in the Superior Court of the State of California, County of San Bernardino, Case Number FWV033085, on or about March 18, 2005;

3.   Possession of a Controlled Substance for Sale, in violation of California Health and Safety Code Section 11378, in the Superior Court of the State of California, County of Riverside, Case Number RIF126798, on or about April 11, 2008.

COUNT TWENTY-EIGHT

[21 U.S.C. § 843(b)]

On or about August 13, 2009, in San Bernardino County, within the Central District of California, defendant ANDREA RICHARDS knowingly used a communication facility, that is, a telephone, in committing and causing and facilitating the commission of a felony drug offense, namely, a conspiracy to distribute at least five grams of methamphetamine, a schedule II narcotic drug controlled substance, a violation of Title 21, United States Code, Section 846.

COUNT TWENTY-NINE

[21 U.S.C. § 843(b)]

On or about September 9, 2009, in San Bernardino County, within the Central District of California, defendant BIANCA LAGUNA knowingly used a communication facility, that is, a telephone, in committing and causing and facilitating the commission of a felony drug offense, namely, a conspiracy to distribute at least five grams of methamphetamine, a schedule II narcotic drug controlled substance, a violation of Title 21, United States Code, Section 846.

COUNT THIRTY

[21 U.S.C. § 843(b)]

On or about September 28, 2009, in San Bernardino County, within the Central District of California, defendant ANGEL ARANDA knowingly used a communication facility, that is, a telephone, in committing and causing and facilitating the commission of a felony drug offense, namely, a conspiracy to distribute at least five grams methamphetamine, a schedule II narcotic drug controlled substance, a violation of Title 21, United States Code, Section 846.


A TRUE BILL

"/s/"

Foreperson


ANDRÉ BIROTTE JR.
United States Attorney

*Dand A. Goodman, Asst. U.S. Atty*
*Deputy Chief, Criminal Division, FoR:*
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Violent and Organized Crimes Section

CHRISTOPHER BRUNWIN
Assistant United States Attorney
Deputy Chief, Violent and Organized Crimes Section

REEMA M. EL-AMAMY
Assistant United States Attorney
Violent and Organized Crimes Section

JUSTIN R. RHOADES
Assistant United States Attorney
Violent and Organized Crimes Section