1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE OTIS D. WRIGHT

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                    - - -

6
United States of America,        )
7                     PLAINTIFF,  )
                                  )
8   VS.                           )  NO. CR 10-351 ODW
                                  )
9   Carlos Rivera, Jessica Medina, Raul)
    Prieto,                       )
10                    DEFENDANT,  )
    _____)

11

12

13

14       REPORTER'S TRANSCRIPT OF PROCEEDINGS

15          LOS ANGELES, CALIFORNIA

16           JURY TRIAL - DAY ONE

17         TUESDAY, DECEMBER 4, 2012

18

19

20    _____

21        KATIE E. THIBODEAUX, CSR 9858
          U.S. Official Court Reporter
22        312 North Spring Street, #436
          Los Angeles, California 90012

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    APPEARANCES OF COUNSEL:

2

3    FOR PLAINTIFF:

4         U.S. DEPARTMENT OF JUSTICE
          U.S. ATTORNEY'S OFFICE
5         BY: REEMA EL-AMAMY, AUSA
          -and- MICHAEL DORE, AUSA
6         312 North Spring Street
          Twelfth Floor
7         Los Angeles, CA  90012

8

9    FOR DEFENDANT RIVERA:

10        ANGEL NAVARRO LAW OFFICE
          BY:  ANGEL NAVARRO
11        714 West Olympic Boulevard
          Suite 450
12        Los Angeles, CA  90015

13

14

15   FOR DEFENDANT MEDINA:

16        JOSEPH F. WALSH LAW OFFICES
          BY:  JOSEPH F. WALSH
17        205 South Broadway
          Suite 606
18        Los Angeles, CA  90012

19

20   FOR DEFENDANT PRIETO:

21        CEPHAS LAW FIRM
          BY:  DANA CEPHAS
22        72960 Fred Waring Drive
          Palm Desert, CA  92260
23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1                        I N D E X

2    OPENING STATEMENT                         PAGE

3    By Ms. El-Amamy                            5
     By Mr. Walsh                              25
4    By Mr. Navarro                            30
     By Mr. Cephas                             34
5

6    WITNESS NAME                              PAGE

7    Erdem Gorgulu
           Direct Examination by Mr. Dore      41
8          Cross-Examination by Mr. Navarro    56
           Cross-Examination by Mr. Cephas     63
9          Redirect Examination                68

10   Brice Devey
           Direct Examination by Mr. Dore      70
11
     Michael Precup
12         Direct Examination by Ms. El-Amamy  74
           Cross-Examination by Mr. Cephas     83
13         Cross-Examination by Mr. Navarro    85
           Cross-Examination by Mr. Walsh      86
14
     John Lemus
15         Direct Examination by Ms. El-Amamy  90
           Cross-Examination by Mr. Walsh      98
16         Cross-Examination by Mr. Cephas    100
           Cross-Examination by Mr. Navarro   101
17         Redirect Examination               103

18
     EXHIBIT                      I.D.      IN EVID.
19   29                            42          43
     1,2                           44          45
20   27                            46          46
     238 - 248                     48          48
21   89, 89A                       71
     71-181                        80
22   71B - 181B                   104         104

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1          LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 4, 2012

2                         1:57 P.M.

3                         - - - - -

4

5

6

7          (The following proceedings were held in the

8           presence of the jury:)

9          THE COURT:  All right.  Ladies and gentlemen, now

10   that we have a jury, we will begin the trial in earnest

11   beginning with the opening statements of the lawyers.  We

12   have not yet reached the point where there is going to be

13   the presentation of evidence in the case.  This will not

14   be evidence.  This is the lawyers', a basic outline or

15   blueprint of the way they see the trial unfolding, the

16   evidence that they see coming in.

17               You can leave and return to the third floor.

18   Thank you for your patience and your willingness to

19   serve.  I wish I had a chance to talk to you, sir,

20   because it sounded like it was going to be interesting.

21          MS. EL-AMAMY:  Your Honor, may we have a minute to

22   set up our computer?

23          THE COURT:  Yes.

24          (Pause in proceedings.)

25          THE COURT:  All right.  Ms. El-Amamy, if you will,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    your opening statement.

2             MS. EL-AMAMY:  Thank you.

3                  Good afternoon, ladies and gentlemen.

4                  This is a case about guns and drugs.

5    Defendant Carlos Rivera who is seated in the back bought

6    methamphetamine from a supplier, and he also bought guns

7    to use in connection with his criminal activity.  During

8    this trial, you are going to hear, though, that he did

9    not commit his crimes alone.  He had help, and he had

10   help from people that he trusted.

11                 One of those people is defendant Jessica

12   Medina, a person who he is in a romantic relationship

13   with.  The other person is his close friend, cousin who

14   helped him.  They both helped defendant Rivera sell his

15   drugs to customers throughout the city of Ontario.  And

16   during this trial, you are going to hear specific

17   examples of crimes that they committed together.

18                 These are the pictures.  Carlos Rivera, he is

19   seated in the back, and he goes by the nickname Chino or

20   Reals.  Raul Prieto seated at the table goes by the

21   nickname Crook.  And that is defendant Jessica Medina

22   also seated at the table.

23                 Now, one of the crimes you are going to hear

24   about in this case occurred on July 22nd, 2009.  On this

25   date, defendant Carlis Rivera unlawfully purchased a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   firearm, a loaded firearm, and he conducted that gun deal
 2   at defendant Prieto's residence.  Now, during this case
 3   you are going to learn about something called a wiretap,
 4   and you are going to hear a number of recorded
 5   conversations.  One of those conversations happened on
 6   July 2, 2009 prior to the gun deal taking place, and that
 7   conversation was between defendant Rivera and an
 8   individual, David Hernandez.
 9        MR. CEPHAS:  Your Honor, I apologize for
10   interrupting, but just so that there is an accurate
11   appellate record, I would like the government to identify
12   the exhibit numbers of the photos that are shown to the
13   jury because we did preserve our objections.
14        THE COURT:  Okay.  That is fine.
15           Are they numbered?
16        MS. EL-AMAMY:  No, your Honor.  I can provide that
17   after opening statement if that is fine.
18        THE COURT:  Okay.
19        MS. EL-AMAMY:  Now, during this case, you are
20   going to hear Carlos Rivera and Mr. Hernandez talk about
21   getting a gun, and Mr. Hernandez told Mr. Rivera that it
22   was a loaded gun and they made arrangements to do the
23   deal.  And you are going to hear that defendant Rivera
24   didn't want to do the deal at his house.  He wanted to do
25   it at a different location, and the next day, they agreed
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    on where that location would be.  It would be at

2    defendant Prieto's house.

3             And you are going to hear them talk about

4    directing Mr. Hernandez to defendant Prieto's house to do

5    the gun deal.  You are going to hear in the recorded

6    conversation that defendant Rivera agreed to pay $250 for

7    this loaded gun, and you are going to hear that

8    Mr. Hernandez arrived at defendant Prieto's house to meet

9    with defendant Rivera on July 22nd, 2009.

10            And the reason you are going to know this is

11   because law enforcement officers were watching and

12   waiting for the gun deal to take place.  They are going

13   to see -- they saw defendant Rivera with a gun case that

14   inside contained the loaded gun, and as soon as they

15   confronted defendant Rivera, he ran.  And you are going

16   to hear that the location where he ran to was inside

17   defendant Prieto's house.  And the location where he

18   tried to hide the gun was inside a refrigerator in

19   defendant Prieto's house.  The officers found the gun.

20            And you are also going to hear defendant

21   Rivera talk to more than one person after this incident

22   occurred.  He is going to admit to you that he possessed

23   that gun, and he is going to admit to you that he hid it

24   in defendant Prieto's residence.

25            You are going to hear about another crime.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    This crime happened on July 31, 2009.  On that date,

2    defendant Rivera sold what you are going to learn is

3    4.4-grams of pure methamphetamine to narcotics customer

4    Robert Tolson.  Again, you are going to hear recorded

5    telephone conversations with defendant Rivera making

6    arrangements to do this deal.  He was going to sell these

7    drugs to Mr. Tolson, a narcotics customer for $300.

8            And just like the incident that you heard

9    about previously, law enforcement officers were

10   conducting surveillance waiting for the deal to happen.

11   They watched as the transaction took place, and right

12   after the transaction took place, they stopped Mr. Tolson

13   who was in the car with another narcotics customer, and

14   they seized the drugs from those narcotics customers.

15           And what you are going to hear after the fact

16   is Mr. Tolson having a conversation with defendant Rivera

17   about the drugs.  You are going to learn during the trial

18   that people involved in crimes apprise each other of law

19   enforcement activity, and Mr. Tolson let defendant Rivera

20   know that there were law enforcement officers in the area

21   and that they stopped them and that they seized the

22   drugs.

23           But you are also going to hear Mr. Tolson say,

24   don't worry, I didn't tell them where the drugs were

25   from, my companion did not tell them that we got the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    drugs from you.  You are going to hear that call.

2            You are also going to hear about another

3    crime, this one involving defendant Medina and defendant

4    Carlos Rivera.  On August 6th, 2009, these two defendants

5    possessed approximately 219-grams of pure

6    methamphetamine.  Now, during this trial, you are going

7    to learn that there is personal use quantities of drugs

8    and there is distribution quantities of drugs.  And

9    one of the things that you are going to learn is that

10   219-grams of pure methamphetamine is a very large

11   quantity of drugs, and you are going to learn that from

12   defendant Rivera himself.  He is going to tell you how

13   much drugs are sold, and he is going to tell you how much

14   you can get for those drugs.

15           You are going to learn that during that

16   recorded conversations with one of his narcotics

17   customers, Francisco Venegas.  Francisco Venegas, and let

18   me clarify, not a narcotics customer, a drug runner.

19   This is an individual who worked for defendant Rivera on

20   a regular basis.  Defendant Venegas' job was to

21   communicate with defendant Rivera, know what kind of

22   quantity defendant Rivera needed to sell to a narcotics

23   customer, package the narcotics for distribution and take

24   it to the narcotics customer.

25           And you are going to hear with frequency those

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    recorded conversations.  You are going to hear for

2    yourselves how much they were selling on a regular basis.

3    And defendant Rivera is going to have conversations with

4    both Mr. Venegas as well as narcotics customers and tell

5    you how much it sells and for what price.  For example,

6    you are going to learn that an ounce is a large quantity

7    of 28-grams.

8            And you are going to learn that there is

9    methamphetamine that is high quality and poor quality.

10   High quality methamphetamine is methamphetamine that is

11   very pure.  It is not mixed with anything.  It is strong

12   versus methamphetamine that you are going to learn is

13   stepped on, mixed with a dilutant.  So the pure

14   methamphetamine costs more than the methamphetamine that

15   is of lesser quality.  And defendant Rivera is going to

16   tell you that himself.

17           So high quality methamphetamine, an ounce goes

18   for $1100.  Whereas in comparison, poor --

19   methamphetamine of poor quality, an ounce goes for $900.

20   Half an ounce, approximately 14-grams, $550 versus the

21   lesser quality, 450.  A quarter of an ounce,

22   approximately 7-grams, $275 versus the 250 of the lesser

23   quality.  And then the smaller quantity that you sell, an

24   eighth of an ounce which you are going to learn is called

25   an 8-ball or a ball, $150 versus $125 for the poor

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   quality.
 2              You are going to hear those calls, and you are
 3   going to hear defendant Rivera tell you all of those
 4   numbers himself when he is having the telephone
 5   conversations.  You are going to hear Mr. Venegas and
 6   defendant Rivera measure their drugs, talk about how much
 7   they have, how much money Mr. Venegas has at any
 8   one time, how much money defendant Rivera needs in order
 9   to buy drugs from a supplier and re-up, that means
10   getting more drugs.
11              You are also going to hear coded language,
12   make a ball, again, an eighth of an ounce, an eight ball.
13   Make it nice or make it chunky.  Don't dilute the
14   methamphetamine.  Make it a good quality for the
15   customer.  You are also going to hear the words clean the
16   house and be on alert.  And in the context of the
17   telephone conversations that you will hear, it will be up
18   to you to decide what it is they are talking about.
19              Now, on August 6, 2009, defendants Rivera and
20   Medina didn't just possess an ounce.  They possessed
21   8-ounces, approximately close to $9,000 worth of drugs
22   that could be sold on the street.  Additionally, you are
23   going to hear that defendant Rivera had approximately
24   $3,000 in cash in his pocket.
25              Now, you are going to hear that defendant
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Prieto was a part of this transaction as well.  You are
 2   going to hear a recorded conversation in which you are
 3   going to learn about defendant Prieto's involvement in
 4   this narcotics delivery.  You are going to hear
 5   specifically that defendant Prieto needed some money and
 6   that he decided that he wanted to go do a robbery in
 7   order to make money.  And defendant Rivera is going to
 8   instruct him don't do the robbery, I am going to get half
 9   a dead bird.  I will give you half an ounce of
10   methamphetamine to sell to narcotics customers.  You will
11   hear him say half an ounce.  Now, he is not going to tell
12   you what a bird is.  There will be witnesses who will
13   talk to you about what that possibly means and what the
14   code is.
15           But what you are going to learn is soon after
16   this conversation, the delivery of approximately
17   219-grams of methamphetamine, the 8-ounces came to
18   defendant Rivera at Medina's house.  And as I just told
19   you, defendant Rivera will tell you in recorded
20   conversations that half an ounce of methamphetamine is
21   $550 worth of drugs.
22           So you will hear that defendant Prieto agreed
23   not to do the robbery in expectation of getting more than
24   $500 worth of high quality methamphetamine, and you will
25   hear him say that he can definitely push that, he can
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1     sell that to narcotics customers.

2              You are going to hear the details of the

3     conversations in the incident that happened on

4     August 6th, 2009.  What you are going to learn on that

5     date is that a narcotics courier delivered the

6     methamphetamine to defendant Rivera and Medina's house in

7     Ontario, California.  Officers were waiting for the

8     delivery, and, soon after it happened, they conducted a

9     search of the residence as well as the house -- the house

10    as well as the car in front of the residence.

11             What defendant Rivera had done, and you will

12    hear that defendant Medina was aware of that as well, is

13    he hid the narcotics, the close to $9,000 of narcotics in

14    a hollowed-out car battery that he hid in this vehicle

15    outside the house.  He hid it in a Tupperware container,

16    and he put it inside the battery in hopes that, A, nobody

17    would find it, and even if they looked inside the car,

18    hopefully, they wouldn't look inside the battery.  It was

19    hidden.

20             When the officers came to the house, they

21    brought a drug dog, and the drug dog alerted on the car.

22    They asked -- the officers asked defendant Rivera and

23    defendant Medina for the key to the car, and you are

24    going to hear defendant Medina lie.  She told the

25    officers that they did not know where the keys to the car

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    were.  You are going to hear, in her own words, tell you

2    in recorded conversations that she hid the keys to the

3    car the entire time in her back pocket.  And she is going

4    to tell you why she did that.  She is going to tell you

5    in her own words that she didn't want the officers to be

6    able to link the drugs to her and defendant Rivera.  She

7    will tell you that.

8           And she will tell that to multiple people in

9    recorded conversations.  She will brag about lying.  You

10   will also hear her talk to the registered owner of the

11   vehicle.  You will hear that the vehicle wasn't actually

12   registered to her or defendant Rivera even though it was

13   their vehicle.  And you will hear her try and convince

14   the registered owner of the vehicle to lie to law

15   enforcement as well so that defendant Rivera and Medina

16   wouldn't get in trouble for the drugs.  You will hear the

17   registered owner of the vehicle also be a little bit

18   hesitant because, of course, he doesn't want to get in

19   trouble either.

20          You are going to learn during this trial that

21   all of defendant Medina's lies can't remove the fact that

22   defendant Rivera's fingerprint is on the Tupperware

23   container that contains the 8-ounces worth of

24   methamphetamine.

25          After August 7, 2009, defendant Medina began

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to play a more active role in the drug distribution

2    operation.  You are going to hear her manage individuals.

3    You are going to hear her tell them to collect from

4    customers and how much to sell and give them instructions

5    about not getting caught.  And you are also going to hear

6    about the fact that she was knowledgable about the drug

7    distribution operation.  You are going to hear her say in

8    recorded conversation, Chino, talking about defendant

9    Rivera, has been doing something with his new dude,

10   meaning his narcotics runner.  I am telling you if they

11   had been watching Chino, they would have hit his spot,

12   meaning if the officers had been conducting surveillance,

13   they would have hit this individual's house, searched

14   this individual's house as well.  And officers didn't

15   search the house, you will hear.

16          You are going to hear that defendant Medina's

17   role in the drug distribution operation did not begin in

18   August, 2009.  It didn't begin on August 6th.  It didn't

19   begin on August 7th.  She was involved prior to that.

20   You are specifically going to hear a series of recordings

21   that happened on July 20th, 2009.  You are going to hear

22   defendant Medina tell defendant Rivera on the telephone

23   that a customer wants drugs.

24          Defendant Rivera will tell defendant Medina

25   that Mr. Venegas who he refers to as Cisco would meet

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    with the customer later because Mr. Venegas was at the

2    mall at that time.  But he told defendant Medina to tell

3    the customer that the customer would get extra drugs in

4    exchange for waiting.  You will hear her say that the

5    customer is going to get hooked up.

6           Then you are going to hear another recorded

7    conversation between defendant Rivera and Mr. Venegas.

8    You are going to hear them talk about the fact that

9    defendant Medina was going to give a drug customer

10   directions to meet with Mr. Venegas to get drugs, but

11   this wasn't the first time that this customer had

12   purchased drugs from Mr. Venegas.  This is the customer

13   that defendant Medina usually gets the narcotics for and

14   delivers personally to the narcotics customer.  However,

15   on this date, she was going to deliver the drugs

16   personally or she was going to give the defendant, the

17   customer directions to meet with Mr. Venegas.  So you

18   will hear defendant Rivera admit in a recorded

19   conversation that previously defendant Medina delivered

20   drugs on more than one occasion.

21          You are going to hear that defendant Prieto's

22   role in the drug operation was not isolated.  You will

23   hear at least three recorded conversations linking him to

24   the drug operation.  On July 29, 2009, defendant Rivera

25   told a customer that he had bomb methamphetamine,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    methamphetamine that is good quality.

2            And the customer asked if he should meet with

3    defendant Rivera at Raul's house, Raul Prieto, defendant

4    Prieto in order to get the drugs.  You are going to hear

5    the customer actually volunteer that as a location where

6    to go to get drugs.  It wasn't defendant Rivera offering

7    defendant Prieto's name as an individual.  You are going

8    to hear that the customer was familiar with Raul and

9    asked if that was the location where they should meet.

10           On August 2nd, 2009, defendant Rivera

11   instructed Mr. Venegas, his drug runner, to go meet a

12   narcotics customer across the street from Crook's house.

13   Again, that is defendant Prieto.  And you are going to

14   hear recorded conversation on August 5th, 2009 where

15   defendant Prieto offered to help defendant Rivera collect

16   drug money from a narcotics customer.  And during that

17   conversation, you are going to hear that defendant Prieto

18   was familiar with who the customer was, had his telephone

19   number and was prepared to call him from another

20   telephone line in order to hope, confuse the customer

21   into answering because the customer was not answering the

22   telephone.

23           In these calls, you are going to hear for

24   yourself that defendant Prieto was well aware of who

25   defendant Rivera's narcotics customers were and how the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    business operated.  And you are going to hear that

2    defendant Prieto himself sold ecstasy and cocaine and

3    used some of the same individuals to sell his drugs as

4    well.

5              So during this trial, you are going to hear a

6    lot about drugs and the drug business and these

7    individuals selling drugs.

8              However, as you heard earlier, this is also a

9    case about a gang.  And this case isn't just about the

10   criminal activities of three defendants working together

11   to sell drugs and make a lot of money.  This is a case

12   about individuals who ran all the crimes in a city

13   together, and they made money doing those crimes.  You

14   are going to hear that they made money doing robberies.

15   They made money selling drugs, just like these defendants

16   were doing, and they made money doing something called

17   taxing.

18             And what taxing is is if there is an

19   individual selling drugs anywhere in the city of Ontario,

20   they had to pay money to the gang.  They either

21   volunteered by approaching the gang themselves, or the

22   gang sought them out in order to collect that money.

23   What you are going to hear is that the Black Angels gang

24   isn't unique.  There is a number of gangs throughout

25   Southern California who are all aligned with something

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    called the Mexican Mafia, and you are going to learn
 2    during the trial what the Mexican Mafia is.  And those
 3    are the leaders of all these street gangs, the Black
 4    Angels gang and you will hear during trial other gangs,
 5    and all these gangs have territories.  The Black Angels
 6    gang is the city of Ontario.  You are going to hear that
 7    other gangs have territories as well, different cities
 8    that they run.  And the reason why it is important to run
 9    a city is because if you run that city -- and you are
10    going to hear a gang member explain this to you, and you
11    are going to hear in recorded conversations gang members
12    talking about this -- if you run the city, you get the
13    money from the individuals selling drugs in the city.
14    You get to sell drugs, and you get to tax people.  The
15    gang gets to tax people.
16            And the Mexican Mafia, those leaders, they get
17    the money for the drugs in that city.  You are going to
18    hear that Armando Barajas was a Mexican Mafia member who
19    was running the city of Ontario.  And you are also going
20    to hear that defendant Rivera, because he was selling
21    drugs in Ontario, shared his drug profits with Armando
22    Barajas.  He gave that tax.  He taxed himself.
23            You are also going to hear that defendant
24    Rivera taxed others.  And you are going to hear about the
25    gang's taxation efforts.  It isn't just methamphetamine
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that is involved in this case.  You are going to hear

2    that drug suppliers sold other drugs including heroin,

3    and you are going to hear about defendant Rivera's

4    involvement in taxing those heroin suppliers.

5           You are going to hear about Carlos Rivera's

6    gang membership.  He is a member of the Black Angels

7    gang.  He has a tattoo of Ontario, and you are going to

8    hear that Ontario is spelled with an E for a purpose.

9    And he has Black Angels across his arms, and you are

10   going to see defendant Medina's name right below his gang

11   tattoo.  You will hear all about his involvement in the

12   gang, when he became a member, the fact that he was an

13   officer in the gang and his involvement in the gang's

14   criminal activities including taxation.

15          You are going to hear about that from an

16   individual called David Navarro.  David Navarro is also

17   or was also a member of the Black Angels gang.  He is no

18   longer a member.  He is cooperating, and he is

19   cooperating in exchange for what he hopes will be a

20   reduced sentence in connection with criminal convictions

21   that he sustained.

22          What he is going to be testifying about is his

23   involvement in the gang, his relationship to the

24   defendants and a number of recorded telephone

25   conversations during which he has conversations with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    these individuals, with defendant Medina, with defendant

2    Rivera, with Armando Barajas, the Mexican Mafia member in

3    charge of the gang, with narcotics customers who he is

4    taxing.  You are going to hear through these recorded

5    telephone conversations that he will explain to you how

6    the gang operates and what these defendants' role is in

7    that criminal enterprise.

8              He is going to explain to you that you rise

9    through the ranks of the Black Angels gang.  You start

10   out as an OVS, Onterio Varrio Sur member.  That is the

11   lowest level, and some of the crimes that OVS gang

12   members commit is tagging.  They mark their territory all

13   throughout the city.  And, again, he will explain to you

14   that the importance of territory is not just a pride

15   thing.  It is a source of income.  He will explain to you

16   how the gang is a business, and one of the most important

17   elements of that business is the money that is generated

18   through drug sales in Ontario.

19             He will talk to you about becoming a junior

20   Black Angel, that is rising through the ranks, and he

21   will explain to you what he did to become a junior Black

22   Angel.  Mr. Navarro is a criminal and has engaged in

23   violent crime.  That is no secret, and he will tell you

24   that.  And he will tell you what he did to do to rise in

25   the ranks and eventually become blessed, to get his wings

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    and become not just a full member of the Black Angels

2    gang but the gang's leader under Armando Barajas.

3           He was the individual who was running the

4    taxation.  He was the president of the Black Angels gang

5    at the same time defendant Rivera was a Black Angels gang

6    member.  He was an individual who defendant Rivera asked

7    if defendant Rivera had to pay taxes on his

8    methamphetamine sale, and you will hear Mr. Navarro tell

9    you, no, you don't, you can pay directly to Mr. Barajas

10   because you are part of the gang and you know Mr. Barajas

11   too.

12          But he will tell you that defendant Rivera and

13   all his methamphetamine sales were being taxed.  You will

14   also hear recorded telephone conversation where defendant

15   Medina shares with Mr. Navarro who was at the time the

16   head of the gang, law enforcement's knowledge of the

17   criminal activity that had just occurred.  She shared

18   with him the details of what happened and also discussed

19   with him whether a certain individual may or may not be

20   cooperating, and that you are going to learn is serious

21   information.  She wanted to let to let Mr. Navarro know

22   that a drug runner in that city may be cooperating with

23   law enforcement and may be jeopardizing the criminal

24   activities of that enterprise.

25          Just again to emphasize the fact that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   defendant Rivera, you can see him blessed, getting his

 2   wings.  You can see the wings spanning over Onterio in

 3   the picture, and you can see the wings on his shoulder.

 4   And you will learn that members of the Black Angels gang,

 5   if you are not a full member of the gang, you can't have

 6   those tattoos.  There are serious and violent

 7   repercussions for having those tattoos, and Mr. Navarro

 8   will explain all of that to you.

 9          Mr. Navarro will also provide context to the

10   criminal activities that we heard about earlier.  I

11   talked to you earlier about about the July 22nd, 2009

12   purchase of a firearm at defendant Prieto's house.  Well,

13   what you are going to learn through Mr. Navarro and

14   through other recorded telephone conversations is that

15   this is actually a gang gun.

16          You are going to learn that the gang has

17   leaders, it has structure, it has meetings and it has

18   dues.  And one of the things those dues are used for is

19   the purchase of firearms in order to maintain the gang's

20   authority.

21          Mr. Navarro will tell you that there is

22   reasons why the gang has guns.  One of those reasons is

23   to aid in drug distribution activity as well as its

24   taxation efforts.

25          Defendant Rivera, at a gang meeting,

1   volunteered to use the dues of the gang to buy a firearm.

2   And he actually showed Mr. Navarro a text message picture

3   of the gun that he was going to purchase at defendant

4   Prieto's house.  And Mr. Navarro took a look at the gun,

5   and he was a leader of the gang at the time, and approved

6   it.  And defendant Rivera was going to use his own money

7   and get reimbursed by the gang with the dues.

8          Now, you are going to hear after the gun was

9   seized by law enforcement as I described, you are also

10  going to hear about a recorded telephone conversation

11  where defendant Rivera gets on the phone with Mr. Navarro

12  and apologizes for losing the gang's gun.  He admits not

13  only that this was a gun, that it was his, but it was a

14  gun that he intended to use for the benefit of the gang.

15         You are also going to hear additional

16  information about the July 31, 2009 sale of

17  methamphetamine to narcotics customer.  Yes, Mr. Tolson

18  and defendant Carlos Rivera had a conversation about what

19  law enforcement knew about defendant Rivera's drug sales,

20  but you are also going to hear defendant Rivera admit in

21  his telephone conversation, I am a Black Angels gang

22  member, I don't cooperate with law enforcement.

23         During this trial, you are going to hear

24  evidence both of the specific crimes of these defendants

25  as well as how each of these individuals helped in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1     larger picture of the criminal enterprise that was the

2     Black Angels gang that ran the city of Ontario.  Each of

3     these individuals facilitated not only their own crimes

4     but the crimes of the gang.

5            At the end of the case, my colleague and I

6     will return and ask you to find guilty verdicts on all of

7     the charged counts.

8          MR. WALSH:  Good afternoon, ladies and gentlemen.

9            I am Joseph Walsh.  I am the attorney for

10    Jessica Medina who has been sitting next to me during

11    jury selection and will be sitting next to me during the

12    trial.

13           Ms. Medina is charged with four offenses.

14    Count 1 is conspiracy to violate the RICO statute.  Count

15    2 is a substantive RICO violation.  Count 5 is a

16    conspiracy to distribute methamphetamine, and Count 10 is

17    possession of the methamphetamine that was seized by law

18    enforcement from a car outside her house on August 6 of

19    2009.

20           Now, the narcotics offenses are very easy to

21    understand, but what you will find more difficult is the

22    concept of this RICO violation.  Now, since this is just

23    the opening statement, I am just going to be talking

24    about evidence.  But I wanted to alert you that there is

25    two types of conspiracies and two types of offenses that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    you have to be focusing on during the course of the
 2    trial, and RICO charge which the court will give you in
 3    jury instructions essentially in a nutshell is whether or
 4    not Ms. Medina is guilty of operating a criminal
 5    enterprise through a pattern of racketeering acts, that
 6    is the commission of numerous felonies with the criminal
 7    enterprise over a long period of time.
 8              To those four charges, Ms. Medina has pleaded
 9    not guilty, and in the opening statement we are only
10    allowed to give a summary of what we believe the evidence
11    will show.  And sometimes attorneys in giving an opening
12    statement where they say the evidence will show this and
13    that, they make a mistake, and I think that may have
14    happened during the government's opening statement.
15              And you have to be aware of that fact that in
16    summarizing what the wiretap calls said and what
17    Ms. Medina said or what Mr. Rivera said, you are going to
18    be actually hearing those transcripts, hearing tapes of
19    tape-recorded telephone calls, intercepted over the
20    wiretap during the course of the trial.  And you will
21    have transcripts that you can read along to assist you in
22    listening to those tapes, and you will be the ones that
23    will have to make the decision concerning what those
24    calls are stating and whether or not they state what the
25    government has said in their opening statement.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Now, the evidence in this case will show that
 2    Ms. Medina is not a gang member.  She is not a member of
 3    the Black Angels gang or the Onterio Varrio Sur gang.
 4    She is not a member of any gang at all.  The evidence
 5    will show that on the critical date of August 6th, 2009.
 6    Ms. Medina was living in Ontario, California on Vineyard
 7    Avenue, and she was residing there with Carlos Rivera
 8    which is the co-defendant seated at the back table in the
 9    black shirt.
10              And Ms. Medina was also living there with her
11    four children in 2009.  The ages of her children were 2,
12    4, 6 and 8.  So they were small children that she was
13    taking care of.  They were living in the apartment with
14    her along with other relatives that were living in the
15    apartment also and Carlos Rivera who was the father of
16    two of those children.  So the relationship between them
17    is he is the father of two of her children.  And the
18    evidence will show that there is no gang relationship to
19    the fact that they are living in the same apartment.
20              The evidence will also show that
21    Ms. Rivera(sic) has no gang tattoos.  There is no
22    evidence that she participated in any gang meeting or
23    discussions with other gang members.  There is no
24    evidence that Ms. Rivera sold drugs to anyone in this
25    case.  What did occur was that on August 6, 2009, the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   police came to her apartment and searched the apartment,

2   the apartment that she was living there with her children

3   and with Mr. Rivera.

4           During the course of that search, police

5   officers found no drugs in the apartment where she was

6   living.  Methamphetamine, however, was seized from a car

7   that was parked out in front on the street.

8           And police surveillance that day, you will

9   hear about from the testimony of the officers conducting

10  the surveillance, will show that Ms. Medina was not seen

11  driving the car.  She wasn't seen going into the car.

12  She is never seen being a passenger on the car on the

13  days leading up to the August 6 search of the car

14  discovering the contraband.

15          And before the search, the law enforcement

16  were listening to telephone conversations of a wiretap of

17  a telephone that Mr. Carlos Rivera was using.  And it was

18  during the listening in on those telephone calls,

19  conversations that led the officers to focus on the

20  residence and to conduct the search of the apartment and

21  the car.

22          But the evidence will show that the wiretap

23  calls overheard on Mr. Rivera's cell phone that were used

24  in order to focus the officers in the direction of the

25  apartment contained no conversations of Jessica Medina.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    There is no conversations on that telephone prior to

2    August 6, 2009.  So nothing on those calls establish her

3    involvement in any drug trafficking or anything to do

4    with the drugs that were seized on August 6.

5           Now, on that date after the search when they

6    found the drugs that were in the car, the police

7    confiscated the drugs, they placed Carlos Rivera under

8    arrest, but they didn't arrest Jessica Medina.  She was

9    allowed to remain at the apartment.  And they left the

10   cell phone of Carlos Rivera in the apartment so that

11   Ms. Medina would have it available to use and make calls.

12          But, unknown to Ms. Medina, this was the same

13   cell phone that had an unexpired wiretap on it so there

14   was an additional two weeks of court authorization to

15   continue listening into the cell phone.  So the police

16   continued to listen in to conversations over the cell

17   phone while it was being used by Jessica Medina.

18          And some of those calls do show that Jessica

19   Medina was very concerned about the arrest of Carlos

20   Rivera.  She is very concerned that he had been taken to

21   jail.  She was concerned about how much time that he was

22   going to be receiving as a result of his arrest.  She

23   told other people that he was arrested because drugs were

24   found in the car, but there is no conversations over the

25   telephone that show that she had any involvement with the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    drugs that were found in the car.

2           There is no conversations over these

3    telephone -- these telephone intercepts during the next

4    two-week period of the intercept indicating that she was

5    in possession of the drugs or that she was in a

6    conspiracy to sell those drugs or that she had anything

7    to do with acquiring those drugs or planning to sell them

8    in the future.  The telephone calls also do not indicate

9    that she entered into any agreement in order to violate

10   the RICO statute by joining the gang or joining a

11   criminal enterprise in order to operate it through a

12   pattern of racketeering activity.

13          And, essentially, in conclusion, the evidence

14   will show, we believe, that at the end of the case that

15   Ms. Medina is not guilty of all four of the charges that

16   are charged against her.

17      MR. NAVARRO:  Good afternoon, ladies and

18   gentlemen.

19          My name is Angel Navarro.  I represent Carlos

20   Rivera.  He is seated in the back row with me.  We are

21   both wearing black shirts today as was pointed out

22   earlier.

23          Now, during this trial, you are going to hear

24   a lot of testimony about my client, about Carlos Rivera.

25   You are going to hear a lot of wiretaps about my client

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Carlos Rivera.  You are going to hear him talk to people.

2    You are going to hear him talk to a fellow gang member

3    who became a cooperator for his own benefit.  We will get

4    to him during the trial.

5              You are not going to hear us deny that my

6    client is a member of the Black Angels street gang in

7    Ontario.  You are not going to hear us deny that my

8    client was intercepted over the phone talking about

9    narcotics and that he was subsequently arrested for

10   narcotics.  You are not going to hear us deny any of

11   these things.

12             What we are going to challenge during this

13   trial is that his membership in the gang somehow involved

14   his wife or his cousin.  You are going to hear us

15   challenge the government's case with regard to this

16   so-called RICO conspiracy.  The government made -- showed

17   you a nice pyramid in their opening statement which

18   linked the Mexican Mafia to the Ontario Black Angels.

19             You will not hear or see, I believe, any

20   evidence of any phone calls between my client and the

21   alleged leader of the Ontario Black Angels, Mr. Armando

22   Barajas.  You won't see any phone calls.  You will hear

23   testimony from government experts and police officers who

24   will say that they were listening to my client's phone

25   calls over a period of time even after he was arrested.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    You will hear testimony that they were looking -- he was

2    one of many people that was being investigated.  And you

3    won't hear any evidence that he was talking to the

4    so-called higher ups within the gang about paying money

5    to them.

6              The only evidence you will hear about that

7    will come from a cooperator, a person who has every

8    interest to benefit himself, betray his friends.  That is

9    not for me to decide.  That is for him to decide.

10             Again, so this case really will have a lot to

11   do about evidence that just simply won't be there about

12   any client's involvement with the higher-ups of the Black

13   Angels.

14             As I indicated to you when I spoke to you

15   briefly earlier today, when the person walks into court,

16   they walk in presumed innocent.  If you are asked now

17   whether you would find any of three defendants guilty or

18   not guilty, you would have to find them not guilty.  The

19   government has the burden of proof.  That is a very

20   unique feature of our system which a few other systems

21   have, and we take that very seriously.

22             Again, as I stated to you, we are not denying

23   that my client is a gang member.  We can't deny those

24   tattoos.  They speak for themselves, and I ask you don't

25   judge my client for being a gang member.  He has chosen a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   path from a very young age, and that path has

2   consequences.  We know that, and he knows that.

3          As I indicated to you, you are not going to

4   hear any evidence of my client talking to so-called

5   higher-ups within either the Mexican Mafia or the Black

6   Angels because the evidence is just not there.

7          Now, what we expect to demonstrate during this

8   trial is that, in fact, when my client was arrested, he

9   was living with his common law spouse.  There were

10  four young children in the home, and they were raising

11  these children.  And I don't want you to judge my client

12  because he chose a different way of earning money to

13  assist his family.  And if he has to be judged for that,

14  so be it.  But don't judge his wife for that, and don't

15  judge his cousin for that.

16         There is no evidence, I think, as Mr. Walsh

17  pointed out, you will hear no evidence whatsoever that

18  either before August 6th, 2009 or even after those 15

19  days expired on the wiretap that there was additional

20  wiretaps of Ms. Medina.  There was nothing of that

21  nature.  You will hear a lot of evidence about them being

22  a couple, and because they -- a wife is aware of what her

23  husband does doesn't necessarily make her a

24  co-conspirator.  And any of you who have relationships

25  whether you are married or just common law relationships

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    would probably understand that.

2              At the end of the case I am going to come back

3    and argue.  This is a very, very difficult case.  And I

4    am going to argue my case to you at the end when all the

5    evidence has been presented.  Thank you.

6         MR. CEPHAS:  Good afternoon, again.

7              My name is Dana Cephas, and I represent Raul

8    Prieto.  As the other attorneys in the court informed

9    you, Mr. Rivera is facing six charges.  Ms. Medina is

10   facing four charges.  My client is facing two charges.

11             Mr. Rivera and Ms. Medina are charged with

12   racketeering acts in violation of RICO.  My client is

13   not.  Mr. Rivera and Ms. Medina are charged with

14   possession of methamphetamine with intent to distribute.

15   My client, Mr. Prieto, is not.

16             My client is charged with conspiracies, very

17   vague and general term, conspiracy to distribute drugs,

18   conspiracy to violate RICO.  Nothing more than that.

19             You will see during this case that my client

20   has known Mr. Rivera for a long time.  They grew up in

21   the same neighborhood.  You will see that if you grew up

22   on my client's street, you would know many gang members.

23   You might not be a gang member.  Some are.  Some aren't.

24   But if you grow up there, if you grow up on that street

25   in Ontario, if any of you had grown up on those streets,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    you would know some gang members.  Some of them would be

2    your friends.  Some of them might not be your friends.

3    And you might associate with those friends despite

4    knowing some of them commit crimes.

5         You will see that Mr. Prieto was not a member

6    of OVS.  He was not a member of Junior Black Angels gang.

7    He was not a member of Black Angels.  He was a friend

8    with a person who was a Black Angel.  He was friends with

9    a person who spent nights in his house when they were

10   both children.  You will learn that Mr. Rivera treats my

11   client's mother like his own mother.  He refers to her as

12   mom.  They are very close friends.  They were good

13   friends as boys.

14        What you will not hear is dozens and dozens

15   and dozens of phone calls among the thousands of phone

16   calls that were recorded in this case indicating that my

17   client was a gang member, that he was engaged in Black

18   Angels business.  That he was in any way assisting or

19   attempting to assist with Black Angels.

20        You will probably see many, many pictures of

21   defendants or I should say co-conspirators who have Black

22   Angels tattoos, who have OVS tattoos, who have Angelitos

23   Negros tattoos.  You will not see any photos like that

24   with Mr. Prieto because he has no such tattoos.

25        Mr. Prieto, however, is a street artist, not

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   graffiti, but he is a street artist.  And he uses the

2   tools of the trade, spray cans, to present his art.  You

3   will not see evidence of him painting Black Angels

4   graffiti or OVS graffiti or Angelitos Negros graffiti.

5          At the end of this case, you will see that my

6   client is sitting here today because he is a friend,

7   because he is a good friend with a Black Angels member.

8          Thank you.

9      THE COURT:  All right.  Thank you, Mr. Cephas.

10  Tell you what.  Let's take 10.  And the government can

11  line up your first witness when we get back.  Have him on

12  the stand ready to go.  Okay.  Remember the admonition,

13  ladies and gentlemen.

14      (Recess from 2:52 to 3:07)

15      (The following proceedings were held in the

16       presence of two members of the jury:)

17      THE COURT:  All right.  What is the nature of your

18  problem, sir?

19      THE JUROR:  So my wife and I share a car.  She

20  works.  I work virtual.  So I don't have a car to get

21  here.  Sometimes, depending on her schedule, I can be

22  here like this morning.  She drove me to the train

23  station, and I took the train, took the subway and ended

24  up getting here.

25          But everyday she can't take me to the train

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    station.  So that is the issue.

 2           THE COURT:  Number 9.  I would have appreciated

 3    you saying something.

 4           THE JUROR:  You were so -- it seemed like you

 5    didn't want to hearing something like that.

 6           THE COURT:  I don't want to hear lameness.  This

 7    isn't lame.  Where do you live?

 8           THE JUROR:  Thousand Oaks.

 9           THE COURT:  You don't want to stay here in the

10    city, do you?

11           THE JUROR:  Not for two weeks.

12           THE COURT:  What about a week-and-a-half?

13           THE JUROR:  It is still a long time.  I don't

14    really want to do it.

15           THE COURT:  All right.  I am going to excuse you.

16    Okay.

17           THE JUROR:  Okay.

18           THE COURT:  All right.  Goodbye.  Thank you.

19               And you, sir, what is your name.

20           THE JUROR:  Anthony Tran.

21           THE COURT:  Mr. Tran.

22           THE JUROR:  Yes.

23           THE COURT:  And the nature of your problem was?

24           THE JUROR:  The way my wife and I schedule our

25    work schedules so that I can drop my kids off in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   morning.  Okay.  And the school won't allow us to drop
 2   our children off before a certain amount of time.
 3        THE COURT:  Okay.  And what time is that?
 4        THE JUROR:  I believe that is 7:45.  I'm sorry.
 5   7:55.  So by the time I drop them off and make it to
 6   work, I typically get to work which is right here
 7   downtown around 9:00 o'clock.  With traffic, I
 8   actually --
 9        THE COURT:  Where is the school?
10        THE JUROR:  It is Arcadia.
11        THE COURT:  All right.  And you didn't want to
12   mention this earlier?
13        THE JUROR:  No.  Because the lady was talking
14   about the child care, and you said well --
15        THE COURT:  It was a 20-year-old.
16        THE JUROR:  I understand.
17        THE COURT:  There was a difference; right?
18        THE JUROR:  And you mentioned something about
19   scheduling of the jury that the jury can discuss during
20   in the jury room.  So I thought maybe there is a
21   flexibility there in terms of start time and whatnot.
22   You say, okay, fine, if that is something that I can work
23   with.
24        THE COURT:  So they wanted to do 8:00 o'clock, you
25   wanted to do 10:00 o'clock?
```

```
 1          THE JUROR:  I said I can be here around 9:30.

 2          THE COURT:  Your life was threatened.

 3          THE JUROR:  No.  No.  I'm sorry.

 4          THE COURT:  Go away.  Thank you, sir.

 5          THE JUROR:  Thank you.  I really apologize,

 6   thanks.

 7          MS. EL-AMAMY:  May we just note on the record that

 8   the government does not object to dismissing those

 9   two jurors.  I just wanted to confirm that the defense

10   did not object to that as well.

11          MR. WALSH:  No objection.

12          MR. CEPHAS:  No objection.

13          MR. NAVARRO:  No objection.

14          THE CLERK:  So number 15 becomes number 9 now?

15          THE COURT:  Whatever you wish because 14 is now

16   gone.  15 is now 9.  Whatever you say.

17          THE CLERK:  No.  Number 15.

18          MR. CEPHAS:  How about we let them get in there

19   seats and then move them once they are here.

20          THE COURT:  No.  I want the lawyers to have some

21   input on this because this has been a mess.  Let them

22   pick who they want to go to Number 9.

23          (The following proceedings were held in the

24           presence of the jury:)

25          THE CLERK:  Calling CR 10-351, United States of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   America, versus Carlos Rivera, et al.

 2            Counsel, may I have your appearances please.

 3        MS. EL-AMAMY:  Good afternoon, again, your Honor.

 4   Reema El-Amamy and Michael Dore on behalf of the United

 5   States.

 6        MR. WALSH:  Good afternoon, your Honor.  Joseph

 7   Walsh on behalf of Jessica Medina present to my left.

 8        MR. CEPHAS:  Dana Cephas on behalf of Raul Prieto

 9   who is present.

10        MR. NAVARRO:  And, your Honor, Angel Navarro

11   present with my client Carlos Rivera seated to my left.

12        THE COURT:  All right.  Good.  And the jury is

13   present.

14            Now, we, over the break, we have let two,

15   well, a juror and an alternate go at their request.  So,

16   Ms. English, are you going to shuffle around.  Let's fill

17   Number 9, then, with alternate number 15.

18        MR. CEPHAS:  No objection.

19        THE COURT:  Okay.

20        MR. DORE:  Your Honor, I am sorry.  Wouldn't we

21   move one of the existing alternates?

22        THE COURT:  Yes.  You are right.

23        THE CLERK:  I asked.

24        THE COURT:  No.  You are right.  Don't let me get

25   involved in these things.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          (The jurors were moved.)

 2          THE COURT:  Okay.  That's right.

 3          THE COURT:  We are going to try it with

 4   two alternates; right?

 5          MR. CEPHAS:  Yes, your Honor.

 6          MR. WALSH:  Yes, your Honor.

 7          MR. DORE:  Yes, your Honor.

 8          MR. NAVARRO:  Yes, your Honor.

 9          THE COURT:  Okay.  Excellent.  Now, your next

10   witness.

11          MR. DORE:  Your Honor, the government calls Deputy

12   Erden Gorgulu.

13          (The witness was sworn.)

14          THE CLERK:  Please be seated.  Please state your

15   name and spell it and speak slowly for the record.

16          THE WITNESS:  Sure.  My name is Erdem Gorgulu,

17   E-R-D-E-M, G-O-R-G-U-L-U.

18          THE COURT:  Okay.  Mr. Dore.

19

20                      DIRECT EXAMINATION

21   BY MR. DORE:

22   Q     Sir, where are you currently employed?

23   A     I am employed as a deputy sheriff with the San

24   Bernardino County Sheriffs' Department.

25   Q     And when did you start working for the San
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Bernardino County Sheriffs' Department?

2   A     It would be July of 2008.

3   Q     Where were you assigned when you started with the

4   San Bernardino County Sheriffs' Department?

5   A     I was assigned to Central Detention Center in

6   downtown San Bernardino.

7   Q     And what was your position when you started there?

8   A     I was a floor deputy.

9   Q     And what is your current position?

10  A     I am currently assigned to patrol division in

11  Morongo Basin.

12  Q     How long have you been assigned to the patrol

13  division?

14  A     I have been on patrol since January of this year.

15        MR. DORE:  Your Honor, may I ask the courtroom

16  deputy to provide the witness with a copy of Exhibit 29?

17           Your Honor, with the court's permission, may I

18  approach the deputy with a list of my exhibits for this

19  witness.  I apologize for not doing that sooner.

20  Q     Deputy, could you please take a look at that

21  photograph marked as Exhibit 29.

22  A     Yes.

23  Q     Do you recognize the person in that photograph?

24  A     Yes, I do.

25  Q     And have you personally spoken with the man in that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   photograph marked as Exhibit 29?

 2   A     Yes, I have.

 3   Q     And who is the person in that photograph marked as

 4   Exhibit 29?

 5   A     Person on this photograph is Mr. Carlos Rivera.

 6         MR. DORE:  Your Honor, the government moves to

 7   admit Exhibit 29 into evidence.

 8         THE COURT:  Any objection?

 9         MR. WALSH:  No objection.

10         MR. CEPHAS:  No objection.

11         MR. NAVARRO:  No objection.

12         THE COURT:  It is admitted.

13         MR. DORE:  Your Honor, permission to publish the

14   exhibit?

15         THE COURT:  As soon as it is admitted, you can do

16   whatever you wish.

17         MR. DORE:  Thank you, your Honor.

18   Q     So Deputy Gorgulu, this is Carlos Rivera?

19   A     Yes, sir.

20   Q     And approximately how many times have you spoken

21   with Mr. Rivera?

22   A     I never counted but probably hundreds, thousands of

23   times.

24   Q     And do you see Carlos Rivera in the courtroom

25   today, sir?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A    Yes, I do.

2    Q    Could you please identity him by clothing that he

3    is wearing?

4    A    He is sitting on the second counsel table to my

5    right wearing a black shirt and wearing glasses.

6         THE COURT:  The record will reflect --

7         THE WITNESS:  With the long hair.

8         THE COURT:  And not wearing a tie?

9         THE WITNESS:  He is not wearing a tie.

10        THE COURT:  All right.  The record will reflect he

11   has identified the defendant Rivera.

12   Q    BY MR. DORE: And, Deputy Gorgulu, do you know Carlos

13   Rivera to go by any nicknames?

14   A    Yes, I do.

15   Q    And what nicknames are those?

16   A    I know him to go by two different nicknames.

17   One is Chino.  One is Reals.

18   Q    Thank you.

19        Now, could you please take a look at what has

20   been marked as Exhibit 1 and Exhibit No. 2.

21   A    You said exhibit 1?

22   Q    Correct.  1 and 2.

23   A    Exhibit 1, yes.

24   Q    And can you also look at Exhibit 2, please?

25   A    Sure.  Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q       Do you recognize the tattoos in those photos marked

2    as Exhibits 1 and 2?

3    A       Yes, I do.

4    Q       And whose tattoos are those?

5    A       These tattoos belong to Mr. Rivera.

6    Q       And do the photos of those tattoos fairly and

7    accurately depict the tattoos as you have seen them on

8    Mr. Rivera?

9    A       Yes, they do.

10          MR. DORE:  Your Honor, government moves to admit

11   Exhibits 1 and 2 into evidence?

12          THE COURT:  Objection?

13          MR. WALSH:  No, your Honor.

14          THE COURT:  Admitted.

15   Q    BY MR. DORE: Just to be clear, Deputy, this

16   photograph No. 1, while we can't see the top of the

17   individual's face, who is this person?

18   A       This picture is Mr. Rivera's chest.

19   Q       And who is this person in Exhibit 2, sir?

20   A       He is Mr. Rivera.

21   Q       Looking at this photograph here, Exhibit 2, have

22   you seen Mr. Rivera wear glasses before?

23   A       I have seen him wear glasses, not exactly the ones

24   that are in the picture probably, but I have seen him

25   wear glasses different times.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Thank you.  Could you please take a look at what

2    has been marked as Exhibit 2, photograph in that folder

3    please.

4    A      Sure.  Yes.

5    Q      And do you recognize the person in that photograph

6    marked as Exhibit 27?

7    A      I do.

8    Q      Have you personally spoken with the man in that

9    photograph?

10   A      Yes, I have.

11   Q      And who is this person?

12   A      This gentleman is Mr. Raul Prieto.

13        MR. DORE:  Your Honor, the government moves to

14   admit what has been marked Exhibit 27 into evidence.

15        MR. WALSH:  No objection.

16        THE COURT:  It will be admitted.

17   Q      BY MR. DORE:So this is Raul Prieto; is that correct?

18   A      That is correct.

19   Q      And do you see Mr. Prieto in the courtroom today?

20   A      Yes, I do.

21   Q      And could you please identify him by an article of

22   clothing that he is wearing?

23   A      He is sitting on the first counsel table to my far

24   right wearing a gray shirt, no tie, buzz cut hair and

25   facial hair.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    THE COURT:  All right.  The record will reflect

2  that he has identified defendant Prieto.

3  Q    BY MR. DORE:And, Deputy, do you know Raul Prieto to

4  go by any nicknames?

5  A    Yes, I do.

6  Q    And which nicknames are those?

7  A    I know him to go by the name Crook.

8  Q    In your experience as a deputy, have you seen

9  Carlos Rivera and Raul Prieto together, speaking to

10  one another?  I'm sorry.

11  A    Yes, I have.

12  Q    And based on your observations, did it appear to

13  you that Mr. Rivera and Mr. Prieto knew each other at

14  that time?

15  A    Yes, I do.

16  Q    And approximately when was that when you saw them

17  speaking to one another?

18  A    It was during their time that they were housed at

19  Central Detention Center, multiple times I saw him

20  talking.

21  Q    I'm sorry, sir.  Approximately what year would you

22  say that was?

23  A    It would be 2009, 2010.

24  Q    Thank you.  Could you please take a look at the

25  photographs marked as Exhibits 238 to 248?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      Yes.  You said 238 and 48?

 2    Q      238 through 248, those ten folders.  Could you just

 3    take a moment to take a quick look at those please.

 4    A      I sure will.

 5            Yes, sir.

 6    Q      Do you recognize those photographs?

 7    A      I do.

 8    Q      And how do you recognize them?

 9    A      Because I took those photographs.

10    Q      And where did you take those photographs?

11    A      I took those photographs at Central Detention

12    Center.

13    Q      And do those photographs fairly and accurately

14    depict what you witnessed at that time that you took

15    those photographs?

16    A      Yes, they do.

17    Q      And approximately when did you take those

18    photographs?

19    A      Mid October.

20         MR. DORE:  Your Honor, the government moves into

21    evidence Exhibits 238 through 248?

22         THE COURT:  All right.  They will be admitted.

23         MR. CEPHAS:  Objection to these.  Excuse me, your

24    Honor.  Objection to the extent a few of the photographs

25    contain what I would refer to as hearsay, specifically
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   246, 247, 248.
 2        MR. DORE:  Your Honor, may I ask some questions on
 3   foundation?  Or, I apologize, your Honor.
 4        THE COURT:  Admitted for the truth of?  Offered
 5   for the truth of?  I don't even know what this says.
 6        MR. CEPHAS:  Well, I don't believe they should be
 7   admitted at this point, then, your Honor, because based
 8   on some interview notes, I don't know if they are going
 9   to be offering them for the truth of the matter asserted.
10        THE COURT:  Overruled.
11   Q    BY MR. DORE: Sir, can you please take a look at
12   Exhibit 238?
13   A    Yes, sir.
14   Q    And what is this that we are looking at here,
15   Exhibit 238?
16   A    What we are looking at here, from the inside of the
17   dayroom area of a housing unit to the door of it.  It
18   slides from left to right closing it.
19   Q    And did you take any pictures in this area depicted
20   as Exhibit 238, this area shown here?
21   A    Yes.  I did take that picture.  Is that what you
22   are asking?  If you can rephrase it.
23   Q    Let me put up Exhibit 239 here.  Do you recognize
24   this photograph Exhibit 239?
25   A    Yes, I do.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  Q    And can you please read what it says that you

2  photographed there in that photograph marked as Exhibit

3  239?

4  A    On the top line, it says OBA's.  Want me to

5  continue down the line?

6  Q    Yes, please.

7  A    Second line says Widget and the third one says

8  Lokie, and the fourth one says Lazy and the last one says

9  Reals.

10        MR. CEPHAS:  Objection, your Honor.  Speculation,

11  foundation.

12        THE COURT:  I am going to overrule it, and the

13  jury can make up its own minds as to what they think

14  those letters depict.

15  Q    BY MR. DORE: And you were standing face-to-face with

16  these letters on the wall when you took this picture;

17  correct?

18  A    Yes, I was.

19  Q    And in your experience working at the Central

20  Detention Center, are you familiar with someone who goes

21  by the nickname Widget?

22  A    I do.  Yes.

23  Q    Are you familiar with someone who goes by the

24  nickname Lokie?

25  A    Yes, I am.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q      Are you familiar with someone who goes by the
2    nickname Lazy?
3    A      Yes, I do.
4    Q      And are you familiar with someone who goes by the
5    nickname Reals?
6    A      Yes, I do.
7    Q      And who is the person who goes by the nickname
8    Reals, sir?
9    A      That would be Mr. Carlos Rivera.
10   Q      Could you take a look, please, at Exhibit 242.
11   Where was this photograph taken?
12   A      This photograph is at the door of a single man
13   cell.  There is what we call the tray door where we,
14   three times a day, when they get their food tray, this is
15   the little opening on the door where we slide the tray in
16   so it is the flat part of it.
17   Q      And you were standing looking at this writing when
18   you took the picture; right?
19   A      Yes, I was.
20   Q      And what does it say that you read there on that
21   tray?
22   A      In the middle of the screen, it says Ontario, OBS.
23   Q      And is this written into the tray?  What are we
24   looking at here as far as these markings on the tray?
25   How did they get there?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      The tray door --
 2           MR. CEPHAS:  Objection.  Speculation.  Foundation.
 3           THE COURT:  Sustained.
 4    Q      BY MR. DORE: Deputy, was this writing like using a
 5    pencil to put these letters into that tray?
 6           MR. CEPHAS:  Same objection.
 7           THE COURT:  Overruled.
 8           THE WITNESS:  No, it wasn't.
 9    Q      BY MR. DORE: And could you see or feel that there
10    was an indentation to make those letters in that tray?
11    A      Yes.  You could feel them.
12    Q      Let's take a look, please, at Exhibit 246, 247 and
13    248.  Are those all the same thing?
14    A      They are all the same.
15    Q      Okay.  So let's start with Exhibit 247, please.
16    A      Sure.
17    Q      Where did you take this picture?
18    A      This picture, I took this picture from inside of a
19    cell, single man cell when you are looking out from
20    inside the cell.  That is above the sliding gate.  There
21    is a flat little panel, metal panel that is right above
22    it.  So only the person inside the cell could see it
23    unless you went inside the cell and looked above.
24    Q      And were you able to read the writing on that,
25    depicted in that picture when you took it?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      I was able to read most it.  I was trying to get
 2   the reflection of the flash out of the pictures.  That is
 3   why I took three of them.
 4   Q      And are you familiar with any person who had used
 5   that cell, that location where you found this writing?
 6   A      Yes, I am familiar.
 7   Q      And whose cell was this where you found this
 8   writing?
 9   A      This cell was occupied  by Mr. Steven Vega.
10   Q      And did you know Mr. Vega to go by any nickname?
11   A      Yes.  He goes by the nickname Widget.
12   Q      Now, looking at this photograph, Exhibit 247, can
13   you read what it says in the last three lines there that
14   you photographed in that writing?
15   A      Last three lines.
16   Q      At the bottom?
17   A      Very last, I can easily say it is Sunkist.  And the
18   one above it is Los Black Angels.  The one above it says
19   South Side Ontario.
20   Q      Now, when you took this photograph, and I realize
21   it is harder to see in the photograph than when you were
22   standing across from it; is that right?
23   A      That's right.
24   Q      So when you were standing there, you were able to
25   read what was on that wall; correct?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A     Sure.  Because there was no flash or reflection on
 2   it.
 3   Q     And there is writing above that South Side Ontario
 4   that you just said.  What is that writing?  What does
 5   that say, not word for word, but what are we looking at
 6   there?
 7   A     We are looking at somewhat of a roll call of all
 8   the different members of that particular group, and their
 9   names listed there which they do for their reasons.
10        MR. CEPHAS:  Objection.  Speculation.  Foundation.
11        THE COURT:  What are you objecting to.
12             What they do for their reasons?
13        MR. CEPHAS:  He essentially described why those
14   names are there.  I don't know that he knows when they
15   were written, why they were written.  I think it is
16   outside the scope of his personal knowledge.
17        THE COURT:  I am going to let the answer stand
18   because he basically says it is written for their
19   personal reason.
20             All right.  Go ahead.
21   Q     BY MR. DORE: Do you recognize any of the names that
22   were listed on that writing there on that wall above the
23   words Los Black Angels?
24   A     I do recognize some of them.
25   Q     And can you -- which ones do you recognize?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   A      Let's see.  We have Crook on the third line.  Very

2   last.  We can easily read that.

3   Q      And I just put a red mark on the screen.  Is that

4   where the word Crook appears; is that correct?

5   A      That is exactly, yeah, that line.

6   Q      All right.  Please continue.

7   A      Before that, to his left, there is Termite, and

8   there is one line below, there is Youngster, Capone,

9   Scrappy, very last on the fourth line.

10  Q      Now, if I could show you another one with a

11  different flash.  It might be a little easier to see.

12  A      Sure.

13  Q      Looking here at what has been marked Exhibit 248,

14  is this the same writing as what we just saw on Exhibit

15  247?

16  A      Yes.  It is the same writing.

17  Q      Now, you see I put a red mark on the screen towards

18  the top left of Exhibit 248.  Do you see that?

19  A      Yes, I do see that.

20  Q      And is there a name next to that dot on that screen

21  that I have just put there?

22  A      Yes, there is.

23  Q      And what name is that?

24  A      That name is Reals.

25  Q      Now, had you ever seen Mr. Prieto writing anything
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   on the wall when you were at CDC?
 2   A      I have.
 3   Q      And what did you see him writing?
 4   A      One time I saw him write Crooks and underneath
 5   Ontario.
 6   Q      I'm sorry.  Was it Crooks with an S or was it
 7   Crook?
 8   A      I really don't remember exactly, but it was either
 9   Crook or Crooks.  Sometimes they would use an S like
10   Reals.  They would go either way.  They would answer to
11   both variations of the same name.
12   Q      And you saw Mr. Prieto writing that on the wall of
13   the CDC?
14   A      Yes, I did.
15   Q      And CDC being?
16   A      Central Detention Center, yes.
17          MR. DORE:  No further questions, your Honor.
18          THE COURT:  All right.  Cross.
19
20                    CROSS-EXAMINATION
21   BY MR. NAVARRO:
22   Q    Good afternoon, sir.
23   A    Good afternoon, sir.
24   Q    I want to take you back to the earlier exhibits,
25   the ones of the tattoos of my client if you don't mind.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    Sure.

2    Q    I believe those were Exhibits 1, Exhibit 2.  Do you

3    have those in front of you?

4    A    Yes, I do.

5    Q    Now, did you take those photographs?

6    A    No, I didn't.

7         MR. NAVARRO:  Sorry, your Honor.  Trying to get

8    all this organized.  I am doing quite the opposite.  And,

9    your Honor, I believe these have been published already.

10   Q    Do you see that photograph I have placed on the

11   overhead?

12   A    Yes, I do.

13   Q    Now, if I could have, it says Onterio across his

14   chest; correct?

15   A    Yes.

16   Q    Now, at the bottom, it says -- what does it say

17   right here where I am pointing with my pen?  Can you read

18   that?

19   A    I want to say the first letter is a T.

20   Q    Could it be Jessica?

21   A    Could be Jessica.  Yes.

22   Q    What about on the other part of where it says

23   Leena?

24   A    Leena.

25   Q    What about here?  Does it say Navaeh?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A    It looks like it.  Yeah.  Navaeh.

2    Q    Do those appear to be names?

3    A    That is what they do.

4    Q    Do they appear to have any gang connection to the

5    Black Angels?

6    A    I wouldn't guess so.

7    Q    And have you seen other inmates in your custody who

8    have tattoos of family members?

9    A    I have, yes.  Pretty common.  Correct.

10        MR. DORE:  No foundation.  Facts not in evidence.

11        THE COURT:  Overruled.

12   Q   BY MR. NAVARRO:Is that pretty common?

13   A    People tattoo, yes, names on their bodies.

14   Q    And it is pretty common to see those while they are

15   in custody; correct?

16   A    Yes.

17   Q    You see inmates without shirts on a regular basis;

18   correct?

19   A    Yes, I do.

20   Q    Now, I believe you have Exhibits 238 through 248 as

21   well.

22   A    38 and 39?

23   Q    Just look at 238 first.  Do you have that in front

24   of you?

25   A    I sure do.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q       Now, you testified this is a single man cell;
2    correct?
3    A       No.
4    Q       Where is this at?
5    A       This actually is the inside of a dayroom area where
6    when we allow them access to the tier of their housing
7    unit, this is where they got their hot water to make
8    their coffee and soup, the food items.
9    Q       I'm sorry.  Go ahead.
10   A       No.
11   Q       It is a common area?
12   A       This one is a common area, yes.
13   Q       So behind it, there would be tables?
14   A       To my left when I am taking this picture, there is
15   a picnic bench type table with couple of chairs.
16   Q       Okay.  Now, Exhibit 239 which was previously
17   admitted, this appears to be some kind of gang writing;
18   correct?
19   A       This is what it appears like.  Yes.
20   Q       Now, you took this photograph when?
21   A       I did take this, like I said, mid October.  Looking
22   at the date, it is October 19th of this year.
23   Q       Did you see who wrote this on the wall?
24   A       I didn't.
25   Q       And it says OBA's on the top; correct?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      That is correct.

 2   Q      And it says Widget?

 3   A      Yes.

 4   Q      Lokie?

 5   A      Lokie.

 6   Q      Lazy II?

 7   A      Lazy.  It could be a junior.

 8   Q      And Reals II?

 9   A      Reals.

10   Q      And there is the Number II next to it; correct?

11   A      Yes.

12   Q      Was anyone disciplined for that incident if you are

13   aware for writing on the wall?

14   A      Not that I am aware of.  Not for this.

15   Q      Now, Exhibit 240 which was previously admitted, is

16   this a single man cell?

17   A      This is a single man cell from the outside, yes.

18   Q      How does someone get to go to a single man cell?

19   A      You mean like why are they in a single man cell?

20   Q      Yes.

21   A      Because of their classification.

22   Q      And what type of classification do you have to have

23   to go into a single man cell?

24   A      In order for you to be able to or in order for you

25   to be assigned to a single man cell, you either have to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    be admin segregation which based on your priors and your
 2    involvements in your prior correctional space, then you
 3    are deemed to be, you accumulate enough discipline points
 4    to classify you as an admin segregation or high security
 5    where you are somebody, you are an important figure
 6    within the prison population community.  Therefore, you
 7    get isolated for that.
 8    Q    And this -- do you know who was assigned to the
 9    cell at that time that you took the photograph?
10    A    When I took the photograph, there was a gentleman
11    by the name Jason Hasso.
12    Q    Is he anybody related to this case?
13    A    No, he is not.
14    A    He is from Northern California if I am remembering
15    correctly.
16    Q    And this photograph here, I believe it is 241?
17    A    241.
18    Q    Is this within that cell or no?
19    A    To be honest with you, I really don't exactly
20    remember, but if we are going in order, after I made
21    entry into that cell, that is where I took these
22    photographs from within the cell.
23    Q    And again you did not witness when this was done?
24    A    No.  I did not.  I just took the pictures.
25    Q    Would it be a correct statement to say -- sorry,
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   your Honor.
 2           Do you see gang writing inside of the jail on
 3   a regular basis?
 4   A     You see them all the time.
 5   Q     All the time; correct?
 6   A     Uh-huh.
 7   Q     If you go to 247.  Now, this photograph came from
 8   an admin seg cell; correct?
 9   A     Admin segregation cell, right.
10   Q     Which means administrative segregation cell?
11   A     Yes.
12   Q     And you testified that at some point Mr. Steven
13   Vega was inside of that cell; correct?
14   A     He stayed in the cell for a long period of time.
15   Q     Now, do you know when this tagging took place?
16   A     I do not know the exact time or date.
17   Q     Do you know a date when it took place?
18   A     I don't know.
19   Q     Now, do you know if everybody in this list whose
20   name is listed here is a member of the Black Angels gang?
21   A     You asking my opinion?
22   Q     No.  I am asking you if you know.
23   A     Based on my training and experience, that is what I
24   would assume that all these names belong to that gang.
25   Q     So you are assuming they belong to the gang?
```

```
 1    A     I am not assuming.  Based on my training and
 2    experience, I believe these names belong to this gang.
 3    Q     Now, have you ever testified as an expert on the
 4    Black Angels?
 5    A     No, I haven't.
 6          MR. NAVARRO:  No further questions, your Honor.
 7          THE COURT:  Redirect?
 8          MR. CEPHAS:  Your Honor?
 9          THE COURT:  Oh.  I'm sorry.
10
11                    CROSS-EXAMINATION
12    BY MR. CEPHAS:
13    Q     Can you -- I didn't hear exactly how long were you
14    assigned to San Bernardino jail.
15    A     I started my career there in early 2009, January to
16    be exact, until I left to go to patrol in 2011, May.
17    Q     Do you recall that Mr. Prieto came to San
18    Bernardino jail around June of 2009?
19    A     I do not remember when he came to that jail.
20    Q     Do you recall him getting out on bail in April of
21    2010?
22    A     Not exactly the date, but I remember him getting
23    out on bail.
24    Q     Do you remember him getting out on bail less than a
25    year after he got there?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      If that is when he got out, that is when he got
 2   out.
 3   Q      Has Mr. Prieto been back to San Bernardino jail to
 4   your knowledge since he got out on bail?
 5   A      Not to my knowledge.
 6   Q      You indicated that you saw Mr. Prieto(sic) with his
 7   shirt off on many occasions.  Did you also see Mr. Prieto
 8   with his shirt off on many occasions?
 9   A      I don't remember Mr. Prieto seeing him without his
10   shirt.
11   Q      Did you speak to Mr. Prieto on many occasions?
12   A      Yes, I have.
13   Q      About how many times?
14   A      I would say at least couple of dozen times.
15   Q      Did you ever see Mr. Rivera speak with individuals
16   who were not related to the Black Angels gang?
17   A      Sure.
18   Q      Did you ever see Mr. Prieto speak to individuals in
19   the prison who were not members of the Black Angels gang?
20   A      Sure, I have.
21   Q      And when I say for the members of the Black Angels
22   gang, I also mean not OBS or not Junior Black Angels.
23   A      You mean like other gangs from different areas?
24   Q      Or just other people who were in custody.
25   A      Sure.  In their housing unit, they are allowed to
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    talk to each other.

2    Q    Where was Mr. Prieto housed during the short period

3    of time that he was in custody?

4    A    As far as I can remember, Mr. Prieto's housing unit

5    was called L South.

6    Q    Sure it wasn't H South?  Could it have been H

7    South?

8    A    No.  Mr. Prieto was in L South which is an

9    upstairs, the higher tier.

10   Q    How many people did he share a cell with?

11   A    Each cell had ten of them, and every tier has

12   five cells.  So there is 50 of them in each tier.

13   Q    So Mr. Prieto shared a cell with nine other

14   individuals?

15   A    That is correct.

16   Q    And those nine other individuals were not Black

17   Angels members; correct?

18   A    They could have been.  Not necessarily.  They don't

19   assign based on their gang affiliation.  They just assign

20   to a cell, and they have to stay in that cell, that is

21   it.

22   Q    As far as you know, were any of the other

23   nine members in his cell members of Black Angels, OBS or

24   Angelitos Negros?

25   A    I do not know.  We have to look at the housing

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   rosters.

 2   Q      Exhibit 247 which is on the screen --

 3   A      Yes.

 4   Q      -- has a date of October 19th, 2012.  Is that the

 5   date that the photograph was taken?

 6   A      That is when I took the photograph.  Yes.

 7   Q      Do you know who wrote the words that are in Exhibit

 8   247?

 9   A      I believe Mr. Steven Vega did.

10   Q      You believe but do you know or are you guessing?

11   A      I am taking an educated guess.

12   Q      The cell that Mr. Prieto was in, you claim it was L

13   South.  Was that next to Mr. Vega's cell?

14   A      It wasn't next to.  No.

15   Q      Wasn't even in the same area; isn't that correct?

16   A      It was in the same area.  Same floor.

17   Q      How close?

18   A      Well, let's say they did not have any physical

19   access to each other, but if one were to yell,

20   everyone could hear.

21   Q      Okay.  Was Mr. Vega's cell closer than the door at

22   the end of the courtroom?

23   A      Maybe a little bit further, but with all the walls

24   and bars in between them, of course, they are not

25   directly from that distance.  There are just segments,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    different segments on the side of each other.
 2    Q     If you had seen Steven Vega -- well, let me
 3    rephrase.  Based on your educated guess you believe
 4    Steven Vega carved the names that are in Exhibit 247;
 5    correct?
 6    A     Well, first, I like to clarify something.
 7    Q     Okay.
 8    A     I am not making these educated guesses based on
 9    what I have heard.  I am making those educated guesses
10    based on my training and experience and 12 hours every
11    day that I worked there that I spent around these guys.
12    So these are not just some I feel like it kind of things.
13    He was assigned to the cell by himself for almost a year.
14    And after him, a gentleman came from Northern California
15    which has no gang affiliation whatsoever with Southern
16    California.  So my guess would be based on my, like I
17    said, training and experience, that he put that writing
18    on there.
19    Q     Did you see the writing prior to Mr. Vega being
20    transferred out of that cell?
21    A     I did not.
22    Q     Okay.  If you had seen Mr. Vega writing that, he
23    would have been written up; isn't that correct?
24    A     He would have.  Even if I didn't see him, if he was
25    still assigned to that cell when I took this picture and
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    located this, yeah, he would get disciplined.

2    Q    You would have written him up, and it would have

3    gone into his file?

4    A    It would have.  Yes.

5    Q    And you would have taken a photo at the time you

6    did the write-up; correct?

7    A    Of course, I would.

8    Q    Now, you claim you saw Mr. Prieto writing Crooks

9    and Ontario, but you didn't write him up for that?

10   A    No, I didn't.

11   Q    And you didn't take a photo of that?

12   A    No, I didn't.

13   Q    The name Crook listed in 247 and some of the other

14   exhibits doesn't indicate who Crook is.  Are you aware of

15   there being another Black Angels member several years

16   older than Raul Prieto who goes by the moniker Crook?

17   A    I am not aware of that.

18        MR. CEPHAS:  Nothing further.

19        MR. WALSH:  No questions, your Honor.

20        THE COURT:  Redirect.

21

22               REDIRECT EXAMINATION

23   BY MR. DORE:

24   Q    Is Steven Vega a Black Angels gang member?

25   A    Yes, he is.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      And that exhibit we were just looking at 247?

2    A      Yes.

3    Q      Could you see that easily from the hallway, what

4    was written in that cell?

5    A      No.  247 the roll call of names of Black Angels,

6    you couldn't see that from the tier because we have

7    hourly walk arounds.  We would have definitely spotted it

8    way before.  It was within the cell, and the only way I

9    could locate it was when I asked the current resident of

10   that cell, I removed them from there.  And I went inside

11   the cell and I turned around and looked above the gate

12   and that is when I saw it.

13          MR. DORE:  No further questions.

14          MR. CEPHAS:  Nothing further, your Honor.

15          THE COURT:  May this witness be excused?

16          MR. NAVARRO:  Yes, your Honor.

17          MR. CEPHAS:  Yes, your Honor.

18          THE COURT:  Thank you, sir.  You are excused from

19   this trial.

20             Your next --

21          MR. DORE:  Your Honor, due to scheduling issues,

22   we would like to call Brice Devey to the stand.

23          THE COURT:  Sure.

24          MS. EL-AMAMY:  Your Honor, may I approach the

25   deputy to give her the number of exhibits.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Please.
 2              (The witness was sworn.)
 3              THE CLERK:  Please be seated.
 4              MR. DORE:  With this witness we will be using
 5    Exhibit 89 and 89A which is the corresponding transcript.
 6              THE CLERK:  Please state your full name and spell
 7    it for the record.
 8              THE WITNESS:  Brice Devey, B-R-I-C-E, D-E-V-E-Y.
 9
10                      DIRECT EXAMINATION
11    BY MR. DORE:
12    Q    Sir, where are you currently employed?
13    A    I am employed as a police officer for the city of
14    Ontario.
15    Q    And how long have you been a police officer with
16    the Ontario Police Department?
17    A    Almost eight years.
18    Q    Are you familiar with somebody named Raul Prieto?
19    A    Yes, I am.
20    Q    And do you see Raul Prieto in the courtroom today?
21    A    Yes, I do.
22    Q    And could you please identity Mr. Prieto by an
23    article of clothing he is wearing?
24    A    He is wearing a gray button-up shirt.
25              THE COURT:  Once again, the defendant has been
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    identified.

2    Q      BY MR. DORE:Have you spoken with Mr. Prieto before?

3    A      Yes, I have.

4    Q      Approximately how many times would you say you have

5    spoken with Mr. Prieto?

6    A      Two, three, maybe four at the most.

7    Q      Now, could you please take a look at the disk which

8    has been marked as Exhibit 89 and the transcript which

9    has been marked as Exhibit 89A.

10           And do you recognize the disk that has been

11   marked Exhibit 89?

12   A      Yes, I do.

13   Q      And how do you recognize it?

14   A      It was a disk that I listened to.

15   Q      And did you listen -- was there a recording on that

16   disk?

17   A      Yes, there was.

18   Q      And did you listen to that recording?

19   A      Yes, I did.

20   Q      And did you recognize the voice of any participant

21   in the call on that disk marked as Exhibit 89?

22   A      Yes, I did.

23   Q      And whose voice did you recognize?

24   A      I recognized Raul Prieto.

25   Q      Now, could you take a look at Exhibit 89A, please,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    the transcript.  Do you recognize that transcript?

 2    A     Yes, I do.

 3    Q     And how do you recognize that transcript marked as

 4    Exhibit 89A?

 5    A     It was the transcript I reviewed as I listened to

 6    the CD.

 7    Q     So you were looking at this transcript as you were

 8    listening to the disk marked Exhibit 89; is that correct?

 9    A     That is correct.

10    Q     And did that transcript accurately identify Raul

11    Prieto as the speaker when he was the person actually

12    speaking in that conversation on Exhibit 89?

13    A     Yes, it did.

14    Q     Now, in speaking with Mr. Prieto, has he ever

15    identified himself to you as a gang member?

16    A     Yes, he has.

17    Q     And what gang did he identify himself with?

18    A     He told me he was a member of OVS.

19    Q     And what does OVS stand for?

20    A     Onterio Varrio Sur.

21    Q     And when did Mr. Prieto tell you he was a member of

22    OVS?

23    A     I believe it was sometime in 2008.

24          MR. DORE:  No further questions, your Honor?

25          THE COURT:  Cross?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MR. CEPHAS:  One moment, your Honor.

2              Your Honor, I don't have any questions for

3    Officer Devey, but I did want to question him in my case

4    in chief, excuse me, in my case.

5          THE COURT:  Go ahead.

6          MR. CEPHAS:  So I would just ask that he be put on

7    hold so that I can call him in my case.  I wasn't able to

8    subpoena him, and I would like to call him.

9          THE COURT:  Examine him now.  He is here.  Examine

10   him now.

11         MR. CEPHAS:  Your Honor, the questions that I want

12   to examine him on will be follow-up to testimony from

13   other officers, and it wouldn't -- my questions to him

14   wouldn't make sense without the testimony of the other

15   officers, and depending on what they say, I may not need

16   Officer Devey, but I would like him.

17         THE COURT:  You don't want to ask him any

18   questions right now?

19         MR. CEPHAS:  Well, I don't have anything that --

20         THE COURT:  "Yes" or "no", come on.

21         MR. CEPHAS:  No.  No.

22         THE COURT:  Okay.  Mr. Walsh?  Mr. Navarro?

23         MR. WALSH:  No questions, your Honor.

24         THE COURT:  You may step down.

25             Your next witness.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MS. EL-AMAMY:  The government calls Michael

2     Precup.

3          (The witness was sworn.)

4          THE CLERK:  Please be seated.  Please state your

5     name and spell your last name for the record.

6          THE WITNESS:  Michael Paul Precup, P-R-E-C-U-P.

7

8                    DIRECT EXAMINATION

9     BY MS. EL-AMAMY:

10    Q     Good afternoon, Mr. Precup.  How are you currently

11    employed?

12    A     I am employed by the San Bernardino County

13    Sheriff's Department.

14    Q     In what capacity?

15    A     I am an automated systems analyst.

16    Q     What does that mean?

17    A     I work for their technical side of the division.

18    Q     Were you so employed in 2009?

19    A     Yes.

20    Q     What are your job responsibilities?

21    A     I maintain the wiretap system for the San

22    Bernardino County Sheriff's Department.  I also do the

23    forensics for computers and cell phones and other

24    technical investigation stuff.

25    Q     So, specifically, in layman's terms, what is it

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that you do?

2    A      That is a tough call.  I set up and maintain

3    wiretaps, troubleshoot and make sure they are working

4    properly, everything gets handled properly.  Cell phone

5    investigations, if they arrest somebody and want

6    everything pulled off their phone, they give it to me.

7    Same with computers and all technical devices,

8    electronics.

9    Q      Was that essentially your job in 2009 as well?

10   A      Yes.

11   Q      Where do you do that job?

12   A      It is a covert location within San Bernardino

13   County.

14   Q      What kind of equipment is at that location?

15   A      We have obviously a lot of telephone lines coming

16   into the building.  We also have a lot of computer

17   equipment, servers to maintain, store all the data that

18   we collect.

19   Q      I guess you mentioned wiretaps, what is a wiretap?

20   A      Wiretap is basically an interception of telephone

21   communications between two parties.  It gets routed to us

22   from the telephone carrier.

23   Q      How does it work?

24   A      The telephone companies all have their telephone

25   switches that all phone calls traverse through, and I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    don't know exactly, but on their side, I know that they

2    have to go into their telephone switches and configure it

3    so that it goes to the intended party and then also to my

4    department.  And we provide the firmware for them to

5    submit our analog lines to.

6    Q     Can you wiretap any phone you want to?

7    A     No.  Not necessarily.  There are phones that cannot

8    be.  Satellite phones.  But most cell phones and land

9    lines, analog land lines that are built into houses can

10   be wiretapped.

11   Q     Do you need a court order to wiretap?

12   A     Yes, I do.

13   Q     Can you wiretap indefinitely?

14   A     No.

15   Q     How long do you wiretap for pursuant to federal

16   court order?

17   A     Each wiretap will give you 30 days of monitoring.

18   Q     So when you start a wiretap, what information comes

19   into whatever system you maintain?

20   A     You get the, obviously, the analog audio from the

21   conversation.  You also get the call data content which

22   is the call direction, the number dialed where its last

23   known switch, where it was connected from.

24   Q     Do you have individuals who monitor the wiretap?

25   A     Yes, we do.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q      What is their job?

2   A      Their job is to listen to the telephone call,

3   determine if the content is pertinent or not pertinent.

4   If it is nonpertinent, then you need to minimize the

5   phone call, or if it is privileged between the privileged

6   parties, then they stop listening to the phone call.

7   They also do transcription and take notes for the case

8   agents.

9   Q      Is there something called a line sheet?

10  A      Yes.

11  Q      What is that?

12  A      It is something they use to keep track of calls

13  coming through, of hot calls.

14  Q      Can you record a call without monitoring it?

15  A      Only in a consent.  If it is a consented party.

16  Both parties agree to the phone call or a single party to

17  a pretext call.  Otherwise, it has to be monitored.

18  Q      So in the case of a regular wiretap, basically,

19  walk me through what happens when a call is made by an

20  individual using a telephone.

21  A      If it is a regular standard Title III wiretap, the

22  called party will actually, the calling party will place

23  the phone call.  The telephone carrier will start routing

24  the call to us, we will hear the -- we will get the

25  information ingoing, outcoming, the called party number

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   then we will start getting the audio feed.  You will hear

 2   the called party pick up the call and the call will take

 3   place.  A monitor must be in place to monitor these calls

 4   and listen to it to determine whether or not it is

 5   actually pertinent or nonpertinent call.

 6            If at that point, they determine that it is a

 7   pertinent call, they will sit there and listen to it.

 8   They will start writing notes as they hear it come

 9   across.  If the call then switches to a nonpertinent

10   situation, they have to minimize the call.  And at that

11   point of minimization, you don't hear any more of the

12   audio.  It goes back to being silent.  And after

13   two minutes, you can go back in for 30 seconds and spot

14   check if they're back to talking to pertinent calls.

15   Q     Prior to coming into court today, did you review

16   any recordings related to this case?

17   A     Yes, I did.

18   Q     Do you know what year those recordings were from?

19   A     They were from start of 2009.

20   Q     Now, prior to coming to court today, when did you

21   review those recordings?

22   A     It was Tuesday of last week.

23   Q     How were you able to review recordings from

24   three years ago?

25   A     We keep and store all calls that we have recorded

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    since the inception.

 2    Q      Where do you store them?

 3    A      Locally in San Bernardino.

 4    Q      What information specifically do you store at your

 5    location?

 6    A      Both the audio and the call detailed information.

 7    Q      What information is detailed for the call?

 8    A      The call direction whether it was incoming or

 9    outgoing.  The phone number dialed, any post-cut digits,

10    if they dialed the number after the phone was picked up,

11    that type of data plus the synopsis that if anybody who

12    typed or transcribed the phone call would have typed into

13    it.

14    Q      So you have the audio stored at your location?

15    A      Yes.

16    Q      And do you also have all this call data that you

17    mentioned?

18    A      Yes.

19    Q      How do you know that nothing has changed over the

20    last three years?

21    A      On the calls themselves?

22    Q      Calls themselves or the data.

23    A      The information is kind of coherent to each other.

24    The database has all the call-detailed records, and it

25    points towards the audio file which has similar
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   information into it.  It is the way the files are named.

2   Q      Now, does this call data include a date and time of

3   the call?

4   A      Yes.

5   Q      Where is that information stored?

6   A      That is also in the database and in the phone call.

7   Q      Is it possible for an individual working at your

8   location to accidentally change that information?

9   A      Yes, but it would break a lot of things.  If you

10  deleted the phone call, the audio then obviously wouldn't

11  point to something in the database, and it wouldn't work.

12  Q      Based on your review of the data and recordings in

13  this case, do you believe that anything has been altered?

14  A      No.

15  Q      And why do you believe that?

16  A      Because all of the calls that we tested and checked

17  were exactly where they were supposed to be and worked.

18  Q      Now, I am going to ask you to look at all of the

19  disks.  Those are 71 through I believe 181.  Do you have

20  71 through 181 in front you?

21  A      I have 71 through 81.

22  Q      And then through 181.

23          Now, you mentioned that you met and reviewed

24  certain items Tuesday of last week.  Did you review all

25  of these disks last week?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A      Yes, I did.

2    Q      How do you know that you reviewed all of those

3    disks?

4    A      Excuse me.  I have initialed and dated all of the

5    disks.

6    Q      And when you initialed and dated the disks, what

7    were you saying was on the disk?

8    A      That there was a telephone call that we intercepted

9    on the phone call on the CD.  Excuse me.

10   Q      Did you match the call data against what was on

11   your system?

12   A      Yes, I did.

13   Q      And how did you do that?

14   A      The file name of the disk would give the date and

15   time of the phone call.

16   Q      Let me just have you flip through them just to make

17   sure that everything has your initial.  As you are

18   flipping through, approximately how long it did it take

19   for you to review the disks?

20   A      It took about four to five hours.

21   Q      As you are continuing to flip through, did you also

22   review transcripts at the same time?

23   A      Yes, I did.

24   Q      What did you do with respect to the transcripts?

25   A      I also initialed and dated them.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q     When you were initialing the transcripts, what were

2    you signifying at that point?

3    A     That the dates and times and the durations of the

4    phone call matched the CD's and my database on my work

5    station.

6    Q     Now, the transcripts also have names of people on

7    there.  Are you able to tell who is speaking based on

8    your review?

9    A     Not necessarily, no.

10   Q     So your review was just for call data information?

11   A     Just to make sure that the data was correct and

12   true.

13   Q     Now, as you are continuing to flip through, did you

14   also look at the telephone numbers?

15   A     Yes, I did.

16   Q     Were you able to verify that the telephone numbers

17   on the call data and the transcripts were accurate?

18   A     Yes, I did.

19   Q     And how were you able to do that?

20   A     The database was used to pull up the phone calls

21   and I searched by phone number.  That was my key.

22   Q     You flipped through a number of disks, are you

23   satisfied that everything you looked at so far is what

24   you initialed?

25   A     Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q     All right.  Now, I am going to direct your

 2   attention to, for example, Exhibit 157A and ask that the

 3   courtroom deputy hand you.

 4            Do you see your initials on that transcript?

 5   A     Yes, I do.

 6   Q     What do those initials signify?

 7   A     Signifies that the CD that I looked at and the

 8   transcripts -- well, the date and times and the duration

 9   and the called number matched my database.

10   Q     Did you make the same notation on every transcript?

11   A     Yes, I did.

12   Q     Have you reviewed all of those transcripts coming

13   to court today?

14   A     Previously.  Yes.

15   Q     And so you have the telephone numbers, the

16   duration, date and time?

17   A     Correct.

18        MS. EL-AMAMY:  I have no more questions at this

19   point.

20        THE COURT:  Any cross?

21

22                    CROSS-EXAMINATION

23   BY MR. CEPHAS:

24   Q     Good afternoon, Mr. Precup

25   A     Hello.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q    What was the timeframe of the calls that were

2    recorded in this case?

3    A    I believe it started in early of 2009.  I do not

4    know what the last call was recorded.

5    Q    Can you provide an estimate of approximately how

6    many calls were recorded?

7    A    No.

8    Q    Several thousand?

9    A    Yes.

10   Q    More than 5,000?

11   A    I do not know.  I know there was 14 numbers that

12   were included in the investigation.

13   Q    Okay.  Now, the exhibits that you were asked to

14   review, it was approximately 111 calls, 110, 111 calls;

15   correct?

16   A    Correct.

17   Q    You said you reviewed them and took four to

18   five hours, when you said you reviewed them, did you

19   listen to each of the calls?

20   A    For a portion of it.  Yes.

21   Q    You only listened to a portion.  You didn't listen

22   to the entire call?

23   A    No, I did not.

24   Q    Is it correct that of those 111 or so calls, there

25   were only two with Raul Prieto; correct?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      I did not look at the names.

 2          MR. CEPHAS:  Nothing further.

 3

 4                      CROSS-EXAMINATION

 5   BY MR. NAVARRO:

 6   Q      Good afternoon, sir.

 7   A      Hello.

 8   Q      So would would it be correct to say that you are

 9   like an IT person?

10   A      Yes.

11   Q      With the sheriff's department?

12   A      Yes.

13   Q      You are not a police officer?

14   A      I am not sworn.

15   Q      And you are not in those wire rooms listening to

16   the calls either?

17   A      And I am not a monitor, no.

18   Q      Now, you were asked how many numbers were recorded,

19   and you said there were 14 numbers recorded?

20   A      Yes.

21   Q      Now, do you know if these numbers were recorded

22   only for 30 days or were there multiple requests to

23   record the numbers?

24   A      Some of them were re-upped for extended times.

25   Q      Are you able to tell how many of the numbers were
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    recorded more than 30 days?

 2    A    I do not have that information in front of me.

 3    Q    And you can't tell us exactly how many calls?

 4    A    No.  I would be able to if it was requested.

 5    Q    But it was in the thousands; correct?

 6    A    It was many calls.

 7         MR. NAVARRO:  Thank you.  No questions.

 8

 9                    CROSS-EXAMINATION

10    BY MR. WALSH:

11    Q    In the location where the recording is, is it a

12    secured location in San Bernardino?

13    A    Yes.

14    Q    Now, this is a location that is operated by the San

15    Bernardino Sheriff's Department?

16    A    Yes, my location, yes.

17    Q    Okay.  And does the -- are there more than

18    one location in San Bernardino?

19    A    We have wire rooms in our homicide units.  We

20    support wire rooms for Riverside DEA, Riverside SO,

21    Southern California Drug Task Force, Ventura, there is

22    multiple agencies that we actually provide wiretaps for.

23    Q    And what was the agency in this case that you were

24    providing wiretap services for?

25    A    I believe this was Riverside DEA.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   Q      And did I hear you correctly, there was 14

2   telephone numbers that were being tapped in this

3   investigation?

4   A      Yes.  That I am aware of, yes.

5   Q      And do you recall the number of months or years

6   during which this investigation took place?

7   A      It was early 2009, and I believe it went into 2010

8   but I don't know how far.

9   Q      And while these particular 14 phones were being

10  monitored, were other wiretap investigations going on at

11  the same time during 2009 and 2010?

12  A      Yes.

13  Q      How many other investigations?

14  A      I believe we do about 2,000 a year.

15  Q      2,000 telephones?

16  A      Yes.

17  Q      And how large of a staff of monitors do you have at

18  that location?

19  A      At my location, it all depends on how many wires

20  each case is doing.

21  Q      On an average day.

22  A      Well, we would have one wire monitor per line that

23  we were active on.

24  Q      In this particular case, you had 14 lines that were

25  active?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      Yes.

 2    Q      And there were other investigations going on in the

 3    same time period; is that correct?

 4    A      Correct.

 5    Q      So there would be 14 monitors?

 6    A      At least 14 monitors, yes.

 7    Q      So then there had to have been additional monitors

 8    of the other lines; is that correct?

 9    A      Yes.  If there were other investigations going on

10    at that facility.

11    Q      And during that period of time, what was the

12    average number of monitors that you had to have?

13    A      For that facility, I would not know.

14    Q      And your work at the facility is just maintaining

15    the equipment?

16    A      To set up and install the wires, maintain them,

17    make sure they work through the duration.

18           MR. WALSH:  Nothing further, your Honor.

19           THE COURT:  Any redirect?

20           MS. EL-AMAMY:  No, your Honor.

21           THE COURT:  May this witness step down?

22           MS. EL-AMAMY:  Your Honor, before he steps down,

23    we would ask to move into evidence the transcripts for

24    Exhibits 71 through 181 which are marked as 71A through

25    181A as well as Exhibits 71 through 181.
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Any objection?
 2          MR. WALSH:  I don't think there has been any
 3  identification of the voices on those transcripts.
 4          MS. EL-AMAMY:  With the understanding that those
 5  identifications, the people on the transcripts will be
 6  identified through later witnesses.
 7          THE COURT:  My understanding is he has just
 8  identified that the transcripts are accurate reflections
 9  of what is on the disk; right?
10          MS. EL-AMAMY:  Correct.  With the dates and the
11  times.
12          THE COURT:  All right.  They will be admitted.
13  You may step down, sir.
14              Do you have another witness?
15          MS. EL-AMAMY:  Yes, your Honor.  The government
16  calls Juan Lemus.
17          THE COURT:  How about one of those potted plants
18  sitting at counsel table help you get witnesses in here.
19          (The witness was sworn.)
20          THE CLERK:  Please state your name and spell your
21  last name for the record.
22          THE WITNESS:  My name is Juan Lemus, L-E-M-U-S.
23  ///
24  ///
25                       DIRECT EXAMINATION
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1  BY MS. EL-AMAMY:

 2  Q     Good afternoon.  How are you employed?

 3  A     Good afternoon.  I am a site supervisor for a

 4  company called Metropolitan Interpreters and Translators,

 5  and I also do private consulting for the U.S. government.

 6  Q     Do you have your own company?

 7  A     Yes, I do.

 8  Q     Has the government hired you in any capacity in

 9  this case?

10  A     Mostly as a transcriber, quality control

11  consultants and also as an expert witness to testify in

12  some of the drug trafficking cases and gang cases.

13  Q     Well, specifically, with respect to this case, have

14  you been hired to do anything?

15  A     Yes.  To produce transcripts, to revise quality

16  control and validate the accuracy of the transcripts.

17  Q     Do you speak both English and Spanish?

18  A     Fluently.  Yes.

19  Q     Do you have any, specialized training in Spanish?

20  A     Well, I am a native-born Spanish speaker.  I also

21  obtained a Bachelor of Arts from the University of

22  Southern California, USC, and I have also taken tests for

23  the Drug Enforcement Administration and for the FBI.

24  Yes.

25  Q     So have you listened to recordings prior to coming
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to court today?

2    A      Well, I have been working as a contract site

3    supervisor for DEA for approximately 16 years.  I have

4    been involved in over a hundred cases' investigations,

5    and I monitor and listen to thousands and thousands of

6    intercepted telephone calls.

7    Q      With respect specifically just to this case, have

8    you listened to any recordings?

9    A      Many.  Yes.

10   Q      Why did you do that?

11   A      I was hired by the government to produce

12   transcriptions and some transcripts that had been

13   produced, I was asked to revise and do quality control on

14   them.

15   Q      What does that mean specifically?

16   A      Check for accuracy, check for correct

17   interpretation, translation of the verbatim.  If the call

18   was in Spanish, translate it into English.  If it was in

19   English, to make sure that it was correctly transcribed

20   verbatim.

21   Q      So, in this case, were you hired, then, to prepare

22   transcripts just transcribing what you heard on certain

23   recordings?

24   A      That is correct.

25   Q      Approximately how much time did you spend doing

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   this job?

 2   A     Hundreds of hours.  I mean, particularly in this

 3   case, I would say four or five hundred hours, I mean, a

 4   lot of hours.  There were so many transcripts to prepare.

 5   Q     Were you paid?

 6   A     Yes.  I am getting paid.  Yes.

 7   Q     What were your rates?

 8   A     For the production of transcription, I charge $48

 9   per hour.  For revision and validating transcripts, I

10   charge 52 an hour, and that is based on the production,

11   if I am transcribing, I produce two minutes of recording

12   in one hour, and if I am revising, doing quality control,

13   I produce double amount which is four minutes of

14   recording per one hour labor.

15   Q     Are you getting paid to testify here today?

16   A     Yes, I am.

17   Q     And how much are you getting paid?

18   A     I am getting paid 175 an hour for testifying.

19   Q     So approximately how many recordings did you listen

20   to in this case?

21   A     Hundreds.  I haven't counted them, but I believe it

22   is close to 400, 450.

23   Q     Let me direct your attention to Exhibits 71 through

24   181 which is a series of disks?

25   A     Okay.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Prior to coming to court today, did you look at all

2    of the disks marked 71 through 181?

3    A      Yes.  I have.

4    Q      Did you initial them?

5    A      Yes, I did.

6    Q      When you initialed them, what were you reflecting?

7    A      Again, I was making sure I was doing like a final

8    revision.  I was making sure they have transcripts that

9    had been prepared, matched the audio recording in that

10   particular disk.

11   Q      Were you also matching the digital data on the

12   disk?

13   A      That is correct, yes.

14   Q      What is digital data?

15   A      Digital data is not only the audio WAV files that

16   have been recorded and the disk itself, but also data

17   such as dates, time stamps on every call that was

18   intercepted.

19   Q      Okay.  Now, I am going to direct your attention to

20   Exhibits 71A through 181A which have already been

21   admitted into evidence.  As you are flipping through, do

22   you recognize those transcripts?

23   A      Yes, I do.

24   Q      Did you prepare those transcripts?

25   A      Yes, I did them.  Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q       Okay.  And did you sign with your initials every
 2   transcript?
 3   A       Initialed and I dated.  Yes.
 4   Q       When you were initialing and dating, what were you
 5   saying with your initial and date?
 6   A       That they were finalized.
 7   Q       What does finalized mean?
 8   A       They were fully reviewed.  They were accurate to
 9   the best of my knowledge and that they were ready to
10   present in court.
11   Q       Now, I am going to show you as an example, 157A
12   which has already been admitted into evidence.
13           Taking a look at the first page, do you see
14   your initials?
15   A       Yes.  Twice.
16   Q       Why did you initial that one twice?
17   A       It is two different dates that I initialed it.  And
18   the reason for that was because the first time that I
19   reviewed them, although the audio calls were in one DVD,
20   then I was asked by the government to come back and go
21   through them again because now the audio were
22   individually recorded and individual disks.
23   Q       All right.  So you see a date on the top.  Did that
24   date match the digital?
25   A       I can't see the date on my screen.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q     Sure.

2    A     Yes.  The date, time, duration.

3    Q     Okay.  Now, it says two individual's names, David

4    Navarro and Armando Barajas.  Have you ever met either of

5    those individuals?

6    A     I never have.

7    Q     All right.  How did you put those names there?

8    A     Well, this call was intercepted in the government

9    agency's wire room, and the systems that are used, we

10   produce line sheets.  As a site supervisor, I staff

11   monitors to intercept these calls and the names of the

12   participants are usually obtained through line sheets of

13   individuals that have been identified either by the

14   investigating agents through DMV records, through calls

15   that have already been intercepted where people have been

16   identified.

17         In this particular case, me preparing the

18   transcripts, I not only used the line sheets but also

19   used the indictments to learn the name of the individuals

20   and to learn also the monitors.

21   Q     But, basically, that information, you were using

22   that information to figure out who to put on there.  You

23   don't know for certain that that is the individual who

24   was speaking?

25   A     No.  But by listening to the recordings and reading
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    the line sheet and learning who is saying what, I become
 2    familiar who the speakers are, yes.
 3    Q     So basically you become familiar with a voice?
 4    A     With a voice, correct.
 5    Q     Not necessarily who the person is but just that
 6    that person who you identified as David Navarro has the
 7    same voice in all the transcripts?
 8    A     Who has been identified in the line sheet.  Yes.
 9    Q     So you recognize the voice of Armando Barajas?
10    A     That is correct, yes.
11    Q     Okay.  Now, I am going to show you the first page
12    of your transcript, and there are some words in italics
13    and some that are not in italics.  What does that mean?
14          MR. CEPHAS:  Objection, your Honor.
15          THE COURT:  Foundation?
16          MR. CEPHAS:  Well, I believe there hasn't been
17    adequate foundation --
18          THE COURT:  Overruled.
19          MR. CEPHAS:  -- to show these.
20          THE COURT:  Go ahead.
21    Q     BY MS. EL-AMAMY: Just looking at what is -- the word
22    "nothing" is in italics, and the word "oh" is not.  What
23    does that mean?
24    A     That means that any word that was spoken in Spanish
25    in that recording, it was translated into English and was
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    italicized.  So the word "nothing" was a word that was
 2    spoken in Spanish and it was translated into English.  So
 3    therefore I italicized it to indicate it was a Spanish
 4    speaking word in that recording.
 5    Q     So throughout all the transcripts that you initial,
 6    every time we see the word in italics, that is a word
 7    that you translated verbatim into English?
 8    A     From Spanish to English.  Yes.
 9    Q     Did you translate using code language or anything
10    like that, or was it just a verbatim translation?
11    A     In this particular case, it was verbatim
12    translation.
13    Q     And that is the practice that you used in 71A
14    through 181A, all the transcripts?
15    A     That is correct.
16    Q     Okay.  Now, you have never met an individual by the
17    name of Carlos Rivera; is that correct?
18    A     I never have.
19    Q     You would not be able to identify him, would you?
20    A     No, I would not.
21    Q     Have you, in some of these exhibits, listed him as
22    a speaker in some of the calls?
23    A     Yes.  In many of the calls, yes.
24    Q     And in the calls where you listed him as a speaker
25    in all the transcripts, did that individual have
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    consistently the same voice?

 2    A      Yes, he did.

 3    Q      Okay.  You never met Jessica Medina, have you?

 4    A      I never have.

 5    Q      Did you list her in some of the transcripts?

 6    A      Yes, I did.

 7    Q      Can you recognize her voice?

 8    A      Yes, I could.

 9    Q      Same question for Raul Prieto?

10    A      Yes.

11    Q      Approximately how many calls did you listen to with

12    an individual who you listed as Raul Prieto?

13    A      Aside from the transcripts I have prepared, I would

14    say within a dozen including pertinent and not pertinent

15    calls, yes.

16    Q      But you, again, have never met that individual?

17    A      I never have.

18           MS. EL-AMAMY:  No further questions.

19           THE COURT:  Cross.

20

21                      CROSS-EXAMINATION

22    BY MR. WALSH:

23    Q      So not having met any of the people that were

24    actually on the telephone, you had to rely on somebody

25    else to tell you what the name was; is that right?
```

```
1   A       Not only that, but in some of the recordings, they

2   would actually identify themselves within the recordings.

3   Q       With their full name, first and last name?

4   A       No.  Most of the time it is first name or their

5   moniker.

6   Q       And were there occasions where there would be

7   two people with the same name?

8   A       Not that I recall.  I mean, again, other times,

9   they used their monikers, but not that I recall.

10  Q       Well, were there two Jessica's?

11  A       As far as I remember, I was familiar with Jessica

12  Medina also known as Jess that I got familiar with.

13  Q       Well, was there a Jessica Perez?

14  A       It could have been.  I prepare only calls that I am

15  requested by the government to prepare.  So I am -- it

16  could have been.  Yes.

17  Q       So then you would on those cases where you would

18  hear a call and someone would self identify themself,

19  they would self identify themself with a first name; is

20  that correct?

21  A       That is correct.  Yes.

22  Q       And then you would take that first name and get

23  other information from other investigators who would tell

24  you that that first name is connected or associated with

25  another last name; is that right?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      That is correct, yes.

 2    Q      And then you would accept that representation from

 3    the other agents, and you would put those names on the

 4    transcript; is that right?

 5    A      That is correct, yes.

 6    Q      And then the familiarity that you would develop

 7    would be upon hearing a voice that had been identified by

 8    someone else and then you would hear that voice on

 9    subsequent telephone calls?

10    A      Correct.   I would become familiar with the voice.

11    Yes.

12           MR. WALSH:   Nothing further.

13

14                     CROSS-EXAMINATION

15    BY MR. CEPHAS:

16    Q      Good afternoon.

17    A      Good afternoon.

18    Q      You reviewed 71 through 181; correct?

19    A      Yes.

20    Q      In addition, did you review -- not for this trial,

21    but during your work in this case -- hundreds of other

22    calls?

23    A      That is correct.

24    Q      In fact, did you review thousands of calls?

25    A      It could have probably reached a thousand, but I
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1    know there were hundreds.  Yes.

2    Q     And of all the calls you reviewed, there was

3    approximately a dozen calls with a voice that you believe

4    was associated with someone named Prieto; correct?

5    A     Prieto.  That is correct, yes.

6    Q     And you said some were pertinent, some were

7    nonpertinent calls?

8    A     That is correct.  Yes.

9    Q     Can you explain to me what a nonpertinent call is?

10   A     A nonpertinent call could be a recording, a

11   telephone call that was intercepted during an

12   investigation that could have been a casual conversation

13   that could be a conversation that talked about a general

14   topic that was not pertinent to the case.

15         MR. CEPHAS:  Thank you.  Nothing further.

16

17                   CROSS-EXAMINATION

18   BY MR. NAVARRO:

19   Q     Afternoon, sir.

20   A     Afternoon.

21   Q     Now, how long have you had your company?

22   A     The company itself, I started actually this year on

23   my own.  A private company, myself, this year.

24   Q     And how long have you been doing this work?

25   A     For approximately 16 years now.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  Q     Now, what educational background do you have in the

2  Spanish language?

3  A     Well, again, I am a native Spanish speaker.  I did

4  obtain a BS in Spanish from USC.  Just listening,

5  thousands and thousands of this type of investigations,

6  and having testified in federal and state courts and with

7  all the experience that I have now obtained not only in

8  supervising hundreds of monitors who are actually

9  intercepting Title III federal and state authorized

10 wiretaps, but also I had the opportunity to work with

11 them closely with law enforcement with federal agents and

12 local officers.

13 Q     Now, is your schooling in this country or in other

14 countries as well?

15 A     I did some schooling in Mexico, but most of my

16 schooling has been here in the United States, that is

17 correct.  Yes.

18 Q     Now, have you taken any, like, exams to be

19 certified as an interpreter?

20 A     Not for the State of California, but I have taken

21 the exams that DEA provides for me to do this type of

22 work, and also I took exams that the FBI gives for their

23 Spanish linguists, and I passed both of them.

24 Q     I'm sorry.  And have you taken the federal

25 interpreters test?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   A     No, I have not.

2         MR. NAVARRO:  Thank you, your Honor.  No further

3   questions.

4         MS. EL-AMAMY:  Just a few questions, your Honor.

5

6                    REDIRECT EXAMINATION

7   BY MS. EL-AMAMY:

8   Q     You mentioned that some individuals identified

9   themselves by moniker.  What moniker did the individual

10  that you list in your transcripts, Carlos Rivera,

11  identify himself as?

12  A     Himself as Chino or other people call him Chino.

13  Q     All right.  Any others?

14  A     No.  Mostly Chino.  Chino was the only one I

15  recall.

16  Q     Did you ever hear the person referred to as Jessica

17  Medina in your transcripts refer to Chino?

18  A     Jessica did mention Chino many, many calls.  Yes.

19  Q     And what about the individual that you list as Raul

20  Prieto, did he go by any moniker?

21  A     Yes.  He went by the moniker Crook, Crooks.

22        MS. EL-AMAMY:  Your Honor, at this time, I would

23  move to admit into evidence 71B through 181B which is the

24  Spanish language portion of the calls.

25        THE COURT:  Any objection?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. CEPHAS:  Object to the extent that the

 2   documents identify the speaker because those names are

 3   based on hearsay.

 4          MS. EL-AMAMY:  That is fine, your Honor.  Just

 5   moving in for the content of the Spanish language

 6   content.

 7          THE COURT:  The translations; right?

 8          MS. EL-AMAMY:  That's correct.

 9          THE COURT:  That is all that is coming in.  All

10   right.  Admitted.

11          MS. EL-AMAMY:  No further questions.

12          THE COURT:  You may step down, sir.

13          THE WITNESS:  Thank you.

14          THE COURT:  All right.  Ladies and gentlemen, we

15   are going to break for the day.  I understand that you

16   have elected your hours; right?  All right.  Break the

17   bad news to us.  What is it going to be?

18          THE JUROR:  8:00 o'clock.

19          THE COURT:  Okay.  See you bright and early.

20             Do not talk about this case amongst your

21   selves.  Don't do any research at home or get on the

22   Internet and start looking for anything.  Don't chat

23   about this online, text-messaging, blogs, Twitter, any of

24   that foolishness, please.  And we will see you first

25   thing in the morning.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          (At 4:45 p.m., proceedings concluded.)
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  December 5, 2012

 /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA