1          UNITED STATES DISTRICT COURT

2      CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3        *HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE*

4                      – – –

5   UNITED STATES OF AMERICA,            )
                                         )
6                       Plaintiffs,      )    Case No.
                                         )
7             vs.                        )   CR 10–00351–ODW
                                         )
8   CARLOS RIVERA (7),                   )
    JESSICA MEDINA (27),                 )
9   AND RAUL PRIETO (29),                )
                                         )
10                      Defendants.      )
    _____     )

11

12

13

14            *REPORTER'S TRANSCRIPT OF*
              *JURY TRIAL – DAY 2*
15        *WEDNESDAY, DECEMBER 5, 2012*
                  *8:00 A.M.*
16          *LOS ANGELES, CALIFORNIA*

17

18

19

20

21

22

23   _____

24        *VICTORIA L. VALINE, CSR 3036, RMR, CRR*
          FEDERAL OFFICIAL COURT REPORTER
25        312 NORTH SPRING STREET, ROOM 440
          LOS ANGELES, CALIFORNIA  90012
             www.victoriavalinecsr.com

*UNITED STATES DISTRICT COURT*

1        *APPEARANCES OF COUNSEL:*

2

3    *FOR THE PLAINTIFF:*

4            ANDRÉ BIROTTE, JR.
             United States Attorney
5            BY:  Reema M. El-Amamy,
                 Michael H. Dore,
6            Assistant United States Attorneys
             United States Courthouse
7            312 North Spring Street
             Los Angeles, California  90012
8

9    *FOR THE DEFENDANT CARLOS RIVERA:*

10           LAW OFFICES OF ANGEL NAVARRO
             Attorney at Law
11           BY:  Angel Navarro, Esq.
             714 West Olympic Boulevard, Suite 450
12           Los Angeles, California 90015
             213-744-0216
13

14   *FOR THE DEFENDANT JESSICA MEDINA:*

15           LAW OFFICES OF JOSEPH F. WALSH
             Attorney at Law
16           BY:  Joseph F. Walsh, Esq.
             205 South Broadway, Suite 606
17           Los Angeles, California 90012
             213-627-1793
18

19   *FOR THE DEFENDANT RAUL PRIETO:*

20           LAW OFFICES OF DANA CEPHAS
             Attorney at Law
21           BY:  Dana Cephas, Esq.
             72960 Fred Waring Drive
22           Palm Desert, CA 92260

23

24

25

*UNITED STATES DISTRICT COURT*

1          *LOS ANGELES, CALIFORNIA;  WEDNESDAY, DECEMBER 5, 2012*

2                            *8:00 A.M.*

3                             *-  -  -*

4              *(The following proceedings were held outside the*

5      *presence of the members of the jury and the alternates.)*

6                            *--o0o--*

7              THE COURT:  Good morning.

8              MR. CEPHAS:  Your Honor, we're just requesting an

9      order allowing Mr. Prieto and Ms. Medina to carpool together,

10     otherwise they're not permitted by the terms of their

11     pretrial release.

12             THE COURT:  All right.  Is there a condition that

13     they are not to associate with other members of Black Angels?

14             MR. CEPHAS:  Yes.  And other co-defendants.

15             THE COURT:  Okay.  Well, then for the purpose of the

16     trial only, then the Court will relax that restriction so

17     they can carpool back and forth to court.  Of course this

18     relaxation ceases upon the termination of this trial.

19             MR. CEPHAS:  Thank you, your Honor.

20             THE COURT:  Okay.

21             MR. DORE:  Your Honor, before we begin, may I raise a

22     few issues?

23             THE COURT:  Yes.

24             MR. DORE:  First of which is we have some physical

25     exhibits, which is a firearm and the other of which is

**UNITED STATES DISTRICT COURT**

1    ammunition.  The firearm is nonoperational, but I wanted to

2    see what the Court's preference was as far as -- I was

3    intending to have the agent bring it up to the law

4    enforcement witness to identify it, and he's obviously going

5    to retain custody.  Is that okay with the Court?

6              THE COURT:  It's okay with me.  It will be empty,

7    right?

8              MR. DORE:  Yes.

9              THE COURT:  It's a revolver?

10             MR. DORE:  Correct.

11             THE COURT:  The cylinder will stay open?

12             MR. DORE:  Yes.

13             THE COURT:  Okay.

14             MR. DORE:  And it has a --

15             THE COURT:  Perfect.

16             MR. DORE:  -- strap --

17             THE COURT:  Perfect.

18             MR. DORE:  The parties have entered into three

19    separate stipulations.  I was wondering, at this point, if we

20    could admit them into evidence and admit the evidence that

21    were covered in the stipulations?

22             THE COURT:  Sure.  Go.

23             MR. DORE:  The stipulations are 275, 276, and 277.

24             THE COURT:  Okay.

25             MR. DORE:  And the exhibits -- the parties agreed to

1    being admissible were 217, 219, 221, and 223, all of which

2    those exhibits are referenced in the stipulation marked as

3    Exhibit 277.

4         The stipulation marked as Exhibit 275 related to the

5    felony conviction of Mr. Rivera.

6         The stipulation number 276 related to the interstate

7    nexus and the firearm and ammunition marked as Exhibit 236

8    and 237.

9         And then the stipulation 277 is -- relates to the

10   controlled substances and references within it the amounts of

11   methamphetamine and the lab reports identifying the

12   substances as being methamphetamine, and those are the

13   exhibits.  So we'd ask that those seven exhibits be admitted

14   into evidence.

15        THE COURT:  All right.  Since they are stipulations,

16   I take it there's no opposition, so they will be admitted.

17        Now, I suppose at sometime -- well, I guess included

18   in the final instructions I'll instruct --

19        MR. DORE:  Your Honor, I was wondering --

20        THE COURT:  -- no.  It won't be necessary, will it,

21   to instruct them on the effect of a stipulation.

22        MR. DORE:  I have to reference the stipulation to see

23   if when it says, you may only consider the following as

24   evidence, you know, witness testimony, exhibits entered into

25   evidence.

1      THE COURT:  All right.

2      MR. DORE:  But also, I was wondering if at the

3  appropriate time I could read the relevant portions of a

4  given stipulation into evidence?

5      THE COURT:  Sure.

6      MR. DORE:  Other than that, I wanted to notify the

7  Court and the parties one of the exhibits, Exhibit 100, was

8  something that we had identified in our pretrial filing as

9  something that we were going to seek to admit into evidence,

10  it was a transcript involving Ms. Medina.  I believe the

11  Court had ordered that that document -- that recording could

12  be admitted.  I just wanted to let the Court know that that

13  was something that we were going to play after -- or seek to

14  play after the officers had testified as to the facts

15  contained within that call.

16      THE COURT:  All right.

17      MR. DORE:  And finally, Exhibit 89 is a recording

18  that will come out -- sorry.

19      Exhibit 89 is a recording that will come up with

20  Officer Martinez when he testifies.  Because there's so many

21  exhibits, I just wanted to make sure everyone is aware that

22  is the recording that Officer Devey had identified

23  Mr. Prieto's voice in.

24      THE COURT:  Okay.

25      MR. DORE:  And so we were intending, after Officer

*UNITED STATES DISTRICT COURT*

1    Martinez identified Mr. Rivera's voice, to play that call as

2    well.

3          THE COURT:  To play that.  All right.  Fine.

4          MR. DORE:  Thank you, your Honor.

5          THE COURT:  Okay.

6          *(The following proceedings were held in the presence*

7    *of the members of the jury and the alternates.)*

8                         --o0o--

9          THE CLERK:  Calling item 1, CR-10-351, United States

10   of America versus Carlos Rivera, et al.

11         Counsel, may I have all appearances?

12         MS. EL-AMAMY:  Good morning, your Honor.  Reema

13   El-Amamy and Michael Dore on behalf of the United States.

14         THE COURT:  Good morning, counsel.

15         MR. DORE:  Good morning.

16         MR. WALSH:  Good morning, your Honor.  Joseph Walsh

17   on behalf of Jessica Medina, who is present.

18         MR. CEPHAS:  Good morning, your Honor.  Dana Cephas

19   on behalf Raul Prieto, who is present at counsel table.

20         MR. NAVARRO:  Good morning, your Honor.  Angel

21   Navarro with Mr. Carlos Rivera.  He's seated to my left.

22         THE COURT:  Good morning everyone.  All right.  Our

23   next witness?

24         MR. DORE:  Your Honor, the government calls Officer

25   Brian Olvera.

*UNITED STATES DISTRICT COURT*

1      ***BRIAN OLVERA, GOVERNMENT'S WITNESS, SWORN***

2           THE CLERK:  Please raise your right hand.

3           Do you solemnly swear the testimony you are about to

4      give in the matter now pending before this Court shall be the

5      truth, the whole truth, and nothing but the truth, so help

6      you God?

7           THE WITNESS:  I do.

8           THE CLERK:  Please be seated.

9           THE WITNESS:  Thank you.

10          THE CLERK:  Please state your name and spell your

11     last name for the record.

12          THE WITNESS:  Officer Brian Olvera, B-R-I-A-N,

13     O-L-V-E-R-A.

14                      ***DIRECT EXAMINATION***

15     BY MR. DORE:

16     *Q.*   Good morning, Officer Olvera.

17     *A.*   Good morning, sir.

18     *Q.*   Where are you currently employed?

19     *A.*   I'm currently employed with the City of San Bernardino.

20     *Q.*   Where were you employed prior to San Bernardino?

21     *A.*   With the City of Upland.

22     *Q.*   During what period of time were you a -- were you a

23     police officer with Upland Police Department?

24     *A.*   Yes, I was.

25     *Q.*   During what period of time were you an officer of the

*UNITED STATES DISTRICT COURT*

```
 1   Upland P.D.?
 2   A.    Approximately 2004 to -- end of 2009.
 3   Q.    And where is Upland, California in relation to Ontario,
 4   California?
 5   A.    It's the neighboring city north of the City of Ontario.
 6   Q.    And are both of those cities in San Bernardino County?
 7   A.    They are both in the County of San Bernardino.
 8   Q.    Are you familiar with someone named Carlos Rivera?
 9   A.    Yes, I am.
10   Q.    Have you spoken with Carlos Rivera before?
11   A.    Yes, I have.
12   Q.    When was that?
13   A.    It was on the date of 3-8 of 2008.
14   Q.    And do you remember around what time you spoke with
15   Mr. Rivera?
16   A.    My initial contact was about one -- 0155 in the morning.
17   Q.    And where was that that you spoke with Mr. Rivera?
18   A.    It was at the 7-Eleven® convenience store located at
19   1594 West 7th Street in the City of Upland, County of
20   San Bernardino.
21   Q.    And were there any people with Carlos Rivera that night
22   when you encountered him in March of 2008?
23   A.    Yes, there was.
24   Q.    And was one of those people Raul Prieto?
25   A.    Yes, it was.
```

*UNITED STATES DISTRICT COURT*

1    Q.    Did you speak with Carlos Rivera that night?

2    A.    Yes, I did.

3    Q.    And what, if anything, did Mr. Rivera say about gang

4    affiliation?

5    A.    Mr. Rivera indicated to me that he was a gang member

6    with the Ontario Varrio Sur criminal street gang out of the

7    City of Ontario.

8             MR. DORE:  No further questions.

9             THE COURT:  Cross?  Any questions?

10            MR. NAVARRO:  No questions, your Honor.

11            MR. WALSH:  No questions.

12            THE COURT:  All right.  You may step down.

13            MR. CEPHAS:  Your Honor, I have questions.

14                      ***CROSS-EXAMINATION***

15   BY MR. CEPHAS:

16   Q.    Good morning, Mr. -- excuse me.  Good morning Officer

17   Olvera.

18   A.    Good morning, sir.

19   Q.    Have you ever spoken with me before?

20   A.    I have not.

21   Q.    Have you ever spoken with any of the attorneys

22   representing the defendants?

23   A.    I don't believe so, sir.

24   Q.    Okay.  To your knowledge have you spoken with any

25   defendant -- excuse me, any investigator, or paralegal, or

**UNITED STATES DISTRICT COURT**

1    anyone else working for any of the defendants?

2    A.    No, sir.

3    Q.    This incident at the 7-Eleven® that occurred back in

4    2008, you -- you wrote a report about that incident, correct?

5    A.    Yes, sir.

6    Q.    When's the last time you reviewed that report?

7    A.    Prior to coming in this morning, sir.

8    Q.    So you reviewed it this morning?

9    A.    Yes, I did.

10   Q.    And you're familiar with the report?

11   A.    Yes, sir.

12   Q.    You're trained to write reports as a police officer,

13   correct?

14   A.    That's correct, sir.

15   Q.    And you're trained to be as accurate as possible in

16   those reports, correct?

17   A.    Yes, sir.

18   Q.    And you tried to be accurate when you wrote that report?

19   A.    Yes, sir.

20   Q.    As part of your training, you understand that those

21   reports may become part of a criminal trial, correct?

22   A.    That's correct.

23   Q.    Now, in that report from the incident in March 2008, you

24   wrote in the report that marijuana and drug -- a drug pipe

25   was found in a truck at the scene of the incident; is that

*UNITED STATES DISTRICT COURT*

1    correct?

2    A.   Yes.  That's correct.

3    Q.   And you learned that that truck belonged to an

4    individual named Francisco Toscana, correct?

5    A.   Yes.  That's correct.

6    Q.   And later that evening, you arrested Mr. Toscana for

7    possession of marijuana and drug paraphernalia, correct?

8    A.   Yes.

9    Q.   Now, in your report you also report that -- you also

10   arrested Mr. Rivera that day, correct?

11   A.   Yes, I did.

12   Q.   And on that same day you arrested Mr. Prieto, correct?

13   A.   Yes.  I was involved with that, yes, sir.

14   Q.   Okay.  During the incident on May -- excuse me, in March

15   of 2008, two individuals ran from the scene when you and

16   another officer drove up; is that correct?

17   A.   It was more than two individuals, but my -- my attention

18   was drawn to two individuals specifically, yes.

19   Q.   Okay.  Mr. Prieto didn't run; isn't that correct?

20   A.   I can't recall if he did or did not upon my initial

21   contact, because I began my initial foot pursuit after Carlos

22   Rivera.

23   Q.   But if Mr. Prieto had run that day and you would have

24   noticed it, you would have put it in your report, correct?

25   A.   If I would have known who he was at the original time of

*UNITED STATES DISTRICT COURT*

1    contact, I would have put it in my report.  However, there

2    was several Hispanic males running from the scene.

3    Q.    Okay.  You did write in your report that another

4    individual named Daniel Navarro, he ran?

5    A.    Yes.  That's correct.

6    Q.    But Mr. Navarro -- and Mr. Navarro, who ran, he was

7    apprehended by a fellow officer, correct?

8    A.    Yes.  That's correct.

9    Q.    But Mr. -- Mr. Navarro was not arrested that evening,

10   correct?

11   A.    No, he was not.

12   Q.    The reason you stopped at that 7-Eleven® is you saw a

13   fight with a few individuals, correct?

14   A.    Yes.

15   Q.    Okay.  And the individual -- one of the individuals that

16   you saw fighting, who you referred to as Enrique Nunez, you

17   interviewed him at the scene, correct?

18   A.    Yes.

19   Q.    And, in fact, you recorded his statement on your digital

20   recorder; isn't that correct?

21   A.    I believe I did, yes, sir.

22   Q.    And you wrote that in your report that you recorded his

23   statement on a digital recorder?

24   A.    I would have to refer to my report to refresh my

25   recollection whether or not I did or did not.

**UNITED STATES DISTRICT COURT**

1    Q.    Do you have your report in front of you?

2    A.    I do, sir.

3    Q.    Can you turn to Page 3 of it?

4    A.    Yes, I will.  Yes, I did indicate I used my digital

5    recorder.

6          MR. DORE:  Objection, your Honor, move to strike as

7    hearsay.

8          MR. CEPHAS:  Your Honor, not offered for the truth of

9    the matter asserted.

10         THE COURT:  I am wondering why this isn't well beyond

11   the scope of the direct -- no, I'm not wondering that.  I

12   know that it is.

13         MR. CEPHAS:  Your Honor, it is -- I am going directly

14   to the point that he raised on direct that he claims -- he

15   testified that Mr. Rivera admitted that he was a member of

16   OVS.

17         THE COURT:  Okay.

18         MR. CEPHAS:  And his report he indicates that he

19   recorded the statements of several individuals, including the

20   statement of Rivera, and there is no evidence that Mr. Rivera

21   made the claim that he says.

22         THE COURT:  And you want to do this through a hearsay

23   document?

24         MR. CEPHAS:  No.  I'm not -- I'm not bringing that

25   in.  I'm bringing --

*UNITED STATES DISTRICT COURT*

1        THE COURT:  I want you to get there directly.

2    BY MR. CEPHAS:

3    Q.   On that date of the incident, you recorded statements of

4    Mr. Navarro, Mr. Nunez, Ms. Jimenez, and Mr. Rivera; isn't

5    that correct?

6    A.   That's correct.

7    Q.   You recorded all of those statements on your digital

8    recorder, correct?

9    A.   Correct.

10   Q.   You did not record any statements of Mr. Prieto; is that

11   correct?

12   A.   I cannot recall if I did or did not, sir.

13       MR. CEPHAS:  One moment, your Honor.

14   BY MR. CEPHAS:

15   Q.   In your -- when you were interviewing Mr. Rivera, he

16   told you on that date that he used to hang out with a gang,

17   and he used to be a gang member with Ontario Varrio Sur, but

18   he told you he no longer hangs out in that neighborhood;

19   isn't that correct?

20       MR. DORE:  Objection, your Honor, hearsay.

21       THE COURT:  Sustained.

22       MR. CEPHAS:  Your Honor, it contradicts what he

23   just --

24       THE COURT:  Sustained.

25       MR. CEPHAS:  -- testified to.

*UNITED STATES DISTRICT COURT*

1  BY MR. CEPHAS:

2  Q.    Did Mr. Rivera tell you he was a member of OVS

3  currently?

4  A.    He told me he was a member of Ontario Varrio Sur.

5  Q.    If he had told you that, would you have written it in

6  your report?

7  A.    I did, sir.

8  Q.    Okay.

9  A.    And I also completed a gang identification card on him.

10  Q.    But didn't you also put in your report that he told you

11  that he was not a member?

12        MR. DORE:  Objection, your Honor, hearsay.

13        THE COURT:  Sustained.

14  BY MR. CEPHAS:

15  Q.    Do you have a recording of Mr. Rivera admitting that

16  he's a member of OVS?

17  A.    I do not have a record, sir.

18  Q.    But you did record Mr. Rivera's statement that day;

19  isn't that correct?

20  A.    I would have to refer to my report to look at that exact

21  statement, sir.

22  Q.    Look at Page 9 of your report.  It indicates you

23  recorded a statement of Rivera; isn't that correct?

24        MR. DORE:  Objection, your Honor, hearsay.

25        MR. CEPHAS:  No further questions.

**UNITED STATES DISTRICT COURT**

1                    ***REDIRECT EXAMINATION***

2     BY MR. DORE:

3     Q.    Officer Olvera, when you encountered Mr. Rivera, was he

4     in possession of anything?

5     A.    Yes, he was.

6     Q.    What was he in possession of?

7     A.    He was in possession of a firearm.

8           MR. CEPHAS:  Objection, your Honor, outside the scope

9     of cross.

10          THE COURT:  Sustained.

11          MR. DORE:  No further questions.

12          THE COURT:  Next witness, please.

13          MR. DORE:  Your Honor --

14          THE COURT:  You may step down, sir, please.

15          MR. DORE:  The government calls officer Imran Ahmed.

16          ***IMRAN AHMED, GOVERNMENT'S WITNESS, SWORN***

17          THE CLERK:  Please raise your right hand.

18          Do you solemnly swear the testimony you are about to

19    give in the matter now pending before this Court shall be the

20    truth, the whole truth, and nothing but the truth, so help

21    you God?

22          THE WITNESS:  Yes, I do.

23          THE CLERK:  Please be seated.

24          Please state your full name and spell it for the

25    record.

*UNITED STATES DISTRICT COURT*

1          THE WITNESS:  Imran Ahmed, I-M-R-A-N, A-H-M-E-D.

2          THE COURT:  All right, Mr. Dore.

3                    ***DIRECT EXAMINATION***

4   BY MR. DORE:

5   Q.   Good morning, Officer Ahmed.  Where are you currently

6   employed?

7   A.   San Bernardino Police Department.

8   Q.   And where were you employed prior to the San Bernardino

9   Police Department?

10  A.   The Upland Police Department.

11  Q.   And during what period of time were you working for the

12  Upland Police Department?

13  A.   From approximately September 2005 to September 2008.

14  Q.   And what was your position at the Upland Police

15  Department?

16  A.   Police officer.

17  Q.   Are you familiar with someone named Raul Prieto?

18  A.   Yes, I am.

19  Q.   Have you spoken to Raul Prieto before?

20  A.   Yes, I have.

21  Q.   Approximately when was that?

22  A.   March 8th, 2008.

23  Q.   And where was that?

24  A.   It was at the 7-Eleven® in Upland at 1594 West 7th

25  Street.

*UNITED STATES DISTRICT COURT*

1    Q.    And was this in the daytime or the evening?

2    A.    It was at 1:55 in the morning.

3    Q.    When you made contact with Mr. Prieto, did he have

4    anything in his possession that you consider noteworthy?

5    A.    Yes.

6    Q.    And what did he have?

7    A.    He had a tagging marker.

8    Q.    And did you notice anything that indicated to you that

9    Mr. Prieto had recently been using that marker?

10   A.    Yes.

11   Q.    And what was that?

12   A.    He had some markings on his hand.

13   Q.    And that night in March 2008, did Mr. Prieto say

14   anything to you about being a member of any gang?

15   A.    Yes.

16   Q.    What did he say?

17   A.    He told me that he claimed OVS Southside Ontario.

18        MR. DORE:  No further questions.

19                        *CROSS-EXAMINATION*

20   BY MR. CEPHAS:

21   Q.    Good morning, Officer.

22   A.    Good morning.

23   Q.    Have you ever spoken to me before?

24   A.    No.

25   Q.    Have you ever spoken to any of the defense attorneys

*UNITED STATES DISTRICT COURT*

1    over here?

2    *A.*    Not that I recall.

3    *Q.*    To your knowledge, have you spoken to anyone

4    representing any of the defendants in this case?

5    *A.*    Not that I recall.

6    *Q.*    On the day of the incident in March of 2008, when you

7    arrived at the 7-Eleven®, were there a number of individuals

8    wearing matching black t-shirts?

9    *A.*    Yes.

10   *Q.*    And were they -- did they appear to be t-shirts from a

11   funeral?

12   *A.*    Yes.

13   *Q.*    Do you know approximately how many individuals you saw

14   with these funeral t-shirts?

15   *A.*    At least four.

16   *Q.*    You wrote a report about that incident, correct?

17   *A.*    Yes, I did.

18   *Q.*    And you tried to be accurate in that report, correct?

19   *A.*    Yes.

20   *Q.*    Did you -- did you review the report prior to coming

21   into court today?

22   *A.*    Yes, I did.

23   *Q.*    Do you have the report with you?

24   *A.*    Yes, I do.

25   *Q.*    Now, during the incident, you saw at least two men

*UNITED STATES DISTRICT COURT*

1   running from the scene, correct?

2   A.   Correct.

3   Q.   Mr. Prieto was not one of the individuals who was

4   running from the scene; isn't that correct?

5   A.   Correct.

6   Q.   Mr. Prieto walked out of 7-Eleven®, you threw him on the

7   ground and detained him, correct?

8   A.   That is not correct.

9   Q.   Okay.  What happened?

10   A.   He was with the group that was involved in the

11   altercation, and as the police cars pulled into the parking

12   lot he walked into the 7-Eleven®.

13   Q.   Okay.

14   A.   And then when he walked out, I detained him.

15   Q.   And you put him down on the ground and you handcuffed

16   him, correct?

17   A.   Correct.

18   Q.   And then you searched him?

19   A.   Correct.

20   Q.   And you found what you believe was a graffiti marker on

21   him?

22   A.   Yes.

23   Q.   In fact, is it something called a paint marker?

24   A.   Yes.

25   Q.   It's a marker that actually has paint in it, correct?

*UNITED STATES DISTRICT COURT*

1    *A.*    Correct.

2    *Q.*    That is used by graffiti artists, correct?

3    *A.*    Correct.

4    *Q.*    And when you found the graffiti marker, Mr. -- you wrote

5    in your report that Mr. Prieto made a spontaneous statement,

6    *I don't tag anymore.  I don't do that*; isn't that right?

7            MR. DORE:  Objection, your Honor, hearsay.

8            MR. CEPHAS:  Not for the truth of the matter

9    asserted, your Honor.  It's to show the inconsistency in two

10   statements.  May I have a sidebar?

11           THE COURT:  Inconsistency of a statement made by the

12   police officer?

13           MR. CEPHAS:  Yes.  What the officer --

14           MR. DORE:  Your Honor, may we address this at sidebar

15   as opposed to in open court?

16           *(The following proceedings were held at sidebar.)*

17           THE COURT:  All right.  This is like the second time

18   you've attempted to get your client's testimony in without

19   putting him through the crucible of being subject to

20   cross-examine.

21           MR. CEPHAS:  Not true, your Honor.  The statement

22   that -- that you're referring to, the statement that he's

23   claiming he no longer writes graffiti is something I already

24   admitted during my opening.  I'm not denying that he is a

25   graffiti artist.

*UNITED STATES DISTRICT COURT*

1          The reason this statement is important is because

2     this officer, to me, makes the unbelievable claim that he

3     walks up to my client, arrests him, throws him on the ground,

4     handcuffs him, we find a marker, and my client immediately

5     starts saying, *I don't do that anymore.  I'm not a graffiti*

6     *artist.  I don't do that.*  But then he says *I'm OVS.*  That's

7     not -- that's -- that's completely illogical for my client --

8          THE COURT:  One is a crime, one isn't.

9          Why is it illogical that he would admit to

10    association, which he has a Constitutional right to do, but

11    not admit to destroying or defacing property?

12          MR. CEPHAS:  In that neighborhood, admitting that

13    you're a member of OVS to a police officer is like admitting

14    to a crime.

15          The officer's report looks as though the paragraph

16    claiming that he made a spontaneous statement, it looks to

17    appear to have been added after the original report.  There

18    is a reference to a spontaneous statement, *man I haven't*

19    *tagged in a long time.*  Then another sentence was added

20    later, *Prieto made a spontaneous statement and stated, I*

21    *claim OVS.*  I believe this was added later on, not the same

22    time, because it should have been --

23          MR. DORE:  Your Honor, can I ask defense counsel to

24    soften his voice, please?

25          THE COURT:  Okay.

*UNITED STATES DISTRICT COURT*

1          MR. CEPHAS:  I think I'm talking this way.

2          THE COURT:  We've got the white noise going, I think

3      it will be okay.

4          MR. CEPHAS:  I believe that the officer's report is

5      not accurate.  I think it's inconsistent, and so the

6      statement that I'm -- that I'm asking him about where my

7      client denied being graffiti, I believe it's inconsistent

8      with him saying oh, but I am OVS.  In his neighborhood that's

9      a bigger crime admitting to something like that.

10          At the same time that the guy he's with, Rivera, who

11      we know was OVS at the time, he's denying.  He told the cop

12      oh, I don't -- I don't do that anymore.  But -- so this is a

13      situation where the real gang member says, *I'm not OVS*

14      *anymore*, and the guy who we'll eventually show wasn't a gang

15      member supposedly claimed he was.  So I believe it's

16      inconsistent for the cop to have said my client denied one

17      thing and did the other.

18          THE COURT:  That's only because you theorize that

19      because they've got two statements set forth in the report in

20      two separate paragraphs, you believe that somehow -- well, it

21      doesn't really matter.  Wait.  Wait.

22          MR. CEPHAS:  It's not --

23          THE COURT:  Wait.  It doesn't matter unless you're

24      saying that somehow this was added to the report after the

25      report was submitted and approved?

**UNITED STATES DISTRICT COURT**

1      MR. CEPHAS:  I'm not --

2      THE COURT:  Here's the way it works.  Officers

3  prepared these reports.  They submit them to a supervisor for

4  approval, and they may get marked up, and they get sent back

5  down and they have to redraft it, and eventually they finally

6  get it right, but that doesn't make it somehow, I don't know,

7  that they're doctoring evidence or submitting false reports

8  or something.

9      MR. CEPHAS:  We don't know, and I speculate that

10  perhaps they did, because they --

11      THE COURT:  You're fishing, aren't you?

12      MR. CEPHAS:  No.  I'm not fishing.

13      THE COURT:  Where's your evidence that there's been

14  something wrong done here?

15      MR. CEPHAS:  It's not my evidence that something's

16  been done wrong.  My evidence is that it's not believable and

17  the jury should be permitted to assess the non-believability

18  of this officer.

19      THE COURT:  You can make that argument and yes, they

20  can make that determination, but now we're getting to an

21  undue consumption of time as you run your fishing expedition.

22      MR. CEPHAS:  Your Honor, this whole witness is going

23  to take less than five minutes.

24      MR. DORE:  Your Honor, can I make a response for the

25  record?

*UNITED STATES DISTRICT COURT*

1        THE COURT:  All right.

2        MR. DORE:  I don't believe the statement is

3   inconsistent.  It's not as if the report said he told me he's

4   not OVS and here he testifies he was OVS.  That is

5   consistent.

6        THE COURT:  Right.

7        MR. DORE:  Here we're relying on an argument without

8   any evidentiary basis to try to claim there's an inconsistent

9   statement.  Those statements are not inconsistent, but for

10  Mr. Cephas' argument, absent evidence, I don't think it's

11  appropriate, and I think it's barred by the rules of evidence

12  as hearsay.

13       THE COURT:  Now, to your point -- and I don't know

14  that this is true, you're saying that it is a bigger crime to

15  admit gang affiliation than it is to admit tagging?

16       MR. CEPHAS:  In their neighborhood with these

17  officers, yes.

18       THE COURT:  And how are we going to know that?

19       MR. CEPHAS:  Well, your Honor, I'm -- I'm going to

20  put on a case later on, but this officer is here right now,

21  and he's testifying about these statements.

22       THE COURT:  Then --

23       MR. CEPHAS:  And I'm almost done.

24       THE COURT:  Fine.  Just get the facts out of his

25  mouth, then when you put on your evidence and you get someone

*UNITED STATES DISTRICT COURT*

1    to come in here and say ah-hah, a bigger crime is admitting

2    this as opposed to that, then you can make your argument.

3              MR. CEPHAS:  Then I can bring him back?

4              THE COURT:  No.  If you subpoena him, you can bring

5    him back.

6              MR. CEPHAS:  So I need to bring him back?

7              THE COURT:  This is a tangential issue.  So go ahead

8    and get your facts out.

9              MR. CEPHAS:  Your Honor, I --

10             THE COURT:  What.

11             MR. CEPHAS:  So, has the objection been overruled?

12             THE COURT:  Yes.  I'm permitting you to get the facts

13   out.

14             MR. CEPHAS:  Thank you, your Honor.

15             *(The sidebar proceedings were then concluded.)*

16   BY MR. CEPHAS:

17   *Q.*   Officer Ahmed, you testified that my client told you he

18   was part of OVS?

19   *A.*    Yes.

20   *Q.*   So if I understand correctly, he first told you I

21   don't -- *I don't tag anymore*, but then he told you, *I'm part*

22   *of OVS*; is that correct?

23   *A.*    He said he hadn't tagged in a long time, then he told me

24   he was part of OVS, yes.

25   *Q.*    Okay.

**UNITED STATES DISTRICT COURT**

1        MR. CEPHAS:  No further questions.

2        THE COURT:  All right.  Thank you.  Any redirect?

3        MR. DORE:  No.  No further questions, your Honor.

4        THE COURT:  All right, officer, you may step down.

5        THE WITNESS:  Thank you.

6        THE COURT:  Call your next witness.

7        MR. DORE:  May I have a moment, your Honor?

8        Your Honor, the government calls Officer Darren

9   Williams.

10              ***DARREN WILLIAMS, GOVERNMENT'S WITNESS, SWORN***

11       THE CLERK:  Please raise your right hand.

12       Do you solemnly swear the testimony you are about to

13  give in the matter now pending before this Court shall be the

14  truth, the whole truth, and nothing but the truth, so help

15  you God?

16       THE WITNESS:  Yes, I do.

17       THE CLERK:  Please be seated.  Please state your name

18  for the record.

19       THE WITNESS:  Darren Williams.

20              ***DIRECT EXAMINATION***

21  BY MR. DORE:

22  Q.   Officer Williams, where are you -- where are you

23  currently employed?

24  A.   Ontario Police Department.

25  Q.   And what is your position with the Ontario Police

1    Department?

2    A.    I work on our narcotics task force.

3    Q.    And are you an officer with the department?

4    A.    Yes, sir, I am.

5    Q.    How long have you been an officer with the Ontario

6    Police Department?

7    A.    About seven years.

8    Q.    And what was your position in July of 2009?

9    A.    The same, police officer for narcotics task force.

10   Q.    On July 22nd, 2009, did you take part in any

11   surveillance?

12   A.    Yes, sir, I did.

13   Q.    Where did you conduct that surveillance?

14   A.    642 East E, like Edward, Street in Ontario.

15   Q.    And about how far away from the house were you?

16   A.    I was between 35 and 50 yards north of the house.

17   Q.    Were you using anything to help you see the situation

18   better?

19   A.    Yes, sir, I was.  I was using binoculars.

20   Q.    And was it light out or was it dark out at that time?

21   Do you remember?

22   A.    It was light out.

23   Q.    Prior to conducting the surveillance, did you have

24   anything in your possession to help you identify individuals

25   you might see?

*UNITED STATES DISTRICT COURT*

1   A.   Yes, sir.  I was given a picture of an individual named

2   Carlos Rivera.

3   Q.   And what did you see at that house on E Street on July

4   22, 2009, when you were conducting surveillance?

5   A.   I saw Mr. Rivera in the front yard of that house.

6   Q.   And did you see any object being held by Mr. Rivera?

7   A.   Yes, I did.

8   Q.   And what did that object look like?

9   A.   It appeared to be a -- like a leather case, like a

10  half-zip bi-fold case, brown or tan in color with like an

11  off-white yellowish furry wool inside.

12  Q.   Okay.

13       MR. DORE:  Your Honor, permission to approach the

14  witness?

15       THE COURT:  Do you want to show the witness

16  something?

17       MR. DORE:  A physical exhibit marked as Exhibit 234.

18       THE COURT:  All right.  234?

19       MR. DORE:  Yes, your Honor.

20       THE COURT:  Yes.

21       (Government's Exhibit 234 marked for Identification.)

22  BY MR. DORE:

23  Q.   Officer Williams, do you recognize the object marked as

24  Exhibit 234?

25  A.   Yes, sir, I do.

*UNITED STATES DISTRICT COURT*

1    Q.    And how do you recognize it?

2    A.    I recognize it as being the case that I saw Mr. Rivera

3    holding that day.

4    Q.    And have you seen that type of case before?

5    A.    Yes, sir, I have.

6    Q.    And what are those cases typically used for?

7    A.    To carry handguns.

8    Q.    Did you see Carlos Rivera do -- well, I'm sorry.

9          MR. DORE:  Your Honor, the government moves to admit

10   Exhibit 234 into evidence.

11         THE COURT:  Any objection?

12         MR. NAVARRO:  No, your Honor.

13         THE COURT:  Admitted.

14         (Government's Exhibit 234 was received into

15   Evidence.)

16   BY MR. DORE:

17   Q.    Did you see Carlos Rivera doing anything with that case

18   in front of you marked as Exhibit 234?

19   A.    Yes, I did.  I saw him holding it, and he had his hand

20   inside the case.

21   Q.    And did you see the inside of the case at all?

22   A.    Yes, sir, I did.

23   Q.    And what did the inside of the case look like?

24   A.    It was like an off-white yellowish-like furry wool-type

25   of material.

*UNITED STATES DISTRICT COURT*

1    Q.    And can you take a look at that Exhibit 234, does that

2    have the same material that you had observed?

3    A.    Yes, sir, it does.

4    Q.    What did you see Mr. Rivera do next?

5    A.    He was looking inside the case standing next to other

6    Hispanic males in the front yard area, and he was kind of

7    meandering in the front yard.

8    Q.    Did you see him headed in any direction?

9    A.    Yeah.  Initially I saw him moving east in the front yard

10   area of the front yard, and as assisting officers began to

11   move in to make contact with Mr. Rivera, he began to move

12   away from these officers westbound in the yard.

13   Q.    Okay.

14        MR. DORE:  No further questions.

15        THE COURT:  Cross?

16                        ***CROSS-EXAMINATION***

17   BY MR. NAVARRO:

18   Q.    Good morning, sir.

19   A.    Good morning.

20   Q.    Have you and I ever spoken before?

21   A.    I don't believe so, sir, no.

22   Q.    And have you ever spoken to any of the attorneys in this

23   case before?

24   A.    No, sir.

25   Q.    Have you ever spoken to any -- any investigator working

**UNITED STATES DISTRICT COURT**

1   on behalf of any of the defendants in this case?

2   A.    No, sir.  I don't believe so.

3   Q.    And you indicated that you were doing surveillance on

4   July 22nd of 2009, correct?

5   A.    That's correct.

6   Q.    You were about 35 to 50 yards away from the residence?

7   A.    Yes, sir.

8   Q.    And you testified you saw Mr. Rivera holding the leather

9   case, but he had his hand inside of the case?

10  A.    Yes, sir.

11  Q.    Now, did it appear as if he was holding something inside

12  of the case?

13  A.    Yeah.  It -- the case seemed like it had some weight to

14  it, so he had one hand holding the underneath of the case,

15  and then one hand inside the case.

16  Q.    And what -- did -- how long of a period of time did you

17  see Mr. Rivera holding this case?

18  A.    I don't recall.  It couldn't have been more than a few

19  minutes.

20  Q.    And during this few minutes that you saw Mr. Rivera

21  holding this case, was his hand inside of the case the entire

22  time?

23  A.    No, sir, it wasn't.

24  Q.    So what did he do with the case during this minutes that

25  he had it?

*UNITED STATES DISTRICT COURT*

1    A.    It looked as though he was -- he briefly stuck his hand

2    inside as -- like he was looking at something that was inside

3    the case and holding onto it, kind of like in the manner you

4    would hold a handgun.

5    Q.    And you said that as officers moved in, he moved away

6    from the yard?

7    A.    He moved westbound in the yard, or he was on the east

8    side of the yard, and he started to move west away from the

9    officers.

10   Q.    Now, was he going towards the house, or just moving

11   within the yard?

12   A.    He was in front of the house, so he was moving towards

13   the west side of the house where there was like a driveway

14   where you could easily go towards the rear of the house.

15   Q.    And this home has a fence in the front of it, correct?

16   A.    Not around the front of it, no.

17   Q.    There's no fence at all in this home?

18   A.    Not that I remember.

19   Q.    And did you see Mr. Rivera go inside of the house?

20   A.    I didn't see him go inside of the house, no, I did not.

21   Q.    You were 35 to 50 yards away, correct?

22   A.    Yes.  When he started moving westbound, he moved towards

23   the -- I might have misspoken or you misunderstood me.  There

24   is a fence to the backyard.  There's no fence in the front

25   yard like a fence to cover the front -- you know, where the

*UNITED STATES DISTRICT COURT*

1    sidewalk meets the grass, there's no fence there that I

2    recall.  There is, in fact, a backyard fence that divides the

3    front yard and the backyard.  And I saw him moving towards

4    the driveway where there's a gate to the backyard fence.

5    Once he got to the west portion of the house, my view was

6    obstructed and I could no longer see him.

7           MR. NAVARRO:  No further questions, your Honor.

8    Thank you.

9           MR. WALSH:  I have a question, your Honor.

10                        **_CROSS-EXAMINATION_**

11   BY MR. WALSH:

12   Q.    Your only assignment that day was to conduct

13   surveillance?

14   A.    For this particular operation, yes.

15   Q.    Were you involved in anything other -- on that day other

16   than just watching the house and reporting your observations?

17   A.    Not that I recall.  I was assigned to our narcotics

18   unit, and we were assisting other officers, and my role that

19   day was just surveillance at that time.

20   Q.    Do you know whose house it was that you were watching?

21   A.    I don't.  I was just given the address.

22   Q.    And you were also given a photograph of Carlos Rivera

23   you told us.  Were you given any other photographs?

24   A.    No, sir, I wasn't.

25   Q.    Were you given any photographs of a woman?

**_UNITED STATES DISTRICT COURT_**

1    *A.*    Not that I recall, sir, no.

2    *Q.*    Okay.  Was your assignment to specifically look for

3    Carlos Rivera and make observations of him?

4    *A.*    I was told at the time that he was known to be at that

5    location, and I was to point at the location and maintain

6    observation on him at that house, yes, sir.

7    *Q.*    Okay.  And so you weren't looking at any other suspects

8    that day, just Carlos Rivera?

9    *A.*    My full attention was on Mr. Rivera.

10   *Q.*    When you saw Mr. Rivera outside of the house with the

11   case, he was speaking to male individuals?

12   *A.*    Yes, sir.

13   *Q.*    Did you ever, while you were watching the house, see any

14   female individuals?

15   *A.*    Not that I recall, sir.

16   *Q.*    Okay.

17           MR. WALSH:  I have no further questions.

18           THE COURT:  Any redirect?

19           MR. DORE:  No redirect, your Honor.

20           THE COURT:  May this witness be excused?

21           MR. CEPHAS:  Nothing, your Honor.

22           THE COURT:  All right.  You may step down, sir.

23           THE WITNESS:  Thank you, sir.

24           MR. DORE:  Your Honor, the government calls Officer

25   Wes Willemstyn.

*UNITED STATES DISTRICT COURT*

1          Your Honor, may I approach your Court Reporter -- I'm

2    sorry, your Courtroom Deputy for a moment?

3          THE COURT:  Yes.

4          ***WES WILLEMSTYN, GOVERNMENT'S WITNESS, SWORN***

5          THE CLERK:  Please raise your right hand.

6          Do you solemnly swear the testimony you are about to

7    give in the matter now pending before this Court shall be the

8    truth, the whole truth, and nothing but the truth, so help

9    you God?

10          THE WITNESS:  I do.

11          THE CLERK:  Please be seated.  Please state your full

12    name and spell it for the record.

13          THE WITNESS:  First name is Wes, W-E-S, last name is

14    Willemstyn, W-I-L-L-E-M-S-T-Y-N.

15          THE COURT:  Go ahead.

16                      ***DIRECT EXAMINATION***

17    BY MR. DORE:

18    *Q.*    Officer Willemstyn, where are you currently employed?

19    *A.*    The Ontario Police Department.

20    *Q.*    What is your position with the Ontario Police

21    Department?

22    *A.*    Police officer.

23    *Q.*    How long have you been a police officer with the Ontario

24    Police Department?

25    *A.*    Approximately 10 and a half years.

*UNITED STATES DISTRICT COURT*

Q.     What was your position with the Ontario Police
Department in July of 2009?

A.     I was a police officer assigned to the multi-enforcement
team.

Q.     And what is that team?

A.     It's a proactive team within our department.  We
primarily do fugitive apprehensions and surveillances.

Q.     On July 22nd, 2009, did you respond to any particular
location as part of your work on the multi-enforcement team?

A.     Yes.

Q.     And what location was that?

A.     642 East E Street in the City of Ontario.

Q.     Do you know who lived at that address at that time?

A.     The only person I knew at the time that lived there was
a gentleman by the name of Raul Prieto.  I knew him as Crook.

Q.     Now, as of July 22nd, 2009, had you already conducted --
well, at that time were you familiar with anyone named Carlos
Rivera?

A.     Yes.

Q.     And as of July 22nd, 2009, had you already conducted any
surveillance on Mr. Rivera?

A.     Yes.

Q.     And do you recall the approximate location where you had
conducted that surveillance on Mr. Rivera?

A.     It was somewhere in the 800 block of North Vineyard

1    Avenue in Ontario.

2    Q.    So as of July 2009, did you know what Mr. Rivera looked

3    like?

4    A.    Yes.

5    Q.    Do you know who Darren Williams is?

6    A.    Yes.

7    Q.    And what was -- did Officer Williams have a role in the

8    surveillance at 642 East E Street on July 22nd, 2009?

9    A.    Yes.

10   Q.    And was Officer Williams broadcasting while -- well, let

11   me back up.

12        What was that role to your recollection?

13   A.    He was conducting surveillance at that location.

14   Q.    Was Officer Williams broadcasting what he observed over

15   the police radio at that time?

16   A.    Yes.

17   Q.    And was that being done in realtime?

18   A.    Yes.

19   Q.    And did you hear Officer Williams describe what he was

20   seeing at that time on July 22nd, 2009?

21   A.    Yes.

22   Q.    And what did he say, if anything, about what he saw

23   Carlos Rivera doing?

24        MR. NAVARRO:  Objection, hearsay, your Honor.

25        MR. DORE:  Present sense impression, your Honor.

*UNITED STATES DISTRICT COURT*

1          THE COURT:  Overruled.

2     BY MR. DORE:

3     Q.    Okay.

4     A.    He said Mr. Rivera was standing in the front yard of

5     that location with several other subjects, and he observed

6     Mr. Rivera holding a brown gun case in his hands, and

7     Mr. Rivera had unzipped the gun case and inside was a -- was

8     believed to be a handgun.

9     Q.    Now, at that time did you approach the location at 642

10    East E Street?

11    A.    Shortly after.

12    Q.    And at that point when you approached, was anyone in the

13    front yard of the house?

14    A.    Yes.

15    Q.    Approximately how many people?

16    A.    I believe approximately five.

17    Q.    Did you see Carlos Rivera do anything then?

18    A.    Yes, I did.

19    Q.    What did you see him do?

20    A.    When we approached, I -- we parked our patrol vehicle in

21    the driveway, all the officers immediately started ordering

22    the subjects in the front yard to show their hands, get down

23    on the ground.  I maintained observation on all the subjects

24    in the front yard, watched as everyone did that, with the

25    exception of Mr. Rivera.

*UNITED STATES DISTRICT COURT*

1    Q.    And what did Mr. Rivera do?

2    A.    Mr. Rivera started walking away from the group -- pardon

3    me -- that was laying on the ground.  He started walking

4    westbound across the front of the house towards the driveway.

5    As he did so, he turned his body to where his back was

6    towards the officers which were at the street.  At the same

7    time he was keeping the object that he had in his hands

8    concealed in front of his body to where the officers at the

9    streets couldn't see what he had.

10    Q.    Did you tell him to stop?

11    A.    Several times.

12    Q.    Did he stop?

13    A.    No.

14    Q.    What did he do then?

15    A.    He continued walking westbound towards the driveway

16    looking back over his shoulders at the officers that were at

17    the streets, me in particular.  I was giving him commands to

18    stop, show his hands, get on the ground.  He continued

19    walking westbound keeping the object away from my view.

20         Once he reached the driveway at the northwest corner of

21    the house, he began walking southbound down the driveway.  As

22    he did so, he moved the object in front of him keeping the

23    object out of my view.  He walked maybe five, six feet to a

24    doorway which was on the west side of the house.  As he

25    reached the porch, he started to step onto the porch, he

**UNITED STATES DISTRICT COURT**

1    moved the item again to keep it out of my view, looked back

2    at me one more time, and then walked into the house keeping

3    the object out of my view.

4    Q.    So he entered the house?

5    A.    Yes, he did.

6    Q.    Now, did you observe, at any point, Mr. Prieto at the

7    scene?  Raul Prieto?

8    A.    I did not.  I take that back.  I did later, but not

9    prior to Mr. Rivera going into the house.

10   Q.    Were there communications over the police radio at that

11   time about what was happening in relation to that

12   surveillance?

13   A.    Yes.

14   Q.    And aside from Officer Darren Williams, were there other

15   officers communicating over the radio to report what they

16   were observing?

17   A.    Yes.

18   Q.    And was that being done in realtime?

19   A.    Yes.

20   Q.    Do you recall hearing anything reported over the police

21   radio about observations with regard to Mr. Prieto?

22   A.    Yes.

23   Q.    And what do you recall hearing?

24         MR. CEPHAS:  Objection, hearsay.

25         THE COURT:  Overruled.

**UNITED STATES DISTRICT COURT**

1              THE WITNESS:  An officer in our air unit, which is

2    our police helicopter that was flying overhead, said he

3    observed a male subject run southbound on the east side of

4    the house as we were making our approach and having everybody

5    get on the ground.  The officer in the air unit observed that

6    male subject enter the backyard and then enter the house

7    through a backyard door on the south side of the house.

8    BY MR. DORE:

9    Q.    Okay.  So now you've personally seen Mr. Rivera go down

10   the driveway and go in the house, right?

11   A.    Correct.

12   Q.    And are you following him at this time?

13   A.    No.

14   Q.    Okay.  Did you enter that house at any point?

15   A.    Yes.

16   Q.    Approximately how long after seeing Mr. Rivera go in the

17   house did you go in the house?

18   A.    Approximately five to eight minutes later.

19   Q.    Now, at this point you said there were some people in

20   the front yard?

21   A.    Yes.

22   Q.    And you said there were approximately five people?

23   A.    Correct.

24   Q.    And do you recall were there any children amongst the

25   people in that yard?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    Now, I'm going to back up a little bit after this, but

3    when this was all done, did you talk to Carlos Rivera at that

4    house?

5    A.    Yes.

6    Q.    And did he say anything about being related to the owner

7    of the house?

8    A.    Yes.

9    Q.    And what did he say about how he was related to the

10   owner of the house?

11   A.    He said it was his aunt's house.

12   Q.    Okay.  So now five to eight minutes after seeing

13   Mr. Rivera walk in, when you go in, what -- when you go into

14   the house, what do you do then?

15   A.    As we entered the house, we were entering the house to

16   clear the location to make sure there were no other subjects

17   inside.  We still had not located the gun, and we were

18   advised by a female who was outside of the house at the time,

19   that there was a small child still in the house.  So myself

20   and other officers entered the home to clear it and to find

21   out where the small child was as well.

22   Q.    So at the time you walked in the house, you thought

23   there was a small child in the house?

24   A.    Yes.

25   Q.    And you also thought there was someone who had a gun

**UNITED STATES DISTRICT COURT**

1    case in the house, correct?

2    A.    I didn't know who else was in the house at the time.

3    Q.    Okay.  Now, did you find the small child in the house?

4    A.    Yes.

5    Q.    Did you take the kid out of the house?

6    A.    Yes.

7    Q.    Now, did you eventually go back into the house after

8    that?

9    A.    Yes.

10   Q.    And what did you find there?

11   A.    While conducting the search of the remainder of the

12   house, myself and Sergeant Nicholson began searching a rear

13   service porch area on the house.  In that service porch area

14   was a washer and a dryer, large stand-up freezer, a shelf

15   with some miscellaneous objects.  So I began searching behind

16   the washer and dryer, the door looking for anybody that might

17   be hiding inside there.

18        The industrial-size freezer was approximately three feet

19   wide, two feet deep, six feet high.  A large -- just a large

20   stand-up stainless steel freezer, something that somebody, if

21   they wanted to, could hide inside of.  So I opened the

22   freezer to make sure there was nobody hiding in there.

23   Inside it was filled with frozen food items, and the one

24   thing that stuck out to me is on top of some frozen food

25   items on the top shelf was a brown gun case, which was not

1    typical for where people would store a gun.

2          MR. DORE:  Your Honor, permission to approach the

3    witness with an exhibit?

4          THE COURT:  Go ahead.

5    BY MR. DORE:

6    Q.   Officer, I've placed in front of you what's been marked

7    as Exhibit 234.  Do you recognize that case?

8    A.   Yes.

9    Q.   How do you recognize it?

10   A.   I recognize the outside of the case being the brown --

11   the brown material that the case that I found inside of the

12   freezer.

13   Q.   Now, did you pick up the gun -- that case when you found

14   it in that stand-up freezer?

15   A.   Yes, I did.

16   Q.   Did you feel anything inside of it?

17   A.   Yes.  I manipulated the outside of the case with my

18   fingers and could feel what I determined to be a handgun

19   inside of the gun case.

20   Q.   Now, throughout this whole situation, did you believe

21   this was a dangerous situation?

22   A.   Yes.

23   Q.   Okay.  So you feel something inside the gun case, what

24   do you do next?

25   A.   I unzip it to find out if there is a gun inside the

**UNITED STATES DISTRICT COURT**

1   case, and there was.

2   Q.   Do you have Exhibit 35 before you?

3   A.   Yes.

4        (Government's Exhibit 35 marked for Identification.)

5   Q.   Do you recognize what's depicted in that photograph?

6   A.   Yes.

7   Q.   Does that photograph fairly and accurately depict what

8   you found inside that gun case when you opened it on that day

9   in July 2009?

10  A.   Yes.

11       MR. DORE:  Your Honor, the government moves to admit

12  Exhibit 35 into evidence.

13       THE COURT:  Any objection?

14       MR. NAVARRO:  No, your Honor.

15       THE COURT:  Admitted.

16       (Government's Exhibit 35 was received into Evidence.)

17          *(The exhibit was displayed on the screen.)*

18  BY MR. DORE:

19  Q.   So when you unzipped the case, that gun is the object

20  you found inside of it?

21  A.   Yes.

22  Q.   Okay.

23       MR. DORE:  Your Honor, permission to approach the

24  witness with additional exhibits?

25       THE COURT:  All right.

*UNITED STATES DISTRICT COURT*

BY MR. DORE:

Q.    Officer, before we get started, I've placed in front of you, among other things, is a firearm.  Is that firearm nonoperational?

A.    At its present state.

Q.    Correct.  Presently?

A.    Yes.

Q.    So there's no danger right now?

A.    Correct.

Q.    Now, taking a look at what you have in front of you, Exhibits 235 -- there's a little yellow sticker with a number on it -- Exhibit 236, and Exhibit 237 which are in a small bag, could you please take a look at those objects?

A.    Sure.

      (Government's Exhibits 235, 236, and 237 marked for Identification.)

Q.    And please tell me if you recognize all of them?

A.    Yes.  Exhibit 236 is the handgun that I found inside the case.

      Exhibit 235 is the brown leather holster which the handgun was placed inside of when it was inside of the brown gun case.

      And Exhibit 237 are the six bullets which were removed from the handgun.

      MR. DORE:  Your Honor, the government moves exhibits

*UNITED STATES DISTRICT COURT*

1    235, 236, and 237 into evidence.

2         THE COURT:  Any objection?

3         MR. WALSH:  No objection.

4         MR. CEPHAS:  No objection.

5         MR. NAVARRO:  No objection.

6         THE COURT:  They will be admitted.

7         (Government's Exhibits 235, 236, and 237 were

8    received into Evidence.)

9    BY MR. DORE:

10   Q.   Just so the jury can see them, because that box may have

11   got in the way, Exhibit 235 is this brown holster which is in

12   the photograph marked as Exhibit 235?

13        THE COURT:  Hold it up.

14   BY MR. DORE:

15   Q.   Could you hold it up so the jury can see it, please?

16   And can you hold up, please, Exhibit 236 just so the jury can

17   see it?

18        And does that gun that you have in your hand have a

19   silver circle insignia at the upper part of the handle?

20   A.   Yes.

21   Q.   Could you just hold up one of the bullets so the jury

22   can see one of the bullets marked as Exhibit 237, please?

23        Now, can you take a look, please, at that gun marked as

24   Exhibit 236.  Is there any writing on the barrel of that gun?

25   A.   Yes.

1    *Q.*    And what does that writing say?

2    *A.*    Agent .38 Special CTG.

3    *Q.*    And --

4    *A.*    And on the other side Colt PTFA Manufacturing Company

5    Hartford, Connecticut, USA.

6    *Q.*    Now, when you found that gun in the gun case, was it

7    loaded?

8    *A.*    Yes.

9    *Q.*    And was it loaded with those bullets marked as Exhibit

10   237?

11   *A.*    Yes.

12   *Q.*    And so how many bullets were in the gun when you found

13   it?

14   *A.*    Six.

15   *Q.*    And did you take the revolver and ammunition into

16   evidence?

17   *A.*    Yes.

18        MR. DORE:  Your Honor, at this point we ask to read

19   the stipulation marked as Exhibit 276 into the record.

20        THE COURT:  All right.  Go ahead.

21        (Exhibit 276 marked for Identification and received

22   into Evidence.)

23        MR. DORE:  Pursuant to government stipulation with

24   the defense marked Exhibit 236, stipulation is as follows:

25        Government's Exhibit 236 is a firearm, namely a Colt

*UNITED STATES DISTRICT COURT*

1    Model Agent .38 Special caliber revolver bearing serial

2    number H98877, which is operable and was designed to expel a

3    projectile by the action of an explosive, and which was

4    manufactured outside the State of California and therefore

5    was shipped or transported in foreign or interstate commerce

6    to California.

7         Government's Exhibit 237 is six rounds of .38 Special

8    caliber ammunition bearing the head stamp of W -- capital W,

9    hyphen, capital W, Super, which were manufactured outside the

10   State of California, and therefore were shipped or

11   transported in foreign or interstate commerce to California.

12   BY MR. DORE:

13   Q.   Now, officer --

14        THE COURT:  Was that it?

15        MR. DORE:  I'm sorry, your Honor?

16        THE COURT:  Was that it?

17        MR. DORE:  Yes, your Honor.

18        THE COURT:  Okay.  Ladies and gentlemen, the parties

19   have agreed to certain facts that have just been stated to

20   you.  You should therefore treat those facts as having been

21   proven.

22        Go ahead, Mr. Dore.

23        MR. DORE:  Thank you, your Honor.

24        Your Honor, I believe Exhibit 100 was already entered

25   into evidence, permission to approach the Court Reporter so I

*UNITED STATES DISTRICT COURT*

1      can play that disk?

2            THE COURT:  Okay.

3            MR. DORE:  I apologize, the Courtroom Deputy.

4            Your Honor, if I may, the transcript for this exhibit

5      marked Exhibit 100 is located at 100-A, which is found in the

6      small thin binder, which I believe are under the chairs of

7      the respective jurors.

8            THE COURT:  All right.  Ladies and gentlemen, if

9      you'll reach under your chairs and pull out the binders,

10     would you please turn to tab 100-A and nothing else.

11           MR. CEPHAS:  Your Honor, should --

12           THE COURT:  Go ahead.

13           MR. CEPHAS:  Your Honor, just for the record, can I

14     have a continuing objection with respect to the names being

15     on these transcripts?  Because I -- I believe the names lack

16     foundation at this point.

17           THE COURT:  All right.  There will be a continuing

18     objection.

19           MR. CEPHAS:  Thank you, your Honor.

20           THE COURT:  Ladies and gentlemen, though transcripts

21     have -- yes, transcripts have been provided to you of these

22     recordings, these transcripts will not go back with you into

23     the jury room.  These transcripts are not evidence.  What is

24     written in these notebooks is not evidence.

25           The evidence is the recording itself and what you

*UNITED STATES DISTRICT COURT*

1    hear.  This is merely designed to assist you in understanding

2    what you hear, but this is not evidence.  Okay.

3              One last thing.  It should be understood when we play

4    these recordings, the recordings themselves will not be

5    transcribed.  Okay.

6              *(Whereupon the conversation was then played.)*

7    BY MR. DORE:

8    Q.    Now, I've paused it there Officer Willemstyn at 50

9    seconds.  Did you hear there was a reference to E Street and

10   Campus?

11   A.    Yes.

12   Q.    Is E Street and Campus near the location where you had

13   this event that you described on July 22nd, 2009?

14   A.    Yes.

15   Q.    And could you please take a look at the Exhibit 100-A,

16   the transcript just very briefly?

17             And on the cover of that transcript, do you see there

18   various signatures and dates?

19   A.    Yes.

20   Q.    I know none of them is yours, but could you please read

21   us the date and time on the front page of that transcript?

22             MR. CEPHAS:  Objection, your Honor, hearsay.

23             MR. DORE:  I believe this information was admitted

24   with Mr. Precup.

25             MR. CEPHAS:  Withdrawn.

**UNITED STATES DISTRICT COURT**

1   BY MR. DORE:

2   Q.   Could you please read us the date and time on the front

3   of this transcript, please, marked for identification as

4   Exhibit 100-A?

5   A.   July 22nd, 2009, 9:07 p.m.

6   Q.   Thank you.

7        Now I'm going to resume the recording starting at 50

8   seconds into Exhibit 100.

9            *(Whereupon the conversation was then played.)*

10  Q.   Officer, I stopped that recording marked as Exhibit 1--

11  at 2 minutes and 59 seconds.

12       Do you know whether -- one way or another whether Raul

13  Prieto is or was a gang member?

14           MR. CEPHAS:  Objection, speculation, foundation.

15           THE COURT:  Sustained.

16           MR. DORE:  I'll withdraw that.

17  BY MR. DORE:

18  Q.   When you went into the house, did -- did you see

19  Mr. Rivera come out of that house?

20  A.   Yes.

21  Q.   Did anyone else come out of the house with Mr. Rivera?

22  A.   Yes.

23  Q.   Who came out of the house with Mr. Rivera?

24  A.   Raul Prieto.

25           MR. DORE:  No further questions, your Honor.

*UNITED STATES DISTRICT COURT*

1        THE COURT:  Cross.

2                      ***CROSS-EXAMINATION***

3    BY MR. NAVARRO:

4    Q.    Good morning, sir.

5    A.    Good morning, sir.

6    Q.    Have you and I ever spoken before?

7    A.    No.

8    Q.    Have you ever spoken to any of the attorneys sitting in

9    the front table here?

10   A.    I don't believe so.

11   Q.    Have you ever spoken to any investigators associated

12   with any of the defendants in this case?

13   A.    No.

14   Q.    Now, prior to coming to court today, did you -- did you

15   hear this call before coming to court today?

16   A.    No.

17   Q.    So this is the first time you hear it?

18   A.    Yes.

19   Q.    And have you ever reviewed the transcript of that phone

20   call?

21   A.    No.

22   Q.    So you're seeing it for the first time today?

23   A.    Yes.

24   Q.    Now, when you testified a little while ago, you said

25   that you were in radio contact in live time with other

*UNITED STATES DISTRICT COURT*

1   officers?

2   A.   Yes.

3   Q.   In realtime?

4   A.   Yes.

5   Q.   And a different officer -- let me get you his name --

6   Officer Williams, told you over the radio that Mr. Rivera was

7   holding a round case?

8   A.   I'm sorry, what kind of case?

9   Q.   Mr. Rivera was holding a round case?

10  A.   A brown case.

11  Q.   A brown case, I'm sorry.  A brown case.  And that he had

12  unzipped the gun case?

13  A.   Correct.

14  Q.   And that inside was a gun?

15  A.   I remember him saying there was an off-white or yellow

16  wool lining inside of the case.

17  Q.   And also there was a gun inside?

18  A.   I don't recall that.  It would help if I reviewed my

19  report.

20  Q.   You testified to that about ten minutes ago?

21  A.   Okay.  That's the case.

22  Q.   I just want to make sure we got it straight.  Now,

23  Mr. Rivera walked in the house away from you?

24  A.   Correct.

25  Q.   And once you went inside of the house, Mr. Rivera had

1   already been detained, correct?

2   A.   Correct.

3   Q.   He had come out and he had been arrested and he had been

4   handcuffed, correct?

5   A.   He had not been arrested at that time.  He was being

6   detained.

7   Q.   And was he handcuffed?

8   A.   Yes.

9   Q.   The child that was in the house, how old was this child?

10  A.   I don't recall exactly.  I do have that in my report.

11  He was a very young child.

12  Q.   And the child was crying?  It was a very small child,

13  correct?

14  A.   Correct.

15  Q.   Now, in reviewing this phone call that was played just

16  right now, if you look at the second page of Government's

17  Exhibit 100-A, do you have that in front of you?

18  A.   I do.  Page 2?

19  Q.   Yes.  The bottom of Page 2, the second to last line.  I

20  believe it was played, but it was stopped right at that time,

21  but it says here *well, I was with him and a couple of other*

22  *friends, fool, just regular cats.*  Do you see that?

23  A.   Yes.

24  Q.   What does that mean to you?  If you know.

25  A.   Which part of that are you referring to, sir?

*UNITED STATES DISTRICT COURT*

Q.    *Regular cats.*

A.    I don't know what he would be referring to in that.

       MR. DORE:  Objection, your Honor, calls for speculation.

       THE COURT:  Sustained.

BY MR. NAVARRO:

Q.    How long have you been an officer?

A.    Approximately 16 years.

Q.    How often do you talk to gang members?

A.    A lot.

Q.    So would it be a correct statement that you -- you understand gang members when they talk?

A.    Some.

Q.    And if you go to the next page, the middle of the page, the third line *associated with Rivera.*  Do you see that?

A.    Yes.

Q.    *They had my kids on the floor, everything, fool* -- and I'll skip the next line, it says, *I had Jessica pick up the kids.*  Do you see that?

A.    Yes.

Q.    Did you hear that on the audio tape as well?

A.    Yes.

Q.    What does that mean, if you know?

A.    I'm assuming he means he had her pick them up.

Q.    He had someone named Jessica pick up the kids, correct?

1    A.    Yes.

2    Q.    And he –– and he –– in this call, Mr. Rivera says that

3    he was detained for about three hours, correct?

4    A.    That's what he says.

5    Q.    Is that accurate?

6    A.    I don't believe so.

7    Q.    How long was he detained for?

8    A.    I don't know.  I don't have the call in front of me.

9    Q.    And that same page, the very last sentence says, *I

10   wasn't around no gang members*.  Do you see that?

11   A.    Yes.

12   Q.    Okay.

13        MR. NAVARRO:  I have no further questions.  Thank

14   you.

<u>***CROSS–EXAMINATION***</u>

16   BY MR. WALSH:

17   Q.    Were you given a specific assignment when you began the

18   surveillance to be observing one particular person?

19   A.    No.

20   Q.    What was your assignment?

21   A.    My assignment, I was with another officer.  We were

22   maybe a block away.  We were just to be a response team in

23   case something happened.  We were in a marked patrol vehicle,

24   so we were going to respond if something happened.

25   Q.    And you were parked in a location where you didn't have

***UNITED STATES DISTRICT COURT***

1   a visual of the residence; is that right?

2   A.    That's correct.

3   Q.    How many officers were in the vicinity working together

4   in this investigation on that day?

5   A.    I would say approximately ten.  I don't have the exact

6   number, sir.

7   Q.    And -- and then when -- when you did respond to the

8   front of the residence, how many people did you see in front

9   of the residence that were standing there?

10  A.    I believe it was approximately five.

11  Q.    And how many of them were adults and how many of them

12  were children?

13  A.    I do not recall if there were five adults and two

14  children.  I do know there were two children.  So there -- I

15  want to say there were maybe five adults in the front yard at

16  the time and two children?

17  Q.    So the two children that you saw standing in front of

18  the house, they were different from the one child that you

19  found later in the house?

20  A.    That is correct, sir.

21  Q.    Now, as to the adults in that group of five, were they

22  all male adults?

23  A.    I believe there was a female.

24  Q.    Okay.  And was that the same female that had advised

25  you, at some point in time, that a small child was in the

*UNITED STATES DISTRICT COURT*

house?

A.    That's the only female that I knew of at the location,

yes, sir.

Q.    Now, when you entered inside the house eventually, the

only person you saw inside the house after you made entry was

the small child; is that right?

A.    Correct.

Q.    And you removed the child from the house?

A.    Correct.

Q.    Did you turn the child over to the female that was

standing out in front of the house?

A.    Yes, I did.

Q.    Did you have any further conversation with the female?

A.    I don't believe so.

Q.    You hadn't been given any photographs of suspects that

you were supposed to be familiar with on that day before

approaching the house?

A.    I don't recall if we had photographs.  I don't -- I

don't recall from that day.

Q.    All right.

        MR. WALSH:  I have nothing further, your Honor.

                    ***CROSS-EXAMINATION***

BY MR. CEPHAS:

Q.    Good morning.

A.    Good morning.

*UNITED STATES DISTRICT COURT*

1   Q.   I believe you testified that Mr. Prieto was the only

2   person who lived at 642 E Street; is that correct?

3   A.   No, I did not say that.

4   Q.   Okay.  And, in fact, other people lived at that house,

5   correct?

6   A.   Correct.

7   Q.   That was his mother's house?

8   A.   I don't know in what relation he was to the other

9   occupants living at that house.

10   Q.   Did you ever learn that that was his mother's house?

11   A.   I don't recall that.

12   Q.   You referenced a call from an air unit that said there

13   was an individual moving down the south side of the house,

14   something like that, correct?

15   A.   Running southbound on the east side of the house.

16   Q.   And there was nothing in that call indicating that the

17   person running southbound had anything in his hands, correct?

18   A.   Correct.

19   Q.   And there was a small child in the house named Michael,

20   2 or 3 years old?

21   A.   Correct.

22   Q.   And did you later learn that that child was Mr. Prieto's

23   stepson?

24   A.   I didn't learn that.

25   Q.   Now, the government played a tape for you, are you

**UNITED STATES DISTRICT COURT**

1    familiar with any of the voices on that tape that was just

2    played?

3    A.    No.

4    Q.    Do you -- do you recognize -- did you recognize

5    Mr. Rivera's voice on that recording?

6    A.    I have not talked to Mr. Rivera long enough to recognize

7    his voice.

8    Q.    But -- but you did hear the recording where it said on

9    the bottom of Page 3, *I wasn't around no gang members*, you

10   heard that, correct?

11   A.    I did hear that.

12          MR. CEPHAS:  Nothing further, your Honor.

13          THE COURT:  Any redirect?

14          MR. DORE:  Very briefly, your Honor.

15                     ***REDIRECT EXAMINATION***

16   BY MR. DORE:

17   Q.    Sir, understanding the way gang members talk, do you

18   know what someone's pad would be?  A homie's pad?

19   A.    Yes.

20   Q.    What would that mean?

21   A.    That would be a house.

22   Q.    And what about a strap, what's a strap?

23          MR. CEPHAS:  Objection, your Honor, speculation,

24   expert testimony.

25          THE COURT:  Overruled.

*UNITED STATES DISTRICT COURT*

```
 1   BY MR. DORE:
 2   Q.   What's a strap?
 3   A.   A gun.
 4   Q.   Now, in listening to this same -- well, one other thing
 5   quickly.
 6        Mr. Rivera walked into the house carrying a case that
 7   you found that 3-year-old crying child, right?
 8   A.   Yes.
 9            MR. DORE:  No further questions.
10            MR. NAVARRO:  No further questions.
11            THE COURT:  All right.  Officer, you're excused.
12            THE WITNESS:  Thank you, your Honor.
13            THE COURT:  Call your next witness.
14            MR. DORE:  Your Honor, may I just collect the
15   physical evidence before we get the next witness up there?
16            THE COURT:  How is that being secured by the way?
17            MR. DORE:  Special Agent Walton has it, your Honor.
18            THE COURT:  Okay.  Great.
19            MR. DORE:  Your Honor, I don't know if now is the
20   appropriate time, but is there going to be a break at any
21   time in the future?
22            THE COURT:  I was thinking about tomorrow, but if you
23   want to do one today?  Do you need to set up?
24            MR. DORE:  No.  We can go forward.  It's just we've
25   got a break in events, and so we're now going to be talking
```

**UNITED STATES DISTRICT COURT**

1    about a different date, so I didn't know if now as opposed to

2    in the middle of witnesses about that date, what obviously --

3              THE COURT:  I was going to break at the hour.

4              MR. DORE:  Okay.  We'll keep going.

5              Your Honor, the government calls Maynor Arana.

6              ***MAYNOR ARANA, GOVERNMENT'S WITNESS, SWORN***

7              THE CLERK:  Please raise your right hand.

8              Do you solemnly swear the testimony you are about to

9    give in the matter now pending before this Court shall be the

10   truth, the whole truth, and nothing but the truth, so help

11   you God?

12             THE WITNESS:  I do.

13             THE CLERK:  Please be seated.  Please state your full

14   name and spell your last name for the record.

15             THE WITNESS:  My name is Maynor Arana, A-R-A-N-A.

16                        ***DIRECT EXAMINATION***

17   BY MR. DORE:

18   Q.   Sir, where are you currently employed?

19   A.   I work for the Ontario Police Department.

20   Q.   What is your position with the Ontario Police

21   Department?

22   A.   I'm a police corporal assigned to the narcotics

23   division.

24   Q.   And how long have you worked with the Ontario Police

25   Department?

*UNITED STATES DISTRICT COURT*

1    A.    About 15 years.

2    Q.    Were you a member of a surveillance team on Thursday,

3    August 6th, 2009?

4    A.    Yes, I was.

5    Q.    And what was the location where that surveillance ended

6    up that day?

7    A.    815 North Vineyard Avenue in Ontario.

8    Q.    And what was your role in that surveillance?

9    A.    I was in charge of the surveillance team that day.

10   Q.    Now, were you traveling around Ontario conducting your

11   surveillance before you ended up at Vineyard, or were you at

12   Vineyard the whole time?

13   A.    No.  We were at different parts of the city before that.

14   Q.    And did the subjects of your surveillance end up at

15   Vineyard Avenue in Ontario?

16   A.    Yes, they did.

17   Q.    And did you set up a location near that 815 Vineyard

18   Avenue address to conduct surveillance?

19   A.    Yes.

20   Q.    And where did you set up your position?

21   A.    I was just north of the apartment complex located at

22   815 North Vineyard.

23   Q.    And were you using binoculars or anything to improve

24   your ability to see the situation?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1   Q.    And before the surveillance started, did you have

2   photographs of Carlos Rivera?

3   A.    Yes.

4         MR. DORE:  Your Honor, may the witness please take a

5   look at Exhibit 29?

6         Your Honor, may I approach the Courtroom Deputy with

7   the original Exhibit 100?

8         THE COURT:  Go ahead.

9         THE CLERK:  Thank you.

10  BY MR. DORE:

11  Q.    Corporal Arana, do you recognize the individual in that

12  photograph marked as Exhibit 29?

13  A.    I do.

14  Q.    And who is that person?

15  A.    Carlos Rivera.

16        (The exhibit was displayed on the screen.)

17  Q.    Is this the same person in Exhibit 29 who was in the

18  photograph you were given to identify Carlos Rivera at the

19  time?

20  A.    That is correct.

21  Q.    Now, on August 6th, 2009 when you were conducting

22  surveillance, did you see Carlos Rivera walk up to anyone who

23  had arrived at that location?

24  A.    Yes.

25  Q.    And that location was 815 Vineyard Avenue?

*UNITED STATES DISTRICT COURT*

1    A.    That's correct.

2    Q.    What did you see?

3    A.    Um -- I saw a gray Lincoln parked in front of the

4    apartment complex.  And as the driver was getting out of the

5    car, Mr. Rivera came out of his apartment and they met.

6    Q.    And did you see the man in the gray Lincoln take

7    anything out of the trunk of his car?

8    A.    Yes.

9    Q.    And what did you see him take out of the trunk of the

10   car?

11   A.    What appeared to me was a small black box with a strap

12   on it.

13   Q.    And can you approximate how big that box was with the

14   strap on it that you saw?

15         Just holding your hands up so the jury can see.

16   A.    About six to eight inches, maybe four inches wide.

17   Q.    Okay.  Now, when you saw this on August 6th, 2009, where

18   was Carlos Rivera in relation to this man holding the box

19   with the strap?

20   A.    He was standing on the sidewalk directly in front of the

21   apartment.

22   Q.    Did you see those -- Mr. Rivera and this man talk to one

23   another?

24   A.    Yes, I did.

25   Q.    And did you see them go anywhere together?

*UNITED STATES DISTRICT COURT*

1    *A.*    They went into the apartment.  Mr. Rivera's apartment.

2    *Q.*    Now, did you see that man who had arrived in the gray

3    Lincoln earlier that day, did you see him leave that

4    apartment?

5    *A.*    At one point he did, yes.

6    *Q.*    And when he left, was he carrying anything?  Was he

7    carrying that box anymore?

8    *A.*    No.  He was empty-handed.

9    *Q.*    Did you see Carlos Rivera again after that first man

10   left?

11   *A.*    Yes, I did.

12   *Q.*    And where did you see Carlos Rivera go?

13   *A.*    He walked to a -- a red Acura that was parked in front

14   of the apartment complex and he got into it.

15          MR. DORE:  No further questions.

16          THE COURT:  All right.

17          MR. NAVARRO:  No questions, your Honor.

18          MR. WALSH:  I have some questions.

19                        ***CROSS-EXAMINATION***

20   BY MR. WALSH:

21   *Q.*    Mr. Arana, have you ever been interviewed by any of the

22   defense attorneys or investigators working for the defense

23   attorneys prior to testifying here today?

24   *A.*    No, I have not.

25   *Q.*    How many officers were involved in the surveillance team

*UNITED STATES DISTRICT COURT*

1    on August 6th?

2    A.    I believe eight or ten.

3    Q.    And when you -- when the team finally arrived at 815

4    North Vineyard and began their surveillance, was it still

5    eight or ten officers or had the number changed?

6    A.    No.  I believe it's still eight or ten.

7    Q.    Now, prior to the surveillance, you were given a

8    photograph of Carlos Rivera.  Were you given a photograph of

9    any other person that you were to be watching?

10   A.    Not that I recall.

11   Q.    Specifically, were you ever given a photograph of a

12   female that you were supposed to place under surveillance and

13   watch that day?

14   A.    I don't recall.

15   Q.    Were you given a photograph of the defendant Jessica

16   Medina, my client, seated here at counsel table to my -- to

17   my left?

18   A.    I don't recall whether we did or not.

19   Q.    The only one you can recall is the photograph of Carlos

20   Rivera?

21   A.    That's correct.

22   Q.    Did you have the photograph with you in your

23   surveillance vehicle at the time you were making your

24   observations?

25   A.    I believe so.

*UNITED STATES DISTRICT COURT*

1  Q.   And so that's so that you could check the person that

2  you were watching to see if he matched the photograph?

3  A.   That's correct.

4  Q.   Do you remember -- and you don't recall whether you had

5  any other photographs?

6  A.   No, I do not.

7  Q.   Was the assignment that you were given in order to

8  conduct the surveillance, was to conduct surveillance of

9  Carlos Rivera, is that your primary assignment that day?

10 A.   I believe so.

11 Q.   And you -- you were instructed to see where Carlos

12 Rivera went and see who he spoke to; is that right?

13 A.   That's correct.

14 Q.   And then did you -- did you write down your observations

15 or did you communicate by radio what you were -- what you had

16 been observing?

17 A.   Both.

18 Q.   Now, the -- the last car that you told us about was an

19 Acura, and I think you said that was parked in front of the

20 apartment that you were watching; is that right?

21 A.   Yes.

22 Q.   Was it parked directly in front of it or was it in front

23 of some other building?

24 A.   I recall it being parked directly in front of the

25 apartment.

**UNITED STATES DISTRICT COURT**

1   Q.   And it was on the -- was it on the same side of the
2   street as the apartment building or the opposite side?
3   A.   The same side of the street.
4   Q.   And had you observed that -- well, could you describe
5   the car, what color it was?
6   A.   It's a red car.
7   Q.   And had you seen it earlier in the day or just there
8   parked in front of the apartment building?
9   A.   I noticed it when I got there, but I didn't realize it
10  was related to Mr. Rivera.
11  Q.   Now, other than Mr. Rivera going into the car, did you
12  see anyone else go into the car that night?
13  A.   Into the car?  No, I did not.
14  Q.   And you didn't see anybody driving the car that night,
15  did you?
16  A.   No, I did not.
17  Q.   You didn't see any females entering or exiting the car
18  that night while you had it under surveillance?
19  A.   No, I did not.
20  Q.   And what time of day was it that you were making your
21  observations?
22  A.   I believe we got there about 8:15 p.m.
23  Q.   And was the sun up or down?
24  A.   I believe it was still up.  It was summertime.
25  Q.   And you didn't have any -- any difficulty making your

*UNITED STATES DISTRICT COURT*

1    observations because of the time of night?

2    A.    That's correct.

3    Q.    At the time that you had the apartment under

4    surveillance, did you see anyone else enter or exit the

5    apartment other than the two individuals that you told us

6    about?

7    A.    No.  I don't remember anybody else.

8    Q.    And during what period of time did you have the

9    apartment under surveillance?  When did you start and when

10   did you end?

11   A.    Well, we got there about 8:00 p.m., and I believe we

12   were done by 10:00 p.m.

13   Q.    And do you recall what time the sun went down?  When it

14   became dark?

15   A.    No, I don't.

16   Q.    Okay.

17         MR. WALSH:  No further questions, your Honor.

18         MR. DORE:  No redirect, your Honor.

19         THE COURT:  All right.  Sir, you may step down.

20   You're excused.

21         THE WITNESS:  Thank you, your Honor.

22         THE COURT:  Mr. Dore.

23         MR. DORE:  Your Honor, the government calls Officer

24   Mike Lorenz.

25              *MICHAEL LORENZ, GOVERNMENT'S WITNESS, SWORN*

*UNITED STATES DISTRICT COURT*

1          THE CLERK:  Please raise your right hand.

2          Do you solemnly swear the testimony you are about to

3    give in the matter now pending before this Court shall be the

4    truth, the whole truth, and nothing but the truth, so help

5    you God?

6          THE WITNESS:  Yes.

7          THE CLERK:  Please be seated.  Please state your full

8    name and spell your last name for the record.

9          THE WITNESS:  Michael Lorenz, L-O-R-E-N-Z.

10                      ***DIRECT EXAMINATION***

11   BY MR. DORE:

12   Q.    Sir, where are you currently employed?

13   A.    City of Ontario.

14   Q.    And what is your position with the City of Ontario?

15   A.    I'm a Sergeant.

16   Q.    Are you a Sergeant with the police department?

17   A.    Yes.

18   Q.    How long have you been working for the Ontario Police

19   Department?

20   A.    For 15 years.

21   Q.    And were you working with the Ontario Police Department

22   then in August of 2009?

23   A.    Yes.

24   Q.    Did you participate in a police matter on August 6th,

25   2009 at 815 North Vineyard Avenue in Ontario, California?

*UNITED STATES DISTRICT COURT*

A.    Yes, I did.

Q.    Why did you go to that address?

A.    We went to do a parole check.

Q.    And were you a member -- are you familiar with something called the multi-enforcement team?

A.    Yes.

Q.    Were you in any way associated with that team in August 2006 -- I'm sorry, August 2009?

A.    I was a member of the team.

Q.    Now, that building you went to at 815 North Vineyard Avenue in Ontario, can you describe to us what it looked like?

A.    It's a -- it's an apartment building.  It would -- I would call it a quadplex.  It has two apartments upstairs, two apartments downstairs.

Q.    Are you familiar with someone named Carlos Rivera?

A.    Yes.

Q.    And based on your experience that night in August 6th, 2009, did you know where -- which of those four apartments belonged to Mr. Rivera?

A.    Yes.

Q.    And which of the four apartments?

A.    If you were facing the apartment building, it was on the ground floor to the right side, it was Apartment B.

Q.    So when you arrived at 815 North Vineyard Avenue on

**UNITED STATES DISTRICT COURT**

1    August 6th, 2009, what do you do -- what did you do?

2    A.    I knocked on the door.

3    Q.    And who answered the door?

4    A.    Carlos.

5    Q.    And what was the full name of Carlos?

6    A.    Carlos Rivera.

7    Q.    And did the person who answered the door, Carlos Rivera,

8    did he identify himself?

9    A.    I asked him if he was Carlos Rivera, and he told me yes.

10   Q.    Now, could you take a look at the photograph marked as

11   Exhibit 29, please?

12         Do you recognize the person in that photograph?

13   A.    Yes.

14             (The exhibit was displayed on the screen.)

15   Q.    And is this the person who answered the door -- answered

16   to the name Carlos?

17   A.    Yes.

18   Q.    Did you pat-down Carlos Rivera at that time?

19   A.    Yes, I did.

20   Q.    And did you find anything unusual on his clothing -- in

21   his clothing?

22   A.    Yeah.  He had a large bulge in his pant pocket.  It was

23   money.

24   Q.    Approximately how much money was it?

25   A.    $3385.

*UNITED STATES DISTRICT COURT*

1    Q.    And that was cash?

2    A.    Yes.

3    Q.    Just in his pocket?

4    A.    In his right front pant pocket, yes.

5    Q.    Okay.

6          MR. DORE:  No further questions.

7          THE COURT:  Cross?

8                    ***CROSS-EXAMINATION***

9    BY MR. WALSH:

10   Q.    What time did you enter the apartment?

11   A.    It was just after 11:00 at night.

12   Q.    And how many officers were with you when you entered the

13   apartment?

14   A.    When I was dealing with Carlos, I didn't actually enter

15   the apartment.  I asked him to step outside.

16   Q.    And then you had a conversation with him outside?

17   A.    Yes.

18   Q.    Was that when you observed the money, or was it at some

19   later date?

20   A.    It was at that time.

21   Q.    And did you take anything else from Mr. Rivera?

22   A.    I did not, no.

23   Q.    Okay.  Did he have a cell phone on him at that time?

24   A.    I don't recall.

25   Q.    Was there anyone else in the apartment?

*UNITED STATES DISTRICT COURT*

1    *A.*    Yes.

2    *Q.*    And who else was in the apartment?

3    *A.*    I'm not positive their names.  I know Jessica Medina was

4    in the apartment, and there was a couple males in the

5    apartment.  I don't recall who they were.

6    *Q.*    Were there any children in the apartment?

7    *A.*    Yeah.  I believe their children were there as well.

8    *Q.*    How many children?

9    *A.*    I couldn't give you an exact number.

10    *Q.*    Would it be approximately four?

11    *A.*    It was more than one.

12    *Q.*    Okay.  And were they young children or old children?

13    *A.*    I believe they were young.

14    *Q.*    Would it be an age range of 2 years to 8 years, is that

15    approximate?

16    *A.*    I would have to -- I would have no clue.  They were

17    younger.

18    *Q.*    Younger than -- than what?

19    *A.*    Younger than teenagers.

20    *Q.*    Other than the -- obtaining the money from Mr. Rivera,

21    were you involved in any further search of the apartment or

22    any additional investigation?

23    *A.*    No, I wasn't.

24    *Q.*    Okay.  And prior to today's date, have you been -- have

25    you spoken to any of the defense counsel in this case or an

*UNITED STATES DISTRICT COURT*

1    investigator from any of the three defense counsel?

2    A.    No, I have not.

3    Q.    Okay.

4          MR. WALSH:  Nothing further, your Honor.

5                    **_CROSS-EXAMINATION_**

6    BY MR. NAVARRO:

7    Q.    Good morning, sir.

8    A.    Good morning.

9    Q.    Prior to August 6th of 2009, had you ever been to the

10   address at 815 North Vineyard?

11   A.    No, I have not.

12   Q.    So this was your first time there?

13   A.    Yes.

14   Q.    But you're familiar with the city, obviously, correct?

15   A.    Yes.

16   Q.    Now, this apartment building is on Vineyard within one

17   signal light of the freeway, correct?

18   A.    Yes.

19   Q.    The 10 freeway, correct?

20   A.    Correct.

21   Q.    If you look across the street from the apartment

22   building, it's a huge open field, correct?

23   A.    That's correct.

24   Q.    It's pretty much out in the open, correct?

25   A.    I'm sorry?

*UNITED STATES DISTRICT COURT*

1    Q.    The apartment building is pretty easy to spot, correct?

2    A.    Well, there's a whole group of apartment buildings

3    there, but yeah, I understand what you're saying.

4    Q.    But only on one side of the street, correct?

5    A.    That is correct.

6    Q.    The other side appears to be a field, which appears to

7    be, maybe, to do with the airport or something like that,

8    it's just unoccupied, correct?

9    A.    It's just a vacant field.

10   Q.    And when you knocked on the door, how many other

11   officers were with you?

12   A.    It would have to be an estimation.  I couldn't tell you

13   exactly.  There was about five of us, I believe.

14   Q.    Was there a parole officer as well?

15   A.    I cannot recall.  I don't remember.

16   Q.    It was about 11:00 at night, correct?

17   A.    That's correct.

18   Q.    And Mr. Rivera answered the door, correct?

19   A.    Correct.

20   Q.    He stepped out -- you asked him to step outside,

21   correct?

22   A.    Yes.

23   Q.    And you searched him?

24   A.    Yes.

25   Q.    For your safety, correct?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.  And it was a parole check, because he was on

2    parole it was part of his search terms.

3    Q.    And you found $3,385 in his right front pocket, correct?

4    A.    That's correct.

5    Q.    Now, did you also find his cell phone on his person?

6    A.    I don't remember finding a cell phone.  It's possible,

7    but I don't remember.

8    Q.    Now, do you recall giving Mr. Rivera the option of

9    leaving the cell phone behind after he was detained?

10   A.    That's usually what I'll do when somebody is arrested,

11   but I don't remember at that particular time, though.

12   Q.    But he was arrested that day, correct?

13   A.    He was arrested that day, yes.

14         MR. NAVARRO:  No further questions.

15                      ***CROSS-EXAMINATION***

16   BY MR. CEPHAS:

17   Q.    Good morning.

18   A.    Good morning.

19   Q.    You met with Mr. Dore and Mr. Walton about four weeks

20   ago in preparation for this case, correct?

21   A.    I spoke with them on the phone.

22   Q.    Oh, you spoke with them on the phone.  Excuse me.

23         They had asked you if you had any knowledge of Raul

24   Prieto?

25   A.    Correct.

**UNITED STATES DISTRICT COURT**

1    *Q.*    And you said you had not heard that name before?

2    *A.*    Yeah.  I don't remember that name.

3    *Q.*    Okay.

4         MR. CEPHAS:  No further questions.

5         MR. DORE:  No redirect, your Honor.

6         THE COURT:  All right.  You may step down.

7         THE WITNESS:  Thank you.

8         THE COURT:  All right.  Ladies and gentlemen, let's

9    take our first break.  Let's come back at quarter after the

10   hour.  Remember the admonition, please.  Do not discuss this

11   case -- by the way, I failed to mention, if during the day

12   you happen to run into any of the attorneys out in the common

13   areas, if you do as most polite people do, you speak, you'll

14   probably discover that they will not return your greeting.

15   Do not hold that against them.  They are absolutely forbidden

16   to communicate at all with any members of the jury on a case

17   that they are trying.  So if they don't speak to you, or nod

18   to you, or be polite to you, don't hold it against them.

19        All right.

20        *(The following proceedings were held outside the*

21   *presence of the members of the jury and the alternates.)*

22                          --o0o--

23        THE COURT:  Anything we need to talk about?

24        MR. DORE:  Your Honor, just so you're aware, we have

25   six more witnesses here for the day.  There are two other

**UNITED STATES DISTRICT COURT**

1   witnesses the government is going to call in its case,

2   neither of whom is available today, one of whom is the

3   in-custody so it couldn't be arranged.  The other one had a

4   -- works for DEA and had a matter scheduled.  So we scheduled

5   for them to show up tomorrow morning.  Just wanted to alert

6   the Court to that.

7          I think we'll get through the rest of our list today,

8   but then I think we may run out by 1:45 or 2:00 or so.

9          THE COURT:  Tomorrow?

10          MR. DORE:  I'm sorry?

11          THE COURT:  Going to run out when today?

12          MR. DORE:  Today, and then we've got our two guys who

13   will be there starting at 8:00, and those will be our last

14   witnesses.

15          THE COURT:  Good, because I need to bail out of here

16   early Friday.  So this is working out just fine.

17          Anything you guys need?

18          MR. CEPHAS:  Well, I am going to call two or three

19   police officers.  I had subpoenaed them for Friday --

20          THE COURT:  Okay.

21          MR. CEPHAS:  -- anticipating that the government

22   would finish sooner than they had estimated, and I don't want

23   them to have to come two days.  So I'm still planning on

24   having them here Friday morning.

25          THE COURT:  Okay.  Friday morning is fine.  I want to

*UNITED STATES DISTRICT COURT*

1    try to get out of here by noon though.  So that's fine.

2        MR. DORE:  And, your Honor, one last -- at some point

3    I think the parties will have to address jury instructions.

4        THE COURT:  Yes, you will.

5        MR. DORE:  But our -- our cooperating witness will

6    take a fair amount of time, so it may be the bulk of

7    Thursday, so Friday may still be the right day either way for

8    Mr. Cephas' witnesses.

9        THE COURT:  Okay.  All right.

10       (Off the record at 10:00 a.m.  Back on the record at

11   10:19 a.m.)

12                            --o0o--

13       THE COURT:  All right.  The record will reflect all

14   counsel and defendants and the jury are present.

15       Mr. Dore.

16       MR. DORE:  Your Honor, the government calls Josh

17   Burks.

18              ***JOSH BURKS, GOVERNMENT'S WITNESS, SWORN***

19       THE CLERK:  Please raise your right hand.

20       Do you solemnly swear the testimony you are about to

21   give in the matter now pending before this Court shall be the

22   truth, the whole truth, and nothing but the truth, so help

23   you God?

24       THE WITNESS:  I do.

25       THE CLERK:  Thank you.  Please be seated.

*UNITED STATES DISTRICT COURT*

1      Please state your full name and spell your last name

2  for the record.

3      THE WITNESS:  It's Josh Burks, J-O-S-H, B-U-R-K-S.

4                    *DIRECT EXAMINATION*

5  BY MR. DORE:

6  Q.    Sir, where are you currently employed?

7  A.    The Ontario Police Department.

8  Q.    And what is your position with the Ontario Police

9  Department?

10  A.    Gang suppression unit.

11  Q.    And how long have you been working for the Ontario

12  Police Department?

13  A.    Thirteen years.

14  Q.    Did you take part in any search in Ontario on August

15  6th, 2009?

16  A.    Yes, I did.

17  Q.    And where was that search?

18  A.    815 North Vineyard Avenue, Apartment B, as in boy, City

19  of Ontario.

20  Q.    Now, walking up to that residence, did you notice any

21  particular vehicles?

22  A.    Yes.

23  Q.    And can you please describe what vehicles you noticed?

24  A.    Just outside the apartment, which is on the west side of

25  Vineyard Avenue, was a 1993 red Acura Integra two-door.

*UNITED STATES DISTRICT COURT*

1    Q.    Now, sitting in the courtroom today, do you see Carlos

2    Rivera?

3    A.    Yes, I do.

4    Q.    And can you please identify Mr. Rivera by an article of

5    clothing he's wearing?

6    A.    Black long-sleeved t-shirt -- I'm sorry, button-up

7    shirt.

8            THE COURT:   The record will reflect that the

9    defendant Rivera has been identified.

10   BY MR. DORE:

11   Q.    Now, did you talk to Carlos Rivera that night, August

12   6th, 2009?

13   A.    Yes, I did.

14   Q.    Did you ask him for the keys to that Acura?

15   A.    Yes, I did.

16   Q.    And what did he tell you?

17   A.    He told me they should be hanging on a hook inside the

18   kitchen, which was inside the apartment.

19   Q.    What did you do next?

20   A.    I walked inside the apartment and looked for the keys.

21   Q.    And did you find them?

22   A.    No, I did not.

23   Q.    Did you talk to another person about finding the keys to

24   that Acura?

25   A.    Yes, I did.

*UNITED STATES DISTRICT COURT*

1    Q.    Who did you talk to?

2    A.    Jessica Medina.

3    Q.    Do you see Jessica Medina in the courtroom today?

4    A.    Yes, I do.

5    Q.    Can you please identify her by an article of clothing

6    she's wearing?

7    A.    Black blouse, three-quarter sleeve.

8          THE COURT:  Defendant Medina has been identified.

9    BY MR. DORE:

10   Q.    What did Ms. Medina say to you about the keys to the

11   Acura?

12   A.    She told me she would help me find them.

13   Q.    Did she?

14   A.    She walked --

15   Q.    Did she find them?

16   A.    No, she did not.

17   Q.    Did a police dog alert to that red Acura that was

18   outside that apartment?

19   A.    Yes, it did.

20   Q.    Was the Acura locked?

21   A.    Yes, it was.

22   Q.    How did you get inside of it?

23   A.    One of our tow companies we use with the city arrived

24   and used a Slim Jim to open the driver's door.

25          MR. DORE:  Your Honor, at this point, we would like

*UNITED STATES DISTRICT COURT*

1    to play Exhibit 142, which has been admitted into evidence,

2    and if I may ask if the jurors can be instructed to look at

3    transcript 142-A in their binder.

4           May I approach the Courtroom Deputy?

5           THE COURT:  Yes, please.  You have to remember,

6    ladies and gentlemen, 142-A only.

7           MR. DORE:  Thank you.

8           (Government's Exhibit 142 marked for Identification

9    and received into Evidence.)

10          MR. DORE:  Your Honor, I'm just firing up the disk,

11   it will just be one second.

12          THE COURT:  It's okay.

13            *(Whereupon the conversation was then played.)*

14   BY MR. DORE:

15   Q.    I'm sorry, was it Corporal Burks?

16   A.    Yes.

17   Q.    Corporal Burks, once you got into that red Acura that

18   was parked outside that apartment on Vineyard Avenue in

19   Ontario, did you find anything in the car that you considered

20   to be suspicious?

21   A.    Yes, I did.

22   Q.    And what did you find?

23   A.    There was a car battery in the trunk on the passenger

24   side.

25          (Government's Exhibit 38 marked for Identification.)

*UNITED STATES DISTRICT COURT*

1    Q.   Could you take a look at Exhibit 38, please, a

2    photograph?

3         Do you recognize what's depicted in that photograph?

4    A.   Yes, I do.

5    Q.   And does what's shown in that photograph, Exhibit 38,

6    fairly and accurately show the back of that Acura as it

7    appeared that night in August 2009?

8    A.   Yes, it is.

9         MR. DORE:  Your Honor, the government moves to admit

10   Government's Exhibit 38 into evidence.

11        THE COURT:  Any objection?

12        MR. NAVARRO:  No, your Honor.

13        THE COURT:  Admitted.

14        (Government's Exhibit 38 received into Evidence.)

15          (The exhibit was displayed on the screen.)

16   BY MR. DORE:

17   Q.   So you found -- where did you find the car battery in

18   this car?

19   A.   In the trunk on the passenger side, so it would be in

20   the right side in the photo right by the brake light.

21   Q.   Did you lift the battery?

22   A.   Yes, I did.

23   Q.   And did you notice anything unusual about the weight of

24   the battery when you lifted it?

25   A.   It seemed to be lighter than a real car battery.

**UNITED STATES DISTRICT COURT**

1    Q.   Have you lifted a real car battery in the past?

2    A.   Yes, I have.

3    Q.   Did that car battery that you found in the trunk of that

4    Acura on August 6th, 2009, did it have a strap or a handle?

5    A.   Yes, it did.

6         MR. DORE:  Your Honor, permission to approach the

7    witness with a physical exhibit?

8         THE COURT:  All right.

9         (Government's Exhibit 231 marked for Identification.)

10   BY MR. DORE:

11   Q.   Corporal Burks, do you recognize what's been marked as

12   Exhibit 231 that I've placed in front of you?

13   A.   Yes, I do.

14   Q.   How do you recognize it?

15   A.   That's the battery that was in the trunk.

16        MR. DORE:  Your Honor, the government moves to admit

17   Exhibit 231 into evidence.

18        THE COURT:  Any objection?

19        MR. NAVARRO:  No, your Honor.

20        THE COURT:  Admitted.

21        (Government's Exhibit 231 received into Evidence.)

22   BY MR. DORE:

23   Q.   When you found this object that looks like a car battery

24   that night in August 6th, 2009, in that red Acura, did you

25   notice anything unusual about its appearance?

**UNITED STATES DISTRICT COURT**

1   *A.*   Yes, I did.

2   *Q.*   What was that?

3   *A.*   The top terminals up here are made of plastic -- the

4   positive and negative that you'd use to jump your car, and

5   these metal points back here, I haven't seen before.

6   *Q.*   Now, did the police dog alert to that battery?

7   *A.*   Yes, it did.

8   *Q.*   I'm sorry, that object that looks like a battery.

9        What did you do next?

10  *A.*   I pried open the lid.

11  *Q.*   How did you open that?  How did you pry it open?

12  *A.*   With a screwdriver.

13  *Q.*   Did it appear to you, in manipulating this object, that

14  it was rigged to open a certain way?

15  *A.*   Yes.

16  *Q.*   And how so?

17  *A.*   There's a latch inside, if you look at it on the inside

18  here, and through my training and experience, I've learned

19  that if you do a positive negative charge on the back, you

20  can pop the lid or pop the latch, and you would be able to

21  open it without having to pry it open.

22  *Q.*   I know it's kind of hard to look inside with the various

23  straps with the tags and everything on them, but looking

24  inside that object marked as Exhibit 231 is it hollow?

25  *A.*   Yes, it is.

*UNITED STATES DISTRICT COURT*

1    Q.    Is it empty?

2    A.    Yes, it is.

3    Q.    All right.  So you opened the battery the old-fashioned

4    way.  What did you find inside of it?

5    A.    I saw two Tupperware containers with blue lids.

6    Q.    Now, you said you found two Tupperware containers?

7    A.    Yes.

8          (Government's Exhibit 39 marked for Identification.)

9    Q.    Could you take a look at Exhibit 39?

10   A.    Okay.

11   Q.    Now, do you recognize what's shown in that photograph?

12   A.    Yes, I do.

13   Q.    And what's shown in that photograph?

14   A.    The inside of the battery with the Tupperware

15   containers.

16   Q.    Were the containers stacked on one another?  I only see

17   one in that photograph.

18   A.    They were stacked.

19   Q.    And does this photograph marked as Exhibit 39 fairly and

20   accurately show the inside of the battery as it appeared when

21   you opened it that night, August 6th, 2009?

22   A.    Yes, it does.

23          MR. DORE:  Your Honor, the government moves to admit

24   Exhibit 39.

25          THE COURT:  Any objection?

*UNITED STATES DISTRICT COURT*

1          MR. NAVARRO:  No.

2          THE COURT:  Admitted.

3          (Government's Exhibit 39 received into Evidence.)

4            *(The exhibit was displayed on the screen.)*

5   BY MR. DORE:

6   Q.   Now, did you take any of these Tupperware containers out

7   of the object that looks like a car battery?

8   A.   Yes, I did.

9   Q.   Okay.

10         MR. DORE:  Your Honor, permission to approach the

11  witness with another exhibit?

12         THE COURT:  Okay.

13         (Government's Exhibit 227 marked for Identification.)

14  BY MR. DORE:

15  Q.   Do you recognize that object in front of you marked as

16  Exhibit 227?

17  A.   Yes, I do.

18  Q.   How do you recognize it?

19  A.   That's the Tupperware container that was retrieved on

20  the night of August 6th.

21  Q.   And is that one of the Tupperware containers that you

22  can see in this photograph marked as Exhibit 39?

23  A.   Yes.

24         MR. DORE:  Your Honor, the government moves to admit

25  Exhibit 227 into evidence.

*UNITED STATES DISTRICT COURT*

```
 1              THE COURT:  Any objection?

 2              MR. NAVARRO:  No, your Honor.

 3              THE COURT:  All right.  It will be admitted.

 4         (Government's Exhibit 227 received into Evidence.)

 5    BY MR. DORE:

 6    Q.   Did one of the Tupperware containers inside that battery

 7    contain anything in it?

 8    A.   Yes.

 9    Q.   What did it contain inside?

10    A.   It appeared to have a large amount of methamphetamine.

11         (Government's Exhibit 225 marked for Identification.)

12    Q.   Could you take a look, please at the photograph marked

13    as Exhibit 225.

14         Do you recognize what's shown in that photograph marked

15    Exhibit 225?

16    A.   Yes, I do.

17    Q.   How do you recognize it?

18    A.   That's what I pulled out of the fake car battery.

19    Q.   All right.

20              MR. DORE:  Your Honor, the government moves to admit

21    225 into evidence.

22              THE COURT:  Any objection?

23              MR. NAVARRO:  No, your Honor.

24              THE COURT:  Admitted.

25         (Government's Exhibit 225 received into Evidence.)
```

*UNITED STATES DISTRICT COURT*

1              *(The exhibit was displayed on the screen.)*

2      BY MR. DORE:

3      Q.    It's a little fuzzy here because of the reflection in

4      the projector, but could you see what the substance was

5      inside that Tupperware container?  What it looked like?

6      A.    Yes, I could.

7      Q.    And what did it look like?

8      A.    Crystal methamphetamine.

9      Q.    What color was it, as far as you can remember?

10     A.    It's like an off-white powdery crystalline substance.

11     Q.    Now, did you take the lid off that Tupperware container

12     that you found in that hollow car battery on August 6th,

13     2009?

14     A.    Yes, I did.

15           (Government's Exhibit 226 marked for Identification.)

16     Q.    Would you take a look at Exhibit 226, please?

17     A.    Okay.

18     Q.    Do you recognize what's in that photograph marked

19     Exhibit 226?

20     A.    Yes, I do.

21     Q.    How do you recognize it?

22     A.    These were the bags inside the Tupperware in

23     Exhibit 225.

24           MR. DORE:  Your Honor, the government moves to admit

25     226 into evidence.

*UNITED STATES DISTRICT COURT*

1              THE COURT:  Admitted.

2          (Government's Exhibit 226 received into Evidence.)

3             *(The exhibit was displayed on the screen.)*

4    BY MR. DORE:

5    Q.    Now, did you give this battery -- this object and the

6    baggies that you found that we see in the photograph marked

7    as Exhibit 226, did you give those to anybody?

8    A.    Yes, I did.

9    Q.    Who did you give them to?

10   A.    Detective Chris Martinez.

11   Q.    And I see on this card in the photograph marked

12   Exhibit 226 there's a reference to Macias, T. as the

13   photographer.  Do you see that?

14   A.    Yes, I do.

15   Q.    Are you familiar with someone named Macias?

16   A.    Yes.

17   Q.    And who is this Macias with the Ontario Police

18   Department?

19   A.    She's one of our forensic specialists.

20   Q.    Do you know if she's still at Ontario Police Department?

21   A.    She is not.

22   Q.    Moving to a different event, just very briefly,

23   Corporal, July 22nd, 2009, were you present for a search of a

24   house on E Street in Ontario?

25   A.    Yes, I was.

*UNITED STATES DISTRICT COURT*

1    Q.    And are you familiar with someone named Raul Prieto?

2    A.    Yes, I am.

3    Q.    Did you see Mr. Prieto that day, July 22nd, 2009?

4    A.    Yes, I did.

5    Q.    And did you see Mr. Prieto go anywhere when police

6    approached that house?

7    A.    Towards the side door of the residence on the west side.

8    Q.    Do you recall if he later said anything about how he was

9    related to the owner of the house?

10   A.    It's his mother.

11   Q.    Did you enter that house on that July day in 2009 with

12   any members of the Ontario Police Department?

13   A.    Yes, I did.

14   Q.    Who did you go in there with?

15   A.    Officer Willemstyn.

16   Q.    Was any evidence recovered from that house?

17   A.    Yes, it was.

18   Q.    What was recovered?

19   A.    A .38 revolver in the refrigerator, in a -- which is in

20   a gun case.

21              MR. DORE:  No further questions.

22              THE COURT:  Cross.

23                    *CROSS-EXAMINATION*

24   BY MR. WALSH:

25   Q.    Before today, Officer, had you spoken to any of the

*UNITED STATES DISTRICT COURT*

1    three defense attorneys in this case?

2    A.    No, I have not.

3    Q.    But on November 6th of this year, you spoke with the

4    United States Attorneys and was interviewed by them; is that

5    right?

6    A.    I'm not sure of the day, but I spoke with them, yes.

7    Q.    About a month ago?

8    A.    Yes.

9    Q.    What time of -- what time was it when you knocked on the

10   door of the residence at Vineyard?

11   A.    Around 11:00 p.m.

12   Q.    And how many officers were with you when you knocked on

13   the door?

14   A.    I actually didn't knock on the door.  I was back in the

15   grass area.  I think -- I believe two went to the door.

16   Q.    All right.  And who -- how many were in the grass area?

17   A.    I don't know.

18   Q.    Can you give us an approximation?

19   A.    Four.

20   Q.    So there were a total of -- approximately a total of six

21   officers that were at the location in order to conduct the

22   parole search?

23   A.    Through the front, yes.

24   Q.    And were there officers in other locations around the

25   house?

*UNITED STATES DISTRICT COURT*

1    A.    I believe there was two to the rear by the garage door.

2    Q.    And were there any other officers?

3    A.    I don't believe so.

4    Q.    So then you witnessed the officers knocking on the front

5    door, Carlos Rivera opening the door and stepping outside?

6    A.    Yes.

7    Q.    And were you able to hear the conversation between the

8    officers and Mr. Rivera?

9    A.    I was able to hear, but I don't remember.

10   Q.    Well, did -- did they explain why they were there?

11   A.    Yes.

12   Q.    And how long was it after talking to Mr. Rivera that you

13   saw the officers do something with respect to Mr. Rivera?

14   A.    I'm not sure what you're asking.  What do you mean by

15   respect as to Mr. Rivera?

16   Q.    Well, did you see the officers pat Mr. Rivera down or

17   search him?

18   A.    Yes.

19   Q.    Did you see them taking property from Mr. Rivera?

20   A.    Yes.

21   Q.    Could you see what they took from him?

22   A.    Currency.

23   Q.    And did you see them take anything else from him?

24   A.    Not from memory, no.

25   Q.    Did you see Mr. Rivera in possession of a cell phone or

*UNITED STATES DISTRICT COURT*

1   the officers taking a cell phone from Mr. Rivera?

2   A.    I don't remember.

3   Q.    And after the money was taken from Mr. Rivera, did the

4   officers -- what was the next thing that happened?

5   A.    He sat down on the steps that led to the upstairs

6   apartment.

7   Q.    And then did the officers immediately go into the

8   apartment?

9   A.    Yes.

10  Q.    Did you follow the officers and go in?

11  A.    No, I did not.

12  Q.    Okay.  So how many officers went in initially?

13  A.    I don't remember.

14  Q.    Well, what do you remember?  Part of them going in and

15  part staying outside?

16  A.    My attention was focused on Mr. Rivera.  I was speaking

17  with him, so I'm not sure what happened after that.

18  Q.    Did you ever go inside the house?

19  A.    Yes, I did.

20  Q.    Before going inside the house, did other people come out

21  of the house?  Other occupants of the apartment come out of

22  the house?

23  A.    Yes.

24  Q.    And who did you see come out of the house?

25  A.    Two males, Jessica Medina, and I believe there were some

**UNITED STATES DISTRICT COURT**

1    children there as well.

2    Q.    How many children did you see?

3    A.    More than three, I believe.  But I'm not sure exact

4    amount.

5    Q.    What were the ages of the children?

6    A.    I don't know.

7    Q.    Were they young children?  Old children?

8    A.    Young.

9    Q.    Would it be fair to say that the ages were between 2 and

10   8, in that range?

11   A.    That's fair.

12   Q.    And did you know the -- did you learn the identities of

13   the two males that came out with Jessica Medina?

14   A.    I didn't speak to them, but the identities were revealed

15   to other officers.

16   Q.    But not to you?

17   A.    Correct.

18   Q.    So you can't testify as to what their names were?

19   A.    That's correct.

20   Q.    Those other two males, they weren't arrested that night?

21   A.    No.

22   Q.    Was Jessica Medina arrested that night?

23   A.    No, she was not.

24   Q.    The only person arrested was Carlos Rivera?

25   A.    That's correct.

*UNITED STATES DISTRICT COURT*

1    Q.    And what was he placed under arrest for?

2    A.    Possession of sales of methamphetamine and a parole

3    violation.

4    Q.    And the methamphetamine you arrested him for was the

5    methamphetamine that was in the trunk of the Acura?

6    A.    That's correct.

7    Q.    Now, at some point in time you tried to make entry into

8    the Acura and you learned it was -- it was locked?

9    A.    That's correct.

10   Q.    And was a narcotics sniffing dog brought to the Acura?

11   A.    Yes, it was.

12   Q.    And did you witness the dog being exposed to the Acura?

13   A.    Yes.

14   Q.    And I take it the dog alerted?

15   A.    Yes.

16   Q.    And at that point in time, then you tried to find the

17   keys to the Acura?

18   A.    I tried to find the keys first to the Acura.

19   Q.    And Mr. -- Mr. Rivera didn't have the keys; is that

20   right?

21   A.    That's correct.

22   Q.    And then you went inside and you asked if Ms. Medina

23   could provide you with the keys; is that correct?

24   A.    Ms. Medina offered to help me find the keys.

25   Q.    And she directed you to an area in the kitchen where the

*UNITED STATES DISTRICT COURT*

1   keys for the vehicles are hanging?

2   A.    She walked with me, yes.

3   Q.    But you were unable to locate the keys; is that correct?

4   A.    That's correct.

5   Q.    Now, you -- did you search any other place in the house

6   to find the keys?

7   A.    No.

8   Q.    And you were there for -- your lawful authority there

9   was to enter to conduct a parole search related to Carlos

10  Rivera; is that right?

11  A.    Right.

12        MR. DORE:  Objection, your Honor, calls for a legal

13  conclusion.

14        THE COURT:  He changed it.  Overruled.

15  BY MR. WALSH:

16  Q.    Your purpose there was to conduct a parole search for

17  Carlos Medina (sic.); is that right?

18  A.    Correct.

19  Q.    No one else in the house was on parole, were they?

20  A.    No.

21  Q.    And pursuant to the parole search, you searched the

22  person of Carlos Medina (sic.); is that right?

23  A.    I --

24  Q.    Or other officers searched the person of Carlos Medina

25  (sic.); is that right?

*UNITED STATES DISTRICT COURT*

1    A.    That's correct.

2    Q.    And you witnessed that on the front porch?

3    A.    Yes.

4    Q.    Now, the officers did not attempt to search the person

5    of any other -- any other persons on the premises; is that

6    right?

7    A.    I believe they did.

8    Q.    Who did they search?

9    A.    The two other males.

10   Q.    And did they search them by just patting them down?

11   A.    I don't know.

12   Q.    You weren't aware that those other persons were on

13   parole or not?

14   A.    They were not.

15   Q.    And you had no information that Jessica Medina was on

16   parole that night, did you?

17   A.    No, I did not.

18   Q.    And you didn't have a search warrant to search the

19   apartment, did you?

20   A.    No.

21   Q.    And you didn't have a search warrant to search Jessica

22   Medina, did you?

23   A.    No.

24   Q.    And how long were you there from the time that you were

25   present when the officers knocked on the door, prior to their

*UNITED STATES DISTRICT COURT*

1    entry, until the entire investigation was completed at the

2    location and the officers left?

3    A.    Maybe an hour.

4    Q.    And was the red Acura impounded and towed away?

5    A.    I'm not sure about that.

6    Q.    You didn't see a tow truck being called in order to tow

7    the vehicle away?

8    A.    No.

9    Q.    Was a tow truck called in order to obtain entry to the

10   red Acura?

11   A.    Yes.

12         MR. DORE:  Objection, your Honor, asked and answered.

13         THE COURT:  Sustained.

14   BY MR. WALSH:

15   Q.    And the entry was made by the tow truck driver?

16   A.    The tow truck driver did not make entry into the

17   vehicle, he just unlocked it.

18   Q.    Then after he unlocked it, then you made entry into the

19   vehicle; is that right?

20   A.    Yes.

21         MR. WALSH:  I have no further questions, your Honor.

22                        *CROSS-EXAMINATION*

23   BY MR. NAVARRO:

24   Q.    Good morning, sir.

25   A.    Good morning.

*UNITED STATES DISTRICT COURT*

1    Q.    Now, when you were there on August 6th of 2009, you

2    entered the apartment, correct?

3    A.    Yes.

4    Q.    As part of the search team?

5    A.    Yes.

6    Q.    And how many bedrooms, if you remember?

7    A.    How many?

8    Q.    Bedrooms, did the apartment have?

9    A.    I never searched the apartment, so I'm not sure how many

10   bedrooms it had.

11   Q.    But you went into the apartment?

12   A.    Just the kitchen.

13   Q.    So you did not search any of the bedrooms inside?

14   A.    I did not.

15   Q.    Now, do you know if any narcotics were found inside the

16   home?

17   A.    No narcotics were located inside the home.

18   Q.    Do you know if any drug paraphernalia was found inside

19   any of the bedrooms?

20   A.    No.

21   Q.    Do you know if any scales were found in any of the

22   bedrooms?

23   A.    No.

24   Q.    And when you questioned Mr. Rivera, he told you that the

25   red Acura was not his, correct?  Was not his?

*UNITED STATES DISTRICT COURT*

1    A.    In the beginning, yes.

2    Q.    All right.

3          MR. NAVARRO:  I have no other questions, your Honor.

4                        *CROSS-EXAMINATION*

5    BY MR. CEPHAS:

6    Q.    Good morning.

7          You indicated that a Slim Jim was used to get into the

8    car; is that correct?

9    A.    Yes.

10   Q.    Okay.  And is that typically how you get into a car

11   during a search warrant when you don't have the keys?

12   A.    During a search warrant?

13   Q.    When you're executing a search warrant and you don't

14   have the keys, you typically have a Slim Jim used to break

15   into the car?

16   A.    It can be.

17   Q.    You generally don't need to break the window to get in,

18   correct?

19   A.    Correct.

20         MR. CEPHAS:  Nothing further.

21         THE COURT:  Any redirect?

22         MR. DORE:  May I just have one moment, your Honor?

23         THE COURT:  Yes.

24         MR. DORE:  No.  No redirect, your Honor.

25         THE COURT:  All right.  You may step down.  Next

*UNITED STATES DISTRICT COURT*

```
1   witness.

2        MR. DORE:  Your Honor, the government's next witness

3   is Matt Gonzalez.

4        May I approach the Courtroom Deputy with the original

5   exhibit.

6        THE COURT:  Yes.

7        MATTHEW FRANK GONZALEZ, GOVERNMENT'S WITNESS, SWORN

8        THE CLERK:  Please raise your right hand.

9        Do you solemnly swear the testimony you are about to

10  give in the matter now pending before this Court shall be the

11  truth, the whole truth, and nothing but the truth, so help

12  you God?

13       THE WITNESS:  I do.

14       THE CLERK:  Please be seated.

15       THE WITNESS:  Thank you.

16       THE CLERK:  Please state your full name and spell it

17  for the record.

18       THE WITNESS:  Matthew Frank Gonzalez.  M-A-T-T-H-E-W,

19  F-R-A-N-K, G-O-N-Z-A-L-E-Z.

20       THE COURT:  All right, Mr. Dore.

21                        DIRECT EXAMINATION

22  BY MR. DORE:

23  Q.   Sir, where are you currently employed?

24  A.   Ontario Police Department.

25  Q.   And what is your position with the Ontario Police
```

**UNITED STATES DISTRICT COURT**

1    Department?

2    A.    I am a forensic specialist.

3    Q.    How long have you been a forensic specialist with the

4    Ontario Police Department?

5    A.    Since July of '97.

6    Q.    Could you please briefly describe your job

7    responsibilities as a forensic specialist with the Ontario

8    Police Department?

9    A.    As a forensic specialist, we're responsible for the

10   documentation, preservation, and collection of evidence.

11   Q.    And did you have the same job responsibilities in August

12   of 2009?

13   A.    Yes, I did.

14   Q.    Now, can you please describe your training and

15   experience with regard to fingerprint identification?

16   A.    I received my training through Riverside Sheriff's

17   Department in the same capacity as a forensic specialist

18   there, attending classes with the FBI, California Criminalist

19   Institute -- which is a branch of DOJ in Sacramento -- and we

20   have ongoing training in order to keep our certification with

21   the International Association For Identification.

22   Q.    Now, how does someone compare fingerprints found on an

23   object with a reference fingerprint?

24   A.    It's done with a side-by-side comparison.  You have the

25   fingerprint that you bring from the crime scene, and then you

**UNITED STATES DISTRICT COURT**

1    have a known subject's prints, and you do a side-by-side

2    comparison with a magnifying glass, either three times

3    magnifying power or five times magnifying power, and look at

4    the individual characteristics of the print and make a

5    determination that it's this individual as opposed to anybody

6    else.

7    Q.    And do you have experience actually making those

8    fingerprint comparisons?

9    A.    Yes.

10   Q.    And did you have experience making those fingerprint

11   comparisons as of August 2009?

12   A.    Yes.

13   Q.    Now, are you familiar with the practices of the Ontario

14   Police Department with respect to lifting fingerprints from

15   an object?

16   A.    Yes.

17   Q.    And when taking -- actually can you describe to the jury

18   what is a latent fingerprint?  What does *latent* mean?

19   A.    *Latent* means hidden.  And when we go to a crime scene in

20   search for latent fingerprints, we try to develop them

21   through different means.  One of the standard practices is to

22   use a fingerprint brush and graphite powder, which is

23   basically a black colored powder and that is for contrast.

24        So you will dust certain items with that fingerprint

25   powder using the brush, develop a hidden fingerprint, and

*UNITED STATES DISTRICT COURT*

1   then subsequently use lifting tape, which is just like a

2   household Scotch tape except it's clear a lot of times, and

3   you'll put that on the surface, take the latent from the

4   surface and put it on the back of a white fingerprint card.

5   Again, that's for contrast so you can see the black powder on

6   the white card.

7   Q.   Now, you mentioned a fingerprint card.  Is it -- was it

8   typical practice for Ontario Police Department forensic

9   analysts to prepare fingerprint cards when they lifted a

10  latent fingerprint from an object?

11  A.   Yes.

12  Q.   And was it typical practice for forensic analysts with

13  the Ontario Police Department to identify where a given

14  fingerprint had come from on those fingerprint cards?

15  A.   Yes.

16  Q.   And are those fingerprint cards kept in the regular

17  course of business by the Ontario Police Department?

18  A.   Yes, sir.

19  Q.   And are those cards made close to, if not almost right

20  after someone actually pulls the fingerprint from a given

21  object?

22  A.   Yes.  There's a list of information on the card like

23  blocks, if you will, that are to be filled in.

24  Q.   And was that the case in August 2009, also?

25  A.   Yes.

1    *Q.*    Are you familiar with someone named Tianna Macias?

2    *A.*    Yes.

3    *Q.*    And how are you familiar with Ms. Macias?

4    *A.*    Tianna Macias came to work for our department, and I

5    actually was her training officer during a period that her --

6    her training period, and then she left the department shortly

7    thereafter.

8    *Q.*    And did she work for the Ontario Police Department in

9    August 2009?

10   *A.*    Yes.

11   *Q.*    And were you overseeing her work at that time?

12   *A.*    Yes.

13   *Q.*    I'm sorry, if you already said, what was her position

14   then at that time in August 2009?

15   *A.*    She was a forensic specialist, and I was overseeing her

16   work in this particular case as the verifier.  At that time

17   she wasn't still in training.

18   *Q.*    And she no longer -- Ms. Macias no longer works for the

19   Ontario Police Department, correct?

20   *A.*    That's correct.

21   *Q.*    Now, in August 2009 did you confirm any fingerprint

22   comparison that Ms. Macias had prepared in connection with

23   this case?

24   *A.*    Yes, I did.

25         (Government's Exhibit 274 marked for Identification.)

**UNITED STATES DISTRICT COURT**

1    Q.    Could you please take a look at Exhibit 274?

2          Just take a second to flip through that, please, sir,

3    and let me know, when you're done, if you recognize what's

4    been marked as Exhibit 274?

5    A.    Yes.  These are the known fingerprints of Carlos Arturo

6    Rivera and the copies of the latent lift cards.

7    Q.    And those cards, do they contain information that a

8    forensic analyst with your department typically would put

9    down in their -- prepare in the course of their work as a

10   forensic analyst?

11   A.    Yes.

12         MR. DORE:  Your Honor, the government moves to admit

13   Exhibit 274.

14         THE COURT:  Any objection?

15         MR. NAVARRO:  No objection.

16         THE COURT:  Admitted.

17         (Government's Exhibit 274 received into Evidence.)

18   BY MR. DORE:

19   Q.    So if you could -- taking this first page of

20   Exhibit 274, what are we looking at here?

21             (The exhibit was displayed on the screen.)

22   A.    These are the known fingerprints.  This is what we would

23   compare the crime scene prints to.

24   Q.    And who -- who are those the known fingerprints for?

25   A.    Carlos Arturo Rivera.

*UNITED STATES DISTRICT COURT*

1    Q.    Now, the rest of Exhibit 274, let's look at the second

2    page.

3              (The exhibit was displayed on the screen.)

4    Q.    What is this a picture of?

5    A.    That is a copy of the back of the latent fingerprint

6    card where the tape is deposited on the back of the card.

7    Again, the black fingerprint powder showing great contrast on

8    the white card.

9    Q.    And this third page of Exhibit 274, what is this that

10   we're looking at here?

11             (The exhibit was displayed on the screen.)

12   A.    That is the front of the latent fingerprint card.  So

13   the tape that I just described would be on the back of that

14   card.

15   Q.    Now, did you confer -- did you make any -- did you

16   confirm the analysis of the comparison of the fingerprints

17   reflected in these cards with those fingerprints of

18   Mr. Rivera?

19   A.    Yes.

20   Q.    And what was your determination?

21   A.    I agreed with Ms. Macias' findings that they were Arturo

22   -- I'm sorry, Carlos Arturo Rivera's fingerprints.

23   Q.    And you made that calculation yourself independently,

24   based on your experience as a forensic analyst?

25   A.    Yes.

**UNITED STATES DISTRICT COURT**

1          MR. DORE:  Your Honor, permission to approach the

2     witness with a physical exhibit.

3          THE COURT:  Okay.

4     BY MR. DORE:

5     Q.   Sir, I've placed in front of you a container that's been

6     marked as Exhibit 227.  Do you see that there's a black

7     residue on that object?

8     A.   Yes, sir.

9     Q.   Do you know what that residue is?

10    A.   It appears to be a surface or a container that's been

11    already processed for fingerprints.  The placement of the

12    black powder and then the voids would appear that something

13    was lifted off the item with tape.

14         MR. DORE:  No further questions.

15         THE COURT:  Cross?

16         MR. NAVARRO:  No questions, your Honor.

17         MR. WALSH:  No questions, your Honor.

18         MR. CEPHAS:  Nothing, your Honor.

19         THE COURT:  You may step down, sir.

20         THE WITNESS:  Thank you.

21         MR. DORE:  Your Honor, the government's next witness

22    is Chris Martinez.  And for this witness we will also be

23    playing several recordings whose transcripts are in those

24    small binders that the jury has.

25         THE COURT:  All right.

*UNITED STATES DISTRICT COURT*

1      ***CHRISTOPHER MARTINEZ, GOVERNMENT'S WITNESS, SWORN***

2          THE CLERK:  Please raise your right hand.

3          Do you solemnly swear the testimony you are about to

4    give in the matter now pending before this Court shall be the

5    truth, the whole truth, and nothing but the truth, so help

6    you God?

7          THE WITNESS:  I do.

8          THE CLERK:  Please be seated.  Please state your full

9    name for the record.

10          THE WITNESS:  Yes.  Christopher Martinez.

11                     ***DIRECT EXAMINATION***

12    BY MR. DORE:

13    Q.    Sir, where are you currently employed?

14    A.    I'm currently employed with the City of Ontario Police

15    Department.

16    Q.    And what is your position with the Ontario Police

17    Department?

18    A.    I'm a detective assigned to the gang investigation unit.

19    Q.    How long have you been an officer -- I'm sorry, a

20    detective with the Ontario Police Department?

21    A.    Approximately eleven years now.

22    Q.    On August 6th, 2009, did you participate in a police

23    matter at 815 North Vineyard Avenue, Apartment B in Ontario,

24    California?

25    A.    I did.

*UNITED STATES DISTRICT COURT*

1    *Q.*   Do you recall any particular vehicle that was parked in

2    front of that building?

3    *A.*   Correct.

4    *Q.*   You do recall it.  Can you describe the vehicle that you

5    recall?

6    *A.*   Yes.  I believe it was a 1993 red Acura Legend.

7    *Q.*   Could you take a look, please, at Exhibit 232.  It's a

8    photograph.

9            (Government's Exhibit 232 marked for Identification.)

10   *Q.*   Do you recognize what's shown in that photograph?

11   *A.*   I do.

12   *Q.*   How do you recognize it?

13   *A.*   The color of the vehicle, the model on it.

14   *Q.*   Is that a picture of the red Acura that you observed

15   that night in August 2009?

16   *A.*   Yes, it is.

17            MR. DORE:  Your Honor, the government moves to admit

18   Exhibit 232 into evidence.

19            THE COURT:  Any objection?

20            MR. NAVARRO:  None, your Honor.

21            THE COURT:  232 is in.

22            (Government's Exhibit 232 received into Evidence.)

23              *(The exhibit was displayed on the screen.)*

24   BY MR. DORE:

25   *Q.*   Was there any evidence that was recovered from that red

**UNITED STATES DISTRICT COURT**

1    Acura shown in this Exhibit 232 on August 6th, 2009?

2    A.    Yes, there was.

3    Q.    And did you see what was recovered?

4    A.    Yes, I did.

5    Q.    What did it look like, this material that was recovered?

6    A.    There were several items that were retrieved from that

7    vehicle.  If I can describe them?

8    Q.    Sure.

9    A.    I believe one was a vehicle battery that was not

10   attached underneath the engine, it was actually in the rear

11   hatch area of the vehicle.  Inside that battery was a plastic

12   container similar to a Tupperware container.  And in

13   addition, there were two baggies -- or clear plastic bags

14   inside that piece of Tupperware with a white crystalline

15   substance inside each bag.

16   Q.    Did you -- what did you do with the plastic bags with

17   that white crystalline substance inside of them?

18   A.    They were taken by me to the Ontario Police Department

19   where they were weighed, and then a small sample was taken

20   from each bag to see if the substance tested positive for

21   what I believed was methamphetamine.

22   Q.    And do you recall approximately what each of those bags

23   weighed?

24   A.    Yeah.  I believe one bag was approximately 3.9 -- just

25   over 3.9 ounces, and the other one was also, I believe, just

**UNITED STATES DISTRICT COURT**

1    over 3.9 ounces.

2    Q.    What did you do with the bags then?

3    A.    Just prior to placing the -- actually what I had done

4    was I took a small sample -- I opened each bag, took a small

5    sample of the substance inside, and tested it to see if it

6    was indicative with amphetamine.

7    Q.    And was it?

8    A.    Yes, they both were.

9    Q.    Are you familiar with someone named Tianna Macias?

10   A.    Yes, I am.

11   Q.    And did Ms. Macias work for the Ontario Police

12   Department in August 2009?

13   A.    She did.

14   Q.    Did you give anything recovered on August 6th, 2009 to

15   Ms. Macias for fingerprinting?

16   A.    Yes.

17   Q.    What did you give her?

18   A.    One item that was given to her was the vehicle battery.

19   The other one was the plastic container similar to the

20   Tupperware container.

21        What I had done with the two individual plastic bags

22   that contained the suspected methamphetamine, I removed the

23   methamphetamine and placed them into another plastic bag, we

24   call it a K-pak, so that the actual bag that was retrieved

25   from the Tupperware could be processed for latent prints,

**UNITED STATES DISTRICT COURT**

1    also.

2    Q.    So you only remember there being one Tupperware, not two

3    Tupperware containers?

4    A.    From what I recall, I believe there was just one

5    Tupperware.

6             *(The exhibit was displayed on the screen.)*

7    Q.    I'm putting up on the screen -- and you may have it in

8    front of you -- Exhibit 221, which has already been admitted

9    into evidence.

10            Can you see up on the screen there, do you recognize

11   that Ontario Police Department evidence tag on that -- in

12   that photograph on that envelope?

13   A.    I do.

14   Q.    And do you know who wrote that tag?

15   A.    That would be me.

16   Q.    So where it says *Martinez*, that's you?

17   A.    Correct.

18   Q.    And who does *Rivera* refer to?

19   A.    That would be the suspect involved in this

20   investigation.

21   Q.    And did you put the two baggies of that white

22   crystalline substance in that envelope?

23   A.    I did.

24   Q.    Did you put that label on the envelope?

25   A.    That's correct.

*UNITED STATES DISTRICT COURT*

1    Q.    And what did you do with the envelope then?

2    A.    It was then placed in an evidence locker which is locked

3    and secured until evidence technicians come in later that

4    afternoon or that following day to retrieve it.

5           MR. DORE:  Your Honor, with the Court's permission,

6    I'd like to read a portion of the stipulation that's been

7    admitted into evidence into the record.

8           THE COURT:  Go ahead.

9           (Exhibit 277 marked for Identification and received

10   into Evidence.)

11          MR. DORE:  Marked as Exhibit 277, parties have

12   stipulated that the DEA laboratory report identified as

13   Government's Exhibit 223 is an authentic true and correct

14   copy of what it purports to be and is admissible for all

15   purposes.  Before it was analyzed, the substance referred to

16   as Exhibit 27 in lab number 223454 in the DEA laboratory

17   report identified as Government's Exhibit 223 was enclosed in

18   the envelope photographed in Government's Exhibit 221.

19          (Government's Exhibit 221 marked for Identification

20   and received into Evidence.)

21   BY MR. DORE:

22   Q.    If I can just have a second, sir.

23          This is the second page of Exhibit 221 which has been

24   admitted into evidence.

25                 (The exhibit was displayed on the screen.)

**UNITED STATES DISTRICT COURT**

1    Q.    Do you see there, sir, the lab number is 223456?

2    A.    Yes, I do.

3          (Exhibit 223 marked for Identification and received into

4    Evidence.)

5    Q.    I'm looking at Exhibit 223 which was admitted into

6    evidence pursuant to that stipulation.

7              *(The exhibit was displayed on the screen.)*

8    Q.    Do you see this is a DEA laboratory report?

9    A.    Yes, sir.

10   Q.    And can you read the lab number on that report?

11   A.    It appears to be 223456.

12   Q.    And do you see active drug ingredient on that page?

13   A.    Yes, sir, I do.

14   Q.    And what does it say there?

15   A.    It says methamphetamine, HCI.

16   Q.    And do you see the amount of actual drug column there?

17   A.    I apologize, the question again?  I'm sorry.

18   Q.    Amount of actual drug, do you see that column, the

19   second from the right on the page marked Exhibit 223?

20   A.    Yes.

21   Q.    And what does it say beneath that column, amount of

22   actual drug?

23   A.    It says 219.0 grams.

24   Q.    We're going to change course a little bit, sir.  Have

25   you spoken with Carlos Rivera before?

**UNITED STATES DISTRICT COURT**

1     A.    Yes, I have.

2     Q.    Approximately how many times would you say you've spoken

3     with Carlos Rivera?

4     A.    I'd say somewhere in the area of three or four times.

5     Q.    Did you review some audio recordings in this case prior

6     to coming today to testify?

7     A.    I did.

8     Q.    Did you recognize the speaker in any of those

9     recordings?

10    A.    I did.

11    Q.    Whose voice did you recognize?

12    A.    I recognized the voice of Carlos Rivera.

13    Q.    In fact, in one of those recordings did you hear anybody

14    talking about you personally?

15    A.    Yes, I believe so, that my name did come up.

16    Q.    Do you remember who referred you to?

17    A.    I believe it was Mr. Rivera.

18    Q.    Now, while listening to those recordings, prior to

19    coming here to testify, did you read transcripts as you were

20    listening to them?

21    A.    I did.

22    Q.    All right.

23          MR. DORE:  Your Honor, at this point we would ask the

24    witness to have Exhibits 81, 81-A, 83, 83-A, 89, 89-A, and

25    100, and 100-A.

*UNITED STATES DISTRICT COURT*

1          (Government's Exhibits 81, 83, and 89, marked for

2    Identification.)

3    BY MR. DORE:

4    Q.    Just review those briefly, sir.

5          Do you recognize those disks and transcripts?

6    A.    Yes, I do.

7    Q.    And how do you recognize them?

8    A.    They were viewed by me back, I believe, on the 6th of

9    November of this year.

10   Q.    And did you initial those various disks and transcripts

11   after you listened to them?

12   A.    Yes, sir, I did.

13   Q.    So did you listen to each recording on those disks

14   marked as Exhibits 81, 83, 89, and 100?

15   A.    Yes, sir.

16   Q.    Now, did the transcripts, which have the same number

17   just with the A after it, did the transcripts match up with

18   the recordings that you listened to?

19   A.    They did.

20   Q.    And did the transcripts that you reviewed accurately

21   identify Carlos Rivera as the speaker when he was the one

22   talking on that respective recording?

23   A.    It did.

24         MR. DORE:  Your Honor, at this point, if I may

25   approach to play Exhibit 89, your Honor?

*UNITED STATES DISTRICT COURT*

1          THE COURT:  Do you need the actual --

2          MR. DORE:  Yes.  I need to get the disk.

3          MR. CEPHAS:  Your Honor, I want to object to each of

4    the four exhibits, to the extent they identify individuals

5    who this witness has never heard before, and lacks foundation

6    to comment as to who these other individuals are, but the

7    transcripts are going to be given to the jury with names of

8    these other individuals on them.

9          THE COURT:  All right.

10         (Government's Exhibit 89 was received into Evidence.)

11   BY MR. DORE:

12   Q.   Detective Martinez, do you know someone named Brice

13   Devey?

14   A.   Yes, sir, I do.

15   Q.   And does Brice Devey work for the Ontario Police

16   Department?

17   A.   Yes, sir, he did.

18   Q.   Do you know which disk Brice Devey testified about in

19   this proceeding?

20         MR. CEPHAS:  Objection, hearsay.

21         THE COURT:  It calls for yes or no.

22   BY MR. DORE:

23   Q.   Do you know or not know?

24   A.   I do not know.

25         *(Whereupon the conversation was then played.)*

**UNITED STATES DISTRICT COURT**

1    Q.    Detective Martinez, does the Ontario gang unit have a

2    specific car assigned to that unit?

3    A.    Yes, we do.

4    Q.    And what type of car is that?

5    A.    We have actually two cars assigned to our unit.  One is

6    a Ford Crown Vic, which is kind of the older one.  It's a

7    black and white with no light bars on top.

8          The other one is a Dodge Charger.  That one, at one

9    time, was all black, but recently, within the last several

10   months, we actually painted that one black and white with no

11   light bars on the roof either.

12   Q.    Now, in your personal experience, have you encountered

13   people who have referred to something called the Black

14   Angels?

15   A.    Yes, I have.

16   Q.    And in your personal experience have you observed any

17   people with tattoos that say the words *Black Angels* on them?

18   A.    I have.

19   Q.    Personally, yourself, have you seen graffiti in the

20   Ontario area that referred to Black Angels?

21   A.    Yes, I have.

22   Q.    What are some of the places where you've seen that

23   graffiti?

24   A.    I've seen them throughout the City of Ontario.  I've

25   seen them in areas that I've worked in for other agencies,

**UNITED STATES DISTRICT COURT**

1    primarily in the City of Ontario.  I've seen them in the area

2    where we see a lot of gang activity.  You know, the area of a

3    street called Belmont Street.  Another street called Sunkist

4    Street, near a park called Sam Alba Park.  There's another

5    park in the area called DeAnza Park.  Some of the older areas

6    of the city is where it's commonly at, but I've also seen it

7    in other areas of the city in the north end, as well as even

8    in the south end, not just the central area of the City of

9    Ontario.

10   Q.   And in your personal experience -- I'm just talking

11   about you -- have you tried to talk to anyone about the Black

12   Angels gang whose mannerisms have suggested that they were

13   afraid to talk to you?

14   A.   I have.

15        MR. DORE:  No further questions.

16                    *CROSS-EXAMINATION*

17   BY MR. CEPHAS:

18   Q.   Good morning.

19   A.   Good morning.

20   Q.   How long did you work for Ontario Police Department?

21   A.   I've been with the City of Ontario for approximately

22   11 years now.

23   Q.   And you -- you met with the -- or you spoke with the

24   prosecutors in preparation for this case several weeks ago;

25   is that correct?

*UNITED STATES DISTRICT COURT*

1    A.    That's correct.

2    Q.    They asked you if you'd ever spoken to Raul Prieto,

3    correct?

4    A.    I believe so, yes.

5    Q.    And you told them you had never spoken to him?

6    A.    That's correct.

7    Q.    Now, you said you've seen a lot of graffiti during your

8    experience as a police officer in Ontario?

9    A.    That's correct.

10   Q.    Have you seen a lot of graffiti of symbols KMR?

11   A.    No, I have not.

12   Q.    Okay.  Have you heard of KMR graffiti?

13   A.    I have heard of KMR.  I have heard of KMR graffiti, yes.

14   Q.    Okay.  And --

15        MR. CEPHAS:  Nothing further.

16                    ***CROSS-EXAMINATION***

17   BY MR. NAVARRO:

18   Q.    Good morning, Detective Martinez.

19   A.    Good morning.

20   Q.    Now, prior to today did you ever meet with myself or any

21   of the lawyers on the defense side?

22   A.    I have not.

23   Q.    Now, those 11 years with Ontario, were they all as a

24   detective?

25   A.    No.  I originally started as an officer and promoted

*UNITED STATES DISTRICT COURT*

1    throughout the ranks.

2    Q.   And during those 11 years you've dealt with gang members

3    on a regular basis?

4    A.   I've been an officer for approximately 20 years.  I've

5    worked for three different agencies.  All three agencies I've

6    been assigned as a gang investigator most of my career.

7    Q.   So you have a lot of experience with gang members; is

8    that correct?

9    A.   Yes, sir.

10   Q.   You're familiar with the language they use?

11   A.   Yes.

12   Q.   Some of the Spanglish they use a lot on?

13   A.   I try and keep up, but it changes frequently.

14   Q.   Now, if -- if I was to say to you that I was hanging out

15   with some regular cats, what would that mean to you?

16   A.   Is that my opinion?

17   Q.   Yeah.  I'm asking for your opinion.

18   A.   It would probably mean something similar to, I'm hanging

19   out with my friends.  My homies.

20   Q.   So, if I said to you, *I'm hanging out with my homies*,

21   does that mean my homies from a gang typically?

22   A.   It -- depending on the individual that's saying it.

23   Q.   And if I'm saying to you there were just some regular

24   cats there, what would that mean to you?  I'm just asking

25   your opinion.

*UNITED STATES DISTRICT COURT*

1    *A.*    Again, it would probably have to be, depending on who's

2    saying it.  If it was a gang member saying it, I'm hanging

3    out with my cats, then he's probably hanging out with some

4    gang members.

5    *Q.*    What if he said, *I'm hanging out with some regular cats*

6    -- not my cats, but regular cats?

7    *A.*    It would probably mean he's hanging out with some gang

8    members.

9    *Q.*    In your opinion?

10   *A.*    In my opinion.

11        MR. NAVARRO:  No other questions, your Honor.

12        MR. WALSH:  No questions, your Honor.

13        THE COURT:  You may step down.

14        MR. DORE:  Your Honor, may I briefly redirect?

15        THE COURT:  Go ahead.

16                   ***REDIRECT EXAMINATION***

17   BY MR. DORE:

18   *Q.*    In your career in dealing with gang members, do you have

19   any experience in which people who weren't necessarily a

20   member of a given gang were helping gang members conduct gang

21   business?

22        MR. CEPHAS:  Objection, outside the scope of cross.

23        THE COURT:  Sustained.

24        MR. DORE:  No further questions.

25        THE COURT:  You may step down, sir.  Next witness.

**UNITED STATES DISTRICT COURT**

1          MR. DORE:  Your Honor, the government calls Travis

2     Cotton.

3          ***TRAVIS COTTON, GOVERNMENT'S WITNESS, SWORN***

4          THE CLERK:  Please raise your right hand.

5          Do you solemnly swear the testimony you are about to

6     give in the matter now pending before this Court shall be the

7     truth, the whole truth, and nothing but the truth, so help

8     you God?

9          THE WITNESS:  Yes, I do.

10         THE CLERK:  Please be seated.  Please state your full

11    name for the record.

12         THE WITNESS:  Travis Cotton.

13                    ***DIRECT EXAMINATION***

14    BY MR. DORE:

15    Q.    Sir, where are you currently employed?

16    A.    The City of Upland.

17    Q.    And what is your position with the Upland Police

18    Department?

19    A.    As a patrolman.

20    Q.    How long have you been employed by the Upland Police

21    Department?

22    A.    Ten and a half years.

23    Q.    Have you spent any time working on a task force related

24    to the City of Ontario?

25    A.    Yes, I did.  I spent four years working undercover

*UNITED STATES DISTRICT COURT*

1    street narcotics.

2    Q.    Were you conducting surveillance with other members of

3    the Ontario Police Department on July 31st, 2009?

4    A.    Yes, I was.

5    Q.    What location were you surveilling on that date of July

6    31st, 2009?

7    A.    An apartment on Vineyard just north of the 10 freeway.

8    Q.    And in what city is that apartment in Vineyard located?

9    A.    The City of Ontario.

10   Q.    And who was the subject of your surveillance?

11   A.    The last name was Rivera.

12   Q.    What did you observe while you were conducting

13   surveillance on Mr. Rivera at that Vineyard Avenue location?

14   A.    I saw the subject that was identified as Rivera walk up

15   to a vehicle in the west alley of Vineyard Avenue just west

16   of his apartment and speak to the passenger of the car, and

17   then walk back to the apartment.

18   Q.    And how did you know that that person was Mr. Rivera?

19   A.    Because prior to the investigation they had shown me a

20   picture of him.

21   Q.    And what was the car that he walked up to?

22   A.    It was an older style Volkswagen Bug.

23   Q.    How many people were in that older style Volkswagen Bug

24   that you could see?

25   A.    There was a driver and a passenger.

*UNITED STATES DISTRICT COURT*

1   Q.    And approximately how long did that -- did Mr. Rivera

2   speak with the passenger of that older model Volkswagen Bug?

3   A.    Maybe a couple minutes at max.

4   Q.    Do you know approximately when this was during the day

5   of July 22nd (sic.), 2009 when you observed this?

6   A.    No.  I know it was daylight.  It was sometime in the

7   afternoon.

8   Q.    And approximately how far away were you from the car?

9   A.    I would say no farther than a hundred yards.  I was

10  parked in the alley, and I had complete clear observation on

11  the subject.

12  Q.    And did you report what you observed to your fellow

13  officers?

14  A.    Yes, I did.

15          MR. DORE:  No further questions.

16          THE COURT:  Any cross?

17          MR. NAVARRO:  No questions, your Honor.

18                        *CROSS-EXAMINATION*

19  BY MR. WALSH:

20  Q.    During the course of your surveillance when you were

21  observing these events, did you see any females?

22  A.    Not to my -- not to my recollection.

23  Q.    And there was no females in the car that you had under

24  observation?

25  A.    Not to my recollection.

**UNITED STATES DISTRICT COURT**

1    *Q.*    And when you saw the subject, it appeared to be

2    Mr. Rivera, he was alone; is that right?

3    *A.*    Yes, sir.

4         MR. WALSH:  Nothing further.

5         MR. CEPHAS:  Nothing, your Honor.

6         THE COURT:  All right.

7         MR. DORE:  No redirect, your Honor.

8         THE COURT:  You may step down, sir.

9         MR. DORE:  Your Honor, just out of curiosity, was

10   there another break coming at a specific time?

11        THE COURT:  Like in five minutes.

12        MR. DORE:  Our next witness plays a couple of these

13   audio recordings, I didn't know if you wanted us to get

14   started with that --

15        THE COURT:  If we're going to do audio recordings and

16   that is not going to tax our Reporter, so let's do it.

17        MR. DORE:  Sure.  The government calls Ron Watson.

18   This one isn't recordings, the one after him is, but this

19   one's short.

20        THE COURT:  Okay.

21        **_RONALD WATSON, GOVERNMENT'S WITNESS, SWORN_**

22        THE CLERK:  Please raise your right hand.

23        Do you solemnly swear the testimony you are about to

24   give in the matter now pending before this Court shall be the

25   truth, the whole truth, and nothing but the truth, so help

*UNITED STATES DISTRICT COURT*

1    you God?

2          THE WITNESS:  I do.

3          THE CLERK:  Please be seated.  Please state your full

4    name for the record.

5          THE WITNESS:  Ronald Watson.

6                     ***DIRECT EXAMINATION***

7    BY MR. DORE:

8    Q.    Sir, where are you currently employed?

9    A.    With the Ontario Police Department.

10   Q.    How long have you worked with the Ontario Police

11   Department?

12   A.    Just under 13 years.

13   Q.    And what is your current position with the Ontario

14   Police Department?

15   A.    I am a detective assigned to be the acting sergeant on

16   graveyard patrol.

17   Q.    So you've been up awhile?

18   A.    I have been up awhile.

19   Q.    What was your position in July 2009?

20   A.    I was a corporal assigned to patrol.

21   Q.    Did you take part in any traffic stop on the afternoon

22   of July 31st, 2009?

23   A.    Yes, I did.

24   Q.    And could you please describe the car that you pulled

25   over that day?

*UNITED STATES DISTRICT COURT*

1    *A.*    It was a VW Bug, early seventies.

2    *Q.*    Now, did you --

3    *A.*    Blue.

4    *Q.*    Did you pull over that Volkswagen?

5    *A.*    I did.

6    *Q.*    How many people were in the car that you pulled over

7    that day, July 31st, 2009?

8    *A.*    There were two subjects in the vehicle.

9    *Q.*    Sitting here today do you know the name of either of

10   those subjects?

11   *A.*    Carl Cook and Robert Tolson.

12   *Q.*    At any point during the stop did any other Ontario

13   police officer arrive to assist you?

14   *A.*    Officer Travis Hartman was my backing officer.

15   *Q.*    Was he with you the whole time, or did he show up after

16   you were there?

17   *A.*    He showed up in another vehicle.

18   *Q.*    Did you ask the driver of that VW Bug if you could

19   search his clothing?

20   *A.*    I did.

21   *Q.*    Do you remember whether the driver was Carl Cook or

22   Robert Tolson, sitting here today?

23   *A.*    The driver was Carl Cook.

24   *Q.*    And Robert Tolson was the passenger?

25   *A.*    He was the passenger.

**UNITED STATES DISTRICT COURT**

1   Q.    And what did the driver of the car say when you asked if
2   you could search his clothing?
3   A.    He said -- he said yes.  I -- I asked -- in fact, I'm
4   almost certain he said yes, not anything else.  That's the
5   direct quote.
6   Q.    Did you find anything suspicious in his clothing?
7   A.    He told me he had a knife prior to, and in his sock I
8   found a white crystal-like substance.
9   Q.    And that substance -- did that white crystal-like
10  substance look familiar to you?
11  A.    Yes.
12  Q.    And had you seen a white crystal-like substance like
13  that before?
14  A.    Several times.
15  Q.    And what did that appear to you to be, based on your
16  experience?
17  A.    Methamphetamine.
18  Q.    Now, can you take a look, please, at Exhibit 46.
19        (Government's Exhibit 46 marked for Identification.)
20  Q.    Does the object in that photograph look familiar to you
21  at all?
22  A.    I --
23  Q.    And if you don't know, you don't know.
24  A.    I remember how it looked, but I couldn't say that this
25  was the exact one.

**UNITED STATES DISTRICT COURT**

1    Q.    Sure.  Could you take a look at -- do you have

2    Exhibit 217 in front of you?

3          I'm sorry, if you'll just give me one second.

4          (Government's Exhibit 217 marked for Identification

5    and received into Evidence.)

6               *(The exhibit was displayed on the screen.)*

7    Q.    Now, Exhibit 217, which has already been admitted into

8    evidence, sir, do you recognize the handwriting on that

9    evidence tag?

10   A.    I do.

11   Q.    The Ontario Police Department tag?

12   A.    I do.

13   Q.    And whose handwriting is that?

14   A.    That is my handwriting.

15   Q.    And does that *Watson* refer to you?

16   A.    That is me.

17        MR. DORE:  Your Honor, at this time I'd like to read

18   another portion of our stipulation marked as Exhibit 277 into

19   evidence.

20        THE COURT:  All right.

21        MR. DORE:  The parties have stipulated, pursuant to

22   stipulation marked as Exhibit 277, the DEA laboratory report

23   identified as Government's Exhibits 219 is an authentic true

24   and correct copy of what it purports to be and is admissible

25   for all purposes.  Before it was analyzed, the substance

*UNITED STATES DISTRICT COURT*

1    referred to as Exhibit Number 25 and lab number 223454 in the

2    DEA laboratory report identified as Government's Exhibits 219

3    was enclosed in Government's Exhibit 217.

4         The photograph identified as Exhibit 217 is an

5    authentic true and correct copy of what it purports to be and

6    is admissible for all purposes.

7         Your Honor, if I may just on a housekeeping matter,

8    I apologize.  The last time I read the stipulation I omitted

9    a paragraph in it.  Just for the record, Paragraph 6 on

10   Page 3 of that exhibit says, the photographs identified as

11   Government's Exhibit 221 are authentic, true and correct

12   copies of what they purport to be and are admissible for all

13   purposes.

14        (Government's Exhibit 219 marked for Identification

15   and received into Evidence.)

16        THE COURT:  Okay, counsel.  Thank you.

17   BY MR. DORE:

18   Q.   Now, sir, do you see below that evidence tag in this

19   exhibit that I'm displaying, which is Exhibit 217, do you see

20   there is a separate tag below that?

21        (The exhibit was displayed on the screen.)

22   A.   I do.

23   Q.   And do you see there's a lab number on that tag?

24   A.   Yes.

25   Q.   And can you read that lab number, please?

**UNITED STATES DISTRICT COURT**

1   A.   223454.

2   Q.   And could you please take a look at Exhibit 223?

3        THE CLERK:  223 you said?

4        MR. DORE:  No, I'm sorry.  That's the wrong one.

5   You're right.  219, I apologize.

6        *(The exhibit was displayed on the screen.)*

7   BY MR. DORE:

8   Q.   Sir, do you see in this document marked Exhibit 219 at

9   the top it says *laboratory report*?

10  A.   Yes.

11  Q.   And do you see that there's a lab number for Exhibit

12  Number 25, which reads 223454?

13  A.   Yes.

14  Q.   And what does it say is the active drug ingredient for

15  that lab number 223454?

16  A.   Methamphetamine.

17  Q.   And what does it say is the actual amount of drug for

18  that methamphetamine?

19  A.   4.4 grams.

20        MR. DORE:  No further questions.

21        THE COURT:  Cross?

22                    ***CROSS-EXAMINATION***

23  BY MR. WALSH:

24  Q.   Before testifying here today, had you spoken to any of

25  the three defense attorneys in this case?

*UNITED STATES DISTRICT COURT*

1    A.    No, I had not.

2    Q.    About a month ago you spoke with government's counsel

3    before your testimony; is that right?

4    A.    Yes, sir.

5    Q.    The -- the purpose of your stopping the vehicle was a

6    traffic stop?

7    A.    Yes.

8    Q.    And you had been directed to the vehicle by some other

9    law enforcement officers?

10   A.    Yes, I had.

11   Q.    And were there any females in the -- in the vehicle that

12   you had stopped?

13   A.    No.

14   Q.    The only two people in the vehicle were Carl Cook and

15   Robert Tolson?

16   A.    Yes, sir.

17   Q.    Before stopping the vehicle, had you been told by other

18   officers who the occupants of the vehicle were?

19   A.    No.

20          MR. WALSH:  I have nothing further, your Honor.

21          THE COURT:  You may step down, officer.

22          MR. DORE:  May I ask the Court if we could take a

23   five-minute break?

24          THE COURT:  It's time anyway.  I'm sorry.  I forgot.

25   Let's take 15 minutes, ladies and gentlemen.  Come back at

*UNITED STATES DISTRICT COURT*

1    five after the hour.  Remember the admonition, please.

2            (Off the record at 11:50 a.m.  Back on the record at

3    12:11 p.m.)

4                              --o0o--

5            THE COURT:  Okay.  We're back on the record.  The

6    jury is present.  All counsel are present as is all the

7    defendants.

8            Next witness.

9            MR. DORE:  Your Honor, the government calls Travis

10   Hartman.

11           THE COURT:  All right.

12           ***TRAVIS HARTMAN, GOVERNMENT'S WITNESS, SWORN***

13           THE CLERK:  Please raise your right hand.

14           Do you solemnly swear the testimony you are about to

15   give in the matter now pending before this Court shall be the

16   truth, the whole truth, and nothing but the truth, so help

17   you God?

18           THE WITNESS:  I do.

19           THE CLERK:  Please be seated.  Please state your name

20   for the record.

21           THE WITNESS:  Travis Hartman.

22                        ***DIRECT EXAMINATION***

23   BY MR. DORE:

24   Q.   Sir, where are you currently employed?

25   A.   Ontario Police Department.

*UNITED STATES DISTRICT COURT*

1   Q.    And what's your position with the Ontario Police

2   Department?

3   A.    Patrol officer.

4   Q.    How long have you been a patrol officer with the Ontario

5   Police Department?

6   A.    Four years.

7   Q.    So were you a patrol officer in July of 2009?

8   A.    Yes.

9   Q.    Did you take part in a traffic stop on the afternoon of

10  July 31st, 2009?

11  A.    Yes, I did.

12  Q.    Okay.  And who had stopped that car?

13  A.    Detective Watson.

14  Q.    And could you please describe the car that Detective

15  Watson had stopped?

16  A.    VW Bug.

17  Q.    How many people were in that car when you arrived?

18  A.    Two.

19  Q.    And did you search any of the driver's clothing?

20  A.    Yes.

21  Q.    What did you find?

22  A.    I had found a small clear plastic baggie with a

23  rock-like substance in it.

24  Q.    Could you take a look at Exhibit 46, please?

25        Do you recognize the baggie and substance in that

*UNITED STATES DISTRICT COURT*

1   photograph?

2   A.   Yes, I do.

3   Q.   And is that the baggie and substance that you found on

4   the driver of that VW Bug on July 31st, 2009?

5   A.   Yes, it is.

6        MR. DORE:  Your Honor, the government moves to admit

7   Exhibit 46 into evidence.

8        THE COURT:  Any objection?

9        MR. NAVARRO:  No, your Honor.

10       THE COURT:  46 is admitted.

11       (Government's Exhibit 46 received into Evidence.)

12          (The exhibit was displayed on the screen.)

13  BY MR. DORE:

14  Q.   There's a little bit of a glare from the lights on the

15  Elmo, but in looking at the picture, can you tell -- can you

16  see the substance inside the baggie?

17  A.   Yes, you can.

18  Q.   Okay.

19       MR. DORE:  Your Honor, at this point, with the

20  Court's permission, I'd like to play two calls that were

21  entered into evidence as Exhibits 81 and 83.

22       THE COURT:  All right.

23       MR. DORE:  May I approach the Courtroom Deputy?

24       MR. CEPHAS:  Same objection with respect to

25  authentication and foundation of voices, your Honor.

*UNITED STATES DISTRICT COURT*

1      THE COURT:  All right.  You just have a continuing

2  objection.  I understand.

3      MR. CEPHAS:  Continuing objection.

4      (Government's Exhibits 81 and 83 were received into

5  Evidence.)

6  BY MR. DORE:

7  Q.   Sir, do you have --

8      MR. DORE:  May I ask the Courtroom Deputy to give the

9  witness the transcripts marked as Exhibits 81-A and 83-A,

10  please?

11  Q.   Now, sir, looking at that transcript marked as -- sorry,

12  I'll get it one second here -- as Exhibit 81-A, do you see on

13  the front page there's various initials and dates on that

14  page there?

15  A.   Yes, I do.

16  Q.   Do you see there's a date and time at the top of that

17  first page of Exhibit 81-A?

18  A.   Yes, I do.

19  Q.   And what is the date and time on that cover page?

20  A.   July 31st, 2009 at 1:21 p.m.

21  Q.   I am now going to be playing Exhibit 81.

22      (Whereupon the conversation was then played.)

23  Q.   All right.  Now, Officer Hartman, could you please take

24  a look at the transcript marked as Exhibit 83-A?

25      Do you see that that transcript has various initials and

*UNITED STATES DISTRICT COURT*

1    dates on the cover page?

2    A.    Yes.

3    Q.    And what is the date and time on that cover page marked

4    as Exhibit 83-A for identification?

5    A.    July 31st, 2009, 3:14 p.m.

6    Q.    And is that approximately the same date and time that

7    you conducted the stop on that VW Bug --

8    A.    Yes, sir.

9    Q.    -- I'm sorry, that you assisted with the stop of that

10   VW Bug?

11   A.    Yes.

12          (Whereupon the conversation was then played.)

13   Q.    Now, Officer, I stopped that call marked as Exhibit 83,

14   I'm sorry, at 38 seconds in.  Did you hear the speaker there

15   say he had it in his sock?

16   A.    Yes.

17   Q.    And did you find the white crystalline substance during

18   that traffic stop on July 31st, 2009, in the driver's sock?

19   A.    Yes, I did.

20   Q.    All right.  Continue with that recording starting at 38

21   seconds.  This is Exhibit 83.

22          (Whereupon the conversation was then played.)

23          MR. DORE:  No further questions.

24          MR. NAVARRO:  Thank you, your Honor.

25                    *CROSS-EXAMINATION*

*UNITED STATES DISTRICT COURT*

1    BY MR. NAVARRO:

2    Q.   Good afternoon, sir.

3         Now, prior to today, had you listened to this phone

4    call?

5    A.   No.

6    Q.   This is the first time you've heard the voices on this

7    phone call?

8    A.   Yes.

9    Q.   Are you able to authenticate any of the speakers on the

10   voices prior to today?

11   A.   No.

12        MR. NAVARRO:  No further questions, your Honor.

13        MR. WALSH:  No questions, your Honor.

14        MR. CEPHAS:  Nothing, your Honor.

15        THE COURT:  You may step down, sir.

16        THE WITNESS:  Thank you.

17        MR. DORE:  No redirect, your Honor.

18        And, your Honor, at this point in the day our next

19   witness is currently unavailable and won't be until tomorrow

20   morning.

21        THE COURT:  All right.  Good.  Ladies and gentlemen,

22   we're going to let you go for the day, and I guess I'll keep

23   the lawyers here and we'll work on jury instructions, but

24   that will be it in terms of the presentation of the evidence

25   today.

*UNITED STATES DISTRICT COURT*

1          I'll let you in on something, looks like we're down

2     to our last four witnesses, at least in terms of what's on

3     the witness list.  So it appears that we're going to wrap

4     this up long before Christmas.  Okay?

5          Remember the admonition.  See you 8:00 tomorrow

6     morning.

7          *(The following proceedings were held outside the*

8     *presence of the members of the jury and the alternates.)*

9                              --o0o--

10         MR. WALSH:  Your Honor, my client has waived her

11    appearance for the jury instructions discussion.

12         MR. CEPHAS:  My client is also waiving his appearance

13    at the jury instructions discussion.

14         MR. NAVARRO:  My client is also waiving his

15    appearance, your Honor.

16         THE COURT:  Okay.  Ms. Medina, before you leave,

17    there's one other issue.  The instruction that we're going --

18    we're only going to give one set of instructions that apply

19    to the case, therefore it certainly applies to everyone.

20         Now, we can have one lawyer from each side meet with

21    me and we go over whether or not the instructions are proper

22    and accurate representations of the law and are appropriate

23    to be given in this case as to the facts of this case.  Or,

24    we can have all of the lawyers here to participate in this

25    discussion.  I would like if any of you defendants agree that

*UNITED STATES DISTRICT COURT*

1    your lawyer does not have to be here participating in this

2    discussion, that any other defense counsel can adequately

3    represent your interests, then I need you to say so on the

4    record.

5            MR. CEPHAS:  Your Honor, to the extent I have

6    objections, they are on the record.  They have been filed.

7    Mr. Navarro and Mr. Walsh will speak for me on behalf of

8    those that have already been filed.

9            THE COURT:  Okay.

10           MR. CEPHAS:  So I will not be here.

11           THE COURT:  Mr. Prieto, that's all right with you?

12           DEFENDANT PRIETO:  Yes, sir.

13           THE COURT:  All right.  Good.  All right.  Then I

14   will see Mr. Walsh, Mr. Navarro, whenever you want,

15   gentlemen.  You pick the time.

16           MR. WALSH:  1:30 is fine with us if it's okay with

17   the government.

18           MS. EL-AMAMY:  That's fine.

19           THE COURT:  Okay.  We'll see you at 1:30.

20           (Whereupon the matter concluded at 12:32 p.m.)

21                         --o0o--

22

23

24

25

*UNITED STATES DISTRICT COURT*

1

**TRIAL INDEX**

2

3      Proceedings outside the presence of the Jury                    3

4      *GOVERNMENT WITNESSES:*

5          **BRIAN OLVERA**
               Direct Examination by Mr. Dore                8
6              Cross-Examination by Mr. Cephas               10
               Redirect Examination by Mr. Dore             17
7

8          **IMRAN AHMED**
               Direct Examination by Mr. Dore               18
9              Cross-Examination by Mr. Cephas              19

10         **DARREN WILLIAMS**
               Direct Examination by Mr. Dore               28
11             Cross-Examination by Mr. Navarro             32
               Cross-Examination by Mr. Walsh               35
12

13         **WES WILLEMSTYN**
               Direct Examination by Mr. Dore               37
14             Cross-Examination by Mr. Navarro             55
               Cross-Examination by Mr. Walsh               59
15             Cross-Examination by Mr. Cephas              61
               Redirect Examination by Mr. Dore             63
16

17         **MAYNOR ARANA**
               Direct Examination by Mr. Dore               65
18             Cross-Examination by Mr. Walsh               69

19         **MICHAEL LORENZ**
               Direct Examination by Mr. Dore               74
20             Cross-Examination by Mr. Walsh               77
               Cross-Examination by Mr. Navarro             79
21             Cross-Examination by Mr. Cephas              81

22         **JOSHUA BURKS**
               Direct Examination by Mr. Dore               85
23             Cross-Examination by Mr. Walsh               97
               Cross-Examination by Mr. Navarro            105
24             Cross-Examination by Mr. Cephas             107

25

*UNITED STATES DISTRICT COURT*

1     ***MATTHEW FRANK GONZALEZ***
              Direct Examination by Mr. Dore                    108
2

3     ***CHRISTOPHER MARTINEZ***
              Direct Examination by Mr. Dore                    116
4             Cross-Examination by Mr. Cephas                   127
              Cross-Examination by Mr. Navarro                  128
5             Redirect Examination by Mr. Dore                  130

6     ***TRAVIS COTTON***
              Direct Examination by Mr. Dore                    131
7             Cross-Examination by Mr. Walsh                    133

8     ***RON WATSON***
              Direct Examination by Mr. Dore                    135
9             Cross-Examination by Mr. Walsh                    140

10    ***TRAVIS HARTMAN***
              Direct Examination by Mr. Dore                    142
11            Cross-Examination by Mr. Navarro                  147

12

13    Proceedings out of the presence of the jury              148

14

15

16

17

18

19

20

21

22

23

24

25

***UNITED STATES DISTRICT COURT***

1              ***EXHIBIT INDEX***

2

3    *EXHIBIT NUMBERS*        *IDENTIFICATION*                    *EVIDENCE*

4            *35*                  *47*                             *47*

5            *38*                  *88*                             *89*

6            *39*                  *92*                             *93*

7            *46*                 *137*                            *144*

8            *81*                 *124*                            *145*

9            *83*                 *124*                            *145*

10           *89*                 *124*                            *125*

11          *142*                  *88*                             *88*

12          *217*                 *138*                            *138*

13          *219*                 *139*                            *139*

14          *221*                 *121*                            *121*

15          *223*                 *122*                            *122*

16          *225*                  *94*                             *94*

17          *226*                  *95*                             *96*

18          *227*                  *93*                             *94*

19          *231*                  *90*                             *90*

20          *232*                 *117*                            *117*

21          *234*                  *30*                             *31*

22          *235*                  *48*                             *49*

23          *236*                  *48*                             *49*

24          *237*                  *48*                             *49*

25          *274*                 *112*                            *113*

*UNITED STATES DISTRICT COURT*

153

1            **_EXHIBIT INDEX_**

2

3   _EXHIBIT NUMBERS_        _IDENTIFICATION_              _EVIDENCE_

4
          276                    50                      50
5
          277                    121                     121
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

CERTIFICATE OF OFFICIAL REPORTER


COUNTY OF LOS ANGELES       )
                            )
STATE OF CALIFORNIA         )

           I, VICTORIA L. VALINE, FEDERAL OFFICIAL

REALTIME COURT REPORTER, REGISTERED MERIT REPORTER, IN AND

FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION

753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A

TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.


DATE:   December 5, 2012




/S/ VICTORIA L. VALINE
_____
VICTORIA L. VALINE, CSR No. 3036, RMR, CRR

FEDERAL OFFICIAL COURT REPORTER


**UNITED STATES DISTRICT COURT**