UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

*HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE*

- - -

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. |
| | ) | |
| vs. | ) | CR 10-00351-ODW |
| | ) | |
| CARLOS RIVERA (7), | ) | |
| JESSICA MEDINA (27), | ) | |
| AND RAUL PRIETO (29), | ) | |
| | ) | |
| Defendants. | ) | |

*REPORTER'S TRANSCRIPT OF*
*JURY TRIAL - DAY 3*
*VOLUME 2*
*THURSDAY, DECEMBER 6, 2012*
*11:30 A.M.*
*LOS ANGELES, CALIFORNIA*

*VICTORIA L. VALINE, CSR 3036, RMR, CRR*
FEDERAL OFFICIAL COURT REPORTER
312 NORTH SPRING STREET, ROOM 440
LOS ANGELES, CALIFORNIA 90012
www.victoriavalinecsr.com

*UNITED STATES DISTRICT COURT*

1          *APPEARANCES OF COUNSEL:*

2

3     *FOR THE PLAINTIFF:*

4              ANDRÉ BIROTTE, JR.
               United States Attorney
5              BY:  Reema M. El-Amamy,
                   Michael H. Dore,
6              Assistant United States Attorneys
               United States Courthouse
7              312 North Spring Street
               Los Angeles, California  90012
8

9     *FOR THE DEFENDANT CARLOS RIVERA:*

10             LAW OFFICES OF ANGEL NAVARRO
               Attorney at Law
11             BY:  Angel Navarro, Esq.
               714 West Olympic Boulevard, Suite 450
12             Los Angeles, California 90015
               213-744-0216
13

14

15    *FOR THE DEFENDANT JESSICA MEDINA:*

16             LAW OFFICES OF JOSEPH F. WALSH
               Attorney at Law
17             BY:  Joseph F. Walsh, Esq.
               205 South Broadway, Suite 606
18             Los Angeles, California 90012
               213-627-1793
19

20    *FOR THE DEFENDANT RAUL PRIETO:*

21             LAW OFFICES OF DANA CEPHAS
               Attorney at Law
22             BY:  Dana Cephas, Esq.
               72960 Fred Waring Drive
23             Palm Desert, CA 92260

24

25

*UNITED STATES DISTRICT COURT*

1          *LOS ANGELES, CALIFORNIA;  THURSDAY, DECEMBER 6, 2012*

2                              *11:30 A.M.*

3                                - - -

4               (Back on the record at 11:35 a.m.)

5          THE COURT:  Go ahead.

6                   **_DIRECT EXAMINATION_ _(Continued)_**

7    BY MS. EL-AMAMY:

8    Q.   Mr. Navarro, I'm going to ask you to take a look at

9    Exhibit 239, which has already been admitted into evidence.

10         Have you seen this photograph before?

11   A.   Yes.

12   Q.   What is this a photograph of?

13   A.   Gang graffiti.

14              *(The exhibit was displayed on the screen.)*

15   Q.   What does the graffiti say?

16   A.   OBAs, Widget, Little Lokie, Little Lazy, and Little

17   Reals.

18   Q.   Anything else?

19   A.   It has a 13 on the bottom.

20   Q.   I'm not seeing the word *little*, where are you getting

21   that from?

22   A.   At the end, the number two in Roman numeral means

23   Lokie II, Lazy II, Reals II, which can also be used as

24   little.

25   Q.   Why would you have a Little Reals versus Reals?

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| 1 | A. | Because there's already a Big Reals. |
| 2 | Q. | Do you know who Reals II is? |
| 3 | A. | Yes. |
| 4 | Q. | Who is that? |
| 5 | A. | Carlos Rivera. |
| 6 | Q. | Do you know who Lazy II is? |
| 7 | A. | Yes. |
| 8 | Q. | Who is that? |
| 9 | A. | Carlos Vasquez. |
| 10 | Q. | What about Lokie II? |
| 11 | A. | Yes. |
| 12 | Q. | Who is that? |
| 13 | A. | Steven Espinosa. |
| 14 | Q. | And what about Widget? |
| 15 | A. | Yes. |
| 16 | Q. | Who is that? |
| 17 | A. | Steven Vega. |
| 18 | Q. | What do they all have in common? |
| 19 | A. | They're all Black Angel gang members. |
| 20 | Q. | Do you know who wrote this graffiti? |
| 21 | A. | By the looks of it, yes. |
| 22 | Q. | Who, by the looks of it, wrote it? |
| 23 | A. | Widget. |
| 24 | Q. | Why do you believe that? |
| 25 | A. | Because he's the first one -- he's the first name that's |

*UNITED STATES DISTRICT COURT*

1    written on the graffiti.

2    *Q.*   Why is that significant?

3    *A.*   Usually the person who writes the graffiti writes their

4    name first.

5    *Q.*   Well, we saw a picture where you wrote graffiti and you

6    didn't even put your name on it, so why would we think that

7    Steven Vega wrote this?

8    *A.*   We don't.  It's not every time that you do it, but most

9    of the times you would write your name first.

10   *Q.*   Now, I'm going to ask you to look at Exhibit 243, 246,

11   47, and 48, all of which have already been identified and

12   admitted into evidence.

13        And while we're getting copies of those exhibits -- that

14   would be 242 --

15             THE COURT:  You said 243.

16             MS. EL-AMAMY:  -- 46, 47, and 48.

17             THE CLERK:  Okay.  So 242, 246 --

18             MS. EL-AMAMY:  47 and 48.  Thank you.

19   BY MS. EL-AMAMY:

20   *Q.*   Looking first at Exhibit 242, which has already been

21   admitted into evidence, what -- have you seen this picture

22   before?

23   *A.*   I believe so.

24             *(The exhibit was displayed on the screen.)*

25   *Q.*   What is this a picture of?

*UNITED STATES DISTRICT COURT*

| | | |
|---|---|---|
| 1 | A. | Gang graffiti. |
| 2 | Q. | How do you know it's gang graffiti? |
| 3 | A. | Because it says *Ontario Black Angels*. |
| 4 | Q. | Do you know who wrote it? |
| 5 | A. | No. |
| 6 | Q. | We talked before about Raul Prieto.  Do you know if Raul |
| 7 | | Prieto has a nickname? |
| 8 | A. | Yes. |
| 9 | Q. | What is that nickname? |
| 10 | A. | Crook. |
| 11 | Q. | How do you know he has that nickname? |
| 12 | A. | Because that's the nickname that I called him and |
| 13 | | everybody else called him. |
| 14 | Q. | When did you start calling him that nickname? |
| 15 | A. | Since I met him. |
| 16 | Q. | When?  What year? |
| 17 | A. | Around 2006. |
| 18 | Q. | Has he ever gone by any other nickname? |
| 19 | A. | Not to my knowledge. |
| 20 | Q. | So he had this nickname before becoming an OVS gang |
| 21 | | member? |
| 22 | A. | Yes. |
| 23 | Q. | Okay.  Do you know of any other individual in the Black |
| 24 | | Angel's gang who goes by the nickname Crook? |
| 25 | A. | No. |

*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| 1 | Q.   What about from a long time ago? |
| 2 | A.   No. |
| 3 | Q.   Are you certain? |
| 4 | A.   To my knowledge, yes. |
| 5 | Q.   How -- how -- would you be fairly certain if you would |
| 6 | know if there was a Crook? |
| 7 | A.   As long as it was somebody -- or if you're speaking of |
| 8 | somebody that was around the time that I became a gang member |
| 9 | until now, in between that time, yes. |
| 10 | Q.   What about from a long time ago, like the seventies or |
| 11 | the eighties, would there be a Crook there? |
| 12 | A.   I wouldn't know. |
| 13 | Q.   Okay.  But you've never heard of one? |
| 14 | A.   No. |
| 15 | Q.   Now, I'm going to ask you to take a look at Exhibits |
| 16 | 246, 47, and 48. |
| 17 | Have you seen those pictures before? |
| 18 | A.   Yes. |
| 19 | Q.   Have you heard of something called a roll call? |
| 20 | A.   Yes. |
| 21 | Q.   What is a roll call? |
| 22 | A.   It's a list or a pattern of several individuals -- or a |
| 23 | lot of individuals. |
| 24 | Q.   For what purpose? |
| 25 | A.   Identification.  In this example, they're nicknames. |

*UNITED STATES DISTRICT COURT*

```
 1    Q.    So you believe this is a roll call?

 2    A.    Yes.

 3              MR. CEPHAS:  Objection, speculation, foundation.

 4              THE COURT:  Overruled.

 5    BY MS. EL-AMAMY:

 6    Q.    Have you -- how many times, in your life, have you seen

 7    roll calls?

 8    A.    Plenty of times.

 9    Q.    Have you written roll calls?

10    A.    Yes.

11    Q.    How many times?

12    A.    Several times.

13    Q.    Were all your roll calls related to your gang?

14    A.    Yes.

15    Q.    Do you know who wrote this roll call?

16    A.    By the looks of it, yes.

17    Q.    Who?

18    A.    Widget.

19    Q.    And who is Widget?

20    A.    Steven Vega.

21    Q.    Has anyone told you that Steven Vega wrote this?

22    A.    No.

23    Q.    Why do you believe that Steven Vega wrote this?

24    A.    His name is first on the roll call.

25    Q.    Can you tell me who the names are of the other
```

*UNITED STATES DISTRICT COURT*

1    individuals that you see on the roll call?

2         MR. WALSH:  I'll object, your Honor.  We've already

3    had lengthy testimony concerning these exhibits, the graffiti

4    at the jail.  We had a jail officer, so I'd object that it's

5    cumulative.

6         THE COURT:  Overruled.

7    BY MS. EL-AMAMY:

8    Q.    Who are these individuals?

9    A.    Widget, Tomas, Limpy, Nito, Spanky, Black Bird, Pelon,

10   Largo, Termite, Crook, Little Widget, Youngster, Capone,

11   Scrappy, Joker, Little Lokie, Nigger, and Wicked.

12   Q.    Okay.  Were there some names that you could not read?

13   A.    Yes.

14   Q.    Can you take a look at the other photographs to see if

15   you can read the rest of the names?

16   A.    Sniper and Little Reals.

17   Q.    Who is Little Reals?

18   A.    Carlos Rivera.

19   Q.    How do you know that's Carlos Rivera?

20   A.    Because that's the name he goes by.  That's the name we

21   call him.

22   Q.    Who is Nito?

23   A.    Juan Gil.

24   Q.    What relationship does Juan Gil have to the gang?

25   A.    He's a Black Angel's gang member and also a Mexican

1    Mafia member.

2    Q.    Is he the person who made you the leader of the gang?

3    A.    Yes.

4    Q.    With the exception of Crook, who you say is defendant

5    Prieto, do you know that everyone else on the list is a Black

6    Angel's gang member?

7    A.    Yes.

8    Q.    How do you know that?

9    A.    From personal knowledge and knowing that they're Black

10   Angels.

11   Q.    Do you know if Crook is a Black Angel's gang member?

12   A.    No.

13   Q.    Have you ever seen a roll call of Black Angel members

14   where one OVS member was also included?

15   A.    No.

16   Q.    Ever?

17   A.    No.

18   Q.    How many roll calls have you seen in your life?

19   A.    Several.

20   Q.    More than 10?

21   A.    Yes.

22   Q.    More than 30?

23   A.    Maybe around 30.

24   Q.    Do you believe then that defendant Prieto is a Black

25   Angel's gang member based on this roll call?

*UNITED STATES DISTRICT COURT*

```
 1    A.    Yes.
 2    Q.    Do you know when this roll call was written?
 3    A.    No.
 4    Q.    Do you know if it was before or after defendant Prieto
 5    became an OVS gang member?
 6    A.    No.
 7    Q.    Do you know how defendant Prieto would become a Black
 8    Angel's gang member?
 9    A.    Yes.
10    Q.    How would he become a Black Angel's gang member?
11    A.    Commit crimes for the benefit of the gang or murder
12    somebody.
13    Q.    Is there any other way?
14    A.    Just anything for the benefit of the gang.
15    Q.    What do the words say at the bottom of the roll call?
16    A.    Southside Ontario, Los Black Angels, Sunkist.
17    Q.    Are any of the individuals on the list gang members from
18    the seventies or eighties?
19    A.    Yes.
20    Q.    Who is that?
21    A.    Nito and Negro.
22    Q.    With the exception of those two individuals -- well,
23    strike that.
24          Is everyone on the list, with the exception of defendant
25    Prieto, an active, to your knowledge, Black Angel gang
```

1    member?

2    A.    Limpy's passed away.

3    Q.    Everybody else besides Limpy and defendant Prieto?

4    A.    Yes.

5    Q.    Based on your review of this roll call, do you believe

6    that defendant Prieto is an active Black Angel's gang member?

7    A.    Yes.

8    Q.    Is there any way, to your knowledge, that you can be

9    included in a list of active Black Angel's gang members if

10   you weren't?

11   A.    To my knowledge, no.

12   Q.    What is the significance of Sunkist?

13   A.    Sunkist is a street that's located in south Ontario.

14   Q.    Why is that a significant street for the gang?

15   A.    Years back it's been known for a lot of gang members

16   from the gang living or hanging out on that street.

17   Q.    Are there any other significant streets for your gang?

18   A.    Yes.

19   Q.    What are those streets?

20   A.    Belmont Street.

21   Q.    Any others?

22   A.    No.

23   Q.    What about parks?

24   A.    Parks?

25   Q.    Any parks in Ontario that are significant for the gang?

*UNITED STATES DISTRICT COURT*

1  A.    Um -- just any -- any parks that are located in the gang

2  territory.

3  Q.    Do you control -- does the gang control the activity

4  only on those streets or is it all of Ontario?

5  A.    All of Ontario.

6  Q.    You talked before about taxing drug dealers.  Is it true

7  that any drug dealer that you -- that the gang knows of

8  selling drugs is taxed by the gang?

9  A.    Is it true if they're --

10  Q.    If they're taxed, if the gang knows about them?

11  A.    Yes.

12  Q.    What kind of drugs does a gang tax?

13  A.    Every drug.

14  Q.    Do they tax heroin?

15  A.    Yes.

16  Q.    Do you know where the drug dealers get their heroin

17  from?

18  A.    On some occasions, yes.

19  Q.    Where have those drug dealers gotten that heroin?

20  A.    From sources in Mexico.

21  Q.    Why in Mexico?

22  A.    That's where a lot of the drugs come from and get

23  smuggled into.

24  Q.    Can you get a large supply of heroin in the State of

25  California?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    Where can you get that from?

3    A.    From the drug dealers.

4    Q.    Were you taxing any individual that was selling heroin

5    in Ontario that got their drugs from outside of California?

6    A.    Yes.

7    Q.    Who was that?

8    A.    Alex.

9    Q.    What is Alex's full name, if you know it?

10   A.    Um -- I believe it's Michael Antonio Torres Cruz.

11   Q.    And he was selling heroin?

12   A.    Yes.

13   Q.    Did defendant Rivera know about this individual?

14   A.    Yes.

15   Q.    How do you know?

16   A.    He went with me one time when I went to go meet up with

17   Alex.

18   Q.    What were you meeting with Alex for?

19   A.    He was willing to pay us money to steal or carjack

20   another individual's car or truck.

21   Q.    And why was he willing to do that?

22   A.    Why was he willing to do it?

23   Q.    Why was Mr. Torres Cruz willing to do that?  Pay you

24   money to carjack someone?

25   A.    He had some kind of disagreement, and I believe he

*UNITED STATES DISTRICT COURT*

1    didn't get along with the guy, so he was willing to pay us

2    money.

3    Q.    Did you -- did you tell defendant Rivera why you were

4    meeting with this individual, Mr. Torres Cruz?

5    A.    Before I met up with him, no.

6    Q.    What did you tell defendant Rivera about Mr. Torres

7    Cruz?

8    A.    That he was a heroin drug collection that I was

9    collecting extortion money from.

10   Q.    Did defendant Rivera act surprised that you were taxing

11   someone that was selling heroin?

12   A.    No.

13   Q.    Did he ask you any details about who this individual

14   was?

15   A.    No.

16   Q.    Did he ask you what taxes were?

17   A.    No.

18   Q.    What did, if anything, he agree to do regarding

19   Mr. Torres Cruz?

20   A.    What was the question?

21   Q.    What did he agree to do with you, if anything, in

22   relation to the incident that you're describing with

23   Mr. Torres Cruz?

24   A.    He was willing to be one of the individuals to go along

25   and do this -- to get paid for it.

*UNITED STATES DISTRICT COURT*

1   Q.   Why was Mr. Torres Cruz asking you specifically to
2   handle this business?
3   A.   Because he knew we would be willing to do it.
4   Q.   Why did he know that?
5   A.   Just from reputation of the gang and him having
6   knowledge that we were gang members.
7   Q.   He was paying money to you regularly; is that correct?
8   A.   Yes.
9   Q.   How much was he paying to you?
10  A.   Two hundred a week.  On other occasions he was paying
11  400 a week.
12  Q.   Do you know how much he was selling?
13  A.   Not exactly, no.
14  Q.   Did you tell defendant Rivera how much he was paying to
15  the gang?
16  A.   I don't think I did.
17  Q.   Do you know if defendant Rivera knew about what quantity
18  of heroin Mr. Torres Cruz was selling?
19  A.   No.
20  Q.   Would he have any reason to believe -- or have any
21  information regarding the quantity?
22  A.   Not to my knowledge.
23  Q.   Does the gang tax low-level dealers?
24  A.   Yes.
25  Q.   Is someone who's paying 200 to $400 a week a low-level

*UNITED STATES DISTRICT COURT*

1    dealer?

2    A.    No.

3    Q.    What kind of quantity is that individual selling in

4    heroin if they're paying 200 to $400 a week?

5    A.    I'd say anywhere from ounces and up.

6    Q.    How much is an ounce of heroin?

7    A.    How much -- the weight or the --

8    Q.    The price.

9    A.    I'm not -- I'm not too sure.

10   Q.    You say a higher level person would be selling ounces.

11   Are we talking two ounces a week?  Or -- when you say ounces,

12   what do you mean in terms of a week for someone paying 200 to

13   $400?

14   A.    Anywhere from two ounces or more.

15   Q.    That's a high level?

16   A.    Yes.

17   Q.    Okay.  Did you and defendant Rivera meet with Mr. Torres

18   Cruz?

19   A.    Yes.

20   Q.    What did you all discuss?

21   A.    We discussed him willing to pay us to go and steal or

22   carjack this truck from this guy he wanted us to steal it

23   from.

24   Q.    Did you agree to do it?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1    *Q.*   Did he tell you how much he would be willing to pay?

2    *A.*   Yes.

3    *Q.*   How much was he willing to pay?

4    *A.*   $6,000.

5    *Q.*   Did he tell you that this was drug money?

6    *A.*   No.

7    *Q.*   Did you believe it was drug money?

8    *A.*   I -- I had an idea maybe, but I wasn't sure.

9    *Q.*   What steps, if any, did you and defendant Rivera take to

10   follow through with this plan?

11   *A.*   After we met with Alex, we drove in two separate cars to

12   the location where the individual lived at, and through cell

13   phone, he indicated to us the house and the truck that he

14   wanted stolen.

15   *Q.*   So who was in one car?

16   *A.*   Alex was in one car.

17   *Q.*   Right.

18   *A.*   And me, Carlos, and Cisco were in the other -- were in

19   my car.

20   *Q.*   Who is Cisco?

21   *A.*   Enrique Jimenez.

22   *Q.*   Is that another gang member?

23   *A.*   Yes.

24   *Q.*   Had this individual previously taxed Mr. Torres Cruz?

25   *A.*   Cisco?

*UNITED STATES DISTRICT COURT*

1   Q.   Yes.

2   A.   Yes.

3   Q.   How often was he collecting money from Mr. Torres Cruz?

4   A.   Just a couple times.

5   Q.   At whose direction?

6   A.   At my direction.

7   Q.   So whose car were you driving?

8   A.   Mine.

9   Q.   You were the driver?

10   A.   Yes.

11   Q.   Where were you in California?

12   A.   I believe the city was Mira Loma.

13   Q.   And the two cars -- you followed Mr. Torres Cruz in your

14   vehicle?

15   A.   Well --

16   Q.   He was driving and trying to show you where the location

17   was?

18   A.   Yes.

19   Q.   What did you, defendant Rivera, and -- I'm sorry, did

20   you give me the full name of Cisco?

21   A.   Yes.

22   Q.   Mr. Jimenez.  What did the three of you talk about while

23   you were following Mr. Torres Cruz?

24   A.   That we would split the money in threes, between all of

25   us.

*UNITED STATES DISTRICT COURT*

1    Q.    So what happened next?

2          You were following Mr. Torres Cruz, did you steal the

3    car?

4    A.    No.

5    Q.    Why is that?

6    A.    I ended up getting a call from Alex, I believe it was

7    the next day or the day after, and he ended up telling me to

8    go ahead and cancel the plan.

9    Q.    Why did he cancel the plan?

10   A.    I don't know.

11   Q.    Would you have been willing to go through with it had he

12   not cancelled?

13   A.    Yes.

14   Q.    Did you tell defendant Rivera that the plan was

15   cancelled?

16   A.    Yes.

17   Q.    What, if anything, did defendant Rivera say?

18   A.    I don't remember exactly.

19   Q.    Do you recall if he was disappointed or not?

20   A.    No.

21   Q.    Did you tell Mr. Jimenez that the plan had been

22   cancelled?

23   A.    Yes.

24   Q.    What, if anything, did Mr. Jimenez say?

25   A.    I don't remember.

*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| 1 | Q.   When did this happen? |
| 2 | A.   I want to say sometime in 2009. |
| 3 | Q.   Do you remember what month? |
| 4 | A.   Sometime in the summer. |
| 5 | Q.   I'm going to show you Exhibit 258. |
| 6 | (Government's Exhibit 258 marked for Identification.) |
| 7 | Q.   Do you recognize the individual in these pictures? |
| 8 | A.   Yes. |
| 9 | Q.   Who is this? |
| 10 | A.   Cisco. |
| 11 | Q.   What is his real name? |
| 12 | A.   Enrique Jimenez. |
| 13 | Q.   And is he a member of the Black Angel's gang? |
| 14 | A.   Yes. |
| 15 | Q.   Is he the person that was in the car with you and |
| 16 | defendant Rivera? |
| 17 | A.   Yes. |
| 18 | MS. EL-AMAMY:  Move to admit, your Honor. |
| 19 | MR. NAVARRO:  No objection. |
| 20 | THE COURT:  In evidence. |
| 21 | (Government's Exhibit 258 received into Evidence.) |
| 22 | (The exhibit was displayed on the screen.) |
| 23 | BY MS. EL-AMAMY: |
| 24 | Q.   Have you seen Mr. Jimenez's tattoos in real life? |
| 25 | A.   Yes. |

*UNITED STATES DISTRICT COURT*

1    Q.    Do these pictures reflect what it is he has on his body?

2    A.    Yes.

3    Q.    What's on his head in the middle picture?

4    A.    Ontario.

5    Q.    What about the side of his head?

6    A.    Sunkist Street.

7    Q.    And his neck?  The back of his neck?

8    A.    Sunkist.

9    Q.    What about on his stomach?

10   A.    OVS.

11   Q.    And on his back?

12   A.    Ontario Sur.

13   Q.    All right.  Now, I'm going to show you Exhibit 201 and

14   202, which have not been admitted.

15         While you're getting copies of those, I'll show you

16   Exhibits 1 and 2, which already have been admitted.

17              (The exhibit was displayed on the screen.)

18   Q.    Do you recognize the individual in this picture?

19   A.    Yes.

20   Q.    Who is that?

21   A.    Carlos Rivera.

22   Q.    Have you seen this tattoo in real life?

23   A.    Yes.

24   Q.    Do you know when he got it?

25   A.    No, not exactly.

*UNITED STATES DISTRICT COURT*

1    Q.   Do you know what the significance, if any, of the items

2    over the Ontario depicted in the picture?

3    A.   Angel wings?

4    Q.   Yes.  Are those significant?

5    A.   Yeah.

6    Q.   How are they significant?

7    A.   Meaning wings as far as for like an angel.

8    Q.   Mmmm-hmmm.

9    A.   Meaning Black Angel.

10   Q.   Can OVS members get wings?

11   A.   No.

12   Q.   What about Junior Black Angels?

13   A.   Yes.

14   Q.   Junior Black Angels can?

15   A.   Yes.

16   Q.   Do you have to ask someone permission to get your wings?

17   A.   If you're already a Junior Black Angel or a Black Angel,

18   no.

19   Q.   Have you seen the other tattoos on his chest?

20   A.   Yes.

21   Q.   What does the tattoo underneath *Ontario* say on the

22   single line, not the double line?

23   A.   *Jessica*.

24   Q.   Do you know who this tattoo represents?

25   A.   Yes.

*UNITED STATES DISTRICT COURT*

```
 1    Q.   Who is that?

 2    A.   His kids' mom.

 3    Q.   And who is that?

 4    A.   Jessica Medina.

 5    Q.   Did Mr. Rivera ever discuss with you getting tattoos?

 6    A.   No.

 7    Q.   Okay.  And showing you Exhibit 2, which has already been

 8    admitted, have you seen these tattoos as well?

 9    A.   Yes.

10              (The exhibit was displayed on the screen.)

11    Q.   What do the tattoos say?

12    A.   Black Angel.

13    Q.   Can an OVS member get that tattoo?

14    A.   No.

15    Q.   What about a Junior Black Angel?

16    A.   Yes, as long as it has junior in it or a J-R.

17    Q.   Do you see J-R in here?

18    A.   No.

19    Q.   Would you then, knowing your rules of the gang, believe

20    that he got this tattoo after he was a Black Angel?

21    A.   Yes.

22              (Government's Exhibits 201 and 202 marked for

23    Identification.)

24    Q.   Now, if I can have you take a look at Exhibits 201 and

25    202.
```

*UNITED STATES DISTRICT COURT*

```
 1          Do you recognize the individual in these pictures?
 2   A.    Yes.
 3   Q.    Who is that?
 4   A.    Carlos Rivera.
 5          MS. EL-AMAMY:  Move to admit, your Honor.
 6          MR. NAVARRO:  No objection.
 7          THE COURT:  Received.
 8          (Government's Exhibits 201 and 202 received into
 9   Evidence.)
10              (The exhibit was displayed on the screen.)
11   BY MS. EL-AMAMY:
12   Q.    Looking at Exhibit 201, do you see any difference in the
13   chest tattoo than the picture we just looked at previously,
14   Exhibit 1?
15   A.    Yes.
16   Q.    What is the difference?
17   A.    In this picture he doesn't have the angel wings.
18   Q.    Do you know when this picture was taken?
19   A.    No.
20   Q.    Have you seen this chest tattoo before and after
21   Mr. Rivera had wings?
22   A.    Um -- I don't -- I don't remember, but I don't think so.
23   Q.    So you've only seen with wings, then?
24   A.    To my knowledge, yes.
25              (The exhibit was displayed on the screen.)
```

*UNITED STATES DISTRICT COURT*

1    Q.   Showing you Exhibit 202, which has been admitted, and

2    this is difficult to see on the Elmo.  In the picture in

3    front of you, do you know if defendant Rivera has any tattoos

4    on his legs?

5    A.   Yes.

6              (The exhibit was displayed on the screen.)

7    Q.   What are those tattoos?

8    A.   Sur Onta and the S-O.

9    Q.   Can anyone outside of the Black Angel's organization get

10   those tattoos?  Sur and Onta?

11   A.   Only OVS gang members.

12   Q.   What if you're not OVS --

13   A.   No.

14   Q.   -- can you get those?

15        What would you do if you saw someone who had those

16   tattoos who wasn't OVS?

17   A.   Beat them.

18   Q.   Would you get more than one gang member to help you beat

19   him?

20   A.   Yes, usually.

21   Q.   Have you ever beaten someone for having tattoos that

22   they weren't supposed to have?

23   A.   No.

24   Q.   Have you heard of anyone being beaten for having tattoos

25   they weren't supposed to have?

*UNITED STATES DISTRICT COURT*

1    *A.*    I've heard of it, but I don't know the individuals.

2    *Q.*    Okay.  When did you hear about such an incident

3    happening?

4    *A.*    A long time ago when I was OVS gang member.

5    *Q.*    Did you know the individual who was beaten?

6    *A.*    No.

7    *Q.*    Did you know the individuals who did the beating?

8    *A.*    Yes.

9    *Q.*    Did they tell you about it?

10    *A.*    Yes.

11    *Q.*    What did they say?

12    *A.*    That they had beat a guy down for having Ontario

13    tattooed on him.

14    *Q.*    Did they say how badly the guy was hurt?

15    *A.*    No.

16    *Q.*    Did they say where they saw that individual?

17    *A.*    No.

18    *Q.*    I want to talk to you more about taxing.

19          Who determines how much any particular drug seller has

20    to pay to the gang?

21    *A.*    The individual that's collecting the tax money.

22    *Q.*    So how many people in your life have you collected taxes

23    from?

24    *A.*    Total, maybe anywhere from 20 to 30 people.

25    *Q.*    In your lifetime?

*UNITED STATES DISTRICT COURT*

1    *A.*    Yes.

2    *Q.*    Starting when?

3    *A.*    Starting in 2009.

4    *Q.*    And ending when?

5    *A.*    Up to when I was incarcerated.

6    *Q.*    Do you know if defendant Rivera has ever taxed anybody?

7    *A.*    Yes.

8    *Q.*    How do you know that?

9    *A.*    From his personal admittance to it.

10    *Q.*    To who?

11    *A.*    To me.

12    *Q.*    What did he tell you about his own taxing?

13    *A.*    That he was collecting extortion money from a couple

14    individuals.

15    *Q.*    Did he tell you who?

16    *A.*    No.

17    *Q.*    Did he tell you what kind of drugs?

18    *A.*    No.

19    *Q.*    Did he tell you how much they were paying?

20    *A.*    No.

21    *Q.*    Did he tell you who he was giving the money to?

22    *A.*    Yes.

23    *Q.*    Who did he say he was giving the money to?

24    *A.*    Armando Barajas.

25    *Q.*    And we saw, I believe in Exhibit 3 earlier...

*UNITED STATES DISTRICT COURT*

1           *(The exhibit was displayed on the screen.)*

2    Q.    Is this the individual who defendant Rivera said he was

3    paying?

4    A.    Yes.

5    Q.    Did defendant Rivera tell you why he was paying to

6    Armando Barajas?

7    A.    Yes.

8    Q.    Why did he tell you?  What did he say?

9    A.    He had asked me if I wanted him to give me the money so

10   I can forward it to Mando.

11   Q.    Why would he give you the money to forward it to

12   Mando -- Armando Barajas?

13   A.    Because at the time I was overlooking the extortion

14   money that was being collected.

15   Q.    What did you tell him to do?

16   A.    To just go ahead and deal with him himself.

17   Q.    And what did he say in response?

18   A.    He agreed.

19   Q.    Did you ever ask him any questions at a later date about

20   how his taxing business was going?

21   A.    No.

22   Q.    When did this conversation take place?

23   A.    Sometime in 2009.

24   Q.    If you were in charge of taxing, why would you want

25   defendant Rivera to deal with Armando Barajas directly?

*UNITED STATES DISTRICT COURT*

A.    I was -- the money I was collecting I was forwarding to

Armando Barajas, and that's who the money was going to, so it

would be okay for him to deal with him himself, because

that's where the money would be going to anyhow.

Q.    Does that take away from your leadership status?

A.    No.

Q.    Why?

A.    Because other Black Angel members deal with him

themselves.

Q.    Did you want to be a leader of the gang?

A.    Yes.

Q.    Why?

A.    Because at the time when I became the leader of a gang,

the ex-leader -- that was the leader before I was -- had

gotten killed, and we didn't know the circumstances of who

had killed him or what had happened, but we had some type of

knowledge that it was amongst some Black Angel members that

decided to murder him.  So, therefore, we all new, and I knew

that something weird was going on within the gang, and I

didn't want somebody that was in the wrong to take leadership

of the gang.

Q.    So why would you want to be the leader?

A.    Because I would make sure that everything would get ran

the way it's supposed to and fair.

Q.    Were you close to the former leader of the gang?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    What was his relationship to you?

3    A.    Just a friend from the gang.

4    Q.    Did you ever want to be a member of the Mexican Mafia?

5    A.    No.

6    Q.    Why?

7    A.    Because it's something more serious that you commit

8    yourself to, and I wasn't willing to make that commitment.

9    Q.    How is that different than your commitment to the gang?

10   A.    Because it's more of a serious and deeper gang or

11   organization.

12   Q.    Is your membership in the gang for life, the Black

13   Angels?

14   A.    It's supposed to be.

15   Q.    How is then that different than a commitment to the

16   Mexican Mafia?

17   A.    Because if you're a gang member of the Mexican Mafia,

18   it's blood in and blood out.  The only way of getting out of

19   it is by being murdered.

20   Q.    What way is there to get out of a gang like the Black

21   Angels?

22   A.    There's not supposed to be a way of getting out of the

23   Black Angels, but it's been known that individuals stop

24   coming around, and they stop participating in activities for

25   the gang, and little by little they sort of fade away, and

*UNITED STATES DISTRICT COURT*

1   everybody tends to kind of forget about them and not push the

2   issue of them not coming around and participating anymore.

3   Q.    What do you mean by *participating*?

4   A.    Participating in gang business or crimes.

5   Q.    What was your plan?

6         Did you plan to fade away, or did you plan to stay

7   active?

8   A.    Up to when I was incarcerated and I decided to do what

9   I'm doing now, I had decided and wanted to stay active.

10  Q.    Okay.  I'm going to ask you to take a look at

11  Exhibit 119-A, which is a transcript of a recording that's

12  already been admitted as a telephone conversation that took

13  place on May 15th, 2009 at 2:30 p.m.

14        Do you see your initials on that transcript?

15  A.    Yes.

16  Q.    Did you recognize the people speaking?

17  A.    Yes.

18  Q.    Who were those individuals?

19  A.    Salvador Martinez and myself.

20  Q.    Who was Salvador Martinez?

21  A.    A drug dealer that I was extorting from.

22  Q.    What was he selling?

23  A.    Methamphetamine.

24  Q.    Do you know how much he was selling?

25  A.    Small amounts.

*UNITED STATES DISTRICT COURT*

1    Q.    How much were you collecting from him?

2    A.    At once I was collecting $100, and then I was collecting

3    $75 from him a week.

4    Q.    A week?

5    A.    Yes.

6              *(Whereupon the conversation was then played.)*

7    Q.    What are you talking about in this telephone

8    conversation?

9    A.    Salvador is asking me if he still has to do his

10   contribution as far as payment -- extortion payment, even

11   though he's not -- or hasn't been working for that last week.

12   Q.    What do you mean by *working*?

13   A.    Dealing drugs.

14   Q.    How do you know that he didn't just mean working a

15   regular job?

16   A.    Because he was paying extortion money, and what he meant

17   by *working* was dealing drugs.

18   Q.    Do you know if Salvador Martinez had a girlfriend?

19   A.    Yes.

20   Q.    Do you know what her name was?

21   A.    Yes.

22   Q.    What was her name?

23   A.    Kim.

24   Q.    Had -- do you know her last name?

25   A.    No.

*UNITED STATES DISTRICT COURT*

```
1    Q.    Had you met her in person?

2    A.    Yes.

3    Q.    How many times?

4    A.    Several occasions.

5    Q.    Did you speak with her in person?

6    A.    Yes.

7    Q.    Were you able to recognize her voice?

8    A.    Yes.

9    Q.    Do you know what her role is -- or was in connection

10   with Mr. Martinez's narcotic sales?

11   A.    To my knowledge she didn't really have a role as far as

12   drug dealing or anything.

13   Q.    I'd ask you to take a look at Exhibit 151-A.

14         Do you see your initials on this transcript?

15   A.    Yes.

16   Q.    And 151-A corresponds to a recording of a telephone call

17   that has already been admitted as a recording that took place

18   on August 30th, 2009 at 1:03 p.m.

19         When you listened to this recording, were you able to

20   identify the people speaking in this call?

21   A.    Yes.

22   Q.    Who were those people?

23   A.    Kim and myself.

24         (Whereupon the conversation was then played.)

25   Q.    What were you talking about in this call?
```

*UNITED STATES DISTRICT COURT*

1          MR. CEPHAS:  Your Honor, relevance, undue waste of

2    time.

3          THE COURT:  It's not like we can put him back, is it?

4    Overruled.

5    BY MS. EL-AMAMY:

6    Q.    What were you talking about in this call?

7    A.    Kim was telling me about -- um -- Jose being raided and

8    tooken in for getting caught with dope.

9    Q.    And this is Salvador Martinez's girlfriend?

10   A.    Yes.

11   Q.    And when she said that they had pounds on them, what did

12   she mean?

13   A.    That they had pounds of meth.

14   Q.    Methamphetamine?

15   A.    Yes.

16   Q.    And when she said that this was your income, what did

17   you understand that to mean?

18   A.    What did I --

19   Q.    What did you understand *your income* to mean?

20   A.    Um -- he was paying extortion money and she knew, so him

21   being arrested meant that that source or that money wasn't

22   going to be coming in from him.

23   Q.    Do you know if defendant Rivera knew Salvador Martinez?

24   A.    Yes.

25   Q.    How do you know that?

*UNITED STATES DISTRICT COURT*

1    A.    He went with me one time to meet with Salvador.

2    Q.    Does Salvador Martinez work with another drug

3    distributor, Jose, that you talked about in the call?

4    A.    Yes.

5    Q.    Do you know if defendant Rivera knew Jose?

6    A.    No.

7    Q.    Okay.  How do you know that -- what did you do when you

8    met with Salvador Martinez and defendant Rivera?

9    A.    We had went over to discuss -- I had got a phone call

10   from Jose letting me know that Salvador had gotten robbed and

11   beaten by guys that were trying to pick up drugs, so we went

12   over there to talk to Salvador and see what the situation

13   was.

14   Q.    Okay.  You talked earlier about Jessica Medina.  What --

15   did you have much of a relationship with her?

16   A.    No.

17   Q.    How did you know her?

18   A.    Through Carlos.

19   Q.    All right.  I'm going to ask you to turn your attention

20   to Exhibits 92 through 95-A.

21        Starting first with 92-A, which is a transcript of a

22   recording that's already been admitted as a recording that

23   took place on August 7th, 2009 at 9:36 a.m.

24        Did you review this recording and transcript prior to

25   coming to court?

*UNITED STATES DISTRICT COURT*

1    *A.*    Yes.

2    *Q.*    Did you recognize one or both of the voices in this

3    recording?

4    *A.*    Yes.  One of them.

5    *Q.*    Who did you recognize?

6    *A.*    Jessica Medina.

7    *Q.*    Is the transcript where -- on your review, in the

8    transcript where it says defendant Medina's name, was it

9    accurate based on your knowledge of defendant Medina's voice?

10   *A.*    Yes.

11          *(Whereupon the conversation was then played.)*

12   *Q.*    Do you know who "D" or Alberto are that were referenced

13   in the call?

14   *A.*    Who?  Who?

15   *Q.*    She said, *"D", Alberto, all those fools got hit.*

16   *A.*    No.

17   *Q.*    Let me turn your attention to Exhibit 93-A, which you

18   should already have in front of you.

19          This is a transcript of a recording that's already been

20   admitted as a recording that took place on August 7th, 2009

21   at 1:27 p.m.

22          Did you listen to this recording before coming to court?

23   *A.*    Yes.

24   *Q.*    Did you initial the transcript?

25   *A.*    Yes.

*UNITED STATES DISTRICT COURT*

1   *Q.*   Did you review the transcript to verify that you knew at

2   least one of the names of the individuals speaking?

3   *A.*   Yes.

4   *Q.*   And who was that individual?

5   *A.*   Jessica Medina.

6   *Q.*   Did the transcript accurately reflect where it was that

7   she was speaking?

8   *A.*   Yes.

9   *Q.*   All right.

10          *(Whereupon the conversation was then played.)*

11   *Q.*   What does it mean to be from the O?

12   *A.*   To be a gang member from Ontario.

13   *Q.*   Have you ever heard that phrase used differently than

14   being a gang member from Ontario?

15   *A.*   Um -- being from the O?

16   *Q.*   Mmmm-hmmm.

17   *A.*   No.

18   *Q.*   Have you ever used the term *slide the numbers over*?

19   *A.*   Yes.

20   *Q.*   What did you mean by that?

21   *A.*   Um -- give me the numbers.

22   *Q.*   To do what?

23   *A.*   To get ahold of the people that I would have to get

24   ahold of.

25   *Q.*   So someone would give you the numbers to get ahold of

*UNITED STATES DISTRICT COURT*

1   different individuals?

2   A.   Yes.

3   Q.   Why would you slide someone numbers?

4        MR. WALSH:  Objection, your Honor, irrelevant.

5        THE COURT:  Sustained.

6   BY MS. EL-AMAMY:

7   Q.   Now, moving on to Exhibit 94-A, which should be in front

8   of you, which is a transcript of a recording that has been

9   previously admitted as a recording that took place on August

10  7th, 2009 at 1:32 p.m.

11       Did you listen to this recording before coming to court

12  today?

13  A.   Yes.

14  Q.   Do you see your initials on the transcript?

15  A.   Yes.

16  Q.   When you initialed the transcript, did you recognize any

17  of the individuals who were speaking?

18  A.   Yes.

19  Q.   Who did you recognize?

20  A.   Jessica Medina.

21  Q.   Do you know the other individual?

22  A.   No.

23  Q.   When you reviewed the transcript, did the transcript

24  accurately list where it was -- where defendant Medina was

25  speaking?

```
1    A.    Yes.

2          (Whereupon the conversation was then played.)

3    Q.    All right.  I'm going to stop it there.

4          I'd like to direct your attention to Exhibit 95-A, which

5    should be in front of you.

6          Is that a transcript of a recording that you listened

7    to --

8    A.    Yes.

9    Q.    -- prior to coming to court?

10         And that's a transcript that has already been admitted

11   into evidence as a recording that happened on August 7th,

12   2009 at 5:12 p.m.

13         When you listened to that recording, did you recognize

14   any of the individuals' voices?

15   A.    Yes.

16   Q.    Whose voice did you recognize?

17   A.    Jessica Medina.

18   Q.    Did you recognize the other individual?

19   A.    No.

20   Q.    Do you know of anybody named Nacho?

21   A.    No.

22   Q.    Have you ever seen a red Acura at defendant Rivera's

23   house?

24   A.    Yes.

25   Q.    How many times have you seen that car?
```

*UNITED STATES DISTRICT COURT*

1    *A.*    Maybe once or twice.

2    *Q.*    Did defendant Rivera ever say anything about that car?

3    *A.*    Yes.

4    *Q.*    What did he say?

5    *A.*    That that was his car.

6    *Q.*    When did he say that to you?

7    *A.*    I don't remember the date.

8    *Q.*    Do you remember the year?

9    *A.*    2009.

10            *(Whereupon the conversation was then played.)*

11   *Q.*    Let me direct your attention to Exhibit 112-A.

12           This is a transcript of a recording that has already

13   been admitted as a recording that took place on August 7th,

14   2009 at 2:25 p.m.

15           Did you listen to this recording before coming to court?

16   *A.*    Yes.

17   *Q.*    Did you recognize one or both of the individuals who

18   were speaking?

19   *A.*    Yes.

20   *Q.*    Who did you recognize?

21   *A.*    Jessica Medina and Robert.

22   *Q.*    Do you know Robert's last name?

23   *A.*    Yes.

24   *Q.*    What is Robert's last name?

25   *A.*    Tolson.

*UNITED STATES DISTRICT COURT*

1   Q.   Do you know what relationship Robert Tolson has to
2   defendant Rivera?
3   A.   From my knowledge he was one of his runners.
4   Q.   What is a runner?
5   A.   A person that sells drugs for him.
6   Q.   How do you know that Robert Tolson was a runner for
7   defendant Rivera?
8   A.   Carlos Rivera told me.
9   Q.   What did he say specifically?  What were his exact
10  words?
11  A.   I don't remember his exact words, but to the extent that
12  that was a person now selling drugs for him.
13       *(Whereupon the conversation was then played.)*
14  Q.   Now, you mentioned previously in your testimony that one
15  of the ways that women help the gang is by passing messages.
16       Is passing a message from one gang member to a narcotics
17  runner something you were talking about?
18  A.   Yes.  It's an example.
19  Q.   What are other examples?
20  A.   What is that?
21  Q.   What are other examples that you can think of?
22  A.   Oh, from one gang member to another gang member.
23  Q.   Do you know if that happens often?
24  A.   Yes.
25  Q.   How do you know that?

*UNITED STATES DISTRICT COURT*

1    A.    From personal knowledge.

2    Q.    Why do gang members use women to pass messages?

3    A.    Usually women -- a lot of times women don't have

4    records, being on parole or probation, so they could visit

5    other individuals that are incarcerated and not have any --

6    any problems come up while visiting them.

7    Q.    Have you ever known women to do anything else for the

8    gang?  In terms of helping them avoid law enforcement

9    detection?

10   A.    For the gang, no.

11   Q.    What about for gang members?

12   A.    Yes.

13   Q.    What -- can you give some examples of that?

14   A.    In this example, getting ahold of people where money has

15   to be collected from.

16   Q.    Why would you use a woman to do that?

17   A.    Most likely --

18        MR. CEPHAS:  Objection, speculation.

19        THE COURT:  You asked him why he would use a woman?

20        MS. EL-AMAMY:  Yes, your Honor.

21        THE COURT:  Overruled.

22   BY MS. EL-AMAMY:

23   Q.    Why would you use a woman to pass information like that?

24   A.    Because a woman would be less detected by law

25   enforcement or less targeted.

*UNITED STATES DISTRICT COURT*

1    Q.    Have you ever used a woman to hide any illegal items?

2    A.    No.

3    Q.    Have you known other gang members to use a woman to hide

4    illegal items?

5    A.    Yes.

6    Q.    What have you known women to hide for the gang?

7    A.    Drugs and one instance a gun.

8    Q.    What -- what was the instance of a gun?

9    A.    Um -- like who or --

10   Q.    Who and what -- what happened?

11   A.    Limpy's kids' mom took a gun from one place to another

12   for him.

13   Q.    Why was she the one to take the gun?

14   A.    She's not on probation or parole, so if she's driving

15   and gets pulled over, they have no probable cause to search

16   her car.

17   Q.    Now, what about the drugs that you mentioned, who did

18   you know hid the drugs for the gang member?

19   A.    Juan Gil's wife.

20   Q.    What did she do?

21   A.    She hid drugs for him.

22   Q.    She hid what?  I'm sorry.

23   A.    She hid drugs for him.

24   Q.    How often?

25   A.    From my knowledge, just once.

*UNITED STATES DISTRICT COURT*

1    Q.    Why did she hide the drugs for him?

2    A.    So it wouldn't be found by law enforcement.

3    Q.    Where did she hide them?

4    A.    I don't know.

5    Q.    How do you know she hid them?

6    A.    She told me.

7    Q.    What did she say?

8    A.    That she had to put and hide some drugs away so law

9    enforcement wouldn't find them.

10   Q.    What kind of drugs did she hide?

11   A.    I believe it was methamphetamine.

12   Q.    Do you know -- strike that.

13         Let me direct your attention to Exhibits 141 through

14   145-A.  I'm sorry, 141 through 144-A.

15         Do you have those exhibits in front of you?

16   A.    Yes.

17   Q.    Now, turning first to Exhibit 141-A, which is the

18   transcript of a recording that's already been admitted as a

19   recording of a conversation that occurred on August 7th, 2009

20   at 5:18 p.m.

21         Did you listen to that recording before you came into

22   court today?

23   A.    Yes.

24   Q.    Were you able to identify one or both of the voices in

25   the conversation?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    Who were you able to identify?

3    A.    Jessica Medina.

4    Q.    And was the transcript accurate in that it listed her as

5    the speaker?

6    A.    Yes.

7              (Whereupon the conversation was then played.)

8    Q.    Did you ever have a conversation with defendant Rivera

9    about the fact that he was on parole?

10   A.    Did I ever have a conversation?

11   Q.    Yes.

12   A.    Not anything specific, just knowledge of him being on

13   parole.

14   Q.    How did you know that he was on parole?

15   A.    Because I knew he had gotten out of prison.

16   Q.    Did he ever talk about not wanting to do stuff at his

17   house because he was on parole?

18   A.    Yes.

19   Q.    What did he tell you he didn't want to do at his house?

20   A.    He didn't want nobody hanging out there.

21   Q.    Do you know what he was going to do with the gun that he

22   bought in July 2009 that was for the gang?

23   A.    Just obtain it for the gang.

24   Q.    Do you know if he was going to take it back to his

25   house?

**UNITED STATES DISTRICT COURT**

1    A.    I don't -- I don't know, but I don't think so.

2    Q.    Why do you not think so?

3          MR. CEPHAS:  Objection, speculation, foundation.

4          THE COURT:  You asked him what he's thinking, right?

5          MS. EL-AMAMY:  Correct.

6          THE COURT:  Overruled.

7    BY MS. EL-AMAMY:

8    Q.    Why did you not think so?

9    A.    Because he was on parole.  He was paroled to the address

10   where he lived at.

11   Q.    Did you have someone ready to pick up the gun from

12   defendant Rivera at defendant Prieto's house?

13   A.    No.

14   Q.    Do you know of any gang member who was going to be

15   available to pick it up?

16   A.    No.

17   Q.    So you don't know how that gun was going to be -- where

18   that gun was going to be stored before someone picked it up?

19   A.    No.

20   Q.    Do you -- have you had conversations with defendant

21   Rivera about traveling in a vehicle if he had contraband like

22   guns or drugs?

23   A.    No.

24   Q.    Okay.  Based on your interactions with him, do you

25   believe he would be concerned about traveling in a vehicle

*UNITED STATES DISTRICT COURT*

1    with a gun?

2    *A.*    Yes.

3    *Q.*    Why do you believe that?

4    *A.*    Because he's on parole.

5          MS. EL-AMAMY:  Would the Court like to take a break

6    at this point?

7          THE COURT:  Okay.  Ladies and gentlemen, let's take

8    what will be our last break of the afternoon.  Let's come

9    back at half passed the hour.

10          *(The following proceedings were held outside the*

11    *presence of the members of the jury and the alternates.)*

12                            --o0o--

13          THE COURT:  Okay.  It looks like we're going to be

14    back here Tuesday.

15          MS. EL-AMAMY:  Right.

16          THE COURT:  Because this is going to be interminable

17    apparently.  We have to do cross-examination.  Wishful

18    thinking had me instructing the jury in the morning and you

19    guys giving closing arguments, but that obviously isn't going

20    to happen.

21          MR. CEPHAS:  Your Honor?

22          THE COURT:  Yes.

23          MR. CEPHAS:  I don't know if the Court recalls.  I

24    have -- I am putting on witnesses, and I have three officers

25    who I had asked to be here tomorrow at 8 a.m., and I don't

**UNITED STATES DISTRICT COURT**

1    want to make them wait around.

2          THE COURT:  I wouldn't.

3          MR. CEPHAS:  But I don't know --

4          THE COURT:  Don't look at me.  I'm not examining

5    anyone, but the way things are working out, the three of you

6    I'm sure, are going to want to talk to this gentleman.

7          MR. CEPHAS:  Right.

8          THE COURT:  So that could go on for awhile.  I don't

9    think I would be counting on putting anybody on in the

10   morning, would you?  I'm just guessing.

11         As a matter of fact, I want to get out of here before

12   noon, okay?

13         MR. CEPHAS:  Okay.

14         THE COURT:  We'll come back Tuesday.

15         MR. CEPHAS:  Can I start my case on Tuesday then, I

16   guess is what I'm asking?

17         THE COURT:  I don't care.

18         MR. CEPHAS:  I don't want the Court to say well,

19   where are your witnesses?  You should be prepared to start.

20         THE COURT:  No.  No.  No.

21         MR. CEPHAS:  Okay.  So I can contact them -- I'm

22   going to go contact them now.

23         THE COURT:  I would say contact them and have them

24   come in Tuesday.  I'm just going by the way things are going.

25   I have no crystal ball here.  Nor do I have a role to play in

*UNITED STATES DISTRICT COURT*

1  this.

2         MR. CEPHAS:  No.  I know.  I don't want to be

3  responsible for --

4         THE COURT:  You are.  You are.

5         (Off the record at 1:16 p.m.  Back on the record at

6  1:38 p.m.)

7                        --o0o--

8         *(The following proceedings were held in the presence*

9  *of the members of the jury and the alternates.)*

10                       --o0o--

11        THE COURT:  Go ahead.

12  BY MS. EL-AMAMY:

13  Q.   Now, Mr. Navarro, do you have Exhibits 143-A and 144-A

14  in front of you?

15  A.   143-A and 144-A?

16  Q.   Correct.

17  A.   Yes.

18  Q.   Are those calls that you listened to before coming to

19  court today?

20  A.   Yes.

21  Q.   All right.  Starting with 143-A, did you recognize the

22  speakers of a call that has already been admitted as a

23  telephone call that took place on August 7th, 2009 at

24  8:17 p.m.?

25  A.   Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    Who were those individuals?

2    A.    Jessica Medina and Francisco Venegas.

3    Q.    Do you know what relationship Francisco Venegas had with

4    defendant Rivera?

5    A.    He was -- he was his runner.

6    Q.    How do you know that he was his runner?

7    A.    From the phone calls that I have listened to.

8    Q.    But prior to listening to any phone calls, you didn't

9    know that he was the runner?

10   A.    No.

11        MR. WALSH:  Your Honor, I move to strike then.

12   It's -- his testimony now is based upon his reading something

13   after his arrest and before trial.  So it's based on hearsay,

14   so I move to strike his answer.

15        THE COURT:  Not necessarily.  Let's explore that.

16        MS. EL-AMAMY:  Okay.

17        THE COURT:  Was this refreshing his recollection or

18   is that the source of his knowledge?

19        MS. EL-AMAMY:  The source of his knowledge.

20        THE COURT:  That's a bit of a problem then.

21        MS. EL-AMAMY:  All right.

22        THE COURT:  It's stricken.

23         (Whereupon the conversation was then played.)

24   BY MS. EL-AMAMY:

25   Q.    I'm going to stop the recording there.

**UNITED STATES DISTRICT COURT**

1     Can you please take a look at Exhibit 144-A, which is

2  the transcript of a telephone conversation that took place on

3  August 7th, 2009 at 9:19 p.m., and has previously been

4  admitted as such?

5     Did you listen to this call before coming to court

6  today?

7  A.   Yes.

8  Q.   Did you recognize the individuals speaking in this

9  telephone call?

10  A.   Yes.

11  Q.   Who were those individuals?

12  A.   Jessica Medina and Francisco Venegas.

13  Q.   And while the disks are firing up, the next exhibits are

14  going to be 85 through 99.

15          (Whereupon the conversation was then played.)

16  Q.   Okay.  Turning to Exhibit 85-A, which should be in front

17  of you, did you listen to this call before coming to court?

18  A.   Yes.

19  Q.   And looking at the transcript of the call which has

20  previously been admitted as a call that took place on August

21  5th, 2009 at 7:26 p.m., did you recognize the individuals who

22  spoke during this telephone conversation?

23  A.   Yes.

24  Q.   Who were those individuals?

25  A.   Carlos Rivera and Raul Prieto.

*UNITED STATES DISTRICT COURT*

1  *Q.*   And during that telephone conversation did the
2  transcript accurately reflect who was speaking?
3  *A.*   Yes.
4           *(Whereupon the conversation was then played.)*
5  *Q.*   Have you ever used the term *soda* to refer to any
6  narcotics?
7  *A.*   Yes.
8  *Q.*   What did you use that for?
9  *A.*   Cocaine.
10  *Q.*   Do you know who White Boy Richard is?
11  *A.*   No.
12  *Q.*   How often were you interacting with defendant Rivera in
13  August of 2009?
14  *A.*   Almost every day, you can say.
15  *Q.*   Do you know of any reason why someone would owe -- based
16  on your interactions with defendant Rivera -- money?
17  *A.*   Probably for drug deals.
18           MR. WALSH:  Objection, your Honor, calls for
19  speculation.
20           THE COURT:  Sustained.
21  BY MS. EL-AMAMY:
22  *Q.*   Have you ever used the term *I'm all strong* or *I'm on
23  strong*?
24  *A.*   I've never used it.
25  *Q.*   Have you ever heard it?

*UNITED STATES DISTRICT COURT*

1    *A.*    Yes.

2    *Q.*    What have you heard it to mean?

3    *A.*    That he has -- or can come up with quantities of -- good

4    amount of quantities of drugs.

5    *Q.*    What do you mean by *good amount*?

6    *A.*    Anything that would be needed or wanted.

7    *Q.*    And have you ever used the term *guaranteed*?

8    *A.*    Not myself, no.

9    *Q.*    Have you heard others that you dealt with use the term?

10   *A.*    Yes.

11   *Q.*    And what did that mean?

12   *A.*    Guaranteed good -- high quality, high potency.

13   *Q.*    Have you ever used the term re-up?

14   *A.*    Yes.

15   *Q.*    What did you use that term to mean?

16   *A.*    To obtain more drugs.

17   *Q.*    Do you ever re-up if you've never gotten drugs before?

18   *A.*    What was the question?

19   *Q.*    Do you ever -- could you re-up if you've never gotten

20   drugs before in the past?

21   *A.*    If you've never gotten them?

22   *Q.*    Yes.  If it's your first time, would you be re-upping?

23   *A.*    No.

24   *Q.*    All right.  Turning your attention to Exhibit 97-A,

25   which should be in front of you.

*UNITED STATES DISTRICT COURT*

1      Did you listen to this recording before coming to court?

2  A.    Yes.

3  Q.    Did you initial the transcript?

4  A.    Yes.

5  Q.    And looking at the transcript, which is the transcript

6  of a recording that's already been admitted as a call that

7  took place on July 20th, 2009 at 7:11 p.m., were you able to

8  recognize the voices during that telephone conversation?

9  A.    Yes.

10  Q.    Who were -- who was speaking?

11  A.    Carlos Rivera and Jessica Medina.

12          (Whereupon the conversation was then played.)

13  Q.    Have you ever used the term *hookup someone fat*?

14  A.    Yes.

15  Q.    What did you mean by that?

16  A.    Give them a little bit more of what they're buying.

17  Q.    And have you ever used the term *dub*?

18  A.    Yes.

19  Q.    What is a dub?

20  A.    Twenty.  Of drugs.

21  Q.    Twenty what?

22  A.    Twenty of drugs.

23  Q.    Twenty what?

24  A.    $20 worth of drugs.

25  Q.    About what quantity is that?

*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| 1 | A.    Um -- .2. |
| 2 | Q.    .2 what? |
| 3 | A.    Ounces. |
| 4 | Q.    Ounces? |
| 5 | A.    Yeah, .2 -- I'm sorry, .2 grams. |
| 6 | Q.    And turning your attention to Exhibit 99-A, which is a |
| 7 | transcript of a recording that's already been admitted as a |
| 8 | recording of a telephone conversation that happened on July |
| 9 | 20th, 2009 at 8:46 p.m., did you listen to that call before |
| 10 | coming to court today? |
| 11 | A.    Yes. |
| 12 | Q.    And who was that call between? |
| 13 | A.    Carlos Rivera and Francisco Venegas. |
| 14 |        *(Whereupon the conversation was then played.)* |
| 15 | Q.    What is a heina? |
| 16 | A.    Excuse me? |
| 17 | Q.    What is a heina? |
| 18 | A.    A girl. |
| 19 | Q.    Is it -- what is a my heina? |
| 20 | A.    My girl or my girlfriend. |
| 21 |        MS. EL-AMAMY:  Your Honor, if the Court thinks this |
| 22 | is a good place to break for the day? |
| 23 |        THE COURT:  You talked me into it. |
| 24 |        MS. EL-AMAMY:  Okay. |
| 25 |        THE COURT:  All right.  Ladies and gentlemen, that's |

*UNITED STATES DISTRICT COURT*

1    it for the day.  Remember the admonition, please.  We're

2    almost there.  Don't talk about this case with anyone.  Don't

3    permit anyone to talk about this case to you.  Please don't

4    do any independent research on any of the things that we've

5    talked about in this trial.  8:00 tomorrow morning.

6            *(The evening recess was taken at 1:58 p.m.)*

7                          --o0o--

*UNITED STATES DISTRICT COURT*

**TRIAL INDEX**

*GOVERNMENT WITNESSES:*

> **DAVID NAVARRO**
>> Direct Examination (Continued) by Ms. El-Amamy    3

**EXHIBIT INDEX**

| *EXHIBIT NUMBERS* | *IDENTIFICATION* | *EVIDENCE* |
|---|---|---|
| *201* | *24* | *25* |
| *202* | *24* | *25* |
| *258* | *21* | *21* |

*UNITED STATES DISTRICT COURT*

1                    *CERTIFICATE OF OFFICIAL REPORTER*

2

3   *COUNTY OF LOS ANGELES      )*
                                 *)*
4   *STATE OF CALIFORNIA        )*

5                    *I, VICTORIA L. VALINE, FEDERAL OFFICIAL*

6   *REALTIME COURT REPORTER, REGISTERED MERIT REPORTER, IN AND*

7   *FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT*

8   *OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION*

9   *753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A*

10  *TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED*

11  *PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE*

12  *TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS*

13  *OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.*

14

15  *DATE:  December 6, 2012*

16

17

18

19  */S/ VICTORIA L. VALINE*
    _____
20  *VICTORIA L. VALINE, CSR No. 3036, RMR, CRR*

21  *FEDERAL OFFICIAL COURT REPORTER*

22

23

24

25

*UNITED STATES DISTRICT COURT*