1        UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3           HONORABLE OTIS D. WRIGHT

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                  – – –

6

United States of America,          )
7                    PLAINTIFF,    )
                                   )
8    VS.                           )  NO. CR 10–351 ODW
                                   )
9    Carlos Rivera, Jessica Medina, Raul)
Prieto,                            )
10                   DEFENDANT,    )
     _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15           LOS ANGELES, CALIFORNIA

16           JURY TRIAL – DAY THREE

17          THURSDAY, DECEMBER 6, 2012

18           7:56 A.M. – VOLUME I

19

20

21    _____

22        KATIE E. THIBODEAUX, CSR 9858
          U.S. Official Court Reporter
23        312 North Spring Street, #436
          Los Angeles, California 90012

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   APPEARANCES OF COUNSEL:

2

3   FOR PLAINTIFF:

4         U.S. DEPARTMENT OF JUSTICE
          U.S. ATTORNEY'S OFFICE
5         BY: REEMA EL-AMAMY, AUSA
          -and- MICHAEL DORE, AUSA
6         312 North Spring Street
          Twelfth Floor
7         Los Angeles, CA  90012

8

9   FOR DEFENDANT RIVERA:

10        ANGEL NAVARRO LAW OFFICE
          BY:  ANGEL NAVARRO
11        714 West Olympic Boulevard
          Suite 450
12        Los Angeles, CA  90015

13

14

15  FOR DEFENDANT MEDINA:

16        JOSEPH F. WALSH LAW OFFICES
          BY:  JOSEPH F. WALSH
17        205 South Broadway
          Suite 606
18        Los Angeles, CA  90012

19

20  FOR DEFENDANT PRIETO:

21        CEPHAS LAW FIRM
          BY:  DANA CEPHAS
22        72960 Fred Waring Drive
          Palm Desert, CA  92260
23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1                          I N D E X

2

3    WITNESS NAME                              PAGE

4    STEVEN PARIS

5         Direct Examination by Ms. El-Amamy     9
          Cross-Examination by Mr. Cephas       18
6

7    DAVID NAVARRO

8         Direct Examination by Ms. El-Amamy    20

9

10   EXHIBIT                        I.D.     IN EVID.

11   203                             37        37
     205                             41        42
12   7                               73        73
     233                             94        95
13   257, 260                       101       101
     259                            101       101
14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        LOS ANGELES, CALIFORNIA; THURSDAY, DECEMBER 6, 2012

 2                            7:56 A.M.

 3                          - - - - -

 4

 5

 6        (The following proceedings were held outside the

 7          presence of the jury:)

 8        THE COURT:  Okay.  We are on the record outside

 9   the presence of the jury with all counsel present.

10   Mr. Prieto is not here.  Mr. Rivera and Ms. Medina are

11   here.

12            The sole purpose of going on the record at

13   this time -- yes.

14        MR. CEPHAS:  Your Honor, Mr. Prieto is here.

15        THE COURT:  He is?

16        MR. CEPHAS:  Mr. Rivera isn't here.

17        THE COURT:  Oh, I'm sorry.  Okay.  Mr. Prieto is

18   here but Mr. Rivera who is in custody is not here yet.

19            But the sole purpose of going on the record

20   now is to place on the record objections that counsel may

21   have following our finalization of the jury instructions

22   last evening.

23            All right.  Mr. Walsh, I believe you had

24   objections to three of the proposed jury instructions,

25   24, 34, and 35?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1          MR. WALSH:  Yes, your Honor.  The objection to 24,
2     that was the special instruction proposed by the
3     government defining association.  We objected to it and
4     felt that the Ninth Circuit instruction didn't define
5     association -- excuse me -- so it was unnecessary and we
6     objected to Number 24 as being an expansion of the
7     standard Ninth Circuit instructions.
8          As to Jury Instruction Number 24, I think all
9     parties agreed yesterday to remove the sentence that drug
10    trafficking is conduct which affects interstate commerce.
11    And the court, I believe, agreed to strike that sentence.
12         THE COURT:  Right.
13         MR. WALSH:  On Jury Instruction Number 34, that
14    was a special instruction dealing with the subject of
15    RICO conspiracy.  We objected to it because there was a
16    standard Ninth Circuit instruction on conspiracy that
17    could be used where you fill in the blanks and put in the
18    information concerning the object of the conspiracy being
19    a violation of RICO and that that would be preferred
20    rather than having a tailored special instruction
21    prepared by the government that was argumentative.
22         And then, as to Jury Instructions 35 and 37, I
23    believe last night we had raised an objection that -- two
24    grounds to having a telephone count, 21 USC 843B, as a
25    racketeering act.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Ground one of our objection was that it wasn't
 2    listed as a racketeering act in the indictment in
 3    Count 2.  There was 14 racketeering acts specifically
 4    identifying federal felonies and state felonies, and the
 5    racketeering act of using a telephone in order to commit
 6    a federal narcotics offense was not listed in Count 2.
 7              And although there was one reference to that
 8    code section in Count 1, we feel that it wasn't properly
 9    pled in the indictment and that instructing the jury that
10    using a telephone in order to commit a federal narcotics
11    offense was beyond the scope of the indictment.
12              And secondarily, it is not listed in the
13    statutory definition of what a racketeering act is.  So
14    we objected to 35 and 37 on the grounds that using a
15    telephone is not a proper racketeering act either in
16    general or specifically under the indictment in this
17    case.
18              And then, I believe the court didn't actually
19    rule last night.  So I think the court needs to advise us
20    as to whether the court is going to instruct on that.
21         THE COURT:  Yes.  Those objections were
22    specifically and expressly overruled, but I wanted you to
23    have an opportunity to place your position on the record.
24         MR. WALSH:  And then the final one was the
25    objection to the use of the state law of extortion and
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the request that the court use the Ninth Circuit

2    instruction on extortion.  That was an objection raised

3    by Mr. Cephas to Instruction Number 36.

4            THE COURT:  I thought you had conceded that?

5            MR. WALSH:  Yes, but I didn't have a chance before

6    we began to -- maybe if I have a moment, I will explain

7    it to Mr. Cephas.

8            THE COURT:  Okay.

9            MR. CEPHAS:  Your Honor, I have no position.  My

10   client isn't charged in that offense.  I had noted -- I

11   had noticed that there were Ninth Circuit models that I

12   thought could be used.  It really applies to the other

13   two defendants, so if counsel for the other two

14   defendants are okay with it, then I have no position on

15   it.

16           THE COURT:  Okay.

17           MR. WALSH:  All right.  So your Honor is correct,

18   we did concede it last night, so we will withdraw our

19   objection to the government's Special Instruction

20   Number 36.

21           THE COURT:  Okay.  All right.  Is there anything

22   the government wishes to add?

23           MS. EL-AMAMY:  No.  Just that the government has

24   circulated the revised versions, which included the

25   proposed instructions from the defendants that were

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   agreed to last night.

 2        THE COURT:  All right.  And the record should also

 3   reflect that a few moments ago Mr. Rivera entered the

 4   courtroom.

 5            Okay.  And I think the jury is all here.

 6            Is there anything else we need to talk about?

 7        MS. EL-AMAMY:  Not right now.

 8        MR. DORE:  Your Honor -- it doesn't involve you.

 9   I will bring it up with Ms. English, I'm sorry.

10        (The following proceedings were held in the

11         presence of the jury:)

12        (The witness was sworn.)

13        THE COURT:  Okay.  We are on the record.  But the

14   record will reflect that the jury has now entered the

15   courtroom.

16            All right.  Sir, if you will please state your

17   name and spell your name for the record, please.

18        THE WITNESS:  Steven with a V, Paris, P-A-R-I-S.

19        THE COURT:  All right.  Mr. Dore.

20        MR. DORE:  Your Honor, before I commence the

21   examination of Special Agent Paris, I was wondering if I

22   could read a stipulation into the record that was from

23   yesterday.  It is unrelated to this witness, but I

24   figured we could get it out of the way now, if that is

25   okay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  Please.

2          MR. DORE:  This is Exhibit 275 which was entered

3     into evidence.  The parties have stipulated that on or

4     about April 25th, 2008, Defendant Carlos Rivera was

5     convicted of a felony punishable by a term of

6     imprisonment exceeding one year.

7          THE COURT:  All right.  All right.  Once again,

8     ladies and gentlemen, with respect to stipulations, you

9     are to consider the facts stated in the stipulation as

10    having been conclusively established.  That isn't

11    something for you to determine.  All right.

12

13                    DIRECT EXAMINATION

14    BY MR. DORE:

15    Q     Okay.  Special Agent Paris, where are you currently

16    employed?

17    A     United States Drug Enforcement Administration.

18    Q     And are you a special agent?

19    A     Yes, I am.

20    Q     How long have you been a special agent with the

21    DEA?

22    A     Approximately 21 years.

23    Q     Could you please briefly describe your job

24    responsibilities as a special agent with the DEA?

25    A     I do criminal investigations related to narcotics.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    DEA is a single-mission agency, so there is a variety of

2    investigations involving narcotics, whether it be money

3    laundering, narcotics trafficking, but it is the

4    investigation of narcotics enterprises and trafficking.

5    Q      Now, you specifically -- could you please describe

6    your own personal experience investigating narcotics

7    cases?

8    A      Sure.  I have been a special agent for

9    approximately 21 years.  And unlike being a regular

10   police officer, it is a single-mission agency, so the

11   entire 21 years is involved in drug investigations.  I

12   have been involved in San Diego, Orange, and Los

13   Angeles Counties for the last 21 years.  All of my career

14   has been in California.

15              A variety -- I work every different kind of

16   narcotic investigation there is; cocaine, heroin,

17   methamphetamine, marijuana, money laundering.  That is

18   what I have been doing for the last 21 years, the last,

19   say, 18 or 19 in the Los Angeles area.

20   Q      And as a result of that experience, have you become

21   familiar with the methods and techniques used to

22   manufacture, distribute, and sell controlled substances?

23   A      I have.

24   Q      And are you familiar with the appearance and

25   physical characteristics of a controlled substance?

```
1    A      I am.

2    Q      And does that include methamphetamine and heroin?

3    A      Yes.

4    Q      Could you please describe any additional training

5    you may have received with respect to controlled

6    substances?

7    A      Well, I attended the DEA academy upon being hired.

8    That is a 16-week, 4-month program during which you are

9    taught and trained in the identification of different

10   drugs, how, where drugs come from, production methods,

11   drug, organized criminal groups, trafficking trends,

12   price, purity, criminal investigation, complex

13   conspiracies, arrest procedures, interview techniques.

14           Then, following training, I have obviously

15   worked in the field for the last 21 years where I have

16   been exposed to all that personally, worked those

17   investigations on a day-to-day basis.

18           You know, when I was young, I worked with guys

19   who were experts in the field, on-the-job training, but

20   in addition to that, over the last 21 years, I have

21   attended both in-service training with my agency and

22   training provided by professional organizations such as

23   the California Narcotic Officers Association, the

24   International Association of Narcotic Interdiction

25   Officers, Clandestine Laboratory Investigators
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Association.

2    Q      And mentioning before the physical characteristics

3    of methamphetamine, what does methamphetamine look like?

4    A      It could have a variety of different appearances,

5    but most commonly it is a whitish or off-white, brown --

6    whitish, off-whitish, brownish, sometimes brownish chunky

7    substance.  Oftentimes it can also be clear, which is

8    what they call ice.

9    Q      Now, is methamphetamine naturally occurring or is

10   it man-made?

11   A      It is man-made.

12   Q      And where can someone get the ingredients to make

13   methamphetamine, some of the ingredients?

14   A      A variety of places, but most of them are commonly

15   found -- one of the main ingredients is pseudoephedrine

16   which is a cold tablet that can be purchased in any

17   pharmacy, WalMart, drug store.  Things like iodine can be

18   purchased at photo labs.  Muriatic acid, hydriatic acid,

19   those are concrete cleaners.  They are pool chemicals.

20   You can get them at pool supply places.  You can get them

21   at Home Depot type places.

22           Solvents used are acetone which is sometimes

23   in the form of nail polish remover which can be purchased

24   anywhere, big stores, small stores, beauty supply places.

25   You can use gun cleaning fluid.  You can use brake

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    cleaners, any auto parts stores.  Camping fuel.

2    Q     And you've under supervision, have you personally

3    made methamphetamine?

4    A     I have.  As part of my training, we were taught how

5    to make methamphetamine under the instruction of the DEA

6    chemist.

7    Q     And in your experience, do drug dealers ever do

8    anything to impact the purity of methamphetamine?

9    A     Yes.  Well, it is all commercially made, so as far

10   as impacting -- when I say commercially made, I mean it

11   is not from a plant.  It is man-made chemicals.

12            So depending on some of the cutting agents or

13   ingredients used, it can affect the purity.  Cut

14   materials could be added to it which would decrease the

15   purity but allow you to have more quantity of drugs.  And

16   if methamphetamine were to be impure, certain solvents

17   can wash away the impurities and leave you with a purer

18   form of the drug.

19   Q     Now, are you familiar with the term personal use

20   quantity in the context of controlled substances?

21   A     Yes.

22   Q     And what does that mean?

23   A     Personal use would be a quantity that a user might

24   have to get himself high, not what we would consider a

25   sales quantity.

1    Q      And in your experience, what would a personal use

2    quantity of methamphetamine be?

3    A      Well, what the DEA considers a dosage unit which

4    would be a one-time use to get high would be 1/10 of a

5    gram.

6    Q      Now, is that also true of heroin?

7    A      Yes, sir.

8    Q      Can you give me an example -- or give the jury an

9    example of what 1/10 of a gram of methamphetamine or

10   anything else would look like?

11   A      Right.  Well, when I talk about a gram, I would

12   think a gram, it sounds like it is a little speck of

13   material.  But, really, a gram is what -- when you go to

14   a coffee shop and you get a cup of coffee and the little

15   packet of sugar.  That entire packet of sugar is one

16   gram.

17          So when you think about it in those terms, if

18   you were to pour the sugar out, there is actually quite a

19   bit of material there which you can separate into various

20   amounts.  So if you separated that into 10 little small

21   amounts, that would be 1/10 of a gram.

22   Q      So, effectively, one gram would equate to

23   approximately ten dosage units of a substance?

24   A      Correct.

25   Q      And specifically, that would apply to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    methamphetamine as well; correct?

2    A     True.

3    Q     And how many grams are in an ounce?

4    A     Approximately 28 grams.

5    Q     So would one ounce be approximately 280 doses of

6    methamphetamine?

7    A     That's correct.

8    Q     And approximately how many ounces are in a pound?

9    A     16.

10   Q     Now, how is methamphetamine typically packaged, in

11   your experience?

12   A     Well, it depends, but most commonly in small

13   plastic Ziplock baggies.

14   Q     And does it have any distinct odor?

15   A     Yes, it does.  It has a chemical odor.

16   Q     Now, do, in your experience, drug traffickers take

17   efforts to hide drugs when they are transporting them?

18   A     Definitely.

19   Q     Can you identify some of the ways that they do

20   that?

21   A     Well, methamphetamine is no different than any

22   drug.  Most of which all have some kind of distinctive

23   odor.  Nobody wants to get caught with that because they

24   are illegal substances.  So they take means to conceal

25   those.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1              So if you are transporting it in your car, a

2    lot of times they use natural voids in the automobile

3    where there is cavities in the vehicle.  In some cases,

4    they create those cavities.  They can hollow out seats,

5    they can put it in spare tires.  They can conceal it in

6    the battery compartment.  Some people put it in the

7    engine compartment so that it is not in the vehicle, it

8    is not in the trunk.  It can be hidden almost anywhere.

9    Q     Now, with respect to cash, is it common in your

10   experience for drug traffickers to possess large

11   quantities of cash?

12   A     Yes.  Definitely.

13   Q     Why is that?

14   A     Because being an illegal substance, and an illegal

15   sales activity, people aren't going to pay for the drug

16   with a credit card or a check, so it is a cash business.

17   Q     Now, you said -- well, in your experience, have you

18   listened to wire recordings of drug conversations?

19   A     Yes, I have.

20   Q     And when talking about drugs, in your experience,

21   is it common for drug dealers to use code words?

22   A     Yes.

23   Q     And how can someone tell typically that a code word

24   is being used?

25   A     Well, typically, it is something that stands out in
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   the conversation that is usually not in the regular

2   context of what they are talking about.  So they can say,

3   hey, you know, how is it going, can we meet at the

4   Denny's, and then all of a sudden they will throw

5   something out that is not in the context of that

6   conversation.  You know, bring the horses, bring the ten

7   girls, bring the shirts, and they weren't talking about

8   shirts before or after that part of the conversation.

9   Q     And is it -- in your experience, is it common for

10  drug traffickers to carry firearms?

11  A     Yes.

12  Q     Why is that?

13  A     Well, of course, some of them have criminal records

14  and they don't want to be arrested, but more typically,

15  because it is a cash business, and if things are stolen

16  from them, such as illegal drugs or illegal monies from

17  the drugs, they are not going to report that to the

18  police.

19        So they are afraid that other drug dealers or

20  other just thieves in general might rob them of their

21  both drugs, which are worth a lot of cash, or the cash

22  itself.

23        MR. DORE:  No further questions.

24        THE COURT:  Cross-examination, gentlemen?

25

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
1                    CROSS-EXAMINATION

2    BY MR. CEPHAS:

3    Q      Good morning.

4    A      Good morning.

5    Q      You said you were a special agent for about

6    25 years; is that right?

7    A      21.

8    Q      21.  And the designation you have, special agent,

9    is that the normal designation that DEA agents have?

10   A      Yes.  I am a criminal investigator, but all the

11   government agencies' title of criminal investigator is

12   special agent.

13   Q      So if you are an investigator, you are a special

14   agent.  It is not a special designation because you are a

15   higher level of investigator for the DEA; correct?

16   A      Correct.

17   Q      And in your experience as an investigator of drugs,

18   do you find or have you found that drug users will often

19   sell small quantities to support their own drug habits?

20   A      They could.  They could.  But it depends.  But

21   usually a user is looking to get himself high, and he

22   doesn't -- he is not typically a salesman because it is

23   such a highly addictive drug that they would use their

24   own product.

25   Q      Are you saying in your experience, you have never
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    heard of --

2    A     I didn't say never.  I said not usually.

3    Q     So you have heard of users buying some and then

4    selling half of it so that they can go out and buy some

5    more?

6    A     Definitely possible, yes.

7    Q     Not just possible, you have heard of it?

8    A     Yes.

9    Q     Have you reviewed reports related to this case and

10   these defendants over here?

11   A     No, I have not.

12        MR. CEPHAS:  Nothing further.

13        THE WITNESS:  Thank you.

14        MR. WALSH:  No questions, your Honor.

15        THE COURT:  Mr. Navarro?

16        MR. NAVARRO:  No questions, your Honor.

17        THE COURT:  All right.  Any redirect?

18        MR. DORE:  No redirect, your Honor.

19        THE COURT:  Special Agent, you may step down.

20   Thank you.

21        THE WITNESS:  Thank you.

22        MS. EL-AMAMY:  The government calls David Navarro

23   at this time.

24        (The witness was sworn.)

25        THE CLERK:  Please be seated.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Please state your full name for the record.

 2              THE WITNESS:  David Navarro.

 3

 4                        DIRECT EXAMINATION

 5    BY MS. EL-AMAMY:

 6    Q     Good morning, Mr. Navarro.

 7    A     Good morning.

 8    Q     Mr. Navarro, how old are you?

 9    A     I am 33 years old.

10    Q     Where were you born?

11    A     In the city of Pomona, California.

12    Q     Did you live in any other cities in Southern

13    California?

14    A     Yes.

15    Q     Where is that?

16    A     In Ontario, California.

17    Q     Where is Ontario in relation to where we are today?

18    A     It is east of Los Angeles, located in

19    San Bernardino County.

20    Q     About how far from here?

21    A     Maybe 35 minutes, half an hour.

22    Q     How long did you live in Ontario?

23    A     All my life.

24    Q     Did you go to school there?

25    A     Yes.
```

1    Q    Where did you go?

2    A    To Bon View Elementary, De Anza Junior High, and

3    Ontario and Montclair High School.

4    Q    Did you graduate?

5    A    Yes.

6    Q    What year?

7    A    1997.

8    Q    Mr. Navarro, have you heard of a gang called the

9    Black Angels gang?

10   A    Yes.

11   Q    Are you a member of that gang?

12   A    I used to be.

13   Q    When did you stop being a member of that gang?

14   A    The day I decided to cooperate.

15   Q    What does cooperate mean?

16   A    Tell everything that I know about my gang lifestyle

17   and the gang lifestyle of the gang.

18   Q    When did you start cooperating with law

19   enforcement?  Is that what you mean?

20   A    Yes.

21   Q    What year did you start?

22   A    In 2010.

23   Q    When did you join the gang?

24   A    When I was about 14 years old.

25   Q    What year was that, do you remember?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A      Maybe around '93, '94.

2    Q      How did you hear about the gang?

3    A      I grew up in the neighborhood where the gang is

4    located, and any older people and some of the people I

5    hung around with were members of the gang.

6    Q      You said you grew up in the neighborhood, what does

7    that mean?

8    A      Grew up in the territory of the gang.

9    Q      How did you know the gang had a territory?  You

10   were 14 years old, what did you know about the gang?

11   A      That they used to terrorize the neighborhood,

12   graffiti.

13   Q      You knew that at 14 years old?

14   A      Yes.

15   Q      How did you know that?

16   A      From what they used to talk about at school and

17   from things that I have seen.

18   Q      So when you say that you were 14 years old people

19   would talk about it at school, who was talking about it

20   at school?

21   A      Other people I used to go to school with.

22   Q      Other 14-year-olds?

23   A      Yes.

24   Q      How did they know about the gang?

25   A      Family members or they were already members

1   themselves.

2   Q      Did you have family members in the gang?

3   A      Yes, at one point.

4   Q      Who was that?

5   A      My older brother.

6   Q      Is he in the gang now?

7   A      No.

8   Q      So you said that you would hear about them at

9   school.  Is there any other way that you would know about

10  the gang?

11  A      Well, I would see them walking around.  I would see

12  them at the local park hanging out.  I could see their

13  tattoos or they would wear gang paraphernalia.

14  Q      How would you know that they were members of

15  something called the Black Angels gang?

16  A      They had tattoos that read Black Angels.

17  Q      Anything else?

18  A      Ontario.

19  Q      How did you know what that meant?

20  A      Just from growing up in the neighborhood.

21  Q      As a 14-year-old, what was it that you thought that

22  the gang did?

23  A      At the time, I had knowledge, not as much knowledge

24  as I have now, but I had knowledge that the gang used to

25  do criminal activities.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q     Such as?  As a 14-year-old, what did you know that
 2   the gang did in terms of criminal activity?
 3    A     Sell drugs, use drugs, terrorize people.
 4    Q     I'm sorry, how could you know at 14 that the gang
 5   sold drugs?
 6    A     From seeing it.
 7    Q     Where would you see it?
 8    A     At the local park.
 9    Q     So you were 14, you were at the local park, and you
10   saw gang members selling drugs?
11    A     Yes.
12    Q     Where were you in relation to these gang members?
13    A     Where was I?
14    Q     Yeah.  How did you see them?  Why were they doing
15   it in front of you?
16    A     They would just do it in the open.
17    Q     They weren't hiding it?
18    A     No, not from us, not from me and the guys I was
19   there with.
20    Q     Were there any females there?
21    A     I can't remember.
22    Q     Now, you said a couple of times that the gang
23   terrorized.  What are you talking about?
24    A     Showed their -- showed their force.
25    Q     At 14, when you are saying that they showed their
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    force, what does that mean?

2    A      Asking any other people that they know that were in

3    the area, asking them where they are from, making sure

4    they are not rival gang members.

5    Q      At 14, how did you know that there was a rival gang

6    member?

7    A      By knowing the knowledge of people I went to school

8    with and seeing it.

9    Q      What did you see specifically?

10   A      Fights of rival gang members.

11   Q      What kind of fights?

12   A      Fistfights.

13   Q      Where?

14   A      At the liquor store, at the park a couple of times.

15   Q      Why were you at the liquor store?

16   A      Just going to buy regular, you know, just candy or

17   soda and chips.

18   Q      So you are a kid, you go to the liquor store to buy

19   candy and you see rival gang members fighting?

20   A      I see a gang member ask another gang member what

21   gang he belongs to.

22   Q      You would just see this out in the open?

23   A      Oh, I have seen it.  Not an every day thing, but I

24   was able to witness it a couple of times.

25   Q      So only a couple of times as a kid?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A      Yes.

2    Q      So drug dealing and getting in fights with rival

3    gang members.  Anything else you knew about the gang at

4    the age of 14 when you wanted to join?

5    A      When I wanted to join, before I joined --

6    Q      Right.

7    A      -- just it was a group of individuals that used to

8    do criminal acts.

9    Q      Why did you want to be a member of something like

10   this?

11   A      Because I used to see, you know, I used to see them

12   tattooed, dressed up nice, hanging out with good-looking

13   girls, and that was something that attracted me.

14   Q      Any other reasons?

15   A      Yes.  When I was younger, my sister had gotten

16   killed in a gang-related shooting, and the guys that got

17   convicted of killing her were gang members and they were

18   caught, convicted, and sentenced to life in prison.

19          So I always thought, you know, if I joined a

20   gang and I ever happened to land in jail or happened to

21   land in the same jail where these individuals were at, by

22   belonging to a gang, I would have more of an ability to

23   be able to do something to them.

24   Q      Why would you think this at 14?

25   A      Because it was something that -- it was -- the gang
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1   was -- the gang was a gang that I now.  The Black Angels
 2   was a gang that I knew had a, you know, a lot of juice,
 3   and a lot of power.
 4   Q      What does juice mean?
 5   A      Power.
 6   Q      What do you mean by power?
 7   A      Just be able to do things and get away with them.
 8   Q      Did you know about how the gang was structured
 9   before you joined?
10   A      Yes.
11   Q      What did you know about the gang structure?
12   A      There was three different ranks.
13   Q      How did you know that?
14   A      From seeing the tattoos, on guys' tattoos, and
15   seeing it, graffiti on the wall, and hearing about it.
16   Q      What did you know about the structure?
17   A      That there was three different structures.
18   Q      What were those structures?
19   A      OVS, junior Black Angels, and Black Angels.
20   Q      What did you know about why they had those
21   structures before you joined the gang?
22   A      I didn't -- I had some knowledge but not too much
23   knowledge of exactly what different structures was.
24   Q      When you joined the gang, did you know if you were
25   going to be entering one category versus another?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A      Yes.

2    Q      How did you know that?

3    A      I was told.

4    Q      By who?

5    A      By other gang members.

6    Q      What were you told?

7    A      That if I wanted to join the gang, I would first

8    start off as OVS gang member.

9    Q      And did they tell you how you could join?

10   A      Yes.

11   Q      How was that?  Like, how could you join?  What did

12   they say?

13   A      Hangout, be known, commit crimes, and get jumped

14   into.

15   Q      Who told you that, specifically?

16   A      I don't remember specifically who told me.

17   Q      Was it more than one person or just one person?

18   A      More than one person.

19   Q      Prior to joining the gang, did you know how long

20   the gang had been around?

21   A      No.

22   Q      Do you know that now?

23   A      Yes.

24   Q      How long has it been around?

25   A      Since the '60s.
```

```
 1   Q    How do you know that?

 2   A    From talking to older guys that are from the gang.

 3   Q    Did you get jumped into the gang?

 4   A    Yes.

 5   Q    What is jumping in?

 6   A    Getting beaten.

 7   Q    For how long?

 8   A    Usually, it is 13 seconds, if not more.

 9   Q    Who jumped you in?

10   A    Three other gang members.

11   Q    Who were they?

12   A    It was Chino, Little Sinister, and Bowzer.

13   Q    Do you know their real names?

14   A    Yes.

15   Q    What are their real names?

16   A    Little Sinister is Salvador Perez.  Chino is

17   Eric Reynoso and Bowzer is -- I don't know his last name,

18   but his first name is Tony.

19   Q    Do you know someone else who goes by the name

20   Chino?

21   A    Yes.

22   Q    Who is that?

23   A    I know two other guys I know by the name Chino.

24   Q    And what are their names?

25   A    One of them's name is David and the other one is
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    Carlos Rivera.
 2    Q     When you are talking about the person who jumped
 3    you in, it is not Carlos Rivera?
 4    A     No.
 5    Q     Why are you jumped in?  What is the purpose of
 6    getting beaten?
 7    A     To show some kind of braveness.
 8    Q     Why is that important?
 9    A     Because if you are going to become a gang member
10    from the gang and you happen to be in a predicament or
11    you run into any rival gang members, you have to show
12    some kind of braveness that you are willing to fight.
13    Q     Have you ever jumped anyone in?
14    A     Yes.
15    Q     How many times?
16    A     Plenty of times.
17    Q     Can you name some people who you jumped in?
18    A     Yes.  Wacko, Little Limpy, Clever, and
19    Little Clever, and Little Spooky.
20    Q     And those people have -- those aren't their real
21    names, are they?
22    A     No.
23    Q     Why do you keep referring to people by nicknames?
24    A     Because that is the nickname that -- that is the
25    name that they used to go by in the gang.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q    Why do gang members have nicknames?

2    A    So they don't go by their real name.

3    Q    Why?

4    A    So they are not detected by law enforcement.

5    Q    How do they get a nickname?

6    A    Usually, it is by a way that they look, maybe a way

7    that they talk.

8    Q    Do you have a nickname?

9    A    Yes.

10   Q    What is your nickname?

11   A    It used to be Plucky.

12   Q    What do you mean it used to be?

13   A    I don't go by Plucky no more.

14   Q    How did you get that nickname?

15   A    A long time ago before I was even a gang member, my

16   brother used to tease me and call me Plucky because there

17   is a character out of the Tiny Toons cartoons that goes

18   by Plucky and he is a duck, and my brother used to tease

19   me because he used to say that I have big lips, and since

20   a duck has a beak, he used to tease me and call me that

21   name.

22   Q    So how did that become your gang nickname?

23   A    Well, it started off as him teasing me with that

24   name, and other people knowing that he used to tease me

25   by that name and it just stuck.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q      Now, you say that you use nicknames so that you are

2   not detected by law enforcement, what do you mean by

3   that?

4   A      Well, just you have a nickname, and if you happen

5   to graffiti your nickname with the gang on the walls, law

6   enforcement doesn't know that you go by that nickname so

7   you are not able to be known or you are not able to --

8   they are not able to know who did the graffiti.

9   Q      Do you use your nicknames on the phone?

10  A      Yes.

11  Q      Why do you do that?

12  A      To avoid detection from law enforcement.

13  Q      How would they detect you on the phone?

14  A      In case they have a wiretap and they are listening

15  to your phone calls.

16  Q      When did you first learn about wiretaps?

17  A      Years back.

18  Q      Like, how old?

19  A      Maybe early 20s.

20  Q      How did you learn about them?

21  A      By hearing other people being caught and arrested

22  for talking about crimes or talking about things on the

23  phone.

24  Q      Other people meaning who?

25  A      Other guys that were -- guys that were -- had been

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    in jail or were in jail.
 2    Q     Did members of the gang talk about being
 3    wiretapped, members of the Black Angels gang?
 4    A     Yes.
 5    Q     When?
 6    A     Around that time.
 7    Q     Around what time?
 8    A     Around when I was -- when I first heard about it
 9    when I was in my early 20's.
10    Q     Where were you when you guys were talking about
11    wiretaps?
12    A     With the Black Angels?
13    Q     Yes.
14    A     Out in the streets.
15    Q     Out in the streets where?
16    A     Out in the city of Ontario.
17    Q     Why were you talking about wiretaps?
18    A     Because at that time everybody thought that the
19    feds were watching the Black Angels.
20    Q     When you were in your 20s?
21    A     Yes.
22    Q     What are the feds?
23    A     The FBI.
24    Q     Why did you think that the FBI or why did members
25    of the gang think that the FBI was watching the gang?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A     That was just a rumor that was going around.  A lot
 2   was going on at that time in the city within the gang and
 3   a lot of indictments were happening to other gangs and we
 4   were hearing about them.
 5   Q     Who in the gang talked to you about the FBI?
 6   A     At one time, it was Johnny Alcana.
 7   Q     Was he an older gang member?
 8   A     Yes.
 9   Q     Anybody else?
10   A     Limpy.
11   Q     Who is he?
12   A     Manual Vega.
13   Q     Was he an older gang member as well?
14   A     Not an older gang member, but a gang member.
15   Q     Prior to starting out in the gang, did you commit
16   crimes?
17   A     Yes.
18   Q     Before you were a gang member?
19   A     Oh, before, no.
20   Q     When you became a gang member, did you commit
21   crimes?
22   A     Yes.
23   Q     What kind of crimes did you do when you were an OVS
24   gang member?
25   A     Graffiti on the walls, intimidation and beatings of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    other people.

2    Q      Who did you beat?

3    A      Rival gang members.

4    Q      Which rivals?

5    A      Different rival gangs.

6    Q      Were you ordered to do these beatings or did you

7    just do it yourself?

8    A      Well, it was something that was known that we had

9    to do as part of being a gang member.

10   Q      How did you learn that you had to do beatings as a

11   gang member?

12   A      At the gang meetings.

13   Q      What gang meetings?

14   A      The gang meetings that were held by the gang.

15   Q      How often did you have meetings?

16   A      Usually every week, if not every two weeks or so.

17   Q      Where were the meetings at?

18   A      Different places.

19   Q      What did you talk about at the meetings?

20   A      Gang business.

21   Q      What do you mean by gang business?

22   A      Just business as far as if there is any rival gang

23   members living within the city or in the neighborhood or

24   anybody that was drug dealing that could be somebody

25   potential for extorting.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q      When -- what do you mean by extorting?

2    A      Getting money from drug dealers.

3    Q      And when did you learn that that was something that

4    the gang did?

5    A      When I was OVS gang member.

6    Q      How did you learn about it?

7    A      At the gang meetings.

8    Q      So what did they say specifically about extorting

9    drug dealers that you learned about as an OVS gang

10   member?

11   A      Just if there was any drug dealers in the city that

12   we knew about, to let it be known so they can go and

13   extort them.

14   Q      Who can go and extort them?

15   A      The Black Angels.

16   Q      Did you let them know who was selling drugs when

17   you were an OVS member?

18   A      No.

19   Q      How come?

20   A      Just didn't take too much interest in it.

21   Q      Did you later?

22   A      Yes.

23   Q      At some point, were you overseeing all of the

24   extortion in Ontario?

25   A      Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q     All right.  Now, let me go back to tagging for a

 2    minute.  If I can ask the CRD if she doesn't mind -- and

 3    there is going to be a lot of exhibits, I apologize.  If

 4    we can first draw your attention to Exhibit 203.

 5              Have you seen this picture before?

 6    A     Yes.

 7    Q     What is this a picture of?

 8    A     A picture of gang graffiti.

 9    Q     Do you know who wrote that gang graffiti?

10    A     Yes.

11    Q     Who did?

12    A     I did.

13    Q     When?

14    A     I don't remember the exact date, but a couple of

15    years back.

16    Q     A couple of years back from today?

17    A     Yes.

18    Q     So 2010 or?

19    A     No, wait.  Maybe, I don't know, early, mid-2000.

20          MS. EL-AMAMY:  Okay.  I move to admit

21    Government's Exhibit 203.

22          THE COURT:  Any objection?

23          MR. NAVARRO:  No objection, your Honor.

24          THE COURT:  It will be received.

25    Q     BY MS. EL-AMAMY: Now, where did you write this
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    graffiti?

2    A     I don't remember the exact location.

3    Q     About how big is this wall that you wrote this

4    graffiti on?

5    A     It looks pretty big.

6    Q     Why did you do it?

7    A     To show that the wall that -- the location where

8    the wall was located at was gang territory.

9    Q     What does the graffiti say?

10    A     Onta BAs Chino snuffs.

11    Q     What does Onta mean?

12    A     It is an abbreviation for Ontario.

13    Q     What about BA?

14    A     BA stands for Black Angels.

15    Q     Now, I don't see your name on this graffiti, why?

16    A     Because I didn't want law enforcement to know that

17    I did the gang graffiti.

18    Q     So why did you put two other gang members' names up

19    there?

20    A     Those two individuals were incarcerated at the

21    time.

22    Q     Now, I see Chino there.  Do you know which Chino

23    you are referring to?

24    A     Yes.

25    Q     Which Chino is that?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      Eric Reynoso.

 2   Q      Again, not Carlos Rivera?

 3   A      No.

 4   Q      And who is Snuffs?

 5   A      Forgot his real name.

 6   Q      But you know they weren't going to get in trouble

 7   for this either?

 8   A      Yes.

 9   Q      Why was it important to you that they not get in

10   trouble?

11   A      Well, if I am not willing to get in trouble for it,

12   it would be wrong if I would want them to get in trouble

13   for it.

14   Q      Are there rules that the gang has?

15   A      Yes.

16   Q      How do you know that they have rules?

17   A      From attending gang meetings.

18   Q      What are those rules?

19   A      There is a lot of them.

20   Q      Can you tell the jury what they are?

21   A      First, you can't be -- you can't be gay.  You can't

22   snitch.  You have to always participate in gang criminal

23   acts.

24   Q      Any others?

25   A      Those are basic -- basic ones.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Why is it one of the rules that you always have to

2    engage in criminal acts?

3    A      To show the force that the gang has and intimidate

4    people or other gangs.

5    Q      Why is that important?

6    A      To show them that we have power.

7    Q      Who cares?

8    A      We do.

9    Q      Why?

10   A      Because it shows that we have power, and it shows

11   that we are able and willing to commit whatever crime is

12   needed.

13   Q      Is your territory important to you, or was your

14   territory important to you?

15   A      Yes.

16   Q      Why?

17   A      Because it was a territory that the gang belonged

18   to.

19   Q      Does the gang get money from claiming a territory?

20   A      Not just from claiming it, no.

21   Q      How does the gang get money?

22   A      Dues that are paid at the gang meetings.

23   Q      What about taxes?

24   A      Yes.

25   Q      If you lost your territory, would the gang be able

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to collect taxes?

2    A     If you are authorized to -- in another city, yes.

3    Q     But if you lost your territory, would you be able

4    to tax the drug dealers in there?

5    A     No.

6    Q     Now, let me please direct your attention to

7    Exhibit 205.

8              Have you seen this picture before?

9    A     Yes.

10   Q     What is this a picture of?

11   A     Gang graffiti.

12   Q     Do you know who wrote the gang graffiti?

13   A     Yes.

14   Q     Who did?

15   A     I did.

16   Q     Anybody else?

17   A     Me and Little Sinister.

18   Q     Who is Little Sinister?

19   A     Salvador Perez.

20   Q     When did you write the gang graffiti?

21   A     This was around 2000, 2001, maybe.

22   Q     Were you still OVS at the time?

23   A     No.

24        MS. EL-AMAMY:  Now, may I move to admit

25   Government's Exhibit 205?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. CEPHAS:  No objection.

 2          THE COURT:  It is admitted.

 3   Q     BY MS. EL-AMAMY: What does this graffiti say?

 4   A     Southside Onterio, 013, Southside OANs, Fucking

 5   Limps, Sinister, Plucks, Chino, Sur Onterio.

 6   Q     Why did you write this graffiti?

 7   A     I had crossed out a rival gang that had wrote on

 8   the wall.

 9   Q     What was the rival gang?

10   A     Compton Varrio Tortilla Flats.

11   Q     Why were they writing on your wall?

12   A     At the time, they were living in the neighborhood,

13   and to show some kind of disrespect, they wrote on the

14   walls.

15   Q     What does SS Ontario mean?

16   A     Southside Ontario.

17   Q     What's Southside?

18   A     The location of the city where the gang is located

19   at.

20   Q     If someone claims Southside OVS, what does that

21   mean?

22   A     It would either be Southside Ontario or OVS.

23   Q     So it would never be Southside OVS?

24   A     No.

25   Q     What is O13?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      Ontario 13.

 2    Q      Why is 13 important?

 3    A      Because it is the thirteenth letter of the

 4    alphabet, which is the M.

 5    Q      Why is that significant?

 6    A      It is showing allegiance to the Mexican Mafia.

 7    Q      When did you learn, at what age did you learn that

 8    the gang was aligned with something called the

 9    Mexican Mafia?

10    A      Around the time when I joined the gang.

11    Q      What is the Mexican Mafia?

12    A      Prison criminal organization, prison gang.

13    Q      What is their relationship to the gang?

14    A      They are, you can say, to an extent, they are our

15    superiors.

16    Q      What do they do for you?

17    A      For us?  What do they do for us?  Nothing really.

18    Q      Then why are you aligned with them?

19    A      Well, they show protection, but as far as anything

20    else, no.

21    Q      What do you mean by protection?

22    A      Protection of the gang in the prison system or

23    federal system.

24    Q      Why is that important?

25    A      Because there's other gangs of other races in
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    prison.

2    Q      Does the gang give anything to the Mexican Mafia?

3    A      Yes.

4    Q      What do you give?

5    A      Extortion proceeds.

6    Q      Why do you do this?

7    A      To show respect and to show allegiance to the

8    Mexican Mafia.

9    Q      Is it required?

10   A      Yes.

11   Q      Can someone be a member of the gang -- you said

12   that there's rules.  Can someone be a member of the gang,

13   OVS Black Angels, junior Black Angels, and say, you know

14   what, I am not a part, I don't want to be aligned with

15   the Mexican Mafia, that is not my deal?

16   A      You mean, become a member?

17   Q      Sure, just -- yeah, become a member, but just say I

18   don't want to be aligned with the Mexican Mafia?

19   A      No.

20   Q      Why?

21   A      Because that is something that the gang is

22   associated and shows allegiance to.

23   Q      What would happen if you say, if you have a gang

24   member just saying, you know what, I am going to do my

25   own thing and I don't want to pay anything to the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Mexican Mafia, I don't want anything to do with that?

 2          MR. CEPHAS:  Objection.  Speculation.  Relevance.

 3          THE COURT:  Overruled.

 4   Q    BY MS. EL-AMAMY: What would happen?

 5   A    You could probably be killed.

 6   Q    Does every member of the gang interact directly

 7   with a Mexican Mafia member?

 8   A    No.

 9   Q    Why is that?

10   A    Because the Mexican Mafia members choose -- usually

11   choose certain individuals that they deal with.

12   Q    Why?

13   A    But they will talk -- they will talk to anybody and

14   everybody, but as far as any gang business, they only

15   choose certain individuals.

16   Q    Why do they only choose certain individuals?

17   A    In this case, usually they would choose only

18   Black Angels or maybe even junior Black Angels.

19   Q    Were -- at some point in 2009, were you in regular

20   communication with the Mexican Mafia?

21   A    Yes.

22   Q    To your knowledge, was everybody else in the gang

23   in regular contact with Mexican Mafia members?

24   A    No, not everybody.

25   Q    Why were you special?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A     Because I was -- at the time, I was the leader of

2    the gang.

3    Q     Did other members of the gang tell you things to

4    tell to the leader of the Mexican Mafia?

5    A     Yes.

6    Q     What kind of things were you told to tell the

7    Mexican Mafia member?

8    A     Anything that had to do with gang business and the

9    prisons or even anything that had to do with gang

10   business in the streets.

11   Q     Did you -- so you started out as an OVS gang

12   member, did you rise to become a junior Black Angel gang

13   member at some point?

14   A     Yes.

15   Q     When was that?

16   A     In '98.

17   Q     How did you rise to become a junior Black Angel

18   gang member?

19   A     I did a shooting.

20   Q     Who did you shoot?

21   A     I shot at rival gang members.

22   Q     Why did you do this?

23   A     To show that I have potential to become a junior

24   Black Angel.

25   Q     Who told you to do the shooting, if anybody?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      At the time, all that time was Drew, the one that
 2   told me to do the shooting.
 3   Q      Who is Drew?
 4   A      Zacharia Ortega.
 5   Q      Did you kill anybody?
 6   A      To my knowledge, no.
 7   Q      Did you -- so what happened?  Describe the
 8   incident.
 9   A      There was rival gang members hanging out at a house
10   located in their area.  One of the gang members from the
11   Black Angels happened to drive by and see them hanging
12   out, out there.  And at the time we were hanging out at a
13   house and he came back and let us know that they were
14   hanging out, out in the front of their house, and we
15   armed ourselves and went to go shoot at him.
16   Q      What do you mean by you armed yourself?  Where did
17   you get the guns?
18   A      We had the guns there with us.
19   Q      Who was we?
20   A      There was a whole bunch of us.  I can't remember
21   exactly everybody.
22   Q      So did you have to go out and buy guns for the
23   shooting?
24   A      Just for the shooting, no.
25   Q      How did you already have -- why did you guys
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   already have guns ready?

 2   A     We were carrying them already.

 3   Q     Does the Black Angels gang maintain a supply of

 4   firearms, at least at that point?

 5   A     Yes.

 6   Q     About how many guns did the gang have?

 7   A     At that point?

 8   Q     Yes.

 9   A     I don't remember exact count of the guns, but we

10   have always maintained a certain amount, a good amount of

11   firearms.

12   Q     Why do you do that?

13   A     To have the guns handy, to be able to go and

14   enforce or commit crimes with them.

15   Q     What do you mean by enforce?

16   A     Take care of any gang business.

17   Q     Such as taxing?

18   A     That is one of them.

19   Q     What else?

20   A     Shooting rival gang members.

21   Q     What about robberies?

22   A     Robberies also.

23   Q     Can anyone in the gang get a gun from the gang?

24   A     Yes.

25   Q     How does that work?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A     Well, from paying dues at every gang meeting, we
 2    obtain the firearms, so, therefore, when we obtain the
 3    firearms, they don't belong to a certain individual, they
 4    belong to the whole gang.
 5    Q     Where are they kept?
 6    A     At different times, different places, different
 7    individuals will store them or have them with them.
 8    Q     If I am in the gang and I need a gun, how do I get
 9    one?
10    A     Get ahold of somebody and ask where you can -- get
11    ahold of another gang member and ask where you can obtain
12    one.
13    Q     In 2009, did the gang have a supply of guns?
14    A     Yes.
15    Q     How many guns did you guys have?
16    A     Roughly anywhere from about six to ten.
17    Q     What kind of guns did you have?
18    A     22's, 9 millimeter guns, 45's, SKS's.
19    Q     Why did you have the guns in 2009?
20    A     It was just something that the gang always has.
21    Q     How did you get the guns in 2009?
22    A     Buying them.
23    Q     From where?
24    A     From other gang members, from other gangs or from
25    other people that we knew.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q      Were you ever charged with that shooting that you

2   did?

3   A      The shooting that I spoke about?

4   Q      Yes.

5   A      No.

6   Q      So you got away with it?

7   A      Yes.

8   Q      Have you ever been charged with anything violent?

9   A      Yes.

10  Q      What have you been charged with?

11  A      Assault with a firearm on a person.

12  Q      When was that?

13  A      I believe in 2000.

14  Q      What happened?  What did you do to get charged with

15  that?

16  A      We went to go shoot at rival gang members.

17  Q      Who did you go with?

18  A      Moony.

19  Q      Who is Moony?

20  A      Frank Medina.

21  Q      What rival gang member did you shoot at?

22  A      The Compton Varrio Tortilla Flats gang.

23  Q      Was that the one that you talked about in this

24  picture?

25  A      Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q      What year did you do the shooting?

 2   A      In 2000, I believe.

 3   Q      Talk about what you did.  How did you locate them?

 4   What did you do?

 5   A      Well, they were showing disrespect by graffitiing

 6   on the walls located in our gang territory, and we found

 7   out where they were staying at or where they lived at and

 8   hung out at.  And the same day that we found out where

 9   they were hanging out at, me and Money went over there to

10   go shoot at them.

11   Q      What kind of guns did you use?

12   A      22.

13   Q      Where did you get the gun?

14   A      It was a gun that belonged to the gang.

15   Q      Who was keeping it at the time?

16   A      At the time, Salvador Perez.

17   Q      Did you hit anyone?

18   A      To my knowledge, no.

19   Q      How did you get caught?

20   A      From what I know, the individuals that we had shot

21   at knew who we were and one of the guys' girlfriends knew

22   who we were or knew who I was, so when the cops arrived

23   at the location, they let them know who was the people

24   that shot at them.

25   Q      So you got convicted?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      Yes.

 2    Q      Did you serve any time?

 3    A      Yes.

 4    Q      How much time?

 5    A      At that time, it was county time.  And then

 6    eventually, I got a four-year joint suspension for it.

 7    Q      Were you a convicted felon at that point, after you

 8    got convicted?

 9    A      I don't remember if --

10    Q      It was a felony?

11    A      I don't remember if the crimes that I had committed

12    at that point were felonies or misdemeanors.

13    Q      Are you a convicted felon?

14    A      Yes.

15    Q      Now, you talked about having guns in connection

16    with gang activity.  At some point, did you know you

17    weren't supposed to have guns?

18    A      Yes.

19    Q      Did you do it any way?

20    A      Yes.

21    Q      What is probation?

22    A      Probation is terms and conditions that you get

23    after you are convicted of a crime.

24    Q      What kind of terms and conditions do you typically

25    get?
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      There is a lot of them, but some of them are you

 2   can't possess a firearm.  If you are a gang member and

 3   you have gang terms, you can't associate with other gang

 4   members, and basically, you can't break the law.

 5    Q      What is parole?

 6    A      Parole is gang -- terms and conditions that you get

 7   when you come out of -- or you are released from state

 8   prison.

 9    Q      Have you been on either probation or parole in your

10   life?

11    A      Yes.

12    Q      How many times?

13    A      Probation once, and parole once.

14    Q      Approximately what span of years were you on

15   probation or parole?

16    A      I'd say on probation maybe from '99 -- I don't

17   recall the exact years, but somewhere around '99 up to

18   when I caught my controlling case that I served state

19   time for.

20    Q      What does that mean, you caught your controlling

21   case?

22    A      Yes.

23    Q      What is that?

24    A      The crime that I committed to catch the state time.

25    Q      Did you violate probation?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A    Yes.

2    Q    How often?

3    A    I believe twice.

4    Q    What about parole?

5    A    Yes, I have been on parole.

6    Q    And you violated parole?

7    A    Yes.

8    Q    What kind of things did you do to violate probation

9    and parole?

10   A    Probation I violated by committing the crime that I

11   got arrested for, and parole I violated by associating

12   with other gang members.

13   Q    Were you associating with other gang members pretty

14   much the entire time you were on probation and parole?

15   A    Yes.

16   Q    Now, was part of your condition not to use drugs?

17   A    Yes.

18   Q    Did you use drugs?

19   A    Yes.

20   Q    What kind of drugs have you used in your life?

21   A    In my life or?

22   Q    In your life.

23   A    I have used meth, marijuana, and alcohol.

24   Q    How often have you used meth?

25   A    About two or three times in my life.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q     Why only two or three times?

 2   A     I didn't like the drug.

 3   Q     What about alcohol, how often did you drink

 4   while -- prior to 2010?

 5   A     I wasn't a regular drinker.  Don't really like it,

 6   but I would say maybe 10 times.

 7   Q     What about marijuana?

 8   A     Yes.  I smoked marijuana every day.

 9   Q     Sometimes more than once?

10   A     More than once a day?

11   Q     Yes.

12   A     Yes.

13   Q     What was the most you smoked weed in a day?

14   A     I don't know.  Maybe six to ten joints.

15   Q     So starting when did you start using marijuana?

16   A     Ever since I was in high school.

17   Q     All the way up until?

18   A     All the way up until I was incarcerated.

19   Q     When, in this --

20   A     For this case, yes.

21   Q     2010?

22   A     Yes.

23   Q     Are you on drugs today?

24   A     No.

25   Q     Have you drank while you have been in custody?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A    No.

2    Q    Do you use drugs?

3    A    I guess.

4    Q    While in custody?

5    A    Yes.

6    Q    What did you use?

7    A    Marijuana.

8    Q    When did you use marijuana -- in custody in this

9    case?

10   A    Yes.

11   Q    When did you use marijuana?

12   A    At the beginning of the incarceration.

13   Q    Where did you get it from?

14   A    I had brought it in when I got incarcerated.

15   Q    How did you bring it in?

16   A    I hid it on myself.

17   Q    Have you used drugs since you have been what you

18   term cooperating?

19   A    No.

20   Q    Have you ever sold drugs in your life?

21   A    Yes.

22   Q    When did you sell drugs?

23   A    Back in the early 2000s.

24   Q    What did you sell?

25   A    Marijuana.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q    Who did you sell it for, if anybody?

 2   A    I sold it for Juan Gil.

 3   Q    Who is Juan Gil?

 4   A    Another gang member of the Black Angels.

 5   Q    How did you start selling for him?

 6   A    He had approached me and asked me if I wanted to

 7   sell marijuana for him, and I told him yes.

 8   Q    Why did you agree?

 9   A    Because I smoked it myself, and I knew a lot of

10   people that smoked it.

11   Q    How much did you sell for Juan Gil?

12   A    It was a pound of marijuana.

13   Q    And you stopped after that?

14   A    Yes.

15   Q    Did you have sell any other drugs?

16   A    Yes.

17   Q    What did you sell?

18   A    Methamphetamine.

19   Q    When?

20   A    In 2009, beginning of 2010.

21   Q    Who did you sell with?

22   A    Who did I sell with?

23   Q    Yeah.

24   A    Or who did I sell for?

25   Q    Who did you sell for, then?
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1   A     I sold for Armando Barajas.

 2   Q     Who is Armando Barajas?

 3   A     Another Black Angels gang member.

 4   Q     What is his status in the gang?

 5   A     He is also a Mexican Mafia member.

 6   Q     Was he in charge of the gang at that time?

 7   A     Yes.

 8   Q     How much were you selling for Armando Barajas?

 9   A     It wasn't a -- it wasn't a steady amount, but maybe

10   total, maybe a pound of meth.

11   Q     How regularly were you selling?

12   A     Weekly.

13   Q     How much a week?

14   A     Couple of ounces.

15   Q     So, what is an ounce?

16   A     A quantity, a weight of the drug.

17   Q     About how many grams is that?

18   A     I believe an ounce is 28 grams.

19   Q     All right.  And would you sell ounce quantities?

20   A     Yes.

21   Q     How much would you sell your ounce for?

22   A     1400.

23   Q     Who would you sell it to?

24   A     A couple of other individuals.

25   Q     Did you have other words that you would use for
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   ounce?

2   A       For ounce.

3   Q       Yeah.  Like, is there other ways to say ounce?

4   A       Like?

5   Q       Like drug terms that you would use or would you

6   just say an ounce?

7   A       You could call -- there is different codes or

8   even -- that are known or even codes that you can make

9   up.

10  Q       What were some of the codes that you used or made

11  up or heard?

12          MR. CEPHAS:  Objection, your Honor.  Due process,

13  violation of Rule 16.  They are seeking to bring in

14  expert testimony through this witness.

15          THE COURT:  Overruled.

16  Q    BY MS. EL-AMAMY: What were some of the words you

17  personally used?

18  A       I used -- one of them dings.  That is about it.

19  Q       Did you sell smaller quantities?

20  A       Yes.

21  Q       What were some of the smaller quantities that you

22  sold?

23  A       A quarter ounce.

24  Q       How much would you sell a quarter ounce for?

25  A       Different amounts at different times.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q    What were some of the prices?

2    A    Ranging anywhere from 300 to $400.

3    Q    Did you use any words to describe quarter ounce?

4    A    QO.

5    Q    A what?

6    A    A QO.

7    Q    Why would you say that?  A QO?

8    A    A QO, yes.

9    Q    Anything else?

10   A    That is really it.

11   Q    Okay.  Why would it range in price?

12   A    Depending on the quality of the drug.

13   Q    What do you mean by quality?

14   A    The potency, how good the drug is, how pure it is.

15   Q    For methamphetamine, what makes the drug better or

16   worse?

17   A    What makes it better?

18   Q    Right.  Why would some methamphetamine be higher

19   versus lower?

20   A    Some could be pure methamphetamine and others can

21   have cut in the meth.

22   Q    Have you or other people you sold drugs with used

23   the term stepped on?

24   A    Yes.

25   Q    What does that mean?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A      Cut.

2    Q      What do you mean by cut?

3    A      Adding other ingredients to make more quantity of

4    the drug.

5    Q      Have you sold smaller quantities of drugs than a

6    quarter ounce?

7    A      Yes.

8    Q      Like what?

9    A      An eight ball.

10   Q      What is an eight ball?

11   A      Seven grams of meth.

12   Q      In terms of an ounce, what quantity is that?

13   A      In terms of an ounce, less than a quarter ounce.

14   Half of a quarter ounce of an ounce.

15   Q      What price would you sell that for?

16   A      Different prices.

17   Q      Like what?

18   A      Anywhere from 150 to $200.

19   Q      Why do you say eight ball, why did you use the word

20   ball?

21   A      It is just a street term that is used.

22   Q      Where did you first hear the word eight ball?

23   A      I don't remember when I first heard it.

24   Q      How much money did you make selling drugs?

25   A      Not too much.
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1  Q     Did you give any of the money to Armando Barajas?

2  A     Yes.

3  Q     Why did you do that?

4  A     He is the one that supplied me with the drugs to

5  sell in the first place.

6  Q     Now, you talked about taxing, and you were in

7  charge of taxing.  Can people sell drugs in Ontario and

8  just not pay taxes?

9  A     They can if we don't know about them.

10 Q     Who is we?

11 A     The gang, the Black Angels.

12 Q     What happens if you find out about them?

13 A     We go and approach them and tell them that they

14 have to pay extortion money to the gang.

15 Q     How do you approach them?

16 A     Go and talk to them.

17 Q     Do you bring guns?

18 A     Sometimes.

19 Q     Do you show them your guns?

20 A     No.

21 Q     Have you ever personally approached drug dealers to

22 say you got to pay taxes?

23 A     Yes.

24 Q     Did you go alone or did you go with other gang

25 members?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A      Sometimes alone, sometimes other gang members.

2    Q      Now, can members of the gang like you used to be,

3    can they sell drugs in Ontario without paying taxes?

4    A      Yes.

5    Q      How does that work?

6    A      Well, if they are already gang members of the gang,

7    they wouldn't -- not all times would they have to pay

8    taxes or if they were picking up their drugs from the

9    gang leader or from within the gang, they don't have to

10   pay gang taxes.

11   Q      So if you are getting supplied by someone higher up

12   in the gang, you don't have to pay taxes?

13   A      No.

14   Q      All right.  So you were selling for

15   Armando Barajas?

16   A      Yes.

17   Q      Is that why -- did you pay taxes?

18   A      No.

19   Q      Why is that?

20   A      Because he was supplying me with the drugs.

21   Q      If I am a gang member and I am getting my drugs

22   from somebody else not in the gang, what would happen?

23   Would I have to pay taxes?

24   A      Sometimes you will and sometimes you won't.

25   Q      When would you have to and when would you not?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      That would be an agreement that you would come to
 2   with the gang leader.
 3   Q      So you would tell the gang leader that I am selling
 4   drugs and this is where I am getting my drugs from?
 5   A      Yes.
 6   Q      What would happen if you didn't tell them that?
 7   A      You could suffer consequences.
 8   Q      How would they even find out?
 9   A      By word on the street or anybody finding out that
10   you are selling drugs.
11   Q      What would happen if you -- if somebody in the gang
12   did that?
13   A      Refused to pay taxes?
14   Q      Or just didn't tell the leader of the gang that
15   they were selling drugs and didn't volunteer to give them
16   some money.
17   A      What would happen to them?  They could be fined or
18   beaten.
19   Q      Okay.  Do you believe that it is likely that the
20   gang would find out if you were selling drugs and not
21   paying taxes?
22   A      Yes.
23   Q      Why is that?
24   A      Because everybody pretty much knows each other, and
25   all druggies know each other, so it would just be a
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   matter of time before the truth would come up and we

2   would find out.

3   Q     How -- I don't understand how that would happen.

4   How would that happen?

5   A     Well, if you are selling -- if you are a drug

6   dealer, you are selling to either other suppliers or

7   people that use drugs, and just amongst the drug users or

8   the drug dealers, they would find out that you are

9   selling drugs.

10  Q     You couldn't get away with it at all?

11  A     That I know of, that doesn't happen very much.

12  Q     Now, what if the gang member who was selling drugs

13  had people working for him.  Would those people have to

14  pay taxes too?

15  A     If --

16  Q     So suppose -- have you heard of the term runner?

17  A     Yes.

18  Q     What does that term mean?

19  A     An individual that sells drugs for you.

20  Q     And if the gang member had a runner, would the

21  runner have to pay taxes too?

22        MR. CEPHAS:  Objection, your Honor.  Speculation.

23  Expert opinion coming in through a lay witness.

24        THE COURT:  Overruled.

25  Q     BY MS. EL-AMAMY: Would the runner have to pay?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   A    If the person that the runner is getting the drugs

2   from is already paying extortion payments, no.

3   Q    How would the gang know whether or not the runner

4   needed to pay?

5   A    By finding out who the runner is working for and if

6   they are already paying taxes or not.

7   Q    Does the gang have female members?

8   A    No.

9   Q    Why is that?

10  A    Because as far as females being gang members, they

11  are seen as being weaker or weak.

12  Q    So do women ever participate at all in gang crimes?

13  A    There used to be females that belonged to the

14  Black Angels, but there isn't anymore.

15  Q    Are there women that were involved in 2009 in some

16  capacity in helping out the gang's crimes?

17       MR. CEPHAS:  Objection.  Speculation.

18  Q    BY MS. EL-AMAMY: Do you know?

19  A    In some capacity, yes.

20  Q    What capacity?

21  A    Visiting other gang members that were incarcerated

22  and relaying messages through them.

23  Q    Why would they do that?

24  A    To try to avoid detection by -- to avoid from one

25  gang member visiting another gang member in the jails.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Any other ways that they would help out?

2           MR. CEPHAS:  Objection.  Speculation.  Foundation.

3           THE COURT:  Overruled.

4    Q    BY MS. EL-AMAMY: Are there any other ways that they

5    would help out, women would help out?

6           MR. WALSH:  Objection, your Honor.  Unless he can

7    establish personal knowledge of actually witnessing such

8    events.

9           THE COURT:  Overruled.

10   Q    BY MS. EL-AMAMY: Do you know of any women that

11   helped out the gang's crimes in 2009?

12   A      The gang's crimes?

13   Q      Any sort of criminal activity done by gang members,

14   Black Angels gang.

15   A      No.

16   Q      Okay.  Now, what kind of drugs were sold in Ontario

17   that the gang was taxing?

18   A      Methamphetamine and heroin.

19   Q      How much heroin was being sold in Ontario?

20   A      By the individuals that were being extorted?

21   Q      Correct.

22   A      I wouldn't be able to say an exact amount, but a

23   good quantity.

24   Q      Like what's a good quantity?

25   A      Pounds.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q     What about methamphetamine?  How much was being

2   sold that was being taxed by the gang.

3   A     Just throughout the whole time?

4   Q     Uh-huh.

5   A     Or at a certain amount?

6   Q     Maybe, for example, in 2009, how much were you

7   aware was being taxed?

8   A     Various amounts.

9   Q     How much were you personally collecting from drug

10  dealers?

11  A     Different, different amounts.

12  Q     What were some of the amounts?

13  A     $200, a hundred dollars, a hundred and fifty, 75.

14  Q     In a week, how much would you collect?

15  A     It varied from week to week.

16  Q     Let's -- since we only have a short amount of time,

17  let's talk about something relatively brief.  Now, you

18  talked about your gang being aligned with the Mexican

19  Mafia.  Do you know if other gangs in Southern California

20  are aligned with the Mexican Mafia?

21  A     Yes.

22  Q     What are some examples of gangs that are aligned

23  with the Mexican Mafia?

24  A     Other gangs?

25  Q     Yeah.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. NAVARRO:  Your Honor, objection.  He is

 2   testifying as an expert.

 3          THE COURT:  Overruled.

 4   Q     BY MS. EL-AMAMY: Did you have conversations with

 5   gang members who are part of gangs that were also aligned

 6   with the Mexican Mafia?

 7   A     Yes.

 8   Q     Where did those members come from?

 9          MR. CEPHAS:  Objection.  Hearsay.

10          THE COURT:  The question was where did the gang

11   members come from.  Overruled.

12   Q     BY MS. EL-AMAMY: Where did they come from?

13   A     Other cities.

14   Q     Like where?

15   A     Other cities in LA County, Orange County,

16   San Bernardino County, Riverside County, San Diego

17   County.

18   Q     So all over Southern California?

19   A     Yes.

20   Q     Are there gangs in Southern California to your

21   knowledge that aren't aligned with the Mexican Mafia?

22          MR. CEPHAS:  Objection.  Speculation.  Foundation.

23          THE COURT:  To his knowledge, overruled.

24   Q     BY MS. EL-AMAMY: To your knowledge, are there?

25   A     Other gangs in Southern California, yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      To your knowledge, is there any difference between

2    those gangs and gangs aligned with the Mexican Mafia?

3    A      Yes.

4    Q      What are those differences?

5    A      The races.

6    Q      Anything else?

7    A      No.  Pretty much the race.

8    Q      To your knowledge, are they structured differently?

9    A      The other gangs?

10   Q      Yes.

11          MR. CEPHAS:  Same objections, your Honor.

12          THE COURT:  To your knowledge.

13   Q      BY MS. EL-AMAMY: To your knowledge, are gangs

14   aligned with the Mexican Mafia structured differently

15   than other gangs?

16   A      Yes.

17   Q      How so?

18   A      They don't answer to a higher person or they are

19   not structured as good.

20   Q      What do you mean by that?

21          MR. CEPHAS:  Objection.  Foundation.  It is

22   speculative, and the government hasn't laid a foundation,

23   your Honor.

24          THE COURT:  Sustained.

25          MS. EL-AMAMY:  Your Honor, I think now would be a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    good time for our break if --

2         THE COURT:  All right.  Sounds good.

3         (Recess from 9:25 a.m. to 9:45 a.m.)

4         (The following proceedings were held in the

5          presence of the jury:)

6         MR. DORE:  Your Honor, may we have a moment?

7         THE COURT:  The record will reflect that all

8    counsel are present as are all defendants and the jury,

9    and Mr. Navarro is on the witness stand.

10             Yes.  Mr. Dore.

11        MR. DORE:  Ms. El-Amamy is returning in a moment,

12   and I was wondering if I could present Ms. English with a

13   list of our exhibits to expedite the transition.

14        THE COURT:  Okay.  Thank you.

15        (Pause in proceedings.)

16        MS. EL-AMAMY:  I apologize.

17        THE COURT:  Go ahead, counsel.

18   Q    BY MS. EL-AMAMY: Now, you talked about the Mexican

19   Mafia.  Who in the Mexican Mafia was running the gang?

20   A    Armando Barajas.

21   Q    Any other Mexican Mafia members?

22   A    Juan Gil.

23   Q    Now, you said that you became a leader of the gang,

24   who made you the leader?

25   A    Juan Gil did.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q     How did he make you the leader?

2    A     How he made me?

3    Q     Yes.  How did you find out you became the leader?

4    A     He related, he first related the message through

5    his wife to relate to me.

6    Q     Now, you mentioned earlier that women didn't help

7    the gang commit criminal activity, but the wife relayed

8    the message?

9    A     Yes.

10   Q     Wasn't she passing along a message related to the

11   gang?

12   A     Yes.

13   Q     Isn't this kind of related to the criminal

14   enterprise?

15         MR. WALSH:  Objection, your Honor.  Leading the

16   witness.

17         THE COURT:  Overruled.

18   Q   BY MS. EL-AMAMY: Is that related to the criminal

19   enterprise?

20   A     In a sort of way, yes.

21   Q     What did Virginia Gil tell you?

22   A     That Juan Gil wanted me to take over.

23         MR. NAVARRO:  Objection, your Honor.  Hearsay.

24         THE COURT:  Overruled.

25   Q   BY MS. EL-AMAMY: What did Virginia Gil tell you?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A      That Juan Gil wanted me to take over the gang,

2    business for the gang.

3    Q      Let me direct your attention to Exhibit No. 8.

4           Who was that individual?

5    A      Juan Gil.

6           MS. EL-AMAMY:  Your Honor, I move to admit Exhibit

7    No. 8.

8           THE COURT:  Any objection?

9           MR. NAVARRO:  No objection.

10          THE COURT:  Will be received.

11   Q      BY MS. EL-AMAMY: Is that the individual who told you

12   that you were the gang's leader?

13   A      Yes.

14   Q      As the leader, what did that mean?

15   A      To overlook anything that had to do with the gang.

16   Q      What specifically?

17   A      Extortion, extortion money or any criminal acts

18   within the gang.

19   Q      Now, let me direct your attention to Exhibit 78A

20   which relates to a disk that has already been admitted

21   into evidence as Exhibit 78.

22          Prior to coming to court today, did you look

23   at a number of recorded disks?

24   A      Yes.

25   Q      About how many did you look at?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    I would say anywhere from 40 or more maybe.

2    Q    What did do you with the disks?

3    A    Initialed them and dated them.

4    Q    Did you listen to them?

5    A    Yes.

6    Q    Did you initial and date transcripts?

7    A    Yes.

8    Q    When you were initialing and dating disks and

9    transcripts, why were you doing that?

10   A    To show that I had listened to them and went over

11   them.

12   Q    When you were initialing transcripts, what were you

13   initialing them for?

14   A    I had read them along with listening to the CD.

15   Q    Did you recognize people's voices on the

16   transcripts?

17   A    Yes.

18   Q    When you initialed the transcripts, every time you

19   initialed a transcript, did you recognize one or more of

20   the voice of the speakers?

21   A    Yes.

22   Q    All right.  Now, you mentioned that you knew an

23   individual named Armando Barajas, and he was running the

24   gang for a period of time.  Showing you Exhibit 3 which

25   already has been admitted into evidence, about how many

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    times have you spoken with Armando Barajas?

2    A     Hundreds of times.

3    Q     Have you spoken with him on the telephone?

4    A     Yes.

5    Q     And in person?

6    A     Yes.

7    Q     Are you able to recognize his voice?

8    A     Yes.

9    Q     When you were reviewing tapes and transcripts in

10   this case, did you review tapes and transcripts related

11   to conversations that you had with Armando Barajas?

12   A     Yes.

13   Q     All right.  Exhibit 78A, does that have your

14   initials on it?

15   A     Yes, it does.

16   Q     And is that the transcript of a call that has been

17   identified as a telephone conversation that took place on

18   July 25th, 2009 at 1:38 p.m.?

19   A     Yes.

20   Q     All right.  I am now going to play a portion of

21   that recording.

22        MS. EL-AMAMY:  May I approach to get Exhibit 78.

23             Your Honor, I would ask the court to let the

24   jury know that they have three binders that contain a

25   series of transcripts.  The transcripts will be in each

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    of the three binders labeled for example on this 178A.

2           THE COURT:  They have got that part down cold.  I

3    understand that there was an addendum made to one of the

4    exhibits.  It is not 78A.

5           MS. EL-AMAMY:  It is 77A.

6           THE COURT:  Okay.  Good.

7           THE COURT:  All right.  Are there any members of

8    the jury having any difficulty at all finding tab 78A?

9    Hands.  Okay.

10   Q    BY MS. EL-AMAMY: Now, turning to 78A, when did you

11   review this transcript?

12   A       On October the 25th, 2012.

13   Q       All right.  And are those your initials?

14   A       Yes.

15          (Tape played.)

16   Q       Now the call just says, what up, Plucks.  What is

17   Plucks?

18   A       That is my nickname that I used to go by.

19   Q       All right.

20          (Tape played.)

21   Q    BY MS. EL-AMAMY: What are you talking about at this

22   point in the conversation?

23   A       He is telling me he was with his daughters and that

24   he had attended a rave party the night before.

25   Q       So this is just social conversation?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A       Yes.

2    Q       And the transcript correctly identifies Armando

3    Barajas as the speaker?

4    A       Yes.

5            (Tape played.)

6    Q       BY MS. EL-AMAMY: Now, I am going to stop the

7    transcript and the recording at that point.  What did he

8    mean by saying that there is a little dude that was

9    saying that he was a BA?

10   A       That there was a guy that was claiming to be a

11   Black Angel.

12   Q       And what did you mean when you said that he was

13   saying that you had blessed him?

14   A       That, what I meant by?

15   Q       Blessed.

16   A       Armando Barajas blessing him, basically giving him

17   the okay to become or be a BA.

18   Q       And then when Armando Barajas said that I am going

19   to tell him that he is unblessed, what does that mean?

20   A       That he didn't give him the okay to be a BA.

21   Q       Why is it significant if someone has the okay or

22   not okay to be a BA?

23   A       Because there is only one right way to become a

24   Black Angel.

25   Q       And how is that?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      Through committing crimes for the benefit of the
 2   gang.
 3   Q      There is no other way?
 4   A      There has been a couple of situations where they've
 5   made a Black Angels because they felt they had the
 6   potential to be one.
 7   Q      What do you mean by potential?
 8   A      That they had basically the requirements that were
 9   required to be a gang member for the gang.
10   Q      But in -- what were the requirements?
11   A      Be willing to commit a crime when called upon for
12   the benefit of the gang.
13   Q      Why were you talking about whether or not this
14   individual was blessed or unblessed, if he was a BA or
15   not a BA?
16   A      Because we weren't sure.  He was claiming to be a
17   Black Angel from, but, from our knowledge, he wasn't.
18   Q      Did you take any steps to confront this individual?
19   A      Yes.
20   Q      What steps did you take?
21   A      We found out where he was hanging out at one day,
22   and showed up to go talk to him about the situation.
23   Q      By talk to him, what did you do?  Did you confront
24   him?
25   A      Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Did you have guns?

2    A      No.

3    Q      What did you say to him?

4    A      That we had heard, that he was claiming to be a

5    Black Angel, and, from our knowledge, he wasn't.

6    Q      Now, I am going to direct your attention to Exhibit

7    132 and 132A.

8    Q      Now, do you have 132A in front of you?

9    A      Yes.

10   Q      Did you listen to this call previously?

11   A      Yes, I did.

12   Q      Are your initials on the transcript?

13   A      Yes.

14   Q      What is the date and time of this call?

15   A      The date is July 18, 2009 and the time is 1:34 p.m.

16   Q      Who are the speakers?

17   A      Armando Barajas and myself.

18          (Tape played.)

19   Q      BY MS. EL-AMAMY: What were you discussing in this

20   call?

21   A      Armando Barajas was telling me about a meeting that

22   they had had with other gangs from other cities.

23   Q      Were these gangs aligned with the Mexican Mafia?

24   A      Yes.

25   Q      What was the purpose of this meeting?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A     To discuss gang business and extortion business.

 2    Q     Why did you need to discuss that with other gangs?

 3    A     It wasn't the Black Angels exactly discussing it

 4    with the other gangs.  It was Armando Barajas and other

 5    Mexican Mafia members discussing gang business and

 6    extortion business with gangs from other cities.

 7    Q     What specifically did you discuss with respect to

 8    the extortion activities?

 9    A     Well, I wasn't there at the meeting, but from what

10    Armando Barajas --

11          MR. WALSH:  Objection, your Honor.  He has no

12    personal knowledge.

13          THE COURT:  Sustained.

14    Q     BY MS. EL-AMAMY: Did Armando Barajas communicate to

15    you what was discussed at this meeting?

16    A     Yes.

17    Q     What did he tell you?

18    A     He told me that him and two other Mexican Mafia

19    members had showed up to a big gang meeting with

20    themselves and other gangs from other cities to discuss

21    extortion and gang business and who has what territory or

22    who has the priority to what territory to collect

23    extortion money from.

24    Q     Why is that important information?

25    A     Because it has to do with the extortion payments
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that are paid to the Mexican Mafia.

2    Q      Now, it says that the gang needed two reps.  What

3    are reps?

4    A      Representatives.

5    Q      Why did the gang need representatives?

6    A      In case other gangs from other cities or any other

7    Mexican Mafia members had to get ahold of somebody from a

8    specific gang, they would have two representatives from

9    each gang to be able to get ahold of them and discuss any

10   questions or business that they wanted to discuss.

11   Q      Do you know an individual by the name of Carlos

12   Rivera?

13   A      Yes.

14   Q      How do you know this individual?

15   A      He is another gang member of the gang.

16   Q      Do you know when he became a member?

17   A      I know maybe around the time when -- I don't know

18   the exact date, but more or less around the time when he

19   became.

20   Q      What time was that?

21   A      Around 2005.

22   Q      How did you know he was a member in 2005?

23   A      Because I met him at a gang meeting.

24   Q      Do you see Carlos Rivera in the courtroom today?

25   A      Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q     Where is he seated?

2    A     To my right.

3    Q     To your right where?  What is he wearing?

4    A     Blue shirt.

5    Q     Any other description?

6    A     Long hair.

7    Q     Will the record reflect that he is -- so you said

8    you met him at a gang meeting.  What did you talk about

9    at the gang meeting that you met him at?

10   A     Gang business.

11   Q     Like what?

12   A     Any business that needs to get taken care of or any

13   crimes that need to be committed for the benefit of the

14   gang.

15   Q     About how many gang meetings have you been to with

16   defendant Rivera?

17   A     I would say anywhere from 40 to 60 maybe.

18   Q     About how many times did you interact with him in

19   your lifetime?

20   A     Hundreds of times.

21   Q     Have you spoken with him on the phone?

22   A     Yes.

23   Q     Have you done crimes with him?

24   A     No.

25   Q     Do you know if he was selling drugs?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A    Yes.

2    Q    How do you know that?

3    A    From knowledge and in seeing it.

4    Q    Now, did Carlos Rivera to your knowledge join the

5    gang as an OVS gang member?

6    A    Yes.

7    Q    How do you know that?

8    A    Because when I met him, he was an OVS gang member.

9    Q    Did he ever hold a leadership position in the gang?

10   A    Yes.

11   Q    What position was that?

12   A    The president to the OVS.

13   Q    What are the responsibilities of the president of

14   the OVS?

15   A    To overlook all the gang business.

16   Q    For the entire gang?

17   A    For the OVS gang.

18   Q    What would the OVS be responsible for?

19   A    Anything that, usually smaller, like not to -- not

20   so much business as the Black Angels.

21   Q    What specific crimes do you know defendant Rivera

22   committed as an OVS member, if any?

23   A    Any specific, I don't know.

24   Q    Do you know if Carlos Rivera has ever paid dues to

25   the gang?
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      Yes.

 2    Q      How do you know that?

 3    A      From attending gang meetings and seeing him turn in

 4    money.

 5    Q      Let me direct your attention to Exhibit 162 and

 6    162A.

 7           Now you mentioned that you interacted

 8    previously with Carlos Rivera.  Are you able to recognize

 9    his voice?

10    A      Yes.

11    Q      Did you recognize his voice in this recorded

12    telephone conversation?

13    A      Yes.

14    Q      When you initialed the telephone conversation, were

15    you saying the transcript was accurate in that it

16    depicted Carlos Rivera?

17    A      Yes.

18    Q      Do you know an individual by the name of David

19    Hernandez?

20    A      Yes.

21    Q      Is David Hernandez an OVS gang member?

22    A      Yes.

23    Q      How do you know this?

24    A      Because I was one of the gang members that voted

25    him in to the gang.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q       In 2009 was David Hernandez an OVS gang member?

2    A       No.

3            (Tape played.)

4    Q    BY MS. EL-AMAMY: Now, at this point, does the

5    transcript accurately say that it is defendant Rivera

6    talking to you?

7    A       Yes.

8    Q       When it says that remember those things we are

9    looking for, those little things, what was he talking

10   about?

11   A       Firearms.

12   Q       And he says remember what we have been looking for.

13   When did you guys start looking for firearms together?

14   A       We have always -- we have always let everybody know

15   at the gang meetings if they come across a gun and they

16   think it is a decent gun for a decent amount of money to

17   purchase it or let it be known so we can purchase it.

18   Q       Did defendant Rivera volunteer to get the gang a

19   gun?

20   A       Yes.

21   Q       Where was he going to get the money?

22   A       From the gang dues.

23           (Tape played.)

24   Q    BY MS. EL-AMAMY:Now, when he says it is a for sure

25   thing, what does that mean?

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1    A    That it is a for sure deal he can make.

2    Q    And he says it is brand new.  What does that mean?

3    A    It is a brand new gun.

4    Q    Why is that important?

5    A    Because it tells us it hasn't been used in any

6    other crimes.

7    Q    Why do you care if it has been used in crimes

8    before?

9    A    We don't want a gun that has been used in a

10   shooting or a murder.

11   Q    Why?

12   A    Because we can get arrested for it.

13   Q    He says this fool wants two.  What does that mean?

14   A    He wants $200.

15        (Tape played.)

16   Q    BY MS. EL-AMAMY: Now, when you asked him two, you

17   said dos, two, what were you asking?

18   A    The caliber of the gun.

19   Q    What is a two?

20   A    It was like there is no such caliber as a two, but

21   I was referring to in code name as .22.

22   Q    And he says a .25?

23   A    Yes.

24   Q    What is that?

25   A    .25 caliber gun.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Is that a small gun or a big gun?

2    A      Small gun.

3           (Tape played.)

4    Q      BY MS. EL-AMAMY: All right.  Let me stop the

5    recording there.

6           How much was he able to buy the gun for?

7    A      To my knowledge, I believe it was $200.

8    Q      And the two five, that doesn't constitute $250?

9    A      No.

10   Q      How do you know that?

11   A      Because when he says two five, he is speaking of

12   the caliber that the gun was.

13   Q      And defendant Rivera says because you know they be

14   coming across that shit.  What is he saying there?

15   A      What was the question?

16   Q      What does he mean, he be coming across that shit?

17   I don't understand what he is saying.

18   A      I believe it is coming across the guns.

19   Q      Do you know that for certain?

20   A      No.

21   Q      Okay.  Why was defendant Rivera telling you that he

22   was getting a gun or could get a gun?

23   A      Just letting me know that he was able to obtain or

24   possibly obtain a firearm for the gang.

25   Q      Why was he talking to you specifically?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   A     Because at that time I was the gang leader, and he

2   wanted to run it by me.

3   Q     Did you have to authorize it?

4   A     No.

5   Q     Why was he running it by you?

6   A     No specific reason, just so I would have knowledge

7   of it.

8   Q     Were you friends?

9   A     Was I what?

10  Q     Were you friends with him?

11  A     Yes.

12  Q     Was it possible he was just telling you as a

13  friend, also, I am getting a gun?

14  A     It is possible.

15  Q     Now, let me direct your attention to Exhibit 73,

16  73A as well as 72 and 72A.

17          Now, starting first with 72, did you date and

18  initial that transcript?

19  A     Yes.

20  Q     You mentioned that you knew who David Hernandez

21  was.  When did you meet David Hernandez?

22  A     Maybe around 2006, 2007.

23  Q     About how many times did you speak with him?

24  A     Hundreds of times.

25  Q     Were you able to recognize his voice?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      Yes.

 2    Q      Does the transcript accurately reflect that this

 3    was a call that was made on July 2, 2009 at 7:50 p.m.

 4    between Carlos Rivera and David Hernandez?

 5    A      Yes.

 6           MR. NAVARRO:  Your Honor?

 7           THE COURT:  Yes.

 8           MR. NAVARRO:  I am going to object on the grounds

 9    of speculation, lack of personal knowledge.  He was not

10    part of this conversation.

11           THE COURT:  You mean with respect to the time?

12           MR. NAVARRO:  Everything about the testimony with

13    regard to this call.

14           THE COURT:  Well, with respect to the time, it is

15    sustained.

16           (Tape played.)

17    Q      BY MS. EL-AMAMY: Did you recognize defendant

18    Rivera's voice?

19    A      Yes.

20    Q      Did you recognize Mr. Hernandez's voice?

21    A      Yes.

22    Q      Now, defendant Rivera says you got that brand new

23    or what.  What does he mean by brand new?

24           MR. NAVARRO:  Objection, your Honor.  Speculation.

25           THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Q    BY MS. EL-AMAMY: Have you ever heard defendant

2   Rivera refer to something as brand new before?

3        MR. NAVARRO:  Objection.  Vague, your Honor.

4        THE COURT:  Overruled.

5        THE WITNESS:  What was the question.

6   Q    BY MS. EL-AMAMY: Have you ever heard defendant

7   Rivera use the phrase brand new?

8   A    Just when he told me about the gun.

9   Q    When was that?

10  A    Around this time.

11  Q    What did he say specifically?

12  A    That there was a gun that was for sale and that was

13  brand new.

14  Q    Did he tell you how much he was buying the gun for?

15  A    Yes.

16  Q    How much did he say?

17       MR. CEPHAS:  Objection.  Asked and answered.

18       THE COURT:  Sustained.

19       MS. EL-AMAMY:  Your Honor, this is a different

20  transaction.  This is a different date.

21       THE COURT:  All right.  Go ahead.

22       MR. CEPHAS:  Objection.  Hearsay.

23       THE COURT:  Sustained.

24  Q    BY MS. EL-AMAMY: Did defendant Hernandez speak to

25  you?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    Yes.

2    Q    About a gun that he was going to purchase on or

3    about this date?

4    A    Yes.

5    Q    Did he tell you how much?

6         MR. NAVARRO:  Objection, your Honor.  Misstates

7    the evidence.  She said defendant Hernandez.

8         MS. EL-AMAMY:  I'm sorry.

9    Q    Did defendant Rivera talk to you about purchasing a

10   gun on or about this date?

11   A    Yes.

12   Q    How much did he say he was going to pay for?

13   A    $200.

14   Q    Did he -- why did he talk to you about the firearm?

15        MR. CEPHAS:  Objection.  Asked and answered.

16        THE COURT:  Overruled.

17   Q    BY MS. EL-AMAMY: Why did he talk to you about the

18   firearm?

19   A    So I could have knowledge of the transaction that

20   was going on.

21   Q    Did he tell you if he was going to use gang dues to

22   pay for the gun?

23   A    We had already agreed that he was going to use gang

24   dues.

25   Q    And when did you make this agreement?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      Prior.

 2   Q      When?

 3   A      Prior to this phone call.

 4   Q      Where did you make this agreement?

 5   A      Where?

 6   Q      Yes.

 7   A      I don't remember the location.

 8   Q      Was it just the two of you?

 9   A      I believe so.

10   Q      Now, did he ask you to be present at the

11   transaction?

12   A      No.

13   Q      Did he tell you where he was going to do the

14   transaction?

15   A      No.

16   Q      Did he tell you when?

17   A      No.

18   Q      Directing your attention to Exhibit 73A.

19              Did you review this transcript before coming

20   to court?

21   A      Yes.

22   Q      Were you able to recognize the speakers during this

23   telephone conversation?

24   A      Yes.

25   Q      Playing for you what is a recording that has
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1    already been identified as a telephone call that took

2    place on July 21, 2009 at 8:34 p.m.?

3         MR. NAVARRO:  Your Honor, the same objections.

4    Foundation.  Personal knowledge.

5         THE COURT:  All right.  There is no question yet.

6    Q    BY MS. EL-AMAMY:Do you see other people's initials

7    on this transcript on the front page?

8    A    Yes.

9    Q    Whose initials do you see?  Do you know the

10   individuals?

11   A    No.

12   Q    Is one of the initials that you see MP?

13   A    Yes.

14   Q    All right.  And is another initial JRL?

15   A    Yes.

16        (Tape played.)

17   Q    BY MS. EL-AMAMY: After defendant Rivera told you

18   that he was going to get a firearm, did he show you a

19   picture of a firearm?

20   A    Yes.

21   Q    How did he show you this picture?

22   A    Through his cell phone.

23   Q    Did you look at his cell phone?

24   A    Yes.

25   Q    What did you see as a photograph?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    A picture of a firearm.

2    Q    Was the firearm in a case or not?

3    A    No.

4    Q    Could you tell from the picture what kind of

5    firearm it was?

6    A    More or less, yes.

7    Q    What kind was it?

8    A    Looked like a .25 caliber.

9    Q    Let me direct your attention to Exhibit 233.  Do

10   you recognize what is in that picture?

11   A    Yes.

12   Q    What is that a picture of?

13   A    .25 caliber gun.

14   Q    Do you know for certain that it is a .25 caliber

15   gun?

16   A    From the looks of it, yes.

17   Q    Have you ever seen guns of any other caliber?

18   A    Yes.

19   Q    What other calibers have you seen.

20   A    9-millimeters, .22 calibers, .45, SKS's, Tek 9.

21   Q    Does this appear to look like the photograph that

22   defendant Rivera showed you?

23   A    Yes.

24        MS. EL-AMAMY:  Move to admit, your Honor

25        MR. NAVARRO:  No objection, your Honor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  All right.  Be received.
 2   Q     BY MS. EL-AMAMY: Do you know if this is the firearm
 3   that was in the picture?
 4   A     Yes.  It looks like it.
 5   Q     How soon after defendant Rivera told you that he
 6   was going to buy the firearm did he tell you that, did he
 7   show you the picture?
 8   A     I don't remember exactly.
 9   Q     Do you know an individual by the name of Raul
10   Prieto?
11   A     Yes.
12   Q     How do you know that individual?
13   A     I met him through Carlos Rivera.
14   Q     When did you meet him?
15   A     Maybe back in 2006.
16   Q     Why did Carlos Rivera introduce you to Raul Prieto?
17   A     No certain reason why he introduced me to him.  I
18   just happened to show up one day when he was at his
19   house.
20   Q     When you were at whose house?
21   A     When Carlos Rivera was at Raul's house.
22   Q     How many times have you spoken with Raul Prieto?
23   A     Lot of times.
24   Q     About how many?
25   A     I don't know.  I don't have any exact.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q     More than 10?

 2    A     Yes.

 3    Q     More than 50?

 4    A     Yes.

 5    Q     More than a hundred?

 6    A     Yeah.  Around there.

 7    Q     Have you ever been to his house?

 8    A     Yes.

 9    Q     Where is his house at?

10    A     In Ontario.

11    Q     Do you see Raul Prieto in the courtroom?

12    A     Yes.

13    Q     Where is he seated?

14    A     To my right.

15    Q     What is he wearing?

16    A     A burgundy shirt.

17    Q     Let the record reflect that he has accurately

18    identified defendant Prieto.

19          THE COURT:  Yes.

20    Q     BY MS. EL-AMAMY: Is defendant Prieto an OVS gang

21    member?

22    A     Yes.

23    Q     How do you know that?

24    A     I was one of the gang members that voted him in.

25    Q     When did you do that?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A    In 2010.

 2    Q    Did other gang members vote him in?

 3    A    Yes.

 4    Q    Who were those gang members?

 5    A    Carlos Rivera, Lonely and Lost Boy.

 6    Q    Who is Lonely?

 7    A    Jose Hurtado.

 8    Q    And who is Lost Boy?

 9    A    Rigo Portillo.

10    Q    Why did you vote defendant Prieto into the gang?

11    A    He wanted to become in the gang, and I believed he

12    had potential to be worthy of being a gang member from

13    the gang.

14    Q    How do you know that he wanted to be part of the

15    gang?

16    A    Because he told us.

17    Q    What did he say to you?

18    A    Well, he told Carlos Rivera that he wanted to join

19    the gang.

20    Q    Did you speak with him directly about why he wanted

21    to join the gang?

22    A    Not specific details, no.

23    Q    Did defendant Rivera tell you why defendant Prieto

24    wanted to be part of the gang?

25    A    Not why.  No.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Why did you think that he would be a worthy gang

2    member?

3    A      Because of his character and how I used to see that

4    he carried himself.

5    Q      What do you mean by that?

6    A      How he acted.

7    Q      How so?

8    A      Seemed like he was willing to do anything when

9    called upon by the gang.

10   Q      Was he ever called to do anything for the gang?

11   A      No.

12   Q      So then why would he seem like he was willing to do

13   anything if called upon?

14   A      Just something that I seen and the other guys seen,

15   that he would be willing to.

16   Q      Did you conduct the vote in front of defendant

17   Prieto?

18   A      No.

19   Q      Now, you mentioned that it was Jose Hurtado and

20   Rigo Portillo?

21   A      Yes.

22   Q      Had defendant Prieto met with these individuals

23   prior to them voting in his membership status?

24   A      Prior to voting?  Yes.

25   Q      How do you know that?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A    Because I seen them.

2    Q    You seen them what, talking?

3    A    Talking.

4    Q    Let me direct your attention to Exhibits 257 and

5    260.  Do you have those pictures in front of you?

6    A    Yes.

7    Q    Do you recognize who those individuals are?

8    A    Yes.

9    Q    Who are those individuals?

10   A    Rigo Portillo and Jose Hurtado.

11   Q    Were these individuals who voted defendant Prieto

12   into the gang along with defendant Rivera?

13   A    Yes.

14   Q    And yourself?

15   A    Yes.

16   Q    Was it a unanimous vote?

17   A    Excuse me?

18   Q    Was it a unanimous vote?

19   A    Unanimous?

20   Q    Did everyone agree?

21   A    Yes.

22        MS. EL-AMAMY:  Your Honor, I move to admit 257 and

23   260.

24        THE COURT:  Any objection?

25        MR. NAVARRO:  No objection, your Honor.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  Be received.

2    Q     BY MS. EL-AMAMY: Showing you first Exhibit 257.  Who

3    is this?

4    A      Jose Hurtado.

5    Q      What is his gang nickname?

6    A      Lonely, Little Lonely.

7    Q      What are the tattoos that he has on him?

8    A      Gang tattoos.

9    Q      Are they Black Angels tattoos?

10   A      Yes.

11   Q      What is on the back of his head?

12   A      The initials OBA.

13   Q      And what about underneath his lip.

14   A      BA.

15   Q      What about on his back?

16   A      Black Angels, South Ontario.

17   Q      What about the picture on the right with the X3?

18   A      That is a 13.

19   Q      What about Sur Onterio?

20   A      Yes.

21   Q      And what does Sur Onterio mean?

22   A      Sur means South Side which is the side of where the

23   neighborhood is located at.

24   Q      And why do you spell Ontario with an E?

25   A      Because that is how you pronounce it in Spanish and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   that is how the gang spells it.

2   Q      Showing you Exhibit 260, who is this a picture of?

3   A      Rigo Portillo.

4   Q      Was that one of the individuals who voted defendant

5   Prieto into the gang?

6   A      Yes.

7   Q      What is his nickname?

8   A      The lost boy.

9   Q      What does defendant Portillo have or Mr. Portillo

10  have on his neck?

11  A      A Black Angel.

12  Q      And what about on his chest?

13  A      Onterio.

14  Q      Let me show you Exhibit 259.  Who is in this

15  picture?

16  A      Me.

17  Q      Are there photographs of your tattoos?

18  A      Yes.

19  Q      Are those accurately -- do those accurately reflect

20  the tattoos you still have?

21  A      Yes.

22       MS. EL-AMAMY:  Move to admit.

23       MR. CEPHAS:  No objection.

24       THE COURT:  Admitted.

25  Q    BY MS. EL-AMAMY: Showing you Exhibit 259, why did

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  you get these tattoos?

2  A    To show my allegiance to the gang.

3  Q    Is anyone allowed to get a Black Angels tattoo?

4  A    Only members.

5  Q    And what happens if somebody who is not a Black

6  Angels gets that tattoo?

7  A    They could be beaten or killed.

8  Q    Is it a requirement that people in the gang get a

9  tattoo?

10  A    Not necessarily, no.

11  Q    Do you know gang members without tattoos?

12  A    Yes.

13  Q    Do you know if defendant Portillo -- or, I'm

14  sorry -- defendant Prieto had any tattoos when you made

15  him an OVS gang member?

16        MR. CEPHAS:  Objection.  Vague and ambiguous.

17        THE COURT:  Overruled.

18  Q   BY MS. EL-AMAMY: Do you know if he had any gang

19  tattoos when you made him an OVS member?

20  A    Any gang tattoos, no.

21  Q    Was it a requirement that he get one?

22  A    No.

23  Q    When you met with -- were you the one who told

24  defendant Prieto that he was an OVS member?

25  A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q      What did he tell him?

2    A      That he had taken a vote upon making him a gang

3    member and we decided that he was -- wanted to make him

4    one.

5    Q      Did you tell him that he had any responsibilities?

6    A      Yes.

7    Q      What did you tell him?

8    A      That he had to attend gang meetings and do criminal

9    activities for the benefit of the gang.

10   Q      Did he ask you any questions about why he had to do

11   criminal activities?

12   A      No.

13   Q      Did he ask you any questions about why he had to

14   attend gang meetings?

15   A      No.

16   Q      Did he ask you what is an OVS?

17   A      No.

18   Q      Did he ask you who else was in the gang?

19   A      No.

20   Q      Did he ask you why he was being made an OVS gang

21   member?

22   A      No.

23   Q      Did he ask you if this could just be a temporary

24   thing?

25   A      No.
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1    Q      Have you heard of something called a tagging crew?

2    A      Yes.

3    Q      What is a tagging crew?

4    A      A group of individuals that write on the walls or

5    do graffiti on the walls.

6    Q      Have you heard of defendant Prieto being associated

7    with any tagging crews prior to being OVS gang member?

8    A      Yes.

9    Q      What tagging crew have you heard that he belongs to

10   or belonged to?

11   A      KMR.

12   Q      What is KMR?

13   A      Tagging crew.

14   Q      Is it rivals with anyone?

15   A      From my knowledge, I believe they have other rivals

16   that are also tagging crews.

17   Q      Are they rivals with the Black Angels?

18   A      No.

19   Q      How could defendant Prieto become a member of OVS

20   if he was a tagging crew member?

21   A      He would have to stop claiming the tagging crew and

22   start claiming the gang.

23   Q      Did he tell you when you made him an OVS gang

24   member that, no, I am already part of a tagging crew?

25   A      No.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q     Do you know if defendant Rivera was ever part of a

2    tagging crew?

3    A     Yes.

4    Q     What tagging crew was that?

5    A     DPR.

6    Q     How do you know he was part of that tagging crew?

7    A     From his personal admittance to it.

8    Q     To who?

9    A     To me.

10   Q     Did he tell you when he was part of that tagging

11   crew?

12   A     I know he was part of it prior to him being an OVS

13   gang member.

14   Q     Was that a problem that he was part of a tagging

15   crew prior to being made an OVS gang member?

16   A     No.

17   Q     Was defendant Prieto authorized to claim that he

18   was an OVS gang member prior to 2010?

19   A     No.

20   Q     What would have happened if you had found out that

21   he was claiming that he was an OVS gang member?

22   A     Probably would have beat him.

23   Q     Did he ever tell you that he was OVS?

24   A     No.

25   Q     Did defendant Rivera ever tell you that defendant

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Prieto claimed OVS?

2    A     No.

3    Q     Have you ever been to defendant Prieto's house?

4    A     Yes.

5    Q     How many times?

6    A     Maybe 10, 15 times.

7    Q     Do you know where defendant Prieto lives, what

8    streets?

9    A     Yes.

10   Q     What street is that or what cross streets?

11   A     On E street off of Campus.

12   Q     May I please direct your attention to Exhibits 75

13   and 77, both A and the call.

14             Now, Exhibit 75 has previously been admitted

15   as a recording that took place on July 22nd, 2009 at

16   5:06 p.m.  Have you viewed a transcript related to that

17   telephone conversation prior to testifying in court

18   today?

19   A     Yes.

20   Q     Did you listen to the call?

21   A     Yes.

22   Q     Were you able to identify the speakers?

23   A     Yes.

24   Q     Who were those speakers?

25   A     Carlos Rivera and David Hernandez.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        (Tape played.)

2    Q     BY MS. EL-AMAMY: Do you know if any other

3    individuals associated with the gang lived on E and

4    Campus?

5    A     What was the question?

6    Q     Do you know if any other individuals associated

7    with the Black Angels gang lived on E and Campus?

8    A     From my knowledge, no.

9    Q     Have you ever seen defendant Rivera conduct crimes

10   at defendant Prieto's house?

11   A     Yes.

12   Q     What have you seen him do?

13   A     Conduct a drug deal.

14   Q     Just one drug deal?

15   A     Two drug deals.

16   Q     Can you describe the first drug deal that you saw?

17   A     We were hanging out at Raul's house --

18   Q     When you say Raul, do you mean defendant Prieto?

19   A     Yes.

20   Q     What did you see?

21   A     We were hanging out at his house, and Carlos got a

22   phone call.  And when he hung up the phone with the

23   person he was talking to, he let us know that somebody

24   wanted to come pick something up.  And maybe about 10, 15

25   minutes later a car pulled up, parked across the street,

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1    and he went out to the front, got in the car and was in

 2    there about 5, 10 minutes and then came back.

 3    Q      So it was you, defendant Prieto, and defendant

 4    Rivera at the house?

 5    A      Yes.

 6    Q      And defendant Rivera got a telephone call?

 7    A      Yes.

 8    Q      And he said that somebody wanted to pick up

 9    something?

10    A      Yes.

11    Q      How do you know that that was drugs?

12    A      Because that was a code word that we used for

13    somebody picking up drugs.

14    Q      Do you know what kind of drugs it was?

15    A      Yes.

16    Q      What kind?

17    A      Methamphetamine.

18    Q      Did he tell you how much they wanted to pick up?

19    A      No.

20    Q      Did he make the statement to both you and defendant

21    Prieto?

22    A      Yes.

23    Q      Approximately when did this happen?

24    A      Maybe around 2009.

25    Q      Do you remember what month?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A     No.

 2   Q     Can you please describe the second time this

 3   happened?

 4   A     He got a phone call, and when he hung up the phone

 5   he said somebody was going to come pick something up.

 6   And about 10, 15 minutes later, a car pulled up.  He

 7   flagged them down, the guy parked, came into the driveway

 8   where we were hanging out at the side of the house, and

 9   they did the drug transaction right there.

10   Q     Did they do the transaction in front of you?

11   A     Yes.

12   Q     Was it in front of defendant Prieto as well?

13   A     Yes.

14   Q     On both times was it in front of you?

15   A     The transaction?

16   Q     Yes.

17   A     No.  Just the second time.

18   Q     Do you know how much was sold the second time?

19   A     No.

20   Q     Did you actually see the drugs?

21   A     Yes.

22   Q     How much was it?

23   A     I don't know the exact amount.

24   Q     What was it in?

25   A     Plastic baggy.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    Q      Do you know how much he got for it?

 2    A      No.

 3    Q      How close was defendant Prieto to you when the

 4    transaction took place?

 5    A      Couple of feet.

 6    Q      Was it light outside?

 7    A      Yes.

 8    Q      About what time of day?

 9    A      I don't remember exactly.

10    Q      Do you know who the drug customer was?

11    A      No.

12    Q      What did the drug customer look like?

13    A      About a guy in his 20's.

14    Q      Did he get out of the car?

15    A      Yes.

16    Q      Did you see him hand the money over?

17    A      Yes.

18    Q      Did you see how much it was?

19    A      No.

20    Q      When did this transaction occur?

21    A      Sometime in 2009.

22    Q      Do you remember the month?

23    A      No.

24    Q      How many times were you together with defendant

25    Rivera and defendant Prieto at the house like that?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      When?

 2    Q      No.  Just generally?

 3    A      Like how many times I --

 4    Q      Were the three of you together just hanging out at

 5    the house the way that you described.

 6    A      Maybe about 10 times.

 7    Q      Why were you hanging out there?

 8    A      I was there hanging out with Carlos.

 9    Q      Why were you hanging out with defendant Rivera at

10    defendant Prieto's house?

11    A      That was just a house where he used to hangout at.

12    Q      Why didn't you hangout at his house?

13    A      At Carlos' house?

14    Q      Yes.

15    A      Because he was on parole.

16    Q      Why was that significant?

17    A      Because if I was to be over there and law

18    enforcement was to show up, he could get a parole

19    violation for associating with me.

20    Q      So he told you to come to defendant Prieto's

21    instead?

22    A      Yes.

23    Q      What else are you not allowed to do?  Or what

24    else -- did he tell you what else he was not allowed to

25    do while he was on parole?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A     Break the law and not associate.

 2   Q     How many times did he tell you to go to defendant

 3   Prieto's house because he was on parole?

 4   A     I don't -- I don't know the exact amount of times.

 5   Q     More than five?

 6   A     Yes.

 7   Q     More than 10?

 8   A     Maybe, maybe around 10.

 9   Q     Did you do business with defendant Rivera at

10   defendant Prieto's house?

11   A     No.

12   Q     What did you do there?

13   A     Just hang out.

14   Q     Why didn't you hang out at your house?

15   A     I lived too far.

16   Q     Do you know if other gang members met with

17   defendant Rivera at defendant Prieto's house?

18   A     Yes.

19   Q     How do you know that?

20   A     From being there.

21   Q     Who else hung out there?

22   A     Other gang members?

23   Q     Yes.

24   A     I know Venom did, Little Limpy.  That is probably

25   all I can remember right now.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q      What are their names?

2    A      Venom is Daniel Rivera, and Little Limpy is Michael

3    Calderon.

4    Q      Did you ever talk to defendant Rivera or one of

5    those two individuals about why they were going to

6    defendant Prieto's house?

7    A      No.

8    Q      Did you ever talk to defendant Prieto about you

9    being a Black Angels gang member?

10   A      No.

11   Q      Was it a secret?

12   A      No.

13   Q      Why do you say that?

14   A      Because I have Black Angels tattooed on my body,

15   and I am pretty sure he seen them.

16   Q      When the drug transaction occurred in front of you

17   and defendant Prieto, did defendant Prieto tell defendant

18   Rivera not to do it?

19   A      No.

20   Q      Did he say don't do it again down the line?

21   A      No.

22   Q      Did he seem to be okay with it?

23   A      Yes.

24   Q      Why do you say that?

25   A      Because he didn't say anything.  He didn't say not
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    to.  He didn't seem bothered by it.

 2    Q     Did he look nervous?

 3    A     No.

 4    Q     Were any other individuals who lived at the house

 5    around when the drug deal happened?

 6    A     No.

 7    Q     Why was nobody else there?

 8          MR. CEPHAS:  Objection.  Speculation.  Foundation.

 9          THE COURT:  Sustained.

10          MS. EL-AMAMY:  Your Honor, Exhibit 77 is the

11    one where there was the alteration to the transcript.

12    Would the court just prefer that I play a portion of the

13    call?

14          THE COURT:  I don't know.  The alteration?

15          MS. EL-AMAMY:  The alteration was just English

16    verbatim.  It would not be submitted as evidence to the

17    jury.  It would just be the portion of the transcript,

18    the recording would be the evidence in this case.

19          THE COURT:  So this is all in English?

20          MS. EL-AMAMY:  Yes.

21          THE COURT:  And you made a -- there was a

22    correction that was made?

23          THE WITNESS:  That's correct, your Honor.

24          THE COURT:  And the jury has now been provided

25    with the corrected transcript?
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1            MS. EL-AMAMY:  That's correct,.

2            THE COURT:  And we can refer them to the corrected

3    transcript and proceed as we always have.

4            MS. EL-AMAMY:  Thank you, your Honor.

5            THE COURT:  Okay.

6            (Tape played.)

7    Q    BY MS. EL-AMAMY: Now, Exhibit 77 has been already

8    admitted as a recorded conversation that took place on

9    July 2nd, 2009 at 7:48 p.m.

10            Did you review the transcript of this

11    conversation prior to coming to court today?

12   A    Yes.

13   Q    Were you able to identify the voices?

14   A    Yes.

15   Q    Was one of them you?

16   A    Yes.

17   Q    Who was the other person?

18   A    Carlos Rivera.

19            (Tape played.)

20            MS. EL-AMAMY:  I will just stop right there.

21   Q    You say that she found out already.  What are you

22   talking about in this call?

23   A    I had got a phone call prior to this phone call by

24   somebody else telling me that they had seen Carlos Rivera

25   in the back seat of a cop car.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Why did they call you?

2    A      Maybe because they knew I knew him.

3    Q      Who did you get the call from?

4    A      Robert Perez.

5    Q      Is he associated with the gang?

6    A      Yes.

7    Q      What was his status at the time?

8    A      At the time he wasn't -- he wasn't an active

9    member.

10   Q      He wasn't an active member?

11   A      No.

12   Q      What had he been previously?

13   A      OVS gang member.

14   Q      When was he active?

15   A      Few years back, maybe late '90's.

16   Q      So he saw defendant Rivera and contacted you?

17   A      Yes.

18   Q      How did he have your telephone number if he wasn't

19   active?

20   A      I used to talk to him and deal with him prior to

21   this.

22          (Tape played.)

23   Q      BY MS. EL-AMAMY: Now, defendant Rivera during this

24   telephone conversation says I was doing something for us;

25   right?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A      Yes.

2    Q      What did he mean by that?

3    A      He was doing a transaction for the gang.

4    Q      What was the transaction?

5    A      Purchasing a firearm.

6    Q      And defendant Rivera says, and everything was done

7    right.  What did you take that to mean?

8    A      Maybe that the transaction was going well until law

9    enforcement showed up.

10   Q      But you don't know that for certain?

11   A      No.

12   Q      And he says that they got that shit.  What what was

13   he referring to?

14   A      The firearm.

15   Q      How did you know that was what he was referring to?

16   A      Because he had told me about the firearm

17   previously.

18   Q      Did he tell you that he was going to get the gun

19   that day?

20   A      No.

21   Q      Did he tell you previously he was going to get the

22   gun?

23   A      Yes.

24   Q      Did he tell you where he was going to do it?

25   A      No.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          (Tape played.)

 2   Q    BY MS. EL-AMAMY: Now he says that he will make that

 3   up.  What did you understand that to mean?

 4   A     That he will reimburse the money that was lost.

 5   Q     Reimburse it to who?

 6   A     To the gang.

 7   Q     And he says it is only half of it, though.  What

 8   did you understand that to mean?

 9   A     I don't understand really.

10          (Tape played.)

11   Q    BY MS. EL-AMAMY: Now, you said both of you said we

12   will talk more when you see each other.  Why did you

13   agree to talk more later?

14   A     So we wouldn't be talking to too much on the phone.

15   Q     Why is that a problem?

16   A     In case law enforcement was listening to our phone

17   calls, they wouldn't know exactly what we were talking

18   about.

19   Q     So defendant Rivera says I will tell you the whole

20   story when we see each other.  What did you understand

21   that to mean?

22   A     That he will tell me everything that happened when

23   we see each other in person.

24          (Tape played.)

25   Q    BY MS. EL-AMAMY: Now, the two of you say it was the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   Charger.  What were you referring to?

2   A     A Dodge Charger.

3   Q     Why was that significant?

4   A     The gang unit for the city of Ontario is known to

5   drive a Dodge Charger.

6   Q     And you talked about black and whites.  What was

7   that?

8   A     We were talking about patrol cars, black and white.

9   Q     Why did you care what kind of police were there?

10  A     Just curious and wondering which officers, what

11  officers showed up.

12  Q     Why was that important if it was.

13  A     It wasn't really important.

14  Q     Now, defendant Rivera says his buddy tried to run.

15  Do you know who he was referring to?

16  A     I believe so.

17  Q     Who do you believe it to be?

18        MR. CEPHAS:  Objection.  Speculation.  Foundation.

19        THE COURT:  Sustained.

20  Q   BY MS. EL-AMAMY: Has he ever referred to someone as

21  his buddy?  This is a translation, but is buddy the way

22  he used it when talking to you on this date?

23  A     Yes.

24  Q     Who has he used that word to refer to?

25        MR. CEPHAS:  Objection.  Speculation.  Foundation.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Overruled.

 2  Q     BY MS. EL-AMAMY: Who has he used that to refer to?

 3  A     To Raul.

 4  Q     Do you mean defendant Prieto?

 5  A     Yes.

 6  Q     How many times has he used that word to describe

 7  defendant Prieto?

 8  A     Almost every time he talked about him.

 9  Q     Has he done it in front of defendant Prieto?

10  A     Yes.

11  Q     How many times?

12  A     Almost every time.

13        (Tape played.)

14  Q     BY MS. EL-AMAMY: Now, there is something in the

15  transcript that says just making the cuts, fool.  Did you

16  hear that in the recording?

17  A     I don't remember.

18  Q     Let me play it for you again.

19        (Tape played.)

20  Q     BY MS. EL-AMAMY: Did you hear him say something

21  like, just regular cats?

22  A     Yes.

23  Q     What does that mean?

24  A     Average people, nongang members.

25  Q     Is it true that defendant Prieto wasn't a gang
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1    member, wasn't OVS at the time?

 2    A     Yes.

 3    Q     So when he says just regular cats, that means the

 4    people he was with at the house at that time weren't gang

 5    members?

 6    A     Yes.

 7          (Tape played.)

 8          MS. EL-AMAMY:  Okay.  I am going to stop the

 9    recording at this point.

10    Q     The two of you were talking about telephones, and

11    you said that you called over with a blocked number.  Why

12    did you do that?

13    A     In case when I called him, in case law enforcement

14    had his phone on them.  When I called him, my phone

15    number wouldn't come up, and they wouldn't be able to

16    obtain it.

17    Q     And when defendant Rivera says they didn't fuck

18    with my phone, what did you understand that to mean?

19    A     They didn't look through his phone.

20    Q     They didn't look through his phone?

21    A     Yes.

22    Q     Why would that be significant information to you?

23    A     Usually law enforcement will try to get our cell

24    phones and look through them, see if they see any

25    pictures, any text messages with any certain messages or
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    any numbers, phone numbers that they would recognize.

 2    Q      Have you used your phone to conduct gang business?

 3    A      How do I?

 4    Q      Have you, in your life?

 5    A      Yes.

 6    Q      How often?

 7    A      Almost all the time.

 8    Q      Every day?

 9    A      Yes.

10    Q      What kind of gang business did you do using your

11    telephone?

12    A      Calling drug dealers to meet with them, to collect

13    extortion payments, get in contact with other gang

14    members to make sure that they were aware when and where

15    we were having gang meetings.

16    Q      Any other purposes?

17    A      Or any messages concerning gang business.

18    Q      Did you ever use your telephone to talk to

19    defendant Rivera to do gang business?

20    A      Yes.

21    Q      What kind of gang business did you conduct with

22    defendant Rivera using your telephone?

23    A      Discussing about gang meetings and in this case

24    discussing the purchase of a gun.

25    Q      How often did you use your telephone to do gang
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   business with defendant Rivera?

2   A      Not every day, but a lot of times.

3   Q      Starting when?

4   A      Ever since I met him.

5   Q      In 2005?

6   A      Around there.

7   Q      All the way until what date?

8   A      Off and on, but all the way up to the last time we

9   spoke on the phone.

10  Q      And every day from 2005?

11  A      No.  On and off.

12  Q      On and off.  Did you ever use your telephone to do

13  gang business with defendant Prieto?

14  A      No.

15  Q      Why is that?

16  A      I never spoke with him on the phone.

17  Q      Why?

18  A      I just, I didn't have his phone number.  He didn't

19  have my phone number, and we really didn't talk or hang

20  out unless Carlos was there with us.

21  Q      Do you know an individual by the name of Jessica

22  Medina?

23  A      Yes.

24  Q      Who is that individual?

25  A      Carlos Rivera's kids' mom.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q      Have you met her in person before?

 2   A      Yes.

 3   Q      How many times?

 4   A      Several times.

 5   Q      More than 20?

 6   A      Maybe around 20.

 7   Q      Under what circumstances have you interacted with

 8   her?

 9   A      I have gone over their house.  I have gone over

10   their family's house at barbecues or gettogethers for

11   Carlos.

12   Q      Are you able to recognize her voice?

13   A      Yes.

14   Q      Have you ever spoken to Jessica Medina on the

15   telephone?

16   A      Yes.

17   Q      Did you ever speak with her about drugs on the

18   telephone?

19   A      Yes.

20   Q      Do you see Jessica Medina in the courtroom today?

21   A      Yes.

22   Q      Where is she?

23   A      To my right.

24   Q      What is she wearing?

25   A      A black shirt.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        MS. EL-AMAMY:  Let the record reflect that

2   defendant has been accurately identified.

3        THE COURT:  Yes.

4   Q    BY MS. EL-AMAMY: Can you describe the time or times

5   that you talked to defendant Medina about drugs on the

6   telephone?

7   A    One time when she called me to let me know that

8   Carlos had gotten taken into custody because they found

9   methamphetamine.

10  Q    Did you talk to her on any other dates about drugs

11  other than that incident?

12  A    No.

13  Q    I am going to direct your attention to Exhibit 100

14  and 100A.  We are not actually going to listen to this

15  call, and so we don't need to go over the transcript for

16  this.

17            Now, this is a call that has already been

18  admitted as July 22nd, 2009 that occurred at 9:07 p.m.

19  and was previously played yesterday with another

20  individual.  Did you listen to this recording prior to

21  coming to court today?

22  A    Yes.

23  Q    Did you put your initials on that transcript

24  indicating that you had listened to it?

25  A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q      When did you listen to this recording?

 2   A      On October 26, 2012.

 3   Q      Were you able to recognize the voice, the voice or

 4   voices that you heard?

 5   A      Yes.

 6   Q      Who were you able to recognize?

 7   A      Carlos Rivera.

 8   Q      Now, just playing for you the first few seconds of

 9   the call to make sure it is what it is you heard.

10          (Tape played.)

11   Q      BY MS. EL-AMAMY: Now, did you listen to this

12   recording previously?

13   A      Yes.

14   Q      Are you -- who was one of the individuals speaking

15   in that call?

16   A      Carlos Rivera.

17   Q      Does the transcript accurately reflect him speaking

18   and the lines that he was speaking?

19   A      Yes.

20          THE COURT:  Are we about to leave this exhibit?

21          MS. EL-AMAMY:  Yes.

22          THE COURT:  Okay.  Let's take a break now.

23              All right.  Ladies and gentlemen, let's take

24   our second morning break.  15 minutes.  Remember the

25   admonition please.
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1          (Recess from 11:16 to 11:30 a.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  December 6, 2012

  /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA