1          UNITED STATES DISTRICT COURT

2       CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

3          *HONORABLE OTIS D. WRIGHT, U.S. DISTRICT JUDGE*

4                     – – –

5   UNITED STATES OF AMERICA,              )
                                           )
6                       Plaintiffs,        )    Case No.
                                           )
7             vs.                          )   CR 10–00351–ODW
                                           )
8   CARLOS RIVERA (7),                     )
    JESSICA MEDINA (27),                   )
9   AND RAUL PRIETO (29),                  )
                                           )
10                      Defendants.        )
    _____)

11

12

13

14              *REPORTER'S TRANSCRIPT OF*
                *JURY TRIAL – DAY 4*
15           *FRIDAY, DECEMBER 7, 2012*
                   *8:00 A.M.*
16           *LOS ANGELES, CALIFORNIA*

17

18

19

20

21

22

23   _____

         *VICTORIA L. VALINE, CSR 3036, RMR, CRR*
24        FEDERAL OFFICIAL COURT REPORTER
          312 NORTH SPRING STREET, ROOM 440
25        LOS ANGELES, CALIFORNIA  90012
             www.victoriavalinecsr.com

*UNITED STATES DISTRICT COURT*

1        *APPEARANCES OF COUNSEL:*

2

3    *FOR THE PLAINTIFF:*

4            ANDRÉ BIROTTE, JR.
             United States Attorney
5            BY:  Reema M. El-Amamy,
                  Michael H. Dore,
6            Assistant United States Attorneys
             United States Courthouse
7            312 North Spring Street
             Los Angeles, California  90012
8

9     *FOR THE DEFENDANT CARLOS RIVERA:*

10           LAW OFFICES OF ANGEL NAVARRO
             Attorney at Law
11           BY:  Angel Navarro, Esq.
             714 West Olympic Boulevard, Suite 450
12           Los Angeles, California 90015
             213-744-0216
13

14

15   *FOR THE DEFENDANT JESSICA MEDINA:*

16           LAW OFFICES OF JOSEPH F. WALSH
             Attorney at Law
17           BY:  Joseph F. Walsh, Esq.
             205 South Broadway, Suite 606
18           Los Angeles, California 90012
             213-627-1793
19

20   *FOR THE DEFENDANT RAUL PRIETO:*

21           LAW OFFICES OF DANA CEPHAS
             Attorney at Law
22           BY:  Dana Cephas, Esq.
             72960 Fred Waring Drive
23           Palm Desert, CA 92260

24

25

*UNITED STATES DISTRICT COURT*

1           *LOS ANGELES, CALIFORNIA;  FRIDAY, DECEMBER 7, 2012*

2                          *8:00 A.M.*

3                            - - -

4           THE CLERK:  Calling item number 1, CR 10-351-ODW, USA

5     versus Carlos Rivera.

6           Counsel, state your appearances.

7           MS. EL-AMAMY:  Good morning.  Reema El-Amamy and

8     Michael Dore on behalf of the United States.

9           THE COURT:  Counsel, good morning.

10          MR. WALSH:  Good morning, your Honor.  Joseph Walsh

11    appearing with Jessica Medina, who is present.

12          MR. CEPHAS:  Good morning, your Honor.  Dana Cephas

13    with Raul Prieto, who is present.

14          THE COURT:  Good morning.

15          MR. NAVARRO:  Good morning, your Honor, Angel Navarro

16    with Carlos Rivera, who is seated to my left.

17          THE COURT:  Good morning.  The record will reflect

18    the jury has returned and Mr. David Navarro has resumed his

19    place on the witness stand.

20          ***DAVID NAVARRO, GOVERNMENT'S WITNESS, (Resumed)***

21          THE CLERK:  Sir, you are reminded that you are still

22    under oath.  Please state your full and true name for the

23    record and spell your last name.

24          THE WITNESS:  David Navarro.  My last name is

25    N-A-V-A-R-R-O.

*UNITED STATES DISTRICT COURT*

```
 1              THE COURT:  All right.  Ms. El-Amamy.
 2              MS. EL-AMAMY:  Thank you, your Honor.
 3              I'm going to ask that the CRD give Mr. Navarro
 4   Exhibits 88, 89, 91-A.
 5              THE CLERK:  88?
 6              MS. EL-AMAMY:  89 and 91.
 7              THE CLERK:  And 91.
 8                    DIRECT EXAMINATION  (Resumed)
 9   BY MS. EL-AMAMY:
10   Q.   Do you have those in front of you, sir?
11   A.   Yes.
12   Q.   Do you recognize those as transcripts that you've
13   previously reviewed before coming to court today?
14        Do they have your initials on them?
15   A.   All of them except for Exhibit 91-A.
16   Q.   All right.  Let's start first with Exhibit 89.  Do you
17   have that in front of you?
18   A.   Yes.
19   Q.   And this is a transcript of a recording that's already
20   been admitted as a recording that took place on August 6th,
21   2009 at 4:51 p.m.
22        Did you listen to this call?
23   A.   Yes, I did.
24   Q.   And did you recognize the speakers?
25   A.   Yes, I did.
```

*UNITED STATES DISTRICT COURT*

```
 1   Q.   And who were those speakers?

 2   A.   Carlos Rivera and Raul Prieto.

 3             (Whereupon the conversation was then played.)

 4   Q.   Mr. Navarro, have you ever used the term hit a lick?

 5             MR. CEPHAS:  Objection, your Honor, calling for

 6   expert testimony.

 7             THE COURT:  Asking him if he has ever used a term is

 8   calling for expert testimony?  Overruled.

 9   BY MS. EL-AMAMY:

10   Q.   Have you ever used that term?

11   A.   Yes.

12   Q.   What does -- what did you use that term to mean?

13   A.   Um -- do a crime or do a robbery.

14   Q.   Have you heard other members of your gang use that

15   term?

16   A.   Yes.

17   Q.   How often?

18   A.   Not too often.

19   Q.   Okay.  And then have you, in your narcotics business,

20   ever used the term bird?

21   A.   Not in my narcotics business, no.

22   Q.   Have you heard the term used?

23   A.   Yes.

24   Q.   What --

25   A.   Have I heard the term?
```

*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| 1 | Q.    *Bird*? |
| 2 | A.    Yes. |
| 3 | Q.    What does that term mean? |
| 4 |       MR. CEPHAS:  Objection, hearsay. |
| 5 |       THE COURT:  Overruled. |
| 6 | BY MS. EL-AMAMY: |
| 7 | Q.    What does that term mean? |
| 8 | A.    The term *bird* also signifies kilo. |
| 9 | Q.    A kilo meaning what, a kilogram? |
| 10 | A.    A kilogram, yes. |
| 11 | Q.    Do you know how many grams are in a kilogram? |
| 12 | A.    I'm not sure how many grams, no. |
| 13 | Q.    Okay.  In your narcotics business, have you ever used |
| 14 | the term *front*? |
| 15 | A.    Yes. |
| 16 | Q.    What does that term mean? |
| 17 | A.    Give an individual the drug without being paid first. |
| 18 | Q.    Why would one do that? |
| 19 | A.    So you don't slow the business down, or so you get paid |
| 20 | eventually. |
| 21 | Q.    What does *stealing something in exchange for being* |
| 22 | *fronted* mean? |
| 23 |       MR. CEPHAS:  Objection, speculation, foundation, |
| 24 | calling for expert testimony. |
| 25 |       THE COURT:  Sustained. |

*UNITED STATES DISTRICT COURT*

BY MS. EL-AMAMY:

Q.    I'm going to ask you to turn to Exhibit 88.

      Do you have that transcript in front of you?

A.    Yes, I do.

Q.    Does it have your signature on it?

A.    Yes.

Q.    Did you recognize the speakers when you listened to that recording?

A.    Yes.

Q.    And who were they?

A.    Carlos Rivera.

Q.    Did you recognize the other individual?

A.    No.

      MS. EL-AMAMY:  For the record this is a transcript of a recording that has already been admitted as a recording that took place on August 6th, 2009 at 4:13 p.m.

      *(Whereupon the conversation was then played.)*

BY MS. EL-AMAMY:

Q.    Now, during this conversation there's discussion about Nocta Street.  Who do you know who lives near Nocta Street?

A.    Near Nocta Street?

Q.    Or on Nocta Street, if anybody?

A.    Near Nocta Street, I know a couple people.

Q.    Okay.  Who do you know who lives there?

A.    That I know that lives there, some -- some white guy and

*UNITED STATES DISTRICT COURT*

1    some other guy, Francisco.

2    Q.    Do you know the last name of Francisco?

3    A.    Yeah, Francisco Venegas.

4    Q.    And you recognized his voice in prior conversations --

5    A.    Yeah.

6    Q.    -- that you testified about?

7    A.    Yes.

8    Q.    Do you know what a michelada is?

9    A.    The real term for michelada?

10   Q.    Correct.

11   A.    Yes.

12   Q.    What is a michelada?

13   A.    It's tomato juice mixed with beer.

14   Q.    Thank you.  I have no further questions on that.

15          MS. EL-AMAMY:  May I please ask the Courtroom Deputy

16   to give the witness Exhibits 107, 134, and 137-A.

17          THE CLERK:  107?

18          MS. EL-AMAMY:  134 and 137 -- A.

19          THE CLERK:  107, 134, and?

20          MS. EL-AMAMY:  107, 134, and 137-A.

21          THE CLERK:  107, 134, and 137.

22   BY MS. EL-AMAMY:

23   Q.   Mr. Navarro, do you see your signature on those

24   transcripts that are in front of you?

25   A.    Yes.

**UNITED STATES DISTRICT COURT**

1    Q.    And when you were putting your transcript (sic.) on

2    Exhibit 104, did you recognize the speaker?

3    A.    Exhibit 104?

4    Q.    107, I mean.

5    A.    Yes.

6    Q.    Who did you recognize?

7    A.    Carlos Rivera.

8    Q.    Did you recognize the other speaker?

9    A.    No.

10    Q.    And playing for you now a recording that has already

11    been admitted as a recording that took place on July 29, 2009

12    at 9:34 p.m.

13          *(Whereupon the conversation was then played.)*

14    Q.    Now, listening to that recording, the individual

15    identified as Eric mentions a Raul, if he was at Raul's

16    house.  Do you know any other individuals named Raul, other

17    than defendant Prieto?

18    A.    No.

19    Q.    Okay.  Now, let me turn your attention to Exhibit 134-A,

20    which should be in front of you.

21          Exhibit 134 which has already been admitted as a

22    recording that took place on July 31st, 2009, at 7:39 p.m.

23          Did you recognize one or both of the speakers in that

24    telephone conversation?

25    A.    Did you say 134-A or 134-B?

**UNITED STATES DISTRICT COURT**

1    Q.    134-A.  Do you have B in front of you?

2    A.    Yeah.  I have B in front of me.

3          MS. EL-AMAMY:  134-A, please.

4          THE CLERK:  All right.

5    BY MS. EL-AMAMY:

6    Q.    Did you recognize the speaker in that telephone

7    conversation?

8    A.    Yes.

9    Q.    And who was that?

10   A.    Carlos Rivera.

11         *(Whereupon the conversation was then played.)*

12   Q.    Mr. Navarro, have you previously sold an ounce of

13   methamphetamine?

14   A.    Yes.

15   Q.    How much have you sold that ounce for?

16   A.    Different prices.

17   Q.    Would $1100 be a fair price for an ounce of

18   methamphetamine?

19   A.    Yes.

20   Q.    Now, turning your attention to Exhibit 137-A, which

21   should be in front of you, did you listen to that recording

22   before coming to court today?

23   A.    Yes.

24   Q.    Did you recognize the speakers?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1    *Q.*    Who did you recognize?

2    *A.*    Carlos Rivera.

3    *Q.*    Did you recognize Brenda?

4    *A.*    No.

5    *Q.*    And playing this recording, which has already been

6    admitted as a recording which took place on July 24, 2009 at

7    1:41 p.m.

8              *(Whereupon the conversation was then played.)*

9    *Q.*    Have you ever used the term *stepped on* when referring to

10   narcotics?

11   *A.*    Yes.

12   *Q.*    And what is stepped on?

13           MR. CEPHAS:  Objection, calls for expert testimony by

14   a lay witness.

15           THE COURT:  Overruled.

16   BY MS. EL-AMAMY:

17   *Q.*    What is *stepped on*?

18   *A.*    When you cut the drug or you mix it with another

19   substance to make more quality -- more quantity.

20   *Q.*    Is -- what is a zone that is stepped on?

21           MR. CEPHAS:  Same objection.

22           THE COURT:  Overruled.

23   BY MS. EL-AMAMY:

24   *Q.*    What is that?

25   *A.*    An ounce that has been mixed.

*UNITED STATES DISTRICT COURT*

1    *Q.*   Is $900 a fair price for that?

2    *A.*   Yes.

3    *Q.*   Have you ever used the term *ball*?

4    *A.*   Yes.

5    *Q.*   What have you used that term to refer to?

6    *A.*   Drugs.

7    *Q.*   Specifically what quantity?

8    *A.*   An 8-ball, 7.0 grams.

9    *Q.*   What price did you sell an 8-ball for?

10   *A.*   Different prices.

11   *Q.*   Is $150 a fair price for an 8-ball?

12   *A.*   Yes.

13         MR. CEPHAS:  Same objection.  Your Honor, can I have

14   a continuing objection?

15         THE COURT:  All right.  Overruled.

16         MS. EL-AMAMY:  All right.  I'm going to ask that the

17   Courtroom Deputy give the witness Exhibits 148, 146, 152, and

18   164.

19         THE CLERK:  148, 146, 164?

20         MS. EL-AMAMY:  And 152.

21   BY MS. EL-AMAMY:

22   *Q.*   Starting with Exhibit 146, do you have that in front of

23   you?

24   *A.*   Yes.

25   *Q.*   And did you listen to that recording before coming to

*UNITED STATES DISTRICT COURT*

1    court today?

2    *A.*    Yes.

3    *Q.*    Playing now a recording that's been already admitted as

4    a recording that took place on August 8th, 2009 at 10:35 a.m.

5         Did you recognize the speakers during that conversation?

6    *A.*    Yes.

7    *Q.*    And who were they?

8    *A.*    Jessica Medina and myself.

9         *(Whereupon the conversation was then played.)*

10   *Q.*    All right.  I'm going to stop the recording there.

11        When you just told defendant Medina to tell defendant

12   Rivera that if you needed him -- or if he needed you to go

13   anywhere or pick up anything for him, what did you mean by

14   that?

15   *A.*    Any drugs or money.

16   *Q.*    And you were telling her that so that she could tell

17   defendant Rivera that?

18   *A.*    Yes.  So she could ask him.

19   *Q.*    Why?

20   *A.*    In case he had unfinished business he hadn't tooken care

21   of, I could take care of it for him.

22   *Q.*    And defendant Medina uses the term *paisa* during this

23   telephone conversation.  What is a paisa?

24   *A.*    Usually it's a person from Mexico.

25   *Q.*    A person who was born in Mexico, but is in the country?

*UNITED STATES DISTRICT COURT*

1   *A.*   Yes.

2   *Q.*   Does it mean legally or illegally?

3   *A.*   Um -- not -- not -- not necessarily.

4   *Q.*   All right.  Now, let me turn your attention to Exhibit

5   152.

6        Do you have that transcript in front of you?

7   *A.*   Yes.

8   *Q.*   Did you listen to the recording of that transcript prior

9   to coming to court?

10  *A.*   Yes.

11  *Q.*   And this is a recording that has already been admitted

12  as a recording that took place on August 30th, 2009 at

13  3:29 p.m.

14       Did you recognize the voices during this telephone

15  conversation?

16  *A.*   Yes.

17  *Q.*   And who were they?

18  *A.*   Pokie and myself.

19       *(Whereupon the conversation was then played.)*

20       MR. CEPHAS:  Your Honor --

21       MR. NAVARRO:  Your Honor, we don't have the

22  transcripts.

23       MS. EL-AMAMY:  We don't have Page 3 of the transcript

24  either.  There was an inadvertent error.  We can listen to

25  the recording without the transcript.

*UNITED STATES DISTRICT COURT*

1        THE COURT:  I thought it was just me.

2        MR. NAVARRO:  Can we start over, your Honor?

3        THE COURT:  Really?

4        MR. NAVARRO:  I was trying to read it.  If we may,

5  your Honor?

6        THE COURT:  Okay.  Go ahead.  Start it over.

7        MS. EL-AMAMY:  Sure.

8       *(Whereupon the conversation was then played.)*

9  BY MS. EL-AMAMY:

10  *Q.*    Now, who is Pokie?

11  *A.*    His last name is Alvarez.

12  *Q.*    Do you know his first name?

13  *A.*    Ralph Alvarez.

14  *Q.*    Is he a member of the Black Angel's gang?

15  *A.*    No.

16  *Q.*    Is he affiliated with the gang?

17  *A.*    He's an OVS gang member.

18  *Q.*    All right.  And when you were talking about *Chino's*

19  *heina*, who were you talking about?

20  *A.*    Jessica Medina.

21  *Q.*    And when you were talking about Chino's heina directing

22  Rafael Alvarez to come by the house so he could see the

23  letter, what were the two of you discussing?

24  *A.*    The letter that she had received stating that they were

25  listening to -- they were listening into the phones.

**UNITED STATES DISTRICT COURT**

1    Q.   Why was this important information to you and

2    Mr. Alvarez?

3    A.   Because that would mean that they're listening to our

4    phone calls.

5    Q.   So you were discussing the fact that defendant Medina

6    had informed Mr. Alvarez to change telephones?

7    A.   Yes.

8    Q.   All right.  Now, do you have Exhibit 148-A in front of

9    you?

10   A.   Yes.

11   Q.   All right.  Can you take a look at --

12            MR. NAVARRO:  148?

13            MS. EL-AMAMY:  -- 148.

14   BY MS. EL-AMAMY:

15   Q.   Did you listen to that recording before coming to court

16   today?

17   A.   Yes.

18   Q.   Who was -- who was speaking in that telephone

19   conversation?

20   A.   Jessica Medina and Francisco Venegas.

21   Q.   Does Mr. Venegas go by any nicknames?

22   A.   Yes.

23   Q.   What nickname is that?

24   A.   Cisco.

25   Q.   Okay.  I'm playing a recording that took place on August

*UNITED STATES DISTRICT COURT*

1    11th, 2009 at 6:30 p.m. and has been admitted as such.

2           *(Whereupon the conversation was then played.)*

3           MS. EL-AMAMY:  I'll stop the recording at this point.

4    BY MS. EL-AMAMY:

5    *Q.*    Have you ever used the term *hot*?

6    *A.*    Yes.

7    *Q.*    What have you used that term as?

8    *A.*    A lot of law enforcement present around the area.

9    *Q.*    Have you ever used the term *charger*?

10   *A.*    Yes.

11   *Q.*    What did you use that term to refer as?

12   *A.*    As the car, Dodge Charger.

13   *Q.*    Is that associated with any particular law enforcement

14   agency?

15   *A.*    Yes.

16   *Q.*    What?

17   *A.*    The Ontario Police Department.

18   *Q.*    Any particular unit or --

19   *A.*    The gang unit.

20   *Q.*    And have you ever used the term *three-way*?

21   *A.*    Yes.

22   *Q.*    In what context?

23   *A.*    Phone call.

24   *Q.*    Why would you -- why would one use a three-way?

25   *A.*    In case a phone doesn't accept collect calls, you call a

*UNITED STATES DISTRICT COURT*

1    phone that does accept collect calls, and from there they

2    three-way you to whatever phone you want to call.

3    Q.    And playing the final recording in this case, do you

4    have 152-A in front of you?

5    A.    Yes.

6    Q.    Did you listen to that recording before coming to court

7    today?

8    A.    Yes.

9    Q.    I'm sorry, I meant 164.  Do you have 164-A in front of

10   you?

11   A.    Yes.

12   Q.    All right.  And this is a recording that took place on

13   July 30th, 2009 at 12:15 p.m., and has been admitted as such.

14        Did you recognize the speakers on this telephone

15   conversation?

16   A.    Yes.

17   Q.    And who were they?

18   A.    Carlos Rivera and myself.

19            (Whereupon the conversation was then played.)

20        MS. EL-AMAMY:  All right.  I'm going to stop the

21   recording there.

22        I'll ask the CRD to hand the witness Exhibits 22,

23   272, 34, and 32.  These are all photographs.

24        (Government's Exhibits 22, 32, 34, and 272 marked for

25   Identification.)

*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| 1 | BY MS. EL-AMAMY: |
| 2 | Q.   Do you have those exhibits in front of you? |
| 3 | A.   Yes. |
| 4 | Q.   Turning first to Exhibit 22, who is that a photograph |
| 5 | of? |
| 6 | A.   Jessica Medina. |
| 7 | Q.   All right. |
| 8 | MS. EL-AMAMY:  The government would move to admit |
| 9 | this photograph. |
| 10 | MR. CEPHAS:  No objection. |
| 11 | MR. WALSH:  No objection. |
| 12 | THE COURT:  It will be received. |
| 13 | (Government's Exhibit 22 received into Evidence.) |
| 14 | BY MS. EL-AMAMY: |
| 15 | Q.   Turning to Exhibit 32.  Do you recognize this |
| 16 | individual? |
| 17 | A.   Yes. |
| 18 | Q.   Who is that individual? |
| 19 | A.   Robert Tolson. |
| 20 | MS. EL-AMAMY:  The government would move to admit |
| 21 | this exhibit. |
| 22 | MR. NAVARRO:  No objection, your Honor. |
| 23 | THE COURT:  It will be received. |
| 24 | (Government's Exhibit 32 received into Evidence.) |
| 25 | (The exhibit was displayed on the screen.) |

**UNITED STATES DISTRICT COURT**

BY MS. EL-AMAMY:

Q.    Now, when you testified yesterday that Robert Tolson was in some of the conversations, is this the individual you were talking about?

A.    Yes.

Q.    And was this the individual who was the runner as you described for defendant Rivera?

A.    Yes.

Q.    All right.  Is Mr. Tolson a member of OVS?

A.    No.

Q.    What about any sort of membership in the Black Angel's gang?

A.    No.

Q.    All right.  Turning to Exhibit 34.  Do you recognize this individual?

A.    Yes.

Q.    I'm sorry, who is this individual?

A.    Francisco Venegas.

        MS. EL-AMAMY:  Move to admit this exhibit.

        MR. NAVARRO:  No objection.

        THE COURT:  Received.

        (Government's Exhibit 34 received into Evidence.)

            *(The exhibit was displayed on the screen.)*

BY MS. EL-AMAMY:

Q.    Is this the individual who you testified in the

1    recording that this is Francisco Venegas?

2    A.    Yes.

3    Q.    Do you know if he goes by any nicknames?

4    A.    Yes.

5    Q.    And what nickname is that?

6    A.    Cisco.

7    Q.    Turning to Exhibit 272.  Do you recognize what this is a

8    photograph of?

9    A.    Yes.

10   Q.    What is it?

11   A.    Gang graffiti.

12   Q.    Who wrote the gang graffiti?

13   A.    I did.

14          MS. EL-AMAMY:  Move to admit Government's Exhibit

15   272.

16          MR. CEPHAS:  No objection.

17          THE COURT:  Received.

18          (Government's Exhibit 272 received into Evidence.)

19          (The exhibit was displayed on the screen.)

20   BY MS. EL-AMAMY:

21   Q.    When did you write this gang graffiti?

22   A.    Maybe sometime around '99, 2000.

23   Q.    And what does the graffiti say?

24   A.    Southside OAN, Little Sinister and Plucky, Southside

25   OBA, Little Stranger and OVS Sickle and Slim.

*UNITED STATES DISTRICT COURT*

1    *Q.*    And were you a Junior Black Angel at that time?

2    *A.*    Yes.

3          MS. EL-AMAMY:  I have no further questions for this

4    witness.

5          THE COURT:  All right.  Mr. Cephas.

6                        ***CROSS-EXAMINATION***

7    BY MR. CEPHAS:

8    *Q.*    Good morning.

9    *A.*    Good morning.

10   *Q.*    You met with the prosecutors several times before

11   testifying here, correct?

12   *A.*    Yes.

13   *Q.*    They prepared reports after those meetings and sometimes

14   they showed you copies of those reports, correct?

15   *A.*    What --

16          MS. EL-AMAMY:  Objection, compound question.

17          THE COURT:  Sustained.

18   BY MR. CEPHAS:

19   *Q.*    They prepared -- you're aware that they prepared reports

20   at your meetings?

21   *A.*    I'm aware that they prepared me?

22   *Q.*    They prepared reports of the meetings that they had with

23   you?

24   *A.*    Oh, yes.

25   *Q.*    And sometimes they reviewed those reports with you?

***UNITED STATES DISTRICT COURT***

1    A.    Um -- what kind of reports?

2    Q.    Reports that they prepared at your meetings.

3    A.    No.

4    Q.    As part of your plea agreement, you met with them and

5    gave them information about your gang?

6    A.    Yes.

7    Q.    And in one of those meetings you told them that the

8    typical age for becoming an OVS member is people of high

9    school age, correct?

10   A.    Yes.

11   Q.    You became a member of OVS when you were a freshman in

12   high school?

13   A.    Yes.

14   Q.    But you claim Mr. Prieto became a member of OVS when he

15   was 25 years old?

16   A.    Yes.

17   Q.    Now, you were jumped into OVS?

18   A.    Yes.

19   Q.    I think you testified that because of where you grew up,

20   you knew -- you knew about gangs even before you were jumped

21   into the gang, right?

22   A.    Yes.

23   Q.    Gangs were commonplace in your neighborhood?

24   A.    Yes.

25   Q.    You had friends who were gang members even before you

*UNITED STATES DISTRICT COURT*

1    became a gang member?

2    A.    Yes.

3    Q.    Did you go around claiming that you were OVS before you

4    became a member of OVS?

5    A.    Yes.

6    Q.    You claimed you were OVS even though you weren't a

7    member of the gang?

8    A.    Not OVS, but just a resident or a person that lived in

9    Ontario.

10   Q.    So you claimed you lived in Ontario?

11   A.    Yes.

12   Q.    But you didn't get OVS tattoos before you were an OVS

13   member, did you?

14   A.    No.

15   Q.    And you didn't go around saying I'm OVS before you

16   became OVS, did you?

17   A.    No.

18   Q.    And because of where you grew up and your familiarity

19   with gangs, you knew that you weren't supposed to claim

20   membership in OVS when you were not an OVS member --

21   A.    Yes.

22   Q.    -- you knew that?

23   A.    Yes.

24   Q.    When -- when someone becomes a member of the gang, they

25   can still have friends who are not gang members, correct?

*UNITED STATES DISTRICT COURT*

1    *A.*   Yes.

2    *Q.*   And you had friends who were not gang members, even

3    after you joined the gang?

4    *A.*   Yes.

5    *Q.*   I want to go back and talk about your meetings with the

6    prosecutors.

7        You -- you met with the prosecutors at least ten times?

8    *A.*   Somewhere around there.

9    *Q.*   When was the last time you met with them?

10   *A.*   I believe it was a week after Thanksgiving.

11   *Q.*   Last week?

12   *A.*   Um -- it was last week.

13   *Q.*   Did you speak with anyone last night after the trial?

14       Anyone from -- any agents or police officers last night?

15   *A.*   No.

16   *Q.*   Did you ever -- did you ever meet me before today?

17   *A.*   No.

18   *Q.*   Have you talked to any of the defense attorneys for the

19   other defendants here today?

20   *A.*   No.

21   *Q.*   You were informed that we wanted to interview you,

22   correct?

23   *A.*   In the court -- in the courthouse?

24   *Q.*   Were you informed that I had requested to interview you?

25   *A.*   No.

*UNITED STATES DISTRICT COURT*

1    Q.    No one showed you a letter I sent you asking to

2    interview you?

3    A.    No.

4    Q.    Okay.  The reason you're testifying is because you want

5    to get a better sentence, correct?

6          You want to get less time when you're sentenced in this

7    case?

8    A.    I'm hoping.

9    Q.    And under the deal you have with the prosecutors,

10   they'll recommend a lower sentence if they like what you say

11   at trial, correct?

12   A.    No.

13   Q.    You signed a plea agreement with them, correct?

14   A.    Yes.

15   Q.    And it's a cooperation plea agreement, correct?

16   A.    Yes.

17   Q.    And they've promised to give you a better sentence if

18   they like what you say; isn't that right?

19   A.    No.

20   Q.    What did they promise you?

21   A.    They didn't promise me anything.

22   Q.    You're doing this for nothing?

23   A.    No.

24   Q.    You're doing this because you want to get a better

25   sentence, correct?

*UNITED STATES DISTRICT COURT*

1    A.    I'm hoping.

2    Q.    And you think that by making them happy gets you a

3    better sentence, right?

4    A.    I'm hoping for a better sentence.

5    Q.    And because you're hoping for a better sentence, you've

6    exaggerated your story about Raul Prieto being a Black Angel

7    member; isn't that right?

8    A.    No.

9    Q.    Well, have they given you any -- have the prosecutors

10   given you anything in exchange for you agreeing to become an

11   informant?

12   A.    No.

13   Q.    Didn't they agree that they wouldn't charge you with

14   your most serious crimes if you helped get them convictions?

15   A.    No.

16   Q.    Well, you're familiar with your plea agreement, correct?

17   A.    Yes.

18   Q.    The most serious crime mentioned in your plea agreement

19   is drug trafficking, right?

20   A.    Yes.

21   Q.    And the sentence -- the proposed sentence in your plea

22   agreement is based on drug trafficking, correct?

23   A.    Yes.

24   Q.    But you were involved in several murders during your

25   time in the gang; isn't that right?

*UNITED STATES DISTRICT COURT*

1    A.    Involved in?

2    Q.    Murders.

3    A.    In what -- I don't understand.

4    Q.    Do you understand what a murder is?

5    A.    Yes.

6    Q.    And weren't you involved in several murders?

7    A.    Not directly, no.

8    Q.    Indirectly you were involved in murders?

9    A.    Yes.

10   Q.    In the year 2000, you were in a car with two other Black

11   Angel members that ran over an unconscious black male that

12   Black Angel members had just been fighting with; isn't that

13   right?

14   A.    Yes.

15   Q.    He was unconscious and you ran him over in your car?

16   A.    I didn't run him over, and it wasn't my car.

17   Q.    You were in the car?

18   A.    Yes, but it wasn't my car.

19   Q.    And that was in 2000, the year you became a Black Angel?

20   A.    Around 2000.

21   Q.    Rivera wasn't a Black Angel in 2000, correct?

22   A.    No.

23   Q.    Prieto wasn't OVS in 2000, correct?

24   A.    No.

25   Q.    In fact, you hadn't even heard of Rivera or Prieto in

*UNITED STATES DISTRICT COURT*

1    2000, correct?

2    A.    Yes.

3    Q.    A few years ago you were involved in a conspiracy to

4    murder another Black Angel member named Eric Rios?

5    A.    Yes.

6    Q.    After Rios had been acting erratic, you held a meeting

7    with other Black Angel members to discuss what to do; isn't

8    that right?

9    A.    Yes.

10   Q.    Four other Black Angels were at the meeting?

11   A.    I believe it was five other.

12   Q.    Okay.  The majority voted to have Rios killed; isn't

13   that right?

14   A.    Yes.

15   Q.    And then you went to Barajas to tell him what happened

16   about the vote, and he gave you the okay to have Rios killed,

17   correct?

18   A.    Yes.

19   Q.    Then you relayed the message back to the other members,

20   correct?

21   A.    Yes.

22   Q.    And then you told Tiznado that if he killed Rios, he

23   would be promoted back to full Black Angel, correct?

24   A.    Yes.

25   Q.    Because Tiznado had been demoted previously, right?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    And then you went back to Barajas again to let him know

3    that Tiznado would be doing the killing, and to make sure you

4    still had the okay, correct?

5    A.    No.

6    Q.    You didn't go back and tell -- and tell Barajas that

7    Tiznado was going to do that?

8    A.    No.  I didn't go back.

9    Q.    Didn't you tell the government that you went back to

10   Barajas?

11   A.    I went to him after the meeting, but after that I didn't

12   go back a second time to him.

13   Q.    Okay.  A few days later Rios was killed, correct?

14   A.    Yes.

15   Q.    You were also involved in the murder of another man at a

16   party around 1999 or 2000 where you and several other Black

17   Angels beat up a man who had told two Black Angels to turn

18   their music down; isn't that right?

19   A.    Yes.

20   Q.    You and several other Black Angels beat him up and then

21   he was shot three to five times, correct?

22   A.    Yes.

23   Q.    Your plea agreement doesn't mention the Rios murder,

24   does it?

25   A.    No.

1    *Q.*    It doesn't mention running over the black male in the

2    car, does it?

3    *A.*    No.

4    *Q.*    It doesn't mention the man who was shot three to five

5    times and killed because he had asked to have the music

6    turned down?

7    *A.*    No.

8    *Q.*    By pleading guilty to drug trafficking, you would be

9    looking at a sentence of 24 years, but if you pled guilty to

10   murder, you'd be looking at 30 to life; isn't that right?

11           MS. EL-AMAMY:   Objection, lacks foundation.

12           THE COURT:   Sustained.

13   BY MR. CEPHAS:

14   *Q.*    Sentencing ramifications were explained to you before

15   you pled guilty, correct?

16   *A.*    The sentencing what?

17   *Q.*    The -- the sentences that you were looking at were

18   explained to you before you signed your plea agreement,

19   correct?

20   *A.*    Explained like -- I don't understand my -- what's the --

21   I don't understand the question.

22   *Q.*    You signed a plea agreement?

23   *A.*    Yes.

24   *Q.*    You -- the terms in the plea agreement were explained to

25   you before you signed it?

*UNITED STATES DISTRICT COURT*

1    A.    The terms, yes.

2    Q.    And before you decided to sign that plea agreement, you

3    understood that you were facing a lot of time if you were

4    charged with murders in this case?

5    A.    No.

6    Q.    You didn't think you would face a lot of time if you

7    were charged with murders?

8    A.    For a murder, yes.

9    Q.    And so you entered into an informant plea agreement to

10   avoid being charged with those murders, correct?

11   A.    No.

12   Q.    Let's talk about your experience with the gang.  You

13   became a member of OVS in '93 or '94?

14   A.    Yes.

15   Q.    You said the gang has rules, correct?

16   A.    Yes.

17   Q.    You knew you had to put in work to move up to become a

18   Junior Black Angel?

19   A.    Yes.

20   Q.    And you later became a Junior Black Angel, in part, for

21   a shooting you did in 2000?

22   A.    No, before 2000.

23   Q.    But you became a Junior Black Angel in part for some

24   shooting you had done?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1   Q.   And you knew you had to put in more work to become a

2   Black Angel, correct?

3   A.   Yes.

4   Q.   And you did put in more work, correct?

5        And eventually you became a Black Angel, correct?

6   A.   Um -- put in more work in what way?

7   Q.   You had to put in -- well, you tell me.

8        What kind of work did you put in in order to become

9   promoted from Black Angel -- from Junior Black Angel to Black

10  Angel -- to full Black Angel?

11  A.   Not any major crimes.

12  Q.   You put in work though for the gang, correct?

13  A.   Of some sort, yes.

14  Q.   Now, generally when -- when you or one of your gang

15  member friends comes into contact with law enforcement, if

16  you don't have visible tattoos, you try to prevent police

17  from knowing you're members of the gang, correct?

18  A.   Yes.

19  Q.   And gang members use monikers to try and prevent police

20  from detecting who they actually are, correct?

21  A.   Yes.

22  Q.   And one of the rules of the gang is, don't talk to law

23  enforcement, correct?

24  A.   Yes.

25  Q.   And if law enforcement came up to you and asked you if a

**UNITED STATES DISTRICT COURT**

1    gang -- if you were a gang member, you would deny it,

2    correct?

3    A.    Yes.

4    Q.    You testified that gang members have to commit crimes to

5    show that the gang is ruthless, to intimidate, to control

6    your territory.  To your knowledge, Mr. Prieto didn't commit

7    any crimes for OVS, correct?

8    A.    Yes.

9    Q.    And he didn't commit any crimes, to your knowledge, for

10   the Black Angels; isn't that right?

11   A.    Yes.

12   Q.    Yes, that's correct?

13   A.    Yes.

14   Q.    And I believe you said the gang never asked him to do

15   anything; isn't that right?

16   A.    Yes.

17   Q.    I want to talk about Mr. Rivera and Mr. Prieto.

18         You were aware that Mr. Rivera and Mr. Prieto were good

19   friends, correct?

20   A.    Yes.

21   Q.    And that they had been good friends for many years?

22   A.    Yes.

23   Q.    And you said Rivera referred to Prieto as his buddy?

24   A.    His compadré.

25   Q.    Is it fair to say Rivera was very protective of

*UNITED STATES DISTRICT COURT*

1    Mr. Prieto?

2    *A.*    Yes.

3    *Q.*    Treated him like a little brother?

4    *A.*    Yes.

5    *Q.*    And before you were all arrested in 2010, Rivera kept

6    Prieto out of Black Angel gang business, correct?

7    *A.*    From my knowledge, yes.

8    *Q.*    You met Mr. Rivera at a gang meeting around 2005,

9    correct?

10   *A.*    Yes.

11   *Q.*    Rivera never brought Mr. Prieto to a gang meeting,

12   correct?

13   *A.*    Yes.

14   *Q.*    Yes, he never brought him?

15   *A.*    Yes.

16   *Q.*    You said that Mr. Prieto asked to become a member of

17   OVS; is that right?

18   *A.*    Yes.

19   *Q.*    But I don't believe the prosecutor ever asked you when

20   that happened.  When did that supposedly happen?  That he

21   asked you to become a member of OVS?

22   *A.*    Sometime in 2010.

23   *Q.*    And, in fact, in 2010 after you were all in custody in

24   this case, correct?

25   *A.*    Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    Now, Mr. Prieto didn't get to San Bernardino Jail until
2    around June of 2010, correct?
3    A.    Um -- I don't remember the exact date.
4    Q.    But you recall that he got there a few months after you
5    got there?
6    A.    Yes.
7    Q.    And you got there in April of 2010?
8    A.    Yes.
9    Q.    And the indictment goes up through April of 2010?
10   A.    Up to 2010 -- April 2010.
11   Q.    Okay.  And you started informing somewhere around August
12   of 2010?
13   A.    Somewhere around there.
14   Q.    So sometime between June of 2010 and August of 2010 you
15   claim Mr. Prieto asked to become a member of OVS?
16   A.    I -- for what I remember, yes.
17   Q.    Do you remember what month?  Was it June?  Was it July?
18   Was it August?
19         Do you remember which of those months it was?
20   A.    No, I don't.
21   Q.    So based on that testimony, Mr. Prieto definitely was
22   not an OVS member in the year 2000, correct?
23   A.    Yes.
24   Q.    Yes, he was not?
25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1 Q. Was he an OVS member in 2008?

2 A. No.

3 Q. Did he go to any gang meetings before June of 2010?

4 A. No.

5 Q. And he was not authorized to claim membership in OVS

6 prior to June of 2010, correct?

7 A. No.

8 Q. No, he was not authorized?

9 A. Yes.

10 Q. Before Mr. Prieto was arrested in this case, you knew he

11 was a member of a tagging crew called KMR, correct?

12 A. Yes.

13 Q. And you've seen tagging by KMR around Ontario?

14 A. Yes.

15 Q. And the tagging is generally like mural-type art?  Spray

16 painting, big letters, KMR?

17 A. Not necessarily murals, but just graffiti and spray

18 paint.

19 Q. Okay.  But you've seen the KMR murals?

20 A. Not murals, no.

21 Q. What have you seen?

22 A. Graffiti.

23 Q. But you've seen like with letters that are as tall as me

24 of graffiti?

25 A. Several types, yes.

*UNITED STATES DISTRICT COURT*

1    *Q.*   In preparation for your testimony, you listened to more

2    than 50 telephone calls, correct?

3    *A.*   Yes.

4    *Q.*   But only two of those calls had Mr. Prieto's voice on

5    it; isn't that correct?

6    *A.*   I --

7           MS. EL-AMAMY:  Objection, lacks personal knowledge.

8    BY MR. CEPHAS:

9    *Q.*   You claim that you recognized Mr. Prieto's voice, right?

10   *A.*   Yes.

11   *Q.*   And during those 50 or more recordings, you only

12   recognized his voice on two of them; isn't that right?

13   *A.*   I don't know the exact count, but a couple of them.

14   *Q.*   And there are a couple of them that you identified here

15   in court, correct?

16   *A.*   Yes.

17   *Q.*   Now, under the terms of your plea agreement, you're only

18   required to plead guilty to Counts One and Five of the

19   indictment, correct?

20   *A.*   I believe so.

21   *Q.*   The same two conspiracy counts that Mr. Prieto was

22   charged with, correct?

23   *A.*   I don't know his exact charges.

24   *Q.*   Okay.  You've seen the indictment though, correct?

25   *A.*   Yes.

*UNITED STATES DISTRICT COURT*

Q.    And the indictment has all the charges for all the

different individuals on it, correct?

A.    I believe so.

Q.    And -- and you have read the indictment, correct?

A.    Yes.

Q.    And you know that Mr. Rivera is charged with six counts,

Ms. Medina is charged with four counts, but you pled guilty

to only two, correct?

          MS. EL-AMAMY:  Objection, compound question.

          THE COURT:  Sustained.

BY MR. CEPHAS:

Q.    The reason you're getting such a great deal is because

you agreed to exaggerate your story to assist them; isn't

that right?

          MS. EL-AMAMY:  Objection, argumentative.

          THE COURT:  Sustained.

          MR. CEPHAS:  Nothing further.

                    ***CROSS-EXAMINATION***

BY MR. NAVARRO:

Q.    Good morning, Mr. Navarro.

A.    Good morning.

Q.    You grew up in Ontario; is that correct?

A.    Yes.

Q.    I believe it was yesterday morning Ms. El-Amamy was

asking you questions about the neighborhood you grew up.  Do

*UNITED STATES DISTRICT COURT*

1    you remember that testimony?

2    A.    Yes.

3    Q.    There was a lot of gang activity?

4    A.    Yes.

5    Q.    Was it a predominant Latino neighborhood?  Mostly

6    Latinos in that neighborhood?

7    A.    Yes.

8    Q.    From a young age you were exposed to gang culture; isn't

9    that correct?

10   A.    Yes.

11   Q.    And you had a brother who was a gang member, correct?

12   A.    At one point, yes.

13   Q.    How many years older than you is your older brother?

14   A.    Six years.

15   Q.    What is his name?

16        MS. EL-AMAMY:  Objection, relevance.

17        THE COURT:  Sustained.

18   BY MR. NAVARRO:

19   Q.    And your brother, was he a member of the Black Angels?

20   A.    No.

21   Q.    What gang did he belong to?

22   A.    OVS.

23   Q.    Which is one of the junior gangs within the Black

24   Angels?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    What was his moniker?

2         MS. EL-AMAMY:  Objection, relevance.

3         THE COURT:  Overruled.

4    BY MR. NAVARRO:

5    Q.    What did they know him -- what did they call him?

6    A.    Cricket.

7    Q.    Cricket.  Okay.  So growing -- when you were a young

8    child, Cricket, your older brother, was a gang member,

9    correct?

10   A.    Yes.

11   Q.    And you would see him get dressed in his gang clothing,

12   correct?

13   A.    Yes.

14   Q.    What did he wear, typically -- when you saw him as a

15   gang member, what did your brother wear?

16   A.    Baggy clothes.

17   Q.    His khakis all the way up here?

18   A.    Not all the way up there, no.

19   Q.    He wore khakis, correct?

20   A.    Dickies.

21   Q.    I'm sorry, Dickies.  And he wore nice creased white

22   t-shirts?

23   A.    Yes.

24   Q.    What kind of shoes did he wear?

25   A.    Several shoes.

*UNITED STATES DISTRICT COURT*

1    Q.    You know what kind of shoes he wore, come on, tell the

2    jury.

3              MS. EL-AMAMY:  Objection, asked and answered.

4              THE COURT:  Overruled.

5    BY MR. NAVARRO:

6    Q.    If you don't remember, that's fine, but if you know,

7    what kind of shoes did your brother wear?

8    A.    Several shoes.

9    Q.    Did he wear tennis shoes?

10   A.    Yes.

11   Q.    And did he wear a certain kind of belt as a gang member?

12   A.    Yes.

13   Q.    What kind of belt did he wear?

14   A.    An initial belt.

15   Q.    What's an initial belt?

16   A.    A belt that has a belt buckle with an initial in it.

17   Q.    Is it a thick belt or a thin belt?

18   A.    Um -- thin.

19   Q.    It's a black belt typically, correct?

20   A.    Yes.

21   Q.    And he -- he had a certain way of walking, too, right,

22   as a gang member?

23   A.    Yes.

24   Q.    And you liked that?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    You liked your brother?

2    A.    I loved him.

3    Q.    You love your brother, but aside from that, he had

4    homeboys that he hung out with, correct?

5    A.    Yes.

6    Q.    And you knew who they were?

7    A.    Yes.

8    Q.    They were other gang members from OVS, correct?

9    A.    Yes.

10   Q.    And other gang members from Black Angels, correct?

11   A.    Yes.

12   Q.    And these were the guys that you looked up to?

13   A.    Yes.

14   Q.    You wanted to be just like them?

15   A.    Yes.

16   Q.    And having a brother who was a gang member -- who was an

17   OVS, gave you a certain degree of clout.

18         Do you know what the word *clout* means?

19   A.    Not exactly, no.

20   Q.    It gave you a certain degree of credibility within the

21   neighborhood; is that correct?

22   A.    No.  Not really.

23   Q.    Did other kids mess around with you because you had an

24   older brother who was a gang member?

25   A.    No.

*UNITED STATES DISTRICT COURT*

1    Q.    Why is that?

2    A.    Just was never teased for it.

3    Q.    Sorry?

4    A.    I was just never teased for it.

5    Q.    Because you knew you had a brother that protected you,

6    correct?

7    A.    Yes.

8    Q.    And you knew that he was a gang member, and that made

9    you special, correct?

10   A.    Not necessarily special.

11   Q.    So when you were going to the liquor store and buying

12   candy, as Ms. El-Amamy said yesterday, you weren't like a

13   regular kid; is that correct?

14   A.    I was a regular kid.

15   Q.    You were a regular kid like every other kid in the

16   neighborhood?

17   A.    Yes.

18   Q.    Did every other kid in your neighborhood have brothers

19   who were gang members?

20   A.    Some did, some didn't.

21   Q.    Did -- so -- some kids have brothers who are gang

22   members and some don't, correct?

23   A.    Yes.

24   Q.    Now, when you were about in middle school you said --

25   middle school, you wanted to join the gang, correct?

*UNITED STATES DISTRICT COURT*

1   A.    In high school.

2   Q.    But even before that, when you were in junior high

3   school, you wanted to join the gang, correct?

4   A.    To some degree, yes.

5   Q.    And you knew you were going to join this gang, correct?

6   A.    No, I didn't know.

7   Q.    And you knew what your brother did, right?

8   A.    At that time, no.

9   Q.    Did he ever -- did you see his girlfriends?

10  A.    Yes.

11  Q.    Did you see him have a good time with his friends?

12  A.    Yes.

13  Q.    He would drink alcohol?

14  A.    Not at that time, no.

15  Q.    Smoke marijuana?

16  A.    No.

17  Q.    He would have a good time, correct?

18  A.    What was the question?

19  Q.    He would have a good time, correct?

20  A.    Yes.

21  Q.    Listening to oldies?

22  A.    All types of music.

23  Q.    So when you were in high school, about 14 years old, you

24  were jumped in, correct?

25  A.    Yes.

*UNITED STATES DISTRICT COURT*

1   Q.   Or -- how long did the beating take, 13 seconds?

2   A.   I don't remember how long it was, but it's usually 13

3   seconds.

4   Q.   And after that you became a member of the OVS, correct?

5   A.   Yes.

6   Q.   And as Mr. Cephas pointed out, or asked you, you put in

7   work for the gang?

8   A.   Yes.

9   Q.   You began by being involved in a couple of -- at least

10   one drive-by shooting, correct?

11   A.   Yes.

12   Q.   And you shot at some guy, but the guy was not hit,

13   correct?

14   A.   It was -- it wasn't a drive-by shooting.

15   Q.   It was a shooting?

16   A.   Yes.

17   Q.   But you missed?

18   A.   I believe I did.

19   Q.   Nobody was -- from what you know, nobody was hurt?

20   A.   Yes.

21   Q.   But that's still considered work for your gang, correct?

22   A.   Yes.

23   Q.   Now, do you remember the day you were arrested in this

24   case?

25   A.   Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    What date is that?

2    A.    April 21st, 2010.

3    Q.    Is that your last day of freedom?

4    A.    Yes.

5    Q.    Now, on that day the police came to your house very

6    early in the morning, correct?

7    A.    Yes.

8    Q.    They came in and they announced through the speakers

9    that they were there to get you, correct?

10   A.    Yes.

11   Q.    And you didn't come out right away?

12   A.    No.

13   Q.    And you were home with your wife?

14   A.    Yes.

15   Q.    And your three children?

16   A.    Yes.

17   Q.    And it took about ten minutes for you to come out,

18   correct?

19   A.    Yes.

20   Q.    And during that time you were hiding narcotics, correct?

21   A.    No.

22   Q.    You didn't hide narcotics?

23   A.    Not hid them anywhere specifically, no.

24   Q.    Now, you testified yesterday that when you were

25   arrested, you went in with some marijuana, correct?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    Where was that marijuana hidden?

3    A.    On my body.

4    Q.    What part of your body?

5    A.    Between my buttocks.

6    Q.    And what do you -- what do -- what do gang members call

7    that, if there's a term?

8    A.    Cheeking.

9    Q.    Cheeking, right?

10   A.    Yes.

11   Q.    Between your butt cheeks, for lack of a better term?

12   A.    Yes.

13   Q.    So when you were being arrested on April 21st of 2010,

14   you were committed to your gang, correct?

15   A.    Yes.

16   Q.    You weren't thinking about your wife and children,

17   correct?

18   A.    I was thinking about them.

19   Q.    But you hid marijuana in your person, correct?

20   A.    Yes.

21   Q.    And you knew that going into custody as a gang member

22   meant that you -- that if you have the opportunity, you would

23   have to bring in narcotics, correct?

24   A.    Yes.

25   Q.    You're aware of that from being in the gang for many

**UNITED STATES DISTRICT COURT**

1    years?

2    A.    Yes.

3    Q.    How old are you now?

4    A.    33.

5    Q.    And you joined the gang when you were how old?

6    A.    Around 14.

7    Q.    That's about 19 years in the gang, correct?

8    A.    Yes.

9    Q.    And then the other 13 you were a child?

10   A.    Yes.

11   Q.    And part of those years you wanted to be in the gang?

12   A.    Yes.

13   Q.    So we would -- so would it be fair to say that most of

14   your life you wanted to be or have been in the gang?

15   A.    Yes.

16   Q.    So you get arrested and you get taken to San Bernardino,

17   correct?

18   A.    Yes.

19   Q.    And you're taken in with a takedown, a bunch of other

20   gang members, correct?

21   A.    Yes.

22   Q.    Now, when did you decide to cooperate with the

23   authorities, if you remember?

24   A.    Not exactly, no.

25   Q.    Was it the same day?

*UNITED STATES DISTRICT COURT*

1    A.    No.

2    Q.    Was it soon thereafter?

3    A.    A couple months after.

4    Q.    Now, between those two months when you decided to

5    cooperate, you met with your attorney, correct?

6    A.    Yes.

7    Q.    And your attorney and you decided that it was best for

8    you to cooperate, correct?

9    A.    Right.

10   Q.    I'm sorry, you decided it was best to cooperate?

11   A.    Yes, I did.

12   Q.    Now, you did this after -- did you go over the hundreds

13   of phones calls that you were in?

14   A.    Not all of them, no.

15   Q.    Were you told there were hundreds, if not thousands, of

16   phone calls involving you?

17   A.    Yes.

18   Q.    And did you look at your indictment?

19   A.    Yes.

20   Q.    Was your name at the top or the bottom of the

21   indictment?

22   A.    The third.

23   Q.    You were the third defendant out of how many, if you

24   remember?

25   A.    About 51.

*UNITED STATES DISTRICT COURT*

1   Q.   What did that mean to you?

2   A.   What did it mean?

3   Q.   If anything?

4   A.   Nothing.

5   Q.   It didn't mean to you that perhaps you were one of the

6   heavies on the case?

7   A.   Perhaps.

8   Q.   It did mean that, correct?

9   A.   Perhaps.

10  Q.   You were a Black Angel, correct?

11  A.   Yes.

12  Q.   You ran the gang on the streets, correct?

13  A.   Yes.

14  Q.   You ran the gang for members of the Black Angels who

15  were also members of the Mexican Mafia, correct?

16  A.   Yes.

17  Q.   Why did you decide to cooperate?

18  A.   Because I believed it was the right thing to do, and I

19  was hoping to one day come out to see my family.

20  Q.   So you decided at some point when you were in jail that

21  it was the right thing to do, and you hoped to one day come

22  out and see your family?

23  A.   Yes.

24  Q.   Now, when you met with your lawyer -- I don't want you

25  to tell us what your lawyer told you, I'm sorry.

*UNITED STATES DISTRICT COURT*

1          When you -- when you -- as you evaluated your case, you

2    and your attorney talked about what you were looking at in

3    terms of jail time, correct?

4          MS. EL-AMAMY:  Objection, calls for attorney/client

5    communications.

6          THE COURT:  Sustained.

7    BY MR. NAVARRO:

8    Q.    Now, you know, as Mr. Cephas asked you, that you pled

9    guilty to a conspiracy and to narcotics charges, correct?

10   A.    Yes.

11   Q.    And the narcotics alone carry maybe 30 years to life?

12   A.    Possibly.

13   Q.    And you know that you may be perceived by the government

14   to be a leader of the gang, correct?

15   A.    I may be perceived?

16   Q.    Or you are a leader of the gang according to the

17   government, correct?

18   A.    Yes.

19   Q.    And that could mean more jail time?  Did anyone tell you

20   about that?

21   A.    Didn't --

22         MS. EL-AMAMY:  Objection, calls for attorney/client

23   communications.

24         THE COURT:  To the extent that this information came

25   to you through discussions with your lawyer, you need not

*UNITED STATES DISTRICT COURT*

1    answer.

2    BY MR. NAVARRO:

3    Q.    Now, are you aware that as a gang leader, you can get

4    more jail time than just a regular gang member?

5    A.    Possibly.

6    Q.    So that means that as a leader of a gang, who was drug

7    dealing in the RICO conspiracy, you could face 30 years to

8    life in this case; is that correct?

9    A.    Yes.

10   Q.    You know that's your starting point, correct?

11   A.    Um -- not --

12   Q.    What is your starting point if you know?

13   A.    I don't exactly know.

14   Q.    You don't exactly know?

15   A.    No.

16   Q.    And yet you pled guilty without exactly knowing?

17   A.    At that time I didn't know what my starting point was.

18   Q.    Do you know now?

19   A.    I know now what I signed to, yes.

20   Q.    What did you sign to?

21   A.    The RICO and conspiracy to distribute.

22   Q.    So from your understanding, what are you looking at in

23   terms of jail time?

24   A.    The guidelines that I signed for was 17 to 22 years.

25   Q.    Seventeen to 22 years.

*UNITED STATES DISTRICT COURT*

1        Now, in your case in your plea agreement, you're also --

2    you also have what's called a mandatory minimum, are you

3    aware of that?

4    A.    Yes.

5    Q.    And what is that minimum?

6    A.    Ten years.

7    Q.    And what does that mean to you, 10 years?  From your

8    understanding?

9    A.    That the mandatory minimum I might do, minimum of

10   10 years.

11   Q.    You might do?

12   A.    Yes.

13   Q.    How might you not do 10 years?  If you know?

14   A.    No.

15   Q.    Now, since you're facing a mandatory minimum of 10

16   years, are you aware, unless the government files a motion

17   with this judge telling him that he can go under 10 years,

18   you will have to do 10 years in the federal prison, are you

19   aware of that?

20   A.    Yes.

21   Q.    Now, when did you move to -- you are no longer in

22   San Bernardino, correct?

23   A.    No.

24   Q.    When did you move out of that facility?

25   A.    I believe it was November of 2010.

*UNITED STATES DISTRICT COURT*

1    *Q.*    And where did you go after that, what facility?

2    *A.*    To the Metropolitan Detention Center in L.A.

3    *Q.*    Now, when you got to the MDC, did you have a tattoo put

4    on your back?

5    *A.*    Yes.

6    *Q.*    What did the tattoo say?

7    *A.*    Belmont Street.

8    *Q.*    What is Belmont Street?

9    *A.*    Um -- street located in the neighborhood.

10   *Q.*    In the Ontario neighborhood that you grew up in,

11   correct?

12   *A.*    Yes.

13   *Q.*    And you testified, I believe it was yesterday, that

14   Belmont and Sunkist are two of the main streets associated

15   with the Black Angels, correct?

16   *A.*    Yes.

17   *Q.*    And when you got to MDC -- after you decided to

18   cooperate, correct?

19   *A.*    Yes.

20   *Q.*    -- you put on a Belmont Street tattoo on your back,

21   correct?

22   *A.*    Yes.

23   *Q.*    Now, did you tell Ms. El-Amamy this?

24   *A.*    No.

25          MR. NAVARRO:  If I could have a second, your Honor?

**UNITED STATES DISTRICT COURT**

1        THE COURT:  We're about to take our break anyway.

2        MR. NAVARRO:  Do you want to do it now?

3        THE COURT:  We can.

4        MR. NAVARRO:  That will be perfect.

5        THE COURT:  Then you can ponder your next move.

6        MR. NAVARRO:  Thank you.

7        THE COURT:  Ladies and gentlemen, we're going to take

8   our first morning break.  We'll come back at precisely

9   10 a.m.

10       Remember the admonition.  Do not talk about this case

11  among yourselves, please.

12       *(The following proceedings were held outside the*

13  *presence of the members of the jury and the alternates.)*

14                      --o0o--

15       MR. CEPHAS:  Your Honor --

16       THE COURT:  Does this need to be on the record?

17       MR. CEPHAS:  I don't think so.

18       (Off the record at 9:45 a.m.  Back on the record at

19  10:01 a.m.)

20                      --o0o--

21       *(The following proceedings were held in the presence*

22  *of the members of the jury and the alternates.)*

23                      --o0o--

24       THE COURT:  All right.  On the record.  Counsel, the

25  defendant, the jury is present.  Mr. Navarro has resumed his

*UNITED STATES DISTRICT COURT*

1    seat on the witness stand.

2         Mr. Navarro, you may continue your cross.

3         MR. NAVARRO:  Thank you, your Honor.

4    BY MR. NAVARRO:

5    Q.   Now, Mr. Navarro, I wanted to ask you a couple more

6    questions about your brother, Cricket.

7         MS. EL-AMAMY:  Objection, your Honor, relevance.

8         THE COURT:  Sustained.

9    BY MR. NAVARRO:

10   Q.   Now, Cricket, you testified during direct, your brother

11   is no longer banging, correct?

12        MS. EL-AMAMY:  Objection, your Honor, same objection.

13        MR. NAVARRO:  Your Honor, she asked questions during

14   direct about --

15        THE COURT:  I'm asking you to now move on to

16   something that has to do with this case.

17        MR. NAVARRO:  I haven't asked this last question,

18   your Honor.

19        THE COURT:  I think we all heard where it was going.

20   BY MR. NAVARRO:

21   Q.   Is your brother a drug dealer?

22        MS. EL-AMAMY:  Same objection, your Honor.

23        THE COURT:  Apparently what I'm saying matters not to

24   you one bit.

25        MR. NAVARRO:  It does matter.  I apologize.  I just

**UNITED STATES DISTRICT COURT**

1    wanted to ask one question.  As you know, we spent more than

2    a day with the government, and I've spent about half an hour,

3    your Honor.

4           THE COURT:  Ask your question.

5    BY MR. NAVARRO:

6    Q.   Now, you also testified that as a member of the gang, it

7    wasn't clear to me whether it was when you were OVS or Junior

8    Black Angel or Black Angel, you were involved in jumping in

9    other individuals.

10          Do you remember that testimony?

11   A.   Yes.

12   Q.   You testified that you jumped -- from what you can

13   recall -- at least five people -- at least five individuals

14   into the gang, correct?

15   A.   Yes.

16   Q.   Were you a Black Angel at that time or were you --

17   what -- what period of time was this?

18   A.   Um -- throughout all when I was OVS, Junior BA, and BA.

19   Q.   And when you jump someone in, you beat them, correct?

20   A.   Yes.

21   Q.   You punch them?

22   A.   Yes.

23   Q.   You kick them?

24   A.   No.

25   Q.   Just punch them?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    And do they defend themselves?

3    A.    Yes.

4    Q.    How many guys do the jumping in?

5    A.    Depends what rank they're getting into.

6    Q.    On average, how many guys do the beating?

7    A.    For OVS, usually three.

8    Q.    How about -- but once they join OVS, they don't get

9    jumped into the Junior Black Angels, do they?

10   A.    Yes.

11   Q.    Oh, so they're beaten a second time?

12   A.    Yes.

13   Q.    And once they become Black Angels, they're beaten a

14   third time?

15   A.    No.

16   Q.    So only for the first two levels?

17   A.    Yes.

18   Q.    When someone is being jumped into OVS, there's three

19   other gang members who beat the prospect, correct?

20   A.    Yes.

21   Q.    What about when they're going to become Junior Black

22   Angels?

23   A.    It's usually everybody that's in attendance at the

24   meeting.

25   Q.    So it could be more than three?

*UNITED STATES DISTRICT COURT*

A.    Yes.

Q.    And how long do the beatings last?

A.    Usually goes for a couple seconds with each person.

Q.    Now, Mr. Cephas asked you questions about some of the conduct that you were not required to specifically admit in the plea agreement.

Do you remember those questions?  He asked you about the homicides?

A.    Yes.

Q.    And Mr. Cephas asked you first about an incident involving a black male who was ran over, correct?

Do you remember that?

A.    Yes.

Q.    And although you did not -- you were not the driver, you were in the car when that happened, correct?

A.    Yes.

Q.    Now, in addition to that, there were three other homicides, not two as Mr. Cephas may have asked you, correct?

A.    Three other homicides where?

Q.    Well, with regard to the individual with -- with the African-American male, do you know if he died?

A.    No.

Q.    You don't know if he died?

A.    I don't know.

Q.    There was the incident with Alex Rios, do you remember

1    that one?

2    A.    No.

3    Q.    Did I miss -- I'm sorry, Eric Rios.  I apologize.

4    A.    Yes.

5    Q.    Now, Eric Rios, was he a Black Angel?

6    A.    Yes.

7    Q.    And there was a vote, and it was approved, and he was

8    killed, correct?

9    A.    Yes.

10   Q.    He was shot?

11   A.    Yes.

12   Q.    That's one homicide, correct?

13   A.    Yes.

14   Q.    Now, there was an incident where you were at a

15   nightclub, do you remember that incident?

16   A.    Yes.

17   Q.    And somebody got killed after that, do you remember

18   that?

19   A.    Yes.

20   Q.    Now, you were involved in that murder as well, correct?

21   A.    Not directly involved, no.

22   Q.    Not directly?

23   A.    No.

24   Q.    You didn't shoot the guy?

25   A.    No.

*UNITED STATES DISTRICT COURT*

1    Q.    But you were there when the guy was getting beaten up

2    before he got killed, correct?

3    A.    Yes.

4    Q.    Now, were you ever charged with that murder?

5    A.    No.

6    Q.    This was in 2009, correct?

7    A.    Yes.

8    Q.    A year before you got arrested?

9    A.    Around there, yes.

10   Q.    About a year before you decided to cooperate?

11   A.    Maybe a little bit more than a year.

12   Q.    But less than two years?

13   A.    Yes.

14   Q.    Then there was the final murder when the individual was

15   killed for asking some Black Angels to lower the music on the

16   radio, correct?

17   A.    Yes.

18   Q.    So Mr. Cephas asked you about three incidents --

19         MS. EL-AMAMY:  You're showing those on the Elmo.

20         MR. NAVARRO:  Sorry.

21         MS. EL-AMAMY:  That's okay.

22   BY MR. NAVARRO:

23   Q.    So Mr. Cephas asked you about three incidents when, in

24   fact, there were four, correct?

25   A.    Four total?

*UNITED STATES DISTRICT COURT*

1  *Q.*   Yes.  Three murders and one beating, or someone getting
2  run over?
3  *A.*   Yes.
4  *Q.*   Now, in your plea agreement those acts are not
5  referenced, correct?
6  *A.*   No.
7  *Q.*   Now, when you met with the government, the very first
8  time you met with them, did they give you what's called a
9  queen for a day letter?
10     Do you know what that is?
11 *A.*   No.
12 *Q.*   Did they give you a letter -- a two-page document that
13 you and your lawyer signed?  Do you remember that?
14 *A.*   I remember signing a document.
15 *Q.*   That everything you said would not be used against you?
16 *A.*   I don't -- I don't remember, no.
17 *Q.*   But you did sign a document that day?
18 *A.*   Yes.
19 *Q.*   But it wasn't your plea agreement, it was something
20 different?
21 *A.*   Yes.
22 *Q.*   Now, when you met with the government, what was your
23 understanding of the meeting -- the first meeting with the
24 government?
25 *A.*   My understanding of it?  That I was there to tell them

1    everything that I knew, and tell them the truth.

2    Q.    Now, prior to that you had obviously discussed this with

3    your attorney, correct?

4    A.    Yes.

5    Q.    And as you testified, you wanted to get back to your

6    family and lower your sentence?

7    A.    No.

8    Q.    What are your goals in this cooperation?

9    A.    To one day be out there with my family, and to do the

10   right thing.

11   Q.    What -- what is doing the right thing mean to you?

12   A.    Doing the right thing by redeeming myself of all the bad

13   things that I've done and coming forward with the truth.

14   Q.    And since you now are trying to redeem yourself and come

15   forward with the truth, have you contacted Mr. Rios' family

16   and apologized to his mother?

17   A.    No.

18   Q.    What about the African-American individual who was run

19   over, have you called his family or made efforts to call his

20   family?

21   A.    No.

22   Q.    What about the individual at the nightclub, have you

23   made any efforts to contact his family?

24   A.    No.

25   Q.    What about the fourth individual who was shot for

*UNITED STATES DISTRICT COURT*

1   telling you guys to lower the music, have you called his

2   family to apologize to them?

3   A.    No.

4   Q.    Have you written letters to any of them?

5   A.    No.

6   Q.    Do you have access to writing letters at the jail?

7   A.    Yes.

8   Q.    And government counsel played you a number of phone

9   calls.  She played you one -- I'm only going to refer to one,

10  I think it was Exhibit 146-A.

11       Do you have that in front of you?

12       MR. NAVARRO:  If you could have 146-A in front of

13  him, that would be great.

14       Your Honor, this document has been previously

15  admitted.

16       THE COURT:  Yes.

17  BY MR. NAVARRO:

18  Q.    Do you see that, Mr. Navarro?

19  A.    Yes.

20  Q.    Do you recall the -- what this call was about between

21  you and Ms. Medina?

22  A.    Yes.

23  Q.    You were talking about the arrest of Carlos Rivera?

24  A.    Yes.

25  Q.    And during this telephone call, you were discussing

*UNITED STATES DISTRICT COURT*

1   whether an individual who had been arrested with him had

2   cooperated; isn't that correct?

3   A.   Yes.

4   Q.   And you were trying to figure out if he was cooperating,

5   correct?

6   A.   Yes.

7   Q.   And you didn't know?

8   A.   No.

9   Q.   Now, at that point, back in August of -- August 8th of

10  2009, you weren't cooperating, correct?

11  A.   No.

12  Q.   And at that point, I think at one point on Page 16, you

13  tell her if you need anything, you know, I'll -- whatever I

14  can do.

15       Do you see that language in the middle of Page 16?

16  A.   Yes.

17  Q.   Now, at that point in time -- not now, but at that point

18  in time, was Carlos Rivera a friend of yours?

19  A.   Yes.

20  Q.   Between then and now, has Carlos Rivera done anything to

21  damage your friendship with him?

22  A.   No.

23  Q.   If you know, the individual that you were referring to

24  in this phone call, did he cooperate against Carlos Rivera?

25  A.   I wasn't sure.

*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| 1 | Q.   I'm sorry? |
| 2 | A.   I'm not sure. |
| 3 | Q.   But you did, correct? |
| 4 | A.   I did what? |
| 5 | Q.   You did cooperate against Carlos Rivera, correct? |
| 6 | A.   Against him? |
| 7 | Q.   Yes. |
| 8 | A.   Yes. |
| 9 | Q.   Now, during the time that you were a member of the gang, |
| 10 | in addition to the homicides we discussed, you were also |
| 11 | involved in other activity on behalf of the gang, correct? |
| 12 | A.   Yes. |
| 13 | Q.   You were -- you worked your way up the ranks; isn't that |
| 14 | correct? |
| 15 | A.   Yes. |
| 16 | Q.   When one of the gang members was killed, you were |
| 17 | promoted to leader of the gang on the street, correct? |
| 18 | A.   Yes. |
| 19 | Q.   And you were promoted by a member of the gang who was |
| 20 | also a member of the Mexican Mafia, correct? |
| 21 | A.   Yes. |
| 22 | Q.   And this was important to you, correct? |
| 23 | A.   Yes. |
| 24 | Q.   Why was it important? |
| 25 | A.   Because I didn't want somebody that was doing the wrong |

*UNITED STATES DISTRICT COURT*

1    thing or running the gang the wrong way to have leadership to

2    the gang.

3    Q.    And the person that you had replaced was Manuel Vega; is

4    that correct?

5    A.    Yes.

6    Q.    He had been doing things the wrong way, correct?

7    A.    He had done some things wrong.

8    Q.    And therefore he was killed?

9    A.    I don't know the reason why he was killed.

10   Q.    You don't know why he was killed?

11   A.    No.

12   Q.    You never talked to anybody about why he was killed?

13   A.    I talked to them about what I thought he might have got

14   killed by.

15   Q.    Fair enough.

16         Now, as a -- as a street leader of the gang, you were

17   going to be in charge of a lot of -- a lot of gang members,

18   correct?

19   A.    Yes.

20   Q.    Approximately how many, if you know?

21   A.    More or less whoever was in the streets at that time.

22   Q.    And is there a number that you can give us?

23   A.    Maybe a total of 40, 50 maybe.

24   Q.    So you were in charge of approximately 40 to 50 gang

25   members, correct?

*UNITED STATES DISTRICT COURT*

1    *A.*    Yes.

2    *Q.*    And one of your duties was to make sure that they were

3    putting in work for the gang, correct?

4    *A.*    Yes.

5    *Q.*    That they were abiding by the gang's rules, correct?

6    *A.*    Yes.

7    *Q.*    You testified about those rules yesterday.  You can't

8    snitch, correct?

9    *A.*    Yes.

10    *Q.*    You can't be homosexual?

11    *A.*    Yes.

12    *Q.*    You have to put in work?

13    *A.*    Yes.

14    *Q.*    Other rules?

15    *A.*    Stay loyal to the gang.

16    *Q.*    And you were also put in charge of collecting payments

17    on behalf of the gang, correct?

18    *A.*    Yes.

19    *Q.*    And you were obtaining extortion money from gang

20    members, correct?

21    *A.*    No.

22    *Q.*    Now, were the gang members from either OVS or Junior

23    Black Angels, were they giving you money directly?  Did they

24    collect it?

25    *A.*    No.

*UNITED STATES DISTRICT COURT*

1    Q.    So you were collecting money from drug dealers yourself?

2    A.    Yes.

3    Q.    And when did this start?  What year, if you remember?

4    A.    In two thousand -- the beginning of 2009.

5    Q.    So from the beginning of 2009 to April of 2010, you were

6    the man on the street for the Black Angels, correct?

7    A.    Yes.

8    Q.    And during that time, you collected money from a number

9    of drug dealers, correct?

10   A.    Yes.

11   Q.    How many of those did you beat up?

12   A.    None.

13   Q.    You never had to beat one of them up?

14   A.    No.

15   Q.    Why is that?

16   A.    Because they all abided.  They all contributed.

17   Q.    And why did they all contribute and abide?

18   A.    Why?

19   Q.    Yes.  If you know.

20   A.    Because they're selling drugs.

21   Q.    Isn't it because they're afraid of you?

22   A.    Possibility.

23   Q.    Possibility?

24   A.    Mmmm-hmmm.

25   Q.    So you don't think the fact that you were a gang member,

*UNITED STATES DISTRICT COURT*

1    that you were a leader of a gang had anything to do with

2    people paying you money?

3    A.    Possibility.

4    Q.    You think it's a possibility.  Isn't it a reality?

5    A.    I don't believe every single person might have been

6    afraid.

7    Q.    Did anyone refuse to pay you?

8    A.    No.

9         MR. NAVARRO:  Now, your Honor, I'm going to place on

10    the overhead, your Honor, Exhibit 259 that's previously been

11    admitted.

12         THE COURT:  Anything that's already in, display it at

13    your pleasure.

14         MR. NAVARRO:  Thank you.

15         *(The exhibit was displayed on the screen.)*

16    BY MR. NAVARRO:

17    Q.    Do you recognize this, Mr. Navarro?

18    A.    Yes.

19    Q.    Now, these are your tattoos, correct?

20    A.    Yes.

21    Q.    Now, we don't see the two for Belmont Street here,

22    correct?

23    A.    No.

24    Q.    This one was taken before?

25    A.    Yes.

1    *Q.*    Now, is the Belmont Street tattoo on the left side of

2    your back or the right side of your back?

3    *A.*    All across my back.

4    *Q.*    So it's all across your back, but we have a tattoo -- we

5    have a close-up here.  I wonder if I can zoom in?

6         Now, that's a close-up of your back, correct?

7    *A.*    Yes.

8    *Q.*    Is it below your pants then?

9    *A.*    It's under the Ontario.

10   *Q.*    So under Ontario you have now Belmont?

11   *A.*    Yes.

12   *Q.*    Does it run all across your back?

13   *A.*    Yes.

14   *Q.*    Now, these tattoos in your back, you didn't get them all

15   at one time, correct?

16   *A.*    No.

17   *Q.*    You get these tattoos over time, correct?

18   *A.*    Yes.

19   *Q.*    For a number of reasons, money, correct?  It costs money

20   to put tattoos on, correct?

21   *A.*    Yes.

22   *Q.*    There's also pain associated with putting tattoos on,

23   correct?

24   *A.*    Yes.

25   *Q.*    You want the tattoos to heal, correct?

*UNITED STATES DISTRICT COURT*

1   A.   Yes.

2   Q.   You don't want to put too many things at once, it might

3   not come out right, correct?

4   A.   Possibility.

5   Q.   Aside from these tattoos and aside from the Belmont, any

6   other tattoos since you've been in custody?

7   A.   No.

8   Q.   I'm going to place before you Exhibit 172.

9        *(The exhibit was displayed on the screen.)*

10   Q.   Do you see this right here?  This is some tagging that

11   you did, correct?

12   A.   Yes.

13   Q.   And government counsel showed you other photographs of

14   tagging that you did as well, correct?

15   A.   Yes.

16   Q.   Now, have you made any efforts to contact the City of

17   Ontario or the property owners about cleaning up some of that

18   mess?

19   A.   No.

20   Q.   I want to make sure I have this straight.  You testified

21   earlier today that an 8-ball was 7 grams, correct?

22   A.   Yes.

23        MR. NAVARRO:  Your Honor, I have no further questions

24   at this time.

25        THE COURT:  All right.  Mr. Walsh.

*UNITED STATES DISTRICT COURT*

1          MR. WALSH:  Thank you.

2                    ***CROSS-EXAMINATION***

3     BY MR. WALSH:

4     *Q.*    My client, Jessica Medina, is not a member of the Black

5     Angels gang, is she?

6     *A.*    No.

7     *Q.*    And she's not a member of Ontario Varrio Sur gang, is

8     she?

9     *A.*    No.

10    *Q.*    And she's not a Junior Black Angel, is she?

11    *A.*    No.

12    *Q.*    Are there any women members of Black Angels, Junior

13    Black Angels, or Ontario Varrio Sur?

14    *A.*    Not anymore.

15    *Q.*    You've never bought drugs from Jessica Medina in the

16    past, have you?

17    *A.*    No.

18    *Q.*    And you never sold drugs to Jessica Medina in the past,

19    have you?

20    *A.*    No.

21    *Q.*    Were you ever present at a gang meeting in which Jessica

22    Medina was also present at the meeting?

23    *A.*    No.

24    *Q.*    Have you ever seen any gang tattoos on Jessica Medina?

25    *A.*    No.

*UNITED STATES DISTRICT COURT*

1    Q.    How well did you know Jessica Medina prior to your being

2    arrested?

3    A.    Pretty well.

4    Q.    How often did you see her?

5    A.    Every now and then when I used to go over their house to

6    see Carlos.

7    Q.    But when you went over to their house, you were mainly

8    going over there because Carlos Rivera was your friend,

9    right?

10   A.    Yes.

11   Q.    And when you'd go over to the house, you'd talk with

12   Carlos Rivera predominantly; is that correct?

13   A.    Yes.

14   Q.    Now, you've identified that one telephone call between

15   you and Jessica Medina earlier in your testimony, is that the

16   only telephone call that you've had with Jessica Medina?

17   A.    From what I remember, yes.

18   Q.    And you never had occasion, prior to that telephone

19   call, to call her specifically?

20   A.    No.

21   Q.    And for example, when you were calling the residence

22   that she lived at along with Carlos Medina (sic.), if you did

23   call that residence, you were calling to talk to Carlos

24   Medina (sic.); is that correct?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1          MS. EL-AMAMY:  Misstates testimony, Carlos Rivera.

2          MR. WALSH:  I'm sorry, Carlos Rivera.  I misspoke.

3    Let me ask it again.

4    BY MR. WALSH:

5    Q.   When you would call the residence of Carlos Rivera and

6    Jessica Medina, you would be calling to talk to Carlos Rivera

7    and not Jessica Medina; is that true?

8    A.   Yes.

9    Q.   And the one call that was played here in front of the

10   jury in which you were talking to Jessica Medina, was that a

11   call that she had called you?

12   A.   I believe so.

13   Q.   And was that the first time that you had heard that

14   Carlos Rivera had been arrested?

15   A.   Yes.

16   Q.   And that was about two days after the arrest?

17   A.   I'm not sure exactly.

18   Q.   And when you -- when you learned that Carlos Rivera had

19   been arrested, were you surprised?

20   A.   Yes.

21   Q.   And when you were offering if there was anything you can

22   do, to her, were you trying to be helpful because Mr. Rivera

23   was in jail and she might need some help?

24   A.   Yes.

25   Q.   And were you offering help in a noncriminal manner as a

**UNITED STATES DISTRICT COURT**

1    friend?

2         MS. EL-AMAMY:   Objection, calls for a legal

3    conclusion.

4         THE COURT:   Sustained.

5    BY MR. WALSH:

6    Q.   Were you offering to do any kind of family help, to

7    Jessica Medina, if she needed it?

8    A.   To her directly, yes.

9    Q.   And that offer was made out of friendship that you had

10   between yourself and Carlos Rivera?

11   A.   Yes.

12   Q.   And you knew that Jessica Medina had four children; is

13   that right?

14   A.   Yes.

15   Q.   So was your offer to help her with anything, did it have

16   anything to do with helping her with her family?

17   A.   One of the reasons, yes.

18   Q.   And is that something that gang members would do if one

19   gang member was placed under arrest and went into custody and

20   he'd left behind a wife and small children, that other gang

21   members would try to help the wife and small children with

22   expenses or any costs that they may have in raising the

23   family?

24   A.   Sometimes.

25   Q.   And was -- and was that what you were doing when you

1    offered to help her if she -- if she needed any help when she

2    called you and told you that Carlos Rivera had been arrested?

3    A.    One of the reasons, yes.

4    Q.    Now, on the day you were arrested, you were arrested at

5    your home; is that right?

6    A.    Yes.

7    Q.    And the other people that were at the home was your

8    wife; is that right?

9    A.    Yes.

10   Q.    And you had three small children at the time?

11   A.    Yes.

12   Q.    And what time was the arrest when the police came to

13   your home?

14   A.    Four in the morning.

15   Q.    And were you sleeping at the time they arrived?

16   A.    Yes.

17   Q.    And were there a large number of officers that came to

18   your house?

19   A.    Yes.

20   Q.    Do you recall how many?

21   A.    Maybe anywhere from 15 to 20.

22   Q.    And when you came to the door, did they have their guns

23   drawn?

24   A.    Yes.

25   Q.    Did they enter the house and search it?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    And was -- your wife and your children had to be removed

3    from the house?

4    A.    Yes.

5    Q.    Now, was your wife a member of the Black Angels gang?

6    A.    No.

7    Q.    Was she a member of any gang?

8    A.    No.

9    Q.    Did you involve your wife in gang activity while you

10   were a gang member before you had been arrested?

11   A.    No.

12   Q.    At the time that the police arrived at the house, did

13   you ask your wife to hide any drugs that were in the house?

14   A.    No.

15   Q.    Had you ever involved your wife in drug trafficking?

16   A.    No.

17   Q.    Did you advise your wife that you were selling drugs?

18   A.    No.

19   Q.    Did you tell your wife when you had large sums of cash

20   that this money was from drug money?

21   A.    No.

22   Q.    Or from the sale of drugs?

23   A.    No.

24   Q.    So -- so your gang activities of selling drugs was

25   something that you concealed from -- you intentionally

*UNITED STATES DISTRICT COURT*

1    concealed from your wife?

2    A.    Yes.

3    Q.    And is that something that gang members would do if they

4    had a wife and small children?

5    A.    Not all gang members, no.

6    Q.    Okay.  But that's something that you did; is that right?

7    A.    Yes.

8    Q.    And was there a reason that you were doing that?

9    A.    Yes.

10   Q.    What was the reason?

11   A.    To avoid problems with my wife.

12   Q.    To avoid having your wife get arrested?

13   A.    No.

14   Q.    Well, if you -- if you got arrested as a result of your

15   drug trafficking and your wife got arrested, then there would

16   be no one out of custody to take care of the children; isn't

17   that right?

18   A.    No.

19   Q.    Who would take care of the children if you and your wife

20   were arrested?

21   A.    Somebody from the family.

22   Q.    And would that be a good thing to have your children

23   raised from someone other than their mother and father?

24   A.    No.

25   Q.    Now, when you went over to the residence of Carlos

*UNITED STATES DISTRICT COURT*

1    Rivera and Jessica Medina, did you ever bring drugs over to

2    the residence?

3    A.    Yes.

4    Q.    And on how many occasions?

5    A.    Probably every single time I went.

6    Q.    And were these drugs that you were just having on your

7    person for your personal use?

8    A.    Yes.

9    Q.    So on those occasions when you'd bring drugs over to the

10   residence, you weren't engaging in a drug transaction with

11   Carlos Rivera at that time, were you?

12   A.    No.

13   Q.    Did you use drugs when you were over at the residence of

14   Carlos Rivera and Jessica Medina?

15   A.    Yes.

16   Q.    And where would you use them, inside the house or

17   outside the house?

18   A.    Outside the house.

19   Q.    And who were you in the company of at the time?

20   A.    Who was I with?

21   Q.    Yes.

22   A.    Sometimes alone, sometimes other gang members.

23   Q.    And how many occasions did you go over to the residence

24   of Carlos Rivera and Jessica Medina?

25   A.    Maybe anywhere from 15 to 20 times.

*UNITED STATES DISTRICT COURT*

1    Q.    In total?

2    A.    Yes.

3    Q.    And over what period of time leading up to the date of

4    Mr. Rivera's arrest on August 6th, 2010?

5    A.    I don't know exact dates.  Roughly anywhere between the

6    last two years that we were -- before we got incarcerated.

7    Q.    So during 2008 and 2009?

8    A.    Around there.

9    Q.    And how long had you known Mr. Rivera?

10   A.    From then until now.

11   Q.    And when was the first time that you met Jessica Medina?

12   A.    Um -- maybe a little bit after I met Carlos Rivera.

13   Q.    And where -- and where was it that you met her?

14   A.    I don't remember.

15   Q.    Well, were the only times that you came in contact with

16   Jessica Medina was when you were over at their house?

17   A.    No.

18   Q.    Where else would you come in contact with her?

19   A.    At other houses of their families.

20   Q.    And during social events?

21   A.    Yes.

22   Q.    And what are the houses and what are the families?

23   A.    I don't -- I don't remember who lived there, but it was

24   just for get-togethers.

25   Q.    So it would be a get-together like a party?

*UNITED STATES DISTRICT COURT*

1    A.    Barbecue, yeah.

2    Q.    And on these occasions they would be entirely social

3    events?

4    A.    Yes.

5    Q.    And Carlos Rivera would arrive, and he would also be in

6    the company of Jessica Medina?

7    A.    Yes.

8    Q.    Would they bring the children with them to these

9    barbecues?

10    A.    Yes.

11    Q.    And during these social events or these barbecues, you

12    weren't engaged in drug trafficking on that occasion, were

13    you?

14    A.    No.

15    Q.    Now, you told us that you had a controlling felony

16    offense which resulted in your going to state prison; is that

17    right?

18    A.    Yes.

19    Q.    And how many prior felony convictions do you have at the

20    present time?

21         Separate from the two that you've pled guilty to in this

22    case, how many prior convictions do you have?

23    A.    Prior felony convictions?

24    Q.    Yes.

25    A.    Maybe two or three.

*UNITED STATES DISTRICT COURT*

1    Q.    And do you remember the names of those crimes?

2    A.    I believe so, yes.

3    Q.    And what are they?

4    A.    Assault with a firearm on a person, a felony evading,

5    and battery.

6    Q.    And felony battery?

7    A.    Yes.

8    Q.    And did -- did you suffer these three prior felony

9    convictions on separate occasions or was it all at one time?

10   A.    Separate occasions.

11   Q.    And which one was the controlling offense which

12   ultimately resulted in your being placed in state prison?

13   A.    Assault with a firearm on a person.

14   Q.    You've never been -- aside from the charges in this

15   case, you've never been arrested and charged with drug

16   trafficking, have you?

17   A.    No.

18   Q.    But yet you've sold drugs on numerous occasions in the

19   past; is that right?

20   A.    Yes.

21   Q.    And these are occasions where you successfully committed

22   the crimes and were not arrested; is that right?

23   A.    Yes.

24   Q.    And how many occasions do you think that happened?  How

25   many drug transactions?

*UNITED STATES DISTRICT COURT*

1   A.    Maybe anywhere from 20, 25.

2   Q.    Now, when you were first arrested in this case, you

3   were -- you were handcuffed at your home; is that right?

4   A.    Yes.

5   Q.    And were you asked by the police any questions?

6   A.    Yes.

7   Q.    Okay.  And did they ask you to tell them about your

8   involvement in the Black Angels?

9   A.    No.

10  Q.    What kind of questions were you asked at that time?

11  A.    Who else was in the house, and if I had anything illegal

12  in the house.

13  Q.    And did you have anything illegal in the house?

14  A.    Yes.

15  Q.    And what did you respond when you talked to the

16  officers?

17        Did you tell them the truth?

18  A.    No.

19  Q.    And what did you tell them?

20  A.    That I didn't have nothing illegal.

21  Q.    And that was a lie?

22  A.    Yes.

23  Q.    And your reason for lying to the officers at that time

24  was what?

25  A.    Not -- not to cooperate with them.

*UNITED STATES DISTRICT COURT*

1    Q.    You were hoping they wouldn't find something illegal in

2    your house; is that right?

3    A.    No.

4    Q.    Well, what was -- what was illegal in your house?

5    A.    Marijuana.

6    Q.    So the -- the marijuana that you had concealed on your

7    body, that was only a part of the marijuana that was in the

8    house?

9    A.    Yes.

10   Q.    How much marijuana was in the house?

11   A.    Maybe total of a quarter ounce.

12   Q.    And that was your marijuana; is that right?

13   A.    Yes.

14   Q.    And you -- and you were hoping that by lying to the

15   police, that they wouldn't charge you with that marijuana?

16   A.    No.

17   Q.    Well, when they asked you if you had something illegal

18   in the house and you told them nothing, what was your

19   motivation at that point in time in lying to the police?

20   A.    Just not to confess what I had inside the house.

21   Q.    Okay.  Because you thought if you confessed, you might

22   get charged with it and you would get more of a sentence; is

23   that right?

24   A.    No.

25   Q.    You wanted to get charged with the marijuana in the

*UNITED STATES DISTRICT COURT*

1  house?

2  A.    No.

3  Q.    And you -- you knew that if you confessed to the

4  marijuana being yours, that there was a likelihood that you

5  would be charged with it, didn't you think that?

6  A.    There's a possibility.

7  Q.    And by lying to the police, there was also a possibility

8  that you wouldn't get charged with it; is that right?

9  A.    No.

10 Q.    Well, if you lied to the police and you were charged

11 with it, you'd have a better case, possibly, in court to try

12 and beat the case; isn't that right?

13 A.    Yes.

14 Q.    So there was some benefit to you personally in lying to

15 the police on the day that you got arrested; isn't that

16 right?

17 A.    No.

18 Q.    No benefit at all?

19 A.    No.

20 Q.    So -- so you -- so when the police asked you if there

21 was something illegal in the house and you lied to them, you

22 just lied to them for no reason because that's -- that's your

23 character?

24 A.    I just didn't want to confess that I had marijuana in

25 the house.

*UNITED STATES DISTRICT COURT*

1   Q.   Did the officers locate the marijuana inside the house

2   and show it to you?

3   A.   They -- they found it, but they didn't show it to me.

4   Q.   And after they found it, did they question you again

5   concerning the fact that they found marijuana in the house

6   and ask you if it was yours?

7   A.   No.

8   Q.   After you were arrested, then were you placed in

9   custody?

10  A.   Yes.

11  Q.   And were you -- were you granted bail by the Court?

12  A.   No.

13  Q.   Did you -- did you ask for bail?

14  A.   Yes.

15  Q.   And bail was denied?

16  A.   Yes.

17          THE COURT:  May I see counsel?

18          *(The following proceedings were held at sidebar.)*

19          THE COURT:  Okay.  I'm worried about time.

20  Mr. Cephas has some police officers --

21          MR. CEPHAS:  Oh, no.  No.  I'm sorry, your Honor.  We

22  talked and decided that we no longer need them.

23          THE COURT:  Okay.  So we don't have an issue

24  anymore?

25          MR. CEPHAS:  No.

*UNITED STATES DISTRICT COURT*

1          THE COURT:  So we can ramble about minutia now?

2          MR. CEPHAS:  I apologize, your Honor.

3          THE COURT:  No.  That's okay.  That's fine.  Thanks.

4          *(The sidebar proceedings were then concluded.)*

5          THE COURT:  Sorry Mr. Walsh.

6   BY MR. WALSH:

7   Q.    On the day that you were arrested and the police found

8   the marijuana in your house, did they arrest your wife?

9   A.    No.

10  Q.    So she wasn't arrested for the marijuana?

11  A.    No.

12  Q.    Where was the marijuana that was in your house?

13  A.    In my drawer.

14  Q.    In your -- um -- in a bedroom drawer?

15  A.    Yes.

16  Q.    Now, after you were asked -- after you asked for bail,

17  and you were denied bail, and you were kept in custody,

18  what -- what jail were you taken to?

19  A.    San Bernardino.

20  Q.    Okay.  And you were there for several months before you

21  decided to cooperate; is that right?

22  A.    Yes.

23  Q.    How many months were you in -- well, let me ask you

24  this.  Did your location change from San Bernardino Jail to

25  another jail?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    And what was the other jail?

3    A.    The Metropolitan Detention Center in L.A.

4    Q.    And when did that transfer occur?

5    A.    In November.

6    Q.    So from April of 2010 to November of 2010, you're in the

7    San Bernardino County Jail, right?

8    A.    Yes.

9    Q.    And during those months -- that's approximately seven

10   months; is that right?

11   A.    Yes.

12   Q.    Did you have any meetings with the government concerning

13   cooperation during that first seven-month period?

14   A.    Yes.

15   Q.    And when was the first meeting that you had with the

16   government concerning your cooperation?

17   A.    I don't -- I don't remember the exact date.

18   Q.    If you -- do you remember the month?  Was it closer to

19   April or closer to November?

20   A.    Maybe closer to November.

21   Q.    And at your first meeting with the government, what were

22   you -- what were you trying to accomplish?

23   A.    Coming home -- coming home to my family one day, and

24   coming forward with the truth.

25   Q.    By coming home for your family, were you hoping that

*UNITED STATES DISTRICT COURT*

1   they would give you bail?

2   A.   Yes.

3   Q.   And did you tell them that that's what you were there

4   for, you wanted to cooperate to see what they could do for

5   you?

6   A.   No.

7   Q.   Did you tell them that you wanted to be released on

8   bail?

9   A.   No.

10   Q.   Were you hoping that you could be released on bail if

11   you cooperated?

12   A.   Yes.

13   Q.   And did that happen?

14   A.   No.

15   Q.   You continued to remain in custody even as of today; is

16   that right?

17   A.   Yes.

18   Q.   Now, when you first met with the government in order to

19   discuss cooperating, did they tell you that you had to plead

20   guilty right away?

21   A.   No.

22   Q.   Did they offer you a plea bargain right away?

23   A.   No.

24   Q.   What was the first thing that happened when you met with

25   the government?

*UNITED STATES DISTRICT COURT*

1          What -- what was going on at that meeting?

2   A.    We sat down and they started asking me questions about

3   the case.

4   Q.    And you answered all their questions?

5   A.    Yes.

6   Q.    And how many of these meetings did you have with the

7   government?

8   A.    Total maybe five, six.

9   Q.    And did the meetings all go the same -- in the same

10  manner?

11  A.    Yes.

12  Q.    Okay.  They would ask you questions about the case and

13  you would answer their questions?

14  A.    Yes.

15  Q.    Okay.  And what -- did the subject of your entering into

16  a plea bargain come up?  Were you offered a plea bargain?

17  A.    Eventually, yes.

18  Q.    And when did that occur?

19  A.    Sometime in two thousand -- towards the end of 2011.

20  Q.    Okay.  Was it about in August of 2011?

21  A.    Maybe around there.

22  Q.    And -- and you were trying to enter into a plea bargain

23  and hoping that the plea bargain, coupled with your

24  cooperation, would result in a lesser sentence in your case;

25  is that right?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    And you -- you pled guilty to a lesser number of charges

3    that were charged against you?

4    A.    No.

5    Q.    No.  You only had two charges against you?

6    A.    I believe it was three.

7    Q.    And didn't you just plead to two charges?

8    A.    Yes.

9    Q.    So what's going to happen to the other charge, it's

10   going to be dismissed?

11   A.    I don't know.  I just -- I know I signed for two

12   charges.

13   Q.    Okay.  And what -- what were those two charges?

14   A.    RICO and conspiracy to distribute.

15   Q.    And these -- these are both offenses that carry a

16   maximum penalty of life imprisonment; is that right?

17   A.    Yes.

18   Q.    And you don't want to serve life in prison, do you?

19   A.    No.

20   Q.    In fact, you'd like to get out today; isn't that true?

21   A.    I would like to.

22   Q.    Okay.  And wouldn't it be fair to say you'd do almost

23   anything in order to get out of jail; isn't that right?

24   A.    No.

25   Q.    No.  Well, would you lie to the police in order to get

*UNITED STATES DISTRICT COURT*

1    out of jail?

2    A.    Before my cooperation, yes.

3    Q.    In fact, you have done that, right?

4    A.    Before my cooperation, yes.

5    Q.    And on the day that you got arrested in this case,

6    that's not the first time that you lied to the police, is it?

7    A.    No.

8    Q.    And you've lied to the police in the past how many

9    times?

10   A.    Several times.

11   Q.    More than ten?

12   A.    Yes.

13   Q.    And on the occasion of those lies you were trying to

14   cover up your own criminal activity; is that right?

15   A.    Yes.

16   Q.    And you're trying to avoid getting arrested; is that

17   right?

18   A.    Yes.

19   Q.    And you knew if you got arrested, you'd have to go to

20   jail; is that right?

21   A.    Yes.

22   Q.    So essentially on these occasions in the past you were

23   lying to the police in order to stay out of jail; is that

24   right?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    Now, do you recall what precisely the benefit that

2    you're to receive out of the plea bargain that you entered

3    into?

4    A.    What was the question?

5    Q.    What exactly is the benefit that you're going to get

6    from entering into your plea bargain?  In your own words.

7    A.    The benefit?

8    Q.    Yes.

9    A.    I don't think there's any benefit.

10   Q.    Isn't there a concept known as substantial assistance

11   that you're familiar with?

12   A.    Yes.

13   Q.    Okay.  Isn't that a term that's in your plea agreement?

14   A.    Um -- I don't remember.

15   Q.    Well, don't you expect that if you provide information

16   to law enforcement and testify, that there's a -- there's an

17   expectation that the government would argue at the time of

18   your sentencing that you should receive a lesser sentence?

19   A.    I don't expect it to, no.

20   Q.    Okay.  But isn't that a part of your plea agreement?

21   A.    Isn't what a part of my plea agreement?

22   Q.    That if you provide substantial assistance, the

23   government may move for a reduction of your sentence and you

24   get a lighter sentence?

25   A.    No.

*UNITED STATES DISTRICT COURT*

1    Q.    Isn't that the whole purpose that you're cooperating, to

2    get a lighter sentence?

3    A.    My whole purpose, yes.

4    Q.    Okay.  And don't you remember your plea agreement, that

5    that was in your plea agreement that you wanted -- that you

6    were hoping that as a result of your cooperation that you'll

7    get a lighter sentence?

8    A.    My hopes, yes.

9    Q.    Isn't that part of your plea agreement?

10   A.    I don't remember details of the plea agreement.

11   Q.    Well, weren't you trying to accomplish something with

12   your plea agreement?

13   A.    Yes.

14   Q.    You were trying to -- trying to get out of jail; isn't

15   that right?

16   A.    Not with the plea agreement, no.

17   Q.    Well, wasn't that your -- well, wasn't that the only way

18   you were ever going to get out of jail is if you entered into

19   some sort of plea agreement and had the government make a

20   motion to give you a lighter sentence?

21   A.    I don't believe so.

22   Q.    Have you been sentenced yet?

23   A.    No.

24   Q.    Has your sentencing been postponed?

25   A.    I never got a date set for it.

*UNITED STATES DISTRICT COURT*

1   Q.   So it just hasn't been set?

2   A.   No.

3   Q.   Do you have an expectation as to when it will be set?

4   A.   No.

5   Q.   Isn't it true that you won't be sentenced until you're

6   finished with your cooperation?

7   A.   I believe so.

8   Q.   And isn't there a reason for that?

9   A.   I don't -- I don't know.

10  Q.   Well, don't you think it's possible that -- well, isn't

11  it true that the reason your sentence is being postponed is

12  because you're trying to cooperate as much as possible so you

13  can get the lowest possible sentence; isn't that true?

14  A.   On my behalf, yes.

15  Q.   And that's why you entered into the plea agreement,

16  isn't it?

17  A.   Isn't why I entered the plea agreement?

18  Q.   I'm sorry?

19  A.   You said is it why I entered the plea agreement?

20  Q.   Yes.   Isn't the reason you entered into the plea

21  agreement is you want to get out of jail and get the lowest

22  possible sentence; isn't that true?

23  A.   Yes.

24       MR. WALSH:  I have no further questions, your Honor.

25       THE COURT:  Redirect.

**UNITED STATES DISTRICT COURT**

1          MS. EL-AMAMY:  Yes.  At this time I'll ask the Court

2     to give the instruction previously discussed.

3          THE COURT:  All right.  Ladies and gentlemen, you

4     have heard testimony from Mr. David Navarro, a witness, who

5     has pled guilty to a crime arising out of the same events for

6     which the defendants are currently on trial.  This guilty

7     plea -- that is the guilty plea of Mr. Navarro, is not

8     evidence against any of the defendants in this case, and you

9     may consider his guilty plea only in determining

10    Mr. Navarro's believability.

11         For this reason, in evaluating the testimony of

12    Mr. Navarro, you should consider the extent to which, or

13    whether his testimony may have been influenced by his plea

14    agreement.  In addition, you should examine the testimony of

15    Mr. Navarro with greater caution than that of other

16    witnesses.

17                    ***REDIRECT EXAMINATION***

18    BY MS. EL-AMAMY:

19    Q.   Mr. Navarro, you talked about being arrested on April

20    21st, 2010.  Do you remember that date?

21    A.   Yes.

22    Q.   Were you the only member of your gang who was arrested

23    on that date?

24    A.   No.

25    Q.   How many members of your gang were arrested?

*UNITED STATES DISTRICT COURT*

1    A.    Members, maybe around 20 to 25.

2    Q.    Were you all arrested at the same date -- on the same

3    date?

4    A.    Yes.

5    Q.    At the same time?

6    A.    Yes.

7    Q.    Were you all brought to a location together?

8    A.    Yes.

9    Q.    Where was that location?

10   A.    The Ontario Police Department.

11   Q.    What happened when all of you were brought to the police

12   department?

13   A.    We were booked, pictures tooken, fingerprints taken.

14   Q.    Did you start talking amongst each other about why you

15   were all in the same place at the same time?

16   A.    Yes.

17   Q.    What did you guys talk about?

18   A.    Trying to find out what was going on.

19   Q.    What did you think was going on?

20   A.    Well, at first we weren't sure.

21   Q.    When did you find out?

22   A.    A little after we were there.

23   Q.    Where?

24   A.    At the police department.

25   Q.    How did you find out?

*UNITED STATES DISTRICT COURT*

1   A.    They -- we seen a -- I seen a paper with the charges

2   that we were being charged with.

3   Q.    What was that paper called?

4   A.    I don't know what it was called.

5   Q.    Did it list everyone who was being charged with a crime?

6   A.    The one that we seen -- that I seen at the police

7   department, no.

8   Q.    Did you eventually see something called an indictment?

9   A.    Yes.

10  Q.    Where did you see that indictment?

11  A.    At the courthouse in Riverside.

12  Q.    The same day?

13  A.    Yes.

14  Q.    What is an indictment?

15  A.    To --

16          MR. CEPHAS:  Objection, vague and ambiguous, calls

17  for a legal conclusion.

18          MR. WALSH:  And --

19          THE COURT:  Sustained.

20  BY MS. EL-AMAMY:

21  Q.    Did it have the names of all of the individuals who were

22  being charged?

23  A.    Yes.

24  Q.    Did it have other members of your gang on it?

25  A.    Yes.

*UNITED STATES DISTRICT COURT*

1   Q.   Approximately how many?

2   A.   Members of the gang?

3   Q.   Yes.

4   A.   Anywhere from 20 to 25.

5   Q.   Did it have members of the Mexican Mafia on it?

6   A.   Yes.

7   Q.   How many?

8   A.   Two.

9   Q.   Who were those Mexican Mafia members?

10  A.   Armando Barajas and Juan Gil.

11  Q.   Were they in court with you that day?

12  A.   Armando Barajas was.

13  Q.   Did it list all the crimes that all of you were charged

14  with?

15  A.   Yes.

16  Q.   How many people were charged with crimes in your

17  indictment?

18  A.   Fifty-one.

19  Q.   When you got to court, did you start talking with

20  members of your gang about what you were charged with?

21  A.   Yes.

22  Q.   What did you guys talk about?

23  A.   The details of the charges.

24  Q.   What specifically did you say?

25  A.   I myself said I was looking at the charges that I was

*UNITED STATES DISTRICT COURT*

1   being charged with and discussing it with them.

2   Q.   Did you guys talk about not cooperating?

3   A.   Yes.

4   Q.   What did you guys say?

5        MR. WALSH:  Objection, your Honor, hearsay.

6        THE COURT:  Sustained.

7   BY MS. EL-AMAMY:

8   Q.   What -- did you talk about the fact that you weren't

9   supposed to cooperate?

10  A.   Yes.

11       MR. WALSH:  Same objection, your Honor.

12       THE COURT:  Overruled.

13  BY MS. EL-AMAMY:

14  Q.   Did you guys talk about the fact that you weren't

15  supposed to cooperate?

16  A.   Yes.

17  Q.   Why was that?

18  A.   Because that's one of the main rules of the gang.

19  Q.   What did you believe would happen if you started

20  cooperating?

21  A.   What happened --

22  Q.   If you started to cooperate?  If you cooperated?

23  A.   With myself?

24  Q.   Yes.

25  A.   I would be killed.

*UNITED STATES DISTRICT COURT*

1   Q.   So after you went to court that day, where did you go?

2   A.   To the Riverside Federal Courthouse.

3   Q.   After you left the Courthouse, where did you go?

4   A.   To the San Bernardino Jail.

5   Q.   Did you go there by yourself?

6   A.   No.

7   Q.   Who did you go there with?

8   A.   All my other co-defendants that were arrested with me.

9   Q.   So you mean other members of your gang?

10   A.   Yes.

11   Q.   Were you put together in the same jail?

12   A.   Yes.

13   Q.   Were you put together in the same cell?

14   A.   Some, yes.

15   Q.   Were others put in cells near you?

16   A.   Yes.

17   Q.   About how many members of your gang were in the cell

18   with you?

19   A.   I say four or five.

20   Q.   Was defendant Rivera in that cell?

21   A.   No.

22   Q.   Was he in a cell nearby?

23   A.   Eventually, yes.

24   Q.   Who was in your cell?

25          MR. CEPHAS:   Objection, your Honor, beyond the scope.

*UNITED STATES DISTRICT COURT*

1          MR. WALSH:  Your Honor, this is responding to

2    questions regarding conduct that this defendant engaged in

3    while in custody.

4          THE COURT:  We'll wait just for a while.

5          MS. EL-AMAMY:  All right.

6    BY MS. EL-AMAMY:

7    Q.    Who was in your cell with you?

8    A.    Sugar Bear, Pokie, Frank, and Lucci.

9    Q.    Now, you said Pokie, was that the Rafael Alvarez who you

10   guys discussed going to defendant Medina's house in that

11   telephone call that we listened to?

12   A.    Yes.

13   Q.    All right.  Eventually you started cooperating with the

14   government; is that right?

15   A.    Yes.

16   Q.    When did you start cooperating?

17   A.    I don't know the exact date.

18   Q.    Were you concerned about other members of your gang

19   finding out that you were cooperating?

20   A.    Yes.

21   Q.    Were you cooperating while you were still in the same

22   cell with members of your gang?

23   A.    Yes.

24   Q.    Did you have to pretend that you weren't cooperating?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

1    Q.   Did you get something in the case called discovery?

2    A.   Yes.

3    Q.   What is discovery?

4    A.   Um --

5         MR. CEPHAS:  Objection, vague and ambiguous, calls

6    for a legal conclusion.

7         THE COURT:  What's your understanding?

8    BY MS. EL-AMAMY:

9    Q.   What do you understand to be discovery?

10   A.   Basically all the evidence that they have against the

11   case.

12   Q.   Were you guys looking at the discovery together?

13   A.   Yes.

14   Q.   Were you guys trying to find out whether or not you were

15   cooperating?

16   A.   Yes.

17   Q.   And who was cooperating?

18   A.   Yes.

19   Q.   Did you identify any people who you guys thought were

20   cooperating?

21   A.   Yes.

22   Q.   Who was that?  Well, actually strike that.

23        Did you guys talk about doing anything to people who you

24   thought were cooperating?

25   A.   Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    What did you guys talk about doing?

2          MR. WALSH:  Objection, your Honor.  It calls for

3    hearsay.  It's unclear who the speaker is.

4          THE COURT:  Overruled.

5    BY MS. EL-AMAMY:

6    Q.    What did you guys talk about doing?

7    A.    Trying to find out who was cooperating.

8    Q.    What did you talk about doing -- what, if anything, did

9    you talk about doing to people you thought were cooperating?

10   A.    Trying to kill them.

11   Q.    Now, you were cooperating with the government in 2010,

12   but you didn't enter a plea until 2011; is that right?

13   A.    Yes.

14   Q.    Why did you wait so long?

15   A.    I was waiting for the deal to come up.

16   Q.    Did you -- you mentioned earlier that you were married;

17   is that correct?

18   A.    Yes.

19   Q.    Was your wife taking any efforts in connection with your

20   cooperation?

21   A.    Was she taking any efforts?

22   Q.    Was she -- was she looking -- was she -- was she living

23   anyplace specific when you were cooperating?

24   A.    Yes.

25   Q.    Was she looking to change that location?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    Why was she looking to do that?

3          MR. WALSH:  Objection, your Honor, calls for hearsay

4    or conclusion on the part of the witness.

5          THE COURT:  Overruled.

6    BY MS. EL-AMAMY:

7    Q.    Why was she looking to do that?

8    A.    For fear of retaliation from the gang.

9    Q.    Was that one of the reasons why you waited?

10   A.    Yes.

11   Q.    Were you looking to wait to have her sell her house?

12   A.    Yes.

13         MR. CEPHAS:  Objection, your Honor, leading.

14         THE COURT:  Overruled.

15   BY MS. EL-AMAMY:

16   Q.    I'm sorry.  Were you looking to have her sell her house?

17   A.    Yes.

18   Q.    Now, you talked about being transferred to MDC, the

19   Metropolitan Detention Center; is that right?

20   A.    Yes.

21   Q.    When you got transferred to the Metropolitan Detention

22   Center, were you still cooperating?

23   A.    Yes.

24   Q.    Do you know of something called general population

25   versus -- do you know of something called general population?

1    A.    Yes.

2    Q.    What is general population?

3    A.    It's where most of the inmates -- or inmates that are

4    not cooperating or not known for cooperating are at -- are

5    housed at.

6    Q.    Were you in general population at MDC?

7    A.    Yes.

8    Q.    Why were you in general population?

9    A.    I didn't want to go into protective custody.

10    Q.    Why was that?

11    A.    I was trying to wait so my family could relocate.

12    Q.    So you stayed in general population because -- so you

13    were in general population, but you were cooperating.

14          Were members of your gang at the Metropolitan Detention

15    Center?

16    A.    Yes.

17    Q.    Who was there?

18    A.    Swifty, Sniper, Pokie, Lost Boy, Frank, Pelon, Sicko.

19    Q.    And they were all on your indictment with you?

20    A.    Yes.

21    Q.    How often did you talk with them?

22    A.    With some more often than others.

23    Q.    Is it fair to say that you talked to them on a daily

24    basis?

25          MR. CEPHAS:  Objection, leading.

*UNITED STATES DISTRICT COURT*

```
 1            THE COURT:  Overruled.

 2   BY MS. EL-AMAMY:

 3   Q.    Is it fair to say that?

 4   A.    Yes.

 5   Q.    Did you have to pretend that you weren't cooperating?

 6   A.    Yes.

 7   Q.    Did you have to pretend that you were down with the

 8   gang?

 9            MR. CEPHAS:  Same objections.

10            THE COURT:  Overruled.

11   BY MS. EL-AMAMY:

12   Q.    Did you have to pretend that you were down with the

13   gang?

14   A.    Yes.

15   Q.    Were you committing crimes on behalf of the gang while

16   you were in custody at MDC?

17   A.    No.

18   Q.    Why not?

19   A.    Because I was cooperating at the time already.

20   Q.    Were you asked to by members of your gang?

21   A.    Yes.

22   Q.    What kind of crimes were you asked to commit?

23   A.    Drug deals.

24   Q.    Who asked you to commit drug deals while you were at

25   MDC?
```

*UNITED STATES DISTRICT COURT*

1    *A.*    Sniper.

2    *Q.*    What did he ask you to do?

3    *A.*    If I could sell drugs for him.

4    *Q.*    What did you say?

5    *A.*    I told him I didn't know who would want to buy them.

6    *Q.*    Did you know someone who would have bought them?

7    *A.*    Yes.

8    *Q.*    Who did you know that would have bought them?

9    *A.*    Different individuals that were housed with me in my

10   housing unit.

11   *Q.*    Did he think it was weird that you said that you didn't

12   know anyone who would buy drugs in custody?

13   *A.*    Maybe.

14   *Q.*    Were you concerned about that?

15   *A.*    Yes.

16   *Q.*    Now, you talked about getting a tattoo while in custody.

17   Why did you get that tattoo?

18   *A.*    I was asked to.

19   *Q.*    By who?

20   *A.*    By Sniper.

21   *Q.*    Now, do you know if Sniper -- and this is Alex Castro,

22   Mr. Castro -- do you know if he was in communication with any

23   members of the Mexican Mafia?

24   *A.*    Yes.

25   *Q.*    How do you know that?

*UNITED STATES DISTRICT COURT*

1    *A.*    From his personal admittance, and from me passing notes
2    back and forth.
3    *Q.*    You were passing notes in between who?
4    *A.*    Sniper and Cisco.
5    *Q.*    And at the time was there any orders out from the
6    Mexican Mafia that you were aware of?
7    *A.*    Orders?
8    *Q.*    Orders in connection with your -- with your case?
9    *A.*    Um -- as far as?
10   *Q.*    In terms of plea agreements.
11   *A.*    Yes.
12   *Q.*    What was the order?
13   *A.*    Nobody was allowed to sign any plea agreements.
14   *Q.*    And why was that?
15        MR. CEPHAS:  Objection, speculation, foundation,
16   calls for hearsay.
17        THE COURT:  Sustained.
18   BY MS. EL-AMAMY:
19   *Q.*    Were you -- do you know -- were you told why people were
20   not supposed to sign plea agreements?
21   *A.*    Yes.
22   *Q.*    Who told you that?
23        MR. WALSH:  I'll object, your Honor, as hearsay.
24   These are statements after the arrest, so I think --
25        THE COURT:  Wait.  Hang on.  Just were you told, yes

*UNITED STATES DISTRICT COURT*

1    or no?

2    BY MS. EL-AMAMY:

3    Q.    Were you told?

4    A.    Yes.

5    Q.    Who were you told by?

6    A.    Armando Barajas and Juan Gil.

7    Q.    Okay.  And those are both members of the Mexican Mafia?

8    A.    Yes.

9    Q.    What did they tell you?

10          MR. WALSH:  Objection, hearsay, your Honor.

11          MS. EL-AMAMY:  These are co-conspirator statements.

12          THE COURT:  Overruled.

13          MR. WALSH:  It's after the arrest.

14          THE COURT:  Overruled.  A lot of things have been

15   gone into post-arrest, haven't they?

16          This door has been opened wide open.  Go ahead.

17   BY MS. EL-AMAMY:

18   Q.    What -- what were you told by Armando Barajas?

19   A.    That we weren't allowed at the time to sign any plea

20   agreements.

21   Q.    And what did he tell you would happen if you signed a

22   plea agreement?

23   A.    We could get green-lighted.

24   Q.    What is a green-light?

25   A.    A hit.  A murder hit out on your -- on a person.

*UNITED STATES DISTRICT COURT*

1    Q.    What were you told, if anything, by Juan Gil?

2    A.    The same thing.

3    Q.    So you were cooperating with the government at this

4    time, weren't you?

5    A.    Yes.

6    Q.    Were you afraid that they would find out?

7    A.    Yes.

8    Q.    Why were you afraid?

9    A.    Because I know I could be killed if they found out.

10   Q.    Now, was there something called a joint defense

11   agreement in the case?

12   A.    Yes.

13   Q.    Now, you probably don't know what that is, but what was

14   your understanding as to what you were supposed to do with

15   respect to the joint defense agreement?

16   A.    Join it.

17   Q.    Why was that?

18   A.    So they could more or less find out who was and who

19   wasn't cooperating, and so we would be able to get together

20   and discuss gang business.

21   Q.    Now, you didn't join the joint defense agreement, did

22   you?

23   A.    No.

24   Q.    Were you asked by members of your gang how come you

25   didn't join?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    Were you asked by Mr. Castro why you didn't join?

3    A.    Yes.

4    Q.    What did you tell him?

5    A.    I just told him my lawyer had advised me it was best not

6    to join.

7    Q.    Was Mr. Castro happy with that answer?

8    A.    No.

9    Q.    What did he do?

10   A.    He made me write a letter to the judge asking him to let

11   me fire my lawyer because I didn't think he was representing

12   me in the correct way.

13   Q.    Did you write the letter?

14   A.    Yes.  I typed it.

15   Q.    You typed it in front of Mr. Castro?

16   A.    No.

17   Q.    Did you show it to him?

18   A.    I -- I gave it to him.

19   Q.    And what did he do with it?

20   A.    He mailed it out.

21   Q.    For you?

22   A.    Yes.

23   Q.    Why did -- why was he the one to mail it out for you?

24   A.    Because he wanted to make sure that it was written or

25   typed and mailed out.

**UNITED STATES DISTRICT COURT**

1    Q.    Because he was watching you?

2    A.    Yes.

3    Q.    And because he was suspicious that you hadn't joined the

4    agreement, right?

5    A.    Yes.

6    Q.    Now, eventually you were transferred to a different

7    location; is that correct?

8    A.    Yes.

9    Q.    Why did you ask to be transferred to a different

10    location?

11    A.    To get away from any of my co-defendants that I would be

12    housed with.

13    Q.    Are you presently with any of your co-defendants?

14    A.    No.

15    Q.    Are you scared about what they'd do to you if given the

16    opportunity?

17    A.    Yes.

18    Q.    Are you scared for your family's life?

19    A.    Yes.

20    Q.    Are you scared for your own life?

21    A.    Yes.

22    Q.    Were you upset during cross-examination when you were

23    being asked about your brother?

24    A.    Yes.

25    Q.    Why?

*UNITED STATES DISTRICT COURT*

1    A.    Because my brother doesn't have any involvement in the

2    case, and I don't want to discuss anything about my family.

3    Q.    Were you mad when you were being asked about your wife?

4    A.    Was I mad?

5    Q.    Yeah.

6    A.    No.

7    Q.    Why was that?

8    A.    I was upset, but I wasn't necessarily mad.

9    Q.    Okay.  Now, prior to coming to court today were you

10   asked by -- were you asked during one of these meetings

11   whether or not you committed any crimes while you were in

12   custody?

13   A.    Yes.

14   Q.    And what did you say?

15   A.    That I had committed crimes while in custody.

16   Q.    But were you asked if you had committed any crimes after

17   you started cooperating?

18   A.    Yes.

19   Q.    And what was your answer?

20   A.    That I hadn't committed any crimes.

21   Q.    Were you asked if you got any tattoos?

22   A.    No.

23   Q.    Did you think that getting a tattoo was a crime?

24   A.    No.

25   Q.    Now, there was a lot of talk about your plea agreement

*UNITED STATES DISTRICT COURT*

1  in this case, but before we get to your plea agreement, you

2  were asked about a crime involving an African-American

3  individual who was run over by a car.  Who told law

4  enforcement about that incident?

5  A.    I did.

6  Q.    Do you know if they were aware of it before then, law

7  enforcement?

8         MR. CEPHAS:  Objection, speculation, foundation.

9         THE COURT:  Do you know?  Overruled.

10  BY MS. EL-AMAMY:

11  Q.    Do you know if any cop knew about your involvement in

12  this crime?

13         THE COURT:  Just yes or no.

14         THE WITNESS:  No.

15  BY MS. EL-AMAMY:

16  Q.    Why did you tell?

17  A.    Because I have to tell the truth at the debriefing

18  sessions.

19  Q.    Were you asked about anything bad that you had ever

20  done?

21  A.    Yes.

22  Q.    And this is one of the things you volunteered?

23  A.    Yes.

24  Q.    Were you asked who -- who told about the Eric Rios

25  murder?

*UNITED STATES DISTRICT COURT*

1    A.   I did.

2    Q.   Do you know if any cop knew about your involvement?

3    A.   No.

4    Q.   Do you believe that any cop knew about your involvement?

5    A.   No.

6    Q.   Why do you believe that?

7    A.   Because it was only a certain amount of us that were

8    there, and nobody -- law enforcement nor anybody else never

9    brought up any details about the murder.

10    Q.   To your knowledge was there any way to find out about

11    the vote that everybody took to kill Eric Rios?

12    A.   Yes.

13    Q.   There was a way for a cop to figure out about that?

14    A.   Yes.

15    Q.   What was that way?

16    A.   Anybody else cooperating.

17    Q.   Other than someone cooperating, was there any way to

18    figure that out?

19    A.   No.

20    Q.   So you mentioned on your cross-examination that there

21    was a vote.  Who was there during that vote?

22    A.   Lonely, Dizzy, Jasper, Night Owl, and Cisco.

23    Q.   Now, you mentioned Lonely, and that was Jose Hurtado; is

24    that correct?

25    A.   Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    And Mr. Hurtado you testified yesterday -- is that the

2    same Mr. Hurtado that voted defendant Prieto into the gang?

3    A.    Yes.

4    Q.    What was the -- what was the vote?  Who voted what?

5    A.    Lonely voted to kill Eric, Dizzy voted to kill him,

6    Jasper voted to kill him, Night Owl voted not to kill him,

7    Cisco voted to kill him, and I voted not to kill him.

8    Q.    And Cisco, that was Enrique Jimenez; is that correct?

9    A.    Yes.

10   Q.    Was that the Mr. Jimenez you talked about yesterday who

11   was in the car with you and Mr. Rivera looking to rob a --

12   steal a car of a drug dealer?

13   A.    Yes.

14   Q.    Why were you voting as to whether or not Eric Rios

15   should be killed?

16   A.    Because that decision couldn't be made by one

17   individual, it had to be a decision that was made by all

18   the -- or the gang members -- the Black Angel gang members

19   that were out on the street at the time.

20   Q.    And what was -- what was the reason for Eric Rios being

21   in trouble with the gang?

22   A.    He had threatened to shoot Blanco, and he had shot at

23   Lonely, and he had also disrespected Reaper's wife's house

24   and scared her kids.

25   Q.    All right.  You voted not to kill him, why?

**UNITED STATES DISTRICT COURT**

1    *A.*   Because I didn't believe it was just for him -- it was a

2    good enough reason for him to get killed for that reason, and

3    I didn't think it was okay for us to be murdering each other

4    for reasons like those.

5    *Q.*   When the majority voted to kill him, what did you do?

6    *A.*   I had to agree.

7    *Q.*   Why is that?

8    *A.*   Because the majority vote is what rules the decision.

9    *Q.*   So Mr. Hurtado was the one who shot Eric Rios?

10    *A.*   No.

11    *Q.*   Who shot Eric Rios?

12    *A.*   Dizzy.

13    *Q.*   Was Mr. Hurtado with him at the time?

14    *A.*   Yes.

15    *Q.*   And this is the same Mr. Hurtado who voted defendant

16    Prieto into the gang?

17    *A.*   Yes.

18    *Q.*   Where did Dizzy get the gun?

19    *A.*   It was a gun that belonged to the gang.

20    *Q.*   So you guys get these guns so that you can do crimes

21    like this?

22    *A.*   Yes.

23    *Q.*   Is that why defendant Rivera was getting a gun for the

24    gang?

25    *A.*   Yes.

*UNITED STATES DISTRICT COURT*

1    Q.    You talked about some other crimes that were committed

2    that you -- at least the way it was characterized, that you

3    weren't being charged with.  Who provided that information?

4    A.    I did.

5    Q.    Do you believe that cops would have found out about your

6    crimes if you hadn't provided that information?

7            MR. CEPHAS:  Objection, speculation, foundation.

8            THE COURT:  Overruled.  State your belief.

9    BY MS. EL-AMAMY:

10   Q.    Do you believe?

11   A.    No.

12   Q.    All right.  So there was discussion about a plea

13   agreement.  Let's show the plea agreement.

14           MS. EL-AMAMY:  Your Honor, the government asks to

15   move Exhibit 273 into evidence.

16           THE COURT:  Is that the much talked about plea

17   agreement?

18           MS. EL-AMAMY:  Correct.

19           THE COURT:  All right.

20           MR. CEPHAS:  Objection, your Honor, hearsay.  I don't

21   believe it should be admitted as an exhibit.

22           THE COURT:  Overruled.  Go ahead.

23           MS. EL-AMAMY:  Okay.

24           (Government's Exhibit 273 marked for Identification

25   and received into Evidence.)

*UNITED STATES DISTRICT COURT*

1              *(The exhibit was displayed on the screen.)*

2    BY MS. EL-AMAMY:

3    Q.    Do you recognize this document?

4    A.    Yes.

5    Q.    What is it?

6    A.    A copy of my plea agreement.

7    Q.    Let's look at the first page.  In paragraph 1, it talks

8    about how this plea agreement doesn't bind other state --

9          MR. WALSH:  I'll object, your Honor, it's leading the

10   witness.

11         THE COURT:  Overruled.

12         MR. CEPHAS:  Your Honor, just for the record, I also

13   want to lodge an objection to the extent this document's

14   being used for improper vouching.

15         THE COURT:  Vouching?

16         MR. CEPHAS:  I believe we're going to get there in a

17   minute.

18         THE COURT:  Okay.  I'll rule when we get there.

19   Overruled.

20   BY MS. EL-AMAMY:

21   Q.    This plea agreement talks about how the agreement's

22   limited to the U.S. Attorney's Office and it doesn't affect

23   other authorities.  Do you see that paragraph?

24   A.    Yes.

25   Q.    What is your understanding regarding how this plea

**UNITED STATES DISTRICT COURT**

1   agreement affects the District Attorney's Office?

2   A.   What was the question?

3   Q.   What is your understanding regarding how this plea

4   agreement affects the District Attorney's Office?

5         MR. CEPHAS:  Objection, your Honor, vague and

6   ambiguous, District Attorney's Office?

7         THE COURT:  I thought it was a misstatement, but then

8   again on further reflection, I believe you intended to talk

9   about the county prosecutorial office, right?

10        MR. CEPHAS:  Withdrawn.

11        THE COURT:  All right.

12  BY MS. EL-AMAMY:

13  Q.   Do you understand that there's a District Attorney's

14  Office?

15  A.   Yes.

16  Q.   Do you understand that you can be charged with crimes by

17  the District Attorney's Office?

18  A.   Yes.

19  Q.   Do you understand that anything in this agreement

20  doesn't affect the ability to go to the District Attorney's

21  Office with any information you provided and get you charged

22  there?

23  A.   Yes.

24  Q.   Now, in your plea agreement, the next paragraph, it

25  talks about certain obligations that you have.  It requires

*UNITED STATES DISTRICT COURT*

1    you to plead guilty to Counts One and Five.  You talked about

2    that during your cross-examination; is that correct?

3    A.    Yes.

4    Q.    It talks about you not committing other crimes after you

5    entered into this plea agreement; is that correct?

6    A.    Yes.

7    Q.    It requires you to be truthful at all times with the

8    Court, among other people?

9    A.    Yes.

10    Q.    What is your understanding regarding if you lie to the

11    Court?

12         MR. CEPHAS:  Objection, your Honor, improper

13    vouching.

14         THE COURT:  What is his understanding is all?

15    Overruled.

16    BY MS. EL-AMAMY:

17    Q.    What do you understand in connection with this plea

18    agreement and your obligation to tell the truth?

19    A.    That if I lie, this agreement wouldn't -- this contract

20    wouldn't be in agreement anymore.

21    Q.    And you refer to this as a contract with the U.S.

22    Attorney's Office, if you lie, what happens to this plea

23    agreement?

24    A.    It goes away.

25    Q.    And what happens in terms of any sentence you may

*UNITED STATES DISTRICT COURT*

1    receive?

2    A.    I'm not -- I'm not too sure.

3    Q.    But you understand you have no agreement?

4    A.    Yes.

5    Q.    Do you understand that you've already pled guilty to

6    crimes?

7    A.    Yes.

8    Q.    And you can't withdraw your guilty pleas?

9    A.    Yes.

10   Q.    So any benefit you get with this contract is out the

11   window?

12   A.    Yes.

13   Q.    Now, Paragraph D on Page 5 talks about the substantial

14   assistance that you were asked about during

15   cross-examination.

16         What is your understanding of substantial assistance?

17   A.    Um -- from my understanding maybe some evidence that

18   isn't known by the government.

19   Q.    Is your understanding regarding substantial assistance,

20   does that depend on whether or not any of these defendants

21   are convicted at trial?

22   A.    No.

23   Q.    Is it your understanding that if all of them walk,

24   nothing happens to you?

25   A.    Yes.

1    *Q.*    Does that say that in your plea agreement?

2    *A.*    I believe so.

3    *Q.*    Can you look at Paragraph E.  Does it state in your plea

4    agreement that the USAO's determination regarding whether you

5    have provided substantial assistance will not depend in any

6    way on whether the government prevails at trial?

7    *A.*    Yes.

8    *Q.*    So your -- is it your understanding that your contract

9    with the government has nothing to do with the outcome of

10   this case?

11   *A.*    Yes.

12   *Q.*    Now, you talked about what you pled to, and what did you

13   plead to?

14   *A.*    To RICO and conspiracy to distribute methamphetamine and

15   heroin.

16   *Q.*    What is your understanding regarding what sentence you

17   could possibly receive?

18   *A.*    Um -- I could possibly receive a life sentence.

19   *Q.*    Anywhere up to life?

20   *A.*    Yes.

21   *Q.*    What does that depend on?

22   *A.*    What does it depend on?

23   *Q.*    Yes.

24   *A.*    If I'm being truthful or not.

25   *Q.*    So you pled guilty to Count One, and you understand that

*UNITED STATES DISTRICT COURT*

1    the statutory maximum sentence that the Court can impose is

2    life?

3    A.    Yes.

4    Q.    Same question for Count Five?

5    A.    Yes.

6    Q.    You understand also that there's a mandatory minimum

7    sentence of at least 10 years?

8    A.    Yes.

9    Q.    Is it up to -- what do you -- what is your understanding

10   regarding whether or not you get that mandatory minimum

11   sentence?

12   A.    I believe if I'm being truthful or not.

13   Q.    Now, there's something in this plea agreement called a

14   factual basis.  Do you know what a factual basis is?

15   A.    More or less, yes.

16   Q.    What is it?

17   A.    Like the facts of the case.

18   Q.    What you admitted pleading guilty to?

19   A.    Mmmm-hmmm.

20   Q.    Did you admit, as part of your factual basis, that

21   members of the gang would permit drug dealers to sell drugs

22   in the City of Ontario?

23   A.    Yes.

24   Q.    Did you also discuss the fact that members of the gang

25   themselves distributed drugs?

**UNITED STATES DISTRICT COURT**

1    A.    Yes.

2    Q.    Did you talk about defendant Rivera in your plea

3    agreement?

4    A.    Yes.

5    Q.    Is his name listed right here?

6    A.    Yes.

7    Q.    And does it state that he's one of the people that would

8    collect drug proceeds from people selling drugs?

9    A.    Yes.

10   Q.    Did you talk about Carlos Rivera, again, in your plea

11   agreement?

12   A.    Yes.

13   Q.    And what are you talking about in this paragraph?

14   A.    That he conspired to smuggle narcotics into prison.

15   Q.    Did you also talk about him selling drugs in the gang's

16   territory?

17   A.    Yes.

18   Q.    Did you admit to a total quantity of narcotics in this

19   case?

20   A.    Yes.

21   Q.    What quantity did you admit to?

22   A.    1.5 kilograms of methamphetamine, and 1 kilogram of

23   heroin.

24   Q.    And when you said 1.5 kilograms of methamphetamine, you

25   meant pure methamphetamine?

*UNITED STATES DISTRICT COURT*

1    *A.*   Yes.

2    *Q.*   Is it your understanding that you pled guilty to the

3    highest drug quantity on the sentencing guideline chart?

4    *A.*   Yes.

5    *Q.*   Now, you got questioned regarding murders and whether or

6    not you pled guilty to murder in this case.  Does your

7    factual basis admit to murder?

8    *A.*   No.

9    *Q.*   Well, isn't it true that on Page 13, right down here at

10    the bottom, you admitted that members and associates would

11    commit a pattern of racketeering activity, including murder?

12    *A.*   Yes.

13    *Q.*   So that's part of the facts that you already admitted

14    to?

15    *A.*   Yes.

16    *Q.*   Do you -- is it your understanding that that murder

17    enhancement could be sought against you at the time of

18    sentencing?

19    *A.*   Yes.

20    *Q.*   You didn't admit any specific murder; is that correct?

21    *A.*   On the --

22    *Q.*   In the plea agreement.

23    *A.*   No.

24    *Q.*   But is it your belief that those facts could be brought

25    out at the time of your sentencing?

*UNITED STATES DISTRICT COURT*

1    A.    Yes.

2    Q.    Now, you pled guilty to something with a base offense

3    level; is that correct?

4    A.    Yes.

5    Q.    And that says base offense level; is that right?

6    A.    Yes.

7    Q.    Right underneath that paragraph, does it talk about the

8    U.S. Attorney's Office reserving the right to argue for

9    additional offense characteristics?

10   A.    Yes.

11   Q.    And adjustments and departures?

12   A.    Yes.

13   Q.    Does that include an adjustment for your leadership

14   role?

15        MR. CEPHAS:   Objection, speculation, foundation.

16        THE COURT:   Overruled.

17   BY MS. EL-AMAMY:

18   Q.    Do you understand -- is it your understanding that the

19   government could argue for a higher sentence based on your

20   role?

21   A.    Yes.

22   Q.    But this is just the starting point that you agreed to

23   in your plea agreement?

24   A.    Yes.

25   Q.    And you understand that there are no promises between

*UNITED STATES DISTRICT COURT*

1    the government and yourself about what sentence the

2    government's going to recommend at the time of sentencing?

3    A.    Yes.

4    Q.    Do you have any idea when you're going to get out of

5    jail in this case?

6    A.    No.

7    Q.    Now, you testified earlier that you sold drugs.  What is

8    an 8-ball?

9    A.    Seven -- seven grams.

10   Q.    Is an 8-ball an eighth of an ounce?

11   A.    I believe so, yes.

12   Q.    Is an eighth of an ounce 7 grams?

13   A.    Yes.

14   Q.    Okay.

15         MS. EL-AMAMY:  I have no further questions.

16                    ***RECROSS-EXAMINATION***

17   BY MR. CEPHAS:

18   Q.    You're housed in Santa Ana now?

19   A.    Yes.

20   Q.    You're housed near other cooperators?

21   A.    Yes.

22   Q.    And you've learned that other people that have

23   cooperated have received very large reductions in their

24   sentences as a result of cooperating; isn't that right?

25         MS. EL-AMAMY:  Objection, lacks foundation.

**UNITED STATES DISTRICT COURT**

```
 1          THE COURT:  Sustained.
 2     BY MR. CEPHAS:
 3     Q.    You were just asked about your base offense level of 38.
 4     Do you see that?
 5     A.    Yes.
 6     Q.    And it's your understanding that offense level of 38 is
 7     based on drug trafficking, correct?
 8     A.    I believe so.
 9     Q.    And if it was based on murders, it would be 43, which is
10     significantly higher; isn't that correct?
11     A.    I'm -- I'm not too sure.
12     Q.    Before you entered into a plea agreement, you met with
13     the prosecutors, agents, police officers, several times,
14     correct?
15     A.    Yes.
16     Q.    And, in fact, the first few times you met with them was
17     in this building, correct?
18     A.    Yes.
19     Q.    And you'd go upstairs on the 13th or 14th floor,
20     correct?
21     A.    I'm not sure exactly what floor.
22     Q.    But one of the floors upstairs?
23     A.    Yes.
24     Q.    And you'd go into a big conference room, correct?
25     A.    Yes.
```

1    Q.    And there would be detectives all around the room?

2    A.    Yes.

3    Q.    And those first few meetings they told you they weren't

4    going to offer you a plea agreement until they were satisfied

5    you could help them; isn't that correct?

6         MS. EL-AMAMY:  Objection, misstates testimony.

7         THE COURT:  Overruled.

8         THE WITNESS:  What was the question?

9    BY MR. CEPHAS:

10   Q.    You were told that you weren't going to get a plea

11   agreement until the government was convinced you could help

12   them?

13   A.    No.

14   Q.    Well, during those -- let's go to the first meeting.

15   They told you if you -- it was your understanding that if you

16   were going to get a plea agreement, you had to admit to your

17   role in the offense, correct?

18   A.    I'm not -- I know I had to admit to stuff.

19   Q.    You had to admit to crimes you had done?

20   A.    Yes.

21   Q.    And they told you that they knew a lot about what you

22   had done; isn't that right?

23   A.    Yes.

24   Q.    And you knew that they had thousands of wiretaps,

25   correct?

*UNITED STATES DISTRICT COURT*

1    A.    I don't exactly know how many, but I knew they had

2    wiretaps.

3    Q.    You knew there were months and months of wiretaps?

4    A.    Yes.

5    Q.    And you didn't know what they knew and what they didn't

6    know because you didn't know what -- what all the wiretaps

7    said; isn't that right?

8    A.    Yes.

9    Q.    And so you were threatened by them, they told you if you

10   didn't come clean, that they wouldn't use you; isn't that

11   right?

12   A.    I wasn't threatened.

13   Q.    Well, you were told they wouldn't use you if you didn't

14   come clean as to everything you did, correct?

15   A.    They told me that they wouldn't use me if they thought,

16   in any sort of way, that I was not telling the truth.

17   Q.    And they said they were going to ask you a lot of

18   questions, some of which they already knew the answers to,

19   but they just wanted to see whether you were going to tell

20   the truth; isn't that right?

21   A.    They didn't tell me that, no.

22   Q.    Well, the reason you brought out details about murders,

23   crimes, other things, is because you didn't know whether or

24   not they already knew about it; isn't that right?

25   A.    No.

*UNITED STATES DISTRICT COURT*

1   Q.   You didn't know whether someone else was cooperating and

2   might have already put the finger on you; isn't that right?

3   A.   Yes.

4        MR. CEPHAS:  Nothing further.

5                    *RECROSS-EXAMINATION*

6   BY MR. NAVARRO:

7   Q.   Now, Mr. Navarro, this plea agreement that was placed

8   before you by Ms. El-Amamy, were you given a copy to keep

9   with you at the jail?

10  A.   At what jail?

11  Q.   Any jails.

12  A.   No, not at any jail.

13  Q.   And the reason for that is because it's a very sensitive

14  document, correct?

15  A.   Yes.

16  Q.   It has information about your cooperation, correct?

17  A.   Yes.

18  Q.   And if any of the inmates at MDC or San Bernardino saw

19  this document, you could be in serious trouble, correct?

20  A.   Yes.

21  Q.   So you don't have a copy of this document?

22  A.   I do.

23  Q.   You have a copy of it now in Santa Ana?

24  A.   Yes.

25  Q.   But before you signed it, did you have a copy?

*UNITED STATES DISTRICT COURT*

1    A.    Before I signed it?

2    Q.    Yes.

3    A.    No.

4    Q.    So did you prepare any portion of this document?

5    A.    No.

6    Q.    Did your lawyer prepare any portion of this document, if

7    you know?

8    A.    I don't believe so.

9    Q.    It was prepared by the government, correct?

10   A.    I believe so.

11   Q.    Those are the terms that they're dictating for you,

12   correct?

13   A.    Yes.

14          *(The exhibit was displayed on the screen.)*

15   Q.    So in their plea agreement at Page 4 they're

16   recommending the low end of the guideline.  See that right

17   there?

18   A.    Yes, I see it.

19   Q.    That's the starting point, correct?

20   A.    Yes.

21   Q.    And then on the next page, on Page 5 towards the bottom,

22   it says, *if the USAO determines*; do you see that language

23   right there?

24   A.    Yes.

25   Q.    Do you understand what that means?

**UNITED STATES DISTRICT COURT**

```
 1    A.    Yes.

 2    Q.    What does that mean to you?

 3    A.    If they believe.

 4    Q.    If they believe or if they determine?

 5    A.    Well, it says determine.

 6    Q.    If the U.S. Attorney's Office determines in its

 7    exclusive judgement.  Do you know what that means?

 8          Do you know what the term exclusive judgment believes

 9    -- refers to?

10    A.    Not exactly, no.

11    Q.    Did your lawyer explain this to you?

12    A.    Not in detail.

13    Q.    So you just signed it without having your lawyer explain

14    it to you?  He made you sign this?

15    A.    He didn't make me sign it, no.

16    Q.    Did he read every single line and make sure you

17    understand it?

18    A.    He asked me if I understood it.

19    Q.    Did you lie to him then about understanding some of

20    these terms?

21    A.    No.

22    Q.    So if I'm -- if I'm understanding you, you hope to get a

23    lesser sentence based on your cooperation, correct?

24    A.    Yes.

25    Q.    And your cooperation is in this case and in other
```

**UNITED STATES DISTRICT COURT**

```
 1    matters, correct?
 2    A.    Yes.
 3    Q.    There could be, I believe you talked to the police about
 4    other unrelated murders, correct?
 5    A.    Yes.
 6    Q.    That you were not involved with?
 7    A.    Yes.
 8    Q.    There were a couple of those that you talked to them
 9    about, correct?
10    A.    I'm not sure exactly how many, but --
11    Q.    For those meetings, there were different police officers
12    here; is that true?
13    A.    Yes.
14    Q.    And they were very interested in your information,
15    correct?
16    A.    Yes.
17    Q.    And these were murders committed by other Black Angel
18    gang members, correct?
19    A.    Yes.
20    Q.    And you hoped to get a benefit from those cases as well?
21    A.    I hope to.
22    Q.    And I think Mr. Cephas already asked you, but your plea
23    agreement makes no reference to sentencing enhancement for
24    murder, correct?
25    A.    I believe it don't.
```

*UNITED STATES DISTRICT COURT*

1    *Q.*   The level 38 is based on heroin and methamphetamine

2    only, correct?

3    *A.*   And the RICO.

4    *Q.*   And the RICO, correct?

5    *A.*   Yes.

6    *Q.*   There's no increase there for guns, correct?

7    *A.*   I believe not.

8    *Q.*   There's no increase there for being a leader of the

9    gang, correct?

10    *A.*   So far, no.

11    *Q.*   And did your attorney explain to you that those things

12    could happen?

13    *A.*   That what can happen?

14    *Q.*   That you can get increases for your role and for weapons

15    as well?

16    *A.*   That I could get what?

17    *Q.*   Increases in your offense level?

18    *A.*   Yes.

19    *Q.*   So you -- you understand that your level 38 is just

20    maybe a starting point?

21    *A.*   Yes.

22    *Q.*   And you could end up a plus 4 for your role, did he talk

23    to you about that?

24    *A.*   Yes.

25    *Q.*   And a plus 2 for the gun?

*UNITED STATES DISTRICT COURT*

1    A.    I'm not sure about the gun.

2    Q.    Do you remember when you pled guilty before

3    Judge Nguyen?

4    A.    Yes.

5    Q.    She talked to you about that, do you remember that?

6    A.    Yes.

7    Q.    It was mentioned to you that there could be an increase

8    for a gun -- it was a different judge, do you remember that?

9    A.    Yes.

10   Q.    So there was a 38 plus a 4, plus another 2, that's a

11   level 44.  Have you ever seen the sentencing guideline chart?

12   A.    Yes.

13   Q.    Does the chart have a level 44, if you know?

14   A.    I believe it goes up to 43.

15   Q.    And when it goes up to 43, it's a life sentence,

16   correct?

17   A.    I believe it depends on the category you fall under.

18   Q.    Now, did your lawyer talk to you about what's called a

19   career offender?

20   A.    Yes.

21   Q.    Now, are you a career offender?

22   A.    No.

23   Q.    You have -- from what Ms. El-Amamy asked you, you have a

24   conviction for assault with a firearm, correct?

25   A.    Yes.

*UNITED STATES DISTRICT COURT*

| | |
|---|---|
| 1 | Q.   A felony battery, correct? |
| 2 | A.   I believe that was dismissed. |
| 3 | Q.   Oh, that was dismissed, that was not a conviction? |
| 4 | A.   I don't think it was. |
| 5 | Q.   What about the felony evading? |
| 6 | A.   I'm not sure if I was convicted of it either. |
| 7 | Q.   Now, were you running from the police at that time? |
| 8 | A.   Yes. |
| 9 | Q.   With regard to the homicide of Mr. Rios, did you assist |
| 10 | one of the -- one of your gang members -- fellow gang members |
| 11 | in getting rid of the gun? |
| 12 | A.   No. |
| 13 | Q.   Were you aware that a gun was destroyed? |
| 14 | A.   That a gun was what? |
| 15 | Q.   That the gun was destroyed? |
| 16 | A.   Yes. |
| 17 | Q.   You were a part of that, correct? |
| 18 | A.   In -- in one way, yes. |
| 19 | Q.   Okay. |
| 20 |      MR. NAVARRO:  I have no additional questions, your |
| 21 | Honor, thank you. |
| 22 | *RECROSS-EXAMINATION* |
| 23 | BY MR. WALSH: |
| 24 | Q.   In your plea agreement, there's a -- there's a section |
| 25 | on Page 10 it's entitled *factual basis*.  What is that? |

**UNITED STATES DISTRICT COURT**

1    A.    I believe it's the facts of the case.  The facts that I

2    pleaded guilty to.

3    Q.    Okay.  Is that -- the facts which establishes the crime

4    that you pleaded guilty to; is that right?

5    A.    I believe so.

6    Q.    Okay.  Now, that goes on for several pages.  Did you --

7    did you prepare those facts?

8    A.    No.

9    Q.    You didn't type them up yourself, did you?

10   A.    No.

11          THE COURT:  Are we going to get serious here?

12          MR. WALSH:  I only have like five questions, your

13   Honor.  I'll get -- I'll get down to it.

14   BY MR. WALSH:

15   Q.    Did you admit anything in signing this plea agreement on

16   the factual basis which is not true?

17   A.    No.

18   Q.    So everything in it is true?

19   A.    Yes.

20   Q.    Did you ever mention the name of Jessica Medina in your

21   factual basis that you pled guilty to and signed?

22   A.    I believe I didn't.  I'm not sure.

23   Q.    I'm sorry, I didn't hear you?

24   A.    I'm -- I'm not -- I'm not sure.  I don't recall.

25   Q.    Okay.  Would you turn to Page 13 of the plea agreement.

*UNITED STATES DISTRICT COURT*

1   Do you have it in front of you?

2   A.    No, I don't.

3         *(The exhibit was displayed on the screen.)*

4   Q.    Do you have Page 13 in front of you?

5   A.    Yes.

6   Q.    Directing your attention to Line 15 through 19, could

7   you read that where it begins *on August 8th, 2009*?  Just that

8   one sentence.

9   A.    From 15 to 19 you said?

10  Q.    Yes.  Where it says, *on August 8th, 2009*?

11  A.    *On August 8th, 2009, co-defendants Jessica Medina and*

12  *defendant Navarro spoke about the fact that on August 6th,*

13  *2009, law enforcement officers had seized a large quantity of*

14  *methamphetamine from co-defendant Carlos Rivera.*

15  Q.    Okay.  That's the only mention of Jessica Medina in your

16  entire factual basis of your plea bargain; isn't that right?

17  A.    I believe so.

18        MR. WALSH:  I have no further questions, your Honor.

19        THE COURT:  Any further redirect?

20        MS. EL-AMAMY:  No, your Honor.

21        THE COURT:  All right.  Ladies and gentlemen, we're

22  going to stop right here.  We'll come back -- we'll pick this

23  up on Tuesday.  Do we have any more witnesses from the

24  government?

25        MR. DORE:  No, your Honor.

*UNITED STATES DISTRICT COURT*

1          THE COURT:  All right.  Then I suppose on Tuesday

2     morning, what we can expect is that the government will rest,

3     and that the defense will have an opportunity to put on their

4     case, and hopefully we're drawing to a close.

5          So, because we are so close, please let's not do

6     anything to spoil what we've accomplished so far.  Stay away

7     from your computer and the internet.  Don't send out any text

8     messages, or blogs, or e-mails to your friends about your

9     involvement or participation in this case.  Please don't do

10    any independent research.  Don't talk about it yet.  You'll

11    have plenty of opportunity to talk about it among yourselves

12    when you're all convened in the jury room.  Enjoy your

13    weekend.

14          (Whereupon the matter recessed at 11:45 a.m.)

15                         --o0o--

16

17

18

19

20

21

22

23

24

25

*UNITED STATES DISTRICT COURT*

1                      **TRIAL INDEX**

2

3   *GOVERNMENT WITNESSES:*

4     **DAVID NAVARRO (Resumed)**
        Direct Examination by Ms. El-Amamy (Resumed)    4
5         Cross-Examination by Mr. Cephas             22
        Cross-Examination by Mr. Navarro           39
6         Cross-Examination by Mr. Walsh             74
        Redirect Examination by Ms. El-Amamy      98
7         Recross-Examination by Mr. Cephas        131
        Recross-Examination by Mr. Navarro      135
8         Recross-Examination by Mr. Walsh       141

9

10

11

12

13

14

15                     ***EXHIBIT INDEX***

16

17   *EXHIBIT NUMBERS*       *IDENTIFICATION*           *EVIDENCE*

18      *22*              *18*                 *19*

19      *32*              *18*                 *19*

20      *34*              *18*                 *20*

21     *272*              *18*                 *21*

22     *273*            *121*              *121*

23

24

25

*UNITED STATES DISTRICT COURT*

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2      COUNTY OF LOS ANGELES      )
                                   )
 3      STATE OF CALIFORNIA        )

 4                    I, VICTORIA L. VALINE, FEDERAL OFFICIAL

 5      REALTIME COURT REPORTER, REGISTERED MERIT REPORTER, IN AND

 6      FOR THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT

 7      OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT TO SECTION

 8      753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING IS A

 9      TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY REPORTED

10      PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT THE

11      TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE REGULATIONS

12      OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

13

14      DATE:   December 7, 2012

15

16

17

18      /S/ VICTORIA L. VALINE
        _____
19      VICTORIA L. VALINE, CSR No. 3036, RMR, CRR

20      FEDERAL OFFICIAL COURT REPORTER

21

22

23

24

25
```

*UNITED STATES DISTRICT COURT*