1          UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3            HONORABLE OTIS D. WRIGHT

4        UNITED STATES DISTRICT JUDGE PRESIDING

5                   - - -

6
United States of America,         )
7                   PLAINTIFF,    )
                                  )
8     VS.                         )  NO. CR 10-351 ODW
                                  )
9     Carlos Rivera, Jessica Medina, Raul)
Prieto,                           )
10                  DEFENDANT,    )
_____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15            LOS ANGELES, CALIFORNIA

16            JURY TRIAL - DAY FIVE

17         TUESDAY, DECEMBER 11, 2012

18

19

20     _____

21          KATIE E. THIBODEAUX, CSR 9858
            U.S. Official Court Reporter
22          312 North Spring Street, #436
            Los Angeles, California 90012
23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   APPEARANCES OF COUNSEL:

 2

 3   FOR PLAINTIFF:

 4         U.S. DEPARTMENT OF JUSTICE
           U.S. ATTORNEY'S OFFICE
 5         BY: REEMA EL-AMAMY, AUSA
           -and- MICHAEL DORE, AUSA
 6         312 North Spring Street
           Twelfth Floor
 7         Los Angeles, CA  90012

 8

 9   FOR DEFENDANT RIVERA:

10         ANGEL NAVARRO LAW OFFICE
           BY:  ANGEL NAVARRO
11         714 West Olympic Boulevard
           Suite 450
12         Los Angeles, CA  90015

13

14

15   FOR DEFENDANT MEDINA:

16         JOSEPH F. WALSH LAW OFFICES
           BY:  JOSEPH F. WALSH
17         205 South Broadway
           Suite 606
18         Los Angeles, CA  90012

19

20   FOR DEFENDANT PRIETO:

21         CEPHAS LAW FIRM
           BY:  DANA CEPHAS
22         72960 Fred Waring Drive
           Palm Desert, CA  92260
23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                         I N D E X

 2

 3   WITNESS NAME                              PAGE

 4   MANUEL CORONA

 5       Direct Examination by Mr. Cephas      7
         Cross-Examination by Ms. El-Amamy    12
 6       Redirect Examination                 16

 7   VELIA PRIETO
         Direct Examination by Mr. Cephas     18
 8       Cross-Examination by Ms. El-Amamy    33

 9   STEVE WALTON
         Direct Examination by Mr. Cephas     45
10       Cross-Examination by Mr. Dore        54
         Reirect Examination                  56
11       Recross-Examination                  57

12

13   JURY INSTRUCTIONS                        64

14

15   CLOSING ARGUMENTS                        PAGE

16   By Mr. Dore                              104
     By Mr. Navarro                           141
17   By Mr. Walsh                             154
     By Mr. Cephas                            175
18   By Ms. El-Amamy                          197

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1        LOS ANGELES, CALIFORNIA; TUESDAY, DECEMBER 11, 2012

 2                           8:04 A.M.

 3                          - - - - -

 4

 5

 6        (The following proceedings were held outside the

 7         presence of the jury:)

 8        THE COURT:  Let's go on the record on the United

 9   States of America versus Armando Barajas, Case No.

10   CR 10-00351.  Appearances, please.

11        MS. EL-AMAMY:  Morning, your Honor.  Reema

12   El-Amamy and Michael Dore on behalf of the United States.

13        MR. WALSH:  Joseph Walsh on behalf of Jessica

14   Medina who is present in court.

15        MR. CEPHAS:  Good morning, your Honor.  Dana

16   Cephas for Raul Prieto who is present in court.

17        MR. NAVARRO:  Good morning, your Honor.  Angel

18   Navarro with Mr. Rivera.  He is seated to my left.

19        THE COURT:  Good morning all.  Yes.  Outside the

20   presence of the jury.  There is a motion?

21        MR. CEPHAS:  Yes, your Honor.  Assuming the

22   government is resting now, I would move to dismiss Count

23   1 against my client pursuant to Rule 29.  Count 1 is the

24   RICO conspiracy.

25        THE COURT:  Is your mic on?  Actually, I don't
```

1    want it -- no.  No.  The jury is standing right out in

2    the corridor.

3            Go ahead.

4        MR. CEPHAS:  I do not believe that the government

5    has put on enough evidence.  I do not believe the

6    government has put on enough evidence that any jury could

7    find beyond a reasonable doubt that my client conspired

8    to violate RICO with respect to Count 1, and, therefore,

9    I would ask that -- excuse me -- I would ask the court to

10   dismiss that count against my client and not let that

11   count go to the jury.

12       THE COURT:  Okay.

13       MR. WALSH:  And on behalf of Ms. Medina, your

14   Honor, the defense moves for judgment of acquittal under

15   Rule 29 on all four counts.

16       MR. NAVARRO:  Submit on that motion as well.

17       THE COURT:  On under Rule 29B, the court will

18   reserve ruling.  All right.

19      (The following proceedings were held in the

20       presence of the jury:)

21       THE CLERK:  Calling Item 1, CR 10-351, United

22   States of America versus Carlos Rivera.

23            Counsel, may I have all appearances please.

24       MS. EL-AMAMY:  Good morning, your Honor.  Reema

25   El-Amamy and Michael Dore on behalf of the United States.

```
 1          MR. WALSH:  Joseph Walsh on behalf of Jessica
 2   Medina who is present.
 3          MR. CEPHAS:  Good morning, your Honor.  Dana
 4   Cephas on behalf of Raul Prieto who is present.
 5          THE COURT:  All right.
 6          MR. NAVARRO:  Good morning, your Honor.  Angel
 7   Navarro with Mr. Rivera seated to my left.
 8          THE COURT:  Good morning to you all and good
 9   morning, ladies and gentlemen of the jury.  All right.
10          When we left off Friday, we were nearing or at
11   the end of the government's case.
12          Ms. El-Amamy.
13          MS. EL-AMAMY:  The government rests, your Honor.
14          THE COURT:  Ladies and gentlemen, this concludes
15   the presentation of evidence by the prosecution.  Now, we
16   begin the defense case in chief, and, in no particular
17   order, which defendant would like to proceed first?
18          MR. CEPHAS:  I would, your Honor.
19          THE COURT:  All right.  Mr. Cephas.
20          MR. CEPHAS:  The defense calls Manuel Corona.
21          The witness is in the restroom, your Honor.
22   He will be here.
23          THE COURT:  Do you have another witness?
24          Of the three witnesses names you have on your
25   witness list, are any of them here?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. CEPHAS:  Yes.  They are all three here.

 2          THE COURT:  Can we put someone on?

 3          MR. CEPHAS:  I believe he is going to get one of

 4   them right now, your Honor.

 5          (The witness was sworn.)

 6          THE CLERK:  Please be seated.  Please state your

 7   name and spell it for the record.

 8          THE WITNESS:  Manuel Corona, C-O-R-O-N-A.

 9          THE COURT:  All right.  Mr. Cephas.

10

11                    DIRECT EXAMINATION

12   BY MR. CEPHAS:

13   Q     Good morning, Mr. Corona.

14   A     Good morning.

15   Q     Do you know Mr. Raul Prieto who is sitting in the

16   courtroom?

17   A     I do.

18   Q     How many years have you known him?

19   A     I have known him about 10 years already since I was

20   like 13, 12.

21   Q     Do you know what a tagging crew is?

22   A     Yes, I do.

23   Q     What is a tagging crew?

24          MS. EL-AMAMY:  Objection, your Honor.  Relevance.

25          THE COURT:  Sustained.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q     BY MR. CEPHAS: Do you know -- have you heard of a

2    tagging crew named KMR?

3           MS. EL-AMAMY:  Same objection, your Honor.

4           MR. CEPHAS:  Your Honor, testimony has come in

5    from --

6           THE COURT:  It was irrelevant then.  It is still

7    irrelevant.

8           MR. CEPHAS:  Your Honor, may I approach the clerk

9    with exhibits, please.

10          THE COURT:  Yes.

11   Q     BY MR. CEPHAS: Mr. Corona, would you look at the

12   three exhibits that have been placed in front of you.

13          Have you had a chance to look at those

14   three exhibits?

15   A     Yes.

16   Q     Are they photographs?

17   A     Yeah.

18   Q     And is there a person in the photographs?

19   A     Yes, there is.

20   Q     And were you at the scene of what is depicted in

21   the photographs?

22   A     I was.

23   Q     And these photographs are pictures of KMR graffiti;

24   is that correct?

25   A     Yes, that's correct.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q     And do these photographs accurately reflect what
 2   the KMR graffiti murals look like?
 3   A     Yes, they do.
 4         MR. CEPHAS:  Your Honor, move to admit Defense
 5   Exhibit 1000, 1001 and 1002.
 6         MS. EL-AMAMY:  Your Honor, there has been no
 7   testimony as to when these photographs were taken, if
 8   they were taken any time near the conduct in this trial.
 9         MR. CEPHAS:  Your Honor, the government has put on
10   numerous pictures --
11         THE COURT:  No.  We are talking about foundation
12   for these pictures.
13               And what is the relevance of these pictures?
14   What is the relevance of graffiti?
15         MR. CEPHAS:  Excuse me, your Honor?
16         THE COURT:  What is the relevance of all this
17   street art or graffiti or anything else?
18         MR. CEPHAS:  The government has put on numerous
19   photos of Black Angels graffiti and have suggested that
20   my client is tied to Black Angels graffiti, and I think
21   it is completely relevant to show that my client, as the
22   government's witness testified to, was a member of KMR
23   and to show the difference between the kind of graffiti
24   art that my client does versus the, say, chicken scratch
25   kind of gang graffiti that Black Angels members do.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Okay.  Stop.  The graffiti that we
 2   looked at during the government's case in chief was
 3   really based upon content of what was in there to
 4   demonstrate an association with that particular
 5   organization.
 6              This, obviously, is much more artistic.  Are
 7   you saying that membership or involvement in
 8   one precludes membership or involvement in the other?
 9          MR. CEPHAS:  Yes, I am.  And the reason I am
10   saying that --
11          THE COURT:  There is no testimony on that.
12          MR. CEPHAS:  There is, your Honor.
13          THE COURT:  There is not.
14          MR. CEPHAS:  I can point --
15          THE COURT:  Nor do we have -- you do that one more
16   time.  You do that one more time.
17          MR. CEPHAS:  Your Honor?
18          THE COURT:  Do we have any testimony as to when
19   these photographs were taken?
20          MR. CEPHAS:  I will ask the witness.
21          THE COURT:  Well, do that before you seek to admit
22   them.
23   Q    BY MR. CEPHAS: Mr. Corona, look at the first exhibit
24   with the silver KMR letters.  Can you tell me
25   approximately when that photograph was taken?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    A     Around 2009.

2    Q     And look at the second KMR with gold letters.  Can

3    you tell me approximately when that photograph was taken

4    and when it was drawn?

5    A     2009.

6    Q     And the third, the third KMR mural, can you tell me

7    approximately when that was taken?

8    A     2009.

9    Q     Okay.

10         MR. CEPHAS:  Your Honor, there was testimony, and

11   I can direct the court to the transcript where

12   Mr. Navarro said that Mr. Prieto was a member of KMR and

13   that he would have to quit KMR when he joined OVS, and

14   that he could not -- he could no longer do KMR if he was

15   going to be a member of OVS.  And I have the transcript

16   tabbed.  I can show the court the page where Mr. Navarro

17   testified as to that.

18         THE COURT:  I would like to see that.

19         MR. CEPHAS:  One moment, your Honor.

20         (Pause in proceedings.)

21         MR. CEPHAS:  Your Honor, and I will approach the

22   court, but for the record, Page 104 of Day 3, Thursday,

23   December 6th, 2012.  May I approach?

24         THE COURT:  Yes.

25         (The following proceedings were held at sidebar

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          outside the presence of the jury:)

 2          THE COURT:  This is Rivera?

 3          MR. CEPHAS:  This is Navarro's testimony.

 4          THE COURT:  Have you seen this?

 5              Do you recall whether or not there was any

 6  cross-examination on this?

 7          MS. EL-AMAMY:  I don't believe that he was crossed

 8  on this.

 9          THE COURT:  Okay.

10          MS. EL-AMAMY:  That is my recollection.

11          THE COURT:  Okay.  Thanks.

12          (The following proceedings were held in the

13          presence of the jury:)

14          THE COURT:  I am going to defer ruling on your

15  motion to admit these until there has been cross either

16  by the government or by the court.  But go ahead.

17          MR. CEPHAS:  Your Honor, I have no further

18  questions.  I just want the jury to see the photographs.

19          THE COURT:  Okay.  Not yet.  Cross.

20

21                    CROSS-EXAMINATION

22  BY MS. EL-AMAMY:

23  Q    Morning, Mr. Corona.

24  A    Morning.

25  Q    I want you to take a look at Exhibit 1001 which is
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the middle photograph.  Do you see what is written in

2    that little white square in the middle?

3    A      Yes.

4    Q      What is written there?

5    A      Crook.

6    Q      Is that the name that you knew Mr. Prieto to go by?

7    A      Yes.  That was his graffiti name.

8    Q      Now, you testified that all of these pictures took

9    place in 2009?

10   A      2009.  2009 or almost at the end of 2008.

11   Q      At the end of 2008 or the beginning of 2009?

12   A      Yeah.  Like January or --

13   Q      So this happened before the summer of 2009?

14   A      No.  After.  In 2009.  It happened in 2009.  Yeah

15   it happened in the summer before 2009.

16   Q      In the summer before 2009.

17   Q      So before June, 2009?

18   A      Yes.

19   Q      Were you at defendant Prieto's house in July of

20   2009?

21   A      No, I wasn't.

22   Q      Did you know Mr. Prieto in July of 2009?

23   A      I did.

24   Q      Were you there on a date in July, 2009 -- I'm

25   sorry.  Do you know an individual named Carlos Rivera?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A     If I knew him?

 2   Q     Do you know him?

 3         MR. CEPHAS:  Objection.  Outside the scope, your

 4   Honor.

 5         THE WITNESS:  Yes, I know him.

 6   Q     BY MS. EL-AMAMY: You know him?

 7   A     Yes.

 8   Q     Were you ever there when Mr. Prieto --

 9         MR. CEPHAS:  Same objection, your Honor.

10         THE COURT:  Where is this going?

11         MS. EL-AMAMY:  Your Honor, I will withdraw from

12   that line of questioning.

13   Q     All right.  So these photographs all took place at

14   the latest in January, 2009?

15   A     Yes.  I can't recall exactly the dates of them

16   because we did a lot from like my best of knowledge

17   around 2009.

18         MS. EL-AMAMY:  All right.  No further questions.

19         THE COURT:  Were you present when any of these

20   photographs were taken?

21         THE WITNESS:  Do I know when?  Where?

22         THE COURT:  No.  Were you present at the time

23   these photographs were taken?

24         THE WITNESS:  I was.

25         THE COURT:  Okay.  And how do you place the date
```

1    at 2009, 2008?

2         THE WITNESS:  I remember having some in my book

3    and my camera showed a date on them.

4         THE COURT:  All right.  So have you looked at

5    these pictures in preparation for trial?

6         THE WITNESS:  Not for trial, but I have seen them

7    before.

8         THE COURT:  Were you asked to look through your

9    pictures or materials in order to ascertain when these

10   pictures were taken?

11        THE WITNESS:  No.

12        THE COURT:  The first time you have been asked as

13   to when these pictures were taken is right now during

14   this case?

15        THE WITNESS:  Yes.

16        THE COURT:  And you were able to clearly remember

17   and testify affirmatively that these pictures were taken

18   three years ago?

19        THE WITNESS:  Yes.

20        THE COURT:  And there is nothing specific about

21   these pictures or the event which would cause you to

22   remember clearly that these pictures were taken

23   three years ago?

24        THE WITNESS:  Specific as in what, though?  I

25   don't get it.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1         THE COURT:  I don't know.  You had just come back
 2   from Washington, DC, from the inauguration.  Anything.
 3   Is there any specific event that happened
 4   contemporaneously with the taking of these pictures which
 5   would help you place the date?
 6         THE WITNESS:  No.
 7         THE COURT:  Okay.  Thanks.  Any further questions
 8   by either counsel?
 9         MS. EL-AMAMY:  No, your Honor.
10         MR. CEPHAS:  Your Honor, are you going to allow me
11   to show the photos to the jury?
12         THE COURT:  Yes.
13
14                    REDIRECT EXAMINATION
15   BY MR. CEPHAS:
16   Q     Mr. Corona, I have placed exhibit, Defense Exhibit
17   1000 on the monitor.  Do you see that?
18   A     Yes.
19   Q     And is that one of the KMR murals that Mr. Prieto
20   painted to your knowledge?
21   A     Yes.  That is one of them.
22   Q     Now I am placing Defense Exhibit 1001.  Is that
23   also a KMR mural that Mr. Prieto painted?
24   A     Yes, it is.
25   Q     And, now, I am showing you Defense Exhibit 1002.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Is that another KMR mural that Mr. Prieto has painted?

2    A     Yes, it is.

3    Q     And I notice that the three are all different

4    styles.  Did you see that?

5    A     Yes.

6    Q     Approximately how many KMR murals have you seen

7    Mr. Prieto paint over the years?

8    A     Around 50, 60.

9          MR. CEPHAS:  Nothing further, your Honor.

10         THE COURT:  Okay.  Anything further, Ms. El-Amamy?

11         MS. EL-AMAMY:  No, your Honor.

12         THE COURT:  All right.  Sir, you may step down.

13   Your next witness.

14         MR. CEPHAS:  Your Honor, defense calls Velia

15   Prieto.

16         (The witness was sworn.)

17         THE CLERK:  Please state your full name for the

18   record.

19         THE WITNESS:  Velia G. Prieto.

20         THE COURT:  All right, Mr. Cephas.

21             And, by the way, 1000 through 1002 are

22   admitted into evidence.

23         MR. CEPHAS:  Thank you, your Honor.

24    ///

25                    DIRECT EXAMINATION

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. CEPHAS:

 2   Q      Good morning.

 3   A      Good morning.

 4   Q      If at any time you have trouble hearing a question

 5   or unclear, just ask me, and I will repeat it.  Okay?

 6   A      Okay.

 7   Q      Are you Raul Prieto's mother?

 8   A      Yes, I am.

 9   Q      Where do you live?

10   A      642 East E Street in Ontario, California.

11   Q      Does Raul Prieto live there?

12   A      Yes, he does.

13   Q      He was in custody for about 10 months before he got

14   out on bail.  Has he lived in that house since he was

15   released on bail?

16   A      Yes, he has.

17   Q      Who owns the house?

18   A      I do.

19   Q      What year did you move to that house?

20   A      1989.

21   Q      Mr. Prieto was born in 1985; is that correct?

22   A      Yes, he was.

23   Q      So he has lived there since he was about four years

24   old?

25   A      Yes, he has.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      Any other sons living there with you?

2    A      Right now, Jesus Prieto, my youngest, and my other

3    son, Henry Prieto, was living there also.

4    Q      Are you familiar with the defendant Carlos Rivera?

5    A      Yes, I am.

6    Q      How old was he when you first met him?

7    A      About 12.

8    Q      How would you characterize your relationship with

9    Mr. Rivera?

10   A      Like my son.

11   Q      He is not actually your son; correct?

12   A      No, he is not.

13   Q      Does -- did Mr. Rivera spend a lot of time at your

14   house over the years?

15   A      Oh, yes.

16   Q      If he came to your house, would he have to knock on

17   the door?

18   A      No.

19   Q      He would just go right in?

20   A      Just walk in.

21   Q      Like it is his home?

22   A      Like it is his house.  It is his house.

23   Q      What name does he call you?

24   A      Mom.

25   Q      And what name do you call Mr. Rivera?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      My son or Chino or Mijo.  That means son in
 2    Spanish, Mijo.
 3    Q      How long have you referred to him like that as your
 4    son?
 5    A      From practically, a good 12,13 years, as long as he
 6    has been around.
 7    Q      How long has he referred to you as Mom?
 8    A      A long time, the same.
 9    Q      Has Mr. Rivera been close friends with anyone in
10    particular in your family?
11    A      With all my family.  With my sons, my husband,
12    nieces, nephews, whoever is there.
13    Q      Now, you mentioned three sons, Henry, Jesus and
14    Raul.  They all lived there at the same time?
15    A      Yes.
16    Q      There has been testimony that -- referring to
17    Mr. Rivera as a cousin of Mr. Prieto.  Are you related,
18    actually related to Mr. Rivera?
19    A      No.
20    Q      Are any of your sons actually cousins of
21    Mr. Rivera?
22    A      No.
23    Q      Was your son Henry older than Rivera?
24    A      Yes, he was.
25    Q      Was Henry close to Rivera?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      Yes.

 2    Q      How about Jessie?

 3    A      Very.

 4    Q      How about Raul?

 5    A      Very.  They seem like a brother.

 6    Q      Now, there has been testimony in this case that

 7    Mr. Rivera was on parole.  I don't want to know why, if

 8    you know, but did Mr. Rivera go to prison some time in

 9    2008?

10    A      Yes, he did.

11    Q      Did Mr. Rivera going to prison have any adverse

12    effect on any of your sons?

13    A      Yes, it did.

14    Q      Which son did it have an effect on?

15    A      My oldest Henry.

16           MS. EL-AMAMY:  Objection.  Relevance.

17           THE COURT:  Sustained.

18    Q    BY MR. CEPHAS: Did your son Henry do anything after

19    Rivera went to prison?

20    A      Yes, he did.

21           MS. EL-AMAMY:  Objection.  Vague.

22           THE COURT:  Sustained.

23    Q    BY MR. CEPHAS: What did he do after Rivera went to

24    prison?

25           MS. EL-AMAMY:  Same objection.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Overruled.

 2            THE WITNESS:  He left.

 3   Q    BY MR. CEPHAS: Why did he leave?

 4   A    Because Rivera wasn't there to protect him.  He

 5   felt lonely without him.  He was -- he was his big

 6   brother.  Even though my son was older, he was his big

 7   brother.

 8   Q    And so --

 9   A    He went to Oregon.  He left me a note saying that,

10   why he left, and he committed suicide in Oregon.

11   Q    Was Rivera like a big brother to all your sons?

12   A    Yes, he was.  They looked up to him.

13   Q    Did you visit your son Raul Prieto when he was --

14   when he was arrested when he was in custody in this case

15   when he was at San Bernardino jail?

16   A    Yes.

17   Q    Did you also visit Mr. Rivera when he was in

18   custody at San Bernardino?

19   A    Yes.

20   Q    Did you visit Mr. Rivera often?

21   A    Yes.

22   Q    Why did you visit Mr. Rivera?

23   A    Because he is like my son.

24   Q    Still consider him like your son?

25   A    Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q      Did Mr. Rivera spend a lot of time at your house

 2   when he was young, 12, 13, 14, 15 years old?

 3   A      Yes.

 4   Q      Did he ever spend the night at your house?

 5   A      Yes.  Numerous occasions.

 6   Q      Okay.  Let's change the subject a little.  Have you

 7   heard of a gang called the Black Angels?

 8   A      Yes.

 9   Q      At some time during the years when Mr. Rivera

10   started hanging out at your home, did you learn that

11   Mr. Rivera had become a member of the Black Angels?

12   A      Yes.

13   Q      When you learned that Mr. Rivera became a member of

14   the Black Angels, did his behavior change around you when

15   he came to your house?

16   A      Not at all.

17   Q      Did he act disrespectful in any way?

18   A      No.

19   Q      Did you ever tell him he couldn't come around your

20   home after you learned he had become associated with the

21   Black Angels?

22   A      No.

23   Q      Why not?

24   A      Pardon?

25   Q      Why didn't you tell him he couldn't come around
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   anymore?

 2   A      Because he is my son to me.  I love him.  I am not

 3   going to chase him out of my house.

 4   Q      Did you criticize him for doing anything to his

 5   body?

 6   A      Yes, I did.

 7   Q      What did you do?

 8   A      I scold him for putting Black Angels on him in a

 9   tattoo.

10   Q      There is an individual named David Navarro who has

11   also testified in this case.  Do you know who David

12   Navarro is?

13   A      I seen him.

14   Q      Has Mr. Navarro ever come to your house looking for

15   your son Raul Prieto?

16   A      No.

17   Q      Did any of Mr. Rivera's friends come to your house

18   looking for your son Raul Prieto when Rivera wasn't

19   there?

20   A      No.

21   Q      About how many times would you say Mr. Navarro has

22   been to your house?

23   A      About two or three.

24   Q      So not very often?

25   A      No.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q     Did many of your sons' other friends spend much
 2   time at your house on E Street?
 3   A     Yes.
 4   Q     I am going to change the subject again slightly.
 5   Do you know what KMR is?
 6   A     Yes.
 7   Q     Do you consider your son a graffiti artist?
 8   A     Yes, I do.
 9   Q     When did your son first get involved in art and
10   drawing?
11   A     At a young age in elementary school.
12   Q     Have you seen some of the graffiti murals he has
13   painted?
14   A     Yes, I have.
15   Q     Has he painted the symbol in your house?
16   A     All over the place, yes.
17   Q     Has he painted the graffiti symbol Crook, his name,
18   in your house?
19   A     Yes.
20   Q     Did Ontario police know about Raul being a member
21   of KMR?
22   A     Yes, they did.
23   Q     Were you ever at -- were you at your home in
24   September of 2008 when police searched your home?
25   A     Yes, I was.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q      And did the police have a search warrant for KMR,

 2   KMR-related graffiti?

 3   A      Yes.

 4          MS. EL-AMAMY:  Objection.  Calls for hearsay.

 5   Q    BY MR. CEPHAS: Did the police go into your home that

 6   day

 7   A      Yes, they did.  They took a --

 8          MS. EL-AMAMY:  Objection.  Nonresponsive.

 9          THE COURT:  "Yes" or "no", did they go into your

10   home?

11          THE WITNESS:  Yes, they did.

12   Q    BY MR. CEPHAS: Did they see photos of -- excuse me.

13   Did they see graffiti of KMR painted on the walls?

14   A      Yes, they did.

15          MS. EL-AMAMY:  Objection.  Lack of personal

16   knowledge.

17          THE COURT:  Sustained.

18   Q    BY MR. CEPHAS: You were there the day that the

19   police went into the home; correct?

20   A      Yes, I was.

21   Q      And did you follow them around part of the time?

22   A      Part of it.  Then they didn't let me the rest.

23   Q      Did you actually see them entering rooms that had

24   graffiti of KMR painted on it?

25   A      Yes, they did.  They took pictures and they
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    collected everything and put it in a bag, all his markers

2    and paints and excess pictures that were around the

3    house, and they took them in.

4    Q    Is there any way they could have gone into some of

5    these rooms and not seen the paintings of KMR on the

6    walls?

7    A    No.  They were all over.

8    Q    Now, that day, did police also look into Raul's

9    vehicle?

10   A    Yes, they did.

11   Q    How did they get into -- did you see how they got

12   into the car?

13   A    Yes, I did.

14   Q    How did they get into the car?

15   A    They broke the window, and they broke the handle

16   from the driver's side.

17   Q    They didn't use a Slim Jim to open?

18   A    No, they didn't.

19   Q    Did they pay to fix it?

20   A    No.  They towed it away too.  I had to take it out

21   of the impound.

22   Q    Did that cost you any money?

23   A    Yes, it did.

24   Q    How much?

25   A    Around 400, something.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q      Okay.  Change the subject again.  Did your son Raul
2    Prieto have any mental health issues or special needs
3    growing up?
4    A      Yes, he did.
5           MS. EL-AMAMY:  Objection.  Relevance.
6           THE COURT:  Overruled.
7    Q   BY MR. CEPHAS: What are those -- what are the
8    special needs or condition --
9           THE COURT:  Woah, woah.  Wait.  Wait.  Wait.
10          (The following proceedings were held at sidebar
11          outside the presence of the jury:)
12          THE COURT:  Are you going to assert some
13   diminished mental capacity defense?
14          MR. CEPHAS:  No, I am not.
15          THE COURT:  Okay.  Then this is irrelevant.
16          MR. CEPHAS:  May I make my record?
17          THE COURT:  Yes.
18          MR. CEPHAS:  What I am establishing is that
19   everyone in his circle of friends knew that he was --
20   knew that he was special needs.  He didn't learn how to
21   read or write until he was 20 years old.  He gets
22   confused when he is talking.  He wasn't gang material.
23          That is one of the reasons why -- excuse me,
24   your Honor.  This is one of the reasons why, although
25   one of his best friends, Rivera, was president of OVS, at
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the time he never brought him into the gang and why he

2    protected him because he was a special ed kid who, you

3    know, this is the kid who got confused.  He had trouble

4    talking.

5            And it is not a diminished capacity, but it is

6    why for years for so many years his best friends never

7    brought him into this, you know, sophisticated, dangerous

8    organization because he just he wasn't up to it.  He

9    wasn't gang material.

10   THE COURT:  All right.  We have had David Navarro

11   on the stand really for quite some time, and as the

12   leader of this gang, he didn't talk about being a Phi

13   Beta Kappa as being a qualifier in order to get into the

14   Black Angels.  He never talked about that at all.

15   MR. CEPHAS:  That's right, your Honor, but that is

16   irrelevant.  This is my case -- excuse me, your Honor.

17   THE COURT:  How is it irrelevant when this is --

18   okay.  If it was irrelevant then to show what the

19   qualifications were to get into the Black Angels, then

20   this line of questioning is irrelevant.

21   MR. CEPHAS:  No.  No.  I am saying I had no

22   obligation to ask Mr. Navarro --

23   THE COURT:  True.

24   MR. CEPHAS:  -- about the qualifications.  I am

25   not saying that.  What I am saying is that Mr. Rivera was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    more protective of Prieto and kept him -- Navarro said

2    that Rivera kept him out, he was protective of him and

3    that he kept him out of gang business.  And I am going to

4    explain to the jury the reason he did that, and the

5    reason he did that is because he was a special needs kid.

6    Everybody made fun of him.  Even Rivera made fun of

7    Prieto.

8         THE COURT:  You can't get that from this witness.

9         MS. EL-AMAMY:  And for the record I would like to

10   say there is no expert notice and this witness has lack

11   of personal knowledge.

12        THE COURT:  This is a waste of time.

13        MR. CEPHAS:  Your Honor, I have approximately

14   five more questions then I am done.

15        THE COURT:  Okay.  If you are going to get into

16   his mental health, his mental status with this witness.

17        MR. CEPHAS:  I am not, your Honor.

18        THE COURT:  Okay.  Good.

19        MR. CEPHAS:  I am just -- my point is just that

20   she can testify he was in special ed classes his whole

21   life.

22        THE COURT:  Not relevant.

23        MR. CEPHAS:  It is relevant, your Honor.

24        THE COURT:  I disagree.

25        MR. CEPHAS:  You are cutting in my case.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  It is not relevant, and I have just

 2    explained why.  You haven't established that mental

 3    capacity is relevant in order to gain membership into the

 4    Black Angels.

 5          MR. CEPHAS:  Your Honor, that is not -- my

 6    argument is not that it is relevant, that it is not

 7    required to -- that it is required to get into.  It is

 8    establishing my defense as to why Rivera didn't bring him

 9    in.  Not that he couldn't come in.  If Rivera didn't

10    know --

11          THE COURT:  She doesn't know that.  Who is going

12    to testify regarding why Rivera did this, that or the

13    other?

14          MR. CEPHAS:  Your Honor, it is -- I am allowed to

15    argue reasonable, reasonable conclusions in my closing,

16    and part of it is based on the fact that everyone who

17    spent time with Prieto knew that he couldn't read,

18    couldn't write, he was special needs, he went to special

19    ed classes, and they were protective of him for that

20    reason.

21          THE COURT:  You can argue that, but there is no

22    evidence of that.

23          MR. CEPHAS:  I am trying to get the evidence in so

24    that I can argue it, and I have like three or for

25    four more questions.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              THE COURT:  Okay.  All right.

 2              MR. CEPHAS:  And that is it.

 3              THE COURT:  We will see.

 4              MR. CEPHAS:  Thank you, your Honor.

 5          (The following proceedings were held in the

 6          presence of the jury:)

 7   Q    BY MR. CEPHAS: During Mr. Prieto's school years did

 8   he attend special ed classes?

 9   A      Yes, he did.

10   Q      And did everyone in the family know that he

11   attended these special ed classes?

12   A      Everybody knew, yes.

13   Q      Did all of Mr. Prieto's friends know?

14              MS. EL-AMAMY:  Objection.  Personal knowledge.

15              THE COURT:  Sustained.

16   Q    BY MR. CEPHAS: During the years Raul was growing up,

17   did you see his friends making fun of Mr. Prieto because

18   of his special needs?

19              MS. EL-AMAMY:  Objection.  Relevance.

20              THE WITNESS:  Yes, they did.

21              THE COURT:  Overruled.

22              THE WITNESS:  Yes, they did because he couldn't

23   read or write, spell.  So they would laugh at him because

24   he was like almost 20 when he learned to read a little

25   and spell.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q    BY MR. CEPHAS: He was 20 years old by the time he

2    learned how to read and write?

3    A    Yes.

4         MR. CEPHAS:  Nothing further.

5

6                    CROSS-EXAMINATION

7    BY MS. EL-AMAMY:

8    Q    Good morning, Ms. Prieto.

9    A    Good morning.

10   Q    Now, you testified that -- you have been in court

11   this entire trial, haven't you?

12   A    Yes.

13   Q    So you have listened to a lot of calls, haven't

14   you?

15   A    Yes.

16   Q    So in listening to calls, you know that defendant

17   Rivera refers to you as his aunt; isn't that right?

18   A    Yes.

19   Q    Now, you said that you considered your son a

20   tagger; is that correct?

21   A    Yes.

22   Q    All right.  Do you also consider your son a drug

23   dealer?

24   A    No, I don't.

25   Q    Were you here in trial listening to calls about

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   drugs?

2   A      Yes.

3   Q      So you heard a call where defendant -- your son is

4   talking to defendant Rivera about getting drugs; right?

5   A      Yes.

6   Q      They were talking about methamphetamine; right?

7   A      Yes.

8   Q      And your son asked for half an ounce; is that

9   correct?

10   A      No.

11   Q      You didn't hear that call?

12   A      I heard my son desperate on the phone, and I heard

13   him being offered.  Yeah.

14   Q      You heard your son desperate on the phone.  Did you

15   also hear your son volunteer to call a drug customer and

16   get money for defendant Rivera?

17   A      No.  I didn't hear that part.

18   Q      You didn't hear that part?

19   A      That part, I didn't.

20   Q      So let me direct your attention to a portion of

21   Exhibit 85 which was a telephone call.  That telephone

22   call was played while you were in court; isn't that

23   right?

24   A      I don't have my glasses on me.  Let me --

25   A      Okay.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q    Did you read that?
2    A    Yeah.  But that day in court, I guess I didn't pay
3    attention to that section because, no, I didn't remember
4    that.
5    Q    Okay.  Well, now, looking at that, you see that
6    your son is saying let me get his number and I will call
7    from another phone; isn't that right?
8    A    Yes.  That is what it says.
9    Q    And he is offering to get drug money for defendant
10   Rivera?
11        MR. CEPHAS:  Objection.  Speculation.  Foundation.
12        THE COURT:  Sustained.
13   Q    BY MS. EL-AMAMY: Now, you were also there when this
14   portion of the call was played; isn't that right?
15   A    Yeah.
16   Q    And you were there when you heard your son say in a
17   recorded telephone conversation sell me half an O, I will
18   fucking move it; isn't that right?
19   A    Yes.
20   Q    And that was moving drugs?
21        MR. CEPHAS:  Objection.  Speculation.
22        THE WITNESS:  Yes.  But you asked me if I knew
23   my --
24        THE COURT:  Hang on.
25        THE COURT:  Say it again, Mr. Cephas?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1          MR. CEPHAS:  Objection.  Speculation, foundation
2    and hearsay.
3          THE COURT:  Sustained.
4    Q    BY MS. EL-AMAMY: Do you consider your son a robber?
5    A    No.
6    Q    All right.  Well, were you there in court when your
7    son said in a recorded telephone conversation I am going
8    to hit a lick, I got a robbery I want to do?
9    A    My son talks a lot of smack, but a robber he is
10   not.  Even though he said it, but he is not a robber.
11   Q    So he was just talking smack when defendant Rivera
12   said don't do that robbery, I am going to give you drugs
13   to sell instead?
14   A    He was just talking smack.  That is like me saying
15   I am going to knock the hell out of somebody.  I am just
16   saying.  And that is what he does.  He talks smack.
17   Q    Now, you have --
18   A    He is not a robber.  No.
19   Q    He is not a robber?
20   A    He has never robbed anybody.  I have seen him help
21   too many people, you know, bring in homeless and feed
22   them and stuff than to be robbing.  No.
23   Q    Well, we just talked about how the cops broke into
24   a car that you owned; isn't that right?
25   A    Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    Q    And the reason why they broke into the car is
2    because your son stole a scooter from an individual?
3              MR. CEPHAS:  Objection.  Speculation foundation.
4              THE COURT:  Overruled.
5              THE WITNESS:  No.  He didn't steal the scooter.
6    He had a part of the scooter, but he didn't steal the
7    scooter.  And the day they broke that car, it had nothing
8    to do with the scooter.
9    Q    BY MS. EL-AMAMY:So he stole a part of a scooter?
10   A    No.  He winded up stuck with it.
11   Q    He winded up stuck with it because somebody else
12   stole it?
13             MR. CEPHAS:  Objection.  Speculation.  Foundation.
14             THE COURT:  Overruled.
15             THE WITNESS:  He got -- does overruled mean to
16   answer?
17             THE COURT:  Yes.  Go ahead.
18             THE WITNESS:  He got hit in the head with a
19   scooter, and when he went to, you know, pull the scooter
20   away from the kid, he winded up left with that part which
21   was the top of the -- a Razor scooter, like a $50
22   scooter.  They put it down as a $400 scooter, but that
23   was not in that car.  That was in another car.  You got
24   the wrong car.
25   Q    BY MS. EL-AMAMY: All right.  But they took the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   scooter from the kid?

 2   A     No.  The scooter was thrown there.  The little part

 3   is the only thing he had, the handle.

 4         MR. CEPHAS:  Objection.  Speculation, foundation.

 5   They are talking about two different incidents.

 6         THE WITNESS:  Exactly.  Oh.  I'm sorry.  I'm

 7   sorry, Judge.  Taking over your job.  Sorry.

 8   Q     BY MS. EL-AMAMY: Now, your son, you were here when

 9   you -- you know that your son sold cocaine; right?

10   A     No.

11   Q     You didn't -- you weren't in court when you heard

12   recorded conversations about your son selling cocaine?

13   A     I heard the message, but did I know, no.

14   Q     So he was talking to defendant Rivera about soda.

15   That is cocaine.

16         MR. WALSH:  Objection.  Speculation.  Relevance.

17         THE COURT:  Overruled.

18         THE WITNESS:  Do I answer?

19         THE COURT:  Yes.

20         THE WITNESS:  You asked me if I knew my son was

21   selling cocaine.  I said no which is the truth.  What I

22   heard on the tape was, you know, that was true that I

23   heard here.  But did I know, no.

24   Q     BY MS. EL-AMAMY:And you also heard that your son

25   sold ecstasy?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    A      On the tape, yes.

 2    Q      Let me ask you again do you believe your son is a

 3    drug dealer?

 4    A      No.

 5    Q      Now, you are the person who owned the house on

 6    Campus and E; isn't that right?

 7    A      Yes.

 8    Q      And you let defendant Rivera do a gun deal there,

 9    didn't you?

10           MR. CEPHAS:  Objection.  Speculation.  Foundation.

11    Argumentative.

12           THE COURT:  You can rephrase that question.

13    Q    BY MS. EL-AMAMY: Did a gun deal happen at your

14    house?

15           MR. CEPHAS:  Objection.  Speculation.

16           THE COURT:  Overruled.

17    Q    BY MS. EL-AMAMY: Did a gun deal happen at your

18    house?

19           MR. CEPHAS:  Objection.  Foundation.

20           THE COURT:  Overruled.

21           THE WITNESS:  Does that mean answer?

22           THE COURT:  Yes.  Please.

23           THE WITNESS:  Yeah.  I heard here, but that day, I

24    didn't see no gun.

25           MR. CEPHAS:  Objection, your Honor.  Hearsay.  She
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1    just said she heard it here.

2         THE WITNESS:  I heard it here.

3         THE COURT:  Okay.

4    Q    BY MS. EL-AMAMY: You heard it here?

5    A    Well, I heard it behind the trial, the case.

6    Q    Okay.

7         THE COURT:  Would you please get clarification

8    from her as to whether or not her knowledge regarding

9    this transaction was her personal knowledge or whether or

10   not she acquired this information elsewhere?

11   Q    BY MS. EL-AMAMY: Were you there in July of 2009 when

12   a bunch of cops came to your house?

13   A    I don't know if that was the date, but I was there,

14   yes.

15   Q    Were you there when defendant Rivera ran into the

16   house when the cops came?

17   A    Defendant Rivera did not run into the house.  He

18   walked into the house.  Yes.

19   Q    So walked into the house.  And were you in the

20   house, or were you outside the house when that happened?

21   A    As a matter of fact, I got in front of him because

22   I was afraid the cops would shoot him because they had

23   guns and rifles on the little kids and everybody.  So he

24   passed me.  I got in front of him.

25   Q    Did you think he was doing something wrong?

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    A      No, I didn't.

2    Q      So why did you get in front of him?

3    A      Because the cops are trigger happy, and I was

4    afraid they would hurt him.

5    Q      Did you know he had -- did you know that he had

6    bought a gun on that date?

7    A      No.

8    Q      So you didn't know that he hid the gun in your

9    refrigerator?

10   A      No.

11   Q      Did you tell him -- so you didn't know at all?

12   A      No, I didn't.  And the officers, I asked to speak

13   to the officers, and they never even gave me a search

14   warrant or even told me that a gun was taken out of my

15   house because I kept asking them, you know, where is the

16   search warrant if you are going in my house.

17            And they never showed me nothing.  They never

18   said nothing.  They had us across the street, and they

19   had rifles on -- like I said a four-year-old and a

20   six-year-old and on everybody and the dogs too.  But they

21   never told me why they were in my house or anything

22   except one officer said, oh, we saw somebody run in here.

23   Nobody ran in.  I had a fence.

24   Q      Now, this isn't the first time you have talked

25   about guns in this case have you?
```

```
 1   A     On this case?  Yeah.  Right now.
 2   Q     Well, you have been to hearings in this trial, in
 3   this proceeding before; isn't that right?
 4         MR. CEPHAS:  Objection.  Relevance.
 5         THE WITNESS:  No.
 6   Q     BY MS. EL-AMAMY: No, you have never been to court in
 7   relation to your son in this case?
 8   A     All the times, I have been here.
 9         THE COURT:  If there is going to be impeachment,
10   there is a way of doing it.
11   Q     BY MS. EL-AMAMY: You let your son --
12   A     Oh.  It dawned on me.  Okay.
13   Q     Would you like to correct your answer?
14   A     Are you talking about the bail hearing?
15   Q     Yes.
16   A     Okay.  That is different.
17   Q     Yes.  So you have been to court before?
18   A     I have been to a bail hearing.
19   Q     Have you filed a declaration before?
20   A     What is that?
21   Q     Where you said some things in an affidavit?
22   A     Did I file it?
23   Q     Did you sign an affidavit on behalf of your son?
24   A     To get him out on bail.  Yes.
25   Q     Did you claim responsibility for some guns?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          MR. CEPHAS:  Objection.  Relevance.  Outside the
 2    scope.
 3          THE COURT:  Sustained.
 4          THE WITNESS:  Does that mean answer?
 5          MS. EL-AMAMY:  No.
 6    Q     Now, you let your son and defendant Rivera use your
 7    house as a place to conduct crimes; isn't that right?
 8    A     No.  That is wrong.
 9    Q     Well, you testified earlier that you had KMR
10    graffiti all over your house?
11    A     And if you would have asked me if I had any
12    drawings, I would have told you I had drawings there too
13    because I draw also.  And I don't call it graffiti when
14    they are -- I draw Bambi.  I like cartooning.  He likes
15    skeletons.  That is not graffiti.  That is his personal
16    room.  He can put up what he wants to on his walls.  I
17    can do the same in mine.  That is not letting my house
18    out for, you know, however you are putting it out there.
19    Q     Did you just testify that you had KMR all over your
20    house?
21    A     KMR because I will explain that one.
22    Q     No.  That is okay.
23    A     He was on my room --
24    Q     That is okay.  Did you testify --
25    A     Yes.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Q     That you had KMR all over your house?
 2           Ms. Prieto, you knew your son was conducting
 3   drug deals out of your house, didn't you?
 4   A     No, I didn't.
 5   Q     You knew that Mr. Rivera was conducting drug deals
 6   out of your house?
 7   A     No, I didn't.
 8   Q     You knew that he was getting guns and storing them
 9   in your house?
10   A     No, they weren't.
11   Q     And you did that because you didn't want Mr. Rivera
12   to get in trouble; isn't that right?
13   A     No.  You are wrong.
14   Q     Because he was like your son?
15   A     Being my son and doing are two different things.
16   No, they were not.  To my knowledge or anything, no, and
17   there was no guns in that house except mine and they were
18   legal.
19   Q     There was never a gun in your house that belonged
20   to Mr. Rivera?
21   A     I have never seen it until this date till I came to
22   court.
23   Q     Now you know that there was one?
24   A     Now I know that there was a gun that existed.
25           MS. EL-AMAMY:  No further questions.
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE COURT:  Redirect?

 2          MR. CEPHAS:  Nothing, your Honor.

 3          THE COURT:  You may step down, Ma'am.  Thank you.

 4              Your next witness.  Well, there is only

 5    one left.

 6          MR. CEPHAS:  Defense calls Steve Walton.

 7          (The witness was sworn.)

 8          THE CLERK:  Please be seated.

 9              Please state and spell your name for the

10    record.

11          THE WITNESS:  Steve Walton, W-A-L-T-O-N.

12

13                      DIRECT EXAMINATION

14    BY MR. CEPHAS:

15    Q     Good morning.

16    A     Morning, Sir.

17    Q     Who do you work for?

18    A     City of Ontario.

19    Q     And are you what is referred to as a case agent?

20    A     Yes, sir.

21    Q     And just so the jury understands, you sort of have

22    responsibility to oversee, oversee the case?

23    A     Yes.

24    Q     You assist the prosecutors putting the evidence

25    together and preparing for trial?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      Yes.

 2   Q      And are you familiar with an officer named Brice

 3   Devey?

 4   A      Yes.

 5   Q      And Mr. Devey testified last week in this case;

 6   correct?

 7   A      Yes.

 8   Q      And he was assigned to the Ontario Police

 9   Department gang unit; is that correct?

10   A      Yes.

11   Q      And at one point, in fact, he was going to testify

12   as a gang expert in this case; isn't that correct?

13         MR. DORE:  Objection, your Honor.  Relevance.

14         THE COURT:  Overruled.

15         THE WITNESS:  I am not sure if he was going to act

16   in that capacity on this case.

17   Q      BY MR. CEPHAS: You heard testimony from David

18   Navarro last week in this courtroom; correct?

19   A      Yes.

20   Q      And during that testimony of Mr. Navarro, he spoke

21   about a list of graffiti in San Bernardino jail that had

22   several names including the name Crook.

23            Do you recall that testimony?

24   A      Yes.

25   Q      And do you recall he talked about it being what he
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    referred to as a roll call?

2    A     Yes.

3    Q     And I believe he testified that Raul Prieto is the

4    only Crook affiliated with Black Angels that he knew of;

5    is that correct?  Something to that effect?

6    A     Yes.

7    Q     And he testified that since the name Crook was up

8    there that Mr. Prieto must have been promoted to full

9    Black Angels.  He said something along that line;

10   correct?

11   A     Yes.

12   Q     And you were here when he gave that testimony;

13   correct?

14   A     Yes.

15   Q     Now, yesterday, did you receive an e-mail from me

16   asking you to find records for an individual named Samuel

17   Solorio who also used an alias Crook?

18         MR. DORE:  Objection, your Honor.  Evidence not --

19   lack of foundation.

20         THE COURT:  Sustained.

21   Q     BY MR. CEPHAS: Did you make some efforts yesterday

22   to obtain records for another individual who may or may

23   not use the moniker Crook?

24         MR. DORE:  Objection, your Honor.  Argumentative.

25         THE COURT:  Overruled.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          THE WITNESS:  Yes.

 2   Q    BY MR. CEPHAS:And was this individual named Samuel

 3   Solorio?

 4   A    Yes.

 5   Q    And did you obtain any records relating to Samuel

 6   Solorio?

 7   A    Yes.

 8          MR. CEPHAS:  May I approach with two defense

 9   exhibits, your Honor.

10          THE COURT:  Who is this person, and how is it

11   suddenly relevant?

12          MR. CEPHAS:  This person, Samuel Solorio --

13          THE COURT:  No.  Get that from -- not from me.

14   Get it from the witness.

15          MR. CEPHAS:  I am going to.  That is why I want to

16   approach with the exhibits, your Honor.

17          THE COURT:  Did you get the exhibits from him,

18   from the witness?

19          MR. CEPHAS:  I believe he was responsible for

20   obtaining these exhibits yesterday.

21          THE COURT:  Okay.  So I assume that he knows what

22   you are referring to.  So let's find out from the witness

23   why this is important.

24   Q    BY MR. CEPHAS: Did you obtain a Ontario Police

25   Department report yesterday related to Samuel Solorio?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   A      Yes.

 2   Q      And did you also obtain some kites related to

 3   Samuel Solorio?

 4   A      No.

 5   Q      Did you obtain some copies of kites that you were

 6   led to believe were in Samuel Solorio's possession?

 7   A      Yes.

 8   Q      And did you have a chance to look at those kites,

 9   those notes, these kites?

10   A      Yesterday, no.

11   Q      You didn't look at them yesterday?

12   A      No.

13   Q      Did you look at them today?

14   A      Yes.

15   Q      And just to refresh the jury's recollection, kites,

16   they are jail house notes, something like that; correct?

17   A      Yes.

18   Q      And these kites that you reviewed, they referred to

19   Crook; correct?

20   A      One of them.

21   Q      At least one of them referred to Crook, and you

22   were led to believe that these kites were in the

23   possession of Samuel Solorio; correct?

24          MR. DORE:  Objection, your Honor.  Hearsay.

25          MR. CEPHAS:  Not offered for the truth, your
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   Honor.
 2        THE COURT:  We have to hurry up and get there.  I
 3   am still not following why any of this is relevant.  So
 4   if we can like advance this a little bit.
 5   Q   BY MR. CEPHAS: This individual named -- well, the
 6   police report that you obtained from Ontario Police
 7   Department indicated that these --
 8        MR. DORE:  Objection, your Honor.  Hearsay.
 9        MR. CEPHAS:  Your Honor, it goes to bias and
10   potential Brady violation.
11        THE COURT:  It is still hearsay.  Overruled.
12            I'm sorry.  Sustained.
13   Q   BY MR. CEPHAS: Did you make any effort to talk to
14   Brice Devey since you obtained these kites?
15   A    Yes.
16   Q    And is it your understanding that Mr. Devey has
17   been in possession of these kites since at least October
18   of 2012?
19   A    Yes.
20   Q    And these are the kites that have the name Crook
21   related to Samuel Solorio on them; isn't that correct?
22        MR. DORE:  Objection, your Honor.  Misstates the
23   testimony.
24        THE COURT:  Sustained.
25   Q    BY MR. CEPHAS: Have you done anything to confirm or
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1    refute that Samuel Solorio uses the moniker Crook?

2    A     Yes.

3    Q     What have you done?

4    A     I had one of my assistants run a criminal history

5    report on Mr. Solorio.  Based on my training and

6    experience, I have found the criminal histories do

7    sometimes indicate an individual's moniker.  After review

8    of Mr. Solorio's criminal history that was run yesterday,

9    I did not see any moniker listed for that subject.

10   Q     There were no monikers listed on there; correct?

11   A     Yes.

12   Q     Isn't that sort of unusual.  Don't rap sheets

13   normally have monikers?

14   A     Not normally.  Sometimes.

15   Q     The rap sheet did indicate that he had several

16   tattoos; isn't that correct?

17   A     I don't recall.  I did not look for that.

18   Q     Would it refresh your recollection if you looked at

19   the rap sheet?

20   A     I could look at it, but yesterday I wasn't looking

21   for tattoos.  I was looking for a moniker.

22   Q     Do you have it in front of you?

23   A     No, I do not.

24         THE COURT:  Can I just -- is the purpose of this

25   to show that there was someone else that goes by the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    street name Crook?

2         THE WITNESS:  There is someone else in the Black

3    Angels gang.  One of the kites says Crook, Angelitos

4    Negros, and it was in the possession of Samuel Solorio.

5         THE COURT:  Okay.  Good.  Here we are.  That is

6    all we need; right?  From this witness?

7         THE COURT:  I think the point got lost.

8         MR. CEPHAS:  Well, no, there is a second point

9    here, your Honor.

10        THE COURT:  Okay.  Let's go to the second point.

11   Q    BY MR. CEPHAS: The rap sheet indicated he had tats;

12   correct?

13   A    I don't know.

14   Q    You did not obtain any of the underlying reports,

15   the underlying police reports that would indicate gang

16   membership, did you?

17   A    I obtained one criminal report from Ontario Police

18   Department.

19   Q    Okay.  But the rap sheet had several arrests,

20   convictions on it; correct?

21   A    Yes.

22   Q    And each of those arrests, convictions, would have

23   police reports attached to them; correct?  Police reports

24   that you could obtain; correct?

25   A    Yes.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Q      And if during those police reports, it was found

2    that Samuel Solorio was a gang member or he was being

3    charged as a gang member or being enhanced for gang

4    conduct, it would normally be somewhere on that police

5    report; correct?

6    A      Yes.

7    Q      But you didn't look at any of those reports, did

8    you?

9    A      I looked at one report.

10   Q      And that is the report that just says that the

11   kites were found on Samuel Solorio; correct?

12   A      Yes, sir.

13        MR. DORE:  Objection, your Honor.  Hearsay.

14   Q    BY MR. CEPHAS: Okay.  Now, that report also

15   indicates that in October, Brice Devey, the government's

16   gang expert, was told about this; isn't that correct?

17        MR. DORE:  Objection, your Honor.

18        THE COURT:  Hang on.  Hang on.

19             First, let the question come out.

20        MR. DORE:  Your Honor, the question itself is

21   argumentative.  And I apologize for interrupting, but I

22   believe that I won't do it again.  I apologize.

23        THE COURT:  Okay.  Thank you.  I need to hear the

24   question.  Go ahead.

25   Q    BY MR. CEPHAS: Now, the report that you did produce

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    also indicated that Brice Devey, gang unit officer, was

2    informed of the Samuel Solorio kites two months ago?

3         MR. DORE:  Objection, your Honor.  Hearsay.

4         MR. CEPHAS:  Goes to bias, your Honor.

5            This is the government's witness.

6         THE COURT:  I'm sorry.  Objection sustained.

7         MR. CEPHAS:  Nothing further.

8         THE COURT:  Cross.

9

10                    CROSS-EXAMINATION

11   BY MR. DORE:

12   Q    Agent Walton, in that group of kites that you

13   reviewed today, were there some kites that were addressed

14   to someone going by a name that was not Crook?

15        MR. CEPHAS:  Objection.  Relevance.

16        THE COURT:  Overruled.

17        THE WITNESS:  Yes, I believe so.

18   Q    BY MR. DORE:Do you recall the names of any

19   individuals to which any of those other kites were

20   addressed?

21   A    Yes.

22   Q    And can you tell the jury any of those names?

23   A    On the one kite that had that made reference to

24   Crook, it was also, alongside Crook, it said and Junior

25   De, I believe it was.  I can't remember the name, but it

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    was of another gang out of Los Angeles.

 2    Q     And do you recall the names of anyone else on any

 3    of the other kites to which those kites were addressed?

 4    A     There were several names on the kites.  I only

 5    really remember one other one, and it was Pulga.

 6          MR. DORE:  No further questions.

 7          MR. CEPHAS:  Your Honor, I would request a

 8    continuance so that I could obtain the presence of

 9    Officer Devey to follow-up on this Crook issue.

10          THE COURT:  Okay.  This Solorio person, did you

11    run across any information which identified him as being

12    a member of the Black Angels?

13          THE WITNESS:  Yes, sir.

14          THE COURT:  You did?

15          THE WITNESS:  Yes.

16          THE COURT:  Did that same information also

17    identify him by the street name Crook?

18          THE WITNESS:  No.

19          THE COURT:  Okay.  Thank you.

20            Anything further?  Anything further,

21    Mr. Cephas?

22          MR. CEPHAS:  I want to follow-up on what he just

23    said.

24

25                    REDIRECT EXAMINATION
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    BY MR. CEPHAS:

2    Q    These documents were produced last night --

3    correct -- the documents with the kites with Crook's name

4    on them?

5         MR. DORE:  Objection, your Honor.  Lack of

6    foundation.

7         MR. CEPHAS:  Let me change it, your Honor.  Okay.

8    Q    You just said that you are not aware of any

9    evidence that indicates Solorio is Crook; is that

10   correct?

11   A    That is correct.

12   Q    But it is your understanding that Solorio had a

13   kite addressed to Crook on his possession; correct?

14   A    Yes.

15   Q    And you wouldn't -- you don't believe that evidence

16   is related to Solorio being Crook?

17   A    No.

18   Q    And you didn't do anything else -- you didn't get

19   the police reports that might force you to let the jury

20   know there is another Crook named Samuel Solorio, did

21   you?

22   A    No.

23        MR. CEPHAS:  Thank you.  Nothing further.

24        MR. DORE:  Just one question, your Honor.

25                    RECROSS-EXAMINATION

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   BY MR. DORE:
 2   Q     Just want to make sure, Special Agent Walton, when
 3   you got that e-mail from defense counsel about
 4   Mr. Solorio, what day did you receive it?
 5   A     Yesterday.
 6   Q     And does it typically take you longer than a day to
 7   get police reports?
 8   A     Yes.
 9         MR. DORE:  No further questions.
10         THE COURT:  All right, Sir.  You may step down.
11            All right.  Any additional witnesses?
12         MR. CEPHAS:  No, your Honor.  Mr. Prieto rests.
13         THE COURT:  All right.
14            Ms. Medina?
15         MR. WALSH:  Ms. Medina rests, your Honor.
16         THE COURT:  Mr. Navarro.
17         MR. NAVARRO:  Mr. Navarro rests, your Honor.
18         THE COURT:  All right.  Ladies and gentlemen,
19   unless -- ladies and gentlemen, that concludes the
20   presentation of evidence in this case.  We are going to
21   take a break, and when we come back, I am going to read
22   you a lot of jury instructions.
23            And then we are going to have closing
24   arguments of the attorneys, and then the case will be
25   submitted to you for decision.  We are practically there.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1            Request for a continuance in the trial is

2     denied.  I'm sorry.  I forgot to rule on that.

3            All right.  Please remember the admonition.

4     We are almost home.  All right.

5        (The following proceedings were held outside the

6         presence of the jury:)

7        THE COURT:  I got the verdict forms.  I think we

8     had indicated long ago we weren't going to send the

9     indictment in so how are they going to be able to

10    identify Racketeering Act No. 6?

11       MS. EL-AMAMY:  I believe that it will be

12    identified in the jury instruction.

13       THE COURT:  Okay.  You are going to go over this,

14    the how to?

15       MS. EL-AMAMY:  Exactly.

16       THE COURT:  All right.  Now, one other thing --

17    this doesn't have to be on the record.

18       MR. CEPHAS:  Your Honor, I would like to keep on

19    the record.  I just want to let the court know.  I just

20    want to preserve for appeal my earlier objection with

21    respect to special instructions being used.  I had -- I

22    filed it last week.

23       THE COURT:  Filed it, being what?

24       MR. CEPHAS:  I filed an objection to not using the

25    general conspiracy instruction and modifying it for Count

```
 1   1, and then also I have an objection to Count -- to the
 2   Count 5 instruction not being complete, not using a full
 3   version of the Ninth Circuit model rule.  The parties are
 4   otherwise in agreement.  I just want to preserve it for
 5   appeal.
 6        THE COURT:  Okay.  I don't know what you are
 7   talking about.  I know we had a meeting of counsel.  You
 8   didn't attend.  And we went over each jury instruction,
 9   instruction by instruction.  Are you saying you filed
10   something last week?
11        MR. CEPHAS:  Yes.
12        THE COURT:  And this is after we had all agreed on
13   the jury instructions?
14        MR. CEPHAS:  No.  It was before.  It was before,
15   and I gave it to defense counsel to make sure they had a
16   copy prior to the meeting and asked them to preserve my
17   position.  The government was aware of it, and we have
18   had discussions since then.  We can't come to agreement.
19   There have been some modifications to the jury
20   instructions that I agree with, but I -- it is still my
21   position that the instruction --
22        THE COURT:  Specifically, which instruction?
23        MR. CEPHAS:  35, I believe, your Honor.  It should
24   be the instruction for Count 1.
25        THE COURT:  All right.  You are right.
```

```
 1          MR. CEPHAS:  And I believe 39.

 2          THE COURT:  Okay.  Hang on.  Let's just deal with

 3   one at a time.

 4          THE COURT:  Specifically, what is your complaint

 5   with Instruction 35?

 6          MR. CEPHAS:  Specifically, your Honor, it is

 7   not -- it does not contain much of the language in the

 8   model instruction that is also in the proposed

 9   instructions at Instruction No. 29.  And there is a --

10   there is a short reference in 25 saying that you are also

11   to consider earlier conspiracy instructions, but it

12   doesn't say which one.  It doesn't point to Instruction

13   29 or 30, and my concern is that the jury may decide the

14   case with respect to my client by looking just at 35 and

15   not also considering 29 and 30 at the same time.

16          THE COURT:  All right.  Let me make sure I

17   understand you.  Your objection to 35 is that it does not

18   include certain information that you agree is covered in

19   29 or 25?

20          MR. CEPHAS:  And 29 and --

21          THE COURT:  That is "yes" or "no".

22          MR. CEPHAS:  And 30 and 31, I believe, at a

23   minimum, 35 should specifically refer to 29, 30 and 31,

24   but I also believe 35 should have just been the model

25   rule.
```

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1            THE COURT:  Okay.  You didn't answer my question.
 2    My question is are you saying that whatever it is that
 3    you feel is lacking in 35 is covered in other
 4    instructions?
 5            MR. CEPHAS:  Yes.
 6            THE COURT:  Okay.  That was painful trying to get
 7    that out, wasn't it.  All right.  Let's move on to
 8    another -- I think that is sufficient.  As long as these
 9    points of law are covered in other instructions.
10            I need estimates in terms of your closings.
11            MR. DORE:  Your Honor, for the government, it
12    would probably be an hour and 15 minutes.
13            THE COURT:  That is what you think.  All right.
14    Mr. Cephas.
15            MR. CEPHAS:  30 minutes, your Honor.
16            THE COURT:  Mr. Navarro?
17            THE WITNESS:  No more than 30 minutes, your Honor.
18            THE COURT:  Mr. Walsh?
19            MR. WALSH:  40 minutes, your Honor.
20            THE COURT:  What.
21            MR. WALSH:  40 minutes, your Honor.
22            THE COURT:  No.  The government, you are going to
23    be limited to one hour.  30, 30, 30 will be sufficient.
24    All right.
25            MR. CEPHAS:  Your Honor, the government -- is that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   including their rebuttal time?

2          THE COURT:  Yeah.  Wait.  No.  No.  It does not.

3   And I assume that the government is also going to explain

4   how to fill out the verdict forms; correct?

5          MS. EL-AMAMY:  In its rebuttal it will, your

6   Honor.

7          THE COURT:  Okay.  Good.  All right.  And the

8   rebuttal will be a rebuttal.

9          MS. EL-AMAMY:  Yes, your Honor.

10         MR. CEPHAS:  Can I ask how much time they have for

11  rebuttal?

12         THE COURT:  I don't know if they will have

13  anything to rebut.

14         MR. DORE:  Sorry, your Honor.  Will the court

15  notify the government during its close as to when it has

16  a certain amount of time left?

17         THE COURT:  I will do that.

18         MR. WALSH:  Your Honor, can we renew the Rule 29

19  motions?  I think they have to be renewed at the close of

20  the evidence in order to preserve the issues.  So I think

21  all defendants move again for judgment of acquittal under

22  Rule 29 for insufficient evidence.

23         THE COURT:  Okay.

24         MR. CEPHAS:  Yes.  I also do.

25         MR. NAVARRO:  Yes, your Honor, for Mr. Rivera.

```
 1        THE COURT:  Certainly, nothing has changed during

 2   the presentation of the defense case.  The motions are

 3   denied.  All right.  Let's take a break.

 4        (Recess from 9:26 to 9:51 a.m.)

 5        THE COURT:  I want to quickly go on the record

 6   before the jury gets in about the special verdict forms.

 7        MR. CEPHAS:  And, your Honor, we did have -- we

 8   did have a question.  We were unclear as to whether the

 9   court still wanted to make additional changes to the

10   verdict form to be more specific on the statutes or

11   something like that.

12        THE COURT:  Yeah.  I really do.  What apparently

13   is called for here is that the jury refer to 50 some odd

14   pages of jury instructions in order to find the overt

15   acts that they are to reach agreement on.

16             This really leaves a lot of room for error,

17   and it troubles me.  The other thing is that I would like

18   to add under each count description something other than

19   the code section.  I would like a verbal description to

20   trigger in their mind what it is that they are actually

21   answering.  Okay.

22        THE COURT:  We can talk about that.  Those will be

23   clarifications not substantive changes to the form.  So

24   you can instruct on how to complete the form.

25        (The following proceedings were held in the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        presence of the jury:)

2        THE COURT:  All right.

3            Members of the jury, now that you have heard

4    all of the evidence, it is my duty to instruct you on the

5    law that applies to this case.  A copy or several copies

6    of these instructions will be available in the jury room

7    for you to consult.

8            It is your duty to weigh and to evaluate all

9    the evidence received in the case and in that process to

10   decide the facts.  It is also your duty to apply the law

11   as I give it to you to the facts as you find them whether

12   you agree with the law or not.  You must decide the case

13   solely on the evidence and the law and must not be

14   influenced by any personal likes or dislikes, opinions,

15   prejudices or sympathy.  You will recall that you took an

16   oath promising to do so at the beginning of the case.

17           You must follow all these instructions and not

18   single out some and ignore others.  They are all

19   important.  Please do not read into these instructions or

20   into anything I may have said or done any suggestion as

21   to what verdict you should return.  That is a matter

22   entirely up to you.

23           This is a criminal case brought by the United

24   States government.  The charges against the defendants

25   are contained in the indictment.  The indictment simply

1   describes the charges the government brings against the

2   defendants.  The indictment is not evidence.  It does not

3   prove anything.  I will give you a general overview of

4   the indictment.

5            Only counts 1, 2, 5, 6, 10 and 23 are before

6   you.  Count 2 charges defendants Carlos Rivera and

7   Jessica Medina and other alleged co-conspirators with a

8   violation of the Racketeer Influenced and Corrupt

9   Organization Act, also known as RICO, by allegedly

10  conducting or participating in the conduct of the affairs

11  of a racketeering organization alleged to be the Ontario

12  Black Angels.  It includes a number of alleged

13  racketeering acts some of which are repeated later as

14  separate counts.  Only Racketeering Acts 1, 6 and 7 are

15  before you.

16           Count 1 charges defendants Carlos Rivera,

17  Jessica Medina and Raul Prieto and other alleged

18  co-conspirators with conspiring to participate in the

19  affairs of a racketeering organization through a pattern

20  of racketeering activity.

21           Count 5 charges defendants Carlos Rivera,

22  Jessica Medina and Raul Prieto and other alleged

23  co-conspirators with conspiring to possess with intent to

24  distribute and to distribute controlled substances.

25           Count 6 charges defendant Carlos Rivera with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    distributing a controlled substance.

2           Count 10 charges defendant Carlos Rivera and

3    Jessica Medina with possession with intent to distribute

4    a controlled substance.

5           Count 23 charges defendant Carlos Rivera with

6    being a felon in possession of a firearm and ammunition.

7           The defendants have pleaded not guilty to the

8    charges and are presumed innocent unless and until the

9    government proves the defendants guilty beyond a

10   reasonable doubt.  In addition, the defendants have a

11   right to remain silent and never have to prove innocence

12   or to present any evidence.  The government has the

13   burden of proving every element of the charges beyond a

14   reasonable doubt.

15          I instruct you that you must presume the

16   defendants to be innocent of the crimes charged.  Thus,

17   the defendants, although accused of crimes in the

18   indictment, begin the trial with a clean slate with no

19   evidence against them.  The indictment as you already

20   know is not evidence of any kind.  The law permits

21   nothing but legal evidence presented before the jury in

22   court to be considered in support of any charge against

23   the defendant.  The presumption of innocence alone,

24   therefore, is sufficient to acquit the defendants.

25          The burden is always upon the prosecution to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    prove guilt beyond a reasonable doubt.  This burden never

2    shifts to defendants for the law never imposes upon

3    defendants in a criminal case the burden or duty of

4    calling any witnesses or producing any evidence.  The

5    defendants are not even obligated to produce any evidence

6    by cross-examining the witnesses for the government.

7          It is not required that the government prove

8    guilt beyond all possible doubt.  The test is one of

9    reasonable doubt.  A reasonable doubt is doubt based upon

10   reason and common sense, the kind of doubt that would

11   make a reasonable person hesitate to act.  Proof beyond a

12   reasonable doubt must therefore be proof of such a

13   convincing character that a reasonable person would not

14   hesitate to rely or act upon it in the most important of

15   his or her own affairs.

16         Unless the government proves beyond a

17   reasonable doubt that a given defendant has committed

18   each and every element of the offense charged in the

19   indictment, you must find the defendant not guilty of the

20   offense.  If the jury views the evidence in the case as

21   reasonably permitting either of two conclusions, one of

22   innocence and the other of guilty, the jury must, of

23   course, adopt the conclusion of innocence.

24         A defendant in a criminal case has a

25   constitutional right not to testify.  You may not draw

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    any inference of any kind from the fact that a defendant

2    did not testify.

3           The evidence you are to consider in deciding

4    what the facts are consists of:

5           One, the sworn testimony of any witness;

6           Two, exhibits received in evidence;

7           And, three, any facts to which the parties

8    have agreed.

9           In reaching your verdict, you may only

10   consider the testimony and exhibits received in evidence.

11   The following things are not evidence and you may not

12   consider them in deciding what the facts are:

13          One, questions, statements, objections and

14   arguments by the lawyers are not evidence.  The lawyers

15   are not witnesses.  Although you must consider a lawyer's

16   questions in order to understand the answers of a

17   witness, the lawyer's questions are not evidence.

18   Similarly, what the lawyers have said in their opening

19   statements and will say during their closing arguments

20   and have said at other times is intended to help you

21   interpret the evidence but it is not evidence.  If the

22   facts as you remember them differ from the way the

23   lawyers state them, your memory of them controls.

24          Two, any testimony that I have excluded,

25   stricken or instructed you to disregard is not evidence.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          Three, anything you may have seen or heard

2   when court was not in session is not evidence.  You are

3   to decide the case solely on the evidence received at the

4   trial.

5          Now, evidence may be direct or circumstantial.

6   Direct evidence is direct proof of a fact such as

7   testimony by a witness about what that witness personally

8   saw or heard or did.  Circumstantial evidence is indirect

9   evidence.  That is, it is proof of one or more facts from

10  which you can find another fact.

11         You are to consider both direct and

12  circumstantial evidence.  Either can be used to prove any

13  fact.  The law makes no distinction between the weight to

14  be given to either direct or circumstantial evidence.  It

15  is for you to decide how much weight to give to any

16  evidence.

17         By way of example, if you wake up in the

18  morning and see that the sidewalk is wet, you may find

19  from that fact that it rained during the night.  However,

20  other evidence, such as a turned-on garden hose may

21  provide an explanation for the water on the sidewalk.

22         Therefore, before you decide that a fact has

23  been proved by circumstantial evidence, you must consider

24  all of the evidence in light of reason, experience and

25  common sense.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          In deciding the facts in this case, you may

2     have to decide which testimony to believe and which

3     testimony not to believe.  You may believe everything a

4     witness says or part of it or none of it.

5          In considering the testimony of any witness,

6     you may take into account:

7          One, the witness's opportunity and ability to

8     see or hear or know the things testified to;

9          Two, the witness's memory;

10         Three, the witness's manner while testifying.

11    Four, the witness's interest in the outcome of the case,

12    if any;

13         Five, the witness's bias or prejudice, if any;

14         Six, whether other evidence contradicted the

15    witness's testimony.

16         Seven, the reasonableness of the witness's

17    testimony in light of all the evidence;

18         And, eight, any other factors that bear on

19    believability.

20         The weight of the evidence as to a fact does

21    not necessarily depend on the number of witnesses who

22    testify.  What is important is how believable the

23    witnesses were and how much weight you think their

24    testimony deserves.

25         You have heard recordings in English that were

1    received in evidence.  Transcripts of the recordings were

2    provided to help you identify speakers and to help you

3    decide what the speakers said.  Remember that the

4    recordings themselves are the evidence, not the

5    transcripts.  If you hear something different from what

6    appeared in any of the transcripts, what you heard is

7    controlling.  The transcripts will not be available

8    during your deliberations.

9          You have heard recordings in the Spanish

10   language, transcripts of the recordings were admitted

11   into evidence.  The transcripts were official English

12   language translations of the recordings.

13         Although some of you may know the Spanish

14   language, it is important that all jurors consider the

15   same evidence.  Therefore, you must accept the English

16   translation contained in the transcript even if you would

17   translate it differently.

18         You have heard testimony of witnesses who --

19         You have heard testimony that the defendants

20   made out of court statements.  It is for you to decide

21   whether the particular defendant made the statement and

22   if so how much weight to give it.  In making those

23   decisions, you should consider all the evidence about the

24   statement including the circumstances under which the

25   defendant may have made it.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    You have heard evidence that a particular

2    defendant has previously been convicted of a crime and

3    that the defendant has been on parole.  With the

4    exception of your determination as to defendant Rivera's

5    guilt or innocence as to Count 23 of the indictment which

6    charges defendant Rivera with being a felon in possession

7    of a firearm, you may not consider a prior conviction or

8    parole status as evidence of guilt of the crimes for

9    which a particular defendant is now on trial.  Similarly,

10   you may not consider any evidence that any particular

11   defendant has spent time in custody as evidence of guilt

12   of the crimes for which that defendant is now on trial.

13          You have heard testimony from a witness, David

14   Navarro, a cooperating witness.

15          Mr. Navarro hopes to receive favored treatment

16   from the government in connection with this case.

17          Mr. Navarro admitted being an accomplice to

18   one or more of the crimes charged.  An accomplice is

19   one who voluntarily and intentionally joins with another

20   person in committing a crime.

21          This witness has plead guilty to a crime or

22   crimes arising out of the same events for which these

23   defendants are on trial.  A cooperating witness's guilty

24   or guilty plea is not evidence against any of these

25   defendants, and you may consider it only in determining

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   Mr. Navarro's believability.

2           Because of the status of Mr. Navarro as a

3   cooperating witness, in evaluating his testimony, you

4   should consider the extent to which or whether his

5   testimony may have been influenced by any of these

6   factors.  In addition, you should examine the testimony

7   plaintiff never with greater caution than that of other

8   witnesses.

9           You have heard testimony from persons who

10  because of education or experience were permitted to

11  state opinions and the reasons for their opinions.

12          Such opinion testimony should be judged like

13  any other testimony.  You may accept it or reject it and

14  give it as much weight as you think it deserves

15  considering the witness's education and experience, the

16  reasons given for the opinions and all the other evidence

17  in the case.

18          You are here only to determine whether the

19  defendant is guilty or not guilty of the charges in the

20  indictment.  The defendants are not on trial for any

21  conduct or offenses not charged in the indictment.

22          A separate crime is charged against one or

23  more of the defendants in each count.  The charges have

24  been joined for trial.  You must decide the case of each

25  defendant on each crime charged against that defendant

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    separately.  Your verdict on any count as to any

2    defendant should not control your verdict on any other

3    count or as to any other defendant.

4         All the instructions apply to each defendant

5    and to each count unless a specific instruction states

6    that it applies only to a specific defendant or count.

7         I am about to begin explaining the law

8    pertaining to the charges in the indictment.  Let me

9    advise you in advance, these instructions are lengthy,

10   especially as to Count 2, the RICO count.  Although the

11   instructions are lengthy, they are also necessary.

12   Please be assured that we have made every effort to

13   shorten the instructions, simplify them and make them

14   more accessible to you.  I am reading the instructions

15   now, but I will also provide you with a set of the

16   instructions to take with you and consult during your

17   deliberations.  You will also be provided with a verdict

18   form for each defendant.

19        I will begin by giving you the instructions

20   for Count 2.  My reason for doing so is that the

21   instructions for Count 2 are longer than for the other

22   counts in part because I will be defining and explaining

23   a number of terms and concepts relating to the

24   racketeering laws.

25        Many of these instructions will be applicable

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to other counts of the indictment including Count 1 which

2    charges RICO conspiracy.  Rather than repeating

3    instructions every time they may be applicable, I will

4    sometimes simply state that I have instructed you earlier

5    on the applicable law on that subject, and I will ask you

6    to apply those earlier instructions.

7         The indictment alleges that certain crimes

8    were committed on or about a certain date.  Although it

9    is necessary for the government to prove beyond a

10   reasonable doubt that the charged crimes were committed

11   on a date reasonably near the particular date alleged in

12   the indictment, it is not necessary for the government to

13   prove that the crimes were committed precisely on the

14   date charged.

15        Defendants Carlos Rivera and Jessica Medina

16   are charged in Count 2 of the indictment with having

17   conducted or participated in the conduct of the affairs

18   of an enterprise through a pattern of racketeering

19   activity in violation of Title 18, United States Code,

20   Section 1962(c).  This statute is commonly referred to as

21   the RICO statute.

22        Racketeering activity means the commission of

23   certain crimes.  These crimes include acts involving

24   extortion in violation of California Penal Code Sections

25   31, 182 and 518 through 520; and distribution of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    controlled substances, possession with intent to
 2    distribute controlled substances and conspiracy to
 3    distribute controlled substances including
 4    methamphetamine and heroin in violation of Title 21,
 5    United States Code, Sections 841(a)(1), 843(b) and 846.
 6              In order for a defendant to be found guilty of
 7    Count 2, the substantive RICO offense, the government
 8    must prove each of the following elements beyond a
 9    reasonable doubt:
10              One, there was an ongoing enterprise with some
11    sort of formal or informal framework for carrying out its
12    objectives consisting of a group of persons associated
13    together for a common purpose of engaging in a course of
14    conduct;
15              Two, the defendant was employed by or
16    associated with the enterprise;
17              Three, the defendant participated directly or
18    indirectly in the conduct of the affairs of the
19    enterprise through a pattern of racketeering activity or
20    collection of unlawful debt.  To conduct or participate
21    means that the defendant had to be involved in the
22    operation or management of the enterprise;
23              And, four, the enterprise engaged in or its
24    activities in some way affected commerce between
25    one state and another state or between the United States
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    and a foreign government.

2              An enterprise need not be a formal entity such

3    as a corporation and need not have a name, regular

4    meetings or established rules.

5              As to Count 2, the first element the

6    government must prove is that the enterprise alleged in

7    the indictment, the Ontario Black Angels gang, existed.

8              As used in these instructions, the term

9    enterprise is any group of people who have associated

10   together for a common purpose of engaging in a conduct

11   over a period of time.  This group of people, in addition

12   to having a common purpose, must have an ongoing

13   organization, either formal or informal.  The personnel

14   of the enterprise, however, may change and need not be

15   associated with the enterprise for the entire period

16   alleged in the indictment.  This group of people does not

17   have to be a legally recognized entity such as a

18   partnership or corporation.  This group may be organized

19   for a legitimate and lawful purpose, or it may be

20   organized for an unlawful purpose.  The name of the

21   organization itself is not an element of the offense and

22   does not have to be proved.

23             Therefore, the government must prove beyond a

24   reasonable doubt that the gang was a group of people

25   associated for a common purpose of engaging in a course

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    of conduct and that the association of these people would

2    not -- correction -- would be an ongoing or informal

3    organization.  The government need not prove that the

4    enterprise would have any particular organized structure.

5            The second element that the government must

6    prove as to Count 2 is that defendants were employed by

7    or associated with the enterprise.

8            The term associated with should be given its

9    plain meaning.  Associated means to be joined, often in a

10   loose relationship as a partner, fellow worker,

11   colleague, friend, companion or ally.  Therefore, a

12   person is associated with an enterprise when, for

13   example, he or she joins with other members of the

14   enterprise and knowingly aids or furthers the activities

15   of the enterprise or he or she conducts business with or

16   through the enterprise.  It is not required that a

17   defendant have a formal position in the enterprise,

18   participate in all of the activities of the enterprise,

19   or have full knowledge of all of the activities of the

20   enterprise.  Rather, it is sufficient that the government

21   proves beyond a reasonable doubt that a defendant was

22   associated with the enterprise within the meaning of the

23   term as I have just explained it and that he or she knew

24   of the general nature of the enterprise and knew that the

25   enterprise would extend beyond his or her role in the

1   enterprise.

2            The third element that the government must

3   prove as to Count 2 is that the defendant conducted or

4   participated in the conduct of the affairs of the

5   enterprise through a pattern of racketeering activity.

6            In order for you to find that the defendant

7   participated directly or indirectly in the conduct of the

8   affairs of the enterprise, you must find that the

9   defendant participated in the operation or management of

10  the enterprise.  This means that the defendant had some

11  part in directing the enterprise's affairs.

12            To find that a defendant participated in the

13  operation or management of the enterprise, it need not be

14  shown that the defendant exercised significant control

15  over or within the enterprise, that he or she held a

16  formal position in the enterprise or that he or she had

17  primary responsibility for the enterprise's affairs.  An

18  enterprise is operated, not just by upper management but

19  also by lower rung participants in the enterprise who are

20  under the direction of upper management or who carry out

21  upper management's orders.

22            A pattern of racketeering activity as set

23  forth in the third element of Count 2 is at least

24  two racketeering acts that have a relationship to each

25  other and that amount to or pose a threat of continued

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    criminal activity.  Conduct forms a pattern if it

2    consists of criminal acts that have the same or similar

3    purposes, results, participants, victims or methods of

4    commission or otherwise are interrelated by

5    distinguishing characteristics.  Sporadic activity or

6    widely separated and isolated criminal activity does not

7    form a pattern of racketeering activity.

8    Two racketeering acts are not necessarily enough to

9    establish a pattern of racketeering activity.

10             Multiple racketeering acts are charged in

11   Count 2.  However, only Racketeering Acts 1, 6 and 7 are

12   before you.  These racketeering acts can be summarized as

13   including conspiracy to distribute narcotics,

14   distribution of methamphetamine and possession with

15   intent to distribute methamphetamine.  I will describe

16   the elements of each of the charged racketeering acts in

17   a few moments.  I instruct you at this time, however,

18   that you must be unanimous as to which racketeering acts

19   have been proved beyond a reasonable doubt before you may

20   find that the third element of the offense as described

21   in my previous instruction has been satisfied against

22   that defendant.  In other words, there must be at least

23   two specific racketeering acts that all of you find were

24   committed by the defendant in order to convict a

25   defendant of Count 2.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          You will receive a verdict form which has a

2    separate space for you to enter your findings as to each

3    defendant for the racketeering acts alleged in Count 2

4    with each defendant as charged.  I will describe to you

5    in more detail the verdict form and the manner in which

6    you must complete it after I have completed instructing

7    you regarding the law you must apply to the case.

8          The fourth and final element which the

9    government must prove as to Count 2 is that the

10   enterprise itself or the racketeering activities of those

11   associated with it had some effect on interstate

12   commerce.  Interstate commerce means commerce between

13   one state and another state or between the United States

14   and a foreign country.  This effect on interstate

15   commerce could have occurred in any way, and it need only

16   have been minimal.

17         It is not necessary for you to find that

18   defendants themselves engaged in interstate commerce or

19   that they knew the enterprise was engaged in interstate

20   commerce.  Nor is it necessary that the effect on

21   interstate commerce have been adverse to commerce.  All

22   that is necessary is that the activities of the

23   enterprise affect interstate commerce in some minimal

24   way.

25         Racketeering Act 1 charges defendants Carlos

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Rivera, Jessica Medina and others with conspiring to, A,

2    distribute methamphetamine and, B, distribute heroin all

3    in violation of Title 21, United States Code, Sections

4    841(a)(1), 841(b)(1)(a) and (b) and Section 846.  In

5    order for a defendant to be found guilty of Racketeering

6    Act 1, the government must prove each of the following

7    elements beyond a reasonable doubt:

8              Beginning on a date unknown and continuing to

9    on or about April 7, 2010, there was an agreement between

10   two or more persons to either, A, distribute

11   methamphetamine or, B, distribute heroin;

12             And, two, the defendant became a member of a

13   conspiracy knowing of at least one of its objects and

14   intending to help accomplish it.

15             I will now explain to you the general law

16   regarding conspiracies.  This instruction on the general

17   law regarding conspiracies applies not only to the

18   conspiracy charged in Racketeering Act 1 but also to the

19   conspiracies charged in Counts 1 and 5 of the indictment.

20             A conspiracy is a kind of criminal

21   partnership, an agreement of two or more persons to

22   commit one or more crimes.  The crime of conspiracy is

23   the agreement to do something unlawful.  It does not

24   matter whether the crime agreed upon was committed.

25             For a conspiracy to have existed, it is not

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   necessary that the conspirators made a formal agreement

2   or that they agreed on every detail of the conspiracy.

3   It is not enough, however, that they simply met,

4   discussed matters of common interest, acted in similar

5   ways or perhaps helped one another.  You must find that

6   there was a plan to commit at least one of the crimes

7   alleged in the indictment as an object of the conspiracy

8   with all of you agreeing as to the particular crime which

9   the conspirators agreed to commit.

10          One becomes a member of a conspiracy by

11   willfully participating in the unlawful plan with the

12   intent to advance or further some object or purpose of

13   the conspiracy even though the person does not have full

14   knowledge of all the details of the conspiracy.

15   Furthermore, one who willfully joins an existing

16   conspiracy is as responsible for it as the originators.

17   On the other hand, one who has no knowledge of a

18   conspiracy but happens to act in a way which furthers

19   some object or purpose of a conspiracy does not thereby

20   become a conspirator.  Similarly, a person does not

21   become a conspirator merely by associating with one or

22   more persons who are conspirators nor merely by knowing

23   that a conspiracy exists.

24          A conspiracy may continue for a long period of

25   time and may include the performance of many

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    transactions.  It is not necessary that all members of

 2    the conspiracy join it at the same time, or one may

 3    become a member of a conspiracy without full knowledge of

 4    all of the details of the unlawful scheme or the names,

 5    identities or locations of all the other members.  It i

 6    not defense that a person's participation in a conspiracy

 7    was minor or for a short time.

 8           Even though a defendant did not directly

 9    conspire with other conspirators in the overall scheme,

10    the defendant has in effect agreed to participate in the

11    conspiracy if the government proves each of the following

12    beyond a reasonable doubt:

13           One, the defendant directly conspired with

14    one or more conspirators to carry out at least one of the

15    objects of the conspiracy;

16           Two, the defendant knew or had reason to know

17    that other conspirators were involved with those with

18    whom the defendant directly conspired;

19           And, three, the defendant had reason to

20    believe that whatever benefits the defendant might get

21    from the conspiracy were probably dependent upon the

22    success of the entire venture.

23           In determining whether or not a particular

24    defendant was a member of the conspiracy, you may

25    consider the evidence of his or her conduct and actions

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   together with his other her own statements and

2   declarations.  You my also consider and weigh the acts

3   and declarations of the co-conspirators which were made

4   during the course of the conspiracy and in furtherance of

5   it as bearing on the question of a defendant's membership

6   in a conspiracy.  Evidence of a defendant's membership in

7   the Black Angels gang or the Ontario Varrio Sur gang by

8   itself is insufficient to establish that person's guilt

9   of a crime as a co-conspirator.

10          You must decide whether the conspiracy charged

11   in the indictment existed and if it did, who at least

12   some of its members were.  If you find that the

13   conspiracy charged did not exist, then you must return a

14   not guilty verdict even though you may find that some

15   other conspiracy existed.  Similarly, if you find that

16   any defendant was not a member of the charged conspiracy,

17   then you must find that defendant not guilty even though

18   that defendant may have been a member of some other

19   conspiracy.

20          Each member of a conspiracy is responsible for

21   the actions of the other conspirators performed during

22   the course and in furtherance of the conspiracy.  A

23   defendant may be responsible for an act even if the

24   defendant personally did not commit that act or acts if

25   the defendant's co-conspirator committed the act in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   furtherance of a conspiracy.
 2            However, you may not find a defendant
 3   responsible for a co-conspirator's actions that occurred
 4   before the defendant joined the conspiracy.  A person
 5   cannot be held criminally liable for the substantive
 6   crimes committed by other members of a conspiracy before
 7   that person joined the conspiracy.
 8            Therefore, you may find a defendant
 9   responsible for a co-conspirator's objections or actions
10   if the government -- let me read this again.
11            Therefore, you may find a defendant
12   responsible for a co-conspirator's action or actions if
13   the government has proved each of the following elements
14   beyond a reasonable doubt:
15            One, a person committed an act;
16            Two, that person was a member of the
17   conspiracy; three, that person performed the action in
18   furtherance of the conspiracy;
19            Four, that person and the defendant were
20   members of the same conspiracy at the time that this act
21   or acts was or were committed;
22            And, five, the act fell within the scope of
23   that conspiracy and could reasonably have been foreseen
24   by the defendant to be a necessary and natural
25   consequence of the conspiracy.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1          A defendant may be found guilty of a crime
 2   charged in the indictment even if the defendant
 3   personally did not commit the act or acts constituting
 4   the crime but aided and abetted in its commission.  To
 5   prove a defendant guilty of aiding and abetting a crime,
 6   the government must prove beyond a reasonable doubt:
 7          First, the crime was committed by someone;
 8          Second, the defendant knowingly and
 9   intentionally aided, counseled commanded, induced or
10   procured that person to commit each element of the crime;
11          And, third, the defendant acted before the
12   crime was completed.  It is not enough that the defendant
13   merely associated with the person committing the crime or
14   unknowingly or unintentionally did things that were
15   helpful to that person or was present at the scene of the
16   crime.  The evidence must show beyond a reasonable doubt
17   that the defendant acted with the knowledge and intention
18   of helping that person commit the crime.
19          The government is not required to prove
20   precisely which defendant actually committed the crime
21   and which defendant aided and abetted.
22          Racketeering Act 6 charges defendant Carlos
23   Rivera with distribution of methamphetamine in violation
24   of Title 21, United States Code, Section 841(a)(1).  In
25   order for defendant Rivera to be found guilty of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Racketeering Act 6, the government must prove each of the

2    following elements beyond a reasonable doubt:

3            One, the defendant knowingly distributed

4    methamphetamine;

5            And, two, the defendant knew that it was

6    methamphetamine or some other prohibited drug.

7            Distributing means delivering or transferring

8    possession of the methamphetamine to another person with

9    or without any financial interest in that transaction.

10           The government is not required to prove the

11   amount or quantity of the methamphetamine.  It need only

12   prove beyond a reasonable doubt that there was a

13   measurable or detectable amount of methamphetamine.

14           Racketeering Act 7 charges defendants Carlos

15   Rivera and Jessica Medina with possession with intent to

16   distribute methamphetamine in violation of Title 21,

17   United States Code Section 841(a)(1).  In order for a

18   defendant to be found guilty of Racketeering Act 7, the

19   government must prove each of the following elements

20   beyond a reasonable doubt:

21           One, defendant knowingly possessed

22   methamphetamine;

23           Two, defendant possessed it with the intent to

24   distribute it to another person.

25           The government is not required to prove the

1   amount or quantity of the methamphetamine.  It need only

2   prove beyond a reasonable doubt that there was a

3   measurable or detectable amount of methamphetamine.

4           It does not matter whether the defendant knew

5   that the substance was methamphetamine.  It is sufficient

6   that the defendant knew that it was some kind of a

7   prohibited drug.

8

9           To possess with intent to distribute means to

10  possess with intent to deliver or transfer possession of

11  the methamphetamine to another person with or without any

12  financial interest in the transaction.

13          All right.  This concludes my instructions for

14  Count 2 of the indictment.  I will now move on to

15  instructions for Count 1 of the indictment.

16          The defendants are all charged in Count 1 with

17  conspiracy to violate the laws prohibiting involvement in

18  Racketeering Influenced and Corrupt Organizations in

19  violation of Title 18, United States Code, Section

20  1962(d).  In order for defendant to be found guilty of

21  RICO conspiracy, the government must prove each of the

22  following elements beyond a reasonable doubt:

23          One, the enterprise alleged in the indictment

24  would exist and that it would have affected interstate

25  and foreign commerce;

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          Two, the defendant or a co-conspirator would

2     be employed by or associated with the enterprise;

3          And, three, beginning on a date unknown and

4     continuing to on or about April 7, 2010, the defendant

5     agreed that either the defendant himself or herself or a

6     co-conspirator would conduct or participate either

7     directly or indirectly in the conduct of the affairs of

8     the enterprise through a pattern of racketeering

9     activity.

10         The RICO conspiracy charged in Count 1 is a

11    distinct offense from the RICO violation charged in Count

12    2, the offense for which you have just received

13    instructions.  There are several significant differences

14    between the two offenses of which I will now advise you.

15         The government is not required to prove that

16    the enterprise actually existed, that a defendant was

17    actually associated with the enterprise or that the

18    enterprise or its activities actually affected interstate

19    commerce.

20         In order for you to convict a defendant of

21    this crime, the government must prove beyond a reasonable

22    doubt that the defendant agreed to participate in the

23    enterprise with knowledge and intent that at least

24    one member of the RICO conspiracy would intentionally

25    commit or cause two or more racketeering acts within

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    ten years of each other.  That one member could be the

2    defendant himself or herself or another person.  The

3    government is not required to prove that a defendant

4    personally committed or agreed to personally commit

5    two or more racketeering acts.

6           The government is not required to prove that

7    each conspirator explicitly agreed with every other

8    co-conspirator to commit a RICO offense, knew all of his

9    fellow conspirators or was aware of all the details of

10   the conspiracy.  Rather, it is only required that the

11   government prove that the defendant knew the general

12   nature and common purpose of the conspiracy and that the

13   conspiracy extended beyond his or her individual role.

14          Finally, in order to convict the defendant of

15   a RICO conspiracy offense, your verdict must be unanimous

16   as to which type or types of racketeering activity that

17   each defendant agreed that he or she or himself or

18   herself or a co-conspirator would engage in.  For

19   example, at least two acts of distribution of illegal

20   controlled substances, possession with intent to

21   distribute a controlled substance, conspiracy to

22   distribute a controlled substance, illegal use of a

23   communication facility, extortion, or any combination

24   thereof.

25          I have already instructed you on the law of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1      conspiracy.  You should apply those instructions here.

2              The racketeering activity which the government

3      charges the defendants agreed would be committed in this

4      case are:  Extortion, possession with intent to

5      distribute a controlled substance, distribution of

6      controlled substances, conspiracy to distribute

7      controlled substances and illegal use of communication

8      facilities.

9              Each racketeering activity has its own

10     elements.  I have already instructed you in the elements

11     of conspiracy to distribute a controlled substance, that

12     is Racketeering Act 1, distribution of a controlled

13     substance, Racketeering Act 6, and possession with intent

14     to distribute a controlled substance, Racketeering Act 7.

15             I will now instruct you on the elements of

16     extortion and illegal use of communication facilities.

17     As I previously stated, there must be at least

18     two specific racketeering acts that all of you find would

19     be committed by any member of the RICO conspiracy.

20             In order for an individual to be found guilty

21     of extortion in violation of California Penal Code,

22     Section 518, 519, 520 which is a felony under state law,

23     the government must prove each of the following elements

24     beyond a reasonable doubt:

25             One, an individual obtained property from the

```
 1   alleged victim;

 2           Two, the property was obtained with the

 3   consent of the alleged victim;

 4           Three, the alleged victim's consent was

 5   induced by the wrongful use of force or fear;

 6           And, four, the individual who wrongfully used

 7   force or fear did so with the specific intent to induce

 8   the alleged victim to consent to the giving up of his or

 9   her property.

10           Fear may be induced by a threat to inflict an

11   unlawful injury on the person threatened, a third person

12   or the property of a person threatened or the property of

13   a third person.

14           The words unlawful injury mean an injury which

15   if inflicted would create civil liability against the

16   person doing it and would support a civil action against

17   him or her.  A threat to do that which one was a legal

18   right to do is not a threat to do an unlawful injury.

19           To constitute extortion, the force or fear

20   induced by the threat must be the operating or inducing

21   cause which produces consent and results in the property,

22   money or other thing of value being delivered to another.

23   In some -- if some other cause is the primary and

24   controlling cause for the consent for the property being

25   delivered to another, the crime of extortion has not been
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   proved.
 2           As used in the law of extortion, consent is
 3   obtained from the person threatened with money or
 4   property or other thing of value is turned over to
 5   another with the understanding that the person threatened
 6   or a third person will be saved from injury to the person
 7   threatened, a third person or the property of the person
 8   threatened or the property of a third person.
 9           The delivery of the money, property or other
10   thing of value is the lesser of two unpleasant
11   alternatives.  Consent as used in the law of extortion
12   exists under these circumstances notwithstanding the fact
13   that the person threatened may silently protest in his or
14   her own mind against the circumstances which compelled
15   the choice.
16           A coerced and unwilling consent compelled by
17   the wrongful use of force or fear constitutes consent in
18   extortion.
19           In order for an individual to be found guilty
20   of illegal use of a communication facility in violation
21   of Title 21, United States Code, Section 843(b), the
22   government must prove beyond a reasonable doubt that the
23   individual knowingly or intentionally used a telephone to
24   help bring about the crime of conspiracy to distribute a
25   controlled substance in violation of Title 21, United
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   States Code, Sections 846 and 841(a)(1) or the crimes of

2   distribution of narcotics or possession with intent to

3   distribute narcotics in violation of Title 21, United

4   States Code, Section 841(a)(1).

5            Each separate use of a telephone to bring

6   about one of these crimes is itself a separate crime.

7            Count 5 charges defendants Carlos Rivera,

8   Jessica Medina, Raul Prieto and other alleged

9   co-conspirators with conspiring to distribute specific

10   controlled substances in violation of Title 21, United

11   States Code, Section 846 and 841(a)(1).

12            In order for a defendant to be found guilty of

13   the conspiracy to distribute controlled substances as

14   charged in Count 5, the government must prove each of the

15   following two elements beyond a reasonable doubt:

16            First, beginning on an unknown date and ending

17   on or about April 7, 2010, there was an agreement between

18   two or more persons to distribute, A, methamphetamine,

19   or, B, heroin, or C, any combination of those controlled

20   substances;

21            And, second, the defendant joined in the

22   agreement knowing of its purpose and intending to help

23   accomplish that purpose.

24            To distribute means to deliver or transfer

25   possession of methamphetamine or heroin to another person

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    with or without any financial interest in that
 2    transaction.
 3              I have already instructed you on the law of
 4    conspiracy.  You should apply those instructions here.
 5              The verdict form as to Count 5 will include
 6    space for you to make findings regarding whether the
 7    conspiracy involved particular drugs and drug quantities.
 8              If you find a defendant guilty of the charge
 9    in Count 5 of the indictment, you are then to determine
10    as to each such defendant whether the government proved
11    beyond a reasonable doubt both the type of controlled
12    substance as well as the amount of that controlled
13    substance that was reasonably foreseeable to the
14    defendant in connection with his criminal activity.
15              Your decision as to both of these questions
16    must be unanimous.  Your determination of weight must not
17    include any packaging material.
18              Defendant Carlos Rivera is charged in Count 6
19    of the indictment with distribution of methamphetamine in
20    violation of Title 21, United States Code, Section
21    841(a)(1).  In order for defendant to be found guilty of
22    that charge, the government must prove each of the
23    following two elements beyond a reasonable doubt:
24              First, on or about July 31, 2009, the
25    defendant knowingly distributed methamphetamine;
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          And, second, the defendant knew that it was

2   methamphetamine or some other prohibited drug.

3          The government is not required to prove the

4   amount or quantity of methamphetamine.  It need only

5   prove beyond a reasonable doubt that there was a

6   measurable or detectable amount of methamphetamine.

7          Defendants Carlos Rivera and Jessica Medina

8   are charged in Count 10 of the indictment with possession

9   with intent to distribute methamphetamine in violation of

10  841(a)(1).  In order for a defendant to be found guilty

11  of that charge, the government must prove each of the

12  following two elements beyond a reasonable doubt:

13         First, on or about August 6, 2009, the

14  defendant knowingly possessed methamphetamine;

15         And, second, the defendant possessed it with

16  the intent to distribute it to another person.

17         To possess with intent to distribute means to

18  possess with intent to deliver or transfer possession of

19  methamphetamine to another person with or without any

20  financial interest in the transaction.

21         It does not matter whether the defendant knew

22  that the substance was methamphetamine.  It is sufficient

23  that the defendant knew that it was some kind of a

24  prohibited drug.

25         The government is not required to prove the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   amount or quantity of methamphetamine.  It need only

2   prove beyond a reasonable doubt that there was a

3   measurable or detectable amount of methamphetamine.

4          The crime of possession of a controlled

5   substance with intent to distribute charged in Count 10

6   includes the lesser crime of simple possession.  If you

7   are not convinced beyond a reasonable doubt that the

8   defendant is guilty of possession of a controlled

9   substance with intent to distribute and all of you are

10  convinced beyond a reasonable doubt that the defendant is

11  guilty of the lesser crime of simple possession of a

12  controlled substance, you may find the defendant guilty

13  of simple possession of a controlled substance.

14         In order for the defendant to be found guilty

15  of the lesser crime of simple possession, the government

16  must prove each of the following elements beyond a

17  reasonable doubt:

18         First, the defendant possessed

19  methamphetamine;

20         And, second, the defendant possessed the

21  methamphetamine knowingly.

22         The crime of simple possession of a controlled

23  substance does not require proof that the government --

24  that the defendant possessed the controlled substance

25  with the intent to distribute.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

         A person has possession of something if the person knows of its presence and has physical control of it or knows of its presence and has the power and intention to control it.

         More than one person can be in possession of something if each knows of its presence and has the power and intention to control it.

         If you find defendant Carlos Rivera or defendant Jessica Medina guilty of the charge in Count 10 of the indictment, you are then to determine as to each such defendant whether the government proved beyond a reasonable doubt that the amount of methamphetamine equaled or exceeded 50-grams of actual methamphetamine. Your determination of weight must not include the weight of any packaging material.  Your decision as to weight must be unanimous.

         The government does not have to prove the defendant knew the quantity of methamphetamine.

         You are instructed as a matter of law that methamphetamine is a Schedule II controlled substance, and heroin is a Schedule I narcotic drug controlled substance as those terms are used in the indictment.

         It is solely for you, however, to determine whether or not the government has proven beyond a reasonable doubt that any of the others conspired to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    distribute, possessed with intent to distribute or

2    distributed a substance which was methamphetamine, heroin

3    or some other prohibited drug.

4           Defendant Carlos Rivera is charged in Count 23

5    of the indictment with the possession of a firearm and

6    ammunition in violation of Title 18, United States Code,

7    Section 922(g)(1).  In order for a defendant to be found

8    guilty of that charge, the government must prove each of

9    the following three elements beyond a reasonable doubt:

10          First, the defendant knowingly possessed the

11   Colt model Agent, .38 caliber revolver bearing serial

12   number H98877 or six rounds of .38 special caliber

13   ammunition bearing the head stamp of W-W Super;

14          Second, the Colt model Agent, .38 Special

15   caliber revolver bearing serial number H98877 or

16   six rounds of .38 special caliber ammunition bearing the

17   head stamp of W-W Super had been transported either from

18   one state to another or between a foreign nation and the

19   United States;

20          Third, at the time the defendant possessed the

21   Colt model Agent, .38 special caliber revolver bearing

22   serial number H98877 or six rounds of .38 special caliber

23   ammunition bearing the head stamp of W-W Super, the

24   defendant had been convicted of a crime punishable by

25   imprisonment for a term exceeding one year.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    The knowledge element is limited to knowing

2  possession.  A defendant need not be aware of his felon

3  status or that the firearm traveled in interstate

4  commerce.

5    A person possesses a firearm if the person

6  knows of its presence and has physical control of it or

7  knows of its presence and has the power and intention to

8  control it.

9    To establish that a defendant knowingly

10  possessed the firearm or ammunition, the government need

11  not prove the defendant's knowledge of the law, only that

12  the defendant consciously possessed what he knew to be a

13  firearm.

14    More than one person can be in possession of a

15  firearm if each knew or knows of its presence and has the

16  power and intention to control it.

17    An act is done knowingly if the defendant is

18  aware of the act and does not act through ignorance,

19  mistake or accident.  You may consider evidence of the

20  defendant's words, acts or omissions along with all the

21  other evidence in deciding whether the defendant acted

22  knowingly.

23    The parties have agreed to certain facts that

24  have been stated to you.  You should therefore treat

25  those facts as having been proved.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        Because you must base your verdict only on the

2   evidence received in the case and on these instructions,

3   I remind you that you must not be exposed to any other

4   information about the case or to the issues it involves.

5   Except for discussing the case with your fellow jurors

6   during deliberations:

7        Do not communicate with anyone in any way and

8   do not let anyone else communicate with you in any way

9   about the merits of the case or anything to do with it.

10  This includes discussing the case in person, in writing,

11  by phone or electronic means, via e-mail, text messaging

12  or any Internet chat room, blog, website or other

13  feature.  This applies to communicating with your family

14  members, your employer, the media or press and the people

15  involved in the trial.  If you are asked or approached in

16  any way about your jury service or anything about this

17  case, you must respond that you have been ordered not to

18  discuss the matter and to report the contact to the

19  court.  Do not read, watch or listen to any news or media

20  accounts or commontary about the case or anything to do

21  with it.  Do not do any research such as consulting

22  dictionaries, researching the Internet or using other

23  reference materials, and do not make any investigation or

24  in any way try to learn about the case on your own.

25        The law requires these restrictions to ensure

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    the parties have a fair trial based upon the evidence
 2    that each party has had an opportunity to address.  A
 3    juror who violates these restrictions jeopardizes the
 4    fairness of these proceedings and a mistrial could result
 5    that would require the entire trial process to start
 6    over.  If any juror is exposed to any outside
 7    information, please notify the court immediately.
 8              Some of you have taken notes during the trial.
 9    Whether or not you took notes, you should rely on your
10    own memory of what was said.  Notes are only to assist
11    your memory.  You should not be overly influenced by your
12    notes or those of your fellow jurors.
13              The punishment provided by law for these
14    crimes is for the court to decide.  You may not consider
15    punishment in deciding whether the government has proved
16    its case against the defendant beyond a reasonable doubt:
17              Okay.  We have got to take a break before we
18    come back and hear closing arguments.  All right.  How
19    long?  10 minutes.  All right.  Remember the admonition.
20        (Recess from 10:57 to 11:13 a.m.)
21        (The following proceedings were held in the
22         presence of the jury:)
23        THE COURT:  All right.  All counsel are present.
24    All three defendants are present.
25              Ladies and gentlemen, we will now begin with
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the closing arguments of counsel.  The government which

2    as you know bears the burden of proof will go first and

3    will close.  And so you will hear from the government

4    twice.  All right.  Mr. Dore.

5         MR. DORE:  In this case, you heard a lot about the

6    city of Ontario which is a little bit east of here in San

7    Bernardino County.  It is a place with homes and parks

8    and schools, but, unfortunately, it is also a territory,

9    a place ruled by the Ontario Black Angels gang and where

10   the defendants, we submit to you, committed their crimes.

11        Now, in some ways, the conduct here had no

12   boundaries.  It wasn't restricted by the presence of the

13   children that defense counsel kept alluding to.  It

14   wasn't stopped by people being in jail cells behind bars,

15   and it wasn't limited to the calls that we played for

16   you at trial.

17        In fact, today I am going to play clips of

18   some of those calls for you, just short ones, and you are

19   not going to need those binders anymore.  But as you

20   listen to them, please keep in mind and note the

21   brazenness, the repetition and the familiarity.

22        In short, the defendants here wouldn't stop

23   even as arrests were made, as guns were taken and drugs

24   were seized.  They kept going.  They kept trying to buy

25   and sell methamphetamine and to help one another in the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    process.

2            You can also tell this is no one shot deal.

3    We submit to you that as you listen to these calls and

4    the clips of them, there is no uncertainty, there is no

5    surprise.

6            These people know who everyone is.  They know

7    who Bony is.  They know what a ball is, when it is hot,

8    who is who and what is what.  These defendants are all on

9    the same page.  They are on the same team.  And we submit

10   to you, ladies and gentlemen, that that team is the

11   Ontario Black Angels gang that whether as an active gang

12   member with tattoos engaging in drug trafficking and

13   extortion or as someone knowingly associated with the

14   gang taking part in pick-ups and collections of drug

15   proceeds or providing a safe house where drug and gun

16   deals can be consummated that these defendants Carlos

17   Rivera, Jessica Medina and Raul Prieto conspired to

18   distribute methamphetamine among other crimes and also to

19   participate in the operation and management of the Black

20   Angels gang through a pattern of racketeering activity.

21           Now, as you heard in those jury instructions

22   there are numerous counts in this case, and these are the

23   counts the defendants here are charged with.  RICO

24   conspiracy, all three defendants are charged with, and on

25   down the line you see who is charged with what.  All

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1     three defendants are charged with the RICO conspiracy and

 2     the conspiracy to distribute methamphetamine.  I am going

 3     to bounce around and address some of these charges in a

 4     different order.

 5             Before I do that, though, I want you to please

 6     take note as reflected in those jury instructions that

 7     the judge gave you, these are not co-extensive, the

 8     crimes that are charged here.

 9             We expect that you are going to hear an

10     argument about whether or not Jessica Medina and Raul

11     Prieto were members of the Black Angels gang.  I am going

12     to argue to you later on why that doesn't matter for

13     purposes of the RICO crime, but, either way, when you are

14     considering the drug counts, for instance, Black Angels

15     gang doesn't make a difference, doesn't matter, you don't

16     have to find that.  Please just focus on the respective

17     elements that apply to each given count.

18             There is some overlap when you talk about the

19     racketeering acts as you heard in those instructions, for

20     instance, the possession with intent to distribute itself

21     is a separately charged crime that can also constitute a

22     racketeering act.  It is broken down in these exhaustive

23     jury instructions that you sat through.  But just keep in

24     mind that these don't have to fit perfectly on top of

25     one another.  Apply the elements as they relate to each

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  specific charge.

2         As I get going here, also, please keep in mind

3  that what I say doesn't matter.  It is just argument.

4  The dots are the evidence.  I can suggest to you how they

5  should be connected.  That is one reason I use that

6  clunky I submit term, but, whatever I say, it is a

7  submission for you to decide.

8         Secondarily, when you are thinking about the

9  jury instructions that I am going to emphasize here, all

10  the jury instructions apply.  I am not telling you that

11  one is more important than the other.  It is just what I

12  am focusing on, but please consider all the instructions

13  when you are reaching your decision here.

14         First count I wanted to cover was Count 23.

15  That is the unlawful possession of the firearm and

16  ammunition.  You have got the firearm and ammunition that

17  were marked as Exhibits 236 and 237 in front of you here

18  on the counsel table.

19         There are three elements for this crime.

20  One is the knowing possession of the gun or ammunition.

21  And the second element there is the interstate nexus,

22  whether or not the gun and ammunition traveled in

23  interstate commerce.  Third element being whether Carlos

24  Rivera, he is the only person charged in this count,

25  whether he has a prior felony conviction.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          As you heard the parties stipulated as to the

2     second and third count.  I believe it is Exhibit 275

3     where Carlos Rivera stipulated the parties agreed that he

4     had a prior felony conviction.  Exhibit 276 is where the

5     parties agreed that the gun and the ammunition, the Colt

6     .38 revolver and the ammunition stamped W-W something

7     else, W-W something, traveled in interstate commerce.  So

8     those are off the board.  The parties have agreed that

9     those elements have been satisfied.

10          What you have left then is the knowing

11    possession of that firearm and ammunition.  Evidence that

12    you heard on this point included Darren Williams who

13    engaged in the observation and saw someone arrive with

14    the brown case with the yellow wool interior.  You have

15    also got Wes Willemstyn who is the Ontario police officer

16    who saw Carlos Rivera walk away, continue to walk away as

17    he told him to stop, continue to walk away into the house

18    carrying that case which was later found to have a loaded

19    handgun.  You have also got Josh Burks who found that

20    handgun with him.  Where did he find it?  He found in the

21    stand-up refrigerator in Raul Prieto's house.  And then

22    as I mentioned before, we have got the two stipulations.

23          These photographs are in evidence, Exhibit 35

24    is the handgun in the case, and you have also got the

25    words of Carlos Rivera himself.  This is a clip from

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Exhibit 100.

2         (Tape played.)

3         MR. DORE:  I submit to you, ladies and gentlemen,

4    that that constitutes knowing possession of a firearm.

5    Carlos Rivera knew what it was, he knew he had it and he

6    tried to hide it.  And just in case there is any further

7    question, he specified exactly what type of gun it was

8    that he hid.

9         (Tape played.)

10        MR. DORE:  As you heard, ladies and gentlemen, on

11   this revolver, on the side of it, it said Colt .38

12   special.  It has the Colt emblem on it.  We submit to you

13   that the defendant Carlos Rivera knowingly possessed that

14   handgun and the ammunition found inside of it on that day

15   of July 22nd, 2009.

16            Another count I want to address briefly is

17   Count 6, the distribution of methamphetamine.  This

18   relates to that July 31 seizure of the 4.4-grams of

19   methamphetamine found in the driver of the VW bug's side.

20   You heard some calls about that.

21            Here, there are two elements, that Carlos

22   Rivera who is the only person charged in this crime

23   knowingly distributed that methamphetamine, and, second,

24   that he knew it was methamphetamine or some other

25   prohibited drug.  Witnesses here included Travis Cotton

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  who observed the old VW bug ride up and Carlos Rivera

2  walk out and speak to the two occupants, Ron Watson, the

3  officer who came in off his graveyard shift, testified

4  about the traffic stop on that VW bug and the drugs that

5  were recovered from the driver's side, Travis Hartman,

6  the Ontario police officer who was with Ron Watson and

7  also recovered that 4.4-grams of meth from the driver's

8  side.  And again the parties stipulated.  Exhibit 277,

9  the 4.4-grams of methamphetamine actual were found in

10 that sock.

11        Now, again, you heard calls from Carlos Rivera

12 setting up the deal, and you will hear Robert Tolson in

13 this call as you did during the trial.  Remember that

14 voice because you are going to hear it again.

15        (Tape played.)

16        MR. DORE:  Again, I submit to you, ladies and

17 gentlemen, that Carlos Rivera knows exactly what it is,

18 and he knows that it is the methamphetamine that he had

19 sold to Robert Tolson and that it is the methamphetamine,

20 the 4.4-grams of methamphetamine, found in the sock of

21 Carl Cook, the driver of that VW drug on July 31, 2009.

22 There was a photograph of that small bindle of

23 methamphetamine.  And there is the DEA lab report.  And,

24 next to it, the evidence envelope identified by Ron

25 Watson as having the tag that he filled out and the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   report indicating that the contents were 4.4-grams of

2   actual methamphetamine.

3           Count 10, Carlos Rivera and Jessica Medina are

4   charged with this one.  This crime has two elements, and

5   it relates to that August 6th, 2009 seizure of the almost

6   half pound of meth found in this thing that looks like a

7   car battery.  The elements here are that defendant

8   knowingly possessed the methamphetamine and that

9   defendant possessed it with the intent to distribute it

10  to another person.

11          Please note as part of the instructions you

12  were instructed that it doesn't matter if the defendant

13  knew that it was meth.  It only matters that the

14  defendant knew it was some kind of prohibited drug.

15          Witnesses here included Maynor Arana from the

16  Ontario Police Department who observed someone arrive and

17  have a black box with a strap talk to Carlos Rivera and

18  walk into that apartment at Vineyard Avenue, Josh Burks

19  who recovered that battery from the back of the red

20  Acura, opened it and found inside this Tupperware

21  container that had two bags of an off-white crystalline

22  substance, Mike Lorenz who went and talked with Carlos

23  Rivera that night August 6, 2009, recovered more than

24  $3,000 cash from his pocket which he had on a late night

25  sitting in his apartment, Matt Gonzalez who confirmed the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    fingerprint analysis on this Tupperware container marked

2    as Exhibit 227 and found that the fingerprints belonged

3    to Carlos Rivera, Chris Martinez who took custody of the

4    evidence, put it in the evidence envelope.

5            And, again, here you also have the stipulation

6    of the parties that there were 219-grams of actual

7    methamphetamine recovered.

8            DEA Special Agent Paris, by the way, also

9    noted as you may remember that DEA practice is to

10   consider a use quantity, a personal use quantity of

11   methamphetamine to be one-tenth of a gram.  You heard

12   that a sugar packet would contain something on the order

13   of ten doses.  That would mean that 219-grams equals over

14   2,000 doses of methamphetamine.

15           Again, here are some of the photographs you

16   saw, the red Acura, the open battery containing the

17   Tupperware container, the Tupperware container and the

18   two large bags of the white crystalline substance inside

19   and, again, the evidence envelope filled out by Detective

20   Martinez with his handwriting on it and the lab report

21   resulting from that finding that the evidence contained

22   inside had 219-grams of actual methamphetamine at a

23   98.2 percent purity.

24           Now, again, you heard the calls.  For

25   instance, this call, I won't bother playing it for you.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   You can read the text on the screen.  Carlos Rivera was

2   talking to David Navarro and he says, yeah, that is my

3   red Acura I am washing.  And Jessica Medina, who I will

4   get to a little bit more who was as much a part as Carlos

5   Rivera who had the knowledge and knew that this stuff was

6   going to be distributed.  She is a part of this as you

7   heard when the officers arrive at her place.  Where are

8   the keys to this car?  She says, I don't know where the

9   keys are, I don't know where the keys are.  But you heard

10  in the calls she had with others, she knew exactly where

11  the keys are.

12       (Tape played.)

13       MR. DORE:  She had them in her pocket.  And why

14  didn't she tell the officer she had them in her pocket?

15  She told you.

16       (Tape played.)

17       MR. DORE:  And her house was linked to that car.

18  She was not surprised by any of this.  I submit to you

19  that when you listen to these calls, you listen to the

20  tone of her voice.  It is not like, oh, my God, what was

21  Carlos doing, what on earth is going on here, what is in

22  the car.

23       Everyone here knows what is going on including

24  the three grand in cash that Carlos Rivera had in his

25  pocket, she claimed to be to buy another car.  But I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    submit to you if you listen to this call, you can clearly

 2    infer from it that that money was meant for something

 3    else and that Jessica Medina knew what it was meant for.

 4         (Tape played.)

 5         MR. DORE:  Here is another one where Jessica

 6    Medina is talking about what led up to that arrest and,

 7    see, again, is there any surprise about what happened,

 8    about who came through, about what that person must have

 9    had.

10         (Tape played.)

11         MR. DORE:  And not only was there drugs at the

12    apartment, you can tell from the calls, we submit to you,

13    that Jessica Medina knew about the larger operation, that

14    Carlos Rivera was involved in drug dealing and had other

15    spots, other places where where he maintained drugs.

16         (Tape played.)

17         MR. DORE:  Junior breaks in, but I submit to you

18    that you listen to that and she knows exactly where

19    Carlos Rivera has a spot and where he has other drugs,

20    what other officers would have found in addition to what

21    was in that car.  She knows these are drugs.  She knows

22    what Rivera is doing.  What they are doing is selling

23    narcotics.  There is one more call on that point where

24    she makes again clear that she knows what is going on.

25         (Tape played.)
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          MR. DORE:  Everybody would have been caught up.

2     She knew that there were drugs here.  She knew what

3     Mr. Rivera was doing, and she played an active role in

4     it.  And we are going to get to that role a little bit

5     more in Count 5.  All three defendants are charged in

6     Count 5 with conspiracy to distribute methamphetamine.

7               The elements here, that beginning on that

8     unknown date and continuing through April 7, 2010, there

9     is an agreement to distribute methamphetamine.  Second,

10    that the defendant joined that agreement knowing of its

11    purpose and trying to help accomplish it.

12              There are some photographs of the

13    methamphetamine recovered in this case, the 4.4-grams and

14    the almost half a pound recovered from that battery

15    outside of Jessica Medina's and Carlos Rivera's

16    apartment.

17              And just in case it is argued later on that

18    Jessica Medina didn't know anything about this, she is

19    not a part of this, who knows what Carlos Rivera is

20    doing, she is in the dark, listen to this call, and

21    listen to the typical practice that Carlos Rivera

22    describes with respect to the woman he is with.

23         (Tape played.)

24         MR. DORE:  What usually happens, Jessica Medina

25    who lives with Carlos Rivera, and you have heard evidence

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that they are together, I submit to you that she is the

2    heina being referred to there engaging in their usual

3    practice to go and get drugs and to take part in Carlos

4    Rivera's drug distribution, their drug distribution.

5            Here is another call I would like you to

6    please focus on.  I am not going to play a clip of it,

7    but it is a call between Carlos Rivera and Eric.  And

8    just take a glance at that transcript and please remember

9    the name Bony.  You are going to hear it again, and

10   remember the name Eric.  Here, you have got Carlos Rivera

11   talking about going through Bony and talking about stuff

12   you might get.  You are going to hear that name again,

13   but before we get there, let's talk about Raul Prieto.

14           Now, whether or not he could read, write and

15   spell as his mother said, we submit to you the guy could

16   sell and he did.  And he talked to Carlos Rivera about

17   it, and he was talking about methamphetamine and an ounce

18   of it and he was talking about what he could push, what

19   he could move.  Please take a listen to some of these

20   calls.

21        (Tape played.)

22        MR. DORE:  Here is another one, and there is that

23   name Bony again, and I leave it to you to think about.

24        (Tape played.)

25        MR. DORE:  I will move it.  Then, ladies and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  gentlemen, I submit to you that that is an agreement a

2  conspiracy to distribute methamphetamine and that Bony is

3  a character that Raul Prieto knows, that Carlos Rivera

4  knows and later on that you will hear Jessica Medina

5  knows, that these people again were all on the same page

6  trying to sell methamphetamine.  And as I mentioned

7  before, is there any surprise in this call, is there any

8  lack of certainty about what are you talking about or

9  rather are these defendants right there together on the

10 same page.

11         And it is a bit of an aside but you may hear

12 from the defense, from Mr. Prieto's counsel about, well,

13 look, there were only two calls in this case.  There were

14 12 non-pertinents from Juan Lemus.  Again, I submit to

15 you that you heard lots of evidence about how tight these

16 guys are, brothers, quote, unquote, not actually by

17 blood.  The mom referred to as Mom, doing deals at the

18 house.  I submit to you that these guys are talking

19 different days, different ways, more than 14 times and

20 that when you listen to these calls, there is no doubt,

21 there is no suggestion that these guys haven't been

22 talking about this stuff before.

23         And also please note the date, August 5, 2009,

24 Carlos Rivera just got popped two weeks ago with that

25 gun.  Then one week after that, they got the 4.4-grams,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1     but he is still going.  He is still getting more.

 2              I am not going to bother playing this

 3     one because it is in Spanish.  This one is actually in

 4     evidence, 88, because it is a Spanish language

 5     transcript.  Referred to this guy as Mr. Nicolada.  He is

 6     the one you heard had the conversation with Carlos Rivera

 7     about getting the Nicolada.  And you heard testimony from

 8     Special Agent Steve Paris about how these nonsequiturs

 9     suggest drug code.  Are they really talking about riding

10     over there with a beer full of tomato juice, or are they

11     talking about something different.  I submit to you,

12     ladies and gentlemen, it is something different.  And it

13     is almost 100 percent just like you saw in that DEA lab

14     report that the methamphetamine recovered in that fake

15     thing was at 98.2 percent.

16          (Tape played.)

17          MR. DORE:  That is August 6, 2009, about

18     5:00 o'clock, same night when officers went to Mr.

19     Rivera's apartment, Jessica Medina's apartment and got

20     that battery with the half-pound of meth out of that red

21     Acura.  Once again, no confusion, same exhibit, same

22     call, August 6, 4:51 p.m.

23          (Tape played.)

24          MR. DORE:  Again, ladies and gentlemen, this count

25     is a conspiracy to distribute methamphetamine.  I can
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    push that, I submit to you, is an agreement for Carlos

2    Rivera to give methamphetamine to Raul Prieto so he can

3    sell it and that this isn't the first time that has

4    happened.

5              Again, little bit later, couple of hours later

6    that same night, another call Mr. Nicolada, did you get

7    it, yeah, I get it, how does it look, it looks good.  It

8    better, it was 98.2 percent pure.  That same night the

9    cops show up at Rivera's house and Jessica Medina's house

10   and get that battery and get the meth out of it that was

11   in this Tupperware container.

12             So then we move to more calls and here is

13   where we get to Jessica Medina.  Day after, she is

14   starting to make reports, what happened.  She is not just

15   making reports, though.  She is doing Carlos Rivera's

16   work.  You heard the calls where she starts making calls

17   like this one to Robert Tolson who you heard before.

18   What is she doing?  She is making collections.

19        (Tape played.)

20        MR. DORE:  Here, she is even more specific.

21        (Tape played.)

22        MR. DORE:  All right.  There is the agreement.

23   There is a reflection of the agreement.  I am not saying

24   that is the only part of it.  It is a reflection of the

25   agreement.  Carlos Rivera, I got money out there.  Robert

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Tolson, you heard from Robert Tolson before when he is

2    making that deal to get the 4.4-grams.  Now, here he is,

3    Jessica Medina talking to Carlos Rivera and Jessica

4    Medina saying Carlos Rivera told me to get at you to get

5    the money.  I submit to you that is money relating to the

6    drug dealing.  It is making a collection from Robert

7    Tolson.  And her role in this is not some innocent

8    bystander, it is not some woman in the dark.  She says

9    all right.  She knows exactly what is going on.

10          Now, given to you or given to the cousin.  You

11   heard that Carlos Rivera is not actually related to Raul

12   Prieto.  I submit to you that they are very tight and

13   that you heard the testimony from Mr. Prieto's mother

14   saying that Carlos Rivera has referred to her as his

15   auntie.  You heard the call.  It is Exhibit 100 where

16   Carlos Rivera talks about when he got hit for the gun he

17   was at his auntie's house.  I submit to you, ladies and

18   gentlemen, the cousin being referred to here is Raul

19   Prieto.

20        (Tape played.)

21      MR. DORE:  No more.  It has been something they

22   have been doing, but let's take a beat because the cops

23   are around, it is hot.  And, then, here is Bony again.

24   You heard about him in the conversation between Prieto

25   and Rivera.  I submit to you that he is the guy who is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the supplier where Rivera gets some drugs, maybe

2    sometimes the stuff is whack, it is not as good as the

3    other stuff Rivera gets, but it is part of the chain

4    giving methamphetamine down the line to Rivera who then

5    gives it to others including Raul Prieto to sell.  And

6    Jessica Medina knows exactly what is going on there with

7    respect to Bony.

8         (Tape played.)

9         MR. DORE:  Note the date here, August 11th, 2009,

10   Exhibit 148.  This is five days after officers just

11   raided their place and got the half pound of

12   methamphetamine out of the battery.  And she is talking

13   about getting more stuff, and where she can keep it.  And

14   then just to close the loop on Bony, we have got the call

15   with Jessica Medina talking about Bony and Crook.

16        (Tape played.)

17        MR. DORE:  I will spare you the alarm sound in

18   that call.  But, again, ladies and gentlemen, I submit to

19   you that this is part of the typical practice, again,

20   using Raul Prieto's house as a safe house.  It is where

21   the cops got that loaded firearm, and it is also where

22   you heard testimony from David Navarro about the two drug

23   deals that happened there where Navarro was present with

24   Prieto and Carlos Rivera when Rivera was conducting drug

25   deals, and that is entirely consistent with here using

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Prieto's house to engage in a three-way call with Bony

2    with Rivera and with Ms. Medina.  It is a safe place

3    where they feel like they can get their job done.

4              Again, another quick aside, please don't get

5    distracted by the street lawyering that you heard in

6    these various calls, what cops can do, what they can't

7    do, what is allowed on a parole search, what isn't.  The

8    law you have to follow is in the instructions that you

9    were given.  And I submit to you again, ladies and

10   gentlemen, these guys, if anything, their statement of

11   law suggested they knew it was something they were trying

12   to avoid, they were trying to act in a way that they

13   thought would put them separate and apart from where they

14   would get hit or get caught.  Doesn't mean they are

15   right.  Doesn't mean these guys have law degrees.

16   Doesn't mean if you keep it in the car and the car is in

17   Nacho's name, you have the key, you are using the car, it

18   is, in fact, where you put the battery full of meth, that

19   it doesn't link back to you.

20             Other parts of the same call to Raul Prieto

21   just to drive home the fact that we are not talking here

22   about anything these guys are surprised about.  They know

23   exactly what is going on, and they are using the phone to

24   do it, and they are using the phone to make agreements

25   about how to sell other drugs as well.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              Raul Prieto, I got some ecstasy, you know
 2    where I can sell it, I can let you know.  Do you know
 3    anybody that wants to buy soda?  Picked some up, it is
 4    pretty bomb and just in case anyone is wondering, hey,
 5    what is soda, Rivera tolls you, it is coke.  Get it?
 6    Coca-Cola, Coke.
 7              Let's move to the next count.  Just to tie the
 8    bow on that one.  Jessica Medina, Raul Prieto and Carlos
 9    Rivera all knew what was going on, they knew what was
10    going on together.  They were taking part in selling and
11    distributing methamphetamine around Ontario.  There was
12    no surprise in what they were doing.  They were all
13    playing a part.
14              Now, let's get to RICO.  These are the
15    instructions.  They are pretty long, but I think if you
16    walk through them, they are not as complicated as they
17    may seem.  The substantive RICO count, Racketeer
18    Influenced and Corrupt Organizations Act.  That
19    one charges Jessica Medina, and it charges Carlos Rivera
20    alone.  For this one, you heard you need to have an
21    on-going enterprise, defendant was employed by or
22    associated with the enterprise and on and on, and I will
23    walk through each of these individually.  You are going
24    to have them back there with you to look at.
25              Enterprise, is there an enterprise.  We submit
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   to you, ladies and gentlemen, that the Black Angels is an

2   enterprise.  No accident that Rivera has got that stuff

3   on his arm.  That is not just out of the blue like, hey,

4   I like the word black, I like the word angel.  It is in

5   homage to something.  It is an existing enterprise, a

6   thing that he belongs to, that operates in the City of

7   Ontario.

8            You heard about the gang meetings.  You heard

9   about paying dues.  This was a working association.  And

10  it is no coincidence that there are other guys with the

11  same sorts of tattoos.  Black Angels on this guy.  Black

12  Angels on these guys.  All got the same tattoos.  They

13  are part of the same group, same affiliation.  Further

14  evidence that we have an enterprise here is the graffiti.

15  It is also all over the place in public.  The gang is

16  flexing its muscles showing who they are.

17           I will refer to this photograph a little bit

18  later.  I submit to you, ladies and gentlemen, that looks

19  like a truck-loading depot with the 5 and the 4, and the

20  openings where maybe you would back a truck up to unload

21  something.

22           Here is more graffiti laying out very clearly

23  the three branches of the Black Angels gang:  OAN,

24  Angelitos Negros; OBA, Black Angels; and OVS, Ontario

25  Varrio Sur.  And each of these the O, as you heard,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1     represented Ontario.  And it wasn't even on the streets

2     of Ontario where it stopped.  It included the jail,

3     etched into the steel of the tray of the jail cell is a

4     shout out to the Ontario OBA's, the Black Angels gang.

5     And you saw the rosters including Lonely, Lazy and Little

6     Reals.

7          And this one which is a disaster to look at on

8     the powerpoint, it is so hard to see, but you will have

9     it back with you.  It is 247.  This is the roll call we

10    talked about with the list of the gangs, the gang

11    members, Los Black Angels.  And, again, if you work in an

12    office, maybe you have got a telephone directory, maybe

13    you have got a list, you know who works there, you have

14    an identification card.  I submit to you that, here, we

15    are talking about a gang, we are talking about a group.

16    These guys are members of it.

17          We will get to it a little bit later.  You saw

18    the words Crook and Little Reals on that graffiti.

19    Employed by or associated with the enterprise.  And this

20    is what I am going to get to a little bit later also in

21    the RICO conspiracy in relation to Raul Prieto.  You

22    don't have to just be a member of Black Angels to be

23    associated with it.  You can be liable for RICO even if

24    you are not a full-fledged, card-carrying member of the

25    enterprise.  If you are helping it out, if you are

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    associated with it, then you are good for this crime.

2              I submit to you, ladies and gentlemen, this

3    law was written, it is a very tightly woven net intended

4    to catch even the smallest fish.  This is not something

5    going after just the top level guys.  If you are helping

6    out the gang, if you are playing a part, then you are

7    associated with it.

8              Now, we are just talking here about the RICO

9    conspiracy so I will limit this discussion to Rivera and

10   Medina.  Rivera, I submit to you, ladies and gentlemen,

11   there is no question he is associated with it.  It is

12   written all over him.  He is a part of the Black Angels.

13   I also submit to you, ladies and gentlemen, that the

14   woman whose name is tattooed just below that Ontario

15   spelled with the Spanish language pronunciation that you

16   heard associated with the Black Angels gang with

17   two large wings sprouting out of it on the father of her

18   children's chest is something that suggests she knew

19   exactly what his role was.  That she knew about Black

20   Angels gang as well as Mr. Prieto's mom knew about the

21   Black Angels gang and that Carlos Rivera was a part of it

22   and that the stuff she was doing was designed to help her

23   husband, not her husband, the person she was living with

24   who was a part of that gang.

25             Because among other things Carlos Rivera

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   doesn't hide it.  When the money is on the table, and he

2   is feeling a little bit pressed when Robert Tolson calls

3   him and says we just got popped for that 4.4-grams that

4   was in the guy's sock, it was a little bit weird, you

5   know, what is going on.  Rivera makes very clear.

6        (Tape played.)

7        MR. DORE:  This isn't something in the shadows.

8   Unfortunately, for the people of Ontario, this is

9   something out there.  You saw the graffiti.  You saw it

10  written on him.  It is hot in San Bernardino.  This guy

11  is walking around showing his tattoos.  He is a member of

12  the Black Angels, and he is not afraid to share that

13  information with others.

14        And he shared it with Robert Tolson who

15  himself is a member of the Black Angels as you heard and

16  I submit to you also was associated with the gang, making

17  deals, making drug running exercises for them.  I submit

18  Jessica Medina knows this just as well.  Further evidence

19  of that is when she is talking about the phone.  Even

20  when Rivera is in custody, again, we are only talking

21  five days after they get hit for that half pound of meth

22  in the battery.  She is making calls, and she is making

23  calls for him.

24        (Tape played.)

25        MR. DORE:  Take note also, ladies and gentlemen,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    what phone she is talking on.  You are going to get the

2    Spanish language translations, but you heard from Mike

3    Precup who is the wiretap analyst way back on Tuesday

4    talking about the call data and how he verified it

5    including the numbers used, times, dates.  I submit to

6    you that the same phone number used by Carlos Rivera

7    early on is the same phone that Jessica Medina is using

8    after he goes into custody on August 6, 2009.

9            And that phone is something she is using to

10   stay in touch with all the other parts of the gang, all

11   the other parts of his criminal conspiracy because these

12   guys, they are not in the phone book.  How else are you

13   going to find them?  You need the phone.  You need the

14   numbers that you already have.

15           Now, let's talk about participated directly or

16   indirectly in the conduct of the affairs of the

17   enterprise through a pattern of racketeering activity.

18   And to conduct or participate means the defendant had to

19   be involved in the operation or management of the

20   enterprise.  It is a mouthful so we are going to have to

21   break it down a little bit.

22           You don't need to show, we don't need to show

23   that the defendants here were the actual tippy-top of the

24   Black Angels gang.  They could be participating in the

25   operation or management of the enterprise acting under

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   the direction of others.

2           And I am going to walk through a couple of

3   exhibits, a couple of recordings why I submit to you that

4   is exactly what Carlos Rivera and Jessica Medina were

5   doing here.  This one up on the screen, Exhibit 162, the

6   calls between Carlos Rivera and David Navarro.  What we

7   have been looking for, those little things.  You heard

8   David Navarro tell you that those were the guns that they

9   were trying to get for the gang.  And what we have been

10  looking for, the we is the Black Angels gang.  And that

11  David Navarro, as he testified, which I believe is

12  uncontroverted, obviously, your memory controls.  David

13  Navarro is a pretty high-up guy on the street at the

14  time.  He is a big cheese and he is talking to Carlos

15  Rivera about what they could get and Rivera is trying to

16  do stuff for him, do stuff for them to get the gun.

17          But then it goes wrong, the cops get it.

18  July 22nd, 2009.  Cops now have the gun.  Rivera lost it.

19  What does he do?  He reports that to David Navarro.  I

20  was doing something for us.  I submit to you, ladies and

21  gentlemen, that us is the gang.  They got that shit.

22  They got the gun.

23          Ms. Medina wasn't really any different.  You

24  heard the call where she reported to David Navarro what

25  was going on, that Carlos Rivera had been taken in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   knowing that David Navarro was a high-up member of the

2   Black Angels.

3          Now, what is a pattern of racketeering

4   activity?  You need at least two racketeering acts to

5   pose a threat of continued criminal activity.  So please

6   keep in mind we need to show you beyond a reasonable

7   doubt not just that these things happened but there is a

8   threat of them continuing.  This was not an isolated deal

9   where it randomly happens one day, randomly happens

10  another, these things are somehow connected.  It is part

11  of an ongoing thread.

12          This charge, the substantive RICO count is a

13  little bit different in that you need to show what these

14  defendants actually did.  We will get into RICO

15  conspiracy when it is a little bit different.  These guys

16  for the RICO substantive count, Carlos Rivera and Jessica

17  Medina, they can't be on the hook for what other people

18  did.  It is what they did.

19          And, here, Racketeering Act 1, please note

20  this.  That is the conspiracy to distribute narcotics.

21  That is the one that Carlos Rivera and Medina are, we

22  have alleged, are responsible for or the grand jury

23  alleged.

24          Racketeering Act 6, the distribution of

25  4.4-grams.  That is that July 22nd deal with the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    methamphetamine in Robert Tolson or Carl Cook's sock who

2    was in that VW with Robert Tolson.

3            Racketeering Act 7 is the possession with

4    intent to distribute the 219-grams of meth.  As I

5    mentioned before ladies and gentlemen, this little

6    diagram, there are some parts of these charges that are

7    overlapping.  That is why I am not going to get too into

8    the elements for the racketeering acts because that is

9    basically what I covered before, why Carlos Rivera and

10   Jessica Medina were conspiring to distribute

11   methamphetamine, why both of them possessed

12   methamphetamine, the 219-grams with the intent to

13   distribute it and why Carlos Rivera distributed the

14   4.4-grams of methamphetamine.

15           I submit to you that as you consider those

16   elements with respect to the earlier counts I discussed,

17   you can use that to help determine whether or not these

18   racketeering acts were something that satisfies the

19   elements of the substantive RICO count.

20           Finally, the interstate commerce.  Please note

21   again that the connection here needs to only be minimal,

22   and I submit to you, ladies and gentlemen, that among

23   other things you have got the graffiti at that, what

24   appears to be a trucking loading station.  You have got

25   the use of cell phones and the payment of cell phone

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1     bills which I submit to you reflects interstate nexus,

2     interstate commerce.  You have got the testimony of Steve

3     Paris talking about how methamphetamine is man made, how

4     the ingredients are man made and how you get those at

5     large retailers maybe a Home Depot.  We submit to you,

6     ladies and gentlemen, that that along with the gun which

7     the parties stipulated to traveling in interstate

8     commerce, all provided the satisfactory link, the minimal

9     necessary link to get the conduct of the gun into the

10    interstate route.

11          Finally, the last count I am going to address

12    is the RICO conspiracy count which is Count 1.  Again,

13    the elements here are similar but a little bit different.

14    This is not a matter of what the defendants actually did.

15    This is a function of what they agreed to do, and so it

16    is a matter of whether the enterprise would exist,

17    whether or not it would have affected interstate commerce

18    whether the defendant or a co-conspirator would have been

19    employed or associated with the enterprise and whether

20    the defendant agreed that the defendant or a

21    co-conspirator would participate directly or indirectly

22    in the conduct of the affairs of the enterprise through a

23    pattern of racketeering activity.

24          Just to break that down a little bit because

25    Congress didn't do a wonderful job in making this simple.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   But if you think about it, the conspiracy is really the

2   agreement, the agreement here is the crime.  What are

3   these defendants agreeing to do?  Whether or not it

4   actually happened, whether or not like the RICO

5   substantive count, for instance, they actually did those

6   things that would constitute the pattern of racketeering

7   activity.

8           Here, it is a matter of what they agreed to

9   do, and, again, you don't have to be a member of the

10  Black Angels to agree to help them out, to agree to

11  participate in the criminal conduct that they are

12  engaging in.  You just need to agree to help out the

13  enterprise.

14          So here is a little slide with checks and X's

15  just to, again, drive home the fact that what we are

16  talking about when we are talking about a conspiracy is

17  the plan, it is the partnership.  It doesn't have to be a

18  formal agreement.  It is not like buying a house, where

19  you are sitting around the table signing pages.  You

20  don't need to be familiar with all the details.  They are

21  not sitting in the war room talking about everything the

22  Black Angels does, the scope of the organization.  And

23  you don't need to all be members at the same time.

24          What you need to be is in agreement about

25  stuff you are going to do that is racketeering activity

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to benefit the enterprise.

2              Now, I talked a little bit about this before.

3    Would be employed or associated with the enterprise.

4    Again, and this is important because this relates to

5    Jessica Medina, Carlos Rivera and Raul Prieto.  We got

6    into a little bit today about other Crooks and whose name

7    is up on that wall.  I submit to you, ladies and

8    gentlemen, that doesn't matter.  It doesn't matter if

9    Raul Prieto was a member of the Black Angels.

10              It doesn't matter whether or not he actually

11   told those officers from the Upland Police Department

12   what he was OBS.  We don't know why he would have or

13   wouldn't have done it.  We don't know if late at night he

14   wanted to flex and show, yeah, I am a part of this, I am

15   with my guy who I want him to think better of me.

16              I look up to Carlos Rivera.  He is my guy.  I

17   want him to think that I am hard, I am saying I'm OVS.

18   Whether or not that is true, it doesn't matter because I

19   submit to you, ladies and gentlemen, there is tons of

20   evidence here that indicates to you that Carlos Rivera

21   and Raul Prieto were connected and that Raul Prieto knew

22   everything that Carlos Rivera was doing, that he was

23   helping him out, and that he was an associate of the

24   gang.

25              He is making his house available to drug deals

```
 1   at which David Navarro who is one of the top guys of

 2   Black Angels is at his house.  He is allowing Carlos

 3   Rivera to bring a loaded gun into the house and to make

 4   the deal there.  He is sitting up or permitting, if you

 5   infer from the call, Jessica Medina and Bony to have a

 6   three way call at his place.

 7            He is working with Carlos Rivera whom anyone

 8   hanging out with Carlos Rivera including Mr. Prieto's mom

 9   would know he is an Ontario Black Angels gang member.

10   And that this association, this assistance, this attempt

11   by him to help out Rivera and thereby help out the gang

12   sufficiently associates him with the gang so that the

13   criminal conduct here is part of the conspiracy that he

14   is tied into this and that that very tightly woven net

15   covers him and applies to him as well.

16            Now, the pattern of racketeering activity.

17   Here, again, it is slightly different.  It is not a

18   matter of what the defendants actually did.  It is what

19   they agreed to do and the types of crimes that they may

20   have agreed to commit that other people, other

21   co-conspirators may have committed.  So it doesn't have

22   to be Raul Prieto, for instance, who is actually making

23   the sale.  If he is agreeing with Carlos Rivera, yeah,

24   give me that, I will push it, I submit to you, ladies and

25   gentlemen, that is an agreement that this stuff is going
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to happen.

2                   As you can see in the bottom bullet point

3    there, the government is not required to prove that

4    defendant personally committed or agreed to personally

5    commit two or more racketeering acts.

6                   You have got to be unanimous.  You guys all

7    have to agree as to what these folks were agreeing to do,

8    and I am going to outline for you a list of the various

9    racketeering acts that they can be held responsible for

10   and that you folks are going to have to agree, if you

11   agree, unanimously, that a given defendant is on the same

12   page for two of them.

13                  So we need at least two of these acts within

14   ten years of each other, and you see the bullets before

15   you.  I am not going to take the time to read them all to

16   you.  Please note that one of them is possession with

17   intent to distribute, conspiracy to distribute controlled

18   substance, illegal use of a communications facility.  You

19   need at least two acts for these, and it can be two of

20   the same one.  It is not like it can only be one

21   distribution and one extortion.  If there are multiple

22   acts of extortion, that is two acts.  If it is multiple

23   uses of the telephone to take part in a drug deal, that

24   is two acts and right on down the line.

25                  You heard the elements of some of these

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    crimes, distribution, knowingly distributed controlled

2    substance, knew that it would be a prohibited drug.

3           Again, ladies and gentlemen, please keep in

4    mind all the calls that you have heard, all the evidence

5    you have seen about just what Jessica Medina, Raul Prieto

6    and Carlos Rivera knew about what was going on, here, in

7    particular, in relation to the distribution of drugs.

8    Medina knows about the spots, she is making collections,

9    she is making pick ups that she is bringing on as part of

10   their usual practice.

11          Raul Prieto is talking to Mr. Rivera about

12   selling a half O, I can move that half O.  Do you know

13   where I could connect with someone so that I could sell

14   ecstasy, sell cocaine.  He making his house available for

15   drug deals.  He is making his house available for three

16   way calls about drugs with Bony, we submit to you.  And

17   he is making his house available, though it doesn't apply

18   to distribution of drugs, he is making his house

19   available for a loaded gun sale.

20          Possession with intent to distribute,

21   similar deal.  You have heard the elements.  I leave it

22   to you, obviously, to consider whether or not there were

23   two instances here committed by each of these defendants

24   or any of the defendants when you are considering which

25   one might be guilty of this crime that they could be held

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1    responsible for.

2              Conspiracy to distribute, extortion.  You

3    heard from David Navarro about the practice of the gang

4    to extort criminal proceeds from drug dealers in Ontario

5    and how this was something that Carlos Rivera was engaged

6    in, and he was kicking up money to Armando Barajas.

7              Finally, illegal use of a communication

8    facility.  You heard the elements to this crime.  We

9    submit to you, ladies and gentlemen, that the phone calls

10   you heard demonstrate the illegal use of a communication

11   facility.  These are phones being used to make phone

12   calls to talk about drugs, talk about the sale of drugs,

13   talk about getting to Nicolada, talk about selling a half

14   O, the dead bird, to talk about whether or not Robert

15   Tolson owes money.  Chino has Jessica Medina out there to

16   make a pick up.  All of these uses of the phone reflect

17   racketeering activity, and they all happened in the last

18   10 years.  We are talking about 2009.

19             Just a couple more clips.  We are in the

20   home stretch here, ladies and gentlemen.  The phone is

21   the thing.  Jessica Medina.

22        (Tape played.)

23        MR. DORE:  Call the phone.  She didn't answer the

24   phone.  This is the day after Carlos Rivera is taken into

25   custody.  If she didn't answer that phone, then no

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    one gets in touch with her, the deal dies.  So what does

 2    she do, she picks up the phone and uses it to keep the

 3    drug business going.

 4         (Tape played.)

 5         MR. DORE:  Slide the numbers to his little homey.

 6    I submit to you, ladies and gentlemen, that what she is

 7    saying is she is going to pass the phone onto another

 8    gang member when she is done cleaning up the immediate

 9    drug business.  This is the day after Carlos Rivera was

10    taken into custody.  And which you heard, for instance,

11    when she is running after Pat and running after Robert

12    Tolson for the money that is out there and owed to Carlos

13    Rivera.

14              So, finally, ladies and gentlemen, just to sum

15    up here, you heard from David Navarro that the Ontario

16    Black Angels control the drug business in Ontario, and

17    you heard that they tax people that they know were

18    dealing drugs.  You also heard from David Navarro that no

19    one is bigger than the gang.  Here is a guy who was on

20    the street who is a big deal, people are doing work for

21    him, but then he is in jail.  And to show his loyalty, he

22    has got some guy demanding he get a tattoo, demanding

23    that he kick out his leg.

24              I submit to you, ladies and gentlemen, that

25    that suggests that no one is bigger than the gang.  So if
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1   you have got a business operating in Ontario, and you

2   have got a world controlled by the Black Angels and

3   Carlos Rivera is a member of the Black Angels and Carlos

4   Rivera is selling drugs is kicking up money, that he is

5   doing this for the gang, that he is a part of the gang

6   and that the gang is involved in this conduct.

7          And that Jessica Medina and Raul Prieto who

8   know him very well and have known him a very long time

9   know that this relates to the gang.  Her name is next to

10  Ontario Black Angels name on Carlos Rivera's chest.  Raul

11  Prieto has got the big cheese David Navarro at his house

12  making drug deals.

13         And he is with Carlos Rivera all the time.  He

14  is with him in '08 when you heard those officers testify

15  about that event in 2008.  You heard about calls and

16  things happening at Prieto's house.  These guys are

17  tight.  They know what is going on.  And these guys, you

18  can hear from the calls, are not babies in the woods.

19  They know what is going on.  There is no surprise in

20  their voices.  There is no question.  They know how this

21  works.  And they are talking to other gang members and

22  engaging with Carlos Rivera and others to sell drugs and

23  participate in the Black Angels gang.

24      (Tape played.)

25      MR. DORE:  No secret.  Carlos Rivera makes it very
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  clear that he is a gang member.  Raul Prieto understands

2  very well what Carlos Rivera is doing.  Hit me with a

3  half O, I can push that.

4           And then last clip I am going to play for you,

5  ladies and gentlemen.  Four days, five days after they

6  get popped for that half pound of methamphetamine,

7  Jessica Medina is on the phone and is she stopping or is

8  she continuing to engage in the business.

9       (Tape played.)

10     MR. DORE:  Just wait a couple of days.  She is the

11  one who says, hey, wait, let's not stop this thing, just

12  wait a couple of days, we will keep the business going

13  again.  That is not someone who is unaware of this

14  business who is not aware of what is going on.  That is

15  someone engaging in this drug business in Ontario in

16  Black Angels territory.  Her house is Black Angels

17  territory where Carlos Rivera lives with her.

18           That is why, ladies and gentlemen, we ask that

19  you find the defendants guilty as charged.  Thank you.

20           All right.  Defense counsel.

21           Mr. Navarro, thank you.

22     MR. NAVARRO:  Good afternoon, ladies and

23  gentlemen.  It has been a long day.  It has been a long

24  week since last week.  Now, I want to start talking to

25  you briefly about the allegations made that my client was

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   paying up to the gang, that he was paying money up to

 2   Mr. Barajas.  That is really at the heart of the

 3   government's RICO case, the RICO and the RICO conspiracy

 4   case, especially the conspiracy.

 5            The government has argued to you that my

 6   client was a gang member.  We can't deny that.  The

 7   government has argued to you that my client has Black

 8   Angels tattoos.  Those speak for themselves.  My

 9   client -- and the government has argued that because of

10   his association with the gang, he was paying money to a

11   Mr. Barajas.  And we heard testimony from David Navarro

12   about that.  And we heard no other testimony with regard

13   to that.

14            Now, in this case, the government played you a

15   number of telephone calls which were recorded over my

16   client's -- over the telephone, over the cell phone that

17   my client used.  And, interestingly enough, there isn't a

18   single phone call in there, and I would have expected it

19   to be because as the government counsel pointed out to

20   you, my client didn't hide the fact of what he was doing.

21            And you can hear that in the phone calls, but

22   if, in fact, my client was paying money whether it was

23   himself or through a runner or somebody else to

24   Mr. Barajas, there probably would have been a phone call

25   about that because there will be no reason for Mr. Rivera
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    to hide that fact.

2           If he was selling narcotics, if he was coming

3    into possession of a weapon, whatever he was doing, he

4    was doing it out in the open.  He wasn't hiding that

5    according to the government, but yet we don't have a

6    single phone call, the only link to Mr. Barajas and my

7    client comes from David Navarro.

8           And I will talk to you about David Navarro at

9    length because I am pretty good at math, and we had trial

10   started Tuesday, we really got into a couple of witnesses

11   Tuesday.  We had a few witnesses Wednesday.  And then the

12   last two days were dedicated to David Navarro so David

13   Navarro is an important part of the government's case and

14   government barely touched upon him which I find

15   interesting.  And there is a reason why probably the

16   government didn't do that, and I am going to get to that

17   later on.

18          Now, this photograph has been shown to you

19   throughout this trial here.  This is my client.  That is

20   his Ontario Black Angels tattoo.  There is his wife's

21   name.  And I believe this is his daughter's name.  Now,

22   having a tattoo of your wife or a child -- maybe some of

23   you have tattoos, I don't have any, but maybe some of you

24   do -- does that mean that somehow she is associated with

25   the gang and perhaps my client's child is as well?  That

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1  is plain silliness.  There is nothing to link his tattoos

2  that are personal in nature, the ones of his family to

3  the gang.

4          The gang tattoos, they are what they are.  He

5  put them on.  When he put them on, he did it for obvious

6  reasons.  He was showing his neighborhood, his barrio

7  where he was from because he was a gang member, and that

8  is fine.  But the other tattoos, the ones that people get

9  on their arms and their ankles, whatever it might be, it

10 could be a you are a Dodger fan or something, whatever it

11 may be.  Those are just personal in nature.  They have

12 nothing to do with a RICO conspiracy.  So I submit to you

13 that this is a -- it is a tattoo that is close to his

14 heart, probably, more than anything.  He loves her, and

15 that is why he has it.  For the same reason that many

16 other people have tattoos.

17         Now, Judge Wright spent a lot of time today

18 talking to you about those instructions.  I think it was

19 about an hour.  I timed him.  It was kind of boring, but

20 we have to go through it.  It is what it is.  But in

21 those instructions, there was a lot of talk about the

22 crimes and I think Mr. Dore did a very good job in kind

23 of setting out to you what the elements of the crimes

24 were.

25         There is two of the alleged crimes are not in

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    dispute.  My client Carlos Rivera is guilty of being a

2    felon in possession.  He doesn't deny it.  We never

3    denied that.  There is no question that he came into

4    possession of a firearm.  He talked about it afterwards.

5    It is clear as day, he is a felon.  We have admitted

6    that.  That is not an issue.  So with regard to, I think

7    it is Count 23, we are not disputing that count.

8                With regard to Count No. 6 which is

9    distribution of 4.4-grams of methamphetamine, he is also

10   guilty of that charge as well.  The evidence speaks for

11   itself.  What I do want to focus on, though, are the

12   other charges in this case.

13               Now, the government has argued to you I think

14   it was the latter part of its argument that my client is

15   guilty of a RICO conspiracy because as he says, you know,

16   there was a -- there was an enterprise, this Black Angels

17   gang.  We don't dispute that the Black Angels gang

18   exists.  Can't argue something that is so obviously

19   incorrect.

20               Now, what I can argue to you, though, is that

21   Mr. Rivera's actions for the short period of time that he

22   was on the street because we know he was in custody in

23   '08.  He was out of custody for a brief period of time in

24   '09, and then he went right back into custody in August

25   of '09.  What I can say to you is that his conduct during

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   the time that he was out wasn't for the benefit of the
 2   gang.  It was for his own benefit.
 3            Now, we heard Mr. Navarro testify about his
 4   brother, and he didn't want to talk about his brother,
 5   Cricket, that he stopped banging and did his own thing.
 6   Well, what makes Cricket different than Chino as he is
 7   called by the gang members?  Why is it that Cricket can
 8   stop banging and do his own thing but Chino is not.
 9   Chino has to be paying up to Barajas.  No phone calls.
10   Only Navarro's testimony.
11            If you listen to the phone calls, and there
12   was a phone call that wasn't played by Mr. Dore.  There
13   is a phone call in which Mr. Rivera is talking about what
14   he has to do with this money that he is getting.  And he
15   doesn't say, well, I got to pay my gang dues.  No.  He
16   doesn't say that.  He doesn't say, well, I got to pay for
17   a legal defense fund for one of my Homeys in jail, or I
18   have got to send money to Barajas.  He doesn't say
19   anything about that.
20            He is clear.  He is pretty honest about what
21   he is trying to do.  He says I need to buy shoes for my
22   kids, I need to pay the bills, I need to pay the rent.
23   Now, those are expenses that we all have, and I told you
24   at the beginning that we are sort of, in a weird way,
25   kind of in a reality show because we are getting reality
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    phone calls about a person who makes his living in an

2    unconventional way.

3            Now, don't judge him for that.  I have never

4    been in prison myself.  Never been arrested.  Been

5    harassed maybe when I was younger, but it doesn't happen

6    to me anymore.  But don't judge him because the money

7    that he gets is not through a regular job.  He is doing

8    what he is doing to feed his family.  He is not doing

9    what he is doing to give money to a gang.  There is no

10   evidence whatsoever presented in this case that what my

11   client was doing was no different than what other people

12   do.

13           And I may have my own personal opinions of

14   that, but the reality is that if you listen to the phone

15   calls of what he was talking about, he is pretty open

16   about it.  And when you listen to him talking to, whether

17   it is him talking to his wife or someone else talking to

18   his wife, what do we hear in the background?  We hear

19   kids running around the house.  There is four children in

20   the house.

21           Now, they are trying to raise a family the

22   best way that he knows how, and he is not doing it for

23   the benefit of any gang member.  He is not doing it to

24   give Navarro the No. 3 guy in the gang money.  He is

25   doing it to buy shoes, clothes, go to the movies, what

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1    parents do with children.

2              That is an important fact for you to keep in

3    mind.  I don't believe there is a pattern of racketeering

4    activity here for the benefit of the gang because it has

5    to be for the benefit of the enterprise.  If someone is

6    selling narcotics, that is a different case.  That is not

7    this case.  So I believe that is an important fact.

8              Now, government counsel never talked about

9    this conspiracy to distribute heroin.  There is no

10   evidence whatsoever that my client ever distributed

11   heroin.  I think that was maybe mentioned by Mr. Navarro

12   that perhaps my client was aware that a Mr. Gil was

13   selling heroin.  There was no phone calls whatsoever

14   between my client and Mr. Gil.  I don't believe there

15   were any phone calls regarding my client or Mr. Rivera

16   talking to Mr. Gil about heroin presented in this case.

17   I submit to you that that speaks for itself.

18             Now, I want to talk to you about David

19   Navarro.  Now, when he first took the stand, I believe

20   government counsel asked him questions about where he was

21   born, where he was raised and talked about, well, there

22   was all this gang activity going on when you were going

23   to the liquor store to buy candy.  And I found that to be

24   very amusing based on my background and experience.  I

25   found it amusing because when you go up around gang

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    members, you kind of know.  When you are growing up on

2    the east side of LA, you know, you know the streets, you

3    know who the gang members are, you know who the wanna-be

4    gang members are.

5            Now, with regard to Mr. Navarro, the

6    government, I have to admire them for not trying to clean

7    him up, put him in a nice three-piece suit and pretend

8    that he is something different than what he actually is.

9    He is a gang member who, unfortunately, for a number of

10   reasons, joined the gang at a very young age, and he kind

11   of moved up the ranks.  He was OVS.  Then, he was Junior

12   Black Angels.  Then he became a full-fledged member of

13   the Black Angels.  We know all about his past.  We know

14   he has been involved in a lot of criminal activity.

15           He didn't want to talk about, I think, the

16   three murders that he was associated with, the

17   one attempted murder of the African-American gentleman,

18   all the fightings, the intimidation, the shootings, the

19   graffiti, the extortion, the drug dealing, everything

20   that he has done.  And yet he is the government's star

21   witness in this case.  He is Defendant No. 3 out of 51.

22   He also told you was he was intercepted hundreds of times

23   if not maybe thousands in this case.

24           What did he do when he got arrested?  He

25   decided to cooperate pretty fast.  I think within

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    two months he was ready to sing like a bird.  Now, he

2    wasn't an eight-year-old child who was exposed to gangs

3    going to a liquor store.  He grew up in gangs.  His older

4    brother, I believe, who is six years older than him was

5    also a member of the Black Angels.  Now, I submit to you

6    that the testimony of Mr. Navarro, we just can't trust it

7    because of who he is, what he has done in his past and

8    what he will probably do in his future.

9            Now, I have always been told that you can tell

10   a lot about a person by where he has been.  And that is

11   what my grandfather used to tell me.  And I think that is

12   true.  You can tell a lot about Mr. Navarro by where he

13   has been and what he has done.

14           Now, he was asked a number of questions about,

15   well, did you have inspirations to be to be in the

16   Mexican Mafia.  And he lied about it.  He said no.  That

17   is a big lie.  If you look at everything he done before,

18   he was trying to get the PHD in being in the Eme.  He

19   rose within the gangs, he was way up in the gang, he was

20   No. 3.  The two guys above him were both Eme.  That is

21   what the testimony was.  So for him to now say I didn't

22   really have aspirations to be in the Mexican Mafia, that

23   is not honest.  Had he not been arrested, had he

24   continued and been on the street, probably would have

25   become Eme and then probably when he got arrested, he

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    would have cooperated and then he would have defected

2    from the Eme, but, again, I just look at him, I apply the

3    common sense that I have learned and I look at him and

4    the things he said, you know, they don't add up to me.

5           Now, he testified that he had no specific

6    knowledge of any crimes committed by Mr. Rivera.  He did

7    say, well, Mr. Rivera paid taxes, but we can't

8    corroborate it one way or the other.  I can't prove it,

9    and neither can the government.  The government has to

10   prove it only through his testimony.  And as I said it to

11   you, Mr. Barajas or Mr. Gil, there is no phone calls, and

12   you would expect there to be phone calls because this

13   case is based on phone calls against my client.

14          He testifies that he saw Mr. Rivera do drug

15   deals at Mr. Prieto's house.  Well, he can say whatever

16   he wants to say, but there is no real evidence to

17   substantiate that.  Talked about a possible carjacking

18   that may or may not have taken place.  He testified that

19   he was aware, that my client was aware that heroin was

20   being sold.  Again, we can't substantiate that in any

21   way.

22          He also indicated that Mr. Rivera admitted

23   that he was being taxed, that he was paying money

24   directly to Armando Barajas.  Again, we have to take --

25   we have to take him at his word with this testimony.  It

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   is interesting that I believe in this case, there were 20

 2   witnesses, maybe 21 or 19.  Every one of them was law

 3   enforcement except for Mr. Navarro.  Some of the officers

 4   came in in their uniforms looked very nice, very

 5   respectable.

 6            So did Mr. Navarro.  He came in in his

 7   uniform, and to me that is important.  Mr. Navarro will

 8   say and do anything to help himself.  He is looking at

 9   spending the rest of his life in prison.  He got the

10   numbers wrong.  Like I said I'm pretty good at math.  I

11   tried to help him a little bit, and he wasn't good at

12   math.  That is fine.  I understand that.  I can't judge

13   him for that.

14            But he indicated, well, I am looking at about

15   17 to 22 years.  That is not true.  He was looking at a

16   life sentence, and he is going to do what cooperating

17   defendants do sometimes.  He is going to do and say

18   whatever is asked of him to help the government.  We know

19   about what he was really thinking about when he got

20   arrested.  Wasn't thinking of his wife and kids.  He was

21   thinking about smuggling narcotics into a jail facility

22   because that is what he does.  That is what he did.

23            Now, you as the jurors have the final

24   decision in terms of which witnesses to believe, which

25   witnesses not to believe, and I think Judge Wright gave
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   you an instruction as Mr. Navarro was testifying about
 2   Mr. Navarro's testimony.  Why is Mr. Navarro here?  Why
 3   was he here?  Why did we spend two days with him?  He is
 4   here because the government wants to win.  And the
 5   government wants to win, it appears to me, at any cost.
 6   They will use a murderer, liar, drug dealer to help their
 7   case.  Doesn't matter.  And it does matter.  And you can
 8   tell the government these kinds of witnesses are not
 9   going to be allowed in these kinds of trials.
10           Now, I submit to you, ladies and gentlemen,
11   that Mr. Rivera -- and the trial was really about
12   Mr. Rivera.  He is sitting in the back very quietly.
13   There is no question that he is a gang member.  There is
14   no question he possessed a firearm and that he
15   distributed that small amount of narcotics.
16           I submit to you that whatever else he did
17   wasn't for the benefit of any gang.  It surely wasn't for
18   the benefit of the Black Angels.  He was doing something
19   similar to probably what Cricket was doing, doing his own
20   thing.  And I know that because we haven't seen any other
21   evidence linking him to the activities of the gang.  We
22   have seen, you know, what I guess Mr. Navarro testified,
23   but I don't give any credibility to anything he said
24   because of who he is and what he is trying to accomplish.
25   He is hoping to one day see his children and hoping that
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Mr. Rivera doesn't see his own children.  And I leave you

2    with that.  Thank you.

3         THE COURT:  All right.  Thank you, Mr. Navarro.

4              Ladies and gentlemen, let's take another 10

5    minute break.  Please remember the admonition.  And when

6    we come back, we will hear our last closing statement.

7         (Recess from 12:24 to 1:03 p.m.)

8         (The following proceedings were held in the

9          presence of the jury:)

10        THE COURT:  All right.  Mr. Walsh.

11        MR. WALSH:  Ladies and gentlemen, this is my

12   opportunity to give the closing argument on behalf of my

13   client, Jessica Medina.  She is charged with four charges

14   in the indictment, a RICO crime, a RICO conspiracy, a

15   crime of conspiracy to distribute methamphetamine and the

16   crime of possession with intent to distribute

17   methamphetamine which is the amount of drugs that were

18   found in the car.

19             One of the things I don't think has been

20   explained to you up to now is what RICO stands for.  It

21   is an acronym, and the long name for the statute is

22   Racketeer Influenced and Corrupt Organizations, and it

23   was a statute that was passed in the '60's to go after

24   the Cosa Nostra, the Italian Mafia and also to go after

25   racketeers that were influencing labor unions on the

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   waterfronts in New York City, and it has been expanded

2   and interpreted to apply to any type of corrupt

3   organization or criminal organization.

4          So in this case the RICO charges that and the

5   government alleges that the Black Angels is a criminal

6   enterprise and the charges that Ms. Medina participated

7   in the conduct of the affairs of the Black Angels

8   enterprise through a pattern of racketeering activity and

9   that Ms. Medina actually did in fact commit

10  two racketeering acts as a part of a pattern type of

11  crimes and committed as a part of her association with

12  the Black Angels enterprise.

13         And, then, the second charge of RICO

14  conspiracy is sort of summed up as this.  The government

15  is alleging that Ms. Medina at some point in time entered

16  into a conspiracy or an agreement to violate the RICO

17  statute in that she agreed with others to conduct the

18  affairs of the enterprise which was the Black Angels gang

19  through a pattern of racketeering activity.

20         So I think that kind of summarizes, it

21  collapses everything down into one or two sentences.  You

22  will have all the of the jury instructions with you back

23  during the course of your deliberations to go back and

24  look at the elements of these crimes, but it is

25  essentially operating a racketeering organization through

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    a pattern of, a continual pattern of crimes.

 2              Now, in this case, the evidence hasn't shown

 3    that that is what Ms. Medina has done.  The real example

 4    in this case that we have of someone who is operating a

 5    racketeering activity is David Navarro, the government

 6    witness that plead guilty to RICO conspiracy.  He is

 7    someone that violated the RICO statute clearly.  He is a

 8    member of the RICO enterprise, the Black Angels.  He went

 9    to meetings.  He was the leader of the group at one point

10    in time.

11              He admitted paying dues to the organization,

12    and he admitted operating the organization, the Black

13    Angels through a pattern of racketeering activity or the

14    commission of a series of racketeering acts and crimes.

15    He said that he committed acts of extortion, committed

16    acts of assault, and he was involved in various murders.

17    And that was part of the regular activity of his

18    operating the Black Angels enterprise.

19              So, essentially, the enterprise is the

20    criminal group, and the RICO statute is asking, well, who

21    is running it.  And David Navarro certainly for sure

22    would fall within that definition of RICO, but Jessica

23    Medina doesn't fall within -- with any rational view of

24    the law and the statutes in this case.

25              The evidence is clear that Jessica Medina is

1   not a member of the Black Angels.  She is not a member of

2   any gang.  She never attended any gang meetings.  She

3   never paid any gang dues.  She never collected any

4   extortion money for the gang.

5          And there are no witnesses that came in here

6   and testified that Jessica Medina actually sold them any

7   drugs in connection with her activities with the gang.

8   And David Navarro himself testified that Jessica Medina

9   is not a member of the Black Angels gang.  She is

10  basically an outsider.  And being a woman, we know from

11  David Navarro's testimony that women are not currently

12  members.  They may have been sometime in the past, but

13  there are no current members of the Black Angels gang who

14  are women.  So her being a woman almost places her

15  outside by virtue of that testimony.

16         And, essentially, she was no more running the

17  Black Angels gang than David Navarro's wife, and I think

18  a comparison to his wife is much more closer than a

19  comparison to him.  Now, the government may argue and has

20  argued that she participated in racketeering acts of drug

21  possession and drug conspiracy, but the RICO crime itself

22  is not just committing racketeering acts.  The RICO crime

23  is conducting the affairs and operating and running the

24  enterprise.  And an isolated crime, if the government has

25  some proof that a person committed an isolated crime,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    that doesn't prove they have committed a RICO violation.

 2    A RICO violation is a much more substantial and much more

 3    complicated building blocks that have to be established

 4    before someone can be said to have committed a RICO

 5    crime.

 6              First of all, there has to be an enterprise, a

 7    crime group, and the accused has to be a part of that

 8    group, and the overwhelming evidence in this case is that

 9    Jessica Medina is not a member of the alleged

10    racketeering enterprise that is in the indictment.

11              So I will be asking that after you review all

12    that and review the jury instructions that you return a

13    verdict of not guilty on the substantive racketeering

14    charge and also the charge of conspiracy to commit the

15    crime of RICO as alleged against Jessica Medina.

16              Now, one of the jury instructions says that if

17    you find that any defendant was not a member of the

18    charged conspiracy, then you must return a verdict of not

19    guilty even though the defendant has been a member of

20    some other conspiracy.  And I think what that means is

21    that if some of you may think she is perhaps guilty of

22    the drug conspiracy, and that is different from the

23    racketeering conspiracy, then you have to vote not guilty

24    on the racketeering conspiracy and then proceed to

25    whether or not the evidence is guilty -- establishes her
```

1    guilt beyond a reasonable doubt for the drug conspiracy.

2              So let's look, then, at the two charges

3    concerning the drug offenses that are alleged against

4    Ms. Medina.  Those are possession with intent to

5    distribute the 219-grams of methamphetamine that were

6    found on August 6 in the search of the red Acura that was

7    parked in front of their house and also an additional

8    crime of conspiracy to distribute methamphetamine.

9              Now, a charge of possessing the 219-grams of

10   methamphetamine has two elements.  The government

11   basically has to prove beyond a reasonable doubt that she

12   knowingly possessed the methamphetamine and that she

13   possessed it with the specific intent to distribute it,

14   in other words, to sell it to someone.

15             And in this case, the evidence never

16   established that she possessed it, and there was no --

17   there is nothing in the wiretaps or the evidence

18   indicating that it was her intention to sell or

19   distribute the 219-grams.

20             The drugs were seized by the police from the

21   red Acura, police surveillance of the red Acura on the

22   night of the search.  They never saw Jessica Medina prior

23   to entering the house.  They never saw her go in the car.

24   They never saw her come out of the car.  She was never

25   observed driving the red Acura.  She was never observed

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    putting anything in the red Acura.

2           And all of the wiretap calls occurring before

3    the search of the red Acura make no mention of Jessica

4    Medina.  She is not picked up on any of the telephone

5    calls, and so her relationship to the 219-grams is such

6    that it is not established at all by the evidence that

7    the government has presented.

8           There is no evidence that is showing that she

9    spoke about the 219-grams or expected its arrival.  There

10   is no evidence that she had prior knowledge that it was

11   going to be placed in the car or that she had future

12   plans for the drugs.  None of this is picked up on any

13   wiretap or through the testimony of any other witness

14   that was called by the government in this case, and

15   one of the witnesses, I think is very important on the

16   issue of possession and that is the fingerprint expert.

17          The fingerprint expert testified that all of

18   the latent fingerprints that were found on the plastic

19   container that was in this black box that was taken from

20   the car, all of those fingerprints were not Jessica

21   Medina's.  So we have essentially concrete evidence that

22   she never had possession of the 219-grams of

23   methamphetamine.

24          And so the only evidence that the government

25   has is they are trying to say that she has possession is

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    the telephone calls.  And, essentially, there is no

2    telephone call that says that that methamphetamine was

3    Ms. Medina's.

4            We have calls after the arrest of Carlos

5    Rivera in which she is calling people and telling them

6    that Carlos has been arrested and that they found

7    methamphetamine in the car.  And in one of those calls,

8    she says they didn't even know what the amount of

9    methamphetamine was.  And in another one of the calls,

10   she is overheard saying that she is describing the scene

11   to someone after the fact, and she is describing the

12   night of the search and the arrest and she is saying that

13   Chino had brought it into the house and when she learned

14   of it, she told him to get that stuff out of the house.

15           And then she made the following comment when

16   she is explaining it to a girlfriend or someone else on

17   the phone that she didn't want to lose the kids over what

18   Chino was doing.  And this shows that the methamphetamine

19   was not hers.  She didn't want it in the house.  And she

20   objected to it being there.

21           Now, later, the police find the

22   methamphetamine in the car, and they arrest Carlos

23   Rivera.  And then from these subsequent calls, we learn

24   that Ms. Medina has the key to the car in her pocket and

25   that she didn't voluntarily give it to the police.  We

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  learn that from her calling a man whose nickname under

2  the wiretaps was Nacho, and he appeared to have been the

3  registered owner of the car.  And there was a discussion

4  of what he could tell the police that might not connect

5  Carlos Rivera, her husband, to the car because the car is

6  where the drugs were found.

7          But this is not evidence that Ms. Medina was

8  possessing the drugs.  There is no call in which she --

9  she is claiming that she wants Nacho to say the car isn't

10  hers.  It is essentially a wife who is trying to present

11  a case being made against her husband, connecting him to

12  the drugs that are found in the car and having him being

13  convicted, prosecuted and sent to prison over this.

14          She is not trying to protect herself.  She is

15  not indicating in those calls that the drugs in the car

16  are hers, and it doesn't establish either her possession

17  of those drugs in the car or any intent or plan on her

18  part to do something with the drugs in the future.  And,

19  in fact, at this point in time, there wasn't anything

20  when she is calling and telling the registered owner

21  asking him is there anything he could say that could help

22  the situation.  At that point in time, the drugs aren't

23  around anymore.  They have already been seized by the

24  police, and so there couldn't be any intent for her to do

25  something in the future established from that particular

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  call.  And, of course, we don't have any calls earlier

2  prior to the seizure.

3         Now, the last charge, then, is a charge of

4  conspiracy to distribute methamphetamine.  It also -- it

5  charges conspiracy to distribute methamphetamine and

6  heroin, but we haven't really heard anything about

7  heroin.  So I think what you really have to focus on is

8  whether or not the government has proven beyond a

9  reasonable doubt that Ms. Medina entered into a

10 conspiracy to distribute methamphetamine.  The government

11 claims that they have proven that by the wiretap

12 telephone calls, but these calls don't prove that she

13 actually is guilty of the crime of conspiracy to

14 distribute methamphetamine.

15        Now, the jury instructions that you have heard

16 this morning and you will have available to you during

17 your deliberations state that conspiracy is an agreement

18 between two or more persons to commit a crime, to commit

19 one or more crimes.  So it is an agreement to do

20 something unlawful in the future.

21        And you have to carefully review the evidence

22 based upon what the law is.  Specifically, the jury

23 instructions say that the two elements of the charge

24 against Ms. Medina require that there must be proof

25 beyond a reasonable doubt that there was an agreement

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    between two or more persons to distribute methamphetamine

2    or heroin.  And, two, the accused joined the agreement

3    knowing its purpose and intending to accomplish that

4    purpose.

5              So you can't find Ms. Medina guilty unless the

6    government has proven both of those elements beyond a

7    reasonable doubt.  And the jury instructions state that

8    proof beyond a reasonable doubt is such proof of a

9    convincing character that a reasonable person would not

10   hesitate to rely upon and act upon it in the most

11   important of their affairs.

12             So it is talking about it is so convincing

13   that you unhesitantly can say, yes, this has been proven

14   to me.  Almost, it is a very, very high standard of

15   proof.  It is not absolute proof, but it is a very high

16   standard of proof before you can return a verdict of

17   guilty in a criminal case.

18             And it requires the jury to essentially change

19   the way that they think about making decisions.  It

20   doesn't allow you, for example, to return a verdict of

21   guilty if the evidence just shows a strong suspicion that

22   Ms. Medina is guilty of something, but it doesn't show

23   proof beyond a reasonable doubt.

24             And it would be wrong for you to return a

25   verdict if you just feel that, oh, I have a strong

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    suspicion that maybe she was involved in here, but I

2    can't really put my finger on what it is that she has

3    done.  You must return a verdict of not guilty.  Because

4    a verdict of not guilty simply means that the case has

5    not been proven.  It means not proven beyond a reasonable

6    doubt.

7              I would like to talk about some of the calls.

8    I won't be able to talk about all of them because there

9    were so many, but I think some of the calls I can

10   highlight in my discussions with you.  And one of the

11   most important calls I suppose is the one that appears in

12   David Navarro's plea bargain.  In there, as a part of his

13   facts of his crime, he states that he received a call

14   from Jessica Medina advising him that Carlos Rivera got

15   arrested.  And that is in his plea agreement.

16             And that is the only mention of Jessica Medina

17   in David Navarro's plea agreement, but you see that

18   doesn't really prove a crime.  It is just a

19   communication.  In the call, she first advised David

20   Navarro that Carlos Rivera got arrested the other night,

21   and she says the police found narcotics in the car, but

22   in the call she says she didn't know what kind of

23   narcotics or even what amount and the reason is because

24   it wasn't her narcotics.

25             The quote that I have that I wrote down when I

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    was listening to the call was they found narcotics but I

2    don't know how much or whatever.  And that she says in

3    the call that Carlos came home with money, another person

4    came by bringing something, and I am like get that out of

5    here, I can't have my kids taken away because of that.

6           So it doesn't show that she is engaging in a

7    conspiracy to distribute those drugs or any drugs with

8    Carlos Rivera or anyone.  In fact, it shows just the

9    opposite.  It shows that she doesn't want the drugs in

10   the home and that she doesn't even know the amount of the

11   drugs or the identity of the drugs.

12          Another call that the government played was a

13   call in which Jessica Medina was talking to a girlfriend,

14   Gaby.  And she explained to Gaby on the telephone that

15   Carlos had been recently arrested and that the police had

16   brought in a drug-sniffing dog, and they brought the dog

17   to the car.  And in listening to that and she is

18   explaining it, part of the explanation that she gave, and

19   I wrote it down as I was listening to it, is she says now

20   I am finding out it is not a little amount, it was a

21   large amount.  And it is an indication in that call when

22   she was talking to Gaby reporting about the arrest that

23   she had no idea that it was a large amount.

24          She suspected that -- she probably suspected

25   that he was bringing home something illegal and told him

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   to get it out of the house, but she had no idea it was a

2   large amount.

3            And, again, it proves that she has -- she is

4   lacking in basic information on the day of the search as

5   to the amount and the identity of the drugs, and, in

6   fact, her voice indicates that she was surprised later

7   when she found out that it was a lot of -- a larger

8   quantity.  And the surprise was because it wasn't her

9   drugs.  She wasn't in possession of the drugs.  She

10  wasn't a part of any conspiracy to distribute.

11           I believe in the phone call with Gaby, though,

12  she did say that she told the police that she didn't know

13  where the keys to the car were.  And then she was telling

14  Gaby that the keys were actually in her pocket.  And so

15  the police then had to get a Slim Jim and call AAA and

16  break into the car, open it up in order to actually get

17  access to the car and seize the evidence.  But her reason

18  for doing that, I think, could easily be explained as her

19  attempts to try and help Carlos not be arrested and

20  charged with the drugs in the car.

21           There was another telephone call in which she

22  is talking to the registered owner of the car, Nacho, and

23  there was some discussion of what Nacho could tell the

24  police that wouldn't connect Carlos to the car and the

25  drugs.  And, once again, what is the reasonable

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    explanation of why she is doing this?  Well, Carlos is

 2    the father of her children, and any wife would want to

 3    help her husband not get arrested.  I am sure it is a

 4    common occurrence that you either know someone or there

 5    is someone in your family that gets arrested, for

 6    example, if you had a son that was arrested for driving

 7    under the influence, a parent would immediately try to do

 8    whatever they can to try to help the son.

 9              And that is kind of a human nature response

10    that everybody has with family, and that is what is going

11    on here.  She is calling the registered owner and

12    proposing that maybe he could say something that could

13    steer the police away from Carlos' connection with the

14    car.

15              Now, that doesn't make her joining a

16    conspiracy to distribute the 219-grams of

17    methamphetamine.  Those grams of methamphetamine are no

18    longer around by the time she is talking to Nacho.  They

19    were seized by the police.  They were in the evidence

20    locker.  So she couldn't be trying to distribute or have

21    an intent to distribute or join a conspiracy to

22    distribute when she is having this conversation with

23    Nacho afterwards.

24              And, essentially, it is just the actions of a

25    wife trying to do something to stop the police from

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    taking her husband to jail.  It doesn't make her a drug

2    trafficker, and it doesn't make her a drug conspiracy.

3    She is essentially acting in a desperate manner, thinking

4    desperate thoughts that just happen to be now

5    tape-recorded and listened into by the police.  But it is

6    not a crime to be desperate and look for desperate

7    solutions for unusual situations.

8              And what evidence is there that anything was

9    done?  I mean, did Nacho sound like he was going to go to

10   the police and say that is my car?  It was just the

11   opposite.  Nacho was saying, well, I don't want to say it

12   was my car.  So this desperate conversation essentially

13   led nowhere, and it isn't proof that she is a member of a

14   conspiracy.

15             And in terms of hiding the key from the

16   police, most people, I think if the police were

17   conducting a search on your premises, and they asked for

18   the keys to your car, you would turn them over.  But

19   Ms. Medina didn't do that.  And so then the question is,

20   well, is that evidence of her being a member of a

21   conspiracy to distribute methamphetamine, and I would say

22   no it is not.  The police were there because they were

23   conducting a parole search of Carlos Rivera, and the only

24   evidence was that only Carlos Rivera was on parole.

25             So if they are coming in to conduct a parole

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    search, does that mean they can search Jessica Medina who

2    is not on parole?  That doesn't seem logical.  So it

3    seems like the parole search allowed them to come in

4    search Carlos Rivera, search the room where Carlos Rivera

5    had his stuff, and that is it.

6           That was the end of their lawful authority

7    because the officers testified they didn't have a search

8    warrant for the house.  And so their only ability to

9    conduct a full fledged sweep, search of the house is

10   beyond the scope of their search warrant or beyond the

11   scope of their parole search, would be if they had a

12   search warrant which they didn't.  So that means that

13   when they asked Ms. Medina or demanded her to turn over

14   everything that was in her pockets, they didn't really

15   have the authority to do that, and that is why they

16   didn't do it.

17          And the fact that she didn't on her own turn

18   it over simply means that she was standing on her rights

19   under the Fourth Amendment not to be subject to search

20   unless they had lawful, a lawful police warrant or some

21   lawful reason like a parole search which they didn't have

22   for her.

23          So is this, then, the evidence of her not

24   turning over the key, hiding the key necessarily evidence

25   that she is a member of a conspiracy?  No.  Because her

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  not turning over the key, although it sounds bad, was not

2  a criminal act.  It wasn't a criminal act.  If she had

3  taken the key and flushed it down the toilet, then that

4  would have been an affirmative act of obstructing

5  justice.  But her simply saying I don't know where the

6  key is when she secretly had it in her pocket, that is

7  not evidence of ger guilt of a conspiracy.

8          THE COURT:  Mr. Walsh.

9          MR. WALSH:  Yes, your Honor. Five minutes.

10          Now, there were other conversations that

11  Ms. Medina had with various people that knew Carlos

12  before he was arrested, and she was calling and having

13  all sorts of conversations with them.  Most of it

14  surrounded the fact that she was telling them that Carlos

15  had been arrested.  She was hoping that he would just get

16  a parole violation, get six months, and he would be back

17  home which of course didn't happen.  And then she told

18  them about the search.

19          And some of these conversations touched on

20  criminal topics and some of the conversations touched on

21  criminal topics related to drugs, but in all of these

22  conversations, Jessica Medina never agreed to do

23  anything.  She never agreed to commit a crime.  She never

24  agreed to distribute methamphetamine.  And she took no

25  actions that were tied to these specific telephone call

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    conversations.

2           Take, for example, the conversation in which

3    she is talking to Robert asking her to pay money that is

4    owed, that Carlos -- that he owes Carlos.  Now, there is

5    no evidence as to what the money was owed for.  The

6    government has argued it is drug money, but that is not

7    what the call says.  When you are listening to the call,

8    it just says he owes money to Carlos.  And so the

9    government can't add words to the dialog and say, well,

10   no, we are going to put the word drug in there, and this

11   is evidence of an attempt to convict Ms. Medina on the

12   basis of a simple call in which she is asking for money.

13          And she also talked with Mr. Venegas asking

14   what he could do to get Robert and Patrick to pay money.

15   Once again, there was no discussion of why the debt was

16   owed or under what circumstances the money had to be

17   paid.  And all Ms. Medina wanted was to collect money

18   that was owed to Carlos because Carlos was in jail, and

19   she told Venegas in the call that she needed money

20   because her kids needed clothes because school started on

21   Monday.

22          And, in fact, there is no evidence that anyone

23   ever paid her any money.  It was just an attempt on her

24   part to try and collect debts, and there is no

25   explanation as to why the money was owed or, in fact,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  even if the money was paid.  And this is not evidence of

2  a conspiracy to distribute methamphetamine.  There is no

3  mention of methamphetamine in the calls, and there is no

4  mention of Ms. Medina doing anything in connection with

5  methamphetamine as a result of those calls.  These are

6  simply discussions trying to obtain money because Carlos

7  Rivera was in custody.

8           Now, there were other discussions between

9  Ms. Medina and Francisco Venegas, between Ms. Medina and

10 other people in which there was some discussions about

11 someone could move this or someone is available to help

12 with this and it is really too hot and maybe nobody

13 should be doing anything.  But what exactly is she saying

14 that she is going to do?  What exactly is she saying on

15 these calls that she agreed to?  And the answer is

16 nothing.  She is not agreeing to do anything.

17          Other people are telling her about what they

18 are doing, and she is listening in and she is learning

19 about it and she is interested.  But she never decides to

20 do anything.  She never agrees to commit a crime.  There

21 is no evidence that the police conducted further

22 surveillance of Ms. Medina around the time of these

23 calls.  There is no police stops of Ms. Medina where she

24 had additional drugs in her pocket.  No police officer

25 saw an exchange of items on the street corner with

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Ms. Medina peddling drugs, and there is no is seizure.

2              So essentially her job was to be raising the

3    kids, and these telephone conversations indicate that she

4    was talking about possible criminal activities of other

5    people.  But that is not what she is charged with.  She

6    is not charged with having criminal thoughts or having

7    discussions with other people that may be engaged in

8    criminal conduct.  She is charged with a specific crime,

9    conspiracy to distribute methamphetamine.  It requires an

10   agreement to do that, an agreement to go out and sell

11   methamphetamine and with the intent to distribute it.

12   And these telephone calls do not prove her guilt of those

13   charges.

14             And, essentially, what this case comes down to

15   is the fact that Jessica Medina may have been near

16   criminal activity and may have known that criminal

17   activity was going on around her, but she never

18   personally joined in the criminal activity and should be

19   found not guilty of the charge of conspiracy to

20   distribute methamphetamine.

21        THE COURT:  Thank you, Mr. Walsh.

22             Mr. Cephas.

23        MR. CEPHAS:  Thank you, your Honor.

24             1:33.  I am going to try to finish by 2:03.  I

25   may talk a little quick because I don't want to run out

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    on of time and miss out on anything.

2           Initially, I want to apologize to any of you

3    who may have seen me in the hallway and I ignored you

4    acted like I didn't know you.  I am not supposed to talk

5    to you as the judge informed you.  It is not that I don't

6    care who you are.  It is awkward.  It is akward for all

7    of us to see you.  I don't enjoy sitting this way facing

8    you.  I never know should I look at the jurors.  Should I

9    not look at them.  Are they going to think I'm trying to

10   intimidate them.  I am not.  And that is why I generally

11   don't look at you during the trial.  Again, it is not

12   that I don't care, I just don't know how to act.  I don't

13   know if it helps me or hurts me so I try not to look.

14          Now, this is a criminal case.  In a criminal

15   case, you are tasked to determine guilt beyond a

16   reasonable doubt.  Some of you may have been on civil

17   cases before and civil trials, excuse me, where the

18   standard was preponderance of the evidence.  It is a much

19   different standard.  It is just is something more likely

20   or less likely to have happened.  That is not the

21   standard we have in criminal cases.

22          And many of you, I am sure, watch TV.  Some of

23   you or maybe all of you have watched Law and Order, have

24   watched other legal shows on TV, and you came into the

25   courtroom expecting this trial to be like those.  And if

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    you watch Law and Order, the defense attorneys always

2    have more information than the prosecutors.  McCoy is

3    always turning to his assistant, how come we didn't know

4    that.  He is always upset that the defense attorneys knew

5    everything.

6            And I am always wondering what world is that?

7    What world do they live in where the defense attorneys

8    have the right to somehow subpoena all the government

9    witnesses beforehand and talk to them?  We don't have

10   that right.  We don't have the right to take their

11   depositions before court.  We don't know if they are

12   going to make up something completely new when they are

13   up there on the stand.

14           You may have heard, you know, a statement

15   sometime in the past where you have, the attorneys are

16   told don't ask a question you don't know the answer to.

17   Well, as a defense attorney, it is very difficult to ask

18   questions when you haven't had an opportunity to question

19   the witnesses beforehand.  And we wanted to make sure you

20   understood that, and that is why we made it clear.

21           We asked, you know, the police officers over

22   and over again, have you met with us, have you talked to

23   us.  No, they haven't.  We didn't know what they were

24   going to say.  And it is dangerous to ask them because

25   they can make things up.  And how do you prove a

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   negative.

2          If an officer says my client was in the grassy

3   knoll when JFK was killed, how do I disprove that?  I

4   don't.  And so I have to be careful.  And because I have

5   to be careful, you have to be careful.  And you cannot

6   find my client or any of the other defendants guilty

7   unless you are convinced beyond a reasonable doubt

8   because this isn't a civil case where it is just more

9   likely than not.

10          Now, there was some mention to a few

11  stipulations, and I just want to make sure you understand

12  there was a stipulation that a firearm is a firearm, it

13  traveled in interstate commerce.  My client is not

14  charged with that.  He is not agreeing that it is a

15  crime.  He is just agreeing that it is a firearm and it

16  traveled in interstate commerce.

17          We all signed a stipulation saying that the

18  drugs were drugs.  None of us were agreeing by signing

19  that stipulation that we were selling those drugs --

20  excuse me -- that the defendants were selling those drugs

21  and possessed them.  We just didn't want to force the

22  government to have to put on witnesses proving what we

23  concede.  They were drugs.

24          So before I get into some of the arguments,

25  I just want to summarize some of the testimony that

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    related to my client over the last week.

2              Officer Erdem Gorgulu testified about graffiti

3    in the prison in San Bernardino jail, and he said that

4    apparently Mr. Vega had written it.  And he was asked

5    would you have written him up and would it have gone into

6    his file.  His answer, it would have, yes.  And would you

7    have taken a photo at the time you did the write-up?

8    Excuse me.  And you would have taken a photo at the time

9    you did the write-up?  Of course, I would.  Then he was

10   asked, you claim Mr. Prieto, you saw Mr. Prieto writing

11   Crooks and Ontario, but you didn't write him up.  His

12   answer, no, I didn't.  Question, and you didn't take a

13   photo of that.  His answer, no, I didn't.

14             Michael Precup testified that he had reviewed

15   several thousand phone calls -- excuse me -- that they

16   had recorded several thousand phone calls.  You have

17   heard two related to my client.

18             Officer Olivera and Officer Ahmed testified

19   about an incident where my client allegedly said, hey, I

20   don't tag anymore, I don't tag, but then he said but I am

21   OVS.  Doesn't make any sense.  It is inconsistent.  In

22   that neighborhood with these police, you don't admit, you

23   don't admit that.  And I asked Officer Olvera, on the

24   date of the incident you recorded statements of

25   Mr. Navarro, Mr. Nunez, Ms. Jimenez and Mr. Rivera; isn't

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that correct.  That's correct.  You recorded all of those

2    states on your digital recorder; correct?  Correct.  You

3    did not record any statements of Mr. Prieto; is that

4    correct?  I cannot recall if I did or did not.

5           If he had recorded -- if Mr. Prieto had said I

6    am OVS, Officer Ahmed or Officer Olvera would have

7    recorded that statement.  It wasn't recorded because it

8    didn't happen.  Officer Willemstyn was asked about a

9    recording, Exhibit 100A, second page of the transcript,

10   where Mr. Rivera said I was with him and a couple of

11   other friends, fool, just regular cats.  And later on, on

12   Page 3, Mr. Rivera said I wasn't around no gang members.

13          Mr. Navarro testified for two days as you

14   recall, and he was asked did Carlos Rivera to your

15   knowledge join the gang as an OVS member.  Yes.  How do

16   you know that?  Because when I met him he was an OVS

17   member.  Did he ever hold a leadership position in the

18   gang?  Yes.  What position was that?  The president of

19   OVS.  He is speaking about Mr. Rivera.  He is speaking

20   about David Hernandez.  He said he had spoken to David

21   Hernandez hundreds of times.

22          He was questioned about Mr. Prieto.  Question,

23   was he ever called to do anything for the gang?  Answer,

24   no.  Mr. Prieto was never asked to do anything for the

25   gang.  He was asked additional questions about

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Mr. Prieto.  Have you heard of defendant Prieto being

2    associated with any tagging crews prior to being OVS gang

3    member?  Answer, yes.  Question, what tagging crew have

4    you heard that he belongs to or belonged to?  Answer,

5    KMR.  What is KMR?  Answer, tagging crew.  Question, are

6    they rivals with the Black Angels?  Answer, no.

7    Question, how could defendant Prieto become a member of

8    OVS if he was a tagging crew member?  Answer, he would

9    have to stop claiming the tagging crew and start claiming

10   the gang.

11          He was asked was defendant Prieto authorized

12   to claim that he was an OVS gang member prior to 2010?

13   Answer, no.  What would have happened if he found out

14   that he was claiming that he was an OVS gang member?

15   Answer, probably would have beat him.

16          Ms. El-Amamy asked Mr. Navarro:

17   "Q Did you hear him say something like just regular cats?

18   "A Yes.

19   "Q What does that mean?

20   "A Average people, not gang members.

21   and that was related to Exhibit 77A.

22   He was later asked:

23   "Q Did you ever use your telephone to do gang business with

24   defendant Prieto?

25   "A No.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    "Q Why is that?

2    "A I never spoke with him on the phone.

3    "Q Why?

4    "A I just, I didn't have his phone number.  He didn't have

5    my phone number, and we really didn't talk or hang out

6    unless Carlos was there with us.

7    He was asked about Robert Tolson.

8    "Q Do you know what relationship Robert Tolson has to

9    defendant Rivera?

10   "A From my knowledge, he was one of his runners.

11   "Q What is a runner?

12   "A A person that sells drugs for him.

13   "Q And was this individual who was the runner as you

14   described for defendant Rivera?

15   "A Yes.

16   "Q All right.  Is Mr. Tolson a member of OVS?

17   "A No.

18   He was asked:

19   "Q What is the typical age for becoming --

20   Excuse me.  He was asked:  In one of those meetings you told

21   them, referring to the government, that the typical age for

22   becoming an OVS member is people of high school age;

23   correct?

24   "A Yes.

25   He was asked:  You knew you had to put in work to move up to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    become a junior Black Angels?

2    "A Yes.

3    He was asked:

4    "Q And one of the rules of the gang is don't talk to law

5    enforcement; correct?

6    "A Yes.

7    "Q Again, with Mr. Navarro, to your knowledge, Mr. Prieto

8    didn't commit any crimes for OVS; correct?

9    "A Yes.

10   "Q And he didn't commit any crimes to your knowledge for the

11   Black Angels; isn't that right?

12   "A Yes.

13   "Q Yes, that is correct?

14   "A Yes

15   "Q And I believe you said the gang never asked him to do

16   anything; isn't that right?

17   "A Yes.

18   He was asked about Mr. Rivera:

19   "Q Treated him like a little brother?

20   "A Yes.

21   "Q And before you were all arrested in 2010, Rivera kept

22   Prieto out of Black Angel business; correct?

23   "A From my knowledge, yes.

24           He was asked about the more than 50 phone

25   calls and that he had only heard two that related to

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

1   Mr. Prieto.

2          Now, as you know, there are six charges

3   against Mr. Rivera, there are four charges against

4   Ms. Medina.  There are only two charges against my

5   client, Raul Prieto, two conspiracy charges.  The same

6   two counts that David Navarro is being charged with, RICO

7   conspiracy and drugs, specifically methamphetamine.

8          Well, you heard the government argue in its

9   close that it doesn't matter if Raul Prieto was a gang

10  member.  It doesn't matter to this case.  Well, if it

11  doesn't matter, why did why they waste so much time

12  trying to prove to you that he was a gang member?  Why

13  did they waste so much time trying to prove to you that

14  he joined the gang?

15          And it was after April of 2010.  The

16  indictment only goes to April, 2010.  Mr. Navarro

17  conceded that Mr. Prieto didn't get to San Bernardino

18  jail until June or sometime thereafter.  Navarro started

19  cooperating in August.  So, supposedly, sometime between

20  June and August, Mr. Prieto decided to become a member of

21  the OVS and immediately become the OG of OVS because he

22  is far and away would be the oldest one in a typical high

23  school gang.

24          He didn't put in any work.  He didn't get

25  jumped in.  Mr. Navarro even said that you have to get

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    jumped in a second time to become a junior Black Angel.

 2    He didn't have any tats.  He didn't have any gang tats.

 3    Well, now, they say it is not important.  But they spent

 4    so much time trying to show you pictures of gang tats,

 5    gang tattoos.  Excuse me.  And you saw a lot of those

 6    pictures, but none of this were them were of my client.

 7            Mr. Rivera, when he didn't know he was being

 8    recorded, was asked who are you hanging out with.

 9    Regular cats, not gang members.  And he was referring to

10    Raul Prieto and other individuals who were at

11    Mrs. Prieto's house.  That is not Raul Prieto's house.

12    It is Velia Prieto's house.  It is his mother's house.

13    He lives there.

14            To be an associate of a gang, the government

15    told you, quote, knowingly aids or furthers the

16    enterprise, end of quote.  Well, did you see any or hear

17    any evidence that Mr. Prieto knowingly aided the

18    enterprise which would make him liable for RICO?  What

19    did Navarro say?  He said we never asked Prieto to do

20    anything.  He said, to his knowledge, Mr. Prieto never

21    engaged in any crimes for the gang.  He said that

22    Mr. Rivera kept Mr. Prieto out of gang business.

23            Now, Mr. Rivera, as Mr. Navarro admitted, was

24    the president of OVS.  He wasn't just a regular gang

25    member for a significant period of time, he was the
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    president of OVS.  And he has known Paul Prieto since

2    they were little kids since before they even thought

3    about being a gang member.  He could have made him an

4    OSVS member when he was president, but as Mr. Navarro

5    said, he kept him out of the gang despite the fact they

6    were friends.  It didn't mean that Mr. Prieto was going

7    to become an OVS member.  And they were friends for all

8    these years, and Mr. Rivera never did a thing to bring

9    them into the gang.

10          And as Navarro said, he did just the opposite.

11   He kept them out of the gang.  He was very protective of

12   them.  He didn't want him in it, but, now, Mr. Navarro

13   says, oh, but if it will help my cooperation and get me a

14   lower sentence, I will just say he joined after we all

15   got arrested.  I don't have any proof, but trust me, I

16   wouldn't lie to you.  Well, and where is the proof?

17   There isn't any.  And it doesn't make sense.

18          Let's look at what Mr. Navarro is responsible

19   for in terms of graffiti.  That is his.  This is his.

20   That is what Mr. Navarro and other Black Angels gang

21   members did as part of their membership in the gang.  But

22   that is not what Mr. Prieto did.  Mr. Navarro admitted

23   that this is what Raul Prieto did.  And that is what he

24   did right up until he was arrested in this case.  That is

25   how he expressed himself.  Is it a crime to paint on

```
 1    these surfaces?  Probably is.  I don't know who owns
 2    these walls, but my client isn't charged with graffiti.
 3    He is not charged with painting murals around town.
 4            You heard thousands of calls.  Excuse me.  You
 5    heard that there were thousands of calls but two related
 6    to Mr. Prieto.  You heard calls after calls with Rivera
 7    and Venegas or Tolson showing that Tolson was a runner,
 8    and, yes, I concede you don't have to be a gang member to
 9    be associated with it.  How do I know that?  Well, Tolson
10    wasn't a gang member, but look at the things that Tolson
11    did.  He was a runner.  And they had evidence of him
12    making phone calls, talking about what he was trying to
13    do.
14            There are phone calls with David Hernandez who
15    also wasn't a gang member, but he was trying to sell a
16    gun, and he was on the phone talking about selling that
17    gun.  There was a statement about a phone call where a
18    cousin is referred to in the government's close.  What
19    cousin?  Jessie Prieto?  Henry Prieto?  Raul Prieto?  Or
20    some other different cousin?  Did the government prove
21    beyond a reasonable doubt that the cousin referred to by
22    Jessica Medina was even a Prieto?  Did the government
23    prove beyond a reasonable doubt that Raul Prieto is the
24    cousin she was referring to?  Is it possible that she was
25    referring to Raul Prieto?  Yes.  It is possible, but it
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    is not even close, not even close on the same planet as

2    beyond a reasonable doubt.

3              What happened after August 6th, 2009?

4    Mr. Rivera's phone was blowing up but not with Raul

5    Prieto.  You listened to several exhibits, Exhibit 92,

6    92A, Jessica Medina and someone named Junior.  Exhibit

7    94, someone named Jorge.  Exhibit 95, someone named

8    Ignacia.  Exhibit 111, someone named Cocky.  And Exhibit

9    112, someone named Robert and also references to Patrick.

10             These people may have been involved in a drug

11   conspiracy, and they may have expected some of the drugs

12   that were seized on August 6th and that is why less than

13   24 hours later on August 7th, they are on the phone.

14   They wanted to know what was going on.  But there were no

15   calls to Raul Prieto.  There were no calls from Raul

16   Prieto saying, hey, what is up, where is my meth?  Where

17   are the drugs that were promised to me?  Why?  Because

18   nothing, nothing was promised to him.

19             Did his friend Rivera agree to help him?

20   Sure, he did.  Did he say exactly how he was going to

21   help him?  No, he didn't.  He said, quote, I am strong, I

22   can help you out.  He knew Prieto needed money.  He has

23   been going out of his way to protect Raul Prieto for

24   years.  If he wanted to use Raul Prieto as a runner, that

25   would have happened a long time ago.  And you would have

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1   heard phone calls between him and Raul Prieto talking

 2   about quantities, talking about price, making it clear

 3   that Raul was selling drugs for him.  And you didn't see

 4   or hear any of that.  The government didn't present that.

 5        What did they present?  They presented

 6   evidence of a guy who wanted to be like one of the guys,

 7   and he talks about other drugs.  You know anybody who

 8   wants to buy any soda.  Well, the Black Angels, they are

 9   not selling cocaine.  They are not dealing with ecstasy.

10   This is not a case about ecstasy or cocaine.

11        The jury instructions don't allow you to

12   convict for a conspiracy to sell ecstasy or cocaine.

13   That is not an issue in this case.  It is meth or heroin.

14   There is no heroin in this case, clearly, with respect to

15   Mr. Prieto.  I would argue there is no heroin in this

16   case with any defendant.

17        But what what is Rivera's response?  He is

18   like, yeah, whatever, I will see what is up, when he

19   talks about soda.  He doesn't seem to really care.  Then

20   Prieto is like what about E, you know anybody who wants

21   to buy some E?  Rivera is like, what?  Ecstasy.  Again,

22   he is like, you know, maybe, whatever.  But he is not --

23   he is not that serious about it.

24        You know, he doesn't deal, there is no

25   evidence that he deals with ecstasy or with cocaine.  And

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1   so in the conversation, is there anything that says or

2   suggests that Mr. Prieto knows Rivera is dealing meth or

3   has meth?  And I am asking beyond a reasonable doubt.

4           There is a reference, hey, I got some bomb,

5   fool.  My shit is guaranteed.  Show me a half O, I will

6   move it.  Well, move what?  You are allowed to use

7   circumstantial evidence, and there has been

8   circumstantial evidence with respect to other people like

9   Tolson and like Hernandez that suggest, you know, Tolson

10  knew what he had was meth.  There is no circumstantial

11  evidence showing that Mr. Prieto knew that they were

12  talking about meth, about ecstasy, about marijuana.

13          Did he want something?  Yeah.  It seems like

14  he wanted something.  Or was he just trying to sound like

15  a big guy?  Yeah, maybe so.  But this is a guy who had

16  never been used or at least the government has no

17  testimony even from Mr. Navarro that Mr. Prieto has ever

18  been used as a runner.  And yet they are saying that you

19  need to assume beyond a reasonable doubt that Mr. Prieto,

20  special needs and all, knew that what Rivera was talking

21  about was methamphetamine.  Is it possible he knew about

22  meth, that he knew they were talking about meth.  Yeah.

23  That is possible.  It is possible.  There is not evidence

24  beyond a reasonable doubt that Mr. Prieto knew they were

25  talking about meth.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1              And that is the same with respect to the other
 2   call, 89A.  Who is this?  It is Chino.  You called me;
 3   right?  I called you?  Yeah.  You called me 5, 10 minutes
 4   ago.  Really?  It is clear Mr. Prieto is confused.  He is
 5   confused easily.  He goes on to say I have got a robbery
 6   to do.  And his friend, who has been protecting him for
 7   years says, no, that is dumb.  I have got you.
 8              Well, what does he got him with?  Well, you
 9   know, Mr. Prieto is I have something, a half a bird.
10   Again, a half of a bird of what?  Does he have a half a
11   bird of marijuana?  Does he have a half a bird of
12   ecstasy.  Did the government put on any evidence that
13   show that Mr. Prieto knew what Mr. Rivera was talking
14   about.  He was talking about ecstasy, he was talking
15   about cocaine.  We know these people smoked marijuana.
16   He didn't care.  He just wanted to be one of the guys.
17   Whatever it is, yeah, give it to me.
18              And, now, they are asking you to find beyond a
19   reasonable doubt that he knew that it was meth and to
20   find that he knew he was conspiring to sell meth.  And he
21   is like, hey, I can push that, I can push that.  You
22   don't hear Mr. Tolson trying to convince him that he can
23   push it.  You don't hear any of the other people who are
24   dealing trying to convince their co-conspirators, hey, I
25   am a big guy, I can do it, you know, give me a chance.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  And, like, don't trip, I have got you.

2            I don't doubt that his friend might have given

3  him some money the next day because he looks out for him,

4  he is going to protect him.  And he may have done that,

5  but did they prove beyond a reasonable doubt that when he

6  said, hey, I have got you, that he was going to give him

7  a half an ounce of something that Mr. Prieto didn't know

8  because there was nothing in any phone call suggesting he

9  knew what half ounce he was getting, what it was.

10            Now, something present in this case is

11  tunnel vision.  The government has ignored evidence that

12  doesn't make sense in its case.  The digital recorder,

13  statements of all these other people at that early

14  occasion when my client supposedly said I am OVS.  How

15  come everybody else got recorded and he didn't get

16  recorded when he said that?  Doesn't seem to make sense.

17            No write-ups for the jail graffiti.  Why did

18  that officer come in here and say something that just

19  doesn't make any sense whatsoever?  He even said if I had

20  known Vega had done that, even if I didn't see him, I

21  would have written him up.  But he says he saw Prieto and

22  didn't write him up and didn't take a picture of it when

23  he said he would have done that if he had seen it.

24            Crook, they let their witness get up there and

25  say, oh, Crook, there is nobody else in the gang.  But

UNITED STATES DISTRICT COURT,   CENTRAL DISTRICT OF CALIFORNIA

```
 1    there is.  Samuel Solorio.  But they put their head in

 2    the sand because that doesn't go with their theory of the

 3    case.  So let's not look into this too much.  Let's

 4    ignore that because my theory of the case is this Crook

 5    has to be Raul Prieto.  So, hey, see no evil, hear no

 6    evil.  We are on our way to some convictions and let's

 7    just move forward.  Thousands of calls.  Two, with my

 8    client.  And they have known each other for years.

 9               Now, quickly, I want to show you the jury

10    instructions that are relevant.  Jury Instruction No. 3,

11    reasonable doubt.  You heard it from several of us.  I

12    apologize for pulling it off fast, but I have got to move

13    quickly.  Jury Instruction No. 29, the fact that I have

14    highlighted some language doesn't mean I want you to

15    ignore the rest.  I am just highlighting some things that

16    I find particularly important.  The end of it.  This is

17    the general instruction for conspiracy, similarly, a

18    person does not become a conspirator merely by

19    associating with one or more persons who are conspirators

20    nor merely by knowing that a conspiracy exists.

21               Mr. Prieto, associated with, and I have no

22    doubt that he knew that Mr. Rivera was doing some things

23    that might be crimes, but that doesn't make him a

24    conspirator.

25               Instruction No. 30, if you find that defendant
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1   may have been guilty of another conspiracy but not one of

 2   the ones charged, you have to to find him not guilty

 3   here.  Was Mr. Prieto involved in a conspiracy to sell

 4   ecstasy with someone?  Maybe.  But that is not a

 5   conspiracy that you are facing.

 6              Instruction 31, some very important

 7   language.  You may not find defendant responsible for

 8   actions that occurred before the defendant joined the

 9   conspiracy.  As Mr. Navarro said, they never asked him to

10   do anything before, and he never did anything before.

11   But he apparently joined the gang after.

12              And Jury Instruction No. 35 shows the key

13   date, beginning on a date unknown, and continuing on or

14   about April 7th, 2010.  Key date.

15              Jury Instruction No. 39, Count 5, same date.

16   Beginning on or about -- excuse me -- an unknown date and

17   ending on or about April 7th.  Second, defendant joined

18   in the agreement knowing of its purpose.  Did the

19   government show beyond a reasonable doubt that he knew of

20   its purpose?  And the purpose being methamphetamine?  Did

21   they show that Raul Prieto knew that beyond a reasonable

22   doubt and present you with that evidence?  No, they did

23   not.

24              The verdict form, when you get to this,

25   unanimously find defendant Raul Prieto not guilty.
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    Because to find him guilty, you have to find all of these

2    elements against him beyond a reasonable doubt.  Well,

3    that hasn't been done.  He didn't do anything for the

4    gang.  He didn't commit any crimes for the gang.

5            Count 5, unanimously find the defendant Raul

6    Prieto not guilty.  But let's say you disagree with my

7    view of the facts and you find that he is guilty, do you

8    unanimously find that he conspired to distribute meth?

9    Well, in his phone calls, he talks about ecstasy, he

10   talks about cocaine.  There is nothing in his phone calls

11   talking about methamphetamine.  There is -- there is a

12   word half a bird.  Half a bird of what?  Half a bird of

13   what?  Make sure you pay attention to that as you get to

14   that.

15           And then, finally, the phone call, he says I

16   want a half an ounce.  82-grams in an ounce so we are

17   talking about 14-grams.  So, again, if you disagree with

18   my facts, where does 14-grams fit in on this?  Right down

19   here.  But I am hoping you agree with me that the

20   government hasn't proven this beyond a reasonable doubt

21   and you stop after No. 2.

22           So I just want to summarize.  Moving so fast,

23   I lost the last page of my notes, but I don't need them.

24   I don't need them because I know what this case was

25   about.  If I was sitting out on the tennis court with my

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    friends and they said, hey, what is your case about, I

2    can tell you.  It is about a guy over here who wanted to

3    be like his friends.  He saw his friend Rivera who was

4    president of OVS for many years, became a Black Angels.

5    They made fun of him because he couldn't read, couldn't

6    write.  Didn't learn until he was 20.  He wanted to be

7    like the guys.  You know, hey, I can do this.  You know,

8    let me do it.  I can push that.

9            And his friend was like, hey, I got you.  I

10   got you, bro.  You know, I am looking out for you, but

11   how did he look out for him?  By keeping him out of gang

12   business.  Did he string him along over and over again?

13   Probably.  How else can you account for the fact that

14   things happened with Rivera yet Mr. Prieto was never

15   involved.  As Navarro said, he wasn't involved in the

16   gang business, and his friend kept him out.  He was

17   protective of him.

18           I told you early on when we were in jury

19   selection, you know, you may believe there is life on

20   another planet but if this case was about them having to

21   prove it beyond a reasonable doubt, then it is not your

22   opinion.  It is did they do that.  Did they prove beyond

23   a reasonable doubt that Raul Prieto knew when he was

24   talking to Rivera that when Rivera was referring to half

25   a bird, that is what, you know, it was meth.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1     It was clearly meth.  We don't have all those

2  other calls that they had for people with Tolson and

3  stuff like that.  We don't have a drug seizure.  We don't

4  have any of that circumstantial evidence that would show

5  that Mr. Prieto knew that they were talking about meth.

6  We have some undefined code words like half a bird that

7  Mr. Prieto was confused about.

8     Ladies and gentlemen, there may be life on

9  other planets, but there is no life in their case.  They

10 didn't prove beyond a reasonable doubt that Mr. Raul

11 Prieto is guilty of Count 1 or Count 5.  Mr. Prieto, you

12 know, he just -- he wasn't gang material.  He knew that,

13 his friend Rivera knew that, you know that, the

14 government knows that.

15     But they put their head in the sand and now

16 they are asking you to ignore the evidence, ignore the

17 obvious lies from their police officers, ignore the lies

18 from their informant.  And now just like, you know what,

19 it doesn't even matter because, yeah, we tried to

20 convince you he was a gang member but now it is not

21 important, let's just use the associated with.  Well,

22 associated means he knowingly aids or furthers the

23 enterprise.  And he didn't do that because, as

24 Mr. Navarro said, we never asked him to do anything.  He

25 never did anything.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
1              So, ladies and gentlemen, follow the law, look
2    at the evidence and please find that the government has
3    not proven the case against Mr. Prieto beyond a
4    reasonable doubt.  Thank you.
5              THE COURT:  All right.  Thank you, Mr. Cephas.
6              MR. CEPHAS:  Thank you, your Honor.
7              THE COURT:  All right.  Let's close it out.
8              MS. EL-AMAMY:  This isn't a case about tennis
9    courts or life on other planets.  This is what this case
10   is about.  And this is how you pay for that.  And these
11   defendants all worked together to help the criminal
12   enterprise run, buy guns for the gang, tax individuals
13   and make sure that the gang operated.
14              Now, we have heard a lot, a lot this
15   afternoon, and my job is to figure out what it is we
16   agree on and what it is we don't agree on.
17              And, your Honor, I am going to ask to show the
18   verdict forms which I think the court has already given
19   permission for me to do.
20              THE COURT:  Please.
21              MS. EL-AMAMY:  You are going to get verdict forms
22   for each of these three defendants, one for Jessica
23   Medina, one for Raul Prieto and one for Carlos Rivera.
24   Now Carlos Rivera's attorney has already told you there
25   are some things that aren't in dispute.  The first of
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    these is the fact that Mr. Rivera is a felon in

2    possession of a firearm.  He was a felon in possession of

3    a firearm that he got when he was at defendant Prieto's

4    house in July of 2009.

5           So on the last page of Mr. Rivera's verdict

6    form, you are going to find this count, and you the jury

7    should unanimously find defendant Carlos Rivera guilty of

8    that crime.  His attorney told you to do it.

9           Now, he also said that he distributed

10   methamphetamine to Robert Tolson.  That is Count 6.

11   Again, it is methamphetamine, it is not a secret.  His

12   attorney told to you do it.  He is guilty of that crime.

13          Now, what that also means is that he is guilty

14   of two racketeering acts, or he is guilty of at least

15   one racketeering act, Racketeering Act No. 6.  And this

16   will be given to you in the jury instructions which you

17   will have back with you.  Racketeering Act No. 6 is that

18   distribution of methamphetamine to Robert Tolson.

19          So right off the bat those are things that

20   aren't in dispute.  Now, I will submit to you that there

21   is one other thing that is not in dispute right now.  And

22   that is possession with intent to distribute

23   methamphetamine.  You heard no argument about that count

24   from defendant Rivera's attorney.  That is the

25   methamphetamine that was in this Tupperware hidden in

```
 1    this compartment inside with defendant Rivera's

 2    fingerprints on it.  There is no dispute there.

 3              Defendant Medina's attorney argued to you, it

 4    was defendant Rivera's meth.  He is guilty of that.

 5              Now, what that requires is that you make a

 6    finding, and we heard evidence as to what the quantity

 7    was.  The quantity was at least 50-grams of pure

 8    methamphetamine.  You saw the lab report.  You heard the

 9    evidence.  That fact is not in dispute.

10              Now, you also heard Mr. Rivera's attorney go

11    on and on about this is how defendant Rivera makes his

12    money, he sells drugs.  What is not in dispute is that

13    Mr. Rivera, putting aside these other defendants,

14    Mr. Rivera conspired to sell methamphetamine.  He was

15    involved in a drug conspiracy.

16              My colleague got up there and talked to you

17    about Mr. Nicolada, the guy who brought him this

18    methamphetamine.  He agreed at least with Mr. Nicolada to

19    get those 219-grams of pure methamphetamine.  So as to

20    the drug conspiracy, that is Count 5 of the indictment,

21    Mr. Rivera is guilty of conspiracy.  Now, do you

22    unanimously find that defendant Carlos Rivera conspired

23    to distribute methamphetamine?  Yes.  His attorney told

24    you that he did.  You saw evidence of the drugs.  You saw

25    how he got those drugs, and you saw that he has
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1  distributed them on more than one date in the conspiracy

2  both to Mr. Tolson and he possessed those 219-grams, half

3  pound, nearly $9,000 worth of methamphetamine that was in

4  that Acura.  So, yes, he conspired to distribute

5  methamphetamine.  And, again, yes, that was at least

6  50-grams of actual methamphetamine.

7          Now Mr. Medina's(sic) attorney got up there at

8  opening statements and told you at the beginning the

9  drugs in this case are simple.  They are easy to

10 understand, and that is what we just knocked out right

11 now.  That means you get to go back to the racketeering

12 acts that are part of Count 2.

13         Racketeering Act No. 1, again, that is the

14 conspiracy to distribute methamphetamine that we already

15 understand that defendant Rivera is guilty of.  Proven.

16         Racketeering Act 7, again, this is this

17 possession to distribute 219-grams of methamphetamine

18 with his fingerprints on it.  Proven.  So that is a

19 substantial number of the counts against defendant

20 Rivera.  We are going to get back to the RICO elements,

21 but right now those are the narcotics elements.

22         Now, let's talk about defendant Medina,

23 possession with intent to distribute that 219-grams of

24 methamphetamine.  Now, in opening statements,

25 Ms. Medina's attorney told you that there was no evidence

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    that Ms. Medina was involved in the drug distribution

2    operation prior to August 6, 2009.  She was taken off

3    guard.  We know that is not true.  We saw the evidence

4    during this trial.

5              One of the attorneys, Mr. Rivera's attorney

6    told you that David Navarro was the government's star

7    witness.  No, he wasn't.  The star witnesses are sitting

8    right up in front of you.  The star witnesses are the

9    recorded conversations that each of these defendants had

10   in front of you, and the reason why David Navarro was up

11   on that stand for so long is because we were spending

12   time playing each of those recorded telephone

13   conversations.

14             Now, in his closing argument today,

15   Mr. Medina's(sic) attorney did not talk to you about her

16   involvement in the drug distribution operation prior to

17   August 6, 2009.  This is a slide that was shown to you in

18   my opening statement.  July 20th, 2009.  This was an

19   example of Ms. Medina's involvement in the drug

20   distribution operation, and my colleague played evidence

21   related to that operation.  That was the heina picking up

22   drugs all the time, and on this time she would give

23   directions.  She was involved in selling drugs prior to

24   August 6, 2009, and any argument that she wasn't is

25   simply false.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    You saw at trial, Exhibit 96, hello, Teresa

2    wants to roll through.  Oh, she has got the money already

3    or what.  That is drug money, money for a narcotics deal

4    that Ms. Medina was setting up.  And defendant Rivera is

5    like, let me call this little fool and see if he is

6    ready.  That is the drug runner, Francisco Venegas that

7    you heard the recorded telephone conversations of.  That

8    is the same drug runner that after Mr. Rivera got

9    arrested Ms. Medina was giving orders to.

10    Ms. Medina's attorney told you that you didn't

11    hear Ms. Medina do anything in relation to the drug

12    operation.  That is because she was the one telling you,

13    telling the people what to do.  She was telling

14    Mr. Venegas what to do.  She was telling Robert Tolson

15    what to do.  And what she did is she paid the cell phone

16    bill and forwarded the calls so that drug operation would

17    still continue.

18    Exhibit 97, defendant Rivera tells Ms. Medina,

19    the mother of his children, I will hook her up.  I will

20    hook her up fat, though.  That is drugs.  That is

21    methamphetamine.

22    And Exhibit 99, July 20th, 2009.  This is

23    what my colleague played for you.  Cause, usually, my

24    chick, my heina goes to pick that up for her and bring it

25    to the pad.  Picking up the drugs.  Remember how, she, my

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1     chick, be going over there to grab it.  And today it is

2     not going to happen like that.  She gave her directions

3     so she should be there in like 20 minutes.  Ms. Medina

4     gave directions to the narcotics customer to go get the

5     drugs.

6            Now, Ms. Medina's attorney has argued to you

7     that she didn't know what was in the car.  Well, you

8     heard the telephone conversations.  You heard the

9     telephone conversations.  The police came to the house.

10     Mr. Rivera and Ms. Medina didn't have time to have a

11     conversation about, oh, no, there is drugs in the car.

12     In fact, Ms. Medina's attorney argued to you that she

13     knew the drugs were in the car, she wanted the drugs out

14     of the house so that they wouldn't get caught with them.

15     You can't argue that you didn't know that there were

16     drugs in the car and argue that she knew that the drugs

17     weren't in the house at the same time.

18            She knew there were drugs in that car, and she

19     grabbed those keys.  It wasn't defendant Rivera who

20     grabbed the keys.  It was Ms. Medina's idea to put it in

21     her back pocket.  And you heard in the telephone

22     conversations that, you know, they didn't have time to

23     have a conversation.  She wasn't instructed to do that,

24     and she did it because she didn't want the drugs linked

25     to the house, not to defendant Rivera to the house.  She

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    was just a part of this drug business as Mr. Rivera.  The

2    July 20th telephone conversations demonstrate that to

3    you.  Her conversations right after that took place also

4    demonstrated that.

5           Now, we have already discussed how defendant

6    Rivera is guilty of the drugs that were in the car, and

7    Ms. Medina's attorney has argued to you that she can't be

8    found guilty for those drugs.  Those drugs were

9    Mr. Rivera's drugs, not hers.  Well, what was not

10   explained to you is what does it mean to possess.  We

11   didn't hear that instruction.  A person has possession of

12   something if the person knows of its presence and has

13   physical control of it or knows of its presence and has

14   the power and intention to control it.  More than

15   one person can be in possession of something if each

16   knows of it presence and has the power and intention to

17   control it.

18          Both Mr. Rivera and Ms. Medina possessed those

19   drugs on that date, and the person who was in control of

20   the drugs, not the cops, not defendant Rivera, it was

21   Ms. Medina.  The cops had to call AAA to even get into

22   the car.  She was the person who possessed the drugs.

23          Now, the other instruction which was not read

24   to you when arguing that defendant Medina did not possess

25   the drugs, and let me give you the instruction.  First,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    on or about August 6, 2009, the defendant, defendant

2    Medina knowingly possessed the methamphetamine, and,

3    second, defendant Medina possessed it with the intent to

4    distribute it to another person.

5            Possess with intent to distribute means to

6    possess with intent to deliver or transfer possession of

7    methamphetamine to another person with or without a

8    financial interest in the transaction.  It does not

9    matter whether the person knew that the substance was

10   methamphetamine.  It is sufficient that defendant Medina

11   knew that it was some kind of prohibited drug.

12           The government is not required to prove the

13   amount or quantity of methamphetamine.  It need only

14   prove beyond a reasonable doubt that this was a

15   measurable or detectable amount of methamphetamine.  So

16   one of the arguments that Ms. Medina's attorney made in

17   this case is that she didn't know how much drugs were in

18   there.

19           Well, I submit that the evidence doesn't

20   demonstrate that.  Ms. Medina was clearly interested in

21   making sure that the cops did not get the keys to those

22   cars.  She knew that there was a large enough quantity in

23   there that bad things were going to happen if the cops

24   found those methamphetamine.

25           You heard in the recorded telephone

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    conversations.  How far am I going to go with this.  How

2    far am I going to go with this.  And she kept the story

3    up because she did not want the cops to link the car with

4    the house.  She didn't want anything bad to happen, and

5    it was important enough to her to lie again and again.

6    She told you in the recorded telephone conversations, I

7    know I can get in trouble for lying, but it was more

8    important for her to tell that lie than to get caught

9    with the keys or have defendant Rivera get caught with

10   the keys and caught with the drugs.

11        I would submit that she knew exactly what was

12   in that car.  I would submit that she knew that it was

13   more than 50-grams of actual methamphetamine, and I would

14   submit that that is consistent with her knowledge that

15   there were $3,000 of drug money in defendant Rivera's

16   pocket that day.  I would submit that that is consistent

17   with her statement that she didn't want to get caught

18   with the drugs in the house.

19        Now, one of the things that was argued is that

20   they just possessed the drugs, they didn't really intend

21   to distribute it.  Well, you have heard evidence at trial

22   how much an ounce costs.  You know that half an ounce of

23   high quality meth is $550.  And you know that based on

24   math and taking that out, that was nearly $9,000 worth of

25   drugs in that car, more than close to 2,000 doses of

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    methamphetamine to use.  They weren't going to just sit

2    on that methamphetamine.  They weren't going to just look

3    at it because it was cool.  They were going to sell those

4    methamphetamines just like they did on July 20th.  She,

5    other individuals like Mr. Venegas, like Mr. Tolson and

6    defendant Rivera and defendant Prieto were all going to

7    work together to sell the drugs.

8              I would submit -- I would submit that there

9    is sufficient evidence to unanimously find defendant

10   Medina guilty of possession of that methamphetamine in

11   that car.  I would also submit that based on her actions

12   with law enforcement, the fact that there was $3,000

13   worth of drug proceeds in the house, the fact that she

14   didn't want those drugs in her house, all of her actions

15   with respect to law enforcement, I would submit that

16   there is sufficient evident to prove beyond a reasonable

17   doubt that there was at least -- that she knew that there

18   was at least 50-grams of actual methamphetamine in that

19   car.  And that is less than a quarter of the

20   methamphetamine that was actually found.  There was

21   219-grams of actual methamphetamine.  And, here, I submit

22   that there is enough evidence to find that there was at

23   least 50-grams in that car.

24              Now, Ms. Medina's attorney also talked to

25   you about the drug conspiracy which is Count 5.  We

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1    didn't go over the elements of that drug conspiracy.  So

 2    let's take a look at them.

 3         MR. WALSH:  Your Honor, I think the government has

 4    exceeded their time limit that the court placed on them.

 5         THE COURT:  I got this.

 6         MS. EL-AMAMY:  Now, you are instructed that in

 7    order to prove reasonable doubt that Ms. Medina conspired

 8    to distribute methamphetamine, and the instruction says

 9    heroin.  We are not asking you to find heroin in this

10    case, just methamphetamine.

11         First, beginning on an unknown date and ending

12    on or about April 7th, 2010, there was an agreement

13    between two or more people to distribute methamphetamine

14    and, second, the defendant joined in the agreement

15    knowing of its purpose and intending to help accomplish

16    it.  And you have heard evidence that she did that.

17    Those calls on July 20th, that is evidence of her

18    participation and evidence of her participation and her

19    agreement as my colleague discussed for you occurred

20    after she took over the narcotics operation.

21         Now, Ms. Medina did things with respect to the

22    narcotics operation.  One of the first things she did is

23    she called the registered owner of the Acura that she had

24    control over, that she had the keys to, the keys that she

25    hid, and she worked with him to change his story, make
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    sure that they were all on the same page regarding what

2    story they were going to tell to law enforcement.

3            Another thing that she did to help out with

4    the conspiracy is she paid for the telephone.  And she

5    told you why.  She said I went to go pay his cell phone

6    today talking about defendant Rivera, and I was going to

7    start forwarding her calls.  And the reason why and you

8    heard in the recorded conversation she wanted to forward

9    the calls is because she wanted to keep the business

10   going.  She wanted the customers to keep calling and keep

11   getting drugs.

12           She also enlisted her cousin.  Her cousin --

13   and this happened on August 11.  She agreed with her

14   cousin that he could push some drugs because Chino, he

15   used to deal with Chino, defendant Rivera as well.  So

16   she paid for the cell phone bill.  She got in touch with

17   the registered owner, and she found people including her

18   cousin to help her sell drugs.

19           MR. CEPHAS:  Your Honor, I just want to object on

20   due process grounds.  I believe the prosecutor has been

21   given much more leeway than us to exceed their time.

22           THE COURT:  One word, counsel.  I have got this.

23           MR. CEPHAS:  Thank you, your Honor.

24           THE COURT:  I appreciate it, but I have got this.

25           MS. EL-AMAMY:  And you heard the calls in my

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    colleague's opening closing about Mr. Venegas and the

 2    instructions that she gave to Mr. Venegas regarding

 3    selling drugs as well.

 4            Now, Ms. Medina's attorney has argued to you

 5    that she didn't know there was a full amount in the car.

 6    Well, after August 6, she did, and she kept the

 7    conspiracy going.  And so even if you find she didn't

 8    know what was in that vehicle on August 6, 2009, she sure

 9    did after the cops came and she kept the conspiracy

10    going.

11            I would submit that there is sufficient

12    evidence to find defendant Medina guilty of the narcotics

13    conspiracy, that there is sufficient evidence to find

14    beyond a reasonable doubt that she conspired to

15    distribute methamphetamine and that she knew even after

16    August 6th, 2009, that that conspiracy involved at least

17    50-grams of actual methamphetamine, again, less than a

18    quarter of what she found out was seized by the cops from

19    her Acura.

20            Now, let's talk about defendant Prieto and his

21    drug distribution involvement.  You have heard arguments

22    that there weren't a lot of telephone calls between

23    Mr. Prieto and Mr. Rivera, but, yet, you hear that they

24    are extremely close and they consider each other to be

25    relatives and he calls the mother mom.  They are talking,

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    and he knows what is going on.  And his calls, there

2    aren't a lot of calls, but his calls demonstrate that he

3    knows what is going on.

4              Now, Mr. Prieto's role in this drug

5    distribution conspiracy is that he gives Mr. Rivera a

6    place to do his business, gang business, because this gun

7    right here isn't just a felon in possession charge.  This

8    is a gang gun paid for with gang dues, paid for with gang

9    drug money.  And the place where he did it is at

10   defendant Prieto's house, and you heard during this trial

11   that defendant Rivera is vocal about not doing stuff

12   where he can get caught.  He doesn't want to do it in his

13   house.  He wants to keep drugs in a car that is

14   registered to someone else, and he wants to do his gun

15   deals and drug deals at another place, specifically,

16   defendant Prieto's house.

17             And I submit to you that defendant Rivera

18   agreed to give Mr. Prieto $550 worth of methamphetamine

19   in exchange for Mr. Prieto not doing a robbery.  Now,

20   one explanation is that they are very close, he looks out

21   for him, he is a little brother.

22             Another explanation is that Mr. Rivera didn't

23   want defendant Prieto to get caught up in some robbery

24   and so that he wouldn't have some place where someone

25   would let him do his business.  And so he is willing to

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    pay him $550.  $550 is a lot of money, $550 worth of

2    drugs so that Mr. Prieto doesn't get caught up in some

3    robbery.  It was important to him, $550 worth important.

4             Now, we talked about that call, in opening, I

5    am going to do a robbery, don't do the robbery, I am

6    going to get half a dead bird instead.  And you heard

7    testimony that was not challenged by any of the

8    defendant's, testimony from Mr. Navarro that half a bird

9    is half a kilogram of methamphetamine.

10            MR. CEPHAS:  Your Honor, object as misstating what

11   was said during the trial.  That is not an accurate.

12            THE COURT:  Overruled.

13            MS. EL-AMAMY:  You also heard other examples

14   during this trial of instances where consistent, I would

15   submit, consistent with Mr. Navarro's testimony is

16   evidence that Mr. Rivera repeatedly used defendant

17   Prieto's house prior to August 6th, 2009, as a place to

18   do his drug deals.  On July 29, 2009, defendant Rivera

19   told the customer that he had bomb methamphetamine, and

20   the customer on his own volunteered to go to Raul's

21   house.  Now, later on during that conversation, you heard

22   defendant Rivera say, no, I can't go to Raul's house, I

23   just got busted there.  He got busted there less than a

24   week before, July 22nd, 2009, and he had to post up some

25   place else.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                    August 2nd, 2009, defendant Rivera instructed
 2     Mr. Venegas to meet a narcotics customer across the
 3     street from Crook's house.  And on August 5th, 2009, this
 4     is in one of the recorded calls that you listened to,
 5     defendant Prieto offered to help defendant Rivera collect
 6     drug money from a narcotics customer.  They didn't have a
 7     lot of telephone conversations, but I submit if you look
 8     at those transcripts which were shown to you repeatedly
 9     during those trials, defendant Rivera and defendant
10     Prieto knew about how the business operated, they knew
11     about how much a ball was, how much it was sold for,
12     Mr. Prieto's offering to call the drug customer from
13     another line to collect that drug money.
14                    Now, you heard, also, my colleague pointed out
15     to you how after that large quantity of methamphetamine,
16     Ms. Medina and defendant Prieto are extremely tight.
17     That was brought out at trial.  It was argued.  She -- it
18     can be reasonably inferred that she told him exactly how
19     much methamphetamine was seized from that house.
20     4-ounces.  More than four -- 219 grams of pure
21     methamphetamine.  And even after that date, defendant
22     Prieto is letting them use the house.  Let's go to
23     Crook's house tomorrow so that Chino, defendant Rivera
24     can three-way with Bony and Ms. Medina.  And what do you
25     think it is they are talking about?
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1        Now, you got talked to about reasonable doubt,

2   but one of the things that you will see in the

3   instruction about reasonable doubt is common sense.  You

4   don't check your common sense at the door.  Common sense

5   tells you what it is they are talking about.  Common

6   sense lets you know that when Mr. Rivera is talking to

7   Mr. Prieto about getting half a dead bird, he is talking

8   about methamphetamine, not marijuana, not any other drug

9   that we haven't heard in the case.

10        It is the methamphetamine that we saw at trial

11   that defendant Rivera got shortly after he talked to

12   defendant Prieto later on that day.  There can be, I

13   submit, no reasonable doubt that defendant Prieto was

14   also involved in a drug conspiracy with defendant Rivera

15   and defendant Medina.  And that drug conspiracy involved

16   methamphetamine.

17        I submit that there is sufficient evidence to

18   unanimously find defendant Prieto guilty as charged in

19   Count 5 of the indictment.  I submit that there is

20   sufficient evidence to find that the drug in choice was

21   methamphetamine, the drug that he was talking to

22   defendant Rivera about very shortly, same day, within

23   hours of getting the methamphetamine delivered.  And I

24   submit that the statement regarding half a dead bird

25   taken in conjunction with the fact that defendant Medina

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    learned that it was the full amount yet she is still

2    going over to Crook's house to do the three-way is

3    sufficient for you to find beyond a reasonable doubt that

4    that conspiracy involved at least 50-grams of

5    methamphetamine.

6              Now, those are all the drug counts.

7         THE COURT:  Ms. El-Amamy, the nondrug count has

8    been conceded.  Let's wrap it up.

9         MS. EL-AMAMY:  Okay.  And one call that my

10   colleague did not get a chance to talk to you about is

11   Exhibit 152, and that was defendant Medina's involvement

12   in the gang activity.  One thing that wasn't talked about

13   is even putting aside all the telephone conversations

14   that she was partially involved in --

15        MR. WALSH:  I will object, your Honor.  If it

16   wasn't talked about in the opening, rebuttal is not an

17   opportunity to supplement.

18        THE COURT:  I want it wrapped up.

19        MS. EL-AMAMY:  An OVS member came to defendant

20   Medina's house to figure out that the phone was tapped.

21   Ms. Medina, in addition to selling her drugs and

22   defendant Rivera's drugs, was helping out the gang by

23   making sure that their phones weren't tapped.

24              I will submit at this point.

25        THE COURT:  All right.  Thank you, counsel.  All

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

 1    right.

 2            Ladies and gentlemen, when you begin your

 3    deliberations, elect one member of the jury as your

 4    foreperson who will preside over the deliberations and

 5    speak for you here in court.

 6            You will then discuss the case with your

 7    fellow jurors to reach agreement if you can do so.  Your

 8    verdict, whether guilty or not guilty, must be unanimous.

 9            Each of you must decide the case for yourself,

10    but you should do so only after you have considered all

11    the evidence, discussed it fully with the other jurors

12    and listened to the views of your fellow jurors.

13            Do not be afraid to change your opinion if the

14    discussion persuades you that you should.  But do not

15    come to a decision simply because other jurors think it

16    is right.

17            It is important that you attempt to reach a

18    unanimous verdict but, of course, only if each of you can

19    do so after having made your own conscientious decision.

20    Do not change an on honest belief about the weight and

21    effect of the evidence simply to reach a verdict.

22            As you noted, verdict forms have been prepared

23    for you.  After you have reached unanimous agreement on

24    your verdicts, your foreperson should complete the

25    verdict form according to your deliberations, sign and

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1    date them and advise the court security officer that you

2    are ready to return to the courtroom.

3              If it becomes necessary during your

4    deliberations to communicate with me, you may send a note

5    through the clerk or the bailiff or court security

6    officer signed by one or more of you.  No member of the

7    jury should ever attempt to communicate with me except by

8    a signed writing.  And I will respond to the jury

9    concerning the case only in writing or here in open

10   court.

11             If you send out a question, I will consult

12   with the lawyers before answering it which may take some

13   time.  You may continue your deliberations while waiting

14   for the answer to any question.

15             Remember, that you are not to tell anyone

16   including me how the jury stands numerically or otherwise

17   on any question submitted to you including the question

18   of guilt of the defendants until after you have reached a

19   unanimous verdict or have been discharged.

20             Officer Williams.

21        (The court security officer was sworn.)

22        THE CLERK:  Please state your name spelling your

23   last name for the record.

24        THE COURT SECURITY OFFICER:  Vernon Williams,

25   W-I-L-L-I-A-M-S.

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

1          THE COURT:  All right.  Officer Williams, take

2    charge of the jury, please.

3          (Proceedings concluded.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA

```
 1                          CERTIFICATE

 2

 3

 4   I hereby certify that pursuant to Section 753, Title 28,

 5   United States Code, the foregoing is a true and correct

 6   transcript of the stenographically reported proceedings held

 7   in the above-entitled matter and that the transcript page

 8   format is in conformance with the regulations of the

 9   Judicial Conference of the United States.

10   Date:

11

12    /s/ Katie Thibodeaux, CSR No. 9858, RPR, CRR

13

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT,  CENTRAL DISTRICT OF CALIFORNIA