1                UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3                    WESTERN DIVISION

4                          ---

5          HONORABLE OTIS D. WRIGHT, JUDGE PRESIDING

6                          ---

7

8   UNITED STATES OF AMERICA,   )
                                 )
9                 Plaintiff,     )
                                 )
10                               )
        vs.                      ) NO:  CR 10-351-ODW
11                               )
                                 )
12  ARMANDO BARAJAS, et al.,     )
                                 )
13                Defendants.    )
    _____)

14

15

16

17          REPORTER'S TRANSCRIPT OF PROCEEDINGS

18              Los Angeles, California

19            Tuesday, September 11, 2012

20

21

22                        KATHERINE M. STRIDE, RPR, CSR
                          Official Court Reporter
23                        Roybal Federal Building
                          255 E. Temple Street, Rm. 181-B
24                        Los Angeles, California  90012

25                        (213)894-2187

1

2    **APPEARANCES:**

3

4    In behalf of the Government:

5                    REEMA M. EL-AMAMY
                     MICHAEL DORE
6                    ASSISTANT UNITED STATES ATTORNEYS
                     Criminal Division, United States Courthouse
7                    312 North Spring Street
                     Los Angeles, California  90012
8                    (213)894-2434

9

10

11

12

13    In behalf of Defendant Armando Barajas:

14                   LAW OFFICE OF WILLIAM HARRIS
                     BY:  WILLIAM HARRIS
15                   1499 Huntington Drive, Suite 403
                     South Pasadena, CA  91030
16                   (626)441-9300

17

18    In behalf of Defendant Juan Gil:

19                   KESTENBAUM EISNER & GORIN
                     BY:  ALAN EISNER
20                   14401 Sylvan Street, Suite 112
                     Van Nuys, CA  91401
21                   (818)781-1570

22

23

24

25

1

2     **APPEARANCES (CONTINUED):**

3

4     In behalf of Defendant Carlos Rivera:

5                     LAW OFFICE OF ANGEL NAVARRO
                      BY:  ANGEL NAVARRO
6                     714 West Olympic Boulevard, Suite 450
                      Los Angeles, CA  90015
7                     (213)744-0216

8

9     In behalf of Defendant Juan Diaz:

10                    LAW OFFICE OF THOMAS NISHI
                      BY:  THOMAS NISHI
11                    725 South Figueroa Street, 31st Floor
                      Los Angeles, CA  90017
12                    (213)629-9066

13

14    In behalf of Defendant Steven Espinoza:

15                    LAW OFFICE OF MICHAEL MAYOCK
                      BY:  MICHAEL MAYOCK
16                    65 N. Raymond Avenue, Suite 235
                      Pasadena, CA  91103
17                    (626)405-1465

18

19    In behalf of Defendant Maria Lopez:

20
                      LAW OFFICE OF WILLIAM R. DOMNARSKI
21                    BY:  WILLIAM R. DOMNARSKI
                      6144 Omega Street
22                    Riverside, CA  92506
                      (951)334-0529

23

24

25

1

2    **APPEARANCES (CONTINUED):**

3

4    In behalf of Defendant Jessica Medina:

5                    LAW OFFICE OF JOSEPH F. WALSH
                     BY:   JOSEPH F. WALSH
6                    205 South Broadway, Suite 606
                     Los Angeles, CA  90012
7                    (213)627-1793

8

9    In behalf of Defendant Raul Prieto:

10                   CEPHAS LAW FIRM
                     BY:  DANA CEPHAS
11                   72960 Fred Waring Drive
                     Palm Desert, CA  92260
12                   (760)844-2662

13

14   In behalf of Defendant Steven Vega:

15                   LAW OFFICE OF LARRY M. BAKMAN
                     BY:   LARRY M. BAKMAN
16                   1901 Avenue of the Stars, Suite 200
                     Los Angeles, CA  90067
17                   (310)461-1555

18

19   In behalf of Defendant Salvador Gutierrez Martinez:

20                   PEREZ & ASSOCIATES
                     BY:  HECTOR C. PEREZ
21                   3020 Old Ranch Parkway, Suite 300
                     Seal Beach, CA  90740
22                   (562)799-5524

23

24

25

1      **LOS ANGELES, CALIFORNIA; TUESDAY, SEPTEMBER 11, 2012;**

2                              **10:11 A.M.**

3

4           THE CLERK:  Remain seated and come to order.

5    This United States District Court is now in session, the

6    Honorable Otis D. Wright, United States District Judge

7    presiding.

8           Calling Item 1, CR 10-351, United States of

9    America versus Armando Barajas, et al.  Also present are

10   Defendants No. 2, No. 7, No. 9, No. 12, No. 26, No. 27,

11   No. 29, No. 32, and No. 45.

12          Counsel, may I have your appearances, please?

13          MS. EL-AMAMY:  Good morning, Your Honor.  Reema

14   El-Amamy and Michael Dore on behalf of the

15   United States.

16          THE COURT:  Good morning, Counsel.

17          MR. WALSH:  Good morning, Your Honor.  Joseph

18   Walsh appearing with Jessica Medina, who is present in

19   court on bond.

20          MR. DOMNARSKI:  Good morning, Your Honor.

21   William Domnarski with Ms. Maria Lopez.  There's a

22   waiver of the Defendant's presence on bond.

23          THE COURT:  Thank you.

24          MR. CEPHAS:  Good morning, Your Honor.  Dana

25   Cephas for Raul Prieto, who is on bond, and he's in the

1    first row.

2          MR. NAVARRO:  Good morning, Your Honor.  Angel

3    Navarro appearing for Carlos Rivera, who is seated to my

4    right.

5          MR. NISHI:  Good morning, Your Honor.  Thomas

6    Nishi on behalf of Mr. Juan Diaz, who is present in

7    court.

8          MR. MAYOCK:  Good morning, Your Honor.  Michael

9    Mayock present with Mr. Steven Espinoza, who is present

10   in court.

11         THE COURT:  Welcome, sir.  I was in another

12   court in the other building and found out I was in the

13   wrong place.  I apologize.

14         MR. BAKMAN:  Good afternoon, Your Honor.  Larry

15   Bakman appearing for Steven Vega, who is present in

16   court.

17         THE COURT:  Welcome back.

18         MR. BAKMAN:  Thank you, Your Honor.  Good to be

19   back.

20         MR. PEREZ:  Good morning, Your Honor.  Hector

21   Perez appearing for Salvador Gutierrez Martinez, who is

22   present in custody, Your Honor.

23         THE COURT:  Good morning.

24         MR. EISNER:  Good morning, Your Honor.  Alan

25   Eisner representing Juan Gil.  He's present in court.

1              MR. HARRIS:  Good morning, Your Honor.  William

2     Harris on behalf of Armando Barajas.  He's present in

3     custody.

4              THE COURT:  Good morning to you all.  All

5     right.  We're going to have to go through this fairly

6     quickly for a number of reasons, and I think I'm going

7     to be encouraged to take a lot of the future motions

8     under submission.

9              With respect to the motion to sever brought by

10    Moreno and Barajas, Docket Nos. 1569 and 1602, as I

11    indicated when we last met, that motion or those motions

12    and the joinders will be granted.  All I wanted to was

13    for there to be some consideration given through an

14    intelligent way of grouping the remaining cases.  I have

15    received in writing at least the Government's input, but

16    that is all I've received.

17             Does that indicate that there is acquiescence

18    in the Government's grouping.

19             MR. CEPHAS:  No, Your Honor.

20             THE COURT:  Anyone?  All right.  Mr. Cephas.

21             MR. CEPHAS:  Your Honor, I believe -- well,

22    first of all, we received the Government's proposed.

23             THE COURT:  Don't cry.  Just give whether or

24    not you've got another grouping.

25             MR. CEPHAS:  What I was going to say is I need

1    a little more time to consider the -- their proposal

2    because I just got it yesterday afternoon, and I also

3    would like to see the Superseding Indictment so that I

4    know exactly what's there so that I can accurately

5    assess the proposal, and until I see what's in the

6    Superseding Indictment, I believe it would be difficult

7    for any of us to adequately assess the proposal and --

8    and, again, like I said, we just got it yesterday

9    afternoon.  That's all Your Honor.

10           THE COURT:  My understanding is that it is

11    going to remove a number of overt acts.

12           MS. EL-AMAMY:  That is correct, Your Honor.  As

13    the Government indicated, there will be minimal

14    revisions to the Indictment that will remove overt acts,

15    no additional violent crime and overt acts will be

16    included.  There will be an additional charge brought

17    against Defendant Rivera related to his possession of a

18    firearm in furtherance of a drug trafficking crime.

19           THE COURT:  That's the 924 you referenced?

20           MS. EL-AMAMY:  Yes, Your Honor.

21           THE COURT:  Okay.

22           MS. EL-AMAMY:  The Government may also include

23    additional phone counts, Title 21, United States Code,

24    Section 843(b), but it will look substantially similar.

25           THE COURT:  Okay.  Mr. Cephas, does that change

1    your position at all?

2            MR. CEPHAS:  No, Your Honor.  My other, I

3    guess, initial point is I think six people -- my

4    client's in the first proposed grouping of six.  I would

5    propose breaking that six up into two separate groups,

6    and the first grouping would be my client, Mr. Rivera,

7    and Jessica Medina.

8            MR. WALSH:  And, Your Honor, Joseph Walsh for

9    Jessica Medina, that would be my comment also.  I think

10   the divisions proposed by the Government is a little bit

11   heavy on the first trial and light on the second trial,

12   and I think that Mr. Cephas's proposal of severing his

13   client, my client, and Mr. Rivera in a single trial

14   would -- would be an appropriate grouping because all of

15   them are directly related to the investigation

16   surrounding the wiretap of Target Telephone No. 9.

17           THE COURT:  All right.  So is -- is -- is your

18   concern primarily with the numbers?  My concern is

19   primarily with the evidence.  I would like to have those

20   who were going to have to defend common evidence be

21   tried together regardless of the numbers.

22           That was a question to you.

23           MR. CEPHAS:  And, Your Honor, I believe that

24   the common evidence would be with Medina, Rivera, and

25   Prieto.  I think if they try us with those other three,

1    it's just going to result and spillover from those three

2    onto my client, Mr. Rivera, and Ms. Medina that really

3    has no relationship to the allegations in the

4    Indictment.  That is why I think that is a fair

5    proposal.

6            THE COURT:  Okay.

7            MS. EL-AMAMY:  Your Honor, respectfully, the

8    Government disagrees.  What I think the Defendants are

9    trying to do is take an extremely narrow view of this

10   case.  However, the Defendants' participation in this

11   conspiracy is much broader than what's being portrayed

12   in just a limited -- what they'd like to do is just look

13   at August, 2009.  However, Carlos Rivera has been a

14   long-time member of the Black Angles gangs.  During a

15   conversation with at least one narcotics trafficker, he

16   threatened him saying "I'm a Black Angels gang member.

17   His co-conspirator better not be informing to law

18   enforcement on me."  Defendant Prieto owns or lives at

19   the residence where a firearm transaction took place

20   where Carlos Rivera admits in a telephone conversation

21   that he was getting a firearm for the gang at that

22   location because he was on parole.  After

23   Defendant Rivera was arrested, Defendant Medina gets on

24   the phone with one of leaders of the Black Angels gang.

25   Defendant Navarro, then, talks about who might be

1    informing with law enforcement and also talks about the

2    fact that other Black Angels gang members have been

3    arrested.  She takes steps to protect the conspiracy as

4    well as to continue the drag trafficking activity.  I

5    think in this case limiting it to just these three

6    Defendants doesn't serve necessarily any judicial -- any

7    purpose for judicial economy.  The same evidence will be

8    presented at their trial as would be other Black Angel

9    gang members' trials.  Additionally, limiting

10   instructions can be taken to cure any spillover effects

11   if there are any, which the Defendants have not shown,

12   and so the Government maintains that at trial with, you

13   know, Defendant Barajas, Defendant Maria Lopez, and

14   Defendant Prieto and Medina and Rivera would be

15   appropriate.

16           MR. CEPHAS:  Your Honor, could I simply suggest

17   that the Defendants have a chance, perhaps a week, to

18   meet and prepare a written response?

19           THE COURT:  Mr. Cephas, did I not ask you all

20   to do that when we all last met?

21           MR. CEPHAS:  Your Honor --

22           THE COURT:  Yes, I did.

23           MR. CEPHAS:  It was my understanding that the

24   Government was going to give us a proposal that we could

25   respond to.

1          THE COURT:  I didn't -- I didn't say anything

2    about that.  I told you all to get together and work out

3    something that makes sense before we met today.

4          MR. CEPHAS:  And to the extent it was going to

5    be a joint effort, then I would have expected the

6    Government to reach out to the Defendants.  That never

7    happened.  All we -- we just got a proposal dropped on

8    us, Your Honor.

9          THE COURT:  What have you -- what have you all

10   done, the Defendants, separately?  Separate and apart

11   from the Government, what have you all done in deciding

12   among yourselves what is an intelligent grouping?

13         MR. CEPHAS:  Your Honor, we didn't do anything.

14         THE COURT:  Okay.  Good.  Thank you.

15         Well, anyway, like I said, I'm going to grant

16   the motion.  The difficulty that I have, of course, is

17   that I'm not in a position of knowing what evidence is

18   going to be presented.  I'm afraid that information

19   resides with the Government.  The Government knows how

20   it's going to put on its case.  So for now, then, seeing

21   I don't have a really contrary proposal, for now, I'm

22   going to go along with the Government's proposal.

23         All right.  Let's move on, then, to -- I'm not

24   sure of the next in any order, but the motion for an

25   order requiring that the Government provide a witness

```
1   list thirty days before trial.  This is -- I guess this
2   is yours Mr. Cephas, Docket No. 1581.
3           Why do you feel that the Government is
4   obligated to provide you with a witness list?
5           MR. CEPHAS:  Well, first, Your Honor, the
6   Government did -- has agreed to do that but --
7           THE COURT:  Answer my question.
8           MR. CEPHAS:  I believe that we are entitled to
9   it in order to adequately prepare because --
10          THE COURT:  No, no, no.  That means you would
11  like it.  I want to know why you feel that you're
12  entitled to have it.
13          MR. CEPHAS:  I believe that, if my clients are
14  to have a fair trial, that I have to have a witness list
15  prior to trial.  I don't believe --
16          THE COURT:  Why don't you give me your
17  recitation to a rule.
18          MR. CEPHAS:  I am -- I am relying --
19          THE COURT:  Why don't you just simply say there
20  is no rule, there is no requirement that they provide
21  you with a witness list.
22          MR. CEPHAS:  Of course, there's not.  It's in
23  the --
24          THE COURT:  Well, why don't you just say that.
25          MR. CEPHAS:  It's in my motion that the Court
```

 1   has discretion to order it.

 2           THE COURT:  Okay.  Now listen.  Here's the

 3   problem that I have with an earlier order.  I would not

 4   have issued that order requiring the disclosure of

 5   cooperating witnesses.  To the extent that the

 6   Government has already made disclosures, fine.  I'm not

 7   requiring that the Government make any further

 8   disclosures of any kind, non-expert, non-expert

 9   witnesses.  Okay.  So that motion is denied.

10           MR. EISNER:  Your Honor, may I be heard on

11   that?

12           THE COURT:  Yes, go ahead, Mr. Eisner.

13           MR. EISNER:  I do acknowledge that this was a

14   motion that was initially filed by Mr. Cephas and also

15   by Mr. Solis on behalf of Mr. Barajas.

16           THE COURT:  And you didn't file a joinder.

17           MR. EISNER:  I believe I did, Your Honor.

18           THE COURT:  Who's your client?

19           MR. EISNER:  Mr. Gil.

20           THE COURT:  Mr. Gil.  Yes, you did.  1610.

21   Okay.  Go ahead.

22           MR. EISNER:  In the Government's reply, the

23   Government agreed to give a witness list, and I think

24   that that acknowledgement -- first of all, it's a

25   appreciated; second of all, it's an acknowledgement of

1    the length and the breadth and the difficulty of

2    defending a case like this.  We're talking about fifty

3    different people --

4            THE COURT:  Uh-huh.

5            MR. EISNER:  -- who, at various times, are

6    pleading out and whose conduct may or may not be part

7    the evidence in the case.

8            THE COURT:  Uh-huh.

9            MR. EISNER:  We're talking about conduct that

10   spans over a decade or decades.  We're talking about

11   violent conduct.  We're talking about wiretaps.  To have

12   the Defendants go in on day one without some degree

13   of -- of knowing the order of the evidence, really puts

14   them at a handicap because of the unique nature of a

15   RICO case.  Again, we're talking about months or years

16   of wiretaps, and -- and there are so many moving

17   parties.  I just --

18           THE COURT:  How do you -- that was raised --

19   maybe it was raised in your papers.  You wanted really

20   to know the order of the evidence, and I'm wondering how

21   are you going to get that unless the Government decides

22   to give you its playbook.

23           MR. EISNER:  I'm not asking for a playbook,

24   Your Honor.  I'm asking for a witness list, which the

25   Government has already agreed to provide thirty days in

1    advance of trial.

2              THE COURT:  Okay.  Why aren't you happy with

3    that?  Why aren't you happy with whatever the Government

4    gives you?

5              MR. EISNER:  Well, I think there are due

6    process concerns in a case like this that require some

7    orderly disclosure of what the anticipated evidence will

8    be.

9              THE COURT:  Uh-huh.

10             MR. EISNER:  These are -- I asked that

11   Your Honor acknowledge these are unique cases.  It's not

12   every day that you sit in a court among what starts out

13   as fifty but dwindles down to thirteen or so Defendants

14   over the course of two years.

15             Another reason, Your Honor, is because, as you

16   can see from some of our other motions, within the last

17   thirty days -- thirty to forty days, there has been over

18   a thousand pages of new, brand new material provided to

19   the Defendants.  When is that going to come in?  In the

20   beginning or the end?  So I don't want to belabor the

21   point, Your Honor, just to emphasize the Government's

22   already agreed to give a witness list thirty days before

23   trial.  They didn't address the exhibit list issue.

24   I've put in my reply the reasons why an exhibit list, I

25   think, is fair and appropriate.  The Government is

1    silent on that.

2            THE COURT:  No, I do want to talk about that.

3            Ms. El-Amamy, what's wrong with the Government,

4    perhaps, even on a rolling basis, continuing to update

5    it's exhibit list?  I understand that, up until the

6    night before trial, that thing may still be modified,

7    but what's wrong with, as you modify it, perhaps, making

8    it available to Defense Counsel?

9            MS. EL-AMAMY:  Well, Your Honor, typically I

10   don't think that I would have an issue with it.

11   However, the posture of this case has put the Government

12   in a difficult situation.  There have been -- the

13   Government's made its best effort to disclose things

14   early, and when it fails to disclose some of those,

15   what's represented not just to the Court but to

16   Government counsel personally in a barrage of e-mails is

17   overwhelming.

18           THE COURT:  I can imagine, and I need to make

19   it clear -- well, what seems to be happening is the

20   Government is being criticized and basically persecuted

21   for making evidence available, and they continue to make

22   evidence available on an ongoing and rolling basis.  I

23   would think that that would be a good thing, but what

24   the Government, then, is being criticized for is now

25   you've got to look at this evidence and maybe alter

1    your -- your strategy somewhat.  I would think that

2    continuing to make things available as it becomes known

3    to the Government is something that you would desire.

4    So I can understand counsel becoming somewhat frustrated

5    and, perhaps, even take the Government personally when

6    you're called into Court to defend these things, and

7    literally the basis for some of these motions is that so

8    much material seems to be produced.  I think it's a good

9    thing that the material continues to be produced.  So

10   don't use that as an argument in the future.  All right.

11          All right.  Ms. El-Amamy, I'm going to ask you

12   to at least every couple of weeks would you please

13   update your exhibit list.  I understand you'll be adding

14   things.  You may be removing things, but I think it's --

15   it's only -- well, I would appreciate if you would do

16   it.

17          MS. EL-AMAMY:  Yes, Your Honor.

18          THE COURT:  All right.

19          MR. CEPHAS:  Your Honor, could I ask for a

20   clarification?

21          THE COURT:  Yes, and I was about to do that

22   now.  With respect to the witnesses, I am not making an

23   order that the Government produce or identify any

24   additional non-expert witnesses that it has not already

25   identified.  I am frankly concerned about witness

1   safety.

2           With respect to the request for the exhibit

3   list -- you've heard the order -- I'm asking that every

4   couple of weeks that the Government provide Defense

5   Counsel any changes made to the exhibit list.

6           With respect to the motion for discovery of

7   information regarding the legal drug allegations and

8   gang membership --

9           MR. EISNER:  I'm sorry, Your Honor.  Can I ask

10  for a clarification on behalf of Mr. Gil.  You said the

11  non-cooperating witnesses.

12          THE COURT:  No, non-expert.

13          MR. EISNER:  All right.  Are we entitled to a

14  list of any -- I'm sorry, Your Honor.  Which witnesses

15  are we entitled to be disclosed of thirty days before

16  trial?

17          THE COURT:  Entitled to?

18          MR. EISNER:  Well --

19          THE COURT:  Okay.  The Government -- let me do

20  it again.  The Government has already identified and

21  disclosed to you a number of witnesses.  I don't think

22  the Government was required to do that, and I'm not

23  ordering that the Government make any further disclosure

24  of non-expert witnesses because I have two concerns,

25  they're not legally required to do it and I'm also

1    concerned by the safety of these witnesses.  Okay.  Is

2    that clear?

3                MR. EISNER:  Right.  I understand the safety

4    issue with respect to cooperators, but are you also not

5    having them provide a list of law enforcement officers,

6    let's say?

7                THE COURT:  Okay.  Let me put it again.  Other

8    than witnesses already identified by the Government, I'm

9    not ordering that the Government disclose any additional

10   non-expert witnesses, period.

11               MR. EISNER:  Thank you.

12               THE COURT:  Okay.

13               MR. BAKMAN:  Your Honor, if I might.  Before we

14   leave that, the only --

15               THE COURT:  We have left that, Mr. Bakman.

16               MR. BAKMAN:  I'm sorry, Your Honor.

17               THE COURT:  We have left that.

18               MR. BAKMAN:  All right.

19               THE COURT:  All right.  All right.  This is

20   Mr. Prieto's motion, Docket No. 1582.  This is with

21   respect to illegal drug allegations and gang membership.

22   The Government has already indicated that there is no

23   intention to introduce any 404(b) evidence.  So this

24   motion has been rendered moot, and on that basis, it's

25   denied.

1          MR. CEPHAS:  Your Honor.

2          THE COURT:  Yeah.

3          MR. CEPHAS:  It seems to me that the Government

4     has not indicated that it will not admit evidence

5     related to this vague allegation that my client was --

6     was storing drugs.  Could I at least ask the Government

7     to clarify that that's not coming in?

8          THE COURT:  The clarification I got from the

9     Government, or the explanation I got from the

10    Government, this isn't going to be used for 404(b)

11    purposes but to establish elements of the offense.

12         MR. CEPHAS:  Well, Your Honor, the problem I

13    have with preparing a defense for this is they've still

14    not provided me any discovery.  I don't know -- I don't

15    know what types of drugs, when.  I don't know where this

16    drug -- this alleged drug happened.  They won't identify

17    the alleged informant who, perhaps, had -- it's not in

18    the Indictment.  So it's a very difficult -- well, it's

19    impossible for me to prepare unless I get something else

20    if the Court is saying they have carte blanche to bring

21    it in as it's inextricably intertwined, and that's why I

22    don't understand.  If they can bring it in, then I need

23    to have some advance notice of it if I'm going to have a

24    fair trial.  That's -- that's my problem, and right now,

25    I have no advance notice of it other than a vague

1    statement of some drug at some time, and that's just not

2    enough.

3            THE COURT:  That's a different motion.

4            MR. CEPHAS:  Well --

5            THE COURT:  Well, bring that motion.

6            MR. CEPHAS:  I brought that motion, Your Honor.

7            THE COURT:  All right.

8            MR. CEPHAS:  And the Government responded in

9    one of their response.  And a footnote -- they footnoted

10   the vague response.  The cooperating witness did not say

11   kilogram, and the Government recalls conveying

12   information that it was a large quantity, not a

13   kilogram.  That doesn't tell me anything.  I don't know

14   what they're referring to.  I don't know when.  I don't

15   know if this is a year ago, five years ago, ten years

16   ago.  I don't know anything about this.

17           THE COURT:  Have you sent the Government an

18   e-mail asking for clarification on that point?

19           MR. CEPHAS:  Yes, Your Honor.

20           THE COURT:  Okay.  Try it again.  Yes.

21           MS. EL-AMAMY:  Your Honor, that -- that

22   information comes from a cooperating witness.  As in the

23   Government's paper, Defendant Prieto was provided an

24   opportunity to have discovery related to that over a

25   year ago.  He didn't show up at the reverse proffer

1    neither did his counsel.

2              THE COURT:  Okay.

3              MS. EL-AMAMY:  So it's a cooperating witness,

4    which the Court's order is not discoverable.

5              THE COURT:  All right.

6              MR. CEPHAS:  And, Your Honor, to be accurate, I

7    told her my client wasn't coming.  I would show up for

8    the reverse proffer, and she said there was no point in

9    it because it was for him.

10             THE COURT:  Okay.

11             MR. CEPHAS:  I was there for the discovery.

12   She did not want to give it to me.  So to say that

13   they've been offering it, that's not true.

14             THE COURT:  This is not for your benefit.  It's

15   for your client's benefit.  If your client's not

16   interested, your client's not interested.

17             Okay.  Let's move on.

18             So 1582 is denied.

19             Next, the motion to preclude the Government's

20   use of evidence produced after April 30th of 2012.  This

21   is also yours, sir.  This is Docket No. 1632.  What

22   troubles me about this one is the failure to initiating

23   a meet and confer to attempt to resolve this -- this

24   discovery issue without the need for judicial

25   intervention.

1          MR. CEPHAS:  And, Your Honor, I e-mailed

2    Ms. El-Amamy all the time.  When she wants to responds,

3    she responds.  When she doesn't, she doesn't respond.  I

4    e-mailed her.  She didn't respond.  I filed the motion

5    as I indicated.

6          THE COURT:  You did.  You did.  I understand.

7    I read it.  You sent her an e-mail 7:00 P.M., and I

8    guess you didn't get a response after 7:00 P.M., and the

9    next morning you filed a motion.  Right.  Okay.  I don't

10   consider that a good faith attempt to meet and confer in

11   an effort to resolve the motion without bringing it to

12   court.  On that basis alone, your motion is denied.

13         Lastly --

14         MR. EISNER:  Excuse me, Your Honor.  I did join

15   in that, and I did want to be heard.

16         THE COURT:  Yes, you did, you joined in it, and

17   so you ride that, and you're subjected to that unless

18   you can tell me that you had a separate meet and confer

19   with the Government on this.  Did you?  Did you?  Yes or

20   no?

21         MR. EISNER:  I did not, Your Honor.

22         THE COURT:  All right.  Then you counted on

23   Mr. Cephas to do that.  You just simply joined his

24   motion.  He didn't do what was necessary in order to

25   really bring that thing to the Court's attention.  You

1    don't send something, a letter or an e-mail at

2    7:00 P.M., not get a response, and then file your motion

3    the next morning.

4          MR. EISNER:  Can I clarify, Your Honor.

5    Perhaps, it's my mistake.  I thought that you were

6    addressing the preclusion of evidence that was tendered

7    after the April 30th date.

8          THE COURT:  That's right.  The entire motion.

9          MR. EISNER:  All right.  I -- I -- that

10   April 30th date occurred months ago, and our motion --

11   or Mr. Cephas's motion and my joinder is to hopefully

12   respectfully call Your Honor's attention to the length

13   and the breadth of discovery that we've seen since

14   April 30th and --

15         THE COURT:  Didn't I just finish telling you

16   that I think it's a good thing that the Government

17   continues to unearth documents and provide you with that

18   discovery?

19         MR. EISNER:  Not if it violates the previous

20   Court's order about that discovery.

21         THE COURT:  No.  I think there's a bigger

22   violation when the Government fails to produce and to

23   turn over to Defense Counsel relevant, perhaps,

24   exculpatory evidence.  I think that's a bigger crime

25   than worrying whether or not it violates Judge Yuen's

1    order.  Okay.  All right.  Listen.  I've ruled.  Let's

2    move on.  I've got a lot of things to do this morning.

3              MR. HARRIS:  Your Honor, just briefly, may I be

4    heard on 1632.

5              THE COURT:  Yes.

6              MR. HARRIS:  I would ask the Court, in light of

7    your ruling, that this be denied without prejudice so

8    that we can do the meet and confer.

9              THE COURT:  Yes, done.

10             MR. HARRIS:  Thank you.

11             THE COURT:  Done.  Denied without prejudice.

12             All right.  Let's go to the motion to suppress

13   the wiretap evidence from Target Telephone No. 9.

14             MR. WALSH:  Yes, Your Honor.  Joseph Walsh for

15   Jessica Medina, and I was going to reserve part of my

16   time for Mr. Cephas to argue also since he joined in it

17   and he has provided the Court with some extensive

18   briefing on the subject.

19             THE COURT:  One second.  This is Docket

20   No. 1590.  Okay.

21             Go ahead, sir.  My understanding now is that

22   the real thrust is, well, lack of necessity, and I

23   believe you also raised the argument that one of the

24   individuals named did not appear on the DOJ

25   authorization letter.

1          MR. WALSH:  Yes, Your Honor.  I'll submit that

2    second argument and focus just on the necessity.  I

3    think that the necessity issue is the main issue on the

4    wiretap.

5          THE COURT:  You understand, when I read these

6    things, then the balance of your argument is -- is

7    shaded by everything you've said, and I'm thinking to

8    myself, if you would raise that kind of frivolous

9    argument, then what's the rest of this?  But go ahead.

10          MR. WALSH:  Well, I didn't think it was a

11    frivolous argument, Your Honor.

12          THE COURT:  Really.  This is a wiretap.

13    Authorization is for what?  Locations, for -- for tele

14    communications, for facilities, and your objection is

15    that this individual's name was -- it's not even your

16    client -- that this individual's name wasn't mentioned

17    and the authorization letter from the Department of

18    Justice.

19          Okay.  Go ahead.

20          MR. WALSH:  All right.  Well, I'll proceed,

21    then, to the necessity issue because I think that's the

22    stronger argument.

23          THE COURT:  Yes, it is.

24          MR. WALSH:  And the main argument in the motion

25    and the basis of the argument that I think the

1  Government has overlooked in their response is that this

2  is a spin-off wiretap on Telephone No. 9 based upon an

3  earlier investigation of David Navarro in Target

4  Telephone No. 5.

5           THE COURT:  Okay.

6           MR. WALSH:  And to obtain a wiretap on a

7  spin-off, they have to conduct a necessity investigation

8  directed to the person who's using the spin-off

9  telephone.  In this case it would have been Carlos

10 Rivera, and my client has standing in this motion

11 because, once Target Telephone No. 9 was wiretapped, my

12 client was overheard and intercepted on the telephone.

13          THE COURT:  And we do have your client's signed

14 Declaration at best.

15          MR. WALSH:  Yes.  And necessity requires that

16 other investigative procedures have been tried and

17 failed or appear to be unlikely to succeed if tried or

18 to be too dangerous, and then the Ninth Circuit case in

19 *United States vs. Gonzalez, Inc.*, makes two very

20 important points, and that is that each application for

21 a new phone, a spin-off phone, must have the necessity

22 requirement established as to that suspect and that

23 phone, and the Government -- and the second principle is

24 that the Government cannot transfer the necessity from

25 one application to another even -- even though this is

1    the same investigation, and in this case, the wiretap

2    application for Target Telephone No. 9, which was the

3    Carlos Rivera, has too little information to establish

4    necessity for that telephone.  Essentially, what I

5    argued in my papers was that the agents conducted one

6    day of surveillance and examined three days of telephone

7    records, but in reviewing the application, it doesn't

8    even appear that the one day of surveillance was even

9    targeted towards Carlos Rivera.  This was a surveillance

10   that was conducted of David Navarro, who was the person

11   on Target Telephone No. 5, and it through that one day

12   of surveillance of David Navarro that they saw a second

13   suspect, and they later identified him as Carlos Rivera.

14   So I may have conceded too much that there was a

15   necessity investigation surveilling Carlos Rivera

16   because that wasn't the purpose of the investigation.

17   He just happened to be there as a happenstance during

18   the course of their targeting David Navarro for

19   surveillance on that day, and then once they identified

20   Carlos Rivera as the person that they -- they saw

21   talking to David Navarro, then they examined three weeks

22   of toll records on his telephone, Target Telephone No.

23   9, and that's not really three weeks worth of a

24   necessity investigation.  It's really an investigation

25   that took, perhaps, maybe one hour.  They examined the

 1    records, and they -- and they looked at who he was

 2    calling and who was calling him over a three-day -- over

 3    a three-week period, and that was the end of it.  And

 4    then from the e-mail exchange of the -- between the

 5    Government Counsel and Mr. Cephas, it turns out that the

 6    actual date on which the wiretap application for Target

 7    Telephone No. 9 was submitted by the Government in its

 8    99 percent finished form to the Department of Justice in

 9    order to get the DOJ authorization that was done on

10    July 8th, which was only five days after they identified

11    Carlos Rivera from this -- from this happenstance and

12    locating him talking to David Navarro on the one day of

13    surveillance, and it was only one day after they had

14    examined his telephone records for a three-week period

15    to see who -- who was -- who Carlos Rivera was calling

16    and who was calling him.  And so -- and then so that's

17    clearly insufficient based upon the case law of the

18    Ninth Circuit, and then added to that is in the

19    application, we not only have a lack of any traditional

20    investigation conducted towards Carlos Rivera, but we

21    have in one of the areas of the wiretap application

22    where they're trying to explain that further

23    investigations could not be conducted in this case

24    concerning trash searches, the agent falsely states that

25    he could not conduct a trash search of the user of

1    Target Telephone No. 9 because law enforcement doesn't

2    know his residence.  Now, in the Government's response,

3    they -- they admit that that's a false statement from

4    what the affiant states this his Declaration, that he

5    failed to update it, and I pointed out in the reply that

6    a failure to update a wiretap application is the same

7    thing as saying that it was a cut and paste of a prior

8    application to put in the application for the spin-off

9    wiretap, and that's the type of conduct that was

10   criticized by the Ninth Circuit in *United States vs.*

11   *Blackman*.  They said that, when you cut and paste

12   earlier wiretap applications on the issue of necessity

13   and then you incorporate them on the subsequent

14   application, it leads to the inclusion of misstatements

15   and false statements and material omissions, which is

16   what has occurred in this case.

17            And so, essentially, the cases that we're

18   relying on is *United States vs. Gonzalez, Inc.*, and

19   that's the case of the wiretap investigation where there

20   was six months of a traditional investigation of a bus

21   company in -- in the state of Arizona, and then they got

22   a wiretap on the offices in two cities in Arizona of

23   this bus company, and during the course of this wiretap

24   investigation, they learned that there was further

25   investigation needed to be done of the owner of the

 1    company who had an office in Los Angeles.  And the

 2    Ninth Circuit held that, just conducting a very brief

 3    investigation -- let's see.  I think -- the

 4    Ninth Circuit said that the -- the wiretap tradition --

 5    or the traditional investigation conducted at the

 6    Los Angeles office consisted of collecting five days of

 7    pen registers on the office, five days of trap and

 8    trace.  In other words, they were just analyzing who

 9    this person was calling over a five-day period, and

10    there was limited surveillance.  The Court wasn't clear

11    as to how many days, but the impression was it was one

12    or two days of surveillance of the Los Angeles office,

13    and then there was a preliminary discussion of whether

14    there was a possibility of introducing an undercover

15    agent, which they decided not to do, and the

16    Ninth Circuit clearly held that, as a matter of law on

17    those facts, that this was an insufficient traditional

18    investigation, and so necessity was not shown as a

19    matter of law to allow for the wiretap on the offices in

20    Los Angeles, and I think this case falls clearly within

21    *Gonzalez*, and it also falls clearly within the holding

22    of *United States vs. Carneiro*, and in the *Carneiro* case,

23    it was a similar situation involving a drug conspiracy,

24    and the original investigation was towards a suspect by

25    the name of McNeil, and before obtaining a wiretap on

1    McNeil, they conducted their normal traditional

2    investigation of McNeil.  They obtained the wiretap, and

3    then during the course of listening into the wiretap of

4    Mr. McNeil, they overheard two additional suspects,

5    Mr. Hardy and Mr. Boyd, but did not conduct further

6    traditional investigations of Hardy and Boyd before

7    obtaining a wiretap order for -- for those two

8    individuals, and the Ninth Circuit held that the

9    wiretaps on Hardy and Boyd, that the spin-off wiretap

10   applications were in violation of Title 3 because there

11   was in traditional investigation conducted of Hardy and

12   Boyd, and the Court held there must be a showing of

13   necessity with respect to each telephone and

14   conspirator, and there wasn't.  That wasn't done in

15   *Carneiro*, and the Ninth Circuit suppressed the evidence,

16   and I think what these cases basically show or hold is

17   that they have ordered suppression of wiretap evidence

18   in cases of spin-off wiretaps where the Government fails

19   traditional investigation of the person using the

20   spin-off telephone, and I think, under the facts of this

21   case, we not only have the insufficiency of the agents

22   doing -- doing nothing more, once identifying Carlos

23   Rivera, other than reviewing three weeks of his

24   telephone records, and -- and then immediately

25   thereafter, one day later, applying for a wiretap.  And

```
 1     in the course of applying for that wiretap, they make
 2     this false representation within the necessity
 3     application concerning trash searches where they falsely
 4     represent, well, we can't do a trash search of the user
 5     of Target Telephone No. 9 because we don't know his --
 6     his address.  And, in fact, the --
 7              THE COURT:  I have a question.  Tell me about
 8     the trash search.  Do you have any estimate of how
 9     valuable a trash search would be in this type of case?
10              MR. WALSH:  Well, every case is different.
11              THE COURT:  This kind of case.
12              MR. WALSH:  Well, sometimes you're able to
13     locate co-conspirators, you're able to locate drug
14     pay-and-owes that have been discarded, you're able to
15     locate packing material from drugs when the drugs are
16     taken out of the packing material and thrown out.
17     There's a possibility of locating the names and
18     addresses of co-conspirators that may have been on -- on
19     notation papers and thrown into the trash, but that --
20     but the point of our argument is that the wiretap
21     application in good faith has to truthfully set forth
22     the reasons in the -- in the four corners of the
23     application as to why trash searches would not be useful
24     in this particular case, and they didn't do that here.
25     What they did was they give a paragraph that was
```

1    completely false as to the reason they can't conduct a

2    trash search, and the inclusion of that false statement,

3    I think, taints -- taints the warrant and puts it on a

4    different class of case than merely reviewing the

5    decision to grant or deny a wiretap under an abuse of

6    discretion standard.  When you have the inclusion of a

7    false statement, then the -- the Court has to basically

8    use de novo review and grant the motion to suppress if

9    it's possible that the motion would have been denied by

10   the -- by the magistrate if the -- if the false

11   statement didn't appear in the -- in the warrant

12   application, but we're not relying entirely on that.

13   We're relying mainly on the language in *United States*

14   *vs. Gonzalez, Inc.*, where they -- they reviewed five

15   days of trap and trace, a couple of days of

16   surveillance, and merely discussing the possibility of

17   having an undercover agent as being insufficient

18   traditional investigation as a matter of law, and I

19   think that the amount of traditional investigation

20   concerning Target Telephone No. 9 and Carlos Rivera in

21   this case is even less than in the *Gonzalez, Inc.* case

22   and would require the Court to grant the motion to

23   suppress the evidence.

24           THE COURT:  Okay.  All right.  Thank you,

25   Counsel.

```
 1            MR. WALSH:  And I think Mr. Cephas wanted to
 2    make a brief argument.
 3            THE COURT:  Mr. Cephas, quickly please.
 4            MR. CEPHAS:  Thank you, Your Honor.  First,
 5    with respect to the DOJ authorization, although the
 6    Court has indicated it's a frivolous argument, I don't
 7    believe it is, and the reason I don't believe it is is
 8    because 18, U.S.C., 25-18-1 says that each application
 9    for an order authorizing or approving the interception
10    of a wire shall -- shall include the following
11    information:  The identity the person if known
12    committing the offense and who's communications are to
13    be intercepted.  Here, they --
14            THE COURT:  Which application?  We're not
15    talking about the application.  We're talking about the
16    DOJ authorization letter.
17            MR. CEPHAS:  That is right, Your Honor.  And
18    the cases and interpreting it have all concluded that
19    the DOJ authorization letter is part of the application,
20    and cases have also said that, if the DOJ did not
21    authorize an individual, then the application fails.
22    This is a case where the evidence suggests the DOJ had
23    no notice.  The Government has had an opportunity to
24    prove, otherwise, that the Government -- that the DOJ
25    had notice.  There is none.  Nothing was presented to
```

1     the reviewing judge showing that DOJ was ever told that

2     they knew the phone was going to be used -- was used by

3     Carlos Rivera; therefore, the application should never

4     have been authorized with respect to Rivera.

5          Moving on to the necessity, 25-18,

6     Subsection C, states that, in order to show necessity,

7     there has to be a full and complete statement as to

8     whether or not investigative procedures have been tried

9     and failed or why they reasonably appear to be unlikely

10    to succeed if tried or to be too dangerous.  The

11    Government cited those three prongs in their opposition;

12    one, have been tried and failed; two, reasonable

13    appeared to be unlikely to succeed if tried; or, three,

14    were too dangerous to attempt, and they cited *Gonzalez*

15    for that.  Nowhere in the application do they say it's

16    too dangerous.  Nowhere in the application do they

17    demonstrate that they tried and failed, and nowhere in

18    the affidavit or application have they pointed out that

19    these traditional methods would be reasonably unlikely

20    to succeed if tried.  All that the agents said over and

21    over again is, well, we've had some success at this.

22    We've had some success at that.  We've had some success

23    at the other things, but it would be so much better if

24    we had a wiretap.  So what they were doing was,

25    actually, successful, but they were given a wiretap

1    based on the claim that it would be even better if we

2    had a wiretap.  Well, that goes without saying in any

3    case.  Their -- their affidavit -- and even their

4    opposition fails to demonstrate any of those three

5    prongs, and for that reason, the wiretap should have

6    never been granted and it should be suppressed.

7            Thank you, Your Honor.

8            THE COURT:  Thank you, sir.

9            Ms. El-Amamy.

10           MS. EL-AMAMY:  Yes, Your Honor, starting first

11   with necessity, I think the Defendants' argument needs

12   to be examined first from a factual basis.  What they

13   would like the Court to believe is the Government's

14   investigation of Carlos Rivera began on a date that he

15   was identified.  However, in the affidavit, at

16   USA 000593, at least by May 16th, 2009, although Carlos

17   Rivera was not identified, he was identified as a person

18   who was relevant to the investigation.  The first of his

19   calls listed in the affidavit was May 16th, 2009, then

20   May 26th 2009, June 26th, 2009, and then a call on

21   July 8th, 2009.  Prior to July 3rd, 2009, he was not

22   identified by the affiant.  However, the affidavit lists

23   surveillances that took place on June 23rd, 2009,

24   targeting the gang; June 24th, 2009, targeting the gang;

25   and again June 25th, 2009, targeting the gang.  The

1    prior affidavit, which is incorporates by reference at

2    USA 000450, also lists a surveillance on May 24th, 2009,

3    which targets the gang.  So it's not accurate to say

4    that we just learned of Carlos Rivera on July 3rd, 2009,

5    and submitted his affidavit to the -- to DOJ.  That's

6    not what happened in this case, and that's what the

7    Defendants are basing their argument on.

8            Now, even with all these instances of

9    surveillance, law enforcement were not able to identify

10   Carlos Rivera until July 3rd, 2009.  What the Defendants

11   are arguing is that somehow there was some investigative

12   technique, and they've conceded that there were no

13   confidential sources, there were no witnesses who were

14   prepared to testify before the Grand Jury.  They failed

15   to acknowledge that the Government did conduct a check

16   to see if there were any jail calls to Target

17   Telephone 9 prior to submitting the affidavit.  That

18   didn't assist in the investigation.  Surveillance

19   activities, while, perhaps, after he was identified,

20   would have tracked this Defendant, it does not indicate

21   how it would identify his co-conspirators, including

22   Defendant Medina and Defendant Prieto, who were not

23   identified as being co-conspirators until after the

24   phone was being intercepted.

25            What they're claiming is that in this case a

1    trash search, a pen register, and GPS and a parole

2    search would have been useful in assisting in the

3    investigation.  In this affidavit, as well as in the

4    previous affidavits which are incorporated by reference,

5    the affiant set out a trash search would not be

6    useful -- would likely not be useful to the

7    investigation.  That's in the four corners of the

8    affidavit.  A parole search at some unidentified time

9    who, perhaps, Carlos Rivera, would have had materials at

10   his home.  Perhaps, he wouldn't at that date and time.

11   It, certainly, wouldn't help law enforcement officers

12   identify his source of supply or Defendant Medina

13   Defendant Prieto's role in the conspiracy.

14        GPS, again, would be useful, perhaps, in

15   assisting law enforcement officers to learn about where

16   Carlos Rivera was located at a particular time.

17   However, we wouldn't be able to know what he was doing

18   at a particular time, whether or not that meeting was

19   useful to send law enforcement resources there; and,

20   again, law enforcement officers would not be able to

21   learn about the co-conspirators' role including

22   defendant Medina and Defendant Rivera.

23        Now, the Defendants argue, too, that the

24   Government's made no showing that it was too dangerous

25   to employ law enforcement resources.  However, the very

1    nature of the calls that are listed in the affidavit

2    display on its face why it's dangerous to conduct law

3    enforcement activities.  For example, in one call, this

4    Defendant and his co-conspirator are discussing getting

5    a gun.  In another call, they're discussing in quotes

6    "fucking with law enforcement," who is behind Carlos

7    Rivera.  In another call, Carlos Rivera is talking about

8    getting at an individual, a female individual who owes

9    money to a co-conspirator.  The very nature of the

10   Government's affidavit demonstrates dangerousness.

11          It's also just simply not true --

12   Defendant Prieto has argued that the Government

13   somehow -- the Department of Justice was not aware that

14   Carlos Rivera was the user of the phone.  The

15   application, affidavit, and proposed order were all

16   submitted to the Department of Justice.  All those

17   clearly state that Defendant Carlos Rivera was a primary

18   user of the telephone.  It just makes no sense that now

19   the Department of Justice wouldn't be aware of who the

20   primary user of the telephone is.

21          This is not a spin-off wiretap application.

22   The Defendants would like to tie this to *Blackman*, which

23   was essentially related to a different investigation,

24   and the Government took great lengths in its opposition

25   to distinguish *Blackman* from this under case.

1          Although the Defendants throw out various

2     investigative techniques, none of them and the

3     Government submits it isn't aware either how those

4     investigative techniques would have furthered the goals

5     of the investigation, which is not just targeted to

6     Carlos Rivera as the Defendants would like the Court to

7     believe but was targeted to him and members of his

8     conspiracy.

9          THE COURT:  I know.  I -- actually, I think

10    *Blackman* probably helps you for reasons that are

11    irrelevant.  I'm familiar with the Jordon Downs Housing

12    Project.  I cannot imagine police conducting some sort

13    of covert investigation in there.  I think a great deal

14    of deference or at least some deference needs to be

15    accorded to law enforcement when they make an assessment

16    as to what will or will not probably work or what will

17    or will not probably be very dangerous.

18          Yes, Mr. Cephas.

19          MR. CEPHAS:  Your Honor, there has to be some

20    deference to law enforcement when they say something,

21    but they didn't say anything here.  They didn't say

22    surveillance wouldn't work.  In fact, as I pointed out,

23    they surveilled Navarro, and that's how they found out

24    who Rivera was by surveilling Navarro.  Ms. El-Amamy

25    claimed surveillance wouldn't have done anything.  Well,

```
1    if they had surveilled Rivera, he would have -- he would

2    have shown them Mr. Prieto because he goes to Prieto's

3    house a lot, and they know that, and so surveillance

4    would have worked.  Surveillance of Mr. Rivera would

5    have revealed his girlfriend, Jessica Medina, because

6    she's his girlfriend.  So to say that surveillance

7    wouldn't have led to co-conspirators is just flat wrong

8    and disproven by the evidence, and it's another one of

9    the conclusory statements that has no case-specific

10   facts.

11          THE COURT:  All right.  Mr. Cephas, I'm going

12   to -- what I'm going to do is go back and read it again

13   based on your representation that it's just not there.

14   Okay.

15          MR. WALSH:  Your Honor.

16          THE COURT:  Even considering the fact that some

17   of your earlier representations to the Court have not

18   been totally accurate.

19          MR. CEPHAS:  Well, Your Honor --

20          THE COURT:  Why don't you just sit down.

21          Yes, sir.

22          MR. WALSH:  May I make a brief response?  Much

23   of the references that the Government was making to the

24   wiretap applications strike me as gathering information

25   on the issue of probable cause, and I think the Court
```

1    has to make a distinction between the necessity

2    investigation and investigation developing probable

3    cause because you can gather a lot of probable cause in

4    listening to the earlier wiretap Target Telephone No. 5,

5    and you can hear Mr. Rivera calling and making

6    conversations, drug-related conversations over the

7    telephone, but that's not a necessity investigation.

8            THE COURT:  I understand that, and I want to

9    take a look at -- at the affidavit with an eye towards

10   whether or not it's established all of those prongs that

11   are required.  So I want to take a look at that.  Okay.

12           MR. WALSH:  And you're focusing only on the

13   necessity.

14           THE COURT:  On necessity only.  Okay.  All

15   right.

16           You're on your feet.

17           MR. CEPHAS:  Your Honor, I thought we were done

18   with this --

19           THE COURT:  We are.

20           MR. CEPHAS:  -- and I wanted to raise a

21   separate issue.

22           THE COURT:  Okay.  We are done.

23           MR. CEPHAS:  Thank you.  The issue is related

24   to expert witnesses, and it -- it's sort of part of what

25   was addressed in the motion to preclude, but it was --

1  it was raised anew by the status conference report that

2  we received yesterday, and then last night, I received

3  expert notice of a new government expert.

4          THE COURT:  Okay.  What's -- what's your

5  concern because you have to understand that this is

6  inevitable?  If you make someone disclose your witnesses

7  a year in advance, there's going to be changes.  You

8  understand that?

9          MR. CEPHAS:  I understand that, Your Honor, and

10  I also understand that, when you give me an order or the

11  Court gives me an order, I'm going to assume I have to

12  follow it.

13          THE COURT:  I read all of that.  Don't do it

14  again.  Okay.

15          MR. CEPHAS:  Well, Your Honor --

16          THE COURT:  You're going to do it, aren't you?

17          MR. CEPHAS:  No, I'm not.  I'm not.

18          THE COURT:  I read your papers.

19          MR. CEPHAS:  Okay.  What I'm going to address

20  is what happened last night, an exchange last night

21  where -- and what you didn't read in my papers hasn't

22  been presented because I didn't know they were going

23  to -- they were going to present an expert witness in

24  their status conference report and then in the notice

25  last night.  Two weeks ago, we got an e-mail saying

1    that, because they're past the expert deadline

2    destination, they were going to move ex parte to seek

3    the Court's permission to designate an expert.  I then

4    sent an e-mail back saying that I didn't believe an

5    ex parte was justified.  Please do it by noticed motion.

6    I got no response.  Then the status conference report

7    yesterday was filed saying we intend to designate

8    another expert.

9            THE COURT:  Is this the gang expert?

10           MR. CEPHAS:  No this is a drug expert.

11           THE COURT:  Drug expert.  Okay.

12           MR. CEPHAS:  And the problem that happened with

13   the gang expert is the gang expert was designated on

14   time, February 9th, I believe was the date, but there

15   was no meat to it.  There were no opinions.  There's

16   were no bases for the opinions.  There were none of the

17   facts that were required.  And over the next four

18   months, we spent thousands and thousands of dollars of

19   CJA money trying to get the Government to flesh out

20   information on -- on the expert, to try to get the

21   opinions, we never did, and then finally on June 15th,

22   the Government said never mind.  So yesterday, we got an

23   expert designation, same thing, even though we have been

24   through all this before, it's got no -- it's got no

25   opinions.  It just lists topics.  It's not an expert

```
 1      designation.  We're now going to have to go through the

 2      same fight and spend thousands more dollars of CJA money

 3      because they didn't designate an expert on time, a drug

 4      expert who works for the Government who could have been

 5      designated at any time, and instead now we're going to

 6      have to start this fight all over again.  And it should

 7      have been done by noticed motion so that we could have

 8      responded to it, and instead the Government sends me an

 9      e-mail last night saying, well, if you intend to

10      challenge this, let me know if you're going to do it by

11      ex parte or noticed motion because they don't have to

12      file the Court's -- follow the Court's rules apparently,

13      and I do, and I don't think it's appropriate.  I think

14      that they should not be allowed to designate a drug

15      expert at this time and, especially, in light of the way

16      they failed to designate properly months ago, costing us

17      thousands of dollars unnecessarily.

18              THE COURT:  What are you asking for?

19              MR. CEPHAS:  Well, my --

20              THE COURT:  Since we're talking about following

21      the rules, what are you asking for because I don't have

22      any paper in front of me?

23              MR. CEPHAS:  Well, you have the Government's

24      status report --

25              THE COURT:  Yes, I do.
```

```
 1            MR. CEPHAS:  -- which indicates that they are
 2    going to designate an expert.  I would like the Court to
 3    rule that they cannot designate any more experts.
 4    There's no basis for a designation at this point.  It
 5    was the relief that I requested in the motion that you
 6    earlier denied, but you denied it on -- because you
 7    think getting more is better.  Well, I agree getting
 8    more is better, too, but I have a history in this
 9    district that Prosecutors always give us more on the eve
10    of trial and not because it's better but because it's
11    better for them to wait until the last minute, and I
12    understand that.  I would like to wait until the last
13    minute and sandbag them if I had the ability to do that
14    as well, but it's not fair.  The order was set.  There
15    was no basis and to slip it in the back door through a
16    status conference report and then put the burden on the
17    Defendants to enforce a prior order is unfair.
18            THE COURT:  All right.  I'm -- I'm curious.  I
19    understand a replacement expert but a drug expert?
20            MS. EL-AMAMY:  Correct.  Well, this isn't --
21    this isn't a replacement expert.
22            THE COURT:  Right.  That's what troubles me.
23            MS. EL-AMAMY:  Right.  What happened was the
24    way this case was -- the Defendants were interested in
25    knowing what the gang expert was going to be so that
```

1    they could challenge whatever opinions he or she may

2    offer.  The Government had no idea a year in advance of

3    trial whether or not it was going to call a gang expert.

4    However, setting the expert notice deadline was set so

5    far that that could be litigated.  The Government sent

6    out an expert notice at the deadline because it was

7    forced to make a decision at that time.

8              THE COURT:  Uh-huh.

9              MS. EL-AMAMY:  It realized because it

10   investigated it more after the deadline had passed, but

11   because the deadline was so early that it really wasn't

12   going to be helpful to the case, that everybody wasted a

13   bunch of time designating an expert that it wasn't going

14   to call and then people investigating it and then not

15   calling the expert.

16             The narcotics expert is just a basic narcotics

17   expert that is called in any type of drug non-complex

18   trial.

19             THE COURT:  Uh-huh.

20             MS. EL-AMAMY:  It doesn't replace anybody, and

21   it is -- and it is a late disclosure if that is

22   troubling to the Court.

23             THE COURT:  Well, and that's what's troubling

24   to Mr. Cephas.

25             MS. EL-AMAMY:  Right.

```
 1              THE COURT:  And in this particular case --
 2    well, I would imagine everyone knew that a drug expert
 3    was going to be called, but I guess Mr. Cephas's point
 4    is he didn't know what this expert's going to testify to
 5    and I don't know the nature of his expertise.  I don't
 6    know if he's a chemist or not.
 7              MS. EL-AMAMY:  He's -- he's.
 8              THE COURT:  Is he going to talk about street
 9    sales and that sort of thing?
10              MS. EL-AMAMY:  He's not, Your Honor.  Mr. Dore,
11    actually, drafted the expert notice, which was very
12    lengthy.
13              MR. DORE:  May I address that briefly,
14    Your Honor?
15              THE COURT:  Yes.
16              MR. DORE:  Your Honor, I can give the Court a
17    copy.
18              THE COURT:  Please.  If we're not going to
19    follow the rules, let's not really follow them.
20                   (Brief interruption.)
21              THE COURT:  Okay.
22              MR. DORE:  Your Honor, that expert notice you
23    have was provided by the Government to Defense Counsel
24    last night.  It was two experts, one of which is DEA
25    Special Agent (Phonetic) Steve Harris, and the other,
```

1   which is a Spanish linguist specialist, (Phonetic)

2   Mr. Jesus Dimas.  The form of the notice was modeled off

3   of a notice provided to Defense Counsel in a separate

4   case, which was upheld by Judge Feess in an order in a

5   case, *United States vs. Albero Vargas*, CR 11-50.  I have

6   copies of that case if Your Honor -- that order, rather,

7   if Your Honor would be interested in seeing it.  In that

8   order -- may I approach, Your Honor?

9          THE COURT:  No, I don't need that.  I don't

10  need that.  I've looked at what you've submitted.  I've

11  never seen this format before, but I was looking at the

12  content, and I'll find out in a moment why Mr. Cephas --

13  in fact, let's find out now.

14         What is your complaint with respect to this

15  when he gives you the categories that this expert

16  intends to testify regarding the --

17         MR. CEPHAS:  Your Honor, my complaint is

18  Rule 16 doesn't require the Government disclosure to

19  show categories and topics.  It requires the Government

20  disclosure to identify opinions.  And there are no

21  opinions in here.  For example, it claims that he's

22  going to take about the use of code words.  Well, I can

23  also cite to several judges in this district who have

24  issued orders saying that the agent has to identify the

25  code words and his opinion as to what those code words

1    are.  And if the expert is going to get on the stand and

2    say this is what that word means, that's an opinion.

3             THE COURT:  Uh-huh.

4             MR. CEPHAS:  And I need that opinion.  I might

5    agree with it; I might disagree with it.

6             THE COURT:  Okay.

7             MR. CEPHAS:  I might need an expert -- a

8    rebuttal expert to say he's dead wrong, and -- and we

9    don't get that.

10            THE COURT:  Okay.  No.  No, that's fine.

11            MR. CEPHAS:  Well --

12            THE COURT:  Anything else?

13            MR. CEPHAS:  Well, throughout the entire

14   designation, that's all we get is topics.  These are the

15   topics that he's going to testify to, and I agree --

16            THE COURT:  Okay.  Here's what I want you to

17   do.  Not that this is a noticed motion that we're

18   dealing with, but what I would like you to do and since

19   everyone's here maybe this would be productive.  I would

20   like you to, without a lot of hyperbole and chest

21   thumping, just please send a short and concise request

22   to Mr. Dore and tell him just what you just said now

23   with respect to the opinions that you would like.

24            And then, Mr. Dore, I would then like you to

25   respond and tell him that that's what -- I don't know.

1    Mechalina, what it really means is half a pound of meth.

2    All right.  Just can you do that?  Do you understand

3    what I'm saying?

4         MR. DORE:  I understand what you're saying.

5    The only question I have is in regards to time.  We,

6    certainly, have different Defendants who are in or going

7    to be out of the case.  At this point, the Government is

8    marshalling its resources to determine exactly what

9    exhibits would be used, what transcripts would be used,

10    and for us to specify exactly -- exact interpretations

11    as to exact terms, in effect, is a determination of what

12    exhibits would be used at trial.

13         THE COURT:  True.

14         MR. DORE:  And so rather than simply having an

15    over-inclusive list would be construed as a dump on

16    Defense Counsel because that, in fact, was not

17    inherently used at trial, the Government would need time

18    to determine that level of specificity if it was

19    required by the Court.  Now, certainly, the Government

20    doesn't oppose providing that to Defense Counsel to the

21    extent the Court thinks it's necessary and warranted,

22    but to do it in the immediate term, at this point, would

23    simply just not be that practical.

24         THE COURT:  I don't -- I don't think Mr. Cephas

25    is asking for it right now.  He just needs it in advance

1    of trial.

2          Now, Mr. Cephas, do you need this in order to

3    make a determination as to whether or not you're going

4    to hire your own expert to say that, no, that is not

5    what this word means in that context?

6          MR. CEPHAS:  Correct.

7          THE COURT:  Why don't you go ahead and hire

8    your expert.

9          MR. CEPHAS:  Well, Your Honor, I will seek CJA

10   authorization to do it.

11         THE COURT:  Okay.

12         MR. CEPHAS:  But also I need to know what their

13   opinions are so that I may challenge some of the

14   designation as being non-expert testimony.

15         THE COURT:  You're there.  All right.  We're

16   talking about timing now.  That's what I'm talking

17   about, is get your expert on board, and my question to

18   you is how far in advance of trial do you think you need

19   this information to give to your expert?

20         MR. CEPHAS:  Well --

21         THE COURT:  Actually, I know the answer to

22   that.  You sit down at Starbucks with your expert and

23   give him a list, and he says yes, yes, yes, no, no, no;

24   right?  I mean, if he's an expert, if he knows what

25   these words mean, he can tell you immediately, can't he?

```
 1              MR. CEPHAS:  Yes.

 2              THE COURT:  Shouldn't he?

 3              MR. CEPHAS:  Yes.  I -- I expect he could.

 4              THE COURT:  All right.  So give me a date.

 5              MR. CEPHAS:  Excuse me?

 6              THE COURT:  Give me a date by which you would

 7     like to have this information from the Government.

 8              MR. CEPHAS:  September 24th.

 9              THE COURT:  The trial's November 6th?

10              MR. CEPHAS:  Correct, your Honor.  Okay.  I

11     gave you a shot at it.  Now I'll take my own shot.

12              Give me a date in mid to late October.  Any

13     date.  Okay.  17th of October.

14              MR. CEPHAS:  Okay.

15              THE COURT:  Mr. Dore, 17th of October.

16              MR. DORE:  Yes, Your Honor.

17              MR. CEPHAS:  The problem with that, Your Honor.

18     It doesn't provide adequate notice to bring a noticed

19     motion to challenge the expert information, and that --

20     that was the point I was trying to make, that I need to

21     file a noticed motion challenging information in the

22     expert designation, and now I'm going to have to do it

23     by ex parte, which is not -- is not appropriate for

24     that.

25              THE COURT:  Look what you've done today.
```

1          MR. CEPHAS:  Well, what I've done today --

2          THE COURT:  What you've done today is stand up

3    and make an oral motion.

4          MR. CEPHAS:  I've made an oral motion --

5          THE COURT:  Okay.  You've gotten what you're

6    going to get, Mr. Cephas.

7          MR. CEPHAS:  Thank you, Your Honor.

8          THE COURT:  All right.  Anybody have anything?

9          MR. EISNER:  Yes, Your Honor.  I just wanted to

10   bring up one of Mr. Cephas's comments regarding that

11   gang expert, and I realize Your Honor discussed the

12   admission of that gang expert.  We were talking about

13   foundation.

14         THE COURT:  Wait a minute.

15         MR. EISNER:  I'm sorry.  The drug expert, but I

16   do want to call Your Honor's attention to the fact that

17   what -- what brought us here is Mr. Cephas's motion to

18   preclude the Government from bringing in witnesses late,

19   and that, Your Honor, was it stems from Judge Yuen's

20   order of October 13th, and in in her order, she says

21   that by January 23rd, 2012; and, again, last night on

22   the 10th of November is when we got this narcotics

23   expert, but Judge Yuen's order back in October of '11

24   says that by January 23rd, the Government shall disclose

25   all experts.  That wasn't the first cut-off date,

1    Your Honor.  Previous to that -- and that date was only

2    given on condition of the Defendants' speedy trial

3    waiver.  We continued the case about eight months in

4    order to have those dates to be placed, but the initial

5    date for expert witness disclosure was October 24th of

6    2011, and that was in an earlier motion to continue the

7    trial.  I don't want to belabor the point, Your Honor.

8         THE COURT:  But you are.  What -- what are you

9    asking?

10        MR. EISNER:  Well, I'm -- I'm just reiterating

11   my objection to the Government being allowed to disclose

12   at this late date additional experts.  We have two new

13   experts as of the last two weeks, one is a language

14   expert and one is a narcotics expert.

15        THE COURT:  Okay.

16        MR. EISNER:  And -- and I just wanted to

17   reiterate my objection to that and just call

18   Your Honor's attention to the previous due dates that

19   had come and gone prior to what's being heard today.

20   Thank you.

21        THE COURT:  All right.  Thank you.

22        MR. DORE:  Your Honor, may I just note one

23   thing for the record?  There is Ninth Circuit authority

24   for expert disclosures happing within twelve days of

25   trial, and so we believe two months is not an

1    exceedingly late date, particularly, given that

2    Agent Steve Harris was noticed in that Judge Feess case

3    I referenced earlier in which two Defense Counsel in

4    this case were, actually, Defense Counsel.  So they had

5    an opportunity to -- at least some of the Defense

6    Counsel had an opportunity to hear him in that case, but

7    just as a more general matter, obviously, we know that

8    two months is not an exceedingly long period.  That

9    said, the operative -- the date in Judge Yuen's order

10   did say February 29th, 2012, to disclose expert

11   testimony or expert witnesses.  We believe that that is

12   too early a date given that it's nine months ahead, and

13   we don't know the shape of the case then when it had

14   over 49 Defendants versus now when it's down to ten.

15   And, thus, at this point, it might expedite things and

16   save time if we resolve with the Court whether or not

17   there's another date that would be appropriate, whether

18   the date is today or some date in the past, whereby, the

19   Government can disclose the exert witnesses including

20   the two last night.

21            THE COURT:  I don't like -- I really don't like

22   this -- this practice or policy of making disclosures

23   eight, nine months in advance, except in this case with

24   respect to gangs and drugs.  I think everyone in the

25   room anticipated that there would be a gang expert and a

1    drug expert.  So neither of those, I think, would come

2    as a surprise to anyone.  However, Mr. Cephas raises a

3    point.  Even though you have provided -- even at this

4    date you have provided categories that this expert is

5    testifying regarding there are no opinions.  So with

6    respect to interpretation of some of the words that were

7    picked up on these telephone conversations, let's get a

8    glossary together and provide it -- is it

9    October 17th? -- to Defense Counsel.

10            Now, with respect to any additional experts,

11   other than having to replace an expert who is now

12   unavailable, does the Government seriously anticipate

13   identifying any additional experts?

14            MS. EL-AMAMY:  Not to its knowledge.

15            THE COURT:  Okay.  Mr. Dore, you were going to

16   exercise caution?

17            MR. DORE:  Yes, Your Honor.  If anyone came to

18   mind immediately, we would have done it, but the fact of

19   the matter is now that we are basically on the eve of

20   trial and two-month period where we basically know where

21   we're going, the Government will be putting its exhibits

22   together, and it's finalizing its witness list.  We do

23   not expect there to be any additional experts, but it is

24   conceivable in finalizing that list and determine

25   exactly what terms, for example, Agent Harris can

```
 1    interpret that there would be another one that would be
 2    necessary.  We, certainly, don't expect to do it.  We
 3    have no desire to drop any witnesses on the Defense at
 4    the last minute, who, obviously, themselves do not
 5    apparently have a deadline to disclose their own experts
 6    in response.  To this is not meant to be an exercise for
 7    the Court by any means.  It was simply to set out so
 8    that we're all on the same page if something does come
 9    up and the Government does provide notice of that, but
10    we are not looking to do that or planning to.
11              THE COURT:  Sure.  All right.  The 28th of this
12    month, but extraordinary good cause would have to be
13    shown.  All right.  That's to add any additional
14    experts.  It's not going to replace.  If you replace an
15    already designated expert, that's a different thing and
16    then provide Mr. -- not just Mr. Cephas but all Defense
17    Counsel by August 17th with a list of the opinions that
18    your gang expert is going to offer.
19              All right.  We are adjourned.
20              MR. BAKMAN:  Your Honor, I had one other
21    matter.  Your Honor, briefly.  Since you've indicated
22    that there was a severance and we have two groupings, I
23    would be in the second grouping with Mr. Vega, do we
24    have any idea as to when to expect the trial date?
25              THE COURT:  No.
```

1          MR. BAKMAN:  All right.  So I can rely upon the

2     fact that I would not be present November 5th for trial

3     in this matter; is that correct, Your Honor?

4          THE COURT:  Maybe we ought to use the 17th as

5     also a final pretrial conference, an all-hands final

6     pretrial conference, and at that time, we need to

7     discuss this, really finalize it so that everyone knows,

8     and then we'll also set a date for the second trial.

9          MR. BAKMAN:  All right.  And the reason I ask,

10    Your Honor, clearly, I start trial with Judge Real in

11    about a week and a half.  I would not be able to prepare

12    this by November 5th.  So I really want to make sure I

13    don't have to go to trial November 5th.

14         THE COURT:  Well, remember.  The November date

15    was set by Defense Counsel; remember?

16         MR. BAKMAN:  I -- I understand, and if I have

17    to go on the 5th, I'll do -- you know as well as I do

18    what I need to do to be ready on November 5th, but I

19    would prefer to know now that I don't have to go there

20    at this point in time in terms of trial prep, final

21    trial prep.

22         THE COURT:  Right now, right this minute, I

23    intend to adopt the only written proposal I have with

24    respect to the grouping; and, coincidentally, I get that

25    proposal from, perhaps, the one who would know best, the

1    Government who is the one who is going to be putting on

2    this evidence.

3              Once, again, your client?

4              MR. BAKMAN:  Steven Vega, Your Honor.

5              THE COURT:  Vega.  As it stands right now, Vega

6    would be in the second group; yes, sir.

7              MR. PEREZ:  Your Honor, I'm on the first group

8    with Salvador Martinez.

9              THE COURT:  All right.

10             MR. PEREZ:  I also want to add that that group

11   should be broken down into two groups, and the reason

12   is, Your Honor, as far as my client is concerned,

13   No. 45 --

14             THE COURT:  Uh-huh.

15             MR. PEREZ:  -- Salvador Martinez, he is not

16   charged in the RICO conspiracy.  He is not charged in

17   the RICO crime.

18             THE COURT:  Uh-huh.

19             MR. PEREZ:  He's merely in the charge drug

20   conspiracy.

21             THE COURT:  Uh-huh.  Listen.  Everyone of you,

22   as I suppose, is in a different position and everyone

23   can stand and voice an opinion.  That is why a month ago

24   I asked you to get together.  Okay.  It would have been

25   nice if I could have ad just a postcard-sized submission

1    from each of you saying this is why this grouping makes

2    sense, okay, in terms of evidence.  I do not know the

3    specific acts that each of your respective clients are

4    going to have to defend against.  In terms of someone in

5    the room who is capable of, actually, making an

6    intelligent decision regarding grouping, I am the last

7    person on the list.  I needed input from all of you.  I

8    got input from Ms. El-Amamy.

9          MR. PEREZ:  Yes, that's the only reason I spoke

10   up because in her input she omitted to mention that my

11   client was not charged in the RICO conspiracy or the

12   RICO crimes, Your Honor.

13         THE COURT:  That would have been good to read.

14   People are handing me things this morning.  I got

15   submissions this morning.  Okay.  It's nice to get these

16   things in writing.

17         Okay.  Anyway, we are --

18         MR. CEPHAS:  I have some housekeeping issues.

19   With respect to the Declaration or the motion to

20   suppress, I submitted an electronic signature.  The

21   Government didn't object to it.  I have -- I have signed

22   versions if the Court wants --

23         THE COURT:  No, I took it at your word.  I

24   didn't think you were --

25         MR. CEPHAS:  Well, I just wanted to make sure

1    because the Court had said something at the last hearing

2    that made me unclear as to whether you would permit the

3    electronic signature.

4             THE COURT:  No, Mr. Cephas, we wouldn't have

5    entertained your argument if it hadn't been established

6    that your client had standing.

7             MR. CEPHAS:  Thank you.

8             THE COURT:  All right.  We're done.  We are

9    done.

10             (Proceedings concluded at 11:31 A.M.)

11

12                      --oOo--

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      **C E R T I F I C A T E**

2

3          I hereby certify that, pursuant to Title 28,

4    Section 753, United States Code, the foregoing is a true

5    and correct transcript of the stenographically reported

6    proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the

9    United States.

10         Certified on June 6, 2013.

11

12

13

14                              /s/ Katherine M. Stride
                                KATHERINE M. STRIDE, CSR, RPR
15                              Official Court Reporter
                                License No. 11773
16

17

18

19

20

21

22

23

24

25